# 22-1426-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

GHISLAINE MAXWELL, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX
## Volume 2 of 2 (Pages A-205 to A-421)

ARTHUR L. AIDALA
DIANA FABI SAMSON
JOHN M. LEVENTHAL
AIDALA BERTUNA & KAMINS PC
*Attorneys for Defendant-Appellant*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

i

# TABLE OF CONTENTS

**Page**

United States District Court Docket Entries .............. A-1

Superseding Indictment, filed March 29, 2021 .......... A-114

Opinion and Order of the Honorable Alison J.
Nathan, dated April 16, 2021 ................................. A-138

Omnibus Memorandum of Ghislaine Maxwell in
Support of Her Supplemental Pretrial Motions
Relating to S2 Superseding Indictment, dated
May 7, 2021
(Omitted herein)

Exhibit B to Maxwell Memorandum -
Non-Prosecution Agreement and Addendum,
dated October 30, 2007 ......................................... A-172

Opinion and Order of the Honorable Alison J.
Nathan, dated August 13, 2021 ............................. A-188

Excerpt from Transcript of Proceedings held the
Honorable Alison J. Nathan, dated
December 20, 2021 ................................................ A-202

Excerpt from Transcript of Proceedings held the
Honorable Alison J. Nathan, dated
December 27, 2021 ................................................ A-207

Letter from Christian R. Everdell to the Honorable
Alison J. Nathan, dated December 27, 2021 ......... A-223

Excerpt from Transcript of Proceedings held the
Honorable Alison J. Nathan, dated
December 28, 2021 ................................................ A-230

Excerpt from Order of the Honorable Alison J.
Nathan, dated February 4, 2022 ............................ A-238

ii

**Page**

Order of the Honorable Alison J. Nathan, dated
February 24, 2022 .................................................. A-239

The Government's Memorandum in Opposition to
the Defendant's Motion for a New Trial, filed
February 24, 2022
(Omitted herein)

Exhibit A to Government Memorandum -
Independent Online Article "Ghislaine Maxwell
Juror Breaks Silence to The Independent: 'This
Verdict is for All the Victims'", published
January 5, 2022 ....................................................... A-242

Exhibit B to Government Memorandum -
DailyMail Online Article "Exclusive: 'Ghislaine
was a Predator as Guilty as Epstein': Maxwell
Juror Describes Moment he 'locked eyes' with
Sex Trafficker and Reveals his Own Abuse
Ordeal", published January 5, 2022 ...................... A-248

Exhibit C to Government Memorandum -
Reuters Online Article "Some Ghislaine Maxwell
Jurors Initially Doubted Accusers, Juror Says",
published January 5, 2022 .................................... A-260

Transcript of Juror 50 Hearing held before the
Honorable Alison J. Nathan, dated March 8, 2022 ... A-264

Exhibit 1 to Hearing Transcript -
Questionnaire Form of Juror 50, dated
March 8, 2022 ...................................................... A-289

Opinion and Order of the Honorable Alison J.
Nathan, dated April 1, 2022 .................................. A-318

Opinion and Order of the Honorable Alison J.
Nathan, dated April 29, 2022 ................................ A-358

iii

|  | Page |
|---|---|
| Excerpt from Transcript of Sentencing, dated June 28, 2022 | A-403 |
| Notice of Appeal, dated July 7, 2022 | A-420 |

A-205

LCKVMAX8                    Charge

1    accident, mistake, or some innocent reason.

2            It is the defendant's intent that matters here.  If

3    the government establishes each of the elements of the crime

4    beyond a reasonable doubt, then the defendant is guilty of this

5    charge whether or not the individual agreed or consented to

6    cross state lines.

7            Instruction No. 21.  Count Four.  Transportation of an

8    individual under the age of 17 to engage in illegal sexual

9    activity.  Second element.

10           The second element of Count Four which the government

11   must prove beyond a reasonable doubt is that Ms. Maxwell

12   knowingly transported Jane in interstate commerce with the

13   intent that Jane engage in sexual activity for which any person

14   can be charged with a criminal offense in violation of New York

15   law.

16           Like Count Two, Count Four alleges sexual activity for

17   which an individual could be charged with a violation of New

18   York Penal Law, Section 130.55, sexual abuse in the third

19   degree.  I've already instructed you regarding that crime, and

20   those instructions apply equally here.

21           In order to establish this element, it's not necessary

22   for the government to prove that the illegal sexual activity

23   was Ms. Maxwell's sole purpose for transporting Jane across

24   state lines.  A person may have several different purposes or

25   motives for such conduct, and each may prompt in varying degree

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-206

LCKVMAX8                    Charge

1    the person's actions.

2         The government must prove beyond a reasonable doubt,

3    however, that a significant or motivating purpose of Jane's

4    travel across state lines was that she would engage in illegal

5    sexual activity; in other words, the illegal sexual activity

6    must not have been merely incidental to the trip.

7         Instruction No. 22.  Count Four.  Transportation of an

8    individual under the age of 17 to engage in illegal sexual

9    activity.  Third element.

10        The third element of Count Four which the government

11   must prove beyond a reasonable doubt is that Ms. Maxwell knew

12   that Jane was less than 17 years old at the time of the acts

13   alleged in Count Four of the indictment.

14        Instruction No. 23.  Counts Two and Four.  Failure to

15   accomplish intended activity is immaterial.

16        Now, with respect to Counts Two and Four, it is not a

17   defense that the sexual activity which may have been intended

18   by the defendant was not accomplished.  In other words, it's

19   not necessary for the government to prove that anyone, in fact,

20   engaged in any sexual activity for which any person can be

21   charged with a criminal offense with the individual after she

22   was enticed for Count Two or transported for Count Four across

23   state lines.  It is enough if the defendant has the requisite

24   intent at the time of the enticement or transportation.

25        Instruction No. 24.  Count Six.  Sex trafficking of an

A-207

3126

LCRVMAXT

1    mind of their own.  Because last week the Court invited them to

2    sit the extra day and they declined that.  So an inquiry may be

3    appropriate, but I don't think telling them what they should do

4    is necessarily the right thing to do.

5            THE COURT:  Well, I have told them previously that

6    they are here till at least 5.  I think the question is

7    whether, in light of the circumstances we find ourselves, we

8    should encourage longer, if it's available to them.  But you

9    think about it.  I'll hear from you.  I'm not intending to do

10   anything just yet.  I presume we will hear from them as to this

11   evening, but think about the indication of at least some

12   extension of hours tomorrow if they have not completed the

13   task.

14           All right?  Thank you.

15           (Recess pending verdict)

16           THE COURT:  I have a note.

17           Under Count Four, if the defendant aided in the

18   transportation of Jane's return flight, but not the flight to

19   New Mexico, where/if the intent was for Jane to engage in

20   sexual activity, can she be found guilty under the second

21   element?

22           I'm going to let you take a -- if you want to just

23   take a look at the note.  Counsel, you're welcome to take a

24   photo of it, if that helps.

25           MS. STERNHEIM:  Thank you.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCRVMAXT

1          THE COURT:  Mark the note as Court Exhibit 14.

2          THE DEPUTY CLERK:  15.

3          THE COURT:  15.

4          Counsel, soon I'll look for your proposals.

5          Another note from the jury.  This one says:  We would

6     like to end deliberations at 5 p.m. today.

7          So we'll take up extending deliberations after we

8     resolve the response to this question.

9          (Counsel conferred)

10          THE COURT:  All right.  Let me get a proposal.

11          MR. EVERDELL:  Happy to talk, your Honor.

12          THE COURT:  Counsel, are you ready?

13          MS. MOE:  I apologize, your Honor.  Can we just have

14     one more moment to confer with our supervisor?

15          THE COURT:  Okay.

16          MS. MOE:  Thank you.

17          (Counsel conferred)

18          MS. MOE:  Thank you, your Honor.

19          Apologies for the delay.

20          THE COURT:  Defense counsel, are you ready?

21          MS. STERNHEIM:  Yes.

22          THE COURT:  Okay.  Go ahead, Ms. Moe.

23          MS. MOE:  Your Honor, our proposal would be to refer

24     the jurors to instruction number 21 on page 28 of the Court's

25     instructions, which pertains to comprehensive instruction with

A-209

LCRVMAXT

1    respect to the second element.  Beyond that, we're not able to

2    parse the question because we find it confusing; so we think

3    the safest course is to refer the jurors to the comprehensive

4    instruction with respect to the second element.

5          THE COURT:  Mr. Everdell.

6          MR. EVERDELL:  Your Honor, I think the answer to this

7    question is no, and I'll tell you the rationale for this.

8                As to the jurors' note, they've clearly separated out

9    in their minds the flight to New Mexico versus the flight back

10   from New Mexico.  And in their minds, there still is a

11   question, it would seem, that the flight -- whatever the

12   purpose of the flight to New Mexico was, whether it was for

13   illicit sexual activity or not, that is different from the

14   purpose of the flight back from New Mexico.  And they are

15   asking can she be found guilty solely on if there's some aiding

16   and abetting, some helping of that flight from New Mexico,

17   which presumably the flight home they're saying.

18         THE COURT:  So the flight from New Mexico to where?

19         MR. EVERDELL:  Well, there is no record of a flight

20   from New Mexico.  But what they are saying, I think, in this

21   note is they are separating out in their minds the flight to

22   New Mexico versus whatever flight she may have taken from New

23   Mexico.  And I would say based on the instructions in the

24   Court's instructions which the government pointed to, there has

25   to be -- the significant or motivating purpose of the travel

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCRVMAXT

1    across state lines has to be that Jane engaged in illicit

2    sexual activity.  There is no significant or motivating purpose

3    of a return trip where Mr. Epstein wasn't present; it's just a

4    return trip from New Mexico.  That would not be a significant

5    or motivating purpose.  She is just presumably going home, but

6    is not for the purpose of engaging in illicit sexual activity.

7            The testimony, if we are to believe it, is that she

8    went to New Mexico for some purpose to engage in sexual

9    activity, that's if you believe Jane's testimony.  But

10   returning from there is not that purpose.  Returning is

11   returning, or it's going somewhere else; it's going somewhere

12   away from where -- at least in the record, the evidence in the

13   record, if there is any -- Epstein was presumably in New

14   Mexico.  This is her leaving New Mexico.  So I don't think that

15   qualifies as a significant or motivating purpose.  That travel

16   across state lines is for some other purpose.

17           MS. MOE:  Your Honor, I don't believe this note is

18   that clear about what flight we're talking about.  The note

19   begins by talking about an unspecified return flight, and then

20   it turns to talking about a flight to New Mexico.  Then there's

21   a modifying clause about intent.  It is unclear which of the

22   two flights we are now modifying.

23           I think the safest course here is to refer the jury to

24   the elements of the crime.  I think guessing at what flight

25   they may be talking about is sort of beyond the reach of this

LCRVMAXT

1    question because they haven't identified a flight here.

2              MR. EVERDELL:  Your Honor, I think they've been fairly

3    clear.  They say:  If the defendant aided in the transportation

4    of Jane's return flight, but not the flight to New Mexico.  The

5    only evidence we have of a flight to New Mexico with Jane is

6    the one in the flight logs, and it is a flight to New Mexico.

7    And so the return flight would be some other flight besides the

8    flight to New Mexico.

9              She is also alleged that -- and to be honest, I think

10   it was a little unclear what may have happened in New Mexico

11   based on her testimony; but if there was any illegal sexual

12   conduct, the flight to New Mexico, this is what they are

13   debating, because they say, but not the flight to New Mexico,

14   where/if the intent was for Jane to engage in sexual activity.

15             Okay.  So it seems that the jury is deliberating or at

16   least trying to decide whether the flight to New Mexico was for

17   the purpose of engaging in illegal sexual activity.  And they

18   are confused that the return flight that happens after that,

19   could that be the basis alone for a conviction on Count Four.

20   Answer is no, because that return flight is not for the purpose

21   of illegal sexual activity.

22             MS. MOE:  Your Honor, at the very least, the answer to

23   this can't be no, because a jury could infer intent to engage

24   in sexual conduct and the return of a flight in aiding and

25   abetting that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-212**

LCRVMAXT

1          We can't tell which flight we're talking about, which

2     leg of a potentially multi-leg trip we're talking about.  And

3     so I think here, again, the Court gave a thorough instruction

4     about this particular element.  Because we can't tell which set

5     of facts they are asking about, I think the proper course here

6     is to refer the jury to the particulars with respect to this

7     element.

8          THE COURT:  It's difficult to know and to have in my

9     head, based on the articulation of the question, as well as the

10    testimony, exactly what they are referring to.  I don't know.

11         So I am inclined to follow the government's suggestion

12    here and to say, I can't provide an additional response to your

13    question other than to consider carefully the instructions as

14    to -- I mean, I could either point them to all of the count or

15    specifically to the second element, since that's what they're

16    asking about.

17         MR. EVERDELL:  If we're going to just refer them to

18    certain language, I think we refer them to the language in the

19    last paragraph.

20         THE COURT:  Page?

21         MR. EVERDELL:  Page 28, instruction number 21, lines

22    14 through 17.

23         MS. MOE:  Your Honor, those particular lines don't

24    appear to be what the jury is asking about.  I recognize that

25    the note refers to Count Four and the second element, but the

LCRVMAXT

1    entire note seems to be about transportation of some kind.  And

2    so we would propose just referring them to the instruction in

3    its entirety.

4          MR. EVERDELL:  Your Honor, I don't find this note

5    confusing.  And I think simply saying it's confusing --

6          THE COURT:  Well, I find it confusing.  For example, I

7    don't know if this is a question about aiding and abetting.  I

8    don't know.

9          MR. EVERDELL:  Your Honor, I think this is pretty -- I

10   think this is a question about whether you can hold her

11   accountable for a return flight, if you believe that she had

12   something to do with arranging that return flight from New

13   Mexico; whereas the first flight to New Mexico may have been --

14   at least there's some testimony to consider about whether that

15   was for the purpose of illegal sexual activity.  It was not

16   true of the return flight, the flight back, wherever she was

17   going, home, somewhere else, somewhere away from Mr. Epstein.

18         I think they are asking, Can we consider if Ms.

19   Maxwell had anything to do with that flight, arranging of that

20   flight, whether she can be convicted, because it's on the

21   return trip from an area where Jane claims she was involved in

22   sexual abuse.

23         THE COURT:  But it says where/if the intent was to

24   engage -- for Jane to engage in sexual activity.

25         MR. EVERDELL:  Right.  They are saying with a flight

**A-214**

LCRVMAXT

1    to New Mexico, where/if there was an intent for Jane to engage

2    in sexual activity.  So there is still an open question in

3    their minds about whether the flight to New Mexico, that

4    travel, was for the purpose of engaging in illegal sexual

5    activity.

6          But they are now considering whether the flight out of

7    New Mexico, if Ms. Maxwell had any -- did anything to do with

8    that flight, with arranging that flight, could we convict her

9    on that count alone.  Because there is no, I think, evidence

10   that she arranged the flight going to New Mexico; instead, they

11   are considering now whether there's any evidence that she may

12   have arranged the flight out of New Mexico.  And is that enough

13   to provide a conviction on Count Two?  And I think the answer

14   to that is pretty clearly no -- I'm sorry, Count Four I should

15   have said, not Count Two.  Because there's no evidence of that.

16         And there is also -- there is no -- in the

17   instructions themselves, that would not be a significant or

18   motivating purpose for that travel across state lines.  That

19   would simply be for her to return home.  That's not travel for

20   the purpose of engaging in illegal sexual activity.

21         MS. MOE:  Your Honor, I think this colloquy

22   illustrates how confusing the note is.  We are now guessing at

23   what hypothetical facts the jury is talking about; and then

24   guessing hypothetically what their legal question is on top of

25   that.  And I think we're compounding guesswork, what this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCRVMAXT

1    question is about.  And so the question is about the element;

2    the charge is about that particular element.  I think more

3    guesswork here makes this more confusing and not less

4    confusing.  I think, as the Court pointed out, some aspects of

5    this note are about aiding and abetting.  And so even referring

6    the jury just to instruction number 21 leaves out that aspect

7    of the jury's deliberations and their determination on this

8    particular issue.  And so we think the safest course is to

9    provide the jury with applicable law in this area, and they can

10   find the facts as they see fit and as they apply to these

11   particular instructions.

12        MR. EVERDELL:  Your Honor, I don't think this is a

13   question about aid and abetting, broadly speaking.  I think

14   they are talking about the flights to and from New Mexico.  I

15   think that much is pretty clear from the note.  And whether or

16   not Ms. Maxwell had anything to do with arranging that

17   travel --

18        THE COURT:  But your legal contention is she can't be

19   found guilty of this count unless the jury concludes that she

20   aided in the transportation to New Mexico.

21        That's not legally accurate, is it?

22        MR. EVERDELL:  Your Honor, the instruction itself says

23   it has to be a significant or motivating purpose for the travel

24   across state lines.

25        THE COURT:  Right.

A-216

LCRVMAXT

1          MR. EVERDELL:  Right?

2          The travel back to a place where she is presumably not

3     engaging in illicit sexual activity, that is not a significant

4     or motivating purpose for that travel.

5          THE COURT:  You didn't answer my question.

6          MR. EVERDELL:  Maybe I'm confused by the question,

7     your Honor.

8          THE COURT:  To be found guilty on this count, must the

9     jury conclude that she aided in the transportation of Jane's

10    flight to New Mexico?

11         MS. MENNINGER:  Your Honor, may I interject myself

12    into this conversation?

13         THE COURT:  If you answer the question, I would value

14    it.

15         MS. MENNINGER:  I will.

16         It has to be a place for which the travel was a

17    significant or motivating purpose for illegal sexual activity.

18         In this hypothetical that they've given in this

19    question, they have a comma in two places.  The first place

20    they have a comma is after the return flight, comma, but not

21    the flight to New Mexico, where the intent was for Jane to

22    engage in sexual activity, comma.  So they have excluded out

23    where they're hypothetically claiming that the flight to New

24    Mexico was the place for which the intent was for Jane to

25    engage in sexual activity.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-217**

LCRVMAXT

1          THE COURT:  Wow.

2          MS. MENNINGER:  And they are asking, Can we find her

3    responsible for the return flight, but not that flight to New

4    Mexico, where the intent was to engage in sexual activity.

5    That's why I think they have written it with the commas as they

6    are.

7          THE COURT:  Okay.

8          MS. MENNINGER:  So they have to be directed --

9          THE COURT:  Let me try again.  Can I get a yes or a no

10   to my question?  Is it your legal position that the jury must

11   conclude, in order to convict on this count, that the defendant

12   had to aid in the transportation of the flight to New Mexico?

13         MS. MENNINGER:  I don't believe that -- no, no, it is

14   not my contention.

15         THE COURT:  Thank you.

16         MS. MENNINGER:  And the reason is the indictment does

17   not specify New Mexico.  It could be a flight to New York, for

18   example.  It could be a flight to New Mexico.  It could be any

19   place, the purpose for which was to engage in illegal sexual

20   activity.  So it doesn't have to be to New Mexico.

21         THE COURT:  I agree with that.

22         This is why it's difficult to parse the question

23   without assuming a variety of meanings, and I'm trying to track

24   your comma argument.

25         MS. MENNINGER:  Had they placed the comma after New

LCRVMAXT

1  Mexico rather than the place where they did put the comma, then

2  that would have told us, can't she be responsible for aiding in

3  the transportation of the return flight, comma, but not the

4  flight to New Mexico, comma.  That would then put the where/if

5  the intent was --

6          THE COURT:  That would be an entirely different

7  meaning to the question.

8          MS. MENNINGER:  I think so.

9          THE COURT:  No, I agree.  What I don't know is I don't

10  know what they meant and I don't know how much weight to put on

11  that comma placement; because, as you've noted, that precise

12  sentence without that comma has an entirely different meaning.

13          MS. MOE:  Yes, your Honor.

14          And I think at the point at which we're parsing jury

15  notes like statutes this finely, I think it illustrates the

16  point that this note is confusing; that we're not sure what the

17  jury is asking about either factually or legally.

18          The question is about the second element; and so we

19  think the proper course is to refer the jury to those

20  particular instructions.  And the jury is free to send a

21  clarifying note, if they wish to do so.  But I think when we

22  are parsing commas this finely in a note that is unclear, it's

23  unclear which clauses are modifying which clauses, or which

24  flights we're even talking about, I think it's far too

25  confusing to give simple answers here.

**A-219**

LCRVMAXT

1    THE COURT:  I can't answer this ambiguous question no.

2    I don't know that the answer is no, even with the ambiguity;

3    because I don't know if what they have in mind is an aiding and

4    abetting question, which we haven't discussed yet.

5    MS. MENNINGER:  They never used the word "abet."

6    THE COURT:  That's true.  I won't assume that's the

7    question for purposes of the answer, but I also don't assume

8    the meaning that you've put on it for purposes of the answer.

9    So the only solution here is to say, I direct you to consider

10   the full instruction on Element 2 of Count Four on page 28.

11   MS. MENNINGER:  Our request would be to emphasize the

12   portion of that that talks about the purpose of the travel.

13   Because they have highlighted the purpose of the travel in

14   their question.  And the way I read it is certainly that that's

15   their question.  If they don't have evidence that the intent on

16   the return flight was for purposes of sexual activity, then I

17   do think the answer, as Mr. Everdell said is, no, they can't

18   convict.

19   MS. STERNHEIM:  May I have a moment?

20   (Counsel conferred)

21   MR. EVERDELL:  Your Honor, I'm sorry to raise another

22   issue, but I think we have to, given the note itself.

23   One moment.  Sorry.  The photograph on the phone keeps

24   disappearing.

25   We're talking about they are referring to Count Four,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCRVMAXT

1    which is the substantive transportation count, which, as we

2    know, has to deal with the violation of New York law.  And they

3    are talking about flights to New Mexico; and can she be found

4    guilty on the second element of Count Four regarding these

5    flights to New Mexico.

6         So I think we may have to respond to the jury on that

7    score as well, which is the fact that they have to be

8    considering New York events for Count Four, rather than -- or

9    violations of New York law, which wouldn't occur in New Mexico

10   for there to be a conviction on Count Four.

11        MS. MOE:  Your Honor, I think that's exactly why we

12   proposed directing the jurors to the entirety of the

13   instruction, which says just that.  The second paragraph of

14   that same instruction reminds the jury, as the instruction does

15   throughout, that we're talking about New York Penal Law,

16   Section 130.55.  And so I think our proposal remains the same

17   that they be referred to the entirety of the instruction, which

18   includes that language, among other aspects of this particular

19   element.

20        THE COURT:  Yes.

21        MS. STERNHEIM:  Judge, may I be heard for a moment?

22        THE COURT:  Sure.

23        MS. STERNHEIM:  I think the fact that the jury has

24   mentioned New Mexico regarding a count that pertains to New

25   York is not just cleared up by referring them to the

**A-221**

3140

LCRVMAXT

1    instruction.  Clearly they are making an error concerning which

2    state begins with "New."  And I suggest that if the Court

3    wishes to refer them to the charge, the Court also clears up

4    the fact that Count Four requires a violation of New York law,

5    not New Mexico law.

6             THE COURT:  That's certainly why we should refer them

7    to the whole charge.  That's what lines 7 through 10 make

8    clear.

9             MS. MOE:  Yes, your Honor.

10            The only illegal sexual activity identified in the

11   entirety of the jury charge is a statute in New York.  There

12   cannot be any risk of confusion on that score.  This particular

13   charge reminds the jury of that and includes that language as

14   well.  The jury has not been charged about any laws in New

15   Mexico; so there can't be any risk of confusion for exactly

16   that reason.

17            MR. EVERDELL:  I just don't understand the confidence

18   about how there can be no possible confusion --

19            THE COURT:  This conversation is stopping.

20            My decision is to refer them back to this charge,

21   because it is a proper instruction on the second element to

22   Count Four.  I do not know what this question means.  It's too

23   difficult to parse factually and legally what they're asking.

24   So the only option in those circumstances is to direct them

25   back to the count.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3141

LCRVMAXT

1        So I'll take any requests beyond simply saying, I

2   received your note.  I refer you to instruction number 21 on

3   page 28.  Please consider carefully the full instruction.

4        MS. MOE:  Yes, your Honor.

5        THE COURT:  Mr. Everdell?

6        MR. EVERDELL:  That's fine, your Honor.

7        THE COURT:  Okay.  I'll do that.  And then -- well,

8   let me write it, and then we'll send it back, and then we'll

9   discuss -- because we have to bring them in to dismiss them.

10        So I received your note.  I refer you to instruction

11   number 21 on page 28.  Please consider the entirety of the

12   instruction.

13        MS. MOE:  Yes, your Honor.  Thank you.

14        THE COURT:  Okay.

15        MR. EVERDELL:  Without waiving our prior objection.

16        THE COURT:  Understood.

17        All right.  While Ms. Williams is handing that to the

18   CSO, for extending deliberation times going forward.

19        MS. MOE:  Yes, your Honor.

20        We've considered the matter.  And the government's

21   view is that is within the Court's discretion certainly to set

22   a schedule for jury deliberations.  Given the circumstances, we

23   agree that it's prudent to advise the jury that, barring any

24   scheduling complications, they should expect an extended day

25   tomorrow.

A-223

**C&G   COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Christian R. Everdell
+1 (212) 957-7600
ceverdell@cohengresser.com

December 27, 2021

**BY ECF**

The Honorable Alison J. Nathan
United States District Court
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

      **Re:  *United States v. Ghislaine Maxwell*, S2 20 Cr. 330 (AJN)**

Dear Judge Nathan:

      We respectfully submit this letter to request that the Court give the jury additional

instructions to correct apparent errors in the jury's understanding of Counts Two and Four, and the

law applicable to those counts, that were highlighted by the jury's note this afternoon (Court

Exhibit #15).

      Court Exhibit #15 reads, in relevant part, as follows:

      Under Count Four (4), [i]f the defendant aided in the transportation of Jane's return
      flight, but not the flight to New Mexico where/if the intent was for Jane to engage
      in sexual activity, can she be found guilty under the second element?

      Count Four alleges that Ms. Maxwell "arranged for [Jane] to be transported *from Florida*

*to New York, New York* on multiple occasions with the intention that [Jane] would engage in one

or more sex acts with Jeffrey Epstein, *in violation of New York Penal Law, Section 130.55*."  S2

Ind. ¶ 21 (emphasis added).

      In response to the note, the Court referred the jury to Instruction No. 21 of the jury charge.

The defense believes that the Court's response was erroneous for two reasons.

2068538.1

The Honorable Alison J. Nathan
December 27, 2021
Page 2

## Constructive Amendment / Variance

**First**, without further instruction, the jury could convict Ms. Maxwell based on a

constructive amendment and/or prejudicial variance from the S2 Indictment.  The Court has

recently explained the law on constructive amendment and variance.  "To prevail on a constructive

amendment claim, a defendant must demonstrate that the terms of [an] indictment are in effect

altered by the presentation of evidence and jury instructions which so modify essential elements of

the offense charged that there is a substantial likelihood that the defendant may have been

convicted of an offense other than that charged in the indictment." *United States v. Gross*, No. 15-

cr-769 (AJN), 2017 WL 4685111, at *20 (S.D.N.Y. Oct. 18, 2017) (cleaned up).  "Because the

doctrine of constructive amendment protects a defendant's Grand Jury Clause rights, a

constructive amendment constitutes a 'per se violation' of the defendant's constitutional rights—

*i.e.* there is no requirement that a defendant make a specific showing of prejudice." *Id.* (quoting

*United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012).

Although the Second Circuit has "consistently permitted significant flexibility" in how the

government proves the crime alleged, the defendant must be "given notice of the core of

criminality to be proven at trial." *Id.* (cleaned up).  "[A]lthough an indictment 'drawn in general

terms' may articulate a broad core of criminality, an indictment that is drawn in specific terms

may be read to specify a narrower set of facts—such that the proof of completely distinct facts at

trial could lead to a constructive amendment." *Id.* (quoting *United States v. Wozniak*, 126 F.3d

105, 109-10 (2d Cir. 1997)).

A-225

The Honorable Alison J. Nathan
December 27, 2021
Page 3

In contrast to a constructive amendment, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id*. at 20 (cleaned up).

Court Exhibit #15 indicates that the jury is considering a conviction on the substantive transportation offense charged in Count Four based on Jane's alleged travel to and from New Mexico and sexual activity that purportedly took place while she was there. That is not what the indictment alleges. Count Four alleges that Ms. Maxwell "arranged for [Jane] to be transported *from Florida to New York, New York* on multiple occasions with the intention that [Jane] would engage in one or more sex acts with Jeffrey Epstein, *in violation of New York Penal Law, Section 130.55*." S2 Ind. ¶ 21 (emphasis added). As such, a conviction on Count Four must be based on evidence that Ms. Maxwell intended Jane to travel from Florida to New York, and while in New York, engage in one or more sex acts that violated Section 130.55 of the New York Penal Law. The government has represented to the Court on numerous occasions that Ms. Maxwell cannot be convicted on any of the four Mann Act counts, including Count Four, without proof of an intent to violate New York law. That excludes any conduct that may have occurred in New Mexico. Indeed, in the discussion about Court Exhibit #15, the government stressed this point:

> The only illegal sexual activity identified in the entirety of the jury charge *is a statute in New York*. There cannot be any risk of confusion on that score. This particular charge reminds the jury of that and includes that language as well. *The jury has not been charged about any laws in New Mexico; so there can't be any risk of confusion for exactly that reason*.

Tr. 3140:10-16 (emphasis added).

2068538.1

The Honorable Alison J. Nathan
December 27, 2021
Page 4

     Despite the government's confidence, Court Exhibit #15 indicates that the jury is

considering a conviction on Count Four based on Jane's travel to and from *New Mexico* and

alleged sexual abuse that purportedly took place in *New Mexico*.  Should the jury convict on this

basis, it would be a constructive amendment and/or a variance from the express language of Count

Four.  Jane's alleged travel from Florida to New York and the sex acts that she purportedly

engaged in there in violation of New York law are part of the "core of criminality" charged in

Count Four.  *See Wozniak*, 126 F.3d at 109-111 (finding constructive amendment where

indictment charged a conspiracy to distribute cocaine and methamphetamine, but the evidence at

trial focused on marijuana).  A conviction based on Jane's travel to and from New Mexico and any

sexual activity that allegedly occurred while she was there would be premised on facts elicited at

trial that are "completely distinct" from the allegations in the indictment.  *Gross*, 2017 WL

4685111, at *20.  If the Court does not instruct the jury that they cannot convict Ms. Maxwell on

Count Four based on the alleged events in New Mexico, it would permit the jury to convict Ms.

Maxwell of an offense "other than that charged in the indictment" and constitute a constructive

amendment.  *Id*.  A constructive amendment like this is *per se* reversible error without a showing

of prejudice. *United States v. Frank*, 156 F.3d 332, 337 n.5 (2d Cir. 1998).

     At the very least, if the jury convicts Ms. Maxwell on Count Four based on Jane's alleged

sexual activity in New Mexico, it would be a substantial variance from the allegations in the S2

Indictment, which requires an intent that Jane travel to New York and violate New York law.  The

Court should instruct the jury as requested below to *prevent* such a variance from occurring.  Ms.

Maxwell has no burden to prove prejudice at this point since the variance can still be prevented by

A-227

The Honorable Alison J. Nathan
December 27, 2021
Page 5

a curative instruction.  Moreover, because the same issues arise with respect to the substantive

enticement offense charged in Count Two, the Court must give the same instruction as to Count

Two as well.[1]

### **Supplemental Jury Instruction**

**Second**, we believe that the Court's response to the jury note was substantively incorrect

and prejudicial to Ms. Maxwell. "A jury's interruption of its deliberations 'to seek further

explanation of the law' is a 'critical moment in a criminal trial'; and [the Second Circuit] therefore

ascribe[s] 'crucial importance' to a 'completely accurate statement by the judge' at that moment."

*United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014) (quoting *United States v. Lefkowitz*,

284 F.2d 310, 314 (2d Cir. 1960)).  "Instructions are erroneous if they mislead the jury as to the

correct legal standard or do not adequately inform the jury of the law."  *Hudson v. New York City*,

271 F.3d 62, 67 (2d Cir. 2001).  Reversal is "required where, based on a review of the record as a

whole, the error was prejudicial or the charge was highly confusing."  *Kopstein*, 759 F.3d at 172;

*see also id*. ("A charge that appears likely to have left the jury 'highly confused' may, on that

ground alone, be reversed." (quoting *Nat'l R.R. Passenger Corp. v. One 25,900 Square Foot More*

*or Less Parcel of Land*, 766 F.2d 685, 688 (2d Cir. 1985) ("A charge that appears likely to have

left the jury 'highly confused' may, on that ground alone, be reversed.")))."Even if an initial

---

[1]  The defense notes that the object of the conspiracies charged in Counts One and Three is a violation of the same
New York statute.  While we do not contest that alleged sexual activity that occurred in other states can be evidence of
those conspiracies, the jury cannot convict Ms. Maxwell on those counts without finding that she acted with the intent
that someone under the age of 17 would engage in sexual activity within the state of New York that violated New
York law.

The Honorable Alison J. Nathan
December 27, 2021
Page 6

instruction is not itself erroneous or highly confusing, a supplemental instruction prompted by a

jury question may be so muddled as to warrant vacatur." *Id*. at 172.

      The jury note indicates that the jury is confused about the second element of Count Four,

and by extension, the third element of Count Two.  Both counts require an intent to violate New

York law and cannot be based on any conduct that allegedly occurred in New Mexico (or any

other state besides New York).  The court's answer to the jury's question permits the jury to

convict Ms. Maxwell on Count Four based on alleged conduct occurring in New Mexico—aiding

in a return flight from New Mexico.  Not only is that conduct not charged in the indictment (see

discussion above), it also is not illegal under New York law.  Under New York law, an intent to

engage in sexual activity in any other state cannot form the basis for a violation of New York law,

as charged in Counts Two and Four.  *See People v. Carvajal*, 6 N.Y.3d 305, 312 (2005) ("CPL

20.20[] has codified the general principle that, for New York to exercise criminal jurisdiction,

some alleged conduct or a consequence of that conduct must have occurred in the state.").  If the

defendant disputes the evidence of the State's prosecutorial authority at trial, "the trial court

should charge the jury that jurisdiction must be proven beyond a reasonable doubt."  *People v.*

*McLaughlin*, 80 N.Y.2d 466, 472 (N.Y. 1992).

A-229

The Honorable Alison J. Nathan
December 27, 2021
Page 7

## Proposed Jury Instruction

For the reasons set forth above, we request that the Court give the jury the following

additional instruction tomorrow:

As to the third element of Count Two, you must determine whether the Government has proven beyond a reasonable doubt that the Defendant acted with the intent that Jane would engage in sexual activity within the state of New York in violation of New York Penal Law 130.55.

As to the second element of Count Four, you must determine whether the Government has proven beyond a reasonable doubt that the Defendant transported Jane with the intent that Jane would engage in sexual activity within the state of New York in violation of New York Penal Law 130.55.

An intent that Jane engage in sexual activity in any state other than New York cannot form the basis of these two elements of Counts Two and Four.

Sincerely,

___/s/ Christian Everdell_____
Christian R. Everdell
**COHEN & GRESSER LLP**
800 Third Avenue, 21st Floor
New York, New York 10022
(212) 957-7600

cc:    All Counsel of Record (By Email)

2068538.1

LCSCMAXT

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
              v.                          20 CR 330 (AJN)
4
    GHISLAINE MAXWELL,
5
              Defendant.                  Jury Trial
6   ------------------------------x
                                          New York, N.Y.
7                                         December 28, 2021
                                          9:49 a.m.
8
    Before:
9                   HON. ALISON J. NATHAN,

10                                        District Judge

11                        APPEARANCES

12  DAMIAN WILLIAMS
          United States Attorney for the
13        Southern District of New York
    BY:  MAURENE COMEY
14        ALISON MOE
          LARA POMERANTZ
15        ANDREW ROHRBACH
          Assistant United States Attorneys
16
    HADDON MORGAN AND FOREMAN
17        Attorneys for Defendant
    BY:  JEFFREY S. PAGLIUCA
18        LAURA A. MENNINGER
             -and-
19  BOBBI C. STERNHEIM
             -and-
20  COHEN & GRESSER
    BY:  CHRISTIAN R. EVERDELL
21
    Also Present:  Amanda Young, FBI
22                 Paul Byrne, NYPD
                   Sunny Drescher,
23                  Paralegal, U.S. Attorney's Office
                   Ann Lundberg,
24                  Paralegal, Haddon Morgan and Foreman

25

A-231

3148

LCSCMAXT

1        (Jury not present)

2        THE COURT:  I received -- I think it was filed in the

3   wee hours, I didn't receive it until this morning, the

4   defense's followup letter taking a slightly different approach

5   to the jury's last note than what was argued in court.

6        I haven't heard from the government.

7        MS. MOE:  I just noticed that the door to the jury

8   room is open.

9        THE COURT:  Thank you.  To be clear, the jury is not

10  there.

11       MS. MOE:  Yes, your Honor.  I meant the door to the

12  area that leads to the jury room.  Just wanted to be cautious.

13       THE COURT:  Thank you.  Appreciate that.

14       MS. MOE:  Thank you, your Honor.  With respect to the

15  defendant's letter, this is essentially the same argument that

16  the defense advanced yesterday, which the Court carefully

17  considered and rejected.  Nothing has changed between then and

18  now.

19       In particular, the defense's letter identifies no

20  error in the instruction the Court referred the jury to nor

21  could they.  It was a correct legal instruction when the Court

22  instructed the jury last week, it was a correct legal

23  instruction when the Court referred the jury to it yesterday

24  afternoon, and that it remains true.  It was a thorough and

25  carefully considered instruction on the legal elements and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCSCMAXT

1    there can be no error in referring the jury to a correct legal

2    instruction.  And so no relief is appropriate here.

3           At bottom, your Honor, the jury asked a question and

4    nothing more.  There is no reason to speculate about what the

5    jury might be concluding.  The jury has been accurately

6    instructed on the law and that's all that's required here.

7    Going beyond that to speculate about the jury's deliberations

8    and compound speculation upon speculation to send back

9    confusing legal instructions would compound the problem here.

10   The simple course is exactly the course the Court took

11   yesterday, which is to refer the jury to a thorough and

12   complete and accurate legal instruction.  There can't be any

13   dispute that the instructions that the Court has given are

14   accurate, and that's all that's required here.

15          THE COURT:  I suppose an additional point, just

16   looking at the -- I mean, the defense's new proposed

17   instruction talks about Count Two, which wasn't asked about.

18   Also, it has -- so it has three paragraphs.  The first one is

19   about Count Two, which wasn't asked about.  There is a second

20   paragraph.  And then the third paragraph I think is just wrong,

21   an intent that Jane engaged in sexual activity in any state

22   other than New York cannot form the basis of these elements.

23   That would suggest it may have no relevance.  This is the same

24   discussion we've had a couple of times, Mr. Everdell.  Sexual

25   activity with respect to Jane in New Mexico under the age of 17

A-233

LCSCMAXT

1    can be relevant to an intent to transport to New York to engage

2    in sexual activity under the age of 17, I think.  I think this

3    is the same basic discussion that we've had.  So, in addition

4    to my reasoning yesterday, I think the proposal made by the

5    defense is wrong.

6              I continue to not know how to parse the jury's

7    question exactly, other than to know that they are asking about

8    Count Four, the defense's original suggestion to just point to

9    the motivating factor I rejected language or to say no.  To say

10   no, I think, was the wrong course, because I don't understand

11   the question well enough to be able to say no.

12             Pointing to just the motivating factor language I

13   think was unhelpful because, really, the point is to remind

14   them of the whole instruction, including that it's a violation

15   of New York penal law that's charged and is the illegal sexual

16   activity that they're considering.

17             So, for those reasons, I am in the same place.

18             I did want to make a little bit of an additional

19   record regarding my extending the deliberations by an hour, the

20   instructions that I gave yesterday regarding that slightly

21   extended schedule.

22             I asked the jury to make themselves available to

23   deliberate until at least 6:00 today, which is a one-hour

24   extension of what's largely been our schedule.  Although, it

25   was until 6 o'clock, I think, on the first night of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-234**

LCSCMAXT

1    deliberations.

2         I made clear that they can let me know through my

3    deputy if this presents a hardship for anyone.  No one has so

4    indicated.  I also made clear that they can take all the time

5    they need.

6         I extended the deliberations by an hour each day

7    because we are seeing an astronomical spike in the number

8    COVID-positive cases in New York City over the last one to two

9    weeks duce to the omicron variant.  We are, very simply, at a

10   different place regarding the pandemic than we were only one

11   week ago, and we now face a high and escalating risk that

12   jurors and/or trial participants may need to quarantine, thus

13   disrupting trial and putting at risk our ability to complete

14   this trial.  Accordingly, extending deliberations by an hour

15   gives the jury more time each day to continue to engage in its

16   thoughtful deliberations.

17        We will take up later in the day how I will approach

18   the remainder of the week and going forward.  I think the same

19   reasoning likely will lead me to talk to the jury at the end of

20   the day about continuing deliberations until a verdict is

21   reached.

22        I'll hear you on that now or later, as you like.

23        MR. EVERDELL:  Your Honor, I don't need to be heard on

24   that issue now.

25        If I could, I understand the Court has overruled the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCSCMAXT

1   request of the letter, but if I could make a brief record on

2   that, it will not take very long.

3           THE COURT:  Okay.  And so there is the record that you

4   made yesterday at the time the question came.  There is the

5   record that you put in the letter this morning that came in

6   late -- early this morning that I reviewed this morning that we

7   just discussed.  So, to the extent you're seeking a third bite

8   at the apple, go ahead.

9           MR. EVERDELL:  I'm simply looking to fill out the

10  record.  I understand it's been rejected by the Court.

11          I think from the defense point of view, I think two

12  things are very clear from this note.  One is that the jury is

13  considering whether or not they can convict Ms. Maxwell on the

14  substantive offense in Count Four based solely on events that

15  took place in New Mexico and traveled to and from New Mexico.

16          THE COURT:  There are a number of assumptions in that

17  that don't necessarily derive from the meaning of that letter,

18  but I understand that is your position.

19          MR. EVERDELL:  Understood, your Honor.

20          And I think the second point is that they are looking

21  at the instructions that they have been given thus far because

22  they reference the second element of Count Four.  So they're

23  looking at that instruction and they are unclear, they are

24  confused by those instructions.  They are not sure whether or

25  not -- those instructions don't inform them that, in fact,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-236

3153

LCSCMAXT

1    conduct that occurs solely in New Mexico, travels to and from

2    New Mexico, solely in New Mexico cannot form the basis for a

3    violation of New York law --

4         THE COURT:  Again, using your language, cannot form a

5    basis, would suggest it is irrelevant.  I'll say that is wrong

6    as a legal matter, number 1.  Number 2, you didn't seek to

7    exclude that testimony, nor did you seek a limiting instruction

8    with respect to that testimony, and I think that was quite ripe

9    for all of the reasons we've articulated.

10         MR. EVERDELL:  Yes.  Although, I would point out we

11    did, in the charging conference, request the inclusion of

12    travel from Florida to New York to make clear that that was the

13    required facts to be proven for those counts.

14         In any event, I think this is a time that calls for a

15    supplemental instruction.  I understand the Court has

16    rejected --

17         THE COURT:  I'm not going to give them an incorrect

18    supplemental instruction.

19         MR. EVERDELL:  If the Court thinks the instruction

20    that was proposed is incorrect, we can certainly work to draft

21    a correct one.  I think the jury is saying that they may

22    convict Ms. Maxwell on Count Four based on conduct that solely

23    relates to New Mexico.  I am not saying it is irrelevant.  What

24    I am saying is if all they had — which is what I think the note

25    is saying — is travel to and from New Mexico and alleged sexual

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LCSCMAXT

1    activity that occurred in New Mexico, that wouldn't be a

2    sufficient basis to convict on Count Four or Count Two because

3    it requires an intent to violate New York law, and you can't

4    violate this section of New York law in New Mexico.

5           So if that's all they're considered on a basis to

6    convict on Count Four and Count Two, then that would be

7    insufficient and improper, and that's why I think a

8    supplemental instruction that clarifies that point is warranted

9    in this case, but I understand the Court has rejected that.

10   And that's all.

11          THE COURT:  I think the instruction is correct that I

12   referred them to.  The reading of the note that you've

13   suggested, I have no idea if that's what the jury is asking or

14   many other plausible readings, and what you've proposed, as you

15   just indicated, would be incorrect.  So, I think that's why

16   precisely we sent them back to the charge.

17          Anything else?

18          MR. EVERDELL:  No, your Honor.

19          THE COURT:  As I said, we'll see where we are at the

20   end of the day, but in light of the variant, my concern about

21   interruption of trial, given the increasing daily risk of

22   exposure to either a juror or trial participant requiring

23   quarantine, it is time to think to have the jurors make plans

24   to continue deliberating until a verdict is reached.

25          I will wait until we hear from the jury, otherwise

COURT EXHIBIT #

DATE: 12/27/2021
TIME:
CASE: US v. Maxwell
20 CR 330 (AJN)

Hello Judge Nathan,

Under Count Four (4), If the

defendant aided in the transportation

of Jane's return flight, but not

the flight to New Mexico

where/if the intent was for Jane

to engage in sexual activity,

Can she be found guilty

under the second element?

Thank u

#26

A-239

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/24/22
```

United States of America,

—v—

Ghislaine Maxwell,

                    Defendant.

20-CR-330 (AJN)

ORDER

ALISON J. NATHAN, District Judge:

On January 19, 2022, the Defendant filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis that Juror 50 "falsely answered a material question during *voir dire* and . . . that, had he answered truthfully, he would have been subject to a challenge for cause."  Maxwell Br., Jan. 19, 2022, at 48.  The Defendant contends that the current paper record sufficiently supports her motion and should be granted without a hearing. In the alternative, she requests that a hearing be conducted.  *Id*.  She also argues that if a hearing is ordered, a broader hearing is required based on a news article that suggests a second juror was allegedly a victim of sexual abuse.  *Id.* at 48–49.

In an Opinion & Order filed under temporary seal, the Court DENIES the Defendant's motion for a new trial on the current record.  As explained in the temporarily sealed Opinion & Order, Defendant's motion on the current record relies extensively on statements made by Juror 50 regarding what occurred during jury deliberations that the Court is prohibited from considering under Federal Rule of Evidence 606.  With regard to Juror 50's statements that do not pertain to jury deliberations, in order to resolve the motion on this record, the Court would have to accept unsworn statements made to media outlets as true and reach factual determinations that are not available on the current record.

1

Accordingly, for the reasons fully explained in the Opinion & Order, a hearing is necessary to resolve the Defendant's motion. Because of the important interest in the finality of judgments, the standard for obtaining a post-verdict hearing is high. The Court concludes, and the Government concedes, that the demanding standard for holding a post-verdict evidentiary hearing is met as to whether Juror 50 failed to respond truthfully during the jury selection process to whether he was a victim of sexual abuse. Following trial, Juror 50 made several direct, unambiguous statements to multiple media outlets about his own experience that do not pertain to jury deliberations and that cast doubt on the accuracy of his responses during jury selection. Juror 50's post-trial statements are "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety"—namely, a false statement during jury selection—has occurred. *United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018). To be clear, the potential impropriety is not that someone with a history of sexual abuse may have served on the jury. Rather, it is the potential failure to respond truthfully to questions during the jury selection process that asked for that material information so that any potential bias could be explored.

In contrast, the demanding standard for ordering an evidentiary hearing is not met as to the conduct of any other juror. The Court DENIES the request to conduct a hearing with respect to the other jurors. The Court also DENIES the Defendant's request for a broader hearing and pre-hearing discovery.

The Court therefore ORDERS that a hearing take place at which the Court will question Juror 50 under oath. The Court further ORDERS that Juror 50's questionnaire be unsealed, for the reasons explained in the Opinion & Order. The Court will email counsel for Juror 50 a copy of his questionnaire and a copy of this Order. As also explained in the Opinion & Order, the

A-241

Court will conduct the questioning at the public hearing with input from counsel for the Defendant and the Government.  The parties may submit by email proposed questions in accordance with the Opinion & Order on or before **March 1, 2022**.

The hearing will take place on **March 8, 2022, at 10:00 a.m.**  The Court ORDERS Juror 50 to appear in Courtroom 906 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York at that date and time to give testimony under oath in response to the Court's questions.  The Court will ensure public access and will provide information on public access as soon as it is available.

The Court will send the temporarily sealed Opinion & Order to the parties.  **By noon on February 25, 2022**, the parties are ORDERED to inform the Court whether either seeks limited redactions to the Opinion & Order, conforming any requests to this Court's prior order, Dkt. No. 596, and justifying any such request by reference to the three-part test articulated by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).

SO ORDERED.

Dated: February 24, 2022
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

3



NEWS    INDEPENDENT TV    POLITICS    CLIMATE    VOICES    INDY100    SPORT    CULTURE    INDY/LIFE    INDYBEST    MY INDEPENDENT    CONVERSATIONS

News > World > Americas

# Ghislaine Maxwell juror breaks silence to The Independent: 'This verdict is for all the victims'

'For those who testified, for those who came forward and for those who haven't come forward. I'm glad that Maxwell has been held accountable,' a juror in Maxwell's sex-trafficking trial tells **Lucia Osborne-Crowley**

Wednesday 05 January 2022 10:13  •  40 Comments





(REUTERS)

A juror in the Ghislaine Maxwell sex-trafficking trial has told *The Independent* that he voted to find Maxwell guilty of the majority of the charges against her because he believed the stories told by the victims and because he believed the pattern of abuse they all described.

A-243

Scotty David, who wishes to be identified by his first and middle name, told *The Independent* in his first media interview that he believed all of the victims who testified against Ghislaine Maxwell in her sex-trafficking trial that took place in lower Manhattan over the past four weeks. All of the accusers corroborated each other and were backed up by other evidence, he said.

David said he is proud to be part of holding Maxwell accountable for her crimes.

"This verdict is for all the victims," David told *The Independent*. "For those who testified, for those who came forward and for those who haven't come forward. I'm glad that Maxwell has been held accountable.

"This verdict shows that you can be found guilty no matter your status."

David told *The Independent* that he found all of the accusers who testified to be believable and credible, despite the defence's many attacks on their credibility and their attempts to poke holes in their memory.

"They were all believable. Nothing they said felt to me like a lie," he said.

David knows that sometimes you can misremember small details of traumatic memories without ever doubting the core of the memory. He knows that because he is himself a survivor of sexual abuse.

"I know what happened when I was sexually abused. I remember the colour of the carpet, the walls. Some of it can be replayed like a video," he said. He explained this to the jury.

"But I can't remember all the details, there are some things that run together."

So he knew that some misremembered details doesn't mean the memory itself didn't happen.

There were also questions from the jury about why the girls didn't come forward earlier.

But David said he knows what that's like, too. "I didn't disclose my abuse until I was in high school," he said.

The jury room went dead silent when he shared his story, he told *The Independent*.

David believes this helped the jury understand that it's possible that these women were telling the truth.

You might forget some things, he said, but the core of a traumatic memory stays with you.

There were also questions about why the girls kept going back to Epstein and Maxwell, why they accepted their help.

"We are not here to judge these victims," David told *The Independent*. "We are here to judge whether we believe their stories, but we are not here to judge the decisions they made or didn't make.

"We cannot judge what they did or didn't do afterward," he said. "It doesn't change that it happened."

David felt that the defence were continually attacking the accusers on the stand, and he said these attempts did little to change his mind.

At one point, the accuser testifying under the name "Carolyn" threw her binder of evidence down beside her because she was so distressed by the questioning she was being subjected to.

"It just made me feel more compassion for her," David said.

The juror said that, ultimately, the jury found that all the victims were credible.

The defence team focused strongly on its memory expert, Professor Elizabeth Loftus. Loftus testified about experiments that had been conducted in which researchers had successfully implanted a false memory into the mind of research subjects.

In one study, the researchers were able to change a detail of a memory about witnessing a car accident. They were able to convince participants that the scene featured a stop sign rather than a yield sign.

But that didn't sway the jury either, David said.

A-245

"None of that relates to traumatic memory," he said. Loftus said herself that she had never conducted a study on whether these tactics would work with memories of sexual abuse, David recalled.

Since the trial, there has been speculation that the fact a juror had been a victim of sexual abuse could be used by Maxwell as grounds for appeal.

Speaking separately to MailOnline, David said he could not remember the details of the 50 question pre-trial questionnaire each potential juror was asked about whether they were a victim of sexual abuse or a relative or a friend of a victim, but felt he had answered all questions honestly.

David told The Independent that the accusers' testimony was corroborated by a significant amount of evidence.

He specifically mentioned Kate – an accuser who testified but was not allowed to be considered for the actual charges because she was over the age of consent in the UK when she was abused – and said her testimony powerfully corroborated the other accusers' stories.

"She was able to show us that this was a pattern," David said. "We knew we couldn't use her testimony to convict Maxwell, but she showed the pattern of how those girls were groomed.

"She showed us the pattern that happened to all of these girls.

"It was about confusing their boundaries," he said. "For Jane, it started with seeing Maxwell topless. For Annie Farmer, it started with Maxwell showing her how to give Epstein a foot massage.

"The pattern is that Ghislaine talks to you like she is also a teenager. Then it moves into massage. She tries to make you comfortable, to see what they can get away with.

"What she did was wrong."

Annie Farmer's story was backed up by her teenage diary, as well as her high school boyfriend. That was important to the jury, he said.

Carolyn's story was backed up by Shawn, her ex-boyfriend who testified that he used to drive her to Epstein's Palm Beach mansion.

Jane's story was backed up by her high school boyfriend, who remembered being told about Epstein when they were younger.

The accuser's stories were backed up by flight logs which placed Jane on at least one flight with Maxwell, David said.

Their stories were backed up by Maxwell's "little black book" – an address book found in Epstein's home that listed the names of "masseuses" including Jane and Carolyn.

David said the little black book also gave the jurors clues about how Maxwell and Epstein had evaded accountability in the past. There were names of several Palm Beach police officers listed on a first-name basis in that book, David said.

"Those girls' names and phone numbers were listed next to the words 'mom' and 'dad'," he said. "Professional masseuses do not need their parents with them."

Many speculated that the jury chose to acquit Maxwell on count two because that count related solely to Jane, and that Jane was less credible than other victims.

But David told *The Independent* that wasn't the case.

"We simply didn't see enough direct evidence to convict on count two," he said. "It wasn't about not believing Jane."

Count two was a substantive charge that required proof that Maxwell "enticed" Jane to travel across state lines. David said there just wasn't any direct evidence for any specific trip that Maxwell took any action to entice Jane to get on those flights.

"I personally was willing to find her guilty on count two," he said. "But we all decided in the end that there wasn't enough evidence."

David also explained that he was convinced by the closeness of Maxwell and Epstein's relationship and the key role she played in his life.

A-247

"Of course she knew what was going on," he said.

The schedule for Maxwell's sentencing hearing has not yet been set.

**More about:**  <u>Ghislaine Maxwell</u>   <u>Juror</u>   <u>Maxwell</u>   <u>Victims</u>

 **Join our new commenting forum**
Join thought-provoking conversations, follow other Independent readers and see their replies

 40 Comments ↓

1/26/22, 3:30 PM
Ghislaine Maxwell juror says evidence convinced panel she was predator | Daily Mail Online

ISEMENT                Privacy Policy | Feedback    f Follow 21.3M          Wednesday, Jan 26th 2022 1PM 30°F    4PM 29°F    5-Day Forecast



Home | U.K. | News | Sports | U.S. Showbiz | Australia | Femail | Health | Science | Money | Video | Travel | Shop | DailyMailTV

Latest Headlines    Covid-19    Joe Biden    Kamala Harris    Donald Trump    US Economy    Prince Harry    Meghan Markle    World News    Most read    Login

ADVERTISEMENT

# EXCLUSIVE: 'Ghislaine was a predator as guilty as Epstein': Maxwell juror describes moment he 'locked eyes' with sex trafficker and reveals his own abuse ordeal

- **Scotty David , a juror in the Ghislaine Maxwell trial, was one of the 12 men and women who convicted Maxwell on five of the six counts of sex-trafficking last week**
- **Scotty says he went into the trial firmly believing that Maxwell was 'innocent until proven guilty' but 'After all I've learned, she's just as guilty as Epstein. I don't want to call her a monster, but a predator is the right word**
- **During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself**
- **Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention'**
- **Scotty revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty**
- **Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done. He says that he believes she will spend the rest of her life in prison unless a deal is done**
- **He said, 'It satisfies me to know that we did our due diligence and that we brought justice for these victims, for these girls who are now women'**

By LAURA COLLINS CHIEF INVESTIGATIVE REPORTER FOR DAILYMAIL.COM and DANIEL BATES FOR DAILYMAIL.COM

**PUBLISHED:** 00:26 EST, 5 January 2022 | **UPDATED:** 09:04 EST, 5 January 2022

**792**
shares

**1.1k**
View comments

A juror in the Ghislaine Maxwell trial has revealed how he viewed her as a 'predator', describing the moment he 'locked eyes' with Jeffrey Epstein's accomplice - and revealed his own child sex abuse ordeal to the jury.

Scotty David said he had helped the other members of the jury understand things from a victim's point of view and explained how 'you can't remember all the details' of traumatic memories - this was a crucial line of attack by Maxwell's lawyers who called a 'false memory' expert witness.

David also claimed that the five guilty verdicts returned in New York last week, possibly condemning Maxwell to spend the rest of life behind bars, were for 'all the victims'.

ISEMENT



Legal experts said that if David failed to disclose his past experiences before the jury deliberations, Maxwell could have grounds to claim a mistrial and have her convictions quashed.

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question survey completed by each juror ahead of selection.

David said he went into the trial firmly believing that Maxwell was 'innocent until proven guilty' and viewing the victims with a skeptical eye.

But, he said, 'After all I've learned, she's just as guilty as Epstein. I don't want to call her a monster, but a predator is the right word.

'She knew what was happening. She knew what Epstein was doing and she allowed it to happen. She participated in getting these girls comfortable so that he could have his way with them.

'And, to me, them returning repeatedly for the money has nothing to do with anything because these girls were minors, and it doesn't matter what incentivized them. It matters what happened to them.'

Ghislaine Maxwell juror speaks out after guilty verdict

 Watch the full video

 00:00 / 18:53      



© John M. Mantel for DailyMail.com

**Scotty, who spoke on condition that only his first and middle names are used, said he went into the trial firmly believing that Maxwell was 'innocent until proven guilty' and viewing the victims with a skeptical eye**

1/26/22, 3:30 PM

Case 1:20-cr-00330-AJN Document 615-2 Filed 02/24/22 Page 4 of 12
Ghislaine Maxwell juror says evidence convinced panel predator | Daily Mail Online

ISEMENT



© John M. Mantel for DailyMail.com

+9
View gallery

1/26/22, 3:30 PM

Case 1:20-cr-00330-AJN Document 615-2 Filed 02/24/22 Page 5 of 12

ISEMENT

**During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself**

During the trial Scotty, who works in finance, was seated in the third row of the jury box, in the back corner. From his vantage point, he said, he had a vista of the entire court and the 'perfect view' of Maxwell herself.

He recalled, 'I could literally see her [all the time]. There were times when it felt like she was staring right at me and we would lock eyes...it didn't feel real.'

'She was constantly taking notes, and constantly passing post-it notes over to her attorneys especially when they were on cross examination.'

At times, he said, 'I felt like she was watching what we were doing because there were times when some jurors, not during when the victims presented their testimony, but when certain other people presented on things that maybe they didn't feel mattered...some people would nod off.'

Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention.'

In an insight that will surely come as a gut blow to Maxwell herself, who reportedly wanted to testify but was advised against it, Scotty revealed that if she had taken the stand, 'It would have shown maybe that she was a little more human.'

'Maybe if she gave her version of the story, who knows, maybe if she gave us a story of how she was manipulated...I don't know. But then that would have been an admission I feel like of guilt.'

Jurors were instructed not to draw any inference of guilt or otherwise from Maxwell's decision not to testify and, Scotty said, it was simply set to one side and not discussed during deliberations.

Asked if, at any stage, he had experienced any sympathy for Maxwell he said, 'Absolutely. Because this is the rest of her life, right? We were deciding what happens based off the evidence provided.

'We took that very seriously because we took at as, this could be our sister, our sister could be on trial here. We have to really comb through the evidence and make sure we have enough proof to say that she's either guilty or not.'

David told The Independent he found all the accusers to be credible, despite the defence's attacks on their stories and memories.

## How Maxwell could claim a mistrial after juror reveals he was victim of child sex abuse and shared his experience with the jury

**Ghislaine Maxwell** could lodge a claim of mistrial after it emerged one of the jurors who convicted her was a victim of child sex abuse.

Scotty David said he had helped the other members of the jury understand things from a victim's point of view.

He also claimed the five guilty verdicts returned last week, possibly condemning Maxwell to spend the rest of her life behind bars, were for 'all the victims'.

David said that after he revealed his ordeal, another juror came forward with to share that they too had been sexually abused.

Legal experts said that if David failed to disclose his past experiences before the jury deliberations, Maxwell could have grounds to claim a mistrial and have her convictions quashed.

Moira Penza, a former federal prosecutor in New York, said: 'I certainly hope the juror disclosed this fully on his questionnaire.

'A little strange the defence didn't strike him. It could definitely be an issue.

'In the first instance it would likely form the basis for a motion to Judge [Alison] Nathan for a new trial.'

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question questionnaire completed by each juror ahead of selection.

Scotty could not remember that question when asked by DailyMail.com but was certain that he had answered all questions honestly.

https://www.dailymail.co.uk/news/article-10370193/Ghislaine-Maxwell-juror-says-evidence-convinced-panel-predator.html

5/16

'They were all believable. Nothing they said felt to me like a lie,' he said.

'I know what happened when I was sexually abused. I remember the color of the carpet, the walls. Some of it can be replayed like a video,' he said, and he explained this to fellow jurors.

'But I can't remember all the details, there are some things that run together.'

Scotty said when he chose to share his own experience of sexual abuse the room 'went silent'.

It has since been speculated that the fact that a juror was a victim of sexual abuse could be used by Maxwell as grounds of appeal.

**SHARE THIS ARTICLE**

**RELATED ARTICLES**

 'Brutal' Prince Andrew court hearing 'couldn't have gone...

 Ghislaine Maxwell juror was abuse victim: Convicted sex...

 New York judge leaves Prince Andrew sweating as he decides...



Scotty recalled looking directly at Maxwell, 'I could literally see her [all the time]. There were times when it felt like she was staring right at me and we would lock eyes...it didn't feel real'

A-254

ISEMENT



© John M. Mantel for DailyMail.com

**Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done. He says that he believes she will spend the rest of her life in prison unless a deal is done**



© REUTERS

1/26/22, 3:30 PM          Case 1:20-cr-00330-AJN Document 615-2 Filed 02/24/22 Page 8 of 12          Maxwell juror says evidence convinced panel she was predator | Daily Mail Online

ISEMENT

**Scotty said that Maxwell's manner in court was discussed during deliberations. He said, 'We did discuss that we thought she was a little standoffish and not necessarily cold, more like she was paying attention'**

However, the question of whether a potential juror was a victim of sexual abuse or a relative or friend of a victim was asked in the 50-question questionnaire completed by each juror ahead of selection.

Scotty could not remember that question when asked by DailyMail.com but was certain that he had answered all questions honestly.

He also revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty.

It did, however, he believes give him access to a better understanding of the testimony of victims.

To that end, he said, the defense's tactic of 'going hard' on the victims did not play well with him or other jurors.

Scotty pointed to defense attorney Laura Menninger's use of air-quotes when questioning Jane about her story of 'escaping' Epstein at one point.

He said, 'Everything, her tone, using air-quotes with escape ... I think she was acting in order to convince us that this girl's lying and lying for money.'

Instead, he said, all it did was convince jurors that the defense team were showing a complete lack of respect for the victims.

He said, 'I just felt terrible I'm like, 'I can't believe you're treating this woman like this.' Like even if she's lying there's better ways to go about it...I don't feel attacking them that way or degrading her based on what she said was the way to go.'

The jury was sent out with a daunting 80 pages of instructions after a trial that was often dizzying in detail with lengthy testimony from the victims alone, and six counts to consider.

At first, Scotty admitted, jurors struggled to know where to start or how to make any progress at all.

He said that they did not take an initial vote of opinions but instead, on the first day they were sent out simply chose a foreperson and began by reading the instructions page by page.

He said, 'It was overwhelming. I mean 80 pages of how you interpret the law on each count, and it flips back and forth between different pages, and you have to flip 20 pages in order to get a definition of something else that can apply to one specific count.'

# 'Brutal' Prince Andrew court hearing 'couldn't have gone worse' for him: Duke's hopes of having case thrown out hang by a thread after judge 'made it very clear he did not accept' royal lawyers' arguments, experts say

Prince Andrew's hopes of getting the case by his US sex accuser thrown out of court were hanging by a thread last night following a 'brutal' hearing in New York.

A judge told the royal he would find out 'pretty soon' – most likely within days – if his bid to have the lawsuit dismissed would be successful.

But the early signs were not good for the Queen's son after Judge Lewis Kaplan put his legal team through a bruising encounter during a make-or-break hearing in New York yesterday.

One legal expert said that the hearing 'could not have gone worse' and pointed out that the fact that his lawyers were reduced to saying they 'respectfully disagree' with the judge did not bode well- adding 'respectfully disagreeing with the judge means you are about to lose.'



Prince Andrew is interviewed for the BBC's Newsnight in November 2019. In the interview, Andrew denied Ms Giuffre's claim that they had shared a sweaty dance at a London nightclub, saying that at the time he could not sweat due to a condition

Andrew's lawyer was seeking to persuade the court that his accuser, Virginia Roberts, now known as Virginia Giuffre, had waived her right to sue him when she

https://www.dailymail.co.uk/news/article-10370193/Ghislaine-Maxwell-juror-says-evidence-convinced-panel-predator.html          8/16

1/26/22, 3:30 PM          Case 1:20-cr-00330-AJN   Document 615-2   Filed 02/24/22   Page 9 of 12   online
ISEMENT

Maxwell faced six counts relating to sex trafficking which centered on the stories of four victims.

A fifth victim, Kate, was called only to show a pattern of grooming behavior and was not directly implicated in any of the counts.

At first jurors struggled to agree, Scotty said, over the legal definitions of terms such as 'enticing.'

He said, 'It was super confusing. It didn't get heated. It was just confusing, and when people are confused, tones can get raised. Nobody ever yelled at other people. People would just speak, sounding frustrated.

'So, we [realized] we had to come up with a new game plan and that game plan was, we're going to talk to each other with compassion.'

According to Scotty once the jurors had found a way to 'understand' each other they worked methodically through each count starting with count 2.

This was the only charge on which they did not convict Maxwell and related to the charge of 'enticing' Jane to travel for sexual exploitation.

An initial vote saw 7 jurors vote guilty and 5 not guilty. Those 'not guilty' votes turned to 'not sure' on further discussion. Ultimately, he said, it was not a question of Jane's credibility but rather the fact that they simply did not feel the evidence was there to meet the necessary bar of beyond reasonable doubt.

Working through each charge jurors wrote out lists of evidence on a white board and attached post-it notes as they built the case for each as they saw it and deliberated towards consensus.

On counts two and four – both relating to Jane – there was a 7/5 split of guilty/not sure. On counts one, three and five – all conspiracy charges – there was a 10/2 guilty/not sure split and on count six, the sex trafficking charge relating to Carolyn, all voted guilty from the start.

Scotty said he never felt pressure from either the judge or the rest of the jurors to reach a verdict. In fact, he said, when the judge sent a note on Wednesday 29 December informing them that if they had not reached a verdict she would recall them the following day, they were about to send her a note saying they had reached consensus on all counts.

signed an earlier £370,000 ($500,000) legal settlement with pedophile Jeffrey Epstein, the duke's friend.

Miss Roberts, 38, one of the billionaire sex offender's most high-profile victims, claims she was trafficked by him and girlfriend Ghislaine Maxwell to have sex with Andrew on three occasions when she was 17.

The 61-year-old prince vehemently denies the claims and says he has no recollection of even meeting her.

Judge Kaplan appeared mostly dismissive of the arguments by the duke's lawyer, Andrew Brettler.

He said that part of the 2009 settlement protecting 'other potential defendants' that Andrew's lawyers had appeared to be leaning on was 'unclear' and pointed to two sentences in the text that seemed to suggest it could not be used by Andrew.

Judge Kaplan also pointed to language in the agreement stating it is 'not intended to be used by any other person' to protect themselves from lawsuits without the agreement of Miss Roberts and Epstein - again suggesting Andrew could not rely on it.

While he did not immediately rule at the end of the hearing, he made clear that he was not leaning Andrew's way as he rejected much of the reasoning offered by Mr Brettler, who said the case 'should absolutely be dismissed'.

Judge Kaplan told the two sides: 'I appreciate the arguments and the passion. You'll have the decision pretty soon.' But he directed that the exchange of potential evidence in the case was to proceed as scheduled – which was seen as an indication he would likely rule against Andrew's motion.

Sources close to the proceedings yesterday described them as 'brutal' for Andrew. During the hour-long hearing, held via video conference due to Covid, Judge Kaplan interjected several times in Mr Brettler's arguments.

He told them once: 'With all due respect, Mr Brettler, that's not a dog that's going to hunt here' and another time asked the lawyer outright: 'So what?'



A-257

ISEMENT



© US District Attorney's Office

**Maxwell (pictured with Epstein) faced six counts relating to sex trafficking which centered on the stories of four victims**

© John M. Mantel for DailyMail.com

A-259

ISEMENT

**Scotty revealed that he was not the only juror to share a story of sexual abuse and that it did not affect his ability to view Maxwell as innocent until proven guilty**

Today Scotty is completely satisfied that they reached the right verdict and that, with Maxwell's conviction, justice has been done.

He says that he believes she will spend the rest of her life in prison unless a deal is done to reduce her sentence. But said that he had no idea of the severity of the potential sentence until after the verdict was reached and that it would not have influenced anything if he had.

He said, 'It satisfies me to know that we did our due diligence and that we brought justice for these victims, for these girls who are now women.'

He said that, ultimately, he and the rest of the jurors were convinced that Epstein and Maxwell's lives were so 'intertwined' that it was inconceivable that she was not fully aware of his crimes.

She aided and abetted, he said. And with her conviction she wasn't paying or being held accountable for Epstein's crimes as her attorneys have argued, Scotty said, instead she was answering to her own guilt because she was 'every bit as culpable' as he.

According to Scotty, 'The prosecution proved their case beyond reasonable doubt.'

---

**Share or comment on this article: Ghislaine Maxwell juror says evidence convinced panel she was a 'predator'**

**792**
shares

It is detrimental and wrong in multiple
ways for a...
by **CLO9**    **8844**

Add comment

These Top-Of-The-Line Luxury SUVs Are Shockingly Affordable
Luxury SUV Savings

Shop Now

He Is Probably The World's Oldest Living Hollywood Actor
Lawyers Favorite

Sponsored Links





January 5, 2022 · 2:33 PM EST
Last Updated 21 days ago

**United States**

# Some Ghislaine Maxwell jurors initially doubted accusers, juror says

By Luc Cohen

   

4 minute read

Case 1:20-cr-00330-AJN Document 615-3 Filed 02/24/22 Page 2 of 4



1/3     Jeffrey Epstein associate Ghislaine Maxwell sits as the guilty verdict in her sex abuse trial is read in a courtroom sketch in New York City, U.S., December 29, 2021. REUTERS/Jane Rosenberg

NEW YORK, Jan 5 (Reuters) - During jury deliberations after the trial of British socialite Ghislaine Maxwell, some jurors initially doubted the accounts of two of her accusers, one member of the jury said on Tuesday night.

This juror, who asked to be identified only by his first and middle names, said some of the jurors had issues with the credibility of witnesses known as Jane and Carolyn, two of the four women who testified that Maxwell set them up with the late financier Jeffrey Epstein as teenagers.

He said that after some of the jurors questioned the accuracy of the two women's memories, he decided to share his own experience of being sexually abused as a child. He said that he remembered most important elements of what happened to him, but not every single detail. That swayed some jurors, he said.

Register now for FREE unlimited access to Reuters.com     **Register**

"When I shared that, they were able to sort of come around on, they were able to come around on the memory aspect of the sexual abuse," Scotty David, a 35-year-old Manhattan resident, told Reuters in a phone interview. He gave an earlier interview to The Independent.

He added that coming to a unanimous verdict "wasn't easy, to be honest."

"There's a room of 12 people and we all have to be on the same page and we all have to understand what's going on," he said. "And then we have to agree. So that's partly why it took so long."

Maxwell, 60, was convicted on Dec. 29 of recruiting and grooming teenage girls for sexual encounters with Epstein. The conviction followed five full days of deliberations.

1/26/22, 8:52 PM    Case 1:20-cr-00330-AJN   Document 615-3   Filed 02/24/22   Page 3 of 4

During jury selection, hundreds of prospective jurors were given questionnaires asking, among other things, if they or anyone in their families had experienced sexual abuse, court records show.

For those who answered yes, the judge in the case asked during follow-up questioning if it would affect their ability to serve as a fair or impartial juror, the records show.

Scotty David said he did not recall being asked about his experience during follow-up questioning, known as voir dire. He said he "flew through" the initial questionnaire and also did not recall being asked on the form about personal experiences with sexual abuse, but that he would have answered honestly.

The U.S. Attorney's office in Manhattan wrote a letter to U.S. District Judge Alison Nathan on Wednesday asking her to conduct an inquiry into the juror's description of being a victim of sexual abuse and his responses to the questionnaire, in light of the juror's statements to outlets including Reuters.

"While the court instructed jurors that they were free to discuss their jury service with anyone of their choosing, some of the statements, as related in the media, merit attention by the court," the letter read.

Maxwell's defense attorneys did not respond to requests for comment about Scotty David's account of the jury deliberations or his responses to questions during jury selection.

Jurors were not identified by name during the trial. Scotty David shared with Reuters a photograph of an instruction sheet from the court telling him to return on Nov. 29 for the final day of jury selection. His juror number, which is listed on the sheet, was among the 18 chosen as jurors or alternates.

Maxwell's defense lawyers argued that the women's memories had been corrupted over the years and that they were motivated by money to implicate Maxwell.

Scotty David said several jurors initially were not sure whether to convict Maxwell on the sex trafficking count, which is backed up by the testimony of a woman named Carolyn who said she was 14 when Epstein began abusing her in 2002.

But he said some jurors changed their minds after hearing the personal story of one juror who said she grew up poor. Carolyn said she dropped out of school in seventh grade and was paid $300 - sometimes by Maxwell - each time she gave Epstein an erotic massage. Carolyn said she used the cash to buy drugs.

"For Carolyn, it took one of the jurors sharing their story of growing up in the same socioeconomic background," he said. "She grew up poor, and said had there been an Epstein or Ghislaine in her neighborhood, some of the girls would have fallen prey to them as well."

Scotty David said he was skeptical of the defense's argument that Maxwell was being treated as a scapegoat for Epstein, who died by suicide at age 66 in a Manhattan jail cell while awaiting trial on sex abuse charges.

"She participated, she was complicit, she did nothing to stop it," he said.

Register now for FREE unlimited access to Reuters.com                    Register

Reporting by Luc Cohen in New York Editing by Noeleen Walder and Amy Stevens

Our Standards: **The Thomson Reuters Trust Principles.**

## More from Reuters



00:12                                                                              01:50

RFK Jr. 'sorry' for Anne Frank reference at rally

Conservative SCOTUS plunges into culture wars

Biden caught on hot mic: 'Stupid son of a bitch'

Sarah Palin set to battle NYT at defamation trial

African Americans vote as much as 'Americans' -McConnell

### Read Next

United States

**U.S. judge keeps Oath Keepers founder Rhodes in jail ahead of sedition trial**

M38TMAX1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------x
     UNITED STATES OF AMERICA,
 4                                         20 CR 330 (AJN)
              v.
 5
     GHISLAINE MAXWELL,
 6
              Defendant.
 7   ------------------------------x
                                          New York, N.Y.
 8                                        March 8, 2022
                                          10:15 a.m.
 9
10   Before:
11            HON. ALISON J. NATHAN,
12                                        District Judge
13                 APPEARANCES
14   DAMIAN WILLIAMS
          United States Attorney for the
15        Southern District of New York
     ALISON MOE
16   MAURENE COMEY
     ANDREW ROHRBACH
17   LARA POMERANTZ
          Assistant United States Attorneys
18
19   COHEN & GRESSER
          Attorneys for Defendant
     CHRISTIAN EVERDELL
20
     BOBBI C. STERNHEIM
21        Attorney for Defendant
22   SPODEK LAW GROUP
          Attorneys for Juror 50
23   TODD A. SPODEK
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

---

M38TMAX1

```
 1             (Case called)
 2        DEPUTY CLERK:  Counsel, please state your name for the
 3   record, starting with the government.
 4        MS. MOE:  Good morning, your Honor, Alison Moe, Lara
 5   Pomerantz, Andrew Rohrbach and Maurene Comey for the
 6   government.
 7        THE COURT:  Good morning, counsel.
 8        MS. STERNHEIM:  Bobbi C. Sternheim and Christian
 9   Everdell for Ghislaine Maxwell, who is present at defense
10   table.
11        THE COURT:  Good morning.
12        And Mr. Spodek on behalf of Juror 50, please state
13   your appearance.
14        MR. SPODEK:  Good morning, your Honor, Todd Spodek on
15   behalf of Juror 50, who is present.
16        THE COURT:  Thank you.  We're here today for a hearing
17   on the defendant's motion for a new trial.  The government has
18   consented to and indeed requested this hearing as to Juror 50.
19        My opinion and order dated February 24, 2022 ordered
20   this hearing into Juror 50's responses to questions on the jury
21   selection questionnaire.  That opinion lays out the scope and
22   nature of today's hearing.
23        In addition to the motion for new trial briefing that
24   I received from the parties, I also received proposed
25   questions from both sides which I have carefully considered in
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

M38TMAX1

1   preparing for today's hearing. In the submitted questions, the
2   defense renewed the request that counsel be permitted to
3   conduct the questioning. I am denying that renewed request. I
4   will conduct this proceeding in accord with my February 24
5   opinion.
6       Following my questioning, I will hear from counsel for
7   the parties at sidebar as to any proposed follow-up questions
8   that they wish be asked and I will consider those requests.
9       In a moment, I will address counsel for Juror 50.
10      Let me ask counsel for the parties if there are any
11  preliminary matters.
12      MS. MOE: Not from the government, your Honor, thank
13  you.
14      MS. STERNHEIM: No, thank you.
15      THE COURT: All right. Juror 50 is present and
16  represented by retained counsel, Mr. Spodek.
17      Mr. Spodek, just as a preliminary matter, does your
18  client wish that he be referred to here as Juror 50 rather than
19  using his full name?
20      MR. SPODEK: Yes, your Honor.
21      THE COURT: And I understand, but again confirm for me
22  that in post-verdict press interviews he did not reveal his
23  last name, is that correct?
24      MR. SPODEK: That's correct.
25      THE COURT: I do intend to continue to refer to him as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

M38TMAX1

1   Juror 50. In post-verdict press interviews he did not reveal
2   his last name. Consistent with that and my juror anonymity
3   order during trial, I will permit that to continue.
4       I received a letter dated March 1st, 2022 from
5   Mr. Spodek. In that letter, Mr. Spodek, you informed me that
6   Juror 50 would invoke his Fifth Amendment privilege against
7   self-incrimination at this hearing. As you see from my
8   February 24 opinion, Mr. Spodek, I am going to ask Juror 50
9   questions today about responses that he gave during the jury
10  selection process in the case of United States v. Maxwell.
11      Does it remain your client's intention to assert his
12  Fifth Amendment privilege in response to those questions?
13      MR. SPODEK: Yes, your Honor.
14      THE COURT: I'm going to confirm on the record with
15  your client, Mr. Spodek:
16      Juror 50, is it your intention to assert your Fifth
17  Amendment privilege in response to the questions I'm going to
18  ask you today?
19      JUROR 50: Yes, your Honor.
20      THE COURT: All right. I received a written
21  application from the government last night.
22      Ms. Moe, could you confirm that the government is
23  making the application?
24      MS. MOE: Yes, your Honor.
25      THE COURT: In accord with the application, I have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1

1  signed the proposed immunity order which will be docketed with
2  Juror 50's name redacted.
3          Juror 50, in view of your assertion of the Fifth
4  Amendment privilege, I have signed an order granting you
5  immunity. It is use immunity with respect to your testimony in
6  this proceeding. That means that no testimony given by you or
7  any information, directly or indirectly, derived from your
8  testimony may be used against you in a federal criminal case,
9  except if you testify falsely today you could be prosecuted for
10 perjury. In light of this immunity, you will be required to
11 answer questions today.
12         So in other words, you need to answer my questions
13 today. You need to answer truthfully. If you don't answer
14 truthfully, you could be prosecuted for perjury. But you will
15 not be prosecuted in federal court based on any truthful
16 testimony that you give here today, even if that testimony
17 indicated that you committed a crime.
18         Juror 50, do you understand that?
19         JUROR 50: Yes, your Honor.
20         THE COURT: All right. I am going to have Juror 50
21 come forward to the witness stand, please.
22         (Continued on next page)

M38TMAX1

1  _____,
2          having been duly sworn, testified as follows:
3  EXAMINATION
4  BY THE COURT:
5          THE COURT: I'm going to approach with the court
6  reporter and ask Juror 50 at the sidebar to state and spell his
7  name for the record. His name will be redacted from the public
8  transcript.
9          (At sidebar)
10         THE COURT: Please state your name for the record.
11         THE WITNESS: _____.
12         (In open court)
13 BY THE COURT:
14 Q.  With that, Juror 50, you are under oath.
15         I will begin with some general instructions to you.
16 If at any point you don't understand something that I'm asking,
17 please ask for clarification. Don't speculate as to the
18 meaning of my question, ask for clarification.
19         In responding to questions, I do instruct you not to
20 tell me about the jury deliberations or your thought process
21 during deliberations. I'm not asking questions about those and
22 you should not provide that information in response to my
23 questions. So listen to my specific questions, let me know if
24 there's something you don't understand, do not respond with
25 information about the jury's deliberations, and tell the truth.

M38TMAX1

7

```
 1              If there is a response that is too difficult or
 2   embarrassing for you to share in open court, you may request to
 3   speak at sidebar with me and counsel. However, if you have
 4   already shared the information publicly, including in media
 5   interviews, then I will not allow the sidebar.
 6              There's a binder in front of you. I have marked the
 7   document in there as Court Exhibit 1, so it's Court Exhibit 1
 8   to the record for this hearing proceeding and you may open
 9   that.
10              That is a copy of the questionnaire that you filled
11   out on November 4, 2021. Please take a moment and look through
12   it so that you're familiar with it and can identify it.
13   A.  Yes.
14   Q.  Do you recognize that as the questionnaire that you filled
15   out on November 4, 2021, as part of the jury selection process
16   in this case?
17   A.  Yes, your Honor.
18   Q.  I will ask you to turn to page 24 and look at question 48.
19              That question reads: Have you or a friend or family
20   member ever been the victim of sexual harassment, sexual abuse
21   or sexual assault, and then in parenthesis, this includes
22   actual or attempted assault or other unwanted sexual advance,
23   including by a stranger, acquaintance, supervisor, teacher or
24   family member. Do you see that question 48?
25   A.  Yes, your Honor.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1

8

```
 1   Q.  On your questionnaire you indicated no as your answer. You
 2   checked the box for no. Is no an accurate answer to that
 3   question?
 4   A.  No, it is not.
 5   Q.  What is an accurate answer to that question?
 6   A.  Yes for self.
 7   Q.  Okay. If you look at question 48A, that question says: If
 8   yes, without listing names, please explain.
 9              And when you filled out the questionnaire on
10   November 4, 2021, you left that blank. What is an accurate
11   answer to question 48A?
12   A.  I would have put I was abused as a child.
13   Q.  Without listing names, what happened?
14   A.  It was a family member, who is no longer a part of the
15   family, and one of their friends when I was nine and ten years
16   old.
17   Q.  Did this happen on one occasion or multiple occasions?
18   A.  Multiple occasions.
19   Q.  And did you tell anyone?
20   A.  I did not for several years until I was in high school.
21   Q.  And when you told someone in high school, did you tell
22   authorities or adults or friends?
23   Q.  Who did you tell?
24   A.  I told my mom and she called the police station and gave a
25   report of the account and but never received any paperwork. So
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

M38TMAXI

1 I don't know if anything was actually filed or anything done.
2 There were no charges brought.
3 Q. You said a family member, no longer a family member.
4 Again, without listing names, what was the nature of the
5 familial relationship?
6 A. A stepbrother.
7 Q. You said stepbrother?
8 A. Yes.
9 Q. I'm going to ask you to look at question 4BB. Question 4BB
10 reads: If your answer to 4B was yes, do you believe this would
11 affect your ability to serve fairly and impartially as a juror
12 in this case?
13 When you filled this out on November 4, you left that
14 blank. What is an accurate answer to 4BB?
15 A. It would have been no, because it did not affect my ability
16 to be fair and impartial at all.
17 Q. I'm going to ask you to turn to page 13 of the
18 questionnaire. Question 25 reads: Have you or any of your
19 relatives or close friends ever been a victim of a crime?
20 And you checked no when you filled this out on
21 November 4. Is no an accurate answer?
22 A. Looking back at it now, no, it's an incorrect answer.
23 Q. Who would an accurate answer have been?
24 A. It would have been yes.
25 Q. Yes self, yes friend or family?

10

M38TMAXI

1 A. Yes self.
2 Q. And when you say "yes self," what are you referring to?
3 A. I'm referring to the sexual abuse.
4 What I was thinking when I was completing that
5 questionnaire was like if I was robbed or mugged or some sort
6 of crime like that. I wasn't thinking of my sexual abuse as
7 being a victim of a crime because I no longer associate being a
8 victim. It's part of my healing process and it's how I dealt
9 with the abuse.
10 Q. Have you ever been robbed?
11 A. Never.
12 Q. Ever been mugged?
13 A. Never.
14 Q. Family or friends ever been robbed?
15 A. No.
16 Q. Or mugged?
17 A. I don't know anybody that has ever been robbed or mugged.
18 Q. Question 25A, asked: If yes, is there anything about the
19 experience that would prevent you from acting as a fair and
20 impartial juror in this case?
21 You left that blank when you filled it out on
22 November 4. What is an accurate answer to 25A?
23 A. It would have been no. I was definitely able to set aside
24 everything and be fair and impartial.
25 Q. Okay. In light of the answer that you gave to 4BA, I am

11

M38TMAX1

1  going to ask you to turn to question 49. It's on page 25.
2  Question 49 reads: Have you or a friend or family
3  member ever been accused of sexual harassment, sexual abuse or
4  sexual assault, and then in parenthesis: This includes both
5  formal accusations in a court or law or informal accusations in
6  a social or work setting of actual or attempted sexual assault
7  or other unwanted sexual advance, including by a stranger,
8  acquaintance, supervisor, teacher or family member.
9      When you filled this out on November 4, you checked
10  no. Is that an accurate answer?
11  A. Yes, your Honor.
12  Q. So the incident that you described in response to 48 in
13  which, as I understand it, you informed your mother when you
14  were in high school that when you were nine or ten a family
15  member had engaged in sexual abuse with you, is that correct?
16  A. Yes.
17  Q. So why is that not responsive to question 49?
18  A. Because I don't consider them part of my family. I never
19  considered them part of my family even when they lived with us
20  for a few years.
21  Q. And when you filled out the questionnaire, when you got to
22  this question were you thinking about what happened to you but
23  you didn't respond yes because you didn't consider them a
24  family member, or you didn't consider it?
25  A. I didn't even consider it at all.

12

M38TMAX1

1  Q. Why is that?
2  A. I flew through this questionnaire. I never thought that
3  I --- I honestly never thought I would be chosen to sit on this
4  jury. We had to be at the courthouse super early, and I got
5  here early and it took 45 minutes just to get through the
6  security line. And we get ushered into a room ---
7  Q. I will come back and ask you some questions about the
8  process for filling it out.
9  A. Got it.
10  Q. Just for the moment, just with respect to this question,
11  tell me your thought process.
12  A. At this point I was super distracted because I was sat
13  right in front of the table, literally within four feet of that
14  table where everybody was dropping off their questionnaires.
15  People were asking questions, there was papers being ripped off
16  the questionnaire packets, and there's a lot of talking going
17  on, and it's super distracting. I'm like: I want to finish.
18  So I just start going through and marking the questions as I'm
19  like: Okay, okay. I didn't spend a whole lot of time thinking
20  about it.
21  Q. As you sit here now, what's the answer to question 49?
22  A. It would have been --- it would have been yes, that a
23  stepbrother was accused --- a stepbrother and his friend was
24  accused of sexual abuse.
25  Q. Okay. So a moment ago you said the answer would have been

13

M38TMAX1

1  no because you didn't consider them family.

2  A.  Family, yeah.

3  Q.  But now you say yes because it would have been a

4  stepbrother.  Explain.

5  A.  Because by law, by marriage, that person was my

6  stepbrother.  So when you read the question that way and it

7  says has a friend or family member ever been accused, then the

8  correct answer would have been yes, a friend or family member.

9  Q.  Okay.  And so the same response then for 48A is what you

10  would have given for 49B?

11  A.  Yes, your Honor.

12  Q.  And 49B, if your answer to 49 was yes, do you believe this

13  would affect your ability to serve fairly and impartially as a

14  juror in this case?

15  A.  In no case.  It would not affect me.

16  Q.  In responding a moment ago you said you never thought you

17  would be chosen as a juror in this case.  Why is that?

18  A.  Only because the sheer volume of people that were there.

19  It was insane, the amount of people.  So I just never

20  thought -- number one, I didn't know what it was when I went

21  into it, and then when they played the video of you, I just

22  thought that the likelihood of being chosen, surely they will

23  be interviewing thousands of people.  And they ultimately

24  choose twelve people to sit on a jury, and I never thought I

25  would be one of those twelve.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

M38TMAX1

1  Q.  Did you hope that you would be?

2  A.  I did not hope to be on this jury.  But again, like if

3  you're going to serve jury duty, it might as well as be

4  something that's interesting, but I did not set out in order to

5  get on this jury.

6  Q.  Let me ask you to return to question 48A, page 24.  You

7  spoke to this a little bit but I want to make sure I understand

8  the answer.  You indicated that when you checked no, that was

9  an inaccurate answer.  Why did you check no?

10  A.  I didn't see the part where it says self, I just -- I

11  completely skimmed way too fast.  I was distracted by all the

12  noise going on around me.  And again, like I said, I just

13  wanted to get done with this.  It had been a long process, I

14  had been sitting for hours, there were audiovisual problems

15  getting your video to play, so we literally sat there for three

16  hours.  I didn't have a phone, I didn't have a book, I was

17  sitting there twiddling my thumbs thinking about the break up

18  that just happened a few weeks prior and sitting in my feelings

19  and not very focused.

20  Q.  So tell me what you understood the question to be asking.

21  A.  I thought it was asking about family or a friend.

22  Q.  And the box that says yes for self?

23  A.  Right, I just missed it.  Inadvertent mistake.  This was

24  one of the biggest mistakes I have ever made in my life, and if

25  I could go back and change everything and have slowed down and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Page 15:

M38TMAX1

1    actually taken the time to read this appropriately, I would in
2    a heartbeat.
3    Q.  There are other questions on the questionnaire that are
4    structured with similar yes self, yes friend or family, or no.
5    Do you recall seeing those questions?
6    A.  Only after I have reread this do I recall that.
7    Q.  So on none of the questions that included yes, parenthesis
8    self, yes friend or family member, or no --
9    A.  I did not pick up on that when I was filling this out.
10   Q.  Okay.  When did you first learn that an answer to the
11   questionnaire was inaccurate?
12   A.  When an article had come out about the article that I had
13   given to Lucia through The Independent.
14   Q.  So you learned of an inaccurate answer in an article about
15   an interview?
16   A.  Yes.
17   Q.  And what about during the interview?
18   A.  During the interview, no.
19   Q.  When did you first learn that the questionnaire may contain
20   a question that asked about sexual abuse history?
21   A.  That was during my Daily Mail interview with the reporter
22   Laura Collins.
23   Q.  So we're talking about your response to 48 which you have
24   indicated was inaccurate.  Did you in any way intentionally
25   provide an inaccurate answer to this question?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

---

Page 16:

M38TMAX1

1    A.  Absolutely not.
2    Q.  In responding to this question, did you answer no so as to
3    make it more likely that you would be selected for the jury?
4    A.  Absolutely not, your Honor.
5    Q.  Did your history of sexual abuse motivate you in any way to
6    try to tailor your answers to make it more likely that you
7    would be selected for this jury?
8    A.  Not at all, your Honor.
9    Q.  At the time you filled out the questionnaire on November 4,
10   did it occur to you that you might personally benefit in any
11   way from being on the jury in this case?
12   A.  Not at all, your Honor.
13   Q.  I'm going to return to question 25 again, which you have
14   indicated was inaccurately responded to, and again you've
15   discussed this, but I want to just hear directly in response to
16   this question, why did you check no?
17   A.  Well, again, I wasn't thinking about abuse.  I don't really
18   think about my abuse really much anymore because it doesn't
19   define me, it doesn't make me who I am today.  It's something
20   that happened, it's an experience that I lived through, and I
21   have become the person I am today because of my goals and
22   ambitions.  And I do not feel that I am a victim of a crime,
23   even though looking back on this abuse, that does make me a
24   victim of a crime, which is why I should have marked yes for
25   self.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

17

M3BTMAX1

1  Q. In any way did you intentionally provide an inaccurate
2  answer to this question?
3  A. Absolutely not, your Honor.
4  Q. In responding to the question, did you answer no so as to
5  make it more likely that you would be selected for the jury?
6  A. No, your Honor.
7  Q. Did your history of sexual abuse motivate you, again, to
8  try to tailor this answer to make it more likely that you would
9  be selected for the jury?
10 A. No, your Honor, I wasn't even thinking about that.
11 Q. I am going to return to the topic of the process for
12 filling out the questionnaire, and you've spoken to that some
13 and I will give you as much space as you want to respond. Just
14 by background, you were summoned to appear for jury duty on the
15 morning of November 4, is that correct?
16 A. Yes, your Honor.
17 Q. And when did you learn you would be filling out a
18 questionnaire?
19 A. When we got to the courtroom.
20 Q. When did you learn the case for which you were being
21 considered as a juror?
22 A. Three hours after sitting in that chair.
23 Q. And how long did it take you to fill out the questionnaire?
24 A. It's a great question. I don't recall how long it took,
25 but I want to say we were done by around noon or a little after

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

M3BTMAX1

1  noon.
2  Q. Were you rushed in any way?
3  A. I felt rushed only because of all the commotion going on in
4  front of me and everybody else just going by on both sides.
5  Q. And how did that make you feel rushed?
6  A. It made me -- growing up in school I never wanted to be the
7  last one finished. You want to finish your test and go hang
8  out with your friends. So it's kinds of that same policy, I
9  just wanted -- everyone else is finishing and I'm like: Why am
10 I still reading this? I'm like: I'm never going to get
11 chosen, let's get this done with.
12 Q. Would you say you approached the filling out of the
13 questionnaire with diligence?
14 A. Looking back on it now, no, your Honor.
15 Q. Were you concerned with following my instructions?
16 A. Absolutely not.
17 Q. You were not concerned with following my instructions?
18 A. No, I really -- this is a terrible excuse, but I didn't
19 really think I would be chosen.
20 Q. Some of the questions required follow up depending on
21 whether a yes or no answer was provided. Do you recall that?
22 A. Yes, your Honor.
23 Q. And we'll take a quick look at two examples, question 9 on
24 page 8, question 9 and 9A and question 10 and 10A.
25 Q. Question 9 asked whether your beliefs would make you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

## 19

1 unable to render a verdict. You checked no. 9A said: If yes,
2 please explain. You left that blank. So that question, if a
3 yes response called for explanation, you didn't provide an
4 explanation because you checked no.
5 The next question 10 asked about principles of law and
6 whether you would accept them if selected to serve on the jury,
7 and you said yes. 10A said: If no, please explain. And you
8 followed that instruction and didn't provide an explanation
9 because you had said yes.
10 You recall there were a number of questions that
11 sometimes called for explanation and sometimes didn't?
12 A. Yes, your Honor.
13 Q. So how did you know whether to include follow-up answers?
14 A. So these questions are in the beginning where I had more
15 focus than I did at the end and less distractions, so it was
16 easier to follow along, like these are the first few questions.
17 It is a pretty thick packet, there's a binder of questions, so
18 at this point I was still, I guess, in focus and in the zone
19 and knew how to respond to these questions I guess accurately
20 at this part.
21 Q. Actually throughout the questionnaire you appeared to have
22 followed the instructions with respect to follow-up questions.
23 A. Right.
24 Q. I reviewed a lot of questionnaires. Some people would
25 provide follow-up when it wasn't called for or not provide

## 20

1 follow-up when it was called for. Your questionnaire seems to
2 follow the instructions throughout. It appears generally that
3 you read and followed the instructions within each question.
4 So how do you reconcile that with what you just testified to
5 that you were distracted, raced through?
6 A. Pretty simply, because you see your answer, you mark a no,
7 then the next question says "if yes." Well, I marked no, so
8 skip, go to the next question. So that's what I'm talking
9 about when I flew through, I skimmed, I didn't read everything.
10 So if I had just marked no and it says "if yes," immediately
11 move on.
12 Q. Just to return to 48 now, sorry to go back, first you told
13 me it was a good question, how long it took you to fill it out,
14 and then you said you couldn't remember. I want to go back. I
15 think you said you were finished by noon. Do you remember what
16 time you started the questionnaire?
17 A. It had to be around 11-something. Again, I don't know,
18 I --
19 Q. I'm not sure that clock works.
20 A. Yeah, I don't remember seeing -- obviously that clock is in
21 the back and I was facing the front of the courtroom that we
22 were in, so I wouldn't have even seen that clock. But I feel
23 like the room we were in was much larger than this one, and I
24 don't know what time I started. It definitely felt like we
25 were there for hours before even seeing your video and then

21

M38TMAX1

1 given the questionnaire.
2 Q. You say, if you had to estimate, an hour to fill out the
3 questionnaire?
4 A. Maybe. I think that would be accurate.
5 Q. And to return to 4B, so you just said it was pretty easy
6 to, if yes, explain, if no, explain, so you skimmed through
7 that. Looking again at 4B, which has sort of a lot of white
8 space for the answer there, do you see that?
9 A. Yes, your Honor.
10 Q. And again, this is how many of the questions were
11 structured: Check box yes self, yes friend or family, or no.
12     Tell me again your thought process and how you
13 understood the yes self, and yes friend or family.
14 A. I just read the friend or family, again, like distracted,
15 so I missed that "have you," and then "yes self" while reading
16 this question.
17 Q. At the time you were filling this out, were you surprised
18 the questionnaire asked about friend and family but not about
19 you?
20 A. I didn't honestly think about it.
21 Q. At the time you filled out the questionnaire, did you think
22 that your history of sexual abuse would be something that the
23 parties and I would want to know in order to determine if you
24 could be fair and impartial?
25 A. Looking back thinking now, yes, that's a question that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

M38TMAX1

1 would have been asked, but I honestly didn't think about it. I
2 really don't think about my sexual abuse, period. I don't tell
3 very many people.
4 Q. After the trial you gave interviews in which you did tell
5 people about your history of sexual abuse.
6 A. Yes.
7 Q. How do you reconcile what you just said with that?
8 A. So I didn't -- this is going back to a deliberation thing,
9 so I have to think about how to say this.
10 Q. Well, I don't want you to talk about deliberations.
11 A. Right.
12 Q. If you can, you just said you don't talk about it, but --
13 A. I didn't talk about my abuse, I only said that -- I only
14 used it in order to talk to a reporter about jury
15 deliberations, I didn't use it in order to insert anything. I
16 just gave that as to why I believe a certain way based on all
17 the evidence that was provided during the trial.
18 Q. I suppose that the question is: You were prepared for the
19 public and you knew the public paid a lot of attention to this
20 case, you were giving national and international media
21 interviews, you were prepared for your history of sexual abuse
22 to be widely known.
23 A. Right, but not something -- I didn't think this would
24 happen, like I didn't lie in order to get on this jury and then
25 go to the press and tell them about my abuse. It just -- it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1                                                           23

1    a little illogical thinking about it, like if I lied
2    deliberately I wouldn't have told a soul. I certainly wouldn't
3    have put myself in a position to where I could -- this position
4    that I'm in now, potentially any sort of criminal charges, I
5    just wouldn't have done it. It was an honest mistake and one
6    of the biggest mistakes, and again, I apologize for wasting a
7    lot of people's time and money, and this is never anything that
8    I intended or did on purpose.
9    Q.   I understand your point, I still want to just make sure I
10   understand as someone who is filling out the questionnaire and
11   sort of walking through life and doesn't think about the
12   history of sexual abuse and talk about it, at the same time you
13   were prepared for the world to know about it. Tell me how to
14   make sense of that.
15   A.   It was only how I view things and how I can recall
16   memories, that's it. I didn't talk about my abuse, I just said
17   I can remember things and recall things, like the color of the
18   wall or --
19   Q.   Did you think about the fact that many people would learn
20   from your interview that you had this history of sexual abuse?
21   A.   No, I did not.
22   Q.   You didn't think about that?
23   A.   No, I did not think that anybody -- certainly my family or
24   friends would find this out.
25   Q.   Friends weren't following the news of the case after you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1                                                           24

1    indicated you had been a juror on it?
2    A.   I don't know if they were following the news of the case,
3    but I have had some conversations about it with my friends
4    afterward, but most people don't even know. It's not like -- I
5    didn't know much about it either. Sexual abuse isn't a topic
6    that I really want to research or learn about or watch about
7    frequently.
8    Q.   You did understand from your interviews that the fact that
9    you were abused would be a known fact in the world.
10   A.   Yes, your Honor.
11   Q.   And did you make a conscious decision that you were okay
12   with that?
13   A.   Yes, your Honor. After sitting on this trial for several
14   weeks and seeing the victims be brave enough to give their
15   story, I felt like if they can do it, then so can I. I didn't
16   have to divulge any of the details that happened to me, I
17   focused on the memory aspect.
18   Q.   Okay. What I'm going to do now is I'm going to take us
19   back in time to not November 4 but November 16, 2021. That's
20   when I questioned you individually in that process that I
21   suspect now you know is called voir dire. You recall that
22   process?
23   A.   Yes, your Honor.
24   Q.   At that time I asked you some follow-up questions based on
25   your responses to the questionnaire and some additional

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1                                                                25

1    questions.  Do you recall that?
2    A.  Yes, your Honor.
3    Q.  So if you had filled out your questionnaire accurately as
4    to 48 and 25 and 49, I would have asked additional questions
5    that day.  So what I'm going to do is ask you those questions
6    now.
7    A.  Okay.
8    Q.  And I need you to answer honestly as to how you would have
9    answered on November 16 if you had answered the questions 25,
10   48 and 49 accurately.  Do you understand that?
11   A.  Yes, your Honor.
12   Q.  And again, I'm not asking for your thought process during
13   deliberations or anything about jury deliberations, I'm asking
14   you to go back to that time and if you had answered these
15   questions accurately, how would you have responded to my follow
16   ups.  Okay?
17        So at the time I asked you questions on November 16,
18   and if you had answered the questions accurately, did you
19   believe there was anything about your prior experience with
20   sexual abuse that would affect your ability to be a fair and
21   impartial juror?
22   A.  No, it would not affect me in any way.
23   Q.  At the time I asked you the questions, if you had answered
24   the questions accurately, did you believe there was anything
25   about your experience with sexual abuse that would have

M38TMAX1                                                                26

1    affected your ability to render a verdict based solely on the
2    evidence presented at trial and my instructions as to the law?
3    A.  Yeah.  No, your Honor, I would be able to review the
4    evidence based solely on the evidence.
5    Q.  Okay.  At the time I asked you questions, and if you
6    answered accurately, did you believe there's anything about
7    your experience with prior sexual abuse that would interfere
8    with your ability to assess the credibility of witnesses
9    alleging sexual abuse?
10   A.  Absolutely in no way.
11   Q.  So at the time did you believe that you would be able to
12   conclude that a witness alleging sexual abuse was not
13   testifying truthfully if that was what the evidence suggested?
14   A.  Correct, your Honor, yes, I did.
15   Q.  At the time I asked you questions on November 16, did you
16   harbor any bias against Ms. Maxwell?
17   A.  Not at all.
18   Q.  At the time I asked you questions on November 16, were you with
19   you biased in favor of the government or the prosecution?
20   A.  Not at all, your Honor.
21   Q.  Did you want to put your thumb on the scale in any
22   direction?
23   A.  No.
24   Q.  At the time I asked you questions, and in light of your
25   experience with sexual abuse, did you believe that the subject

27

M38TMAX1

1 matter of the case would upset you in such a way that would
2 distract you from your duty as a juror?
3 A. No, your Honor.
4 Q. Would you be thinking about your own experience in a way
5 that would prevent you from being fair or impartial?
6 A. No, your Honor.
7 Q. At the time I asked you questions on November 16, and in
8 light of your experience with sexual abuse, did you believe
9 that issues of reporting or not reporting sexual abuse that
10 might be discussed at trial would interfere with your ability
11 to be fair or impartial as a juror in the case?
12 A. No, your Honor.
13 Q. At the time I asked you questions on November 16, and if
14 you had answered accurately and based on your experience with
15 sexual abuse, did you have any doubt as to your ability to be
16 fair to both sides?
17 A. No, your Honor, no doubt.
18 THE COURT: All right. I will meet with counsel at
19 sidebar.
20 (At sidebar)
21 THE COURT: I will give you an opportunity to propose
22 follow-up questions in light of his responses to questions of
23 counsel.
24 MS. MOE: Yes, your Honor, just one proposal. I
25 believe the Court asked Juror 50 about the way in which he

28

M38TMAX1

1 approached the questionnaire process, whether he took the
2 Court's instructions seriously. We would just propose asking
3 parallel questions about the questions he was asked in person,
4 in particular because the juror was asked during voir dire
5 similar questions about questions of bias for or against the
6 government, impartiality. And so to clarify the record,
7 whether he took answering those questions in person seriously
8 and answered truthfully.
9 MS. STERNHEIM: Could we have a moment?
10 THE COURT: You may.
11 (Pause)
12 MR. EVERDELL: Your Honor, I think there was several
13 areas of follow-up here that are warranted.
14 First, the juror made some reference to his healing
15 process. I couldn't quite understand what he said at the time,
16 something about how he views himself as a victim or not as a
17 victim of a crime. I think we need to understand his healing
18 process and what he has gone through, because that affects his
19 ability to be an impartial juror in a case involving sexual
20 abuse. Is this something that he still is seeking treatment
21 for? Is this something he is still thinking? How he deals
22 with the healing process and how he thinks about himself as a
23 victim affects how he views the victim witnesses in this case,
24 and I think there ought to be more questions about that.
25 THE COURT: What's the proposed question?

29

M38TMAX1

1    MR. EVERDELL:  What was -- we gave a number of those
2    in our submissions, but:  You talked publicly about the fact
3    that you were in therapy, what was the nature of the therapy?
4    Does it deal with your experiences as victim of sexual abuse?
5    What was the healing process that you talked about?  Describe
6    this healing process for me.  Does it involve addressing this
7    issue of prior child sexual abuse?  Were you in therapy during
8    the trial?  Is this an issue that you are still dealing with?
9        THE COURT:  I did review those questions proposed and
10   I considered them.  The defense did not propose any comparable
11   questions for jurors during the voir dire process who indicated
12   yes to this question and indicated a history of sexual abuse,
13   so those requests are denied.
14        Any other follow-up requests?
15        MR. EVERDELL:  Your Honor, I think we need to talk
16   further about the nature of abuse.  We talked about the fact
17   this happened, happened multiple times.  This happened with
18   more than one person, a stepbrother and a friend.  I think we
19   need to understand because -- I'm not trying to pry, your
20   Honor, I'm not trying to get into these gory details, but it is
21   relevant, the extent of the similarities of this juror's abuse
22   and whether that lines up with the testimony we heard from the
23   victims is relevant in an inquiry to bias.
24        And I think we need to understand a little more about
25   similar questions that we asked -- we proposed to the Court in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

30

M38TMAX1

1    our follow up:  How long did this go on?  When did it stop?
2    Were you home when this happened?  What was the interaction
3    between you and the abusers and family members?  These are all
4    things that go to the similarity.
5        THE COURT:  I have the same response.  I considered
6    those questions.  We had, I think it was Juror 21 who had
7    talked about familial abuse.  The defense didn't propose any
8    comparable follow-up questions.  The questions went to the core
9    questions of impartiality and fairness.  The defense didn't
10   request those questions and they didn't move to strike for
11   cause.  Here, there's dissimilarity of age; for example,
12   younger than some of the proposed jurors, some of the
13   inquired-into jurors who indicated yes, the defense didn't
14   request follow up as to the specific similarities and the like,
15   and I don't think I would have asked them because the bottom
16   line questions are what is in issue.  So that request is
17   denied.
18        Any other proposed follow up?
19        MR. EVERDELL:  Yes, I have a few more.
20        MS. STERNHEIM:  Judge, you have asked certain things
21   about the questionnaire, but I do not believe that you asked
22   about the summary of the case which specifically says what this
23   case is about, it is about sexual abuse of a minor, and did he
24   just fly through that as well?
25        It is clear that this juror has supplemented --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

31

M38TMAX1

1   THE COURT: Make your arguments in briefing
2   afterwards, if you're doing that. I want specific proposed
3   questions in light of responses.
4   MS. STERNHEIM: I know your Honor did not want to get
5   into what happened in the jury room, but a couple of --
6   THE COURT: I'm not permitted to get into that.
7   MS. STERNHEIM: You are permitted to discuss what he
8   stated publicly, and publicly he said that he --
9   THE COURT: You misunderstand the law, or I do, but I
10  have written an analysis of that issue in my opinion. That he
11  revealed what happened in jury deliberations does not allow me
12  to accept, as part of this hearing, evidence of what he said in
13  jury deliberations. You may disagree with that legal analysis.
14  I have written extensively about it in my February 24 opinion.
15  I won't relitigate that now.
16  MS. STERNHEIM: He did not tell very many people about
17  it, then he told the world.
18  THE COURT: Right. I pressed repeatedly on that
19  issue. If you have a specific follow up that you would like me
20  to ask --
21  MR. EVERDELL: I do have some follow up. He said he
22  didn't tell many people, but he also said he didn't think
23  people would learn about his history of sexual abuse, despite
24  the fact that he was telling reporters about that. We need to
25  ask him, I think, about his post to Annie Farmer where he says:

32

M38TMAX1

1   Thanks for telling my story. So if he says: I didn't expect
2   the world to hear about my sexual abuse, yet at the same time
3   he's telling Annie Farmer, one of the victims in this case,
4   post-trial, "Thanks for telling my story," that suggests to me
5   that he wanted to be known as the victim of sexual abuse, he
6   wanted to be seen as a champion of sexual abuse, and that this
7   explanation that he is giving is simply false.
8   There's also the Facebook post that he made after the
9   fact --
10  THE COURT: Just a moment. I will ask him to explain,
11  to reconcile that if he can, that he said he didn't think
12  people would know about it with the fact that he went on social
13  media and thanked one of the witnesses in the case. I will ask
14  about that.
15  MR. EVERDELL: Your Honor, he said this is a verdict
16  for all of the victims, which I think includes himself. How
17  does he reconcile that comment with the fact that he didn't
18  want to share with the world that he himself was a victim of
19  sexual abuse, meaning: I'm doing this for the victims of
20  sexual abuse. That's clear import of that comment. I think
21  that's a conflict.
22  There's also his Facebook posts after the fact where
23  he says: I can now tell everybody that I was a juror on the
24  Ghislaine Maxwell trial. What an incredible, surreal
25  experience. Again, telling the world that I'm out here.

33

M3BTMAX1

1    THE COURT: I will ask the question how does he
2  reconcile the statement that he didn't think anyone would know
3  with the fact that he was posting on social media.
4    MR. EVERDELL: I think we also need some follow-up
5  questions that we proposed in our letter about his belief about
6  victim memory, because I think that goes to his ability to
7  evaluate the evidence fairly and impartially.
8    THE COURT: I will deny that.
9    MR. EVERDELL: I believe also he said in his answers
10  that he didn't hope to be on the jury but if he is going to be
11  on a jury, it might as well be something interesting. I'm
12  paraphrasing, but that's the import of his comment. I think we
13  need some follow up about what he meant by that comment. Why
14  was it that he found this interesting? Was it some reflection
15  of the fact that it involved victims of sexual abuse, and
16  because he was the victim of sexual abuse himself that made it
17  interesting for him?
18    THE COURT: I will ask him what he meant.
19    MS. STERNHEIM: Judge, I may have an issue. I thought
20  the last question about following your instructions, I think he
21  said no. And insofar as saying no, how did he not follow your
22  instructions after he filled out the questionnaire?
23    THE COURT: Okay. I will ask that question and then I
24  will ask the government's question about whether he followed my
25  instructions during voir dire.

34

M3BTMAX1

1    MS. MOE: Thank you, your Honor.
2    THE COURT: And then I will —
3    MR. EVERDELL: Your Honor, I believe he mentioned
4  something about his interview with the journalist Lucia, first
5  name Lucia, and I was trying to follow his response, but he
6  said something about: I didn't understand that this was an
7  issue in the questionnaire. But I believe the reporting is
8  that they discussed this at length, the consequences of him
9  going public and the consequences of the fact that there was a
10  jury questionnaire at issue here and there were answers to
11  those questions that he would be talking about. I can't
12  remember exactly what it is, but there was some discussion
13  about the consequences of him going forward. And I believe
14  what he said was: I didn't have any discussions or any lengthy
15  discussions with the journalists about me coming forward and
16  just answered their questions. But I believe there was a
17  discussion with Lucia about the consequences, about whether he
18  wants to do this, about — I don't remember now —
19    THE COURT: I don't understand what you're referring
20  to.
21    MR. EVERDELL: I think the issue is he was saying how
22  he didn't expect to be public, he didn't expect to be known
23  worldwide as a victim of sexual abuse, he didn't expect this
24  come out, even though he's talking to journalists. My
25  understanding is he had a discussion with Lucia, the journalist

M38TMAX1

35

1    from The Independent, about the consequences of him coming
2    forward, which is: This is a momentous decision you're making.
3    So I don't see how he squares his comments about. I
4    never thought by talking to the press that I would come forward
5    and be known this way, when in fact I think there was a lengthy
6    discussion he had with a journalist about this very fact.
7    THE COURT: He said that he recognized by talking to
8    the press about it that it would be known publicly.
9    MR. EVERDELL: I think he may have said that, but I
10    think at the same time he's saying I didn't think this would be
11    known by my parents and my friends. I don't know how you
12    square those responses. To me -- and I know this was the
13    subject of argument that you don't want to hear at this point,
14    but his responses are simply not credible on this point because
15    he's talking out of both sides of his mouth: I didn't think I
16    would be known, but yet I did know I would be known. It makes
17    no sense to me. I'm curious to hear more about what I perceive
18    as blatant conflict in answers about a discussion with a
19    journalist about the consequences of going forward.
20    THE COURT: You want me to ask about what he discussed
21    with which journalist?
22    MR. EVERDELL: Lucia, who I believe is The Independent
23    journalist. So I would -- I'm sorry it's not coming out very
24    focused, I apologize, but: You had discussed before in
25    responses to my questions about the fact that you didn't think

M38TMAX1

36

1    that talking to a reporter would necessarily make you known to
2    the world about -- your sexual abuse known to the world. If
3    that wasn't something that truly entered your head, isn't it a
4    fact that you spoke to Lucia, the reporter from The Independent
5    that you spoke to, about the consequences that you might face
6    in revealing all this stuff -- we won't get into jury
7    deliberations -- about what you said to her about your sexual
8    abuse and other things, there would be well-known consequences
9    to what you were doing. How do you square those two thoughts
10    in your head, which you didn't think it would be public, didn't
11    think you would be known for this, and the journalist is
12    telling you that very fact?
13    MS. MOE: Your Honor, the government has no objection
14    to limited follow-up questions about his understanding about
15    whether it would become public. I do have concerns about the
16    proposed question because it's confusing and a little cryptic.
17    I don't know what the word "consequences" might mean in
18    response to the question or what that's in particular driving
19    at. I think, as the Court noted, he has already sort of
20    explained his understanding about speaking publicly to a
21    reporter and whether it would be publicly known that he was the
22    victim of sexual abuse.
23    There's also, I think, some tension between the
24    Court's focused question about whether he understood it would
25    become public that he was the victim of sexual abuse and

M38TMAX1     37

1  further questions about his understanding about sort of the
2  magnitude of press coverage arising from the issue that gives
3  rise to this hearing, which I believe he touched on as well.
4  THE COURT: I think what I will do is go back and ask:
5  Did you understand at the time you talked to the press in the
6  way that you did, did you understand that it would be publicly
7  known that you were a victim of sexual abuse? We'll see what
8  he says.
9  Did you think about the consequences of talking to the
10  press about that? Did you talk to the press, the press
11  reporter about the consequences?
12  It's difficult for me to see what it's going at, but I
13  will seek clarification on his answers, as I did multiple
14  times, on the reconciling and understanding his thinking about
15  coming out publicly as a victim of sexual abuse. He has
16  explained some of the transformation process and the like. You
17  can make your arguments about credibility. But I will go back
18  and see if there's something to ask regarding talking to the
19  reporter about the consequences. Which also there's a temporal
20  issue here, he didn't think about it until he talked to the
21  press, and in the course of that the press talked to him about
22  the consequences and that changed his understanding
23  potentially.
24  MS. MOE: Yes, your Honor. And I think yet a third
25  point, talking about consequences today, I think Juror 50

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1     38

1  rightly understands that question to be referring to whether he
2  would understand he would be sitting in a courtroom like this.
3  THE COURT: I will go back and try to get an
4  understanding of what he thought would happen when talking to
5  the press regarding his own sexual history regarding it being
6  publicly known that he was someone who suffered from sexual
7  abuse.
8  MS. STERNHEIM: During the interview he mentioned
9  question 48, and he said: I recall being asking about friend
10  and family, and she said "it also asked about you," he turned
11  beet red, and she said: You're turning beet red. He said:
12  The blood is rushing to my head.
13  THE COURT: She actually said: You're not on the
14  stand. You misquoted it in the papers.
15  MR. EVERDELL: Not in the sun.
16  THE COURT: You're not in the sun, she said, you're
17  not on the stand, don't worry, but yes.
18  MS. STERNHEIM: What was going through his mind when
19  she mentioned that the question included you?
20  THE COURT: I will ask that. He talked about the
21  first time he learned that the questionnaire had the question.
22  MS. STERNHEIM: And last thing is: What was his
23  motivation in speaking to the press and being interviewed?
24  THE COURT: Those questions, what motivated him after
25  trial, is not relevant to what was going on during the filling

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M38TMAX1

39

1 out of the questionnaire and responding to the voir dire. I
2 would ask questions about that, and I have, but what motivated
3 him to talk to the press is not relevant to the inquiry.
4 All right. Anything else?
5 MS. MOE: Not from the government, your Honor, thank
6 you.
7 (Continued on next page)

M38TMAX2

40

1 (In open court)
2 THE COURT: All right. I do have some additional
3 questions, Juror 50.
4 BY THE COURT:
5 Q. I asked you whether you approached filling out the
6 questionnaire with diligence.
7 Can you recall that?
8 A. Yes, your Honor.
9 Q. And you indicated no and you wish you had and that sort of
10 thing. And I asked you whether you took my instructions
11 carefully in the questionnaire.
12 Do you remember that?
13 A. Yes, your Honor.
14 Q. And your answer is no? Is that accurate?
15 A. Yes, your Honor.
16 Q. And to make sure I understand, why is that? Why didn't you
17 take my instructions carefully?
18 A. It was definitely inadvertent. Again, like I said, I began
19 to float, fly through it, in order to get done. I was super
20 distracted, and it just -- I don't know what happened. I just
21 wanted to get done with it.
22 Q. When you came back on November 16 for the follow-up
23 questions, there was another instruction video.
24 Do you recall that?
25 A. Yes, your Honor.

41

M38YMAX2

```
 1   Q.  And when I asked you questions, those one-on-one questions,
 2   did you pay attention to the instructions at that time?
 3   A.  Yes, your Honor.
 4   Q.  Did you listen carefully to my questions?
 5   A.  Yes, your Honor.
 6   Q.  Do you have any doubt that you answered those questions
 7   accurately?
 8   A.  I answered every single one of those questions accurately.
 9   Q.  Might you have failed to pay attention to the specifics of
10   the questions in any way?
11   A.  Not at all, your Honor.
12   Q.  And how do you know that, given how you approached the
13   questionnaire?
14   A.  Because it was a different situation.  I wasn't distracted.
15   There weren't things going on.  I wasn't sitting there for
16   hours.  It was multiple weeks later.  So, again, I wasn't -- at
17   that point, I wasn't thinking about my ex.
18   Q.  Would you say that you're distracted easily?
19   A.  I think I can become distracted, but it had no effect me
20   serving in the jury, on the jury, and listening to all the
21   evidence given during the trial.
22   Q.  And what was your approach to my instructions at various
23   points?
24   A.  It was to follow them.
25   Q.  When you were testifying earlier -- and I asked you some
```

42

M38YMAX2

```
 1   questions about this -- you said that you didn't think that
 2   your family or friends would learn that you were a victim of
 3   sexual abuse, despite the press interviews.
 4                Do I have that right?
 5   A.  Yes, your Honor.
 6   Q.  And why didn't you think that?
 7   A.  Well, I wasn't using my full name.  I'm also not ashamed
 8   about it.  It's something that happened, and it's something
 9   that is relatively common that happened to multiple people
10   throughout the world.
11   Q.  And we talked about this, but you understood that there was
12   a high level of press and public attention to the case.
13   Correct?
14   A.  Yes, your Honor.
15   Q.  Help me reconcile that you didn't think friends and family
16   would learn about your sexual abuse with the fact that you were
17   speaking publicly about it.
18   A.  The one thing that I can point to is that when my friends
19   commented, texted me -- commented on my post, texted me about
20   it, they didn't even know that this trial was even happening.
21   So I figured a little article about a juror giving their
22   experience wouldn't be record-breaking or really in the news at
23   all.
24   Q.  So you couldn't see how they would find out about it?
25   A.  Yes, your Honor.  That wasn't something that I was
```

43

M38YMAX2

1   intentionally planning to hide; right?  So if somebody were to
2   ask me if I was abused, I would say yes.
3   Q.  And otherwise -- well, let me ask you:  You were posting on
4   social media about your role as a juror.
5   A.  After the trial, yes.
6   Q.  So wouldn't your friends and family find out in that
7   regard?
8   A.  It just -- I just said that I had served on the jury.  I
9   didn't say anything about it in it.
10  Q.  There was a communication with one of the witnesses in the
11  case, Annie Farmer, on social media?
12  A.  That's right.
13  Q.  And you thanked her for sharing your story.
14  A.  Yes.
15  Q.  What did you mean by that?
16  A.  She just shared the article, and then I commented on it;
17  that thank you for sharing my story because she said that I was
18  brave enough to come forward, and so I thanked her for sharing
19  hers as well.
20  Q.  So your friends who followed you there would see that.
21  A.  I don't have any followers.  I think I had like two
22  followers, and they were random things.  Twitter is not
23  something I normally use.  So I just randomly seen that
24  she'd shared that.  So I felt like I wanted to comment.
25  Q.  You testified, when I asked whether you hoped you'd be on

44

M38YMAX2

1   the jury, and you had said that you didn't think you would.
2   And I asked you why, and I asked you if you hoped you would.
3       And you said, well, I thought it would be interesting.
4   If you were going to serve jury duty, this would be --
5       What did you mean you thought it would be interesting?
6   A.  So not everybody gets called for jury duty.  Some people
7   never get called in their entire lifetime.  I figured if --
8   what I mean by that is this is something interesting.  It's not
9   like -- I don't know.  Maybe a fraud case might be boring.  I
10  don't know.  I just felt like this might be something
11  interesting that keeps my attention.
12  Q.  I asked you when you first learned that the questionnaire
13  included a history-of-sexual-abuse question.
14      Do you remember that?
15  A.  Yes, your Honor.
16  Q.  And you told me during a videoed interview.
17  A.  Yes, your Honor.
18  Q.  Correct.
19      What was your reaction when you learned that the
20  questionnaire contained that question?
21  A.  Well, she asked me.  And I was, like, they don't ask about
22  your own personal abuse because it's what I believed.  It's
23  what I thought.  It's what I read.  I didn't know I had made a
24  huge mistake like that, and that's why I responded that way.
25  Q.  And how did you feel?

M3BYMAX2

45

1   A.  Well, number one, I was, like, did I just mess something up
2   entirely?  And I was embarrassed and sort of like shocked and
3   didn't know that that was the full question.
4   Q.  I think at one point you said that you sort of didn't
5   realize the extent to which your interviewing would kind of
6   reverberate.  I don't mean this process.
7       But in terms of the public knowing that you had a
8   history of sexual abuse, with any of the reporters you spoke
9   to, did you talk through the consequences?
10  A.  No, your Honor.
11  Q.  And, again, I don't mean about this kind of process.  But I
12  just mean to speak about your history of sexual abuse.
13  A.  Correct.  No, your Honor.
14      THE COURT:  I'll briefly meet with counsel.
15      (At the sidebar)
16      THE COURT:  I want to make sure that I've accurately
17  captured the follow-up questions that were requested and give
18  you a final opportunity if you have any additional questions
19  for followup.
20      MS. POMERANTZ:  Nothing further, your Honor.  Thank
21  you.
22      MS. STERNHEIM:  Judge, I had asked before if the Court
23  could inquire about the summary of the case.  He said he paid
24  attention early on.  He specifically said that the case was
25  about sexual abuse.

M3BYMAX2

46

1       THE COURT:  I don't understand what the question is.
2       MS. STERNHEIM:  Well, you had read that.  So you knew
3   what this case about, and that was in your mind when you were
4   answering the questionnaire.  For him to say that --
5       THE COURT:  I don't want argument.
6       What question do you want me to ask?
7       MS. STERNHEIM:  Did you read the summary of the case
8   and understand that the subject matter of this case --
9       THE COURT:  Well, I won't summarize it.  I'll read the
10  whole thing and ask:  "Did you understand that that was the
11  subject matter of the case?"
12      MS. STERNHEIM:  Yes.
13      MS. POMERANTZ:  No objection, your Honor.  Thank you.
14      (In open court)
15  BY THE COURT:
16  Q.  Returning to the questionnaire, it says, page 4.  It's
17  actually the second page of the questionnaire.  There were
18  documents that you took off when you filled it out.
19      I provided a summary of the case.
20      Do you recall that?
21  A.  Yes, your Honor.
22  Q.  The third paragraph down in that summary reads:  "The
23  charges of the indictment stem from allegations that from at
24  least 1994 through 2004, the defendant conspired with and aided
25  and abetted Jeffrey Epstein to entice minors to travel to

47

M38YMAX2

1  engage in criminal sexual activity, to transport minors to
2  engage in criminal sexual activity, and to engage in sex
3  trafficking of a minor."
4         And then the next paragraph lays out of the specific
5  counts.
6  Q. Do you recall if you read that summary of the case?
7  A. Yes, your Honor. I did.
8  Q. So what did you understand the case to be about?
9  A. Just that, just what was written there.
10 Q. And in reading that, did that cause you to think about your
11 history of sexual abuse?
12 A. It did not. Again, it's something that I don't think
13 about. It happened so long ago. Again, it's not part of who I
14 am.
15         THE COURT: All right. You may step down.
16         (Witness excused)
17         THE COURT: Counsel, let me ask your proposals as to
18 some briefing, if necessary, post-trial briefing.
19 Government?
20         MS. MOE: Your Honor, the government would
21 respectfully propose that the parties submit letter briefing
22 promptly following the hearing within the next few days.
23         If I could just have a moment to confer with my
24 colleagues about a specific date. Our general proposal would
25 be to have a short and tight briefing schedule to resolve the

48

M38YMAX2

1  issues from the hearing, but if I could just have one moment
2  about a specific date.
3         THE COURT: Okay.
4         (Government counsel confer off the record)
5         MS. MOE: Your Honor, the government would propose
6  that we submit our letter briefing by Friday.
7         MS. STERNHEIM: May I, Judge?
8         THE COURT: Yes. I think your response on the other
9  briefing is due on Friday.
10        MS. STERNHEIM: And I am starting a trial, not that
11 that is going to necessarily prolong our request. But I would
12 ask for two weeks for us to submit our written submission.
13        MS. MOE: Your Honor, the government respectfully
14 submits that this issue has been prolonged in litigation. It
15 has been briefed exhaustively. The only remaining issues are
16 about Juror 50's testimony today and the inferences to be
17 drawn, which is a very narrow and confined issue which can be
18 resolved quickly and briefed quickly.
19        MS. STERNHEIM: Your Honor, this is an incredibly
20 important issue. We are not asking for —
21        THE COURT: I know it's incredibly important,
22 Ms. Sternheim. That doesn't alter the fact of what there is to
23 do. But let me look at the calendar.
24        What date does your trial start, Ms. Sternheim?
25        MS. STERNHEIM: The 16th.

49

M38YMAX2

1    THE COURT:  All right.  I think simultaneous briefing
2  is appropriate.  For one, I have responsive briefing on the
3  legal issues, and so really what we're talking about is
4  argument following based on today's record.
5    One week from today, the 15th.  Simultaneous briefing,
6  I don't care if you call it letter briefing or otherwise.  As
7  you know, all I care is that it's double-spaced so I can read
8  it on my iPad.  Fifteen pages max per side.
9    Anything else from the government?
10    MS. POMERANTZ:  No, your Honor.  Thank you.
11    MS. STERNHEIM:  Your Honor, I would just request that
12  our submission of questions which was sent to chambers be made
13  a part of this record.
14    THE COURT:  Yes.  As I've said, I will docket
15  everything.  There's identifying information of Juror 50 in
16  your submitted questions.  So that needs to be redacted.
17    But other than Juror 50 identifying information, the
18  redactions for all materials, I believe, for all materials
19  based on the post-trial briefing and the submitted questions
20  can be publicly docketed.
21    Is that correct?  As well as my opinion had two lines
22  of redactions.  So I'll docket my opinion without redactions.
23  I'll ask the parties to — actually, I think we can handle the
24  submitted questions, the redactions for identifying
25  information.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

50

M38YMAX2

1    The parties' briefing, I'll ask you to submit the
2  briefs with redactions only for protecting juror privacy and
3  juror identity.
4    Any reason not to do that by tomorrow?
5    MS. MOE:  Yes, your Honor.
6    THE COURT:  By tomorrow?
7    MS. STERNHEIM:  Yes.
8    THE COURT:  Thank you.
9    So that will put everything on the record.  As for
10  today's hearing, the only thing that's redacted is Juror 50's
11  name.  And that's redacted on the immunity materials, as well
12  as Mr. Spodek's letter just indicated "Juror 50."
13    Anything further, Ms. Sternheim?
14    MS. STERNHEIM:  Not at this time.
15    THE COURT:  Ms. Moe?
16    MS. MOE:  No, your Honor.  Thank you.
17    THE COURT:  All right.  We're adjourned.
18    (Adjourned)
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A-289**

DATE: 3/8/22
TIME:
CASE: 20cr330, US v. Maxwell
Post-verdict hearing

Juror ID: 50

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/9/22

## PRELIMINARY INSTRUCTIONS

Please read the following instructions carefully before completing any portion of this questionnaire. Please print your juror number in the space provided at the top of **each** page. **Do not write your name on the questionnaire.** Please answer each and every question fully. Some questions have more than one part.

**YOU ARE SWORN TO GIVE TRUE AND COMPLETE ANSWERS TO ALL QUESTIONS IN THIS QUESTIONNAIRE.** This questionnaire is designed to help simplify and shorten the jury selection process. The purpose of the questionnaire is to determine whether prospective jurors can decide this case impartially based upon the evidence presented at trial and the legal instructions given by the presiding judge. The questions are not intended to inquire unnecessarily into personal matters. Although some of the questions may appear to be of a personal nature, please understand that the Court and the parties must learn enough information about each juror's background and experiences to select a fair and impartial jury.

Please answer all questions to the best of your ability. If you do not know the answer to a question then write, "I don't know." There are no "right" or "wrong" answers, only truthful answers. If you have strong feelings about this case in general, please do not hesitate to share them. Although you may be a perfectly good juror in another case, this may or may not be the right case for you to sit on as an impartial juror. Both parties have the right to get honest answers and to hear your true opinions. Do not discuss the case or your answers with anyone. It is important that the answers be yours alone. Remember, you are sworn to give true and complete answers to all questions.

If you need extra space to answer any question, please use the extra blank sheets of paper included at the end of the questionnaire. Be sure to indicate on the blank page the number of the question you are answering. Do not write anything on the back of any page.

**DO NOT DISCUSS YOUR QUESTIONS AND ANSWERS OR THE CASE WITH ANYONE, NOW OR UNTIL FURTHER INSTRUCTED BY THE COURT.** You should not discuss the questions or answers with fellow jurors. It is very important that your answers be your own individual answers. More broadly, do not discuss the case with anyone, including the lawyers (except in the presence of the Court), your fellow jurors, your family, your friends, or anyone else. Do not communicate about the case in any way, including telephone, e-mail, any social media app or website (such as Facebook), any communications app or website (such as Twitter). You must also avoid reading or hearing about the case (or anyone participating in the case) in newspapers, in magazines, on the radio or television, or on the Internet.

**DO NOT DO YOUR OWN RESEARCH ON THE CASE.** Do not conduct any research into the case (or anyone participating in the case) at any time before your entire jury service has been completed. That includes performing Internet searches, asking other people about the case, reading news stories, books, or reports about the case, or watching films or television programs that relate to the case. Do not read, watch, or listen to any information about this case.

-3-

A-290

Juror ID: _50_

Your name will not be disclosed or connected to this questionnaire beyond the Judge and the parties in this case. However, if you believe that any of your answers contain private information that could embarrass you or otherwise seriously compromise your privacy and wish to request that the Court keep them confidential and not distribute them beyond the Judge and parties, please indicate the particular question number at the end of the questionnaire.

## SUMMARY OF THE CASE

**The Court is selecting a jury for a trial commencing on Monday, November 29, 2021. Although it is never possible to predict the length of a trial, currently this trial is expected to last approximately six weeks.**

This is a criminal case. The Defendant, Ghislaine Maxwell, has been charged in an Indictment with various criminal offenses. The Indictment is not evidence. It simply contains the charges—referred to as "counts"—that the Government intends to prove to the jury at trial beyond a reasonable doubt.

The charges in the Indictment stem from allegations that from at least 1994 through 2004, the Defendant conspired with and aided and abetted Jeffrey Epstein to entice minors to travel to engage in criminal sexual activity, to transport minors to engage in criminal sexual activity, and to engage in sex trafficking of a minor.

The Indictment charges the Defendant in 6 counts: Count One of the Indictment charges the Defendant with conspiring with Jeffrey Epstein and others to entice minors to travel to engage in sexual activity for which a person can be charged with a criminal offense. Count Two charges the Defendant with enticing a minor to travel to engage in sexual activity for which a person can be charged with a criminal offense, and aiding and abetting the same. Count Three charges the Defendant with conspiring with Epstein and others to transport minors to engage in sexual activity for which a person can be charged with a criminal offense. Count Four charges the Defendant with transporting a minor to engage in sexual activity for which a person can be charged with a criminal offense, and aiding and abetting the same. Count Five charges the Defendant with participating in a sex trafficking conspiracy. Count Six charges the Defendant with sex trafficking of a minor, and aiding and abetting the same.

Ms. Maxwell has pled not guilty to all charges. Ms. Maxwell is presumed innocent, and before she can be found guilty on any charge, the jury must find that the Government has proven each element of that crime beyond a reasonable doubt.

A-291

Juror ID: _50_

## SCHEDULE

Potential jurors will be called back for further questioning and jury selection from Tuesday, November 16, 2021, through Friday, November 19, 2021. Your availability during that week will be required.

The trial will commence on Monday, November 29, 2021. The trial is expected to last about six weeks. Generally, trial will be held five days per week, Monday through Friday, from 9:30 a.m. until 5:00 p.m. Trial will not be held on Friday, December 24, 2021 (Christmas Eve Day) and Friday, December 31, 2021 (New Year's Eve).

If you are selected as a juror, you will be required to be present for the taking of testimony and evidence for as long as the trial lasts. There are no plans to sequester the jury, which means you will go home every day after court.

All jury service involves some degree of hardship. Our court and justice system depends on citizens doing their civic duty to serve as jurors, which involves temporarily putting aside their regular business for jury service. The Court views service on a jury to be one of the highest duties a citizen owes to the United States. Mere inconvenience or the usual financial hardship of jury service will not be sufficient to excuse a prospective juror. You must show extraordinary personal or financial hardship to be excused from service.

A-292

Juror ID: _50_

## PLEASE ANSWER THE FOLLOWING QUESTIONS:

| | ABILITY TO SERVE |
|---|---|
| | **Please note:** In the event you are excused from service on this jury, you will likely not be excused from jury service in general. You will instead be required to report to the Court's Jury Clerk for placement on another panel for another case. |
| 1. | Do you have any unmovable commitments between November 16, 2021, and November 19, 2021, which is when jury selection will take place? <br> ☐ Yes ☒ No |
| 1a. | If yes, please explain (without indicating the name of where you work or the names of any family members or friends, or other personal information that might identify who you are): <br> _____ <br> _____ <br> _____ |
| 2. | Do you have any unmovable commitments between November 29, 2021, and approximately January 15, 2022, which is the estimated length for trial? <br> ☐ Yes ☒ No |
| 2a. | If yes, please explain (without indicating the name of where you work or the names of any family members or friends, or other personal information that might identify who you are): <br> _____ <br> _____ <br> _____ <br> _____ |
| 3. | Do you have any international travel plans between now and November 29, 2021? <br> ☐ Yes ☒ No |
| 4. | Do any circumstances exist such that serving on the jury in this case would entail <u>serious</u> hardship or <u>extreme</u> inconvenience? <br> ☐ Yes ☒ No |
| 4a. | If yes, please briefly describe the serious hardship or extreme inconvenience: <br> _____ <br> _____ <br> _____ <br> _____ |

-6-

A-293

Juror ID: _50_

| | | |
|---|---|---|
| 5. | Do you have any personal commitments that would make it difficult for you to get to court by 9:30 a.m., every day of trial, or remain at the courthouse until 5:00 p.m.? (Please note, the Court will arrange and provide transportation to and from the Courthouse each day for selected jurors).<br><br>☐ Yes        ☒ No | |
| 5a. | If yes, please explain why you would be unable to get to court by 9:30 a.m. or remain until 5:00 p.m.:<br><br>_____<br>_____<br>_____<br>_____ | |
| 6. | Do you have any difficulty reading, speaking, or understanding English?<br><br>☐ Yes        ☒ No | |
| 7. | Do you have any medical, physical, or mental condition or illness that makes you unable to serve on a jury, including difficulty hearing, seeing, reading, or concentrating?<br><br>☐ Yes        ☒ No | |
| 7a. | If yes, please briefly describe the condition or illness. If you believe you could serve as a juror if such condition were accommodated in some way, please state the accommodation.<br><br>_____<br>_____<br>_____<br>_____ | |
| 8. | Are you taking any medication which would prevent you from giving full attention to all the evidence at this trial?<br><br>☐ Yes        ☒ No | |
| 8a. | If yes, please explain:<br><br>_____<br>_____<br>_____<br>_____ | |

-7-

A-294

Juror ID: _50_

| 9. | Do you have any religious, philosophical, or other beliefs that would make you unable to render a verdict in a criminal case?<br><br>☐ Yes            ☒ No |
|---|---|
| 9a. | If yes, please explain:<br><br>_____<br>_____<br>_____<br>_____ |

| | **BASIC LEGAL PRINCIPLES AND MEDIA RESTRICTIONS** |
|---|---|
| 10. | Under the law, the facts are for the jury to determine and the law is for the Judge to determine. You are required to accept the law as the Judge explains it to you even if you do not like the law or disagree with it, and you must determine the facts according to those instructions. Do you accept this principle, and will you be able to follow the Judge's instructions if selected to serve on this jury?<br><br>☒ Yes            ☐ No |
| 10a. | If no, please explain:<br><br>_____<br>_____<br>_____<br>_____ |
| 11. | The law provides that a defendant in a criminal case is presumed innocent at all stages of the trial and is not required to put on any defense at all. The Government is required to prove the defendant guilty beyond a reasonable doubt on each charge. Do you accept these principles, and will you be able to apply them if selected to serve on this jury?<br><br>☒ Yes            ☐ No |
| 11a. | If no, please explain:<br><br>_____<br>_____<br>_____<br>_____ |

A-295

Juror ID: _50_

| 12. | The law provides that a defendant in a criminal case has an absolute right not to testify, and that a juror cannot hold it against the defendant if she chooses not to testify. Do you accept this principle, and will you be able to apply it if selected to serve on this jury?<br><br>☒ Yes                    ☐ No |
|---|---|
| 12a. | If no, please explain:<br><br>_____<br>_____<br>_____<br>_____ |
| 13. | A juror is required by law to make his or her decision based solely on the evidence or lack of evidence presented in Court, and not on the basis of conjecture, suspicion, bias, sympathy, or prejudice.  Do you accept this principle, and will you be able to apply it if selected to serve on this jury?<br><br>☒ Yes                    ☐ No |
| 13a. | If no, please explain:<br><br>_____<br>_____<br>_____<br>_____ |
| 14. | Under the law, the question of punishment is for the Court alone to decide, and thus the issue of punishment must not enter into your deliberations as to whether the defendant is guilty or not guilty as charged.  Do you accept this principle, and will you be able to apply it if selected to serve on this jury?<br><br>☒ Yes                    ☐ No |
| 14a. | If no, please explain:<br><br>_____<br>_____<br>_____<br>_____ |

A-296

Juror ID: _50_

| 15. | You may hear testimony in this case that law enforcement officers recovered certain evidence from searches. The Court will instruct you that those searches were legal and that the evidence obtained from those searches is admissible in this case. Do you have any feelings or opinions about searches conducted by law enforcement officers, or the use of evidence obtained from searches, that would affect your ability to be fair and impartial in this case?<br><br>☐ Yes          ☒ No |
|---|---|
| 15a. | If yes, please explain:<br><br>_____<br>_____<br>_____<br>_____ |
| 16. | You also may hear testimony in this case from expert witnesses. Have you had any experiences with experts, or do you have any general feelings about the use of experts, that would affect your ability to be fair and impartial in this case?<br><br>☐ Yes          ☒ No |
| 16a. | If yes, please explain:<br><br>_____<br>_____<br>_____<br>_____ |
| 17. | As instructed above, **from now and until your jury service is complete**, you are instructed to avoid all media coverage and not to go on the Internet with regard to this case for any purpose. That is, you are forbidden from consuming any news media or social media, or any discussion of this case (or of anyone participating in the case) outside of the courtroom whatsoever. You also must not discuss this case with anyone. This includes your family, friends, spouse, domestic partner, colleagues, and co-workers. These instructions apply from now and until you are either dismissed from jury selection or chosen as a juror and the trial is complete. When we return for the next step in jury selection, the Judge will ask you if you have followed this instruction.<br><br>Do you have any reservations or concerns about your ability or willingness to follow this instruction?<br><br>☐ Yes          ☒ No |

A-297

Juror ID: _____ **50**

| 17a. | If yes, please explain: <br><br> _____ <br> _____ <br> _____ <br> _____ |
|---|---|

| | **PRIOR JURY SERVICE** |
|---|---|
| 18. | Have you ever served as a juror in a trial in any court? <br><br> ☐ Yes     ☒ No |
| 19. | Have you ever at any time served as a member of a grand jury, whether in federal, state, county, or city court? <br><br> ☐ Yes     ☒ No |

| | **EXPERIENCE AS A WITNESS, DEFENDANT, OR CRIME VICTIM** |
|---|---|
| 20. | Have you, or has any relative or close friend, ever participated in a state or federal court case, whether criminal or civil, as a witness, plaintiff, or defendant? <br><br> ☐ Yes (self)     ☐ Yes (friend or family member)     ☒ No |
| 20a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case? <br><br> ☐ Yes     ☐ No |
| 20b. | If yes to 20a, please explain: <br><br> _____ <br> _____ <br> _____ <br> _____ |
| 21. | Have you or any relative or close friend ever been involved or appeared as a witness in any investigation by a federal or state grand jury or by a congressional or state legislative committee, licensing authority, or governmental agency, or been questioned in any matter by any federal, state, or local law enforcement agency? <br><br> ☐ Yes (self)     ☐ Yes (friend or family member)     ☒ No |

-11-

A-298

Juror ID: _50_____

| 21a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?<br><br>☐ Yes　　　　　☐ No |
|---|---|
| 21b. | If yes to 21a, please explain:<br>_____<br>_____<br>_____<br>_____ |
| 22. | Have you, or has any relative or close friend, ever been subpoenaed for any inquiry or investigation?<br><br>☐ Yes (self)　　☐ Yes (friend or family member)　　☒ No |
| 22a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?<br><br>☐ Yes　　　　　☐ No |
| 22b. | If yes to 22a, please explain:<br>_____<br>_____<br>_____<br>_____ |
| 23. | Have you, or has any relative or close friend, ever been arrested or charged with a crime?<br><br>☐ Yes (self)　　☐ Yes (friend or family member)　　☒ No |
| 23a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?<br><br>☐ Yes　　　　　☐ No |
| 23b. | If yes to 23a, please explain:<br>_____<br>_____<br>_____<br>_____ |

-12-

A-299

**Juror ID:** _50_

| | |
|---|---|
| 24. | Have you, or has any relative or close friend, ever been the subject of any investigation or accusation by any grand jury, state or federal, or any other investigation?<br><br>☐ Yes (self)     ☐ Yes (friend or family member)     ☒ No |
| 24a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?<br><br>☐ Yes          ☐ No |
| 24b. | If yes to 24a, please explain:<br><br>_____<br>_____<br>_____ |
| 25. | Have you, or any of your relatives or close friends, ever been a victim of a crime?<br><br>☐ Yes (self)     ☐ Yes (friend or family member)     ☒ No |
| 25a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?<br><br>☐ Yes          ☐ No |
| 25b. | If yes to 25a, please explain:<br><br>_____<br>_____<br>_____ |
| 26. | Have you, or has any member of your family or any of your close friends—either as individuals or in the course of their business affairs—ever been a party to a legal action or dispute with the United States, or with any of the officers, departments, agencies, or employees of the United States, including the United States Attorney's Office, the FBI, or the NYPD?<br><br>☐ Yes (self)     ☐ Yes (friend or family member)     ☒ No |

-13-

A-300

Juror ID: _50_

| 26a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?<br><br>□ Yes                    □ No |
|------|------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 26b. | If yes to 26a, please explain:<br><br>_____<br>_____<br>_____<br>_____ |
| 27.  | Have you, or has any member of your family, ever had a dispute concerning money owed to you by the Government or owed by you to the Government?<br><br>□ Yes (self)      □ Yes (friend or family member)      ☒ No |
| 27a. | If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?<br><br>□ Yes                    □ No |
| 27b. | If yes to 27a, please explain:<br><br>_____<br>_____<br>_____<br>_____ |

| | **RELATIONSHIP WITH, AND VIEW OF, GOVERNMENT, DEFENSE, AND OTHERS** |
|------|-----------------------------------------------------------------------------------------------------------|
| 28.  | Do you or any member of your family or a close friend work in law, law enforcement, the justice system, or the courts?<br><br>□ Yes      ☒ No |
| 28a. | If yes, please explain:<br><br>_____<br>_____<br>_____<br>_____ |

-14-

A-301

Juror ID: _50_

| | |
|---|---|
| 28b. | If yes to 28, would this affect your ability to serve as a fair and impartial juror in this case? <br><br> ☐ Yes　　　　　　☐ No |
| 28c. | If yes to 28b, please explain: <br><br> _____ <br> _____ <br> _____ <br> _____ |
| 29. | Do you know or have any association—professional, business, or social, direct or indirect—with any member of the staff of the United States Attorney's Office for the Southern District of New York? <br><br> ☐ Yes　　　　　　☒ No |
| 29a. | If yes, please explain: <br><br> _____ <br> _____ <br> _____ <br> _____ |
| 29b. | If yes to 29, would this affect your ability to serve as a fair and impartial juror in this case? <br><br> ☐ Yes　　　　　　☐ No |
| 29c. | If yes to 29b, please explain: <br><br> _____ <br> _____ <br> _____ <br> _____ |
| 30. | Do you know or have any association—professional, business, or social, direct or indirect—with the Federal Bureau of Investigation, commonly known as the FBI? <br><br> ☐ Yes　　　　　　☒ No |
| 30a. | If yes, please explain: <br><br> _____ <br> _____ <br> _____ <br> _____ |

-15-

A-302

Juror ID: ___50___

| | |
|---|---|
| 30b. | If yes to 30, would this affect your ability to serve as a fair and impartial juror in this case? <br><br> ☐ Yes      ☐ No |
| 30c. | If yes to 30b, please explain: <br><br><br><br> |
| 31. | Do you know or have any association—professional, business, or social, direct or indirect—with the New York City Police Department, commonly known as the NYPD? <br><br> ☐ Yes      ☒ No |
| 31a. | If yes, please explain: <br><br><br><br> |
| 31b. | If yes to 31, would this affect your ability to serve as a fair and impartial juror in this case? <br><br> ☐ Yes      ☐ No |
| 31c. | If yes to 31b, please explain: <br><br><br><br> |
| 32. | Do you have any opinion of the U.S. Attorney's Office for the Southern District of New York, the U.S. Attorney Damian Williams, or the former Acting U.S. Attorney Audrey Strauss that might make it difficult for you to be a fair and impartial juror in this case? <br><br> ☐ Yes      ☒ No |

-16-

A-303

Juror ID: __50__

| 32a. | If yes, please explain: <br> _____ <br> _____ <br> _____ <br> _____ |
|---|---|

| | **PERSONAL RELATIONSHIP WITH CASE PARTICIPANTS** |
|---|---|
| 33. | The next subset of questions asks whether you or any member of your family or a close friend <u>personally</u> knows or has past or present dealings with individuals involved in this case. To "personally know" means to have some direct or personal knowledge or connection to the following individuals. If you have only heard the names through media or social media, for example, that is not personal knowledge. |
| 33a. | Do you or does any member of your family or a close friend <u>personally</u> know or have past or present dealings with the Defendant in this case, Ghislaine Maxwell, or her family members? <br><br> ☐ Yes ⊠ No |
| 33b. | Do you or does any member of your family or a close friend <u>personally</u> know or have past or present dealings with Jeffrey Epstein? <br><br> ☐ Yes ⊠ No |
| 33c. | Do you or does any member of your family or a close friend <u>personally</u> know or have past or present dealings with the U.S. Attorney for the Southern District of New York, Damian Williams, the former Acting U.S. Attorney for the Southern District of New York, Audrey Strauss, or anyone else who works for or used to work for the U.S. Attorney's Office for the Southern District of New York? <br><br> ☐ Yes ⊠ No |
| 33d. | Do you or does any member of your family or a close friend <u>personally</u> know or have past or present dealings with any of the Assistant United States Attorneys who are prosecuting this case: <br><br> Maurene Comey ☐ Yes ⊠ No <br> Alison Moe ☐ Yes ⊠ No <br> Lara Pomerantz ☐ Yes ⊠ No <br> Andrew Rohrbach ☐ Yes ⊠ No |

-17-

A-304

Juror ID: _50_

| | |
|---|---|
| 33e. | Do you or does any member of your family or a close friend <u>personally</u> know or have past or present dealings with any of the defense attorneys or law firms who are representing the Defendant:<br><br>Christian Everdell of Cohen & Gresser LLP  ☐ Yes  ☒ No<br>Jeffrey Pagliuca of Haddon, Morgan and Foreman, P.C.  ☐ Yes  ☒ No<br>Laura Menninger of Haddon, Morgan and Foreman, P.C.  ☐ Yes  ☒ No<br>Bobbi Sternheim of Law Offices of Bobbi C. Sternheim  ☐ Yes  ☒ No |
| 33f. | Do you or does any member of your family or a close friend <u>personally</u> know or have past or present dealings with the United States District Court Judge who is presiding over this case, Alison J. Nathan, or anyone who works on her staff?<br><br>☐ Yes                    ☒ No |
| 33g. | If you answered "yes" to any of the above sub-questions (33a, 33b, 33c, 33d, 33e, or 33f), please explain whom you know, how you know the individual(s), and whether your relationship with that person might make it difficult for you to be a fair and impartial juror in this case:<br><br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____ |

A-305

Juror ID: _50_

| | KNOWLEDGE OF CASE AND PEOPLE |
|---|---|
| | This case has been widely reported in the national and local media. There is nothing wrong with having heard something about this case. It is important to answer all of the following questions truthfully and fully. |
| 34. | Before today, had you read, seen, or heard anything about Ms. Maxwell?<br><br>☒ Yes        ☐ No        ☐ Unsure |
| 34a. | If yes or unsure, please state what you remember hearing, and how or from whom you may have heard (*e.g.*, a friend, the newspaper, a website, social media). If you heard about Ms. Maxwell from a media source, please identify the media source by name:<br><br>I read on a website that she was Jeffrey Epstein's girlfriend - source was CNN.com |
| 35. | Have you personally formed an opinion about Ms. Maxwell's guilt or innocence of the crimes charged as a result of anything you have heard, read or seen?<br><br>☐ Yes        ☒ No        ☐ Unsure<br><br>☐ Not applicable, I have not read/seen/heard about Ms. Maxwell |
| 35a. | If yes or unsure, please summarize your opinion: |

-19-

A-306

Juror ID: 50

| 36. | Based on anything that you have read, seen, or heard about Ms. Maxwell, including anything about criminal charges against Ms. Maxwell, have you formed any opinions about Ms. Maxwell that might make it difficult for you to be a fair and impartial juror in this case?<br><br>☐ Yes   ☒ No   ☐ Unsure<br><br>☐ Not applicable, I have not read/seen/heard about Ms. Maxwell |
|---|---|
| 36a. | If yes or unsure, please explain why it might be difficult for you to be a fair and impartial juror in this case:<br><br>_____<br>_____<br>_____ |
| 37. | Before today, had you read, seen, or heard anything about Jeffrey Epstein?<br><br>☒ Yes   ☐ No   ☐ Unsure |
| 37a. | If yes or unsure, please state what you remember hearing, and how or from whom you may have heard (e.g., a friend, the newspaper, a website, social media). If you heard about Mr. Epstein from a media source, please identify the media source by name:<br><br>CNN is source. Heard about his death and that he was in jail awaiting trial. |
| 38. | Have you verbally stated or posted your opinion on social media or online about Ms. Maxwell or Mr. Epstein?<br><br>☐ Yes   ☒ No<br><br>☐ Not applicable, I have not read/seen/heard about Mr. Epstein/Ms. Maxwell |
| 38a. | If yes, when and where did you state or post your opinion?<br><br>_____<br>_____<br>_____ |

-20-

A-307

Juror ID: __*50*__

| | |
|---|---|
| 39. | Based on anything that you have read, seen, or heard about Jeffrey Epstein, have you formed any opinions about Mr. Epstein that might make it difficult for you to be a fair and impartial juror in this case?<br><br>☐ Yes   ☒ No   ☐ Unsure<br><br>☐ Not applicable, I have not read/seen/heard about Mr. Epstein |
| 39a. | If yes or unsure, please explain why it might be difficult for you to be a fair and impartial juror in this case:<br><br>_____<br>_____<br>_____<br>_____ |
| 40. | If you have heard about Jeffrey Epstein, do you think Ms. Maxwell's alleged association with Jeffrey Epstein will make it difficult for you to fairly and impartially consider the evidence presented at trial and render a verdict based solely on the evidence?<br><br>☐ Yes   ☒ No   ☐ Unsure<br><br>☐ Not applicable, I have not read/seen/heard about Ms. Maxwell and/or Jeffrey Epstein |
| 40a. | If yes or unsure, please explain:<br><br>_____<br>_____<br>_____<br>_____ |
| 41. | Based on anything you have read, seen, or heard about Ms. Maxwell, including anything about criminal charges brought against Ms. Maxwell, would you be able to follow the Court's instruction to put that information out of your mind and decide this case based only on the evidence presented at trial?<br><br>☒ Yes   ☐ No   ☐ Unsure<br><br>☐ Not applicable, I have not read/seen/heard about Ms. Maxwell |

A-308

Juror ID: _50_

| 41a. | If no or unsure, please explain: |
|---|---|
| | |

| | **NATURE OF CHARGES** |
|---|---|
| 42. | During the trial, you will hear evidence alleging sex crimes against underage girls. Some of the evidence in this case will involve sexually suggestive or sexually explicit conduct.  Is there anything about the nature of this case and the accusations as summarized at the beginning of this questionnaire that might make it difficult for you to be a fair and impartial juror in this case? <br><br> ☐ Yes                                   ☒ No |
| 42a. | If yes, please explain: |
| 43. | Do you have any specific views or feelings concerning laws regarding the age at which individuals can or cannot consent to sexual activity with other individuals that would affect your ability to serve as a fair and impartial juror? <br><br> ☐ Yes                                   ☒ No |
| 43a. | If yes, please explain: |
| 44. | Do you have any opinion about the enforcement of the federal sex trafficking laws or the federal laws concerning sex crimes against minors that might prevent you from being fair and impartial in this case? <br><br> ☐ Yes                                   ☒ No |

-22-

A-309

Juror ID: _50_

| 44a. | If yes, please explain: |
|---|---|
| | |
| 45. | Have you or a family member ever supported, lobbied, petitioned, protested, or worked in any other manner for or against any laws, regulations, or organizations relating to sex trafficking, sex crimes against minors, sex abuse, or sexual harassment? <br><br> ☐ Yes          ☒ No |
| 45a. | If yes, please explain when and what you or your family member did: |
| | |
| 45b. | If your answer to 45 was yes, do you believe that this would affect your ability to serve fairly and impartially as a juror in this case? <br><br> ☐ Yes          ☐ No |
| 45c. | If yes to 45b, please explain: |
| | |
| 46. | The witnesses in this case may include law enforcement witnesses. Would you have any difficulty assessing the credibility of a law enforcement officer just like you would any other witness? <br><br> ☐ Yes          ☒ No |
| 46a. | If yes, please explain: |
| | |

-23-

A-310

Juror ID: _50_

| 47. | Witnesses in this case may testify claiming sexual abuse or sexual assault. Would you have any difficulty assessing the credibility of a witness claiming sexual assault or abuse just like you would any other witness? |
|-----|---|
| | ☐ Yes          ☒ No |
| 47a. | If yes, please explain: |
| | _____<br>_____<br>_____<br>_____ |
| 48. | Have you or a friend or family member ever been the victim of sexual harassment, sexual abuse, or sexual assault? (This includes actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.) |
| | ☐ Yes (self)          ☐ Yes (friend or family member)          ☒ No |
| 48a. | If yes, without listing names, please explain: |
| | _____<br>_____<br>_____<br>_____<br>_____<br>_____ |
| 48b. | If your answer to 48 was yes, do you believe that this would affect your ability to serve fairly and impartially as a juror in this case? |
| | ☐ Yes          ☐ No |
| 48c. | If yes to 48b, please explain: |
| | _____<br>_____<br>_____<br>_____ |

A-311

Juror ID: _50_

| 49. | Have you or a friend or family member ever been accused of sexual harassment, sexual abuse, or sexual assault? (This includes both formal accusations in a court of law or informal accusations in a social or work setting of actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.).<br><br>☐ Yes (self)　　　☐ Yes (friend or family member)　　　☒ No |
|---|---|
| 49a. | If yes, <u>without listing names</u>, please explain: |
| 49b. | If your answer to 49 was yes, do you believe that this would affect your ability to serve fairly and impartially as a juror in this case?<br><br>☐ Yes　　　　　☐ No |
| 49c. | If yes to 49b, please explain: |
| 50. | Is there any other experience that you or anyone close to you has had that may affect your ability to serve fairly and impartially as a juror in this case?<br><br>☐ Yes　　　　　☒ No |
| 50a. | If yes, please explain: |

-25-

A-312

Juror ID: _50___

| | | CLOSING QUESTION |
|---|---|---|
| | 51. | Do you wish for any particular answers to remain confidential and to not go beyond the Judge, counsel, and the Defendant, because the answer would embarrass you or otherwise seriously compromise your privacy? <br><br> ☐ Yes        ☒ No <br><br> If yes, please list which question number(s): <br><br> _____ <br><br> _____ |

-26-

A-313

Juror ID:  50

## DECLARATION

I, Juror Number 50 declare under penalty of perjury that the foregoing answers set forth in this Jury Questionnaire are true and correct to the best of my knowledge and belief.  I have not discussed my answers with others, or received assistance in completing the questionnaire.

Signed this 4th day of November, 2021

**DO NOT WRITE YOUR NAME. PLEASE SIGN USING YOUR JUROR NUMBER.**

-27-

A-314

Juror ID: _50_

You may use these pages to finish any answers that you could not fit in the spaces provided above.  If you write anything below, please indicate the number of the relevant question.

-28-

A-315

**Juror ID:** _50_

---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---
---

-29-

A-316

**Juror ID:** 50

A-317

**Juror ID:** _50_

A-318

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/1/22

United States of America,

—v—

Ghislaine Maxwell,

                            Defendant.

20-CR-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, Circuit Judge, sitting by designation:

Central to our system of justice is a defendant's right to have guilt adjudged by a lay jury

of one's peers.  Citizens give their time and attention to this critical role in the administration of

justice, a role which is enshrined in our Constitution.  Judicial officers are charged with the

implementation of this constitutional right.  In all cases, whether of high profile or low, trial

courts must ensure that only jurors who can fairly and impartially assess the evidence are seated

on the jury.  And once seated, the jury must be permitted to deliberate fully and frankly in an

effort to reach a unanimous verdict.  Trials entail significant investments of public and private

resources.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984).  For all of

these reasons, a verdict may be set aside only in the most extraordinary of circumstances.

Before the Court is the Defendant's motion for a new trial pursuant to Federal Rule of

Criminal Procedure 33 on the basis that a juror provided inaccurate information during jury

selection.  Maxwell contends the juror's presence on the jury violated her Sixth Amendment

right to an impartial jury.  Bearing these principles in mind, the Court conducted an uncommon

post-trial hearing.  Although uncommon, the hearing was necessary because of incontrovertible

evidence that Juror 50 failed to respond accurately during the jury selection process to a question

on a written questionnaire about his history of sexual abuse.  At the hearing, the Court

questioned the juror under oath and under the penalty of perjury.  The Court inquired about whether his answers were false, his explanation for giving those answers, and how he would have responded to follow-up questions if accurate answers had been provided at the time of jury selection.  This inquiry was limited by Federal Rule of Evidence 606, which prohibits a juror from testifying about the content of deliberations or his mental processes in evaluating the evidence at trial.  The rule embodies long-accepted federal law and is an important safeguard of the integrity of the jury trial system.  The hearing was further limited by Supreme Court and Second Circuit law that permits inquiry only if there is clear and incontrovertible evidence of potential misconduct by the juror.

Based on the hearing record, the questions before the Court are whether Juror 50 failed to answer honestly a material question during jury selection, and whether, if he had provided a correct response, the Court would have struck him "for cause" because he was biased.  Controlling law is clear that the question is not whether the Defendant would have chosen to exercise one of her discretionary peremptory strikes against this juror had he accurately disclosed his prior sexual abuse.  It is only whether the Court would have struck him for cause due to actual, implied, or inferred bias.  *See McDonough Power Equip., Inc.*, 464 U.S. at 555–56.  The limits on the nature of the post-trial inquiry serve the important interest in the finality of judgments.

The Court concludes that the Defendant has failed to satisfy the demanding requirements of the controlling Supreme Court decision, *McDonough v. Greenwood*.  The Court finds Juror 50 testified credibly at the hearing.  There are many reasons for that finding.  He appeared to testify frankly and honestly, even when the answers he gave were the cause of personal embarrassment and regret.  His incentive at the hearing was to testify truthfully or face criminal perjury charges.

His tone, demeanor, and responsiveness gave no indication of false testimony. The Court thus credits his testimony that he was distracted as he filled out the questionnaire and "skimmed way too fast," leading him to misunderstand some of the questions. Assuming mistakenly that he would not be one of the twelve jurors selected from the hundreds of prospective jurors who had been summoned, he rushed through the questionnaire. This led to inaccurate answers. Juror 50's lack of attention and care in responding accurately to every question on the questionnaire is regrettable, but the Court is confident that the failure to disclose was not deliberate.

The Court further finds that Juror 50 was not biased and would not have been stricken for cause even if he had answered each question on the questionnaire accurately. At the hearing, the Court asked Juror 50 the same set of questions that it asked of all prospective jurors who had indicated prior experience with sexual abuse on the questionnaire. These questions are typical of how trial court judges seek to assess potential bias and determine—based on the juror's responses—whether the juror should be struck for cause. This is so because the key question is not simply whether an individual has had experiences similar to the issues that will be explored at trial, but whether the individual can serve fairly and impartially.

This Court has presided over a murder trial in which a juror who had a family member murdered was not struck for cause. So too victims of fraud serve faithfully in fraud trials and individuals who have been discriminated against serve fairly in discrimination cases. And survivors of rape have and can serve impartially in trials charging the crime of rape. In this case, Juror 50's responses at the hearing to the questions regarding his ability to be a fair and impartial juror, even in light of his past experience of sexual abuse, established that he too could serve fairly and impartially. Thus, this Court would not have struck Juror 50 for cause if he had provided accurate responses to the questionnaire.

3

A-321

The Defendant's motion for a new trial pursuant to Rule 33 is therefore DENIED.

## I.   BACKGROUND

### A.  Jury Selection Process

The jury selection process in this case was designed to screen a sufficient number of prospective jurors for the high-profile trial while also complying with the Southern District of New York's COVID-19 protocols and protecting the health and safety of prospective jurors, court staff, and case participants during the unprecedented pandemic. Selection proceeded in three stages: a written pre-screen questionnaire, one-on-one oral *voir dire*, and, finally, the exercise of peremptory strikes.  The Court developed the questionnaire and *voir dire* with input from the parties.  *See* Dkt. No. 367; *see also* Oct. 21, 2021 Tr., Dkt. No. 459.  The questionnaire was designed to pre-screen for "the major for-cause strike issues in the case"—that is, "the trial's length and schedule, a juror's personal knowledge of the parties, [the] extent of a juror's awareness of publicity about the case and the defendant, and any bias due to publicity or as a result of the nature of the charges."  Oct. 21, 2021 Tr. at 5.  In-person *voir dire* would then focus on appropriate follow-up questions based on questionnaire responses, additional questions more appropriately asked orally, and background information to aid the parties' exercise of informed peremptory challenges.  *Id.* at 7.

When prospective jurors arrived to complete the questionnaire, and when they returned for *voir dire*, they watched videotaped instructions from this Court.  The Court prepared those instructions with the parties' input.  Dkt. Nos. 366, 404, 427.  These instructions briefly explained the jury selection process, explained the nature of the charges (using the same language that the parties proposed for the jury questionnaire), and instructed jurors not to discuss the case or consume any media about the case.

4

The final questionnaire contained 51 questions, although multiple questions required follow-up responses for certain answers.  Dkt. No. 462.  Questions 25, 48, and 49 asked about a prospective juror's experience with crime and sexual abuse, harassment, and assault.

Question 25 asked: "Have you, or any of your relatives or close friends, ever been a victim of a crime?," and provided three answer options in the following order: "Yes (self)," "Yes (friend or family member)," and "No."  *Id.* at 13.  Question 25a then asked: "If yes, is there anything about that experience that would prevent you from acting as a fair and impartial juror in this case?," and provided two answer options: "Yes" and "No."  Finally, Question 25b asked: "If yes to 25a, please explain."  Several lines were then provided for the prospective juror to explain their answer.  *Id.*

Question 48 asked:

Have you or a friend or family member ever been the victim of sexual harassment, sexual abuse, or sexual assault?  (This includes actual or attempted sexual assault or other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member).

*Id.* at 24.  Like Question 25, there were three answer options in the following order: "Yes (self)," "Yes (friend or family member)," and "No."  Question 48a next asked: "If yes, <u>without listing names</u>, please explain."  Space was provided to write an answer.  Question 48b asked: "If your answer to 48 was yes, do you believe that this would affect your ability to serve fairly and impartially as a juror in this case?"  There were two answer choices: "Yes" and "No."  Finally, Question 48c asked: "If yes to 48b, please explain."  Like Question 48a, several lines of space were provided to answer the question.  *Id.*

Finally, Question 49 asked:

Have you or a friend or family member ever been accused of sexual harassment, sexual abuse, or sexual assault?  (This includes both formal accusations in a court of law or informal accusations in a social or work setting of actual or attempted sexual assault or

5

A-323

other unwanted sexual advance, including by a stranger, acquaintance, supervisor, teacher, or family member.).

*Id.* at 25.  Like Questions 25 and 48, there were three answer options in the following order: "Yes (self)," "Yes (friend or family member)," and "No."  The follow-up questions to Question 49 followed the same structure as the follow-up questions to Question 48.  Question 49a asked: "If yes, <u>without listing names</u>, please explain."  Question 49b asked: "If your answer to 49 was yes, do you believe that this would affect your ability to serve fairly and impartially as a juror in this case?" and had checkboxes for "Yes" and "No."  Finally, Question 49c asked: "If yes to 49b, please explain."  *Id.*  The Court developed Questions 48 and 49 in response to requests from both sides that the Court inquire into a prospective juror's experience with sexual abuse and assault. *See* Dkt. No. 367 at 21, 24.  The Defendant also sought questions about experience with sexual harassment.  *See id.* at 22.  Rather than ask several separate questions, the Court adopted a compromise of two sufficiently broad questions so as not to unduly lengthen the questionnaire.

During five sessions held over three days on November 4, 5, and 12, 2021, 694 prospective jurors completed the questionnaire.  *See* Nov. 15, 2021 Tr. at 2, Dkt. No. 529. Counsel reviewed the completed questionnaires and jointly submitted four lists to the Court: (1) prospective jurors that both sides agreed should proceed to *voir dire*; (2) prospective jurors that both sides agreed should be excused or struck for cause; (3) prospective jurors that the Defendant but not the Government believed should be excused; and (4) prospective jurors that the Government but not the Defendant believed should be excused.  *Id.* at 2–3.  Because the parties agreed on a sufficient number of prospective jurors to proceed to *voir dire*, the Court did not resolve any disputes from lists 3 and 4, and those prospective jurors were excused by consent. *Id.* at 2–5.

6

As a result of this process, 231 prospective jurors were selected to return for in-person questioning for *voir dire*. *Id*. at 4. At this second stage of selection, the Court questioned prospective jurors one-on-one due to "Covid-related space limitations, to streamline the process in light of a likelihood of a high number of sidebars which would otherwise be required, and to ensure that the comments of one juror [did] not infect the pool." *Id*. at 8. If a prospective juror was not struck for cause, the Court instructed the now-qualified juror to return on the morning of November 29, 2021, for the parties' exercise of peremptory strikes.

### B. Juror 50's jury selection process

Juror 50 completed the questionnaire on the morning of November 4, 2021—the first questionnaire session. Mar. 8, 2022 Hearing Tr. at 7. In his questionnaire, Juror 50 checked "No" for Question 25. Hearing Exhibit 1 at 13, Dkt. No. 638 (hereinafter "Questionnaire"). He left Questions 25a and 25b blank. For Question 48, he checked the box "No." *Id*. at 24. He left Questions 48a, 48b, and 48c blank. Finally, Juror 50 checked "No" for Question 49. *Id*. at 25. He left Questions 49a, 49b, and 49c blank.

Juror 50 was among the prospective jurors the parties agreed should proceed to *voir dire*. He returned for in-person questioning on November 16, 2021. Consistent with other prospective jurors who had answered "No" to Questions 25, 48, and 49, the Court did not ask Juror 50 any follow-up questions on these issues. However, the Court did ask Juror 50 about his background, whether he would follow the Court's instructions, and his prior knowledge of the Defendant and Jeffrey Epstein, among other questions. Juror 50 explained that he had seen a news article on *CNN*, but he could "absolutely" decide the case "based on the facts and evidence, or lack of evidence, here presented in court." Nov. 16, 2021 Voir Dire Tr. at 130; *see also id.* at 131 (indicating that he had "no doubt" as to his ability to put his prior knowledge aside). In closing,

A-325

the Court asked if Juror 50 had any doubt about his ability to be fair to both sides.  Juror 50

replied, "No" and affirmed that he did not have "any reason to think that [he] can't be fair and

impartial here."  *Id*. at 134.

On November 29, the parties exercised their peremptory strikes.  The Defendant used all

of her strikes.  *See* Nov. 29, 2021 Trial Tr. at 731–32.  Juror 50 was one of fifty-eight qualified

prospective jurors, and he was ultimately one of the twelve deliberating jurors.  *Id*. at 733.

### C.  Juror 50's post-verdict interviews and party response

Following the thirteen-day trial, the jury began deliberations on December 20, 2021.  The

jury returned a unanimous verdict on December 29, 2021, finding the Defendant guilty of five of

the six counts.  Dkt. No. 593 at 29–30.

A week after the jury announced its verdict, on January 5, 2022, the Government

informed the Court that a juror had given at least three post-verdict interviews to press outlets

about his jury service and requested a hearing be held on the matter.  Dkt. No. 568.  The letter

noted that in the interviews, which were both in print and on video, the juror "described being a

victim of sexual abuse" and asserted that he "flew through" the jury questionnaire and did not

recall being asked whether he had been a victim of sexual abuse.  *Id*. at 1.  The Government

indicated that it believed the juror to be Juror 50, and a review of his questionnaire showed that

he had provided a negative response to a question that asked whether a prospective juror had

been a victim of sexual abuse.  *Id*. at 2 n.2; *see also* Feb. 25, 2022 Op. & Order, at 3 & n.1, Dkt.

No. 620.  A letter from the Defendant followed shortly thereafter also informing the Court about

the juror's interviews.  Dkt. No. 569.  The Defendant filed a second letter that same day

opposing the Government's request for a hearing "because based on undisputed, publicly

A-326

available information, the Court can and should order a new trial without any evidentiary hearing." Dkt. No. 570.[1]

On January 19, 2022, the Defendant filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, on the basis of Juror 50's statements. Dkt. Nos. 613, 642. In an Opinion & Order dated February 25, 2022, the Court denied the Defendant's motion for a new trial on the current record and determined that a hearing was necessary to resolve the motion. The Court ordered an evidentiary hearing limited to instances supported by clear, strong, and incontrovertible evidence that a specific, nonspeculative impropriety had occurred—namely, a false statement during jury selection. The hearing was also limited by Federal Rule of Evidence 606, which bars the Court from receiving evidence of a juror's statements regarding what occurred during jury deliberations. Fed. R. Evid. 606(b)(1). Accordingly, the evidentiary hearing was limited to "whether Juror 50 provided false answers on the questionnaire, the explanation for those answers, and how Juror 50 would have responded to follow-up questions if accurate answers had been provided" during the jury selection process. Feb. 25, 2022 Op. & Order, at 7.

### D. Evidentiary Hearing

The hearing took place on March 8, 2022. Juror 50 appeared with retained counsel and testified pursuant to a grant of immunity. Hearing Tr. at 3–5. Juror 50 confirmed he understood that if he provided false answers he could be prosecuted for perjury. *Id.* at 5. The Court conducted the questioning with input from counsel; both parties submitted proposed questions in advance for the Court's consideration. Dkt. Nos. 635, 636. The Court's inquiry went beyond the

---

[1] As noted in the Court's prior Opinion, also on January 5, 2022, the Jury Department of the Southern District of New York received a call from Juror 50 asking for guidance because of statements he had given to certain media outlets that were being widely reported on in the press, inquiring whether he needed an attorney, and asking if he could receive a copy of his completed questionnaire. February 25, 2022 Op. & Order, at 3 n.2.

limited approach proposed by the Government.  The Court also rejected many of the Defendant's proposed lines of questions.  The parties were also permitted to propose follow-up questions at the hearing in light of the Court's questioning and Juror 50's responses.  The Court accepted some of these proposals and rejected others.

Juror 50 testified that his answers to Questions 25, 48, and 49 were not accurate.  He explained that when he was nine and ten years old, he was abused on multiple occasions by a stepbrother, who he no longer considered part of the family, and one of the stepbrother's friends.  Hearing Tr. at 8.  He disclosed the abuse to his mother when he was in high school.  His mother called the police and gave a report, but no charges were brought.  *Id*. at 8–9.  Although he first testified that "no" was correct for Question 49 because he did not consider the stepbrother part of his family, upon further questioning from the Court, he acknowledged that the correct answer would have been "yes."  *Id*. at 11–13.  He similarly acknowledged that "yes (self)" would have been correct to Question 25; although at the time of the questionnaire, he understood the question to be asking about being "robbed or mugged or some sort of crime like that."  *Id*. at 9–10.

Juror 50 testified that these incorrect answers were an inadvertent mistake and that he had not intentionally failed to disclose his personal history of sexual abuse.  *Id*. at 14–16, 22–23.  He explained that he was distracted as he filled out the questionnaire and "completely skimmed way too fast," leading him to misunderstand the questions.  *Id*. at 14–15.  It took several hours to start the questionnaire after a long security line and technical issues with the Court's instructional video.  His mind was preoccupied with a recent romantic breakup and the commotion at the nearby check-out table.  He saw other prospective jurors completing their questionnaires and rushed to finish.  He explained that he was unconcerned with diligently completing the questionnaire; he assumed due to the sheer "volume" of prospective jurors being screened that it

was impossible he would be selected as a final juror.  *Id.* at 11–13, 18.  He testified that his personal history of sexual abuse was not something he typically thought about and that it had not crossed his mind as he filled out the questionnaire.

The Court asked follow-up questions consistent with those asked of prospective jurors during *voir dire* who responded affirmatively to Questions 25, 48, and 49 on their questionnaires, including those questions proposed by Defense counsel at that stage during trial.  Further, the Court asked Juror 50 about several potential inconsistencies in his testimony.  The Court did not permit questions that were inconsistent with the process as it played out in *voir dire* or otherwise irrelevant or redundant.  Ultimately, Juror 50 testified that his experience would not affect his ability to be a fair and impartial juror.  He affirmed that he did not harbor any bias against the Defendant nor in favor of the Government.  He asserted that he would be able to assess the credibility of witnesses alleging sexual abuse.  And he affirmed that the subject matter of the case would not upset him in such a way that would distract him from his duty as a juror, nor would he be thinking about his experience in a way that would prevent him from being fair or impartial.

At the conclusion of the hearing, the Court ordered the parties to submit supplemental briefing on Juror 50's testimony, which the parties simultaneously submitted on March 15, 2022.  Dkt. Nos. 648, 649.[2]

## II.   LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial[] by an impartial jury."  U.S. Const. amend. VI.  An impartial jury is one "capable and

---

[2] On April 1, 2022, the Defendant requested the Court stay its ruling pending the release of a documentary in which Juror 50 is expected to appear.  Dkt. No. 651.  That request is denied.  The Defendant provides no basis to conclude that the interview would affect the Court's analysis or conclusion having held an evidentiary hearing.

A-329

willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  One important means of ensuring an impartial jury is *voir dire* examination, which "expos[es] possible biases, both known and unknown, on the part of potential jurors," by eliciting information under oath. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

Once a jury has returned a verdict, a motion to set aside that verdict is "disfavored" and the moving party must overcome an "exacting hurdle" of proof. *United States v. Ventura*, No. 09-CR-1015 (JGK), 2014 WL 259655, at *3 (S.D.N.Y. Jan. 21, 2014); *see United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).  And while Federal Rule of Criminal Procedure 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires," Fed. R. Crim. P. 33(a), the Second Circuit has cautioned district courts that "such action must be done 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)).

The parties agree that a defendant's Rule 33 motion premised on a juror's alleged nondisclosure during *voir dire* is governed by *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).  Maxwell Br. at 22–28, Dkt. No. 642; Gov. Br. at 11, Dkt. No. 643.  In *McDonough*, the Supreme Court held that to obtain a new trial on the basis of juror nondisclosure during *voir dire*, "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556; *see also United States v. Shaoul*, 41 F.3d 811, 815–16 (2d Cir. 1994).

12

The parties dispute whether the first prong of *McDonough* requires "deliberate juror misconduct"—that is, whether the juror must have deliberately provided a false answer in *voir dire*. The Government, relying on Second Circuit precedent such as *United States v. Shaoul*, argues that a deliberate falsehood is required. Gov. Br. at 13 (citing *Shaoul*, 41 F.3d at 815–16). In contrast, the Defendant contends that *McDonough* does not require deliberateness and that an inadvertent false statement satisfies the first prong. Maxwell Br. at 23–28; Maxwell Reply at 9–14, Dkt. No. 644.[3] The Court does not resolve this legal dispute because, as explained in the analysis section below, regardless of which approach is the correct one, the Court finds that the false answers were not deliberate *and* that the second prong of *McDonough* is not satisfied.

Under the second prong of *McDonough*, the Court "must determine if it would have granted the hypothetical challenge" for cause if the juror had responded accurately. *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002); *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006). "Challenges for cause are generally based on actual bias, implied bias, or inferable bias." *Greer*, 285 F.3d at 171. These categories do not always elucidate the analysis and there is overlap (and sometimes confusion) in how they are discussed in some of the cases. Nevertheless, it is important to attempt to delineate. Actual bias is "bias in fact," due either to the juror admitting partiality or a judge finding actual partiality based on the juror's *voir dire* answers. *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). Implied bias is "bias presumed as a matter of law" due to a juror's relationship to the parties or connection to the actual crime itself. *Greer*, 285 F.3d at 171–72. Finally, a judge may infer bias when actual or implied bias does not apply. "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse

---

[3] In an amicus curiae brief, the National Association of Criminal Defense Lawyers also argues that deliberateness is not required under *McDonough*. *See* Dkt. No. 614.

13

the juror for cause, but not so great as to make mandatory a presumption of bias." *Id*. at 171 (quoting *Torres*, 128 F.3d at 47). The ensuing determination of whether the juror was biased or prejudiced against the defendant may be "affected both by whether the nondisclosure was deliberate and, if it was, by the juror's motivation to conceal the truth." *United States v. McCoy*, 995 F.3d 32, 51 (2d Cir. 2021); *see also Greer*, 285 F.3d at 172–73. It is important to consider whether a juror's answer was dishonest in the second part of the test "because it can show 'a personal interest in this particular case that was so powerful as to cause the juror to commit a serious crime [by lying during *voir dire*].'" *United States v. Nix*, 275 F. Supp. 3d 420, 438 (W.D.N.Y. 2017), *aff'd sub nom. United States v. McCoy*, 995 F.3d 32 (2d Cir. 2021) (alteration in original) (quoting *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989)).

The *McDonough* inquiry is restricted by Federal Rule of Evidence 606, which states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). As explained in this Court's prior opinion, the rule is subject to certain exceptions inapplicable here. *See* Feb. 25, 2022 Op. & Order, at 12. The rule, which embodies "long-accepted Federal law," is an important safeguard on the integrity of the jury trial system. *Tanner v. United States*, 483 U.S. 107, 120–21 (1987) (rejecting a constitutional challenge to the rule). It enables "full and frank discussion in the jury room" and secures "jurors' willingness to return an unpopular verdict." *Id*. Without the rule, the finality of verdicts, upon which the system relies, would be seriously disrupted. *See id.* at 120–21, 124–25; *see also Warger v. Shauers*, 574 U.S. 40, 45, 49–50 (2014). And though not at issue in this case, the rule plays a

14

critical role in those extreme cases where dissatisfied litigants may be tempted to harass or

tamper with jurors in an attempt to impeach the verdict.  *See Tanner*, 483 U.S. at 120–21.

Finally, what is not at issue in resolving this motion is whether the Defendant would have

exercised a peremptory strike against this juror had he accurately disclosed his prior sexual

abuse.  Although the Defendant argues in her pre-hearing briefing that she is also entitled to a

new trial because Juror 50's failure to disclose his history denied her the opportunity to exercise

her peremptory challenges, that is not the law in federal court.  Indeed, in making this argument

she cites only decisions that relied on New Jersey state law.  Maxwell Br. at 46–47.  But the rule

in New Jersey state courts is different than the rule that binds this Court.  *See State v. Scher*, 650

A.2d 1012, 1019–20 (N.J. App. Div. 1994) (explaining that New Jersey's "rule differs from its

federal counterpart" of *McDonough*).  Under *McDonough*, a defendant seeking a new trial must

show that "a correct response would have provided a valid basis for a challenge *for cause*."  464

U.S. at 555–56 (emphasis added).  A desire to "wipe the slate clean simply to recreate the

peremptory challenge process" is not enough.  *Id.*; *see also Shaoul*, 41 F.3d at 816 (concluding

that a defendant failed to satisfy the second prong of *McDonough* where the defendant "may

certainly exclude such jurors by the use of peremptory challenges, but he has no basis for

arguing that a district court is required to sustain such a challenge for cause").  That difference

arises in part from the fact that "[u]nlike challenges for cause, peremptory strikes are not

constitutionally required."  *Torres*, 128 F.3d at 43 n.4.

## III.   ANALYSIS

### A.  *McDonough* Prong One

The Court begins with what Juror 50's testimony at the evidentiary hearing makes plain:

Juror 50 provided inaccurate answers to Questions 25, 48, and 49 of the questionnaire.  For each

15

of these questions, Juror 50 answered "No" on the questionnaire, but testified that the correct

answer would have been "Yes (self)" for Questions 25 and 48 and "Yes (friend or family

member)" for Question 49.  Hearing Tr. at 7–12.  Those three inaccurate answers all stem from

Juror 50's failure to disclose that he was sexually abused as a child.  Under the Defendant's

interpretation of *McDonough*, that would be sufficient to satisfy the first prong.  But the

Government's interpretation requires that the Court make a further finding that the inaccurate

answers were made deliberately.

    After close consideration of the record, including Juror 50's testimony under oath, the

Court concludes that Juror 50's answers to the questionnaire, while incorrect, were not

deliberately inaccurate.  Rather, for the reasons that follow, the Court credits Juror 50's

explanation that he "flew through" the questionnaire, misread the relevant questions, and

provided inadvertently inaccurate responses.  *Id*. at 12.

    As a preliminary matter, Juror 50 testified under oath pursuant to a grant of immunity.

*Id*. at 5.  He faces the possibility of perjury charges if he testified falsely at the hearing.  Juror 50

therefore had a strong incentive to testify truthfully.

    Moreover, the Court credits Juror 50's testimony in light of his demeanor in testifying

under oath.  At the hearing, the Court was able to closely observe Juror 50 as he testified and to

assess his reaction to questions, including those he appeared not to expect, as well as to the

overall tone of his answers.  Juror 50 answered the Court's questions in a calm and

straightforward manner.  He was apologetic for his carelessness.  His tone, demeanor, and

responsiveness gave no indication of false testimony.

    Further, Juror 50's answers to the Court's questions were logical explanations and

generally internally consistent.  He testified that his attention to the questionnaire was distracted

by several factors, among them the several hours that he had to wait in the courthouse's security line, to wait in the room to hear the Court's instructional video, and then to begin answering questions.  And while he waited, he says, he was distracted by his thoughts on the recent end of a romantic relationship.  *Id.* at 14 ("I didn't have a phone, I didn't have a book, I was sitting there twiddling my thumbs thinking about the break up that just happened a few weeks prior and sitting in my feelings and not very focused.").  That explanation is not only consistent with his other hearing testimony, but also with his sworn statements months earlier at oral *voir dire*.  *See* Nov. 16, 2021 Voir Dire Tr. at 133 (stating that he "just got out of a relationship and I didn't want to see anything regarding them").

Distractions continued, and increased, as he neared the end of the questionnaire.  Juror 50 testified that he was seated near the table where prospective jurors dropped off their completed questionnaires.  As more potential jurors completed their questionnaires, the noise and bustle at that table increased.  And as more potential jurors completed their questionnaires, he "felt rushed" to finish so that he would not be the last to turn in a questionnaire.  Hearing Tr. at 18.  Moreover, the Court credits Juror 50's candid admission that he was not concerned with following the Court's instructions, and did not proceed with "diligence," because he had concluded that he would not be selected as a juror given the "sheer volume of people that were there."  *Id.* at 13, 18; *see also id.* at 40.

This explanation coheres with Juror 50's testimony that his sexual abuse history was not a salient or front-of-mind consideration as he completed the questionnaire.  He repeatedly testified that he does not often think about his sexual abuse.  *See, e.g.*, *id.* at 16, 22.  The summary of the charges, which do not use the terms "abuse" or "assault" but explained that the Defendant had been charged with a total of six counts that involved "travel to engage in criminal

17

sexual activity" and "sex trafficking of a minor," did not cause him to think of his own sexual

abuse.  Hearing Tr. at 47; Questionnaire at 4.  The Court finds that explanation to be reasonable.

Last, the Court finds Juror 50's explanation that his answers were made inadvertently to

be the most logical explanation of his overall behavior.  Shortly after trial, Juror 50 readily

disclosed the fact of his sexual abuse in several media interviews in which he used his real first

name and pictures of himself.  Finding that Juror 50 intentionally provided false answers on the

questionnaire requires concluding that he willingly disclosed his deliberate and unlawful

deception in public interviews.  The more likely explanation for Juror 50's behavior is the one to

which he credibly testified: Juror 50's inaccurate answers were provided inadvertently, and he

was made aware of his mistake only after he completed his media interviews.  That explanation

is corroborated by a video recording of Juror 50's interview with the *Daily Mail*, which the

Defendant entered into the record and previously cited in support of her claim for a new trial.

*See* Maxwell Br. at 39–40.  In that video, Juror 50 states that he was asked only about the sexual

abuse history of his friends and family but not his own.  When the interviewer asks Juror 50

about Question 48 in particular, he appears genuinely and completely surprised to learn that the

questionnaire included this question.  That moment of surprise is consistent with Juror 50's

hearing testimony that this was the moment at which he realized he may have made a serious, but

honest, mistake.  *See* Hearing Tr. at 15 (stating that he first learned that the questionnaire may

ask about his own sexual abuse history "during [his] Daily Mail interview with the reporter

Laura Collins").

The Defendant raises several arguments for why the Court should instead find that Juror

50 committed perjury at the hearing and that his answers on the questionnaire were intentionally

inaccurate.  The Court is not persuaded.  *First*, the Defendant characterizes much of Juror 50's

A-336

testimony as "self-serving" and "rehearsed."  Maxwell Post-Hearing Br. at 7, 10, Dkt. No. 649.

Juror 50 certainly appeared prepared to answer the Court's questions, but that is consistent with

what any good counsel would have recommended he do.  It is unremarkable that Juror 50 would

have reflected on his experience in anticipation of testifying under oath and was prepared for

anticipated questions.  The Court did not detect in Juror 50's responses any fabrication or

improper rehearsal of a false narrative.  *Cf. Singh v. Barr*, 823 F. App'x 10, 12 (2d Cir. 2020)

(summary order) (declining to discount a witness's testimony as "rehearsed" where that witness

did "what any reasonable person . . . would do: namely, prepare for questioning at a potentially

life-altering hearing").  As for being "self-serving," as noted above, Juror 50's personal interests

were served by testifying truthfully at the hearing so as not to face criminal perjury charges.

  *Second*, the Defendant argues that it is not credible that Juror 50 "did not see the word

'you' and the answer 'Yes (self)'" for Question 48.  Maxwell Post-Hearing Br. at 8.  She notes

that he answered fifty-two prior questions and follow-up questions with the word "you" and that

it is not plausible that Question 48 would ask only about friends and family.  Yet the Court, in

several lines of questioning, tested exactly this component of Juror 50's testimony and is

satisfied by his answers.  The Court first observed to Juror 50 that throughout the questionnaire,

he "appeared to have followed the instructions."  Hearing Tr. at 19.  When asked how he

correctly followed the instructions elsewhere, Juror 50 explained, as he had previously in his

testimony, that for questions appearing earlier in the questionnaire, he "was still . . . in focus"

and so more able to respond accurately.  *Id*.  That focus waned, he explained, in reading later

questions, including Question 48.

  Additionally, the Court observed that many questions were structured like Question 48,

asking jurors both about their personal experience and providing options to check for "yes self,

yes friend or family, or no." *Id.* at 15, 21. Consistent with his explanation that he skimmed the questionnaire, he testified that he "did not pick up on" that pattern when filling out the questionnaire, *id.* at 15, and read only "the friend or family" and "missed that 'have you,' and then 'yes self' while reading," Question 48, *id.* at 21. And when asked a follow-up question, Juror 50 said he was not "surprised" at the time, but only surprised "thinking now" that the questionnaire had asked about the sexual abuse history of friends and family but not about a juror's own sexual abuse history. *Id.* at 21–22. The Court finds that Juror 50's answers to each of these lines of questioning were reasonable and credible.

*Third*, the Defendant argues that, as to Question 49, Juror 50 was inconsistent in first stating that he was sexually abused by "a family member, who is no longer part of the family," but then stating that he "never considered [the stepbrother] part of [his] family even when they lived with us for a few years." Maxwell Post-Hearing Br. at 9–10 (quoting Hearing Tr. at 8, 11). The Court acknowledges the tension between these two statements, but does not agree that tension suggests Juror 50 deliberately concealed his stepbrother's abuse. Juror 50's explanation of his answer to Question 49 proceeded in three stages. He clarified, first, that on November 4, he "didn't even consider . . . at all" whether his stepbrother's conduct was responsive to Question 49 as he "flew through" the questionnaire. Hearing Tr. at 11–12. At the hearing, he initially stated that "No" was an accurate answer because, as the Defendant notes, he "never considered" the stepbrother to be a member of his family. *Id.* And finally, when asked whether, "[a]s [he] sit[s] here now," what his answer to Question 49 would be, Juror 50 said "it would have been yes" because "by law, by marriage, that person was [his] stepbrother." *Id.* at 12–13. In short, it was only after Juror 50 was made to reflect on the question and its answer that he reached an

accurate response.  Yet Juror 50 did not read closely Question 49 or consider carefully his answer to it on November 4.

These evolving answers do not reflect Juror 50 changing his story so much as an explanation of a complex and fraught set of events and relationships from decades before.  The Court is cognizant that jurors may well assign their own emotional connotations to terms like "family" rather than interpret it in the technical or legal manner as would an attorney or judge.  *Cf. United States v. Stewart*, 317 F. Supp. 2d 432, 438 (S.D.N.Y. 2004) ("Would a reasonable juror necessarily consider an ex-girlfriend to be 'someone close to him?'").

*Fourth*, the Defendant argues that Juror 50's proclaimed reluctance to disclose his sexual abuse is inconsistent with his post-trial conduct.  Maxwell Post-Hearing Br. at 5–6, 10–11.  In particular, Juror 50 testified that he "[doesn't] tell very many people" about his abuse.  Hearing Tr. at 22.  Yet he conducted several interviews with international media outlets in which he revealed his sexual abuse history.  Further, Juror 50 posted a comment on social media to Annie Farmer, a witness in this case, in which he "thanked her for sharing [her] story."  *Id*. at 43.  These prominent disclosures of his sexual abuse, the Defendant argues, contradict Juror 50's statement that he rarely disclosed that abuse.

The Court confronted Juror 50 at length about each of these purported contradictions.  As to his interviews, the Court asked Juror 50 how he "reconcile[d] what [he] just said" about nondisclosure with his high-profile disclosure in media interviews.  *Id*. at 22.  Juror 50 primarily provided two overlapping explanations.  He first testified that he "didn't think this would happen."  *Id*.  That is, he explained, he "did not think that anybody— certainly [his] family or friends would find this out," despite the significant media attention that the case had received.  *Id*. at 23.  When the Court returned to this issue later in the hearing, Juror 50 added that in the

21

interviews he "wasn't using [his] full name," which Juror 50 apparently understood reduced the

chance that people that knew him would draw the connection. *Id*. at 42. And, further, he

explained that several friends that contacted him after the trial were unaware of the trial

occurring, so he assumed his post-trial media interviews would not attract substantial attention.

Second, Juror 50 simultaneously acknowledged that because of his interviews, the fact

that he was abused "would be a known fact in the world." *Id*. at 24. He explained that he had

made a conscious decision in favor of disclosure because, "[a]fter sitting on this trial for several

weeks and seeing the victims be brave enough to give their stories, [he] felt" that he could too.

*Id.*; *see also id*. at 42 ("I'm also not ashamed about it. It's something that happened, and it's

something that is relatively common that happened to multiple people throughout the world.").

In short, Juror 50's willingness to disclose his sexual abuse changed to some extent

between November 4, 2021, and January 2022. He made a conscious decision to share the fact

of his sexual abuse with a wider circle of people than he had prior to the time that he completed

the questionnaire. At the same time, he presumed—in hindsight, mistakenly—that his

interviews, given without his last name and predominantly to international media outlets, would

not be seen by his friends or family in his life who, he believed, had not followed the trial up to

that point. That explanation of partial public disclosure is further consistent with the fact that in

his interviews he related only the fact that he had been abused, not any details of what had

occurred. Juror 50's wishful thinking—or as the Government suggests, naivety—with respect to

his post-trial interviews does not suggest that when he completed his questionnaire, he intended

to deceive. *See* Government Post-Hearing Br. at 10 n.4, Dkt. No. 648.

The Court also asked Juror 50 about his social media interaction with Annie Farmer. On

Twitter, Farmer shared an article that contained an interview with Juror 50 and she said that

Juror 50 "was brave enough to come forward," to which Juror 50 responded by "thank[ing] her

for sharing her[] [story] as well."  Hearing Tr. at 43.  He explained that he had "randomly seen"

Farmer's post and "felt like [he] wanted to comment."  *Id*.  That comment was unlikely to be

seen by Juror 50's friends and family, he speculated, because at the time he had only "two

followers," which "were random things," and he did not "normally use" Twitter.  *Id*.  The Court

concludes that Juror 50's comment to Annie Farmer on Twitter, made in January 2022, does not

provide a basis to question his testimony that as of November 4, 2021, he did not tell many

people about his sexual abuse.

At bottom, based on Juror 50's demeanor and consistent responses while testifying under

oath pursuant to a grant of immunity, the Court finds Juror 50 credible.  His failure to attend with

diligence and care to the questions on the jury selection questionnaire is frustrating and

regrettable, but it was not motivated by intentional deception.  In light of his testimony, the Court

finds that Juror 50's answers to Questions 25, 48, and 49 were not deliberately incorrect.

### B.  *McDonough* Prong Two

Assuming without deciding that Juror 50's inadvertently inaccurate responses satisfy the

first prong of *McDonough*, the Defendant has, in any event, not established that the Court would

have excused Juror 50 for cause if he had answered the questions during jury selection

accurately.  *See McCoy*, 995 F.3d at 46.  At the hearing, the Court asked Juror 50 the same set of

questions that was asked of all prospective jurors during *voir dire* who indicated prior personal

experience with sexual abuse.  Juror 50's credible responses to those questions under oath at the

hearing established that he would not have been struck for cause if he had provided accurate

responses to the questionnaire.

23

A-341

### 1. Actual Bias

"Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Torres*, 128 F.3d at 43.  A court may find a juror to be partial because the juror admits as much, or based on the juror's other *voir dire* answers.  *Id.* (citing *United States v. Haynes*, 398 F.2d 980, 984 (2d Cir. 1968)).  This finding is "based upon determinations of demeanor and credibility."  *Id.* at 44 (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)).

The record does not support a finding that Juror 50 was actually biased.  As explained above, the Court finds Juror 50's sworn testimony to be credible overall.  He was responsive and forthright, and his demeanor evinced that he answered the Court's questions truthfully.  He repeatedly and credibly affirmed that his personal history of sexual abuse would not affect his ability to serve as a fair and impartial juror "in any way."  Hearing Tr. at 25; *see also id.* at 9, 10, 13.  He testified that there was "absolutely in no way" anything about his experience that would interfere with his "ability to assess the credibility of witnesses alleging sexual abuse," and that he would be able to conclude such a witness was not testifying truthfully if that was what the evidence suggested.  *Id.* at 26.  He testified that he did not harbor any bias against the Defendant nor any bias in favor of the Government.  Indeed, he did not want to put his "thumb on the scale in any direction."  *Id.*  He declared that he had "no doubt" as to his ability to be fair to both sides. *Id.* at 27.  As noted above, the Defendant dismisses these responses as "self-serving."  Maxwell Post-Hearing Br. at 7.  The Court disagrees; it finds each of these responses to be credible.

Moreover, Juror 50's hearing testimony is corroborated by his answers during *voir dire*. Without hesitation, he declared that he would follow the Court's instructions on the law, he "absolutely" could decide the case based on the evidence or lack of evidence presented in court,

24

he had no doubt about his ability to be fair to both sides, and he had no reason to think otherwise. Voir Dire Tr. at 128, 130, 134.

The Court is unpersuaded by the Defendant's arguments to the contrary. The Defendant argues that Juror 50 was actually biased because his post-trial statements reveal that at the time of *voir dire* he regarded himself as a non-neutral advocate for the victims. Maxwell Post-Hearing Br. at 6.[4] In particular, she relies on Juror 50's post-trial interviews, in which he "proclaim[ed]" that the guilty verdict was for "for all the victims." *Id.* But these *post-trial* statements do not establish that Juror 50 was actually biased against the Defendant. The evidence at trial established that there was more than one victim of the Defendant's crimes, making Juror 50's post-trial statement reasonable. And, more importantly, Juror 50's view of the Defendant after the thirteen-day trial, during which he heard evidence that swayed him and eleven other jurors to convict the Defendant on five counts, does not shed light on any bias he allegedly harbored "*before* he heard the evidence presented." *Stewart*, 317 F. Supp. 2d at 439–40 & n.4 (emphasis in original) (rejecting argument that juror's post-trial statements that the verdict was "a victory for the little guy who loses money in the markets" and that the defendant "thought she was above everything" revealed bias).

### 2.  Implied and Inferred Bias

The Defendant's central argument is that the Court should imply—based on Juror 50's personal history of sexual abuse, post-trial actions, and hearing testimony—that Juror 50 was biased against the Defendant. She similarly argues that the Court should infer Juror 50's bias

---

[4] In her pre-hearing briefing, the Defendant reserved arguing that Juror 50 was actually biased in the event the Court held an evidentiary hearing. Maxwell Br. at 39. The Defendant does not expressly argue that Juror 50 was actually biased in her post-hearing briefing, but the Court understands this argument to raise an actual bias issue. *See* Maxwell Post-Hearing Br. at 2–3.

based on the purported similarities between his personal history and the issues at trial.  Because
these arguments overlap, the Court addresses implied and inferred bias together.[5]

"Implied bias" is "a concept that is reserved for 'extreme situations,' warranting a
conclusive presumption of bias as a matter of law."  *McCoy*, 995 F.3d at 48 (internal quotations
omitted) (quoting *Greer*, 285 F.3d at 172).  Such bias is "attributed to a prospective juror
regardless of actual partiality" because the law presumes that "an average person in the position
of the juror in controversy would be prejudiced."  *Torres*, 128 F.3d at 45 (citing *United States v.
Wood,* 299 U.S. 123, 133 (1936)); *see also Haynes*, 398 F.2d at 984.  The category applies to
"certain highly limited situations where a juror discloses a fact that creates such a high risk of
partiality that the law requires the judge to excuse the juror for cause."  *Torres*, 128 F.3d at 41.
Namely, "jurors who are related to the parties or who were victims" or otherwise involved in the
alleged crime itself are impliedly biased.  *Id.* at 45; *see also Greer*, 285 F.3d at 172.

On the other hand, a finding of inferred bias is a determination within the trial court's
discretion.  *Greer*, 285 F.3d at 171; *see also McCoy*, 995 F.3d at 49.  "Bias may be inferred when
a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant
granting the trial judge discretion to excuse the juror for cause, but not so great as to make
mandatory a presumption of bias."  *Greer*, 285 F.3d at 171 (quoting *Torres*, 128 F.3d at 47)).
The inquiry is whether the juror's responses at *voir dire* "permit an inference that the juror in
question would not be able to decide the matter objectively."  *Torres*, 128 F.3d at 47.  If such
facts are elicited, "then, just as in the situation of implied bias, the juror's statements as to his or
her ability to be impartial become irrelevant."  *Id.*  However, "a judge may—particularly when

---

[5] It is unsettled in the Second Circuit whether implied or inferred bias may serve as the basis for a post-trial
allegation of juror partiality. *See Greer*, 285 F.3d at 172.  Because the Court determines that Juror 50 is neither
impliedly nor inferably biased, it need not resolve this issue.

considering whether some marginal types of disclosed facts are enough to show inferable bias—ask about a juror's impartiality and might be persuaded by the force of the juror's assurance." *Id.* at 47 n.12. For example, in *Torres*, the Second Circuit held that the trial court did not abuse its discretion when it concluded during *voir dire* that a juror was inferably biased because she had engaged in money-structuring activities that were highly similar to the conduct charged in the case. But the Second Circuit made clear that the district court would not have erred if it had kept the juror. *Id.* at 46–48.

The Court concludes that Juror 50 is neither impliedly nor inferably biased. First, none of the "extreme situations" in which the Court must conclusively presume bias as a matter of law apply here. *McCoy*, 995 F.3d at 48. Juror 50 was not a victim of the charged crime itself, nor is he related to any of the attorneys, witnesses, victims, or other case participants. *See Nix*, 275 F. Supp. 3d at 451. Thus, the Court would not have granted a hypothetical challenge for cause based on implied bias even if Juror 50 had provided correct answers to the questionnaire.

Second, Juror 50's personal experience of sexual abuse does not evidence partiality sufficient to infer that Juror 50 was biased against the Defendant. The Court need not imagine a wholly hypothetical universe for this conclusion. That is because the *voir dire* provides highly relevant indications of how the parties and Court would have reacted had Juror 50 provided accurate answers during jury selection. A review of the *voir dire* of jurors who responded "yes (self)" to Question 48 reveals that it is unlikely that the Defendant would have challenged Juror 50 for cause. It also reveals that the Court would not have granted a for-cause challenge had one been raised. *See McCoy*, 995 F.3d at 49.

Eight prospective jurors who answered "yes (self)" to Question 48 proceeded to *voir dire*. The Court asked every follow-up question requested by the Defendant with regard to a juror's

A-345

personal experience with sexual assault, abuse, or harassment; although, for a majority of these

eight jurors, the Defendant did not propose any follow-up questions.  The Defendant did not

challenge any of these prospective jurors for cause on the basis of the juror's answer to Question

48.

Some of these jurors disclosed experiences distinct from that disclosed by Juror 50—for

example, sexual harassment on the subway.  Two jurors, however, disclosed experiences similar

to that of Juror 50, neither of whom was challenged for cause.  Juror A reported that she was

"sexually molested by an uncle when [she] was 12, 13."[6]  Although this juror was even closer in

age to the victim-witnesses when they first were abused, and presumably abused by "someone

familiar to [her] . . . who was part of [her] life," Maxwell Post-Hearing Br. at 4, the Defendant

did not propose any follow-up questions or challenge the prospective juror for cause.  Like Juror

A, Juror 50 credibly affirmed that his personal experience would not impact his ability to be fair

or impartial nor would the subject matter "upset [him] in such a way that would distract [him]

from [his] duty as a juror."  *See* Hearing Tr. at 26–27.  Next, Juror B explained that just two

years before jury selection, she had reported that a friend was being coerced and sexually abused

by a professor.  At the Defendant's request, the Court asked whether the experience might in any

way interfere with her ability to be fair and impartial to the extent there may be issues in the case

that arise around reporting or not reporting allegations related to sexual abuse.  She affirmed that

it would not, and the Defendant did not challenge her for cause.  Like Juror B, Juror 50 credibly

affirmed at the March 8 hearing that "issues of reporting or not reporting sexual abuse that might

---

[6] To further the important interest of protecting juror anonymity and privacy, the Court has redacted references to specific juror numbers.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006); *Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 511–12 (1984).  In this opinion, Juror A refers to Juror ▮  Juror B refers to Juror ▮ and Juror C refers to Juror ▮  The Court has provided an unredacted copy of the Opinion & Order to the parties and will file an unredacted copy under seal.

be discussed at trial would [not] interfere with [his] ability to be fair or impartial as a juror in the case." *See* Hearing Tr. at 27.[7]

Accordingly, even if Juror 50 had disclosed his abuse during jury selection, the Court would not have granted a hypothetical challenge for cause, as consistent with other prospective jurors who disclosed similar experiences. This is so because our system of trial by jury does not exclude individuals with experiences similar to the issues at trial when those individuals can serve fairly and impartially. This Court has presided over a murder trial in which a juror who had a family member murdered was not struck for cause. So too victims of fraud serve faithfully in fraud trials and individuals who have been discriminated against have served without bias in discrimination trials.

So the critical question, as for any juror, is whether the juror has the ability to decide the case based only on the evidence presented in court, not extraneous information, and without bias, prejudice, or sympathy. *See U.S. ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970). Juror 50 repeatedly and unequivocally affirmed his ability to do just that. And for all the reasons articulated above, the Court found that testimony credible. To imply or infer that Juror 50 was biased—simply because he was himself a victim of sexual abuse in a trial related to sexual abuse and sex trafficking, and despite his own credible testimony under the penalty of perjury, establishing that he could be an even-handed and impartial juror—would be tantamount to concluding that an individual with a history of sexual abuse can never serve as a fair and

---

[7] In her pre-hearing briefing, the Defendant raises that out of 694 prospective jurors, the parties jointly agreed to excuse 67 of the 114 prospective jurors who answered "yes (self)" to Question 48, and the "Court granted" the Defendant's challenges to 23 and the Government's challenges to 2 additional prospective jurors who answered "yes (self)." Maxwell Br. at 9–10. But that is a mischaracterization. First, a significant number of those prospective jurors stated that they could not be fair and impartial for a variety of reasons. Second, and as noted above, all of those excusals "resulted from the parties' agreement, not from the court's analysis of each challenged juror's ability to be impartial." *Stewart*, 317 F. Supp. 2d at 439. "The question now is whether [Juror 50's] omission reveals a bias sufficient to support a for-cause challenge." *Id.* As explained above, it does not.

29

impartial juror in such a trial.  That is not the law, nor should it be.  *See Gonzales v. Thomas*, 99 F.3d 978, 989–90 (10th Cir. 1996) ("To hold that no rape victim could ever be an impartial juror in a rape trial would, we think, insult not only all rape victims but also our entire jury system."); *Buckner v. Davis*, 945 F.3d 906, 914–15 (5th Cir. 2019) (affirming conclusion that juror who failed to disclose childhood abuse was not impliedly biased in conviction for sexual assault of a child).  Thus, the Court finds no basis to infer that Juror 50 is biased.

The Defendant's arguments to the contrary do not disturb the Court's conclusion that Juror 50 was neither impliedly nor inferably biased.  *First*, the Defendant argues that Juror 50 was impliedly biased because of multiple "dishonest answers."  Maxwell Br. at 36; Maxwell Post-Hearing Br. at 11.[8]  But this is not a case involving a juror's extreme deceit due to a desire to be selected.  By contrast, in *United States v. Daugerdas*, on which the Defendant extensively relies, a juror "created a totally fictitious persona in her drive to get on the jury."  867 F. Supp. 2d 445, 473 (S.D.N.Y. 2012), *vacated and remanded on other grounds*, *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015).  The court granted the defendant's motion for a new trial, emphasizing the "deliberate lies engineered to create a fictitious, 'marketable' juror" warranted "extraordinary relief."  *Id*. at 468.  Such is not the case here.  The Court credits Juror 50's explanation that his nondisclosure was an "inadvertent mistake," not intentional deception.  Hearing Tr. at 14–15.  Juror 50 explained how the circumstances surrounding his completion of the questionnaire—including his recent romantic breakup, that he had no expectation of being selected, the technical issues and ensuing long wait to begin the questionnaire, and the generally distracting environment—resulted in his "skimming" the questionnaire and missing the personal

---

[8] The Defendant argued that these repeated lies included Juror 50's use of social media in her pre-hearing briefing. Maxwell Br. at 36.  For the reasons stated in this Court's February 25 Opinion, that Juror 50 used social media accounts *after* the completion of trial does not establish that he lied about having been inactive on social media *before* trial.  Feb. 25, 2020 Op. & Order, at 9–10.

aspect of Questions 48 and 49.  As he repeatedly explained, he never expected or even hoped to

be selected.  The Court finds Juror 50's testimony to be credible, forthright, and responsive and

does not find as a factual matter that Juror 50 deliberately lied in order to be selected as a juror.

The Defendant's reliance on *Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013), is

similarly unavailing.  *See* Maxwell Post-Hearing Br. at 11.  There, a juror failed to disclose that

her husband had previously threatened her with a shotgun during jury selection for a bank

robbery case in which the defendants threatened the bank tellers at gunpoint.  However, the juror

had told a "litany of lies" during *voir dire* bearing on a number of issues, including her

daughter's incarceration and her own substance abuse issues.  *Id*. at 161–62, 168.  By contrast,

Juror 50's inadvertent nondisclosure, while implicating multiple questions on the questionnaire,

stems only from his experience of sexual abuse.

*Second*, the Defendant contends that Juror 50 was biased due to the "similarities between

[his] personal experiences . . . and the issues being litigated."  Maxwell Br. at 30 (quoting

*Daugerdas*, 867 F. Supp. 2d at 472).  She expressly disavows arguing "that *every* person who has

been a victim of sexual assault or sexual abuse was subject to a 'mandatory' challenge for cause

based on implied bias."  Maxwell Reply at 17.  Distancing from that position is necessary—

again, it is not the law that an individual with a history of sexual abuse cannot serve as a fair and

impartial juror.  Rather, the Defendant finesses the argument by saying that Juror 50's personal

history is sufficiently similar to the issues at trial so as to warrant a mandatory finding of implied

bias, or alternatively, a discretionary finding of inferred bias, and points to Juror 50's testimony

and post-trial statements as evidence that these purported similarities made him biased.  Maxwell

Br. at 31–32; Maxwell Post-Hearing Br. at 5–6.

The Court is unpersuaded.  First, the Second Circuit has not held that bias must be implied when a juror has a personal experience similar to the issues at trial.  The Defendant's only in-circuit decision is the district court opinion in *Daugerdas*.  *See* Maxwell Br. at 30–35; Maxwell Post-Hearing Br. at 5.  In passing, the *Daugerdas* court noted that "[c]ourts imply bias 'when there are similarities between the personal experiences of the juror and the issues being litigated.'"  867 F. Supp. 2d at 472 (quoting *United States v. Sampson*, 820 F. Supp. 2d 151, 164 (D. Mass. 2011)).  But the court resolved the motion on other grounds—it did not imply bias because that juror had similar experiences to those at issue in the trial, but instead (as discussed above) implied bias because of that juror's "brazen[]," "deliberate," and "repeated lies" and creation of "a totally fictitious persona in her drive to get on the jury."  *Id.* at 472–74.

The Second Circuit has made clear that implied bias is an intentionally narrow category. The circuit has "consistently refused 'to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where . . . there is no showing of actual bias or prejudice.'"  *Torres*, 128 F.3d at 46 (quoting *United States v. Brown*, 644 F.2d 101, 104–05 (2d Cir. 1981)); *see also United States v. Garcia*, 936 F.2d 648, 652 (2d Cir. 1991).  As noted above, the *Torres* court held that it was not an abuse of discretion for the trial court to *infer* that a juror was biased when she engaged in money structuring activities that were similar to conduct charged in the case.  128 F.3d at 46–47.  But the circuit "decline[d] to hold as a general matter that, where a juror has engaged in conduct similar to that of the defendant at trial, the trial judge *must presume* bias."  *Id.* at 46 (emphasis added).  As the court explained, "[s]uch cases are unlikely to present the 'extreme situations' that call for mandatory

32

removal."  *Id.*  Accordingly, this Court refuses the Defendant's invitation to expand this "strictly limited" category of "truly 'exceptional'" circumstances absent binding authority.  *Id.*

Second, even if a court must imply bias on the basis of a juror's similar experience, the *voir dire* in this case of comparable jurors evinces that Juror 50's personal experience is not so similar to the issues in this case as to constitute a "truly exceptional" situation.  Nor is it sufficiently similar to warrant the Court's exercise of discretion to infer bias.  In arguing that Juror 50's experience is sufficiently similar, the Defendant highlights that Juror 50 was sexually abused as a minor on multiple occasions by "two people who were friends"—his stepbrother, who was "someone familiar to him . . . who was part of his life," and the stepbrother's friend. Maxwell Post-Hearing Br. at 4.  He also delayed reporting the abuse.  *Id.*  But the Defendant overlooks the important differences.  Juror 50 was younger—ages 9 and 10—than the victims testified they were when they were abused by the Defendant and Epstein.  He disclosed his abuse to his mother in high school, unlike the victims here.  And unlike the period of two years of abuse that Juror 50 endured, some of the trial witnesses testified about several years of abuse. Like Juror A and Juror B, the Court would not have implied or inferred bias if Juror 50 had disclosed his experience during jury selection.  The Court would have asked appropriate follow-up questions proffered by counsel and determined based on the juror's answers to those questions whether he could serve as a fair and impartial juror.

Juror 50 is also dissimilar to the cases from other federal circuits and state courts cited by the Defendant.  For example, as noted above, the Defendant's prominent citation to *Sampson v. United States* is misplaced because the juror in that case told a "litany of lies" bearing on a variety of issues.  724 F.3d at 161.  Thus, unlike here, a "combination of factors" led the First

A-351

Circuit to affirm the district court's order for a new penalty-phase hearing.  Maxwell Br. at 33 (citing *Sampson*, 724 F.3d at 168).

The Defendant next relies on a state court case, *State v. Afshar*, 196 A.3d 93 (N.H. 2018), in which a court granted a new trial in a child sexual assault case when a juror failed to disclose that a babysitter sexually assaulted him when he was five or six years old.  Maxwell Post-Hearing Br. at 5; *see also* Maxwell Br. at 34.  But that juror had previously reported an inability to be impartial in another case involving sexual assault of a minor, and the court concluded that there was "little in the way of logical explanation for how he could have differentiated between the two cases."  196 A.3d at 98.  Such is not the case here.

Finally, in *Burton v. Johnson*, the Tenth Circuit concluded that a juror was impliedly biased when she suffered an abusive relationship with her husband that was highly similar to that of the defendant.  948 F.2d 1150, 1158–59 (10th Cir. 1991).  However, not only had that juror deliberately lied during *voir dire* about the experience, but she was also living in that abusive situation during *voir dire*, the trial itself, and her post-verdict testimony to the court.  *Id.* Conversely, Juror 50 credibly testified that his abuse "happened so long ago" that it is not something that he "think[s] about," "it's not part of who [he is]."  Hearing Tr. at 47.  And again, the Court has not found that Juror 50 deliberately lied about his personal history.

The Defendant's remaining arguments also fail to alter the Court's conclusion that Juror 50 is not biased.  The Defendant contends that Juror 50's post-trial conduct—in particular, his posts on social media and his decision to give interviews using his picture and first name—is "strong evidence" of his bias because he was "not looking to avoid notice," but rather to "soak up his 15 minutes of fame."  Maxwell Post-Hearing Br. at 10–11.  The Court disagrees that this conduct reveals bias.  Whether wise or foolish, the fact that a juror may give an interview

34

following a high-profile trial does not establish bias.  This common occurrence is not necessarily

nefarious.  *See Stewart*, 317 F. Supp. 2d at 440.  Even if Juror 50 were selfishly seeking his

fifteen minutes of fame, his interview "would have garnered the same amount of media attention

after a verdict of acquittal."  *Id*.

The Defendant next argues that "the victims' testimony personally resonated with [Juror

50] in a way that jurors who had not been sexually abused as children would not have felt."

Maxwell Post-Hearing Br. at 5–6.  She argues this is evinced by his explanation that the victims'

testimony inspired him to give post-trial interviews and "tell his story" despite his apparently

normal reserve to discuss his sexual abuse pre-trial.  *Id*.  As noted above in this Court's finding

that Juror 50 is not actually biased, Juror 50's statements regarding his post-trial view of the

verdict and the Defendant do not illuminate pre-trial bias.  A juror's view of a case and defendant

would necessarily change after reviewing thirteen days of evidence that persuaded twelve jurors

of the Defendant's guilt.  *See Stewart*, 317 F. Supp. 2d at 439–40.  It is unsurprising that such an

experience might change the way a juror views his own life experiences.

The Defendant also argues that Juror 50 is biased because "his own experience of sexual

abuse shaped his beliefs about how victims' memories of traumatic events work."  Maxwell

Post-Hearing Br. at 6.  The Defendant relies on Juror 50's statements in post-trial interviews and

his hearing testimony regarding his view of the evidence at trial.  For example, Juror 50 noted at

the hearing that he referenced his abuse in interviews "in order to talk to a reporter about jury

deliberations" and to explain why he "believe[d] a certain way based on all the evidence that was

provided during the trial."  Hearing Tr. at 22.  The Court does not agree, as an initial matter, that

these statements demonstrate bias.  A foundational principle is that jurors rely on their common

sense and life experiences to adjudge guilt.  All jurors have no doubt experienced the recall of

personal memories, some from decades earlier and some involving sensitive or tragic events.  So

long as jurors can be fair and impartial and decide the case based solely on the evidence and the

law as instructed, then it is those "very human elements that constitute one of the strengths of our

jury system, and we cannot and should not excommunicate them from jury deliberations."  *U.S.*

*ex rel. Owen*, 435 F.2d at 818.  In any event, Rule 606(b) bars the Court from relying on these

statements because they pertain to Juror 50's "mental processes concerning the verdict or

indictment."  Fed. R. Evid. 606(b)(1).  "[P]arsing how jurors considered the evidence or their

mental states while hearing testimony is exactly what *Tanner* and the plain text of Rule 606(b)

seek to prevent."  *United States v. Leung*, 796 F.3d 1032, 1036 (9th Cir. 2015) (cited favorably

by *United States v. Baker*, 899 F.3d 123, 132 (2d Cir. 2018)); *see also United States v. Abcasis*,

811 F. Supp. 828, 834 (E.D.N.Y. 1992) (Rule 606 does not permit inquiry into jurors'

discussions or "reactions to the evidence as it developed" (cleaned up)).

Finally, the Defendant argues that Juror 50's statements about his "healing process" and

his hearing testimony as to Question 25 "reveal just how deeply the trauma affected him and

continues to affect him."  Maxwell Post-Hearing Br. at 9.  The Court is unpersuaded.  First, at

the March 8 hearing, the Court rejected the Defendant's proposed follow-up questions on

Juror 50's "healing process" because the Defendant had not proposed comparable questions

during the *voir dire* process for other prospective jurors who indicated a personal history of

sexual abuse on their questionnaires.  Hearing Tr. at 28–29.  Moreover, that an individual has

undergone a "healing process" at some point in his life does not evince that the experience

interferes with his ability to be fair and impartial.  Juror 50 credibly testified that his sexual abuse

is not usually on his mind, that the subject matter would not upset him in a way that would

distract him from his duty, and that he would not think about his own experience in a way that

36

A-354

would prevent him from being fair or impartial.  As discussed above, the minor discrepancies raised by the Defendant do not alter this assessment.[9]

Nor was Juror 50's inaccurate answer to Question 25 unreasonable.  He testified that he understood the question to ask whether he "was robbed or mugged or some sort of crime like that," and that he did not think of his history of "sexual abuse as being a victim of a crime." Hearing Tr. at 10.  Because neither he nor a friend or family member had been robbed or mugged or been the victim of a similar type of crime, he testified, he answered "No" to Question 25. That interpretation of what it means to be a victim of a crime, while technically incorrect, does not evince intentional deception or partiality.  *Cf. United States v. Fell*, No. 2:01-CR-12, 2014 WL 3697810, at *7, *13 (D. Vt. July 24, 2014) (crediting the explanation of a juror that was sexually abused as a child that she "ha[d] not considered [herself] a victim of a crime in all these years" in part because the abuser was "not convicted of any crime"); *McDonough*, 464 U.S at 555 ("[J]urors are not necessarily experts in English usage.  Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges.").  Evidently, other prospective jurors similarly interpreted Question 25 to not refer to uncharged incidents of sexual abuse.  For example, Juror C disclosed being "█████ ███████████████████████," in response to Question 48, but in response to Question 25, reported only that a family member was mugged.  *See* Juror C Questionnaire.

In sum, the Court concludes that Juror 50 is not impliedly or inferably biased.

---

[9] The Defendant also notes that Juror 50 apparently posted on social media about attending therapy to help "deal[] with the stress of the [Maxwell] case."  Maxwell Post-Hearing Br. at 9; *see also* Maxwell Br. at 20.  It is perfectly reasonable for a juror to go to therapy and use of such services does not disqualify a citizen from service.  In fact, courts in this district routinely make counseling services available to jurors following the completion of a trial.

**3. The Court rejects the Defendant's additional post-hearing argument that Juror 50 was biased because he failed to follow instructions.**

In her post-hearing briefing, the Defendant argues that Juror 50's testimony that he was "absolutely not" concerned with following the Court's instructions when filling out the questionnaire is an additional ground for concluding that Juror 50 was unable to serve as an unbiased juror. Maxwell Post-Hearing Br. at 11–12 (quoting Hearing Tr. at 18). The Court disagrees.

Juror 50's testimony established that his lack of diligence was limited to the questionnaire session. Juror 50 showed up for trial on time every day and appeared to the Court that he was attentive throughout trial. There is no indication that Juror 50 failed to follow this Court's instructions during *voir dire*, trial, or deliberations. Juror 50 explained that he was unconcerned with following the Court's instructions while completing the questionnaire because he was "super distracted" and believed that there was no possibility that he would be selected for the jury. Hearing Tr. at 40. *Voir dire*, he testified, was a "different situation." *Id.* at 41. When he answered the Court's questions in person at *voir dire*, he had not been "sitting there for hours . . . thinking about [his] ex." *Id.* He felt confident that he accurately answered all of the Court's questions. This included affirming that he was able to follow the Court's instructions as to the presumption of innocence and the law generally, the prohibition on consuming media on the case or any other extraneous information, and his ability to put any prior knowledge to the side and decide the case based on the evidence, or lack of evidence, presented at trial. Voir Dire Tr. at 128–31. Under oath, he testified that although he "can become distracted," that "had no effect" on him serving and "listening to all the evidence given during the trial." Hearing Tr. at 41. The Court confirmed that Juror 50 "carefully" followed the Court's instructions during *voir dire* and trial. *Id.*

A-356

Even if confined to the questionnaire session, the Defendant argues that Juror 50's "willingness to disregard the Court's instructions" during the questionnaire "shows an inability to serve as an unbiased juror." Maxwell Post-Hearing Br. at 11. She relies on *Dyer v. Calderon*, 151 F.3d 970 (9th Cir. 1998) (en banc), as her sole support. But *Dyer* stands for the distinct proposition that a juror who deliberately lies, and thus commits perjury, cannot be trusted to "stand in judgment of other people's veracity." *Id.* at 983. It does not support that an uncareful and inattentive prospective juror who mistakenly provides an inaccurate response during jury selection is biased. As explained above, the Court does not conclude that Juror 50 committed perjury and lied in an effort to be on the jury. Accordingly, the Court rejects granting the Defendant's motion on this basis.

\* \* \*

In sum, the Court concludes that the evidence in the record does not support finding that Juror 50 was biased. Juror 50's sworn testimony did not reveal actual partiality. And Juror 50 was not impliedly or inferably biased. He was neither a victim nor otherwise involved in the actual crimes. Nor does he have any sort of relationship with any of the parties or case participants. And as consistent with other jurors who answered "yes (self)" to Question 48, the Court would not have granted a for-cause challenge on the basis of Juror 50's personal history of sexual abuse. That Juror 50 was distracted during the questionnaire does not reveal that he was biased or failed to follow the Court's instructions during *voir dire* and the trial. Prong two of the demanding *McDonough* inquiry is not satisfied.

## IV.   CONCLUSION

For the reasons stated above, the Court concludes that Juror 50 testified credibly and truthfully at the post-trial hearing. His failure to disclose his prior sexual abuse during the jury

39

selection process was highly unfortunate, but not deliberate.  The Court further concludes that Juror 50 harbored no bias toward the Defendant and could serve as a fair and impartial juror. The requirements for a new trial under *McDonough* are not satisfied.  The Defendant's motion for a new trial pursuant to Rule 33 is therefore DENIED.

The Court orders the preparation of the presentence investigation report.

With respect to Counts 7 and 8, the Court hereby excludes time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A), from today's date through April 22, 2022.  The Court finds that the ends of justice served by granting this exclusion from speedy trial computations outweigh the interests of the public and the Defendant in a speedy trial on these counts because the pending post-trial motions affect the scheduling considerations set forth in the Government's January 10, 2022 letter.  *See* Dkt. No. 574.  The Defendant consents to this exclusion.  Dkt. No. 650.

The Court will rule on the Defendant's remaining post-verdict motions in due course. Sentencing remains scheduled for June 28, 2022.  This resolves docket numbers 613, 614, 642, 650, and 651.

SO ORDERED.

Dated: April 1, 2022
       New York, New York
                                          _____
                                          ALISON J. NATHAN
                                          United States Circuit Judge
                                          Sitting by Designation

A-358

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/29/22
```

United States of America,

—v—

Ghislaine Maxwell,

Defendant.

20-CR-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, Circuit Judge, sitting by designation:

In 2020, the Defendant Ghislaine Maxwell was indicted for her participation in a scheme to entice, transport, and traffic underage girls for sexual abuse by and with Jeffrey Epstein, her longtime companion. The Government at trial presented extensive witness testimony from multiple victim witnesses and others, as well as corroborating documentary and physical evidence. The testimony and other trial evidence established the Defendant's role in grooming and recruiting underage girls and using the cover of massage to perpetrate sexual abuse.

Following the thirteen-day trial, the Court submitted to the jury the six counts in the Indictment. The jury deliberated for over five days and returned a verdict of guilty on five of the six counts. Two of these counts of conviction charged the Defendant with substantive violations of federal statutes that target sexual abuse of minors—the Mann Act as to Count Four and the Trafficking Victims Protection Act as to Count Six. The other three counts of conviction, Counts One, Three, and Five, charged the Defendant with conspiring with Jeffrey Epstein to violate those same statutes from 1994 to 2004.

Before the Court are the Defendant's post-trial motions making four alternative arguments for vacating some or all of her five counts of conviction. First, the Defendant argues that judgment may be imposed on only one of the three conspiracy counts (*i.e.*, Counts One,

Three, and Five) because they are "multiplicitous"—meaning that they all charge the same offense—and therefore entry of judgment on all three counts would violate the Fifth Amendment's Double Jeopardy Clause.  Second, she requests under Rule 29 of the Federal Rules of Criminal Procedure that the Court acquit her of all counts because there is insufficient evidence for any rational juror to find her guilty beyond a reasonable doubt.  Third, the Defendant moves to vacate Counts One, Three, and Four under Rule 33 because, she claims, the convictions were based on a constructive amendment of, or variance from, the Indictment.  And fourth, she requests that the Court vacate all five convictions because the Government intentionally and prejudicially delayed its prosecution.

With one exception, the motions are denied.  The Rule 29 motion challenging all counts of conviction is denied because the jury's guilty verdicts were readily supported by the extensive witness testimony and documentary evidence admitted at trial.  Further, those counts of conviction matched the core of criminality charged in the Indictment, presented by the Government at trial, and on which the jury was accurately instructed.  The Defendant's contrary claim of a constructive amendment of or variance from the Indictment rests on an implausible and speculative interpretation of a single ambiguous jury note.  In addition, the Court concludes that the Government did not intentionally delay its prosecution and, in any event, the Defendant's ability to prepare a defense was not prejudiced by any delay.

The Court does conclude, however, that the three conspiracy counts charge the same offense, and, accordingly, are multiplicitous.  The Government concedes that Count One is multiplicitous with Count Three but argues that Count Three and Count Five nevertheless involve distinct conspiracies.  The Court concludes that Count Five, like Counts One and Three, charges the Defendant's participation in the same decade-long unlawful agreement with the

A-360

Defendant's continuous coconspirator, Jeffrey Epstein.  The overarching conspiracy—which, as the Government argued and proved at trial, employed a single "playbook" to groom and sexually abuse underage girls—constitutes a single conspiracy offense with multiple victims.  Because the Double Jeopardy Clause prohibits the Court from imposing multiple punishments for the same offense, the Court will enter judgment on Count Three alone among the conspiracy counts.  This legal conclusion in no way calls into question the factual findings made by the jury.  Rather, it underscores that the jury unanimously found—three times over—that the Defendant is guilty of conspiring with Epstein to entice, transport, and traffic underage girls for sexual abuse.

   I.   **The Court grants the Defendant's multiplicity claim.**

   The Defendant was indicted on six counts: (1) conspiracy to entice individuals under the age of seventeen to travel in interstate commerce with intent to engage in sexual activity illegal under New York law, in violation of 18 U.S.C. § 371; (2) enticement of individuals under the age of seventeen to travel in interstate commerce with intent to engage in sexual activity illegal under New York law, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2422, 2; (3) conspiracy to transport individuals under the age of seventeen to travel in interstate commerce with intent to engage in sexual activity illegal under New York law, in violation of 18 U.S.C. § 371; (4) transportation of an individual under the age of seventeen with intent to engage in sexual activity illegal under New York law, and aiding and abetting the same, in violation of 18 U.S.C. §§ 2423(a), 2; (5) conspiracy to commit sex trafficking of individuals under the age of eighteen, in violation of 18 U.S.C. § 371; and (6) sex trafficking of an individual under the age of

A-361

eighteen, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1591, 2.  S2 Indictment, Dkt. No. 187.[1]

In two prior pretrial motions, the Defendant requested that the Court dismiss two of the three conspiracy counts—that is, Counts One, Three, and Five—as multiplicitous, given that all three were premised on the Defendant's participation in a single criminal conspiracy with Epstein.  To punish her for all three counts, she argued, would violate the Double Jeopardy Clause.  In opinions dated April 16, 2021, and August 13, 2021, the Court denied those motions as premature because the Double Jeopardy Clause would prohibit only multiple punishments for the same offense, but not indictments for the same offense.  *United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021) (citing *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006)); *United States v. Maxwell*, No. 20-CR-330 (AJN), 2021 WL 3591801, at *5 (S.D.N.Y. Aug. 13, 2021).

Because the jury convicted the Defendant on all three conspiracy counts, the Defendant now requests that the Court impose judgment on only one of these counts.  Maxwell Br. at 19, Dkt. No. 600.  The Government concedes that Counts One and Three are multiplicitous and agrees that the Court should not impose judgment on Count One, but it argues that Counts Three and Five are distinct offenses premised on distinct criminal conspiracies, and so the Court should impose judgment on both.  Gov. Br. at 24, Dkt. No. 621.

On consent of both parties, the Court will not impose judgment on Count One because it is multiplicitous.  For the reasons that follow, the Court further grants the Defendant's motion to also not enter judgment on Count Count Five because it is also multiplicitous with Count Three.

---

[1] The original and S2 Indictments also included two counts of perjury.  *See* S2 Indictment ¶¶ 28–31.  The Court granted the Defendant's motion to sever those counts for a separate trial.  *United States v. Maxwell*, 534 F. Supp. 3d 299, 321 (S.D.N.Y. 2021).

### A. Applicable law

The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V. That guarantee "serves principally as a restraint on courts and prosecutors," ensuring that a court does not "exceed its legislative authorization by imposing multiple punishments for the same offense."  *Brown v. Ohio*, 432 U.S. 161, 165 (1977); *see also Morris v. Reynolds*, 264 F.3d 38, 48 (2d Cir. 2001).  An indictment is multiplicitous, and therefore implicates double jeopardy, "when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed."  *Maxwell*, 534 F. Supp. 3d at 322 (quoting *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999)).  "A claim of multiplicity cannot succeed, however, 'unless the charged offenses are the same in fact and in law.'"  *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006) (quoting *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir. 2003)).

If the two offenses at issue are both conspiracies charged under the same statute, then the multiplicity inquiry turns on whether the two conspiracies are the same "in fact," meaning they involve the same agreement.  *United States v. Araujo*, No. 17-CR-438 (VEC), 2018 WL 3222527, at *3 (S.D.N.Y. July 2, 2018) (citing *United States v. Ansaldi*, 372 F.3d 118, 124–25 (2d Cir. 2004)); *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004) ("[T]o survive a double jeopardy attack, the government would have to show that the two schemes involved 'distinct' agreements.").  Yet "whether the evidence shows a single conspiracy or more than one conspiracy is often not determinable as a matter of law or subject to bright-line formulations."  *Jones*, 482 F.3d at 72.  Rather, the parties agree that the Court's inquiry is guided by the Second Circuit's *Korfant* factors.  *See, e.g.*, *United States v. Diallo*, 507 F. App'x 89, 91 (2d Cir. 2013)

5

(summary order) (citing *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985) (per curiam)); *United States v. Villa*, 744 F. App'x 716, 720 (2d Cir. 2018) (summary order).  Those factors include:

> (1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*United States v. Macchia*, 35 F.3d 662, 667 (2d Cir. 1994) (quoting *Korfant*, 771 F.2d at 662).  In applying the *Korfant* factors, "no dominant factor or single touchstone" determines whether two allegedly distinct conspiracies "'appear in fact and in law the same.'"  *Id*. at 668 (quoting *United States v. Reiter*, 848 F.2d 336, 340 (2d Cir. 1988)).  Moreover, "the *Korfant* list is not exhaustive, and every case must be assessed on its own terms . . . based on the entire record." *United States v. Maslin*, 356 F.3d 191, 196 (2d Cir. 2004).

    In assessing the evidence, the Second Circuit applies a burden-shifting framework.  The defendant carries the initial burden of making a non-frivolous showing that the two counts in fact charge only one conspiracy.  If met, the burden then shifts to the Government to show, "by a preponderance of the evidence, that there are in fact two distinct conspiracies and that the defendant is not being placed in jeopardy twice for the same crime."  *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir. 2004) (per curiam) (citing *United States v. DelVecchio*, 800 F.2d 21, 22 (2d Cir. 1986)); *see also United States v. Mallah*, 503 F.2d 971, 986 (2d Cir. 1974) (applying this burden-shifting approach post-conviction); *United States v. Hernandez*, No. 09-CR-625 (HB), 2009 WL 3169226, at *9 (S.D.N.Y. Oct. 1, 2009).

A-364

### B.  Analysis

A further summary of the two counts at issue is required.  As briefly outlined above, Count Three of the Indictment charged the Defendant under 18 U.S.C. § 371, the general federal conspiracy statute, with conspiring to violate 18 U.S.C. § 2423(a) (the Mann Act), by transporting minors across state lines with the intent to engage in sexual activity criminalized by state law.  S2 Indictment ¶¶ 16–18.  In this case, the relevant state offense was New York Penal Law Section 130.55, which criminalizes sexual contact with an individual known to be under the age of seventeen.  Trial Tr. 3034–35.  The Count Three conspiracy spanned from 1994 to 2004.  S2 Indictment ¶ 17.  As the Government explained in its summation, the jury could convict the Defendant under Count Three based on evidence related to Jane, Carolyn, and Annie Farmer, three victims who testified at trial.  Trial Tr. at 2895.[2]

Count Five of the Indictment also charged the Defendant under 18 U.S.C. § 371, but for conspiring to violate 18 U.S.C. §§ 1591(a) & (b) (the Trafficking Victims Protection Act), by trafficking individuals under the age of eighteen for commercial sex acts that affect interstate commerce.  S2 Indictment ¶¶ 22–24.  Count Five's conspiracy spanned from 2001 to 2004.  *Id.* ¶ 23.  The Government explained to the jury that it could convict the Defendant on Count Five based on evidence related to Carolyn and Virginia Roberts.  Trial Tr. at 2896.

The Defendant primarily contends that Count Five is a subset of, is subsumed in, or is otherwise too similar to Count Three under the *Korfant* factors.  The Court agrees.  Although some *Korfant* factors favor the Government, the weight of the factors—supplemented by a review of the Government's case presented at trial—demonstrates that the Government has not

---

[2] The Court permitted certain victim witnesses to testify using a pseudonym or first name.  *See* Nov. 1, 2021 Tr. at 6–7.

7

met its burden of proving by a preponderance of the evidence that the counts are not multiplicitous.

*The offenses charged and common objectives*.  Both Counts Three and Five are charged under the same statute, 18 U.S.C. § 371, for conspiracy to commit an offense against the United States.  But going beyond this "general level" of similarity, the statutory objectives of the two counts differ.  *Macchia*, 35 F.3d at 669.  Count Three is a conspiracy to violate § 2423(a) and Count Five a conspiracy to violate § 1591.  These differing statutory objectives entail legal differences.  Count Three, for example, charges unlawful sexual activity (defined as sexual touching of a minor) while Count Five charges commercial sexual activity with a minor.  And each provision defines "minor" differently: under seventeen years old for Count Three but under eighteen years old for Count Five.  Further, Count Three requires an agreement with intent to transport across state lines, while Count Five's agreement requires only intent of sexual activity that affects interstate commerce.  These differences push the first *Korfant* factor in the Government's favor.  *See Estrada*, 320 F.3d at 182 (distinguishing between a conspiracy to distribute cocaine and one to distribute crack); *United States v. Villa*, No. 3:12-CR-40 (JBA), 2014 WL 252013, at *4 (D. Conn. Jan. 22, 2014), *aff'd*, 744 F. App'x 716 (2d Cir. 2018) (summary order) (distinguishing between a § 371 conspiracy to "commit theft from an interstate shipment and to transport stolen property across state lines" and one to "sell stolen property").

The Government, however, errs in suggesting that this factor alone is "fatal" to the Defendant's multiplicity claim.  Gov. Br. at 29.  To the contrary, no single *Korfant* factor is dominant or dispositive.  *Macchia*, 35 F.3d at 668.  And courts in this district have found two conspiracy counts to be the same offense even when they have different statutory objectives because both counts can arise from the same agreement.  *E.g.*, *Hernandez*, 2009 WL 3169226, at

8

*11 (concluding that conspiracies to defraud the United States and to commit mail and wire fraud were the same conspiracy as earlier conspiracy to use or transfer false IDs).  After all, "[a] single agreement to commit several crimes constitutes one conspiracy."  *United States v. Broce*, 488 U.S. 563, 570–71 (1989).  The Government implicitly conceded this point of law when it agreed that Counts One and Three were multiplicitous.  Count One charges a conspiracy to *entice* minors to travel across state lines in violation of 18 U.S.C. § 2422 while Count Three charges a conspiracy to *transport* minors across state lines in violation of 18 U.S.C. § 2423(a).  Despite distinct statutory predicates for these two § 371 conspiracies, the Government did not contest that they were the same offense.  Though Count Five is unquestionably less similar to Count Three than is Count One, the difference in statutory predicates does not end the matter.  It is well established that a single conspiracy can contain multiple objectives, particularly if the objectives share important similarities, as they do here.  *United States v. Salameh*, 152 F.3d 88, 148 (2d Cir. 1998) (citing *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992)).

*Overlap of participants*.  The participants in the two conspiracies in Counts Three and Five substantially overlap with one another.  Of course, the defendant will always overlap between two allegedly multiplicitous conspiracies, so their participation in both conspiracies has negligible significance.  *Villa*, 2014 WL 252013, at *5.  More importantly here, Epstein was the Defendant's primary coconspirator in both conspiracies, and the Government argued that in both conspiracies the Defendant played the same role of acquiring underage girls for Epstein to sexually abuse.  They were, the Government explained, "partners in crime" over the decade alleged in the Indictment.  *E.g.*, Trial Tr. at 34, 2842, 2885; *see also id.* at 41 ("For a decade, the defendant played an essential role in this scheme.").  This overlap in key participants, and in core

9

roles played by those participants, significantly favors the Defendant as to the second *Korfant* factor. *See Macchia*, 35 F.3d at 669; *Hernandez*, 2009 WL 3169226, at *11.

The Government responds that the Count Five conspiracy included Sarah Kellen, who was not involved in Count Three. Yet Kellen received far less attention than other conspirators in the Government's case, being mentioned only briefly in the Government's opening statement and closing arguments. *E.g.*, Trial Tr. at 2876 (noting, "and sometimes Sarah Kellen would call, too"). Conspiracies often change membership without forming a new, distinct conspiracy, particularly if key members of the conspiracy remain over the course of a decade. *See United States v. Eppolito*, 543 F.3d 25, 48 (2d Cir. 2008). Kellen's participation beginning in 2001 therefore does not shift the import of the second *Korfant* factor.

*Overlap of time*. The time periods of the two counts overlap completely. Namely, Count Five's period of 2001 to 2004 is "wholly within the time frame" of Count Three from 1994 to 2004, which substantially favors the Defendant on this *Korfant* factor. *United States v. Calderone*, 982 F.2d 42, 47 (2d Cir. 1992). The Government's attempt to minimize this factor by noting that most overt acts for Count Three occurred in the 1990s is simply not reflected in this circuit's case law. *See, e.g.*, *Macchia*, 35 F.3d at 669 (focusing on the overlap in time frame alleged in the indictment). The overlap in time here raises the inference that one conspiracy wholly encompasses the other, and that inference tips in the Defendant's favor. *See Araujo*, 2018 WL 3222527, at *6.

*Similarity of operations*. Counts Three and Five involve significant similarities in operations. The methods by which the Defendant groomed and facilitated the sexual abuse of minor victims was a central focus of both parties' cases at trial. The Government called as an expert witness Dr. Lisa Rocchio, who identified the typical steps in sexual abusers' grooming of

10

minors for sexual abuse.  Trial Tr. at 714–19.  Applying that expert testimony to the witnesses'

testimony, the Government argued that the Defendant's conduct as to each victim followed a

uniform "playbook."  *E.g.*, *id*. at 2184 ("She ran the same playbook again and again and again.

She manipulated her victims and she groomed them for sexual abuse."), 2853 ("The patterns you

saw throughout this trial, the playbook that Maxwell ran for years, is just one of the many ways

that you know that Maxwell is guilty.").  And the Government emphasized the many similarities

in the Defendant's conduct as recounted by all four witnesses.  *Id*. at 2848 ("The similarities

between what happened to Jane and Annie and Carolyn and Kate are incredibly powerful

evidence of the defendant's guilt.  So I want to talk to you about the playbook that Maxwell ran

again and again and again."), 2901 ("Four women have testified at this trial about Maxwell.

They all describe the same woman, the same playbook.").  Carolyn was the only witness who

testified regarding Count Five.  The Government argued that her testimony "was corroborated by

what Annie and Kate and Jane told [the jury] about Maxwell and how she operated for years."

*Id*. at 2880; *see also id*. at 2895–96 ("Maxwell groomed both Annie and Carolyn as part of a

broader agreement with Epstein to provide him with underage girls for abuse.").  The

Government, in short, argued that the Defendant engaged in substantially the same operations for

a decade as to all victims under both Counts Three and Five.

      The Government responds that while the Defendant and Epstein continuously conspired

to sexually abuse minor victims, their conduct beginning in 2001 evolved from developing one-

on-one relationships with their victims to include a "pyramid scheme of abuse," by which they

acquired underage girls by paying them for so-called "massage" appointments.  Gov. Br. at 32

(quoting Trial Tr. at 40).  To be sure, the Government in both its opening statement and its

closing arguments explained that the Defendant and Epstein's abuse "evolved over the course of

A-369

a decade," having both the "earlier phase" and the later "pyramid scheme."  Trial Tr. at 40; *see also, e.g.*, *id*. at 2886 (describing 2001 as "the beginning of the pyramid scheme of abuse").  But a single conspiracy can enter "two or more phases or spheres of operation" without creating a discontinuity in the underlying unlawful agreement, particularly if the same people are serving the same roles in each phase.  *United States v. Pena*, 846 F. App'x 49, 51 (2d Cir. 2021) (summary order) (quoting *United States v. Berger*, 224 F.3d 107, 114–15 (2d Cir. 2000)); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990).  Notably, the Government, after distinguishing between earlier and later phases in the pattern of abuse, immediately emphasized that "[f]or a decade, the defendant played an essential role in this scheme," blurring any difference between the two phases.  Trial Tr. at 41.

Moreover, though these phases did involve some differing means to acquire minor victims, the differences presented at trial were not as great as the Government suggests in its brief.  As to both counts, both before and after 2001, the Government emphasized that massage was a primary means by which the Defendant and Epstein normalized bodily contact and also the means by which the Defendant and Epstein commonly instigated instances of sexual abuse. *Compare id*. at 40 ("You will learn that in the 1990s, they used the cover of mentoring young girls . . . to introduce massage . . . and that you will learn that they used these so called massages as a way to sexually abuse the victims."), *with id*. at 41 ("Under this pyramid scheme of abuse, the defendant could just call girls to schedule massage appointments and hand them cash afterwards . . . ."); *e.g.*, *id*. at 35 ("You will learn that the cover of massage was the primary way the defendant and Epstein lured girls into sexual abuse."), 2852 ("Again and again throughout this trial, you heard about how these girls were asked to perform sexualized massages on Jeffrey Epstein.").

12

A-370

Further, in both counts, the witnesses testified that they received financial gifts and payments as a means by which the Defendant and Epstein acquired their victims' trust and extended the period of sexual abuse. *E.g.*, *id.* at 302 (Jane testified that she was given money "[a]lmost every visit" and that Epstein paid for things like voice lessons and clothes). The Government emphasized such financial gifts as one step in the Defendant's playbook of grooming. *E.g.*, *id.* at 2851 ("Then came the next step in the playbook: Making these girls feel special, giving them gifts, making friends, giving them money, promising to help with their futures, promises like sending Annie on a trip to Thailand or helping to pay for Jane's voice lessons and tuition."), 2890 ("[Jane] told you that Epstein gave her money and gifts and paid for school. That money wasn't free . . . . That is inducement, that is enticement, that is coercion."). The financial quid pro quo may have become more explicit beginning in 2001, but that shift in approach is not nearly so dramatic as to suggest that the Defendant and Epstein at that time entered "a wholly new agreement" with a new "conspiratorial objective." *Haji v. Miller*, 584 F. Supp. 2d 498, 519 (E.D.N.Y. 2008). The similarity-of-operations factor therefore favors the Defendant.

*Overlap of geographic scope*. There is some, albeit incomplete, geographic overlap between the two counts. Count Three focused on travel to New York because the ultimate objective of the conspiracy was to transport minors to New York to engage in criminal sexual activity in violation of New York law. Count Five, by contrast, focused on Epstein's residence in Florida, where Carolyn and Virginia Roberts were paid to give Epstein sexualized massages. Nevertheless, some geographic overlap between the two counts remained. All four witnesses testified about sexual conduct by the Defendant or Epstein in locations other than New York, whether Florida, New Mexico, or London. The Court admitted such testimony concerning

13

sexual conduct outside of New York as relevant to Count Three because it tended to establish the existence of a conspiracy and of the Defendant and Epstein's intent to abuse the victims in New York. In sum, the same locations—particularly Florida—were part of the Government's case for both counts. And over time, a conspiracy's "shifting emphasis in the location of operations do[es] not necessarily require a finding of more than one conspiracy." *Eppolito*, 543 F.3d at 48 (quoting *Jones*, 482 F.3d at 72). This factor therefore favors the Defendant or, at least, is neutral.

*Common overt acts*. The Government correctly notes that the overt acts provided to the jury for Counts Three and Five are distinct. *See* Jury Charge, Dkt. No. 565 at 49–50. This factor therefore tips toward the Government—but only slightly. A number of the overt acts listed for Count Three could have been prosecuted under Count Five but for the fact that 18 U.S.C. § 1591, the Trafficking Victims Protection Act, was not enacted until 2000. *See* Gov. Br. at 28. That some identical overt acts were not listed for both conspiracies is therefore more a function of legal timing than an indication of two distinct conspiracies. *Cf. Hernandez*, 2009 WL 3169226, at *12.

*Interdependence*. Counts Three and Five are not interdependent because the success or failure of one conspiracy is independent of the success or failure of the other. *See Macchia*, 35 F.3d at 671. In other words, the success of the Defendant and Epstein's scheme to abuse Carolyn from 2001 to 2004 was not made more or less likely by the prior success or failure to abuse Jane, Annie, or any other underage girl. This factor, however, makes little difference in the final analysis if "what was ultimately proven was one common conspiracy." *Maslin*, 356 F.3d at 197.

*The Government's theory at trial*. The Second Circuit has instructed district courts to consider not only the enumerated *Korfant* factors but to consider the entire record. *See id.* at 196; *United States v. Olmeda*, 461 F.3d 271, 282 (2d Cir. 2006). In *Maslin*, the Second Circuit

14

first explained that applying the *Korfant* factors led to the conclusion that successive prosecutions for conspiracies to distribute marijuana were barred by double jeopardy, but then continued, stating that "several additional factors . . . not directly addressed in *Korfant* . . . further point toward a finding of double jeopardy," namely, "the fact that the Government, in its opening and closing arguments, presented both cases to the jury as broad conspiracies of an essentially identical nature." 356 F.3d at 197. The same is true here. As explained above, the Government's opening statement and closing arguments presented a theory of a singular conspiracy, highlighting: The degree of similarity between each victim witness's experience over a decade; the common "playbook" that the Defendant ran "over and over and over again," Trial Tr. at 2848; and the tight partnership between the Defendant and Epstein. And each of those features was accompanied by references to a singular "scheme" to abuse all victim witnesses. *Id.* at 36, 2843, 2853. At bottom, the case presented to the jury by the Government was of a single decade-long conspiracy by the Defendant and Epstein to sexually abuse underage girls. Having pursued such a broad and encompassing conspiracy, the Government cannot now claim, and cannot carry its burden of proving by a preponderance of the evidence, that Count Five was legally and factually distinct. *See Maslin*, 356 F.3d at 197.

Because Count Three and Count Five are multiplicitous, the proper remedy is to enter judgment on only one of the counts. *See Josephberg*, 459 F.3d at 355 ("If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." (citing *Ball v. United States*, 470 U.S. 856, 865 (1985))). Because Count Five is factually subsumed by Count Three, the Court will impose judgment only on Count Three. The Court emphasizes, however, that finding Count Five to be multiplicitous "does not

15

overturn any of the factual findings made by the jury" —it means only that, "as a matter of law, the jury found the same thing twice." *Ansaldi*, 372 F.3d at 125.  Or, in this case, three times.

## II.    The Court denies the Defendant's Rule 29 motion.

The Defendant argues there was insufficient evidence to support any of her five counts of conviction, and, therefore, the Court should enter a judgment of acquittal as to all counts under Rule 29 of the Federal Rules of Criminal Procedure.  Rule 29 provides, in relevant part, that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a); *United States v. Pugh*, 945 F.3d 9, 19 (2d Cir. 2019).  "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  "The court must make that determination with the evidence against a particular defendant, viewed in the light most favorable to the government, and with all reasonable inferences resolved in favor of the government."  *Pugh*, 945 F.3d at 19 (cleaned up) (quoting *Eppolito*, 543 F.3d at 45).  Under this inquiry, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319 (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *United States v. Zhong*, 26 F.4th 536, 560 (2d Cir. 2022).

At the close of the Government's case, the Defendant made her Rule 29 application "with respect to every count in the S2 indictment," but "confine[d] [her] comments to address specifically Counts One and Two."  Trial Tr. at 2266.  The Court denied the motion.  *Id*. at 2274.

16

Following the close of the defense case, the Defendant renewed her previous Rule 29 application. *Id*. at 2736.

In her brief, the Defendant reiterates her request that the Court "enter a judgment of acquittal as to all counts." Maxwell Br. at 30. The Court has deemed Counts One and Five multiplicitous, *see supra* Part I, and therefore the Court will not enter judgment on those counts. And at trial, the jury found the Defendant not guilty on Count Two. Thus, the Court will consider the sufficiency of the evidence for the remaining counts: Three, Four, and Six. After considering the arguments and evidence, the Court denies the Defendant's Rule 29 motion.

The Court first notes that the Defendant has not provided substantive argument on the sufficiency of the evidence—in either the oral application or the post-conviction briefing—for Counts Three, Four, or Six. Instead, for these remaining counts, the Defendant simply asserts that the Court should "enter a judgment of acquittal as to all counts under Rule 29 . . . because the government failed to prove each element of the charges beyond a reasonable doubt." Maxwell Reply at 18, Dkt. No. 647; Maxwell Br. at 30. The Court disagrees.

The Court first considers the substantive counts. Count Four charged the Defendant with the substantive count of transportation of an individual under the age of seventeen with intent to engage in sexual activity in violation of New York law. This count related only to Jane during the period 1994 to 1997. The Government was required to establish the following elements beyond a reasonable doubt: (1) that the Defendant knowingly transported an individual in interstate commerce, as alleged in the Indictment; (2) that the Defendant transported the individual with the intent that the individual would engage in sexual activity for which any person can be charged with a criminal offense under New York law, as alleged in the Indictment; and (3) that the Defendant knew that the individual was less than seventeen years old at the time

17

A-375

of the acts alleged in Count Four; or that the Defendant aided and abetted the same.  Jury Charge at 26, 37.

The Court concludes that there was sufficient evidence for the jury to find the Defendant guilty of Count Four beyond a reasonable doubt.  Jane testified that Epstein first engaged in sexual activity with her in Palm Beach when she was fourteen years old.  Trial Tr. at 305.  She then began traveling from Palm Beach to New York with the Defendant and Epstein at that same age.  *Id*. at 315–16.  Jane explained that she traveled on commercial flights and Epstein's private jet.  *Id*. at 316.  She testified that the Defendant also traveled on some of these flights, and that the Defendant assisted her in making her travel arrangements to New York.  *Id*. at 316–17.  On one occasion when she was fifteen, Jane recounted, she had trouble getting on a commercial flight because she did not have proper identification.  However, the Defendant "made it happen" for her by making a call and helping her get on the flight.  *Id*. at 323–24.  Jane also testified that the Defendant was present on some occasions when Epstein sexually abused Jane in New York when she was under the age of seventeen.  *Id*. at 320.  The Court concludes that this evidence, taken together, was sufficient for the jury to find beyond a reasonable doubt that the Defendant knowingly transported Jane to New York with the intent to engage in sexual activity illegal under New York law, or at minimum, aided and abetted Epstein in doing so.

Next, the Court concludes that there was sufficient evidence for the jury to find the Defendant guilty of Count Six.  Count Six charged the Defendant with the substantive count of sex trafficking of an individual under the age of eighteen.  The Government was required to prove beyond a reasonable doubt that: (1) the Defendant knowingly recruited, enticed, harbored, transported, provided, or obtained a person; (2) the Defendant knew that the person was under the age of eighteen; (3) the Defendant knew the person would be caused to engage in a

18

commercial sex act; and (4) the Defendant's acts were in or affecting interstate commerce; or that the Defendant aided and abetted the same.  Jury Charge at 32, 37.  Count Six applied solely to Carolyn during the period 2001 to 2004.  *Id.* at 32.

Carolyn testified that when she was under the age of eighteen, the Defendant would call her to set up appointments for Carolyn to perform sexualized massages on Epstein.  Trial Tr. 1527, 1530.  Carolyn explained the sexual activities that occurred during the massages.  *Id.* at 1544–47.  Carolyn testified that the Defendant saw her naked in the massage room and continued to call Carolyn to schedule appointments with Epstein.  *Id.* at 1538.  She recalled a specific incident when she was fourteen in which she was naked in the massage room and the Defendant touched her breasts and commented that Carolyn "had a great body for Mr. Epstein and his friends."  *Id.* at 1536–38.  Carolyn testified that the Defendant knew that she was under the age of eighteen and continued to call her to schedule appointments with Epstein after learning that fact.  *Id.* at 1535.  Carolyn further testified that she received money in exchange for performing sexualized massages on Epstein.  *E.g.*, *id.* 1523.  She recalled that while money was often left on the sink outside of the massage room, the Defendant paid her directly after massages on one or two occasions.  *Id.* at 1540–41.  Carolyn's testimony was corroborated by Shawn, Carolyn's boyfriend at the time, and physical evidence including phone message pads.  This evidence was plainly sufficient for the jury to find beyond a reasonable doubt that the Defendant committed sex trafficking of an individual under eighteen, or aided and abetted Epstein in doing so.[3]

---

[3] If the Court were to conclude that Count Five is not multiplicitous, it would deny the Defendant's Rule 29 motion as to Count Five.  Count Five charged the Defendant with participating in a conspiracy to commit sex trafficking of individuals under the age of eighteen from about 2001 to 2004.  The evidence that supports the Defendant's conviction of Count Six, the substantive count, also supports the Count Five conspiracy conviction.  Additionally, Juan Alessi testified that the Defendant approached Virginia Roberts in a parking lot and that he then saw her at Epstein's Palm Beach residence later that day.  Trial Tr. at 841–43.  Documentary evidence, including flight records, established that Virginia was under the age of eighteen when she met the Defendant and Epstein.  *See, e.g.*, *id.* at 1855 (December 2000 flight record including Epstein, the Defendant, and Virginia); *see also* GX-14 (birth certificate).  Carolyn testified that Virginia recruited her and that Virginia performed sexualized massages on

A-377

Finally, Count Three charged the Defendant with conspiracy to transport individuals under the age of seventeen to travel in interstate commerce with intent to engage in illegal sexual activity in violation of New York law. The Government was required to prove beyond a reasonable doubt: (1) that two or more persons entered into the unlawful agreement charged; (2) the Defendant knowingly and willfully became a member of that conspiracy; (3) one of the members of the conspiracy knowingly committed at least one overt act; and (4) the overt act that the jury found to have been committed was committed in furtherance of that conspiracy. Jury Charge at 41.

The Court concludes that the trial evidence supported a finding of guilt beyond a reasonable doubt for each element of Count Three. The Government presented evidence that could lead a reasonable juror to conclude that the Defendant worked with Epstein between 1994 and 2004 to groom minor victims in an effort to transport them to New York to engage in sexual activity illegal under New York law. As noted above, Jane testified in detail about her travel to New York with the Defendant and Epstein where she was sexually abused. Trial Tr. at 319–20. Jane also testified about the steps taken by the Defendant and Epstein to make her feel comfortable before they began engaging in sexual activity with her and inviting her to travel. *Id*. 299–303; *see also id*. at 348 (Jane testifying that their behavior toward her made her "feel special").

Other witnesses testified to similar conduct. Annie testified that after she met Epstein in New York, she was invited to travel with the Defendant and Epstein to New Mexico when she was sixteen. *Id*. at 2068–69, 2075–77. She testified that on this trip, the Defendant and Epstein took her shopping and to the movies. *Id*. at 2080–81. She also testified that the Defendant

---

Epstein in exchange for money. Trial Tr. 1518–24. The Court concludes that the evidence related to Carolyn and Virginia was sufficient for the jury to convict the Defendant on Count Five.

encouraged her to massage Epstein's feet, and that the Defendant then gave her a massage during which the Defendant touched Annie's breasts.  *Id*. at 2083–86.  As noted above, Carolyn testified that the Defendant paid her for performing sexualized massages on Epstein.  She also testified that Epstein and the Defendant asked her about her life and family and discussed sexual topics with her.  *Id*. at 1533–36.  Epstein then invited her to travel generally, and the Defendant invited her to travel to Epstein's private island in the Caribbean.  *Id.* at 1535, 1540.  A reasonable juror could have concluded that the Defendant's and Epstein's actions, including their efforts to normalize sexual conduct and invitations for underage girls to travel to New Mexico and the Caribbean, were in furtherance of the conspiracy's goal of transporting minors to New York for the purpose of engaging in sexual activity illegal under New York law.  Finally, although the jury was instructed that it could not convict the Defendant solely on the basis of Kate's testimony, her testimony corroborated the testimony of other witnesses as to the Defendant's knowledge and role in the conspiracy.  *Id*. at 1177–90.  The Court concludes that this evidence was sufficient for a reasonable jury to convict the Defendant for conspiring to transport individuals in interstate commerce with intent to engage in sexual activity illegal under New York law.

Accordingly, the Court denies the Defendant's Rule 29 motion for a judgment of acquittal.

### III.   The Court denies the Defendant's motion claiming a constructive amendment or prejudicial variance.

The Defendant also seeks to vacate her convictions as to Counts One, Three, and Four (the Mann Act counts) pursuant to Federal Rule of Criminal Procedure 33.  She contends that the jury convicted her of intending that Jane engage in sexual activity in New Mexico, rather than New York, thus resulting in a constructive amendment of the Indictment, or in the alternative, a

21

prejudicial variance.  For the following reasons, the Court disagrees and denies the Defendant's motion on this basis.

### A.  Applicable Law

Under the Fifth Amendment's Grand Jury Clause, "a defendant has the right to be tried only on charges contained in an indictment returned by a grand jury." *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997).  "[W]hen the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted," a constructive amendment occurs and reversal is required. *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021).

"To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998)).  In making this determination, the Court first delineates the "core of criminality" of the crime alleged. *United States v. Gross*, No. 15-cr-769 (AJN), 2017 WL 4685111, at *20 (S.D.N.Y. Oct. 18, 2017), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019).  The "core of criminality . . . involves the essence of a crime, in general terms." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016) (alteration in original) (quoting *United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012)).  The Court then determines whether the evidence or jury instructions at trial created a "substantial likelihood" that the defendant was not convicted of the crime described in that core, but instead of a crime "distinctly different." *D'Amelio*, 683 F.3d at 416, 419.  The Second Circuit has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core* of criminality to be proven at trial." *United States v.*

*Banki*, 685 F.3d 99, 118 (2d Cir. 2012) (quoting *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007)).  Thus, the defendant must show that "the challenged evidence or jury instructions tied a defendant's conviction to 'behavior *entirely separate* from that identified in the indictment.'"  *United States v. Bastian*, 770 F.3d 212, 223 (2d Cir. 2014) (emphasis added) (quoting *United States v. Danielson*, 199 F.3d 666, 670 (2d Cir. 1999)).

By contrast, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment."  *Salmonese,* 352 F.3d at 621 (quoting *Frank*, 156 F.3d at 337 n.5).  "Although the distinction between constructive amendment and variance may appear 'merely one of degree,' there is an important difference in outcome: 'a constructive amendment of the indictment is considered to be a *per se* violation of the grand jury clause, while a defendant must show prejudice in order to prevail on a variance claim.'"  *Id.* (quoting *Frank*, 156 F.3d at 337 n.5); *see also Rigas*, 490 F.3d at 226 ("[A] defendant alleging variance must show 'substantial prejudice' to warrant reversal.").  "A defendant cannot demonstrate that [s]he has been prejudiced by a variance where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense."  *Khalupsky*, 5 F.4th at 294 (quoting *Salmonese*, 352 F.3d at 621–22).  Moreover, when a defendant has sufficient notice of the Government's theory at trial, she cannot claim that she was unfairly or substantially prejudiced.  *See United States v. Kaplan*, 490 F.3d 119, 129–30 (2d Cir. 2007).

Finally, the Court bears in mind that the Defendant brings her motion pursuant to Rule 33, which permits the Court to "vacate any judgment and grant a new trial if the interest of

23

justice so requires."  Fed. R. Civ. P. 33(a).  Such a motion is granted "sparingly and in the most

extraordinary circumstances, and only in order to avert a perceived miscarriage of justice."

*United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019) (cleaned up).

> **B.  No constructive amendment occurred.**

Count Four charged the Defendant with transportation of an individual under the age of

seventeen with intent to engage in illegal sexual activity, and Count Three charged a conspiracy

to do the same.  The core of criminality of these counts, the parties agree, was a scheme by

Epstein and the Defendant to cause underage girls to travel to New York with the intent that they

would engage in sexual activity in violation of New York law.  Gov. Br. at 6; Maxwell Br. at 9.[4]

The Defendant contends that a jury note received during deliberations revealed that the

jury convicted the Defendant on a crime different from this core of criminality.  Namely, the

Defendant argues that in convicting her of Count Four, the jury found she intended for Jane to

engage in sexual activity in New Mexico, *without* finding that she intended for Jane to engage in

sexual activity in New York.  Maxwell Reply at 2.  She argues the Court's decision to refer the

jury back to the charge and refusal to give a supplemental instruction was error.  As a result of

this same error, she says, the jury also improperly convicted her of Count Three.  For the reasons

that follow, the Court concludes that there is not a "substantial likelihood" that the Defendant

was "convicted of an offense other than that charged in the indictment."  *D'Amelio*, 683 F.3d at

416 (quoting *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988)).

---

[4] The Defendant also contends that her conviction on Count One was the result of a constructive amendment.
Because the Court will not enter judgment on Count One per the parties' consent, the Court does not address Count
One here.  In any event, the Defendant's argument as to why Count One was constructively amended is the same as
her argument as to Count Three, and the Court's analysis would be the same.  *See* Maxwell Br. at 16.

1. **The Court's instructions, the evidence at trial, and the Government's summation captured the core of criminality.**

*First*, the Court's instructions to the jury during trial and after the close of evidence captured the core of criminality.  As explained above, the Indictment charged the Defendant with four counts in violation of the Mann Act, each predicated on a violation of New York Penal Law Section 130.55.  That provision of New York law criminalizes sexual contact with an individual known to be under the age of seventeen.  Jury Charge at 24.  The jury charge made clear that this provision of New York law served as the predicate offense for Counts Two and Four.  *See id.* at 23–24 (Count Two), 28 (Count Four, instructing the jury to decide whether the Defendant had knowingly transported Jane with the intent to engage in sexual activity with Jane in violation of New York Penal Law Section 130.55, as alleged in the Indictment).  The Court also accepted the Defendant's requested edits that further clarified that the predicate state offense was New York law.  *See, e.g.*, Request to Charge at 19, 23, 26, 30, 31, Dkt. No. 410-1; Jury Charge at 20, 24, 26, 28 (specifying, *e.g.*, that the predicate state offense was "New York law," rather than an unspecified "criminal offense").

The jury charge also clearly instructed on the role of New York law in the jury's assessment of the Mann Act conspiracy counts, Counts One and Three.  The charge explained that the object of the conspiracies was a violation of the same New York law at issue in Count Two.  *See* Jury Charge at 44–45.  In particular, the objects of Counts One and Three were the enticement of minors to travel and the transport of minors, respectively, with the intent to engage in sexual activity illegal under New York law.  *See id.*  As for the overt acts, the Court, at the parties' request, did not provide the jury with a copy of the Indictment.  Trial Tr. at 2781–82.  Rather, the charge specified the relevant overt acts.  Jury Charge at 49–50.  For Counts One and Three, this included the instruction: "the Indictment alleges as follows: . . . (2) In or about 1996,

25

when Jane was under the age of 17, Jane was enticed to travel from Florida to New York for purposes of sexually abusing her at the New York Residence, in violation of New York Penal Law, Section 130.55." *Id.* at 49.

The Court also gave two limiting instructions to ensure that the jury's consideration of certain relevant evidence was properly focused on the core of criminality. These instructions pertained to testimony about sexual activity that was not criminal conduct under New York Penal Law Section 130.55. The first limiting instruction pertained to Kate. This instruction informed the jury that it could not convict the Defendant on Counts One and Three solely on the basis of Kate's testimony because Kate could not be considered a victim of the crimes charged. Trial Tr. at 1167–68. This was so because she was older than seventeen at the time of the events, and, as explained, the object of the charged conspiracies was transport with intent to engage in sexual conduct in violation of New York Penal Law Section 130.55, which criminalizes sexual contact with individuals under the age of seventeen. *See* Nov. 1, 2021 Tr. at 67–68. The second limiting instruction pertained to Annie, who testified about sexual contact in New Mexico only. The instruction explained that her testimony about sexual conduct did not describe "illegal sexual activity" as alleged in the Indictment, which was a legal term that the Court would explain at the end of the case. Trial Tr. at 2048–49. This was so because, as explained, the object of the charged conspiracies was a violation of New York law, not New Mexico law. Both limiting instructions explained that the jury could determine that the testimony was relevant evidence. That was so because such evidence tended to establish the Defendant's intent that transport of a minor victim to New York was for the purpose of sexual activity illegal under New York law. The Defendant concedes this point as to testimony about sexual activity in states other than New

26

York.  Maxwell Reply at 5.  The jury charge and limiting instructions at trial thus instructed the

jury on the core of criminality.

       *Second*, the Government marshaled evidence that captured the core of criminality as pled

in the Indictment and instructed by the Court.  Jane testified that after she met the Defendant and

Epstein at a summer camp, Epstein began engaging in sexual activity with her at his residence in

Florida.  Trial Tr. at 293–95, 305–06.  Jane then began traveling with Epstein and the Defendant

when she was fourteen years old.  *Id.* at 315.  As the Defendant notes, the majority of Jane's

testimony discussing travel pertained to trips to New York and sexual activity that took place in

New York.  Maxwell Br. at 13.  In her testimony, Jane recalled specific details of Epstein's New

York residence and the sexual acts that occurred there.  *See* Trial Tr. at 316–20.  She explained

that while she "mainly" traveled to New York on Epstein's private plane, she also took

commercial flights.  *Id.* at 316.  She further testified that the Defendant assisted in making these

travel arrangements.  *Id.* at 316–17.  Corroborating evidence included flight records to New York

and photos of Epstein's New York residence matching Jane's description.  *See id.* at 320.

       In addition to the New York trips, Jane testified about a trip she took to New Mexico with

the Defendant and Epstein when she was fifteen or sixteen years old.  *Id.* at 321.  In her

testimony regarding this trip, which spanned only three transcript pages, Jane explained that

during the trip Epstein engaged in sexual activity with her similar to what took place in New

York.  *See id.* at 321–23.  As explained above, testimony about sexual activity in other states,

including Florida and New Mexico, was relevant to the Defendant's intent.  The testimony was

part and parcel of the Defendant and Epstein's scheme to groom underage girls at Epstein's

various properties, including in New Mexico and Palm Beach, to then be transported to New

York for sexual activity illegal under New York law.  Accordingly, this particular testimony was

A-385

part of the same "set of discrete facts consistent with the charge in the indictment," not a previously unidentified and independent theory of guilt. *D'Amelio*, 683 F.3d at 419; *see also United States v. Jones*, 847 F. App'x 28, 30 (2d Cir. 2021) (summary order) (no constructive amendment in sex trafficking case where indictment did not allege "advertising" but the evidence "fell squarely within the charged scheme" (cleaned up)).

 *Third*, the Government's summation also reflected the core of criminality of transporting Jane and other underage girls to New York with the intention that sexual activity would occur in New York. In its summation regarding Count Four, the Government focused on travel to New York. *See* Trial Tr. at 2891–92.[5] The Government's explanation of Counts One and Three followed this pattern as well, with the summation again making clear that the Defendant and Epstein had intended for the victims to be "sexually abused in New York." *Id.* at 2895. Thus, the Court's instructions to the jury, the evidence presented at trial, and the Government's argument in summation did not describe "behavior entirely separate from that identified in the indictment," *Bastian*, 770 F.3d at 223 (quoting *Danielson*, 199 F.3d at 670), but instead consistently captured the core of criminality with which the Defendant was charged.

## 2. The jury note and the Court's response did not result in a constructive amendment.

 The Defendant contends that regardless of whether the Court's prior instructions or Government's arguments at trial were proper, a jury note revealed that the jury convicted the Defendant for intending that Jane engage in sexual activity in New Mexico, not New York. *See* Maxwell Reply at 2. She argues that the Court then erred by refusing a supplemental instruction. The ambiguous note and the Court's rejection of the Defendant's proposed responses to it did not

---

[5] In its summation regarding Count Two, which introduced the New York predicate offense to the jury, the Government also repeatedly emphasized that the Defendant and Epstein enticed Jane to travel to New York to be abused. *See* Trial Tr. 2889–90.

A-386

alter the fact that the evidence and instructions at trial captured the core of criminality of the Indictment.

The jury note at issue read:

Under Count Four (4), if the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico where/if the intent was for Jane to engage in sexual activity, can she be found guilty under the second element?

Court Ex. 15, Dkt. No. 593 at 23.  After hearing from the parties, the Court determined that it was unclear to what testimony the note referred and what legal question the note asked. Accordingly, the Court concluded that the appropriate course was to refer the jury back to the instruction for the second element of Count Four, with a reminder to consider carefully the full instruction.  Trial Tr. at 3141.  The Court also rejected the Defendant's supplemental instruction proposed the following day because it was partially unresponsive, partially redundant, and partially an erroneous statement of law.  *Id.* at 3148–50.

The Defendant's contention that this series of events worked a constructive amendment to the Indictment is without merit.  *First*, the Defendant speculates extensively about which flights and evidence the jury was referencing in the note, hazarding that the jury was focused on a 1997 flight from New York to New Mexico and an unidentified return flight to Florida.  *See* Maxwell Br. at 14–15.  But Jane testified about taking numerous flights both on Epstein's private plane and on commercial carriers.  The note did not specify which of these many flights or other testimony the jury was considering.  The Court could not provide supplemental instruction based on such a speculative foundation.

*Second*, the note was not "crystal clear" as the Defendant contends.  Maxwell Reply at 6. Rather, as sometimes occurs, the note was decidedly ambiguous as to the precise legal question being asked.  For example, the jury could have been asking about aiding-and-abetting liability as

29

to the second element.  Or it could have been asking if it was permissible to consider the New

Mexico testimony in its assessment of Count Four.  Indeed, the Defendant proffered a different

interpretation when the Court first read the note at trial.  Initially, the Defendant argued that the

jury was asking if the Defendant could be found guilty solely for aiding and abetting a flight

home from New Mexico, which she said raised the issue of whether sexual activity could be the

"significant or motivating purpose" for the travel.  Trial Tr. at 3128–30.  It was only after a

protracted discussion, spanning ten pages of transcript, that the Defendant eventually suggested

that the jury was considering convicting the Defendant on Count Four solely on conduct in New

Mexico without any travel to New York.  On this score, the Defendant argued at trial and argues

now that the absence of a comma between "New Mexico" and "where/if" revealed the jury's

thinking.  Maxwell Reply at 6 n.2.[6]  But hinging the note's meaning on an absent comma does

not indicate a meaning "clear on [its] face."  Maxwell Reply at 9.  With or without the comma,

the note was ambiguous as to the destination of the hypothetical return flight, the testimony

being referenced, and the legal question being asked.

        The note was clear on one point—the jury was asking about the second element of Count

Four.  Accordingly, the Court sent the jury back to the charge, which accurately instructed that

Count Four had to be predicated on finding a violation of New York law.  This response ensured

that the jury focused on the correct instruction and, in turn, reminded the jury that the only state

law at issue was *New York's*, even if sexual abuse in New Mexico was relevant evidence of

intent.  *See United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007) ("[A] trial court

---

[6] The Defendant also accuses the Government of muddying the inquiry by inserting a comma in this supposedly crucial spot.  Maxwell Reply at 5, 6 n.2.  It is apparent from the Government's brief that it relied on the trial transcript for its transcription of the jury note, which included a comma between these words.  *See* Gov. Br. at 13 (quoting Trial Tr. at 3126).

responding to a note from a deliberating jury is only required to answer the particular inquiries posed."); *see also United States v. Parker*, 903 F.2d 91, 101 (2d Cir. 1990) ("The trial judge is in the best position to sense whether the jury is able to proceed properly with its deliberations, and [s]he has considerable discretion in determining how to respond to communications indicating that the jury is experiencing confusion."). The jury was free to send a clarifying or further note following the Court's instruction.

By contrast, the Defendant failed to propose a legally accurate response for the jury. Her proposed responses to the note on the day it was received and the following morning were erroneous. At the time the Court received the note and discussed it with counsel, the Defendant first proposed that the answer to the note's question was simply "no" because, she argued, a return flight is for the purpose of returning home, "not for the purpose of illegal sexual activity." Trial Tr. at 3128–30. But the Court could not respond "no" to an ambiguous question. *Id.* at 3138. Moreover, the Defendant eventually conceded the principle that assistance with a return flight home could aid and abet a trip that was for the purpose of illegal sexual activity. *See id.* at 3136. Alternatively, the Defendant requested that if the Court were to refer the jury to the charge, that it direct the jury to lines 14 to 17 of Instruction No. 21, which instructed on "significant or motivating purpose." *Id.* at 3131. But it was unclear that those particular lines addressed the jury's question, and the Court's decision to refer the jury to the entirety of Instruction No. 21 encompassed those lines.

The following day, although the jury had not sought further clarification, the Defendant took another pass at proposing an additional response to the note. She requested a three-paragraph supplemental instruction that referenced elements of Counts Two and Four. *See* Dkt.

No. 566.[7]  The Second Circuit has cautioned that supplemental instructions "enjoy special

prominence in the minds of jurors," *Arroyo v. Jones*, 685 F.2d 35, 39 (2d Cir. 1982), and that

complete accuracy is of "crucial importance," *United States v. Kopstein*, 759 F.3d 168, 172 (2d

Cir. 2014) (quoting *United States v. Lefkowitz*, 284 F.2d 310, 314 (2d Cir. 1960)).  Portions of

the requested instruction were unresponsive, portions were redundant, and portions were legally

inaccurate.  The first paragraph, which pertained to Count Two, was unresponsive to the jury's

note that asked only about Count Four.  The second paragraph was unnecessary because it was

redundant.  The Defendant now raises for the first time, in a footnote, that the Court should have

*sua sponte* provided the jury this paragraph alone.  Maxwell Reply at 9 n.4.  But the charge as a

whole already made clear that a violation of New York Penal Law Section 130.55 was the key

inquiry.  *See* Jury Charge at 20, 23, 26, (specifying "a criminal offense under New York

law"), 24 (Count Two instructions on New York Penal Law Section 130.55), 28 (Count Four

referring back to these instructions), 49–50 (specifying the overt act of Jane traveling "from

Florida to New York for purposes of sexually abusing her at the New York Residence, in

violation of New York Penal Law, Section 130.55").  Finally, the proposal also inaccurately

stated that "sexual activity in any state other than New York *cannot form the basis*" of

---

[7] The requested instruction read:

> As to the third element of Count Two, you must determine whether the Government has proven beyond a
> reasonable doubt that the Defendant acted with the intent that Jane would engage in sexual activity within
> the state of New York in violation of New York Penal Law 130.55.

> As to the second element of Count Four, you must determine whether the Government has proven beyond a
> reasonable doubt that the Defendant transported Jane with the intent that Jane would engage in sexual
> activity within the state of New York in violation of New York Penal Law 130.55.

> An intent that Jane engage in sexual activity in any state other than New York cannot form the basis of
> these two elements of Counts Two and Four.

Dkt. No. 566 at 7.

convictions on Counts Two and Four, erroneously implying that such evidence was irrelevant. Dkt. No. 566 at 7 (emphasis added).  Thus, in light of the note's ambiguity and the Defendant's failure to propose an accurate response in either the first attempt or the second attempt a day later, the Court's decision to refer the jury back to the legally sound charge was not error and plainly did not result in a constructive amendment to the Indictment.

The Defendant does not expressly contend that the instructions were legally erroneous— nor could she.  As explained above, the charge made clear that the only predicate state law at issue was New York's.  Instead, the Defendant objects that the charge was "stripped of any mention of 'travel to New York.'"  Maxwell Br. at 15.  But the Court rejected the Defendant's specific requests that were unnecessary, inaccurate, or would have confused the jury.  For example, the Court rejected the Defendant's request to limit the charge to requiring travel from "Florida to New York," as alleged in the "to wit" clause of the Indictment, because travel from New Mexico to New York, for example, would also have been sufficient.  *See* Trial Tr. at 2758– 61 (Charging Conference); *see also United States v. Little*, 828 F. App'x 34, 37–38 (2d Cir. 2020) (summary order) (noting that generally, "'to wit' clauses do not modify essential elements of the offense").  The Court also denied the Defendant's request to instruct the jury on law governing the age of consent in New Mexico, the United Kingdom, and Florida.  First, the Defendant's proposal oversimplified New Mexico's age of consent law.  The Court could not accurately instruct the jury on New Mexico's law without potentially introducing a theory of guilt that the Government had not charged, or resolving a factual question on the use of force for the jury.  Trial Tr. at 1712–13; Nov. 23, 2021, Final Pretrial Conference Tr. at 31–38.  And second, instructing on state law that the Defendant was not alleged to have violated ran a serious risk of confusing the jury as to the role of that law.  Indeed, it was the Defendant's proposal that

A-391

ran the risk of moving the jury away from consideration of the core of criminality alleged in the Indictment.[8]

The appropriate approach was to instruct the jury on the one and only predicate state offense for the Mann Act counts charged in the Indictment: New York Penal Law Section 130.55. For that reason, the Court also rejected the Defendant's request to repeat in the charge the limiting instructions as to Kate's and Annie's testimony and the Defendant's request, raised for the first time at the charging conference and well after completion of her testimony, to include an unspecified limiting instruction as to Jane's New Mexico testimony. Trial Tr. at 2773–77. During the witnesses' testimony, the jury had yet to be instructed on the meaning of "illegal sexual activity as alleged in the indictment." But it was unnecessary to repeat the limiting instructions alongside the charge's definition of "illegal sexual activity." *Id.* at 2774–75. The jury now had that phrase clearly defined as a violation of New York Penal Law Section 130.55. In sum, the jury instructions charged that the jury could convict the Defendant only on the predicate state offense of New York law. The jury is presumed to have followed these instructions. *See United States v. Joyner*, 313 F.3d 40, 47 (2d Cir. 2002).

At bottom, the Defendant asks the Court to speculate based on an ambiguous note that the jury disregarded Jane's substantial testimony about travel to New York and sexual conduct in New York and further assumed a violation of *New York* law could be based on conduct only in *New Mexico.* It is hardly plausible, let alone substantially likely, that this was the jury's

---

[8] The Defendant's proposed instruction on other jurisdictions' ages of consent first stated that "[t]o prove Counts One and Three, the government must establish beyond a reasonable doubt that Ms. Maxwell acted with the intent that the minors would engage in sexual activity for which any person can be charged with a criminal offense." Request to Charge at 51. It then instructed on the ages of consent in several jurisdictions and stated that "[i]f the individual was at or above the age of consent in the relevant jurisdiction when the sexual activity occurred, then for the purposes of Counts One and Three, the sexual activity was not illegal." *Id*. at 52. This proposed instruction would likely have created the confusion the Defendant raises now.

A-392

understanding.  *See D'Amelio*, 683 F.3d at 416.  Accordingly, the Court concludes that no constructive amendment resulted as to Count Four.

### 3.  No constructive amendment occurred as to Count Three.

The Defendant's argument as to constructive amendment of Count Three, conspiracy to transport, wholly depends on her theory as to Count Four.[9]  She argues that since it is "clear" that the jury convicted the Defendant of Count Four based only on Jane's New Mexico testimony, it must have convicted on the same basis for the conspiracy counts.  Maxwell Br. at 16.  Because no constructive amendment resulted as to Count Four, this argument is unavailing.  But even if the Court were persuaded that the jury note revealed that the jury convicted the Defendant of Count Four on that basis, the note pertained only to Count Four and provided no basis to speculate as to the jury's conviction of Count Three.  Moreover, it is not substantially likely that the jury convicted the Defendant of Count Three on Jane's New Mexico testimony alone.  As described in detail above in the Court's denial of the Defendant's Rule 29 motion, the Government presented evidence that Annie and Carolyn were also victims of the conspiracy.  Accordingly, even if a constructive amendment resulted as to Count Four, vacatur would still not be warranted as to Count Three.

### C.  No prejudicial variance occurred.

In the alternative, the Defendant argues that she was substantially prejudiced because the Indictment did not contain any allegations that Jane was sexually abused in New Mexico.  She therefore claims she was unfairly surprised by its introduction.  For purposes of this motion, the Court will assume that Jane's testimony regarding New Mexico constituted a variance from the

---

[9] As noted above, because the Court will not enter judgment on Count One on the parties' consent, the Court addresses only Count Three here.  In any event, the Defendant's arguments as to why Counts One and Three were constructively amended are the same.  *See* Maxwell Br. at 16.

Indictment.  The Defendant has nevertheless failed to show that she was substantially prejudiced by this evidence.  *See Salmonese*, 352 F.3d at 621.

When a defendant has notice of the government's theory of the case before trial, she is not prejudiced by a variance.  *See Kaplan*, 490 F.3d at 129–30.  Pretrial disclosures may put a defendant on notice of evidence not specifically included in the indictment.  *See Khalupsky*, 5 F.4th at 294.  And a defendant's failure to object to allegedly surprising evidence or to request a continuance when evidence is introduced suggests that a defendant was not unfairly surprised or prejudiced.  *See Kaplan*, 490 F.3d at 130.

Here, the Defendant had sufficient notice of the Government's theory of the case, and of Jane's testimony regarding New Mexico specifically, to avoid substantial prejudice.  The Indictment charged a scheme to sexually abuse underage girls in New York.  In service of this scheme, the Indictment alleged that Epstein and the Defendant groomed the victims for abuse at various properties and in various states, including Epstein's ranch in New Mexico.  Jane had long recalled traveling to New Mexico, *see* Maxwell Br. at 16–17, although she did not report that Epstein had engaged in sexual activity with her at this property until closer to trial.  But the Defendant had adequate notice of this particular testimony such that there was no danger of substantial prejudice.  The Defendant received the Government's notes of Jane's interview where she recalled abuse in New Mexico on November 6, 2021, more than three weeks before trial.  At that point, the parties were still litigating the very instructions for Kate and Annie that the Defendant claims she would have sought for Jane had she received adequate notice.  *See, e.g.*, Nov. 23, 2021 Tr. at 28–38; *see also Lebedev*, 932 F.3d at 54 (concluding in part that the defendant was not "unfairly and substantially" prejudiced because "[t]he government disclosed the evidence and exhibits . . . four weeks prior to trial").  Moreover, that the Defendant did not

request a continuance or object to Jane's testimony until the charging conference suggests that

she was not unfairly surprised.  *See Kaplan*, 490 F.3d at 130.  Accordingly, there is no indication

in the record that the evidence adduced at trial unfairly surprised or prejudiced the Defendant.

Finally, the Defendant argues that Jane's testimony resulted in the "ultimate prejudice"

because it led to the jury improperly convicting her on three of the four Mann Act counts.

Maxwell Br. at 18.  For the same reasons noted above, the Defendant was not prejudiced by the

Court's response to the jury note because the ambiguous note did not reveal that the jury

improperly convicted the Defendant of the Mann Act counts.  Moreover, as explained above, the

Defendant's request for a limiting instruction in the jury charge and a supplemental instruction

following the ambiguous jury note was unnecessary.  While Kate's and Annie's limiting

instructions were appropriate at the time of their testimony when the jury had not yet been

instructed on the meaning of "illegal sexual activity," it was unnecessary and potentially

confusing to repeat them again in the context of the charge.  At that point, the charge made clear

to the jury that only a violation of New York law could form the predicate for the Mann Act

counts—not New Mexico law.  In sum, the Defendant has not shown that she suffered

"substantial prejudice" meriting the vacatur of the Mann Act counts.

**IV.      The Court denies the Defendant's pre-indictment delay claim.**

Last, the Defendant argues, as she did in two pretrial motions, that all of her convictions

should be vacated because of the Government's allegedly excessive and prejudicial delay in

prosecuting the Defendant.  As this Court previously explained, because "the statute of

limitations is 'the primary guarantee against bringing overly stale criminal charges,'" the

Defendant must satisfy a stringent two-part test.  *Maxwell*, 534 F. Supp. 3d at 316 (quoting

*United States v. Cornielle*, 171 F.3d 748, 751 (2d Cir. 1999)).  The Defendant "must show both

that the Government intentionally delayed bringing charges for an improper purpose and that the delay seriously damaged [her] ability [to] defend against the charges." *Id.* (citing *Cornielle*, 171 F.3d at 751).

In its prior rulings, this Court concluded that the Defendant satisfied neither requirement: there was "no evidence that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense," and she "failed to establish actual prejudice from the Government's delay." *Id.* at 316–17.  But, the Court explained, the Defendant could renew her motion if the factual record at trial showed prejudice that the pretrial record did not.  The Defendant now renews her motion, identifying a bevy of documentary records and witnesses that, she says, were unavailable because of the Government's delay.  The Court, for the reasons stated below, disagrees and denies the motion.

As an initial matter, even if the Court accepts all of the Defendant's contentions in her briefing, her pre-indictment delay claim must fail because the Defendant has made no claim that the Government intentionally delayed the Indictment to gain a tactical advantage over the Defendant.  *United States v. Alameh*, 341 F.3d 167, 176 (2d Cir. 2003).  The Court has twice concluded that "nothing in the record indicates that the Government's delay in bringing these charges was designed to thwart Maxwell's ability to prepare a defense." *Maxwell*, 2021 WL 3591801, at *5.  It is the Defendant's burden to prove the Government's improper motive, but in her briefing she does not attempt to present evidence of intentional delay for tactical advantage. The Court therefore does not alter its prior conclusion.  If anything, as the Government notes, testimony at trial supplied legitimate explanations for the Government's failure to indict the Defendant at an earlier time.  For example, several witnesses testified that their cooperation with

38

A-396

the Government's investigation was relatively recent, *e.g.*, Trial Tr. at 354 (Jane), 1245 (Kate),

1680–84 (Carolyn), suggesting that an earlier prosecution was not feasible.

Even on the first step of the inquiry, the Defendant has failed to demonstrate that she

suffered actual and substantial prejudice from delay.  *United States v. Pierre-Louis*, No. 16 CR

541 (CM), 2018 WL 4043140, at *5 (S.D.N.Y. Aug. 9, 2018).  Substantial prejudice is a

stringent standard.  The Defendant's "proof of prejudice must be definite and not speculative."

*United States v. Birney*, 686 F.2d 102, 105–06 (2d Cir. 1982).  Actual prejudice "is commonly

demonstrated by the loss of documentary evidence or the unavailability of a key witness."

*Corniele*, 171 F.3d at 752.  But "claims of mere loss of memory resulting from the passage of

time have been held to be insufficient."  *Pierre-Louis*, 2018 WL 4043140, at *4.  And for any

evidence lost because of delay, the Defendant "must 'demonstrate how (the loss of evidence) is

prejudicial' to her."  *Birney*, 686 F.2d at 106 (quoting *United States v. Mays*, 549 F.2d 670, 677

(9th Cir. 1977)).

The Defendant identifies two major sets of lost evidence that, she says, demonstrate

actual prejudice to her defense at trial.  First, she points to documentary evidence absent at trial:

(1) flight records, including passenger manifests and records from Epstein's travel agent, that

may have been more detailed than the flight logs entered at trial; (2) financial documents,

including bank records and credit card records, which would have revealed more about the

Defendant's receipt of funds from Epstein and could have been used to verify or disprove certain

dates; (3) a complete set of the Defendant's phone records; and (4) Epstein's property records for

both his New York and New Mexico residences.  Second, the Defendant identifies four deceased

witnesses: Albert Pinto and Roger Salhi, architects that built and renovated Epstein's residences

in Florida, New York, and New Mexico; Sally Markham, a property manager for Epstein in the

A-397

2000s that could have testified the household manual was created by "the Countess," not the Defendant; and Lynn Fontanilla, a live-in housekeeper for Epstein in New York that could have testified about the Defendant's and Epstein's habits.

None of these identified pieces of alleged evidence satisfies the Defendant's burden of proving actual and substantial prejudice. The Court addresses first the documentary evidence. *First*, the Defendant does not attest, or even suggest, what the absent documents are likely to show. Though the Defendant would herself be best positioned to explain her own financial transactions (or the lack thereof), her brief does not suggest what the absent financial records would have shown. Similarly, the Defendant does not identify what would have been shown in the absent phone records. The same is true of the flight records that the Defendant argues were missing. At trial, the Government elicited testimony that flight manifests from before September 11, 2001, were far less detailed than modern manifests. *E.g.*, Trial Tr. at 2518–22. The Defendant can therefore only speculate that more accurate records *ever* existed. The location and appearance of Epstein's residences were also the source of significant testimony at trial. The Defendant does not explain what additional information would have been contained in official property records.

*Second*, even if more detail of the contents of these documents were presented, the Defendant fails to show why the evidence, if admitted at trial, would have benefitted her case. The Defendant's motion presumes that each piece of missing evidence would have favored her: an absence of payments by Epstein to the Defendant, an absence of phone calls from the Defendant to victims, an absence of the victims on detailed flight manifests. But this presumption is purely speculative. Each piece of evidence may very well have further substantiated the Government's case. Because the Defendant carries the burden of proof, she is

40

A-398

not entitled to the inference that all absent evidence would have been both favorable and material to her case. *United States v. Berry*, No. 20-CR-84 (AJN), 2021 WL 2665585, at *2 (S.D.N.Y. June 29, 2021).

*Third*, the Defendant must show that the prejudicial loss of evidence was *caused* by the pre-indictment delay. That is, the Defendant must show that the evidence was at one point available but that at trial "the lost testimony or information was not available through other means." *Pierre-Louis*, 2018 WL 4043140, at *4 (quoting *United States v. Sprouts*, 282 F.3d 1037, 1041 (8th Cir. 2002)). Here, the Defendant has made only a "bare allegation that [certain] records have been lost or destroyed," but without explaining when or why they were lost. *United States v. Dornau*, 356 F. Supp. 1091, 1094 (S.D.N.Y. 1973). Further, the Defendant does not explain whether any attempt was made to acquire these records either directly or by other means. It is unexplained, for example, why the Defendant believes that government property records that at one point existed are no longer available. Or why the Defendant could not have proven Epstein's residency by any alternative means. Similarly, the Defendant does not explain why the flight manifests that pilot Larry Visoski delivered to Epstein's office in New York have been lost. *See* Trial Tr. at 172. In short, the Defendant fails to show that the absence of documentary evidence was causally related to any decision by the Government to delay the Indictment.

For similar reasons, the Defendant fails to demonstrate prejudice by reference to the deceased potential witnesses. *First*, "[c]ourts have generally found that vague assertions that a deceased witness might have provided favorable testimony do not justify dismissing an indictment for delay." *Maxwell*, 534 F. Supp. 3d at 317; *see, e.g.*, *United States v. Lovasco*, 431 U.S. 783, 785–86, 788–90 (1977) (reversing dismissal for pre-indictment delay where a material defense witness had died); *United States v. Snyder*, 668 F.2d 686, 689 (2d Cir. 1982) (two

defense witnesses died three years or more prior to indictment); *United States v. King*, 560 F.2d

122, 130 (2d Cir. 1977) (defense witness died a year prior to the indictment). Here, the

Defendant largely speculates about the contents of these deceased witnesses' absent testimony.

She states, for example, that the two architect witnesses "could have established" the timeline for

Epstein's residences and renovations at each but does not say what that timeline is. Maxwell Br.

at 29. Similarly, the Defendant states that Epstein's live-in housekeeper *could* have testified that

the Defendant spent only limited time with Epstein at his townhouse in New York but provides

little basis or detail for that anticipated testimony. As with the documentary evidence above,

such speculation, with the apparent presumption that absent evidence would necessarily favor the

Defendant, is insufficient to establish actual prejudice. *See United States v. Long*, 697 F. Supp.

651, 657 (S.D.N.Y. 1988) (no prejudice where there is "no way of knowing what [an absent

witness's] testimony would have been").

     *Second*, the Defendant fails to establish that the content of these witnesses' testimony

could not have been introduced into trial by other means. At trial, witnesses testified that Epstein

employed a significant number of individuals to work at his residences, renovate those

residences, or fly his private airplane. Some, like Juan Alessi, Larry Visoski, and David

Rodgers, testified at trial. Still others were listed on the parties' witness lists. The Defendant

does not explain why these witnesses' testimony, or the testimony of those listed witnesses who

were not called, could not have supplied the same information that she seeks from individuals

who were unavailable to testify. Her assertion that only individuals that have since died could

provide adequate testimony is entirely unsubstantiated. Similarly, the Defendant does not

explain why evidence of construction or renovations at Epstein's residences could not be proven

by other witness testimony or by documentary evidence.

And *third*, the Defendant does not demonstrate that such witnesses, even if available to testify as the Defendant speculates they may have, would have meaningfully altered her defense such that she was substantially prejudiced by their absence. *Pierre-Louis*, 2018 WL 4043140, at *4. No witness listed could testify directly to whether or not the Defendant and Epstein sexually abused the victims. Rather, each would at best provide additional corroboration of the Defendant's arguments at trial to impeach the witnesses' credibility as to particular aspects of their testimony. This falls short of substantial prejudice. *United States v. Lawson*, 683 F.2d 688, 694 (2d Cir. 1982) (no prejudice where absent witness's testimony was "at best corroborative on minor points").

Specifically, the housekeeper's anticipated testimony that the Defendant rarely spent the night at Epstein's townhouse and that she and Epstein were not "always" together contradicts little, if any, of the Government's case at trial. Maxwell Br. at 30. The Defendant does not claim that the housekeeper was always aware of the Defendant's or Epstein's actions, and so is unlikely to have rebutted testimony that at other times and other locations, the Defendant and Epstein committed crimes. *See Pierre-Louis*, 2018 WL 4043140, at *4 (absence of a witness not prejudicial because unless the witness was with the defendant "every moment," it would have been "impossible for him to testify that defendant did not commit the charged crimes").

The speculated testimony of Sally Markham—that an individual known only as "the Countess," not the Defendant, wrote the household manual—is similarly unhelpful to the Defendant's claim. In considering whether testimony would have been beneficial to the Defendant, the Court must consider whether the witness would have been credible and withstood cross-examination. *See Maxwell*, 534 F. Supp. 3d at 317 (citing *United States v. Spears*, 159 F.3d 1081, 1085 (7th Cir. 1999)). The Defendant provides no basis to conclude that the jury

would have credited this vague testimony about an unnamed individual over the evidence

presented at trial, including the testimony of Juan Alessi and an email chain between the

Defendant and Markham that indicates that the Defendant worked closely with Markham to

create the manual and provided specific content, such as the checklists, to be included.  *See* GX-

424.

Finally, the Defendant refers to her prior briefing in which she alleged substantial

prejudice because of the absence of other deceased potential witnesses, including Epstein,

Epstein's mother, Jane's talent agent Michael Casey, and Palm Beach Police Department

Detective Joseph Recarey.  *See* Dkt. No. 138 at 8–11.  The Court has previously considered and

rejected the Defendant's claim of prejudice based on these absent witnesses.  *Maxwell*, 534 F.

Supp. 3d at 317.  The Defendant points to no development at trial that she believes should alter

the Court's conclusion, nor is the Court aware of any such reason for reconsideration.

The Defendant's reply brief devotes just a single sentence to her claim of pre-indictment

delay and does not address any of the defects identified by the Government.  She has not

satisfied either element required for a claim of pre-indictment delay, as she has not demonstrated

that the Government improperly delayed prosecution nor that she suffered actual and substantial

prejudice from such delay.  The Court therefore denies her motion to vacate her convictions on

this basis.

**V.    Conclusion**

For the foregoing reasons, the Court denies the Defendant's Rule 29 motion because the

jury's guilty verdicts were supported by the witness testimony and documentary evidence

presented at trial.  The Court denies the Defendant's motion based on constructive amendment or

variance because the jury instructions, the Government's evidence at trial, and summation all

A-402

captured the core of criminality charged in the Indictment, and the Defendant was not prejudiced by any alleged variance.  Further, because the Government neither intentionally delayed its prosecution nor was the Defendant prejudiced by any delay, the Court also denies the Defendant's motion based on pre-indictment delay.  Finally, the Court grants the Defendant's motion as to multiplicity.  The Government concedes that Count One is multiplicitous with Count Three, and the Court further concludes that Count Five is multiplicitous with Count Three.  Count Five, like Counts One and Three, charged the Defendant's participation in the same decade-long unlawful agreement with the Defendant's continuous coconspirator, Jeffrey Epstein, to groom and sexually abuse underage girls.

Accordingly, the Court will enter judgment of conviction on Counts Three, Four, and Six.  The Defendant's sentencing date remains scheduled for June 28, 2022.  The Court previously set a schedule for sentencing submissions that remains in effect.  Dkt. No. 656.

This resolves Dkt. No. 599.

SO ORDERED.


Dated: April 29, 2022
       New York, New York                    _____
                                                        ALISON J. NATHAN
                                                   United States Circuit Judge
                                                    Sitting by Designation

45

M6SQmax1

1    your Honor.  If the Court remembers the record evidence, there

2    was some evidence of money moving, but it was to buy a

3    helicopter that was not for her.  We heard testimony from Larry

4    Visoski that he often kept assets of cars in his name for

5    Mr. Epstein.  That doesn't make Larry Visoski a participant in

6    the criminal endeavors.  I think it's a stretch for the

7    government to point to that as some sort of evidence of

8    continued involvement or continued profit after the end date of

9    the conspiracy.  I just wanted to make that one point, your

10   Honor.

11           THE COURT:  Anything on that, Ms. Moe?

12           MS. MOE:  Your Honor, with respect to the financial

13   transaction, we offered that along with other evidence to

14   refute the claim that the defendant had moved on, which, as we

15   noted, is an expression that has no legal meaning.  And so

16   contrary to the assertion that the defendant had moved on and

17   was no longer associated with Epstein, the trial evidence

18   established that she remained a close associate for many years,

19   and that is the purpose for which we offered that evidence.

20           THE COURT:  Understood.  Thank you.

21           I do want to address -- do you have other -- I want to

22   ask about 3(b)(1).

23           MR. EVERDELL:  Yes, your Honor.

24           THE COURT:  I think it's for the government.  So as I

25   see the question here, the guidelines require me to find that

**A-404**

M6SQmax1

1    the defendant was an organizer or leader, and that the criminal

2    activity either involved five or more participants or was

3    otherwise extensive.  The guidelines defines a participant as a

4    person who is criminally responsible for the commission of the

5    offense but need not have been convicted.

6         So I think my question for the government is, you're

7    asking the Court to look to as a criminally responsible -- a

8    person who is criminally responsible for the commission of the

9    offense over whom Ms. Maxwell exercised supervisory or

10   leadership role.

11        MS. MOE:  Yes, your Honor.  As we noted in our

12   briefing, our view is that the trial evidence establishes that

13   the defendant had a supervisory role over Sarah Kellen.  Here,

14   we're not required to establish that there were five or more

15   participants; that is, people who were criminally responsible

16   for the charged conduct, but rather that it was extensive, and

17   that the defendant supervised at least one other person.

18   That's the text of the commentary, although as we noted, the

19   Second Circuit in applying this factor hasn't really engaged

20   with that from what we can tell, but on the factual question of

21   the trial record and whether it establishes the defendant

22   supervised another participant, it absolutely does.

23        THE COURT:  And the government is pointing to Sarah

24   Kellen for that conclusion, which you agree, there has to be

25   one criminally responsible participant who we can point to.

**A-405**

M6SQmax1

1      MS. MOE:  Yes, your Honor.  Looking at the text of the

2  application note -- again, it's unclear from some case law on

3  this, but under the text of the application note, if we're

4  looking to one criminal participant, we would direct the

5  Court's attention to Sarah Kellen.

6      THE COURT:  And the leadership over her as opposed to

7  Epstein being the leader over her or them being -- Kellen sort

8  of replacing the defendant's role, could you focus my mind on

9  what specifically you point to to show supervision and

10  leadership by Ms. Maxwell over Ms. Kellen.

11      MS. MOE:  Yes, your Honor.

12      The trial evidence was that Sarah Kellen became an

13  assistant, and that she worked for both Maxwell and Epstein.

14  Essentially, when you look at defendant's role in earlier

15  years, she was doing things like calling victims and arranging

16  for massage appointments.  As the scheme shifted, they brought

17  in another member of the scheme beneath them in the structure

18  and hierarchy of the scheme.  The defendant remained a close

19  associate.  She was often traveling with them, often traveling

20  with Kellen together.  So as Kellen took on some of the tasks

21  that were then delegated to a lower member of the conspiracy,

22  the defendant was higher up in the leadership structure.

23      There wasn't direct evidence about, you know, the

24  defendant directly instructing Kellen to make a certain phone

25  call, and we acknowledge that, but we think the inference is

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

M6SQmax1

1    very clear that when you have two knowing conspirators, Maxwell

2    and Epstein, and they bring in a much younger woman as an

3    assistant and have her take on some of those roles while the

4    defendant remains a lady of the house in the hierarchy of the

5    structure to whom a person like Sarah Kellen would report, that

6    she has leadership of that person; that she is directing that

7    person; that she has control.  Even the simple task of

8    directing her to take on some of those responsibilities, which,

9    of course, to transition parts of that role she would have to

10   do would qualify for leadership.

11            THE COURT:  And there's clear time overlap in the

12   role?

13            MS. MOE:  Yes, your Honor.  As we noted in our brief,

14   the flight records reflect that the defendant continued flying

15   on Epstein's private jet at the same time that Sarah Kellen was

16   also traveling, and that there was an overlap in the years of

17   the time period where they were all close associates of Jeffrey

18   Epstein and the scheme was ongoing.

19            THE COURT:  Go ahead.

20            MR. EVERDELL:  Yes.  Your Honor, before I address the

21   Sarah Kellen point, I would just make the point that the

22   government seems to argue that there is some case law that is

23   not clear that you don't have to necessarily show that they're

24   supervising another criminal participant.  That's just wrong.

25   All those cases that the government cites, the issue has

M6SQmax1

1    already been decided or conceded by the defendant.  The court

2    found they were leader or the defendant didn't contest that, so

3    the issue was only about whether the criminal activity was

4    otherwise extensive.  So that is not -- that is clear under

5    Second Circuit law, that they have to supervise another

6    criminal participant, and it's clear from the guidelines too,

7    as the government concedes.

8             Let's just talk a bit about Sarah Kellen.  I don't

9    think it is a fair inference to say from the trial record that

10   Ms. Maxwell was supervising Sarah Kellen.  In fact, the

11   inference is exactly the opposite.  And you can rely on

12   Carolyn's testimony alone for that; that she herself testified

13   that there was a clear break between when she says that

14   Ms. Maxwell was calling her to schedule for massage

15   appointments versus when Sarah Kellen took over and scheduled

16   for massage appointments.  They did not overlap.  There was a

17   break.  That is corroborated by Juan Alessi no less, who said

18   the same thing.  He said Sarah Kellen came at the end of my

19   employment, to his recollection, and as soon as she got there,

20   she took over the responsibility of scheduling the massage

21   appointments.  Again, a clear break.

22            What the record shows is that there was a replacement.

23   Sarah Kellen replaced Ms. Maxwell, at least according to the

24   trial testimony; not that there was some sort of ongoing

25   supervision by Ms. Maxwell over Sarah Kellen.  It couldn't be

M6SQmax1

1   clearer, your Honor, this notion that she was somehow -- Sarah

2   Kellen was an assistant of both Epstein and Maxwell is again

3   belied by the trial record.

4        If you look at Larry Visoski's testimony, which I

5   believe is what the government is relying on there, he

6   originally testified, oh, I think she was an assistant for

7   both.  But on cross-examination, he conceded that he really

8   didn't know what her role was, and his best recollection was

9   that she was an assistant for Epstein.

10       And again, just look again at Cimberly Espinosa's

11  testimony who was the actual assistant for Ms. Maxwell, and she

12  says unequivocally, "I was her assistant.  Kellen was Epstein's

13  assistant."  So there is no fair inference that Ms. Maxwell was

14  supervising Sarah Kellen.  The inference is exactly the

15  opposite, and it can't provide a basis for that leadership

16  enhancement.

17       THE COURT:  All right.  Anything further on the

18  enhancements for the government's objection?

19       MS. MOE:  Your Honor, just very briefly with respect

20  to the leadership question, I just want to direct the Court's

21  attention, we noted this on page 27 of our brief, but the

22  testimony at trial was that Carolyn recalled that even after

23  Sarah Kellen took over calling to schedule massages, Maxwell

24  was still present inside the Palm Beach residence when Carolyn

25  arrived for massage appointments.

M6SQmax1

1          With respect to the testimony of the pilots who

2     testified, whether they -- whether an employee was paid by

3     Maxwell or Epstein or technically reported to one, according to

4     their job descriptions, is not the question here.  The fact

5     that pilots based on their observation thought at one point

6     that Kellen reported to Maxwell proves the point that she had

7     supervisory authority over Kellen and exercised it, whether in

8     the chain of command or on their formal employment paperwork,

9     she was just an employee for one or the other, it makes no

10    difference.  There was an overlap here.  They had different

11    roles in the conspiracy, and the defendant had a supervisory

12    roll over Kellen.

13          MR. EVERDELL:  Your Honor, just to that point.  Being

14    present does not mean that you're a supervisor.  That's way too

15    far a stretch.  So the fact that there was testimony she was

16    present still in the house while Kellen was making the calls

17    and scheduling the massage appointments means nothing in terms

18    of supervisory authority.

19          THE COURT:  Thank you.  Other enhancements before the

20    government's objection is to be addressed.

21          MS. MOE:  No, your Honor.  Thank you.

22          MR. EVERDELL:  Your Honor, I assume you don't want to

23    hear or have any questions about the five-point enhancement for

24    repeated and dangerous sex offenders.

25          THE COURT:  I believe I have what I need, but as I

**A-410**

M6SQmax1

1    said, I don't need repetition of the arguments in the papers,

2    but if there is any additional points you want to make, you're

3    welcome to.

4            MR. EVERDELL:  Your Honor, just one point.  I will be

5    brief.  The government in its papers makes the argument that

6    the background commentary can't be relied upon as authoritative

7    because it is not explanatory or interpretative of what the

8    guideline is.  I think that is incorrect.

9            It is not simply a recitation of what Congress was

10   considering.  That first sentence or two which talks about how

11   this guideline can only be applied to offenders who represent a

12   continuing danger to the community is interpretative of what

13   the guideline is.  The title of the guideline is repeat and

14   dangerous sex offenders.  That explanatory commentary explains

15   how to interpret what dangerous means.  It means someone who is

16   continuously dangerous to the community, not someone who's

17   never been accused of a crime in the 18 plus years since the

18   crime in this case, and has never been accused of re-offending.

19   So I don't agree with that point.  This is authoritative

20   guidance from the Sentencing Commission, and the Court should

21   consider it as such.  Thank you.

22           THE COURT:  Ms. Moe, do you want to respond?

23           MS. MOE:  No, your Honor.  We rest on our briefing on

24   this issue, but thank you.

25           THE COURT:  Thank you.  Anything else?

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

**A-411**

M6SQmax1

1          MR. EVERDELL:  No, your Honor.  We rest on the papers.

2          THE COURT:  I thank you counsel for your thorough

3     briefing.  I am prepared to rule.

4          The defendant raises four objections to the

5     calculation of the guideline range contained in the PSR.  As we

6     discussed, first, she argues I must apply the 2003 guidelines

7     rather than the 2004 guidelines.  Beyond that, she objects to

8     the application of three sentencing enhancements.  The

9     government's sole objection to the calculation of the

10    guidelines is that Virginia Roberts and Melissa should be

11    considered victims.  So I will address the defense objections

12    and then the government's objections.

13         I begin by determining which of the Guideline manuals

14    apply.  Generally, a sentencing court applies the version of

15    the guidelines in effect on the date that the defendant is

16    sentenced.  18 U.S.C. Section 3553(a)(4)(A)(ii).  But the

17    *Ex Post Facto* Clause is violated if a defendant is sentenced

18    under Guidelines issued after she's committed her offense and

19    the new Guidelines provide a higher sentencing range than the

20    version in place at the time of the offense.  That's the

21    principle of a case called *Peugh v. United States*, 569 U.S. 530

22    (2013).  In that case, a sentencing court must -- in the case

23    of a higher range at the time of sentencing than in place at

24    the time of the offense, in that case the sentencing court must

25    apply the guidelines in effect when the offense was committed.

**A-412**

37

M6SQmax1

1    *United States v. Guerrero*, 910 F.3d 72 (2d Cir. 2018).  Here,

2    the parties and the probation department agree that applying

3    the current Guidelines would result in a significantly longer

4    sentence than the application of the guidelines in place when

5    the defendant committed her offense, whether that is the 2003

6    or 2004 guidelines.

7         The controlling date for ex post facto purposes is the

8    last date of the offense of conviction.  The 2004 Guidelines

9    became effective on November 1, 2004.  So I must determine if

10   the last date of the offense was after November 1, 2004.

11        Because it seeks an increased punishment, the

12   government bears the burden of persuasion.  The government

13   charged a decade-long conspiracy of sexual abuse that the

14   indictment alleged ended in 2004.  It's proof at trial that the

15   conspiracy continued in 2004 related to Carolyn.  And the

16   charged conspiracy had to end no later than very early 2005

17   because that's when Carolyn turned 18 and can no longer be

18   deemed a victim of the federal sex-trafficking offense charged

19   which proscribes conduct with respect to individuals under the

20   age of 18.  So the government purports to carry its burden on

21   this issue based on portions of Carolyn's testimony and some

22   message pads regarding what occurred in 2004 and 2005.

23        Let me state clearly, I found, as I said repeatedly in

24   my factual conclusions on the PSR objections, I found Carolyn

25   to be a credible witness, as did the jury.  The question before

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

M6SQmax1

1    me is specific and highly technical.  Does the preponderance of

2    the evidence demonstrate that the offense to sex traffic

3    Carolyn continued after November 1, 2004 before she turned 18

4    in early 2005?  In other words, does a preponderance of the

5    evidence establish that acts in furtherance of the conspiracy

6    to traffic Carolyn occurred in either November or

7    December 2004?  Although Carolyn testified regarding contact

8    earlier in 2004 and after she turned 18 in 2005, there is no

9    evidence, either in the form of testimony or documentary

10   evidence, including the message pads, that demonstrates by a

11   preponderance of the evidence conspiratorial conduct during

12   those last two months of 2004 before Carolyn turned 18 in 2005.

13            In those portions of Carolyn's testimony cited by the

14   government, Carolyn stated that she was 18 years old the last

15   time she went to Epstein's house, which would have been in

16   2005.  As Carolyn further explained, she returned more than

17   four or five times to Epstein after she gave birth to her son

18   in March of 2004, and that testimony is supported by message

19   pads entered at trial that show Carolyn called Epstein several

20   times in the summer of 2004:  Once in late April or early May

21   again on July 6, and again on July 30.  When she did return to

22   Epstein, Carolyn testified Epstein asked if she had younger

23   friends, and she explained during her testimony that at 18

24   years old, she was too old for him.  Carolyn wasn't asked, and

25   her testimony doesn't specifically address, whether she went to

**A-414**

39

M6SQmax1

1   Epstein's house after November 2004 before she turned 18.

2   Message pads entered at trial show contact only before

3   November 1.

4           The government's reliance on two additional pads that

5   were not entered into evidence doesn't change my analysis.  The

6   first message GX-4B, it's undated, and the context does not

7   give sufficient confidence that it came after November 1.  The

8   other message pad is dated March 1, 2005, which falls outside

9   the scope of the conspiracy alleged in the indictment, and

10  after Carolyn turned 18.  Because I cannot on this record find

11  by a preponderance of the evidence that the offense continued

12  during that two-month window after November 1, 2004, and before

13  early 2005, I must apply the 2003 guidelines.  Because I find

14  that the date of the offense was not after November 1, 2004, I

15  do not address the defendant's alternative argument that a jury

16  must decide if the 2004 Guidelines apply.

17          Within the Guidelines themselves, the defendant

18  objects to the application of three enhancements in the PSR.

19  She takes issue first with 4B1.5(b).  The enhancement

20  statements that the offense level is increased by five if:

21  One, the offense of conviction is a covered sex crime; two,

22  4B1.5(a) for prior convictions does not apply; three, the

23  defendant engaged in a pattern of activity involving prohibited

24  sexual conduct.  All three requirements are met:  The defendant

25  was convicted of a covered sex crime; she was not previously

**A-415**

M6SQmax1

1    convicted of a sex crime; and I readily find she engaged in a

2    pattern of activity involving prohibited sexual conduct.

3    Specifically, the Guidelines define a pattern of such activity

4    as the defendant engaging in prohibited sexual conduct with a

5    minor on at least two separate occasions.

6         The defendant doesn't contest any of these enumerated

7    requirements. Rather, she argues that I may apply this

8    enhancement only if I further find that the defendant poses a

9    continuing danger to the public. Here, the defense draws this

10    requirement from background commentary by the Sentencing

11    Commission and a few statements made by members of the Congress

12    who of emphasized high recidivism rates in enhancing sentences

13    for sex offenders.

14         I overrule this objection because it lacks any basis

15    in the Guidelines. As with all interpretive matters, I start

16    with the text of the Guidelines. If the text is unambiguous, I

17    apply it as written and do not resort to background commentary.

18    *United States v. Sash*, 396 F.3d 515 (2d Cir. 2005). Commentary

19    cited by the defendant simply provides policy rationale for a

20    particular enhancement. It does not purport to interpret the

21    Guidelines and so is not binding. Nor can scattered

22    legislative history override the clear text of the Guidelines,

23    especially when that history amounts to only a few short floor

24    statements which are "among the least illuminating forms of

25    legislative history." *NLRB v. SW General, Inc.* 137, S. Ct. 929

M6SQmax1

1    (2017).

2           Moreover, the defendant fails to prove that 4B1.5(b)

3    was enacted only to prevent future danger to the public.

4    Background commentary explains that aside from recidivism,

5    Congress "directed the Commission to ensure lengthy

6    incarceration for offenders who engage in a pattern of activity

7    involving the sexual abuse or exploitation of minors."  That's

8    4B1.5 comment background.

9           Further, the legislative history quoted by the

10   defendant says that Congress increased Guidelines sentences for

11   sexual abuse of minors "to address the egregiousness of these

12   crimes."  And, in fact, the defendant's brief cites that I

13   believe at 12.  Thus, I find no basis for a requirement that I

14   must first find the defendant to be a public danger before

15   applying the enhancement.  The defendant's remaining argument

16   that applying this enhancement would result in an excessive

17   sentence is appropriately considered as part of the defendant's

18   request for a downward variance.

19          Next the defendant objects to the application

20   3B1.1(a), which we've discussed, which adds four offense levels

21   for her leadership role in a criminal activity.  "a court must

22   make two specific factual findings before it can properly

23   enhance a defendant's offense level under 3B1.1(a): (i) that

24   the defendant was an organizer or leader; and (ii) that the

25   criminal activity involved five or more participants or was

**A-417**

M6SQmax1

1    otherwise extensive."  Quoting from *United States v. Patasnik*,

2    89 F.3d 63 (2d Cir. 1996).  The Guidelines define a participant

3    as a person who is criminally responsible for the commission of

4    the offense, but need not have been convicted.  That's Section

5    3B1.1, comment note 1.  And in assessing whether criminal

6    activity is extensive, all persons involved during the course

7    of the entire offense are to be considered, including persons

8    who provided services unknowingly.  Comment note 3.

9        The defendant argues that she did not lead another

10   criminal participant.  I overrule this objection because I do

11   conclude that the government has proved by a preponderance that

12   the defendant supervised Sarah Kellen, who was a knowing

13   participant in the criminal conspiracy.

14       Larry Visoski and David Rodgers both testified for

15   that at least part of the time period at issue Sarah Kellen

16   acted as a personal assistant to the defendant.  I credit that

17   testimony which is corroborated by further testimony that the

18   defendant was Epstein's number two and the lady of the house.

19   At some point, Kellen took over some of the defendants duties.

20   But even after that time, the defendant retained her leadership

21   position, as evidenced by Carolyn's testimony, by flight

22   records in evidence, and the household manual in evidence.  I

23   do conclude by a preponderance of the evidence that the

24   defendant led a criminally responsible participant.

25       I further find that the defendant's criminal activity

**A-418**

M6s2Max2

1    appellate rights.  You have the right to appeal your conviction

2    and your sentence.  The notice of appeal must be filed within

3    14 days of the judgment of conviction.

4            Other matters to take up counsel?

5            MS. MOE:  Not from the government, your Honor.  Thank

6    you.

7            MS. STERNHEIM:  No.  Thank you.

8            THE COURT:  Let me note, I will issue a housekeeping

9    order posttrial to ensure complete docketing of all -- any

10   outstanding materials and complete records, so please look for

11   that.  I will issue the judgment -- I should just say, Ms. Moe,

12   the Court intends to indicate the end of the conspiracy date as

13   the last date in the record, which I believe is in July of

14   2004, of acts in furtherance of the criminal conduct, and

15   obviously the government took a different position with respect

16   to that.  But in light of the Court's finding, any objection to

17   that?

18           MS. MOE:  No, your Honor.  We will review the

19   exhibits.  If that date is different from the sentencing

20   transcript, we will submit a letter to the Court, but otherwise

21   no objection, your Honor.

22           MS. STERNHEIM:  No objection.

23           THE COURT:  All right.

24           MS. MOE:  With apologies, your Honor, with respect to

25   the judgment, in light of the Court's decision to impose an

M6s2Max2

1    above-guidelines sentence and an above-guidelines fine, we

2    would respectfully request that the Court address both the

3    sentence and the fine in the Court's statement of reasons.

4              THE COURT:  Yeah, I actually -- guideline range, let

5    me just check.  I meant to talk about that.  I'm not sure it is

6    an above-guidelines, but it may be since, as we know, I read

7    over five to mean five.  So maybe I got that wrong.  Let me

8    just check.

9              Oh, you are right.  It is 20 to 200,000 for each

10   count.  Do I have that right?

11             MS. MOE:  Yes, your Honor.  Thank you.

12             THE COURT:  All right.  Thank you.

13             I want to thank counsel.  As I indicated, I do thank

14   the victims who made statements in writing or orally and their

15   counsel who supported them in that endeavor.  I thank counsel

16   for Ms. Maxwell and counsel for the government.

17             We are adjourned.

18                              oOo

19

20

21

22

23

24

25

A-420

Criminal Notice of Appeal - Form A

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/7/2022

# NOTICE OF APPEAL

## United States District Court

__Southern__ District of __New York__

Caption:
__United States of America__ v.

__Ghislaine Maxwell__

Docket No. __S2 20 Cr. 330__
__Alison J. Nathan (SBD)__
(District Court Judge)

Notice is hereby given that __Ghislaine Maxwell__ appeals to the United States Court of

Appeals for the Second Circuit from the judgment __✓__, other |_____
(specify)

entered in this action on __6/29/2022__.
(date)

This appeal concerns: Conviction only |___|   Sentence only |___|   Conviction & Sentence |✓|   Other |___|

Defendant found guilty by plea |   | trial |✓| N/A |   .

Offense occurred after November 1, 1987?   Yes |✓|   No |___|   N/A |___|

Date of sentence: __6/28/2022__   N/A |___|

Bail/Jail Disposition: Committed |✓|   Not committed   |   N/A   |

Appellant is represented by counsel?   Yes |✓*|   No |✓**|   If yes, provide the following information:

Defendant's Counsel: __Bobbi C. Sternheim, Law Offices of Bobbi C. Sternheim__

Counsel's Address: __225 Broadway, Suite 715__

__New York, NY 10007__

Counsel's Phone: __212-243-1100__

Assistant U.S. Attorney: __Maurene Comey__

AUSA's Address: __One Saint Andrew's Plaza__

__New York, NY 10007__

AUSA's Phone: __212-637-2324__

* **FOR FILING OF NOTICE OF APPEAL _ONLY_**
** *_NOT RETAINED_* **FOR REPRESENTATION ON APPEAL**
Signature

A-421

Generated: Jul 7, 2022 11:56AM

Page 1/1

# U.S. District Court

## New York Southern - Manhattan

Receipt Date: Jul 7, 2022 11:56AM

BOBBI C. STERNHEIM FBO GHISLAINE MAXWELL

| Rcpt. No: 2280 | | Trans. Date: Jul 7, 2022 11:56AM | | | Cashier ID: #ST |
|---|---|---|---|---|---|
| **CD** | **Purpose** | **Case/Party/Defendant** | **Qty** | **Price** | **Amt** |
| 203 | Notice of Appeal/Docketing Fee | | 1 | 505.00 | 505.00 |

| CD | Tender | Amt |
|---|---|---|
| CC | Credit Card | $505.00 |
| | Total Due: | $505.00 |
| | Total Tendered: | $505.00 |
| | Total Cash Received: | $0.00 |
| | Cash Change Amount: | $0.00 |

**Comments**: 20CR330-1 AJN

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.