# 22-1426-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

GHISLAINE MAXWELL, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

ARTHUR L. AIDALA
DIANA FABI SAMSON
JOHN M. LEVENTHAL
AIDALA BERTUNA & KAMINS PC
*Attorneys for Defendant-Appellant*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................v

STATEMENT OF SUBJECT MATTER AND APPELLATE
     JURISDICTION ..............................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE..................................................................4

    A.    The Trial .......................................................................6

SUMMARY OF THE ARGUMENT .........................................................8

INTRODUCTION ..............................................................................11

    POINT I

    ALL COUNTS SHOULD BE DISMISSED PURSUANT TO THE
    NON-PROSECUTION AGREEMENT ......................................................13

        A.    The NPA ...................................................................13

        B.    Appellant may enforce the NPA as a third-party
            beneficiary.................................................................16

        C.    The "potential co-conspirators" provision binds the
            USAO-SDNY, and *Annabi* is not to the contrary....................16

            1.    Introduction....................................................16

            2.    *Annabi* does not apply because the NPA was
                negotiated and entered into outside of the Second
                Circuit ...................................................25

            3.    *Annabi* does not apply to Count Six because that
                count falls wholly within the timeframe
                contemplated by the NPA...............................30

            4.    There is affirmative indication that the NPA
                binds the USAO-SDNY..................................33

            5.    If it is reasonable to conduct a hearing, then
                *Annabi* is a tiebreaker that only applies if
                ambiguity remains after the hearing ...............38

i

    D.    All counts fall within the scope of the NPA and must be dismissed ............................................................................40

POINT II

ALL COUNTS ARE BARRED BY THE STATUTE OF LIMITATIONS.................................................................................41

    A.    Section 3283 Does Not Apply to the Mann Act Violations (Counts Three and Four) ........................................43

    B.    The District Court erred in applying § 3283 retroactively ...............................................................................52

        1.    Congress evinced an intent that § 3283 operate only prospectively.............................................................54

        2.    The District Court's application of § 3283 creates "impermissible retroactive effects" without authorization from Congress ............................58

    C.    Count Six is also barred by the Statute of Limitations ............62

POINT III

DEFENDANT WAS DENIED HER CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL JURY BECAUSE A JUROR MADE FALSE STATEMENTS IN *VOIR DIRE* AS TO MATERIAL FACTS THAT, IF KNOWN, WOULD HAVE PROVIDED A VALID BASIS TO REMOVE HIM FOR CAUSE. U.S. Const. amend. VI ................................................................63

    A.    Introduction ...............................................................................63

    B.    Applicable Law ..........................................................................64

    C.    Juror No. 50's False Responses Deprived Ms. Maxwell of her Constitutional Right to a Trial by an Impartial Jury................................................................................65

        1.    Juror 50 Did Not Truthfully Answer Material Questions During *Voir Dire* ............................................65

    D.    Under the McDonough Test, Juror 50's Actual, Implied and Inferred Bias was established............................................66

        1.    The McDonough Test: The First Prong..........................66

2. The McDonough Test: The Second Prong ....................66

E. The District Court Abused its Discretion in the Manner in Which it Conducted the Post-Trial Hearing .........................68

    1. The Court Erred in Precluding Defense Counsel From Questioning Juror 50 ..............................................69

    2. FRE 606 Did Not Prevent Inquiry into Juror 50's Use of Prior Abuse in Persuading Jury to Convict Maxwell .........................................................70

F. The District Court Erred in Finding that (1) Juror 50 was Not Biased and (2) Juror 50 Would Not Have Been Stricken Even if He Had Answered the Questions Accurately .................................................................................71

POINT IV

THE COURT CONSTRUCTIVELY AMENDED COUNTS THREE AND FOUR OF THE INDICTMENT ...........................................73

A. Background Facts .....................................................................74

    1. The Jury Note ..................................................74

B. Applicable Law .......................................................................75

    1. The "Core of Criminality" of Counts Three and Four Was a Scheme to Cause Underaged Girls to Travel to New York with an Intent to Violate New York Law ........................................................................76

    2. There is a Substantial Likelihood that Maxwell Was Convicted on Counts Three and Four Based on Conduct Not Charged in the Indictment.....................77

C. The Variance Between the Proof at Trial and the Allegations in the Indictment Substantially Prejudiced Maxwell .....................................................................................81

POINT V

THE SENTENCE SHOULD BE VACATED AND REMANDED FOR RESENTENCING AS THE DISTRICT COURT ERRED IN APPLYING AN INCORRECT GUIDLINE RANGE AND OFFENSE LEVEL .......................................................................82

A.     Standard of Review ................................................... 82

B.     Procedural Errors ..................................................... 83

C.     The District Court improperly applied the four-level
aggravating role adjustment under USSG § 3B1.1 .................. 84

CONCLUSION ......................................................................... 86

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Appalachian Power Co. v. E.P.A.*,
  249 F.3d 1032 (D.C. Cir. 2001) .................................................................54

*Arizona v. Fulminante*,
  499 U.S. 279 (1991) ....................................................................................64

*Brazeail v. State*,
  821 So. 2d 364 (Fla. App. 2002) ...............................................................28

*Bridges v. U.S.*,
  346 U.S. 209 (1953) ..............................................................................46, 47

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*,
  464 U.S. 89 (1983) ......................................................................................55

*Doe v. Indyke et al.*,
  Case No. 1:21-cv-08469-PKC (S.D. Fla.) ..................................................35

*E. Enterprises v. Apfel*,
  524 U.S. 498 (1998) ....................................................................................60

*Egbert v. Boule*,
  142 S. Ct. 1793 (2022) ................................................................................23

*Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp.*,
  502 F.3d 78 (2d Cir. 2007) .........................................................................28

*Enterprise Mortg. Acceptance Co., LLC, Securities Litig. v.*
  *Enterprise Mortg. Acceptance Co.*,
  391 F.3d 401 (2d Cir. 2004) .....................................................53, 55, 58, 61

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ....................................................................................55

*Gall v. United States*,
  552 U.S. 38 (2007) ......................................................................................82

*Garcia v. U.S.*,
  469 U.S. 70 (1984) ......................................................................................57

*Giglio v. United States*,
  405 U.S. 150 (1972) ..............................................................................19, 20

*Hudson Valley Black Press v. I.R.S.*,
　409 F.3d 106 (2d Cir. 2005) ..........................................................55

*In re Arnett*,
　804 F.2d 1200 (11th Cir. 1986) ....................................................27

*James v. U.S.*,
　550 U.S. 192 (2007)......................................................................50

*John Wiley & Sons, Inc. v. DRK Photo*,
　882 F.3d 394 (2d Cir. 2018) ........................................................27

*Johnson v. U.S.*,
　576 U.S. 591 (2015)......................................................................50

*Kaplan v. C.I.R.*,
　Case No. 25652-12, 2014 WL 988456 (U.S. Tax Ct. Mar. 13, 2014) .... 26-27

*Kawashima v. Holder*,
　565 U.S. 478 (2012)............................................................44, 45, 50

*Landgraf v. USI Film Prod.*,
　511 U.S. 244 (1994).................................................................*passim*

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
　424 F.3d 195 (2d Cir. 2005) ........................................................34

*Lattab v. Ashcroft*,
　384 F.3d 8 (1st Cir. 2004).............................................................55

*Leocal v. Ashcroft*,
　543 U.S. 1 (2004)..........................................................................45

*Little v. U.S.*,
　Nos. 1:08-cr-59, 1:09-cv-822, 2010 WL 3942749
　(S.D. Ohio Oct. 7, 2010)..............................................................21

*Margalli-Olvera v. I.N.S.*,
　43 F.3d 345 (8th Cir. 1994) ........................................................20

*Martin v. Hadix*,
　527 U.S. 343 (1999)......................................................................55

*Martin v. Hunter's Lessee*,
　14 U.S. 304 (1816)........................................................................54

vi

*McDonough Power Equipment, Inc. v. Greenwood*,
    464 U.S. 548 (1984)..............................................................9, 64, 66

*Morales v. Irizarry*,
    976 F. Supp. 256 (S.D.N.Y. 1997) ................................................59

*Nijhawan v. Holder*,
    557 U.S. 29 (2009)......................................................................50

*Paradiso v. U.S.*,
    689 F.2d 28 (2d Cir. 1982) ...........................................................28

*Port Consol., Inc. v. Int'l Ins. Co. of Hannover, PLC*,
    826 F. App'x 822 (11th Cir. 2020) ................................................34

*Rivas v. Brattesani*,
    94 F.3d 802 (2d Cir. 1996) ...........................................................64

*Rowe v. Griffin*,
    676 F.2d 524 (11th Cir. 1982) ................................................27, 29

*Salahuddin v. Mead*,
    174 F.3d 271 (2d Cir. 1999) ..........................................................54

*Sampson v. United States*,
    724 F.3d 150 (1st Cir. 2013)....................................................67, 72

*Samra v. Shaheen Bus. & Inv. Grp., Inc.*,
    355 F. Supp. 2d 483 (D.D.C. 2005)..............................................27

*Santobello v. New York*,
    92 S. Ct. 495 (1971)................................................................13, 19

*Smith v. City of Jackson, Miss.*,
    544 U.S. 228 (2005).....................................................................47

*Stogner v. California*,
    539 U.S. 607 (2003)................................................................56, 60

*Tanner v. United States*,
    483 U.S. 107 (1987).....................................................................70

*Thom v. Ashcroft*,
    369 F.3d 158 (2d Cir. 2004) .........................................................61

*Thomas v. I.N.S.*,
    35 F.3d 1332 (9th Cir. 1994) ........................................................21

vii

*U.S. v. Abbamonte*,
　　759 F.2d 1065 (2d Cir. 1985) ...............................................................*passim*

*U.S. v. Alessi*,
　　544 F.2d 1139 (2d Cir. 1976), *cert. denied,* 429 U.S. 960,
　　97 S. Ct. 384 (1976)...............................................................................*passim*

*U.S. v. Andreas*,
　　216 F.3d 645 (7th Cir. 2000) ........................................................................16

*U.S. v. Annabi*,
　　771 F.2d 670 (2d Cir. 1985) ...................................................................*passim*

*U.S. v. Arnett*,
　　628 F.2d 1162 (9th Cir. 1979) ......................................................................28

*U.S. v. Ashraf*,
　　320 F. App'x 26 (2d Cir. Apr. 6, 2009)..................................................23, 26

*U.S. v. Brown*,
　　Nos. 99-1230(L), 99-1762, 2002 WL 34244994 (2d Cir.
　　Apr. 26, 2002)........................................................................................23, 26

*U.S. v. Bruno*,
　　Case No. 14-cr-556, 2015 WL 13731357 (E.D.N.Y. Dec. 15, 2015),
　　*report and recommendation adopted in part, rejected on other
　　grounds in part*, 159 F. Supp. 3d 311 (E.D.N.Y. 2016) ...............................26

*U.S. v. Carmichael*,
　　216 F.3d 224 (2d Cir. 2000) ........................................................................22

*U.S. v. Carter*,
　　454 F.2d 426 (4th Cir. 1972) ..................................................................21, 32

*U.S. v. Coutentos*,
　　651 F.3d 809 (8th Cir. 2011) ..................................................................51, 52

*U.S. v. Davis*,
　　139 S. Ct. 2319 (2019)...................................................................................45

*U.S. v. Diehl*,
　　775 F.3d 714 (5th Cir. 2015) ..................................................................51, 52

*U.S. v. Gebbie*,
　　294 F.3d 540 (3d Cir. 2002) .......................................................18, 19, 20, 28

*U.S. v. Gentile*,
235 F. Supp. 3d 655.................................................................58, 59, 60

*U.S. v. Gerena*,
667 F. Supp. 911 (D. Conn. 1987) .................................................29

*U.S. v. Gonzales*,
93 F. App'x 268 (2d Cir. Mar. 24, 2004) .........................23, 26, 39

*U.S. v. Harvey*,
791 F.2d 294 (4th Cir. 1986) ...........................................21, 28, 30

*U.S. v. Jefferies*,
908 F.2d 1520 (11th Cir. 1990) ................................................27, 29

*U.S. v. Jeffries*,
405 F.3d 682 (8th Cir. 2005) ....................................................... 61-62

*U.S. v. Leo Sure Chief*,
438 F.3d 920 (9th Cir. 2006) .................................................61, 62

*U.S. v. Levasseur*,
846 F.2d 786 (1st Cir. 1988)..........................................................21

*U.S. v. Lindemuth*,
Case No. 16-40047-01-DDC, 2017 WL3593226 (D. Kan.
Aug. 21, 2017) ................................................................................26

*U.S. v. Longo*,
70 F. Supp. 2d 225 (W.D.N.Y. 1999)...........................................29

*U.S. v. Morgan*,
393 F.3d 192 (D.C. Cir. 2004)......................................................45

*U.S. v. Nersesian*,
824 F.2d 1294 (2d Cir. 1987) ......................................................23

*U.S. v. Noveck*,
271 U.S. 201 (1926)..........................................................45, 46, 47

*U.S. v. Oruche*,
257 F. Supp. 2d 230 (D.D.C. 2003).............................................27

*U.S. v. Ozuna*,
129 F. Supp. 2d 1345 (S.D. Fla. 2001)........................................29

ix

*U.S. v. Papa*,
533 F.2d 815 (2d Cir. 1976) ................................................... 18-19, 25, 38, 39

*U.S. v. Pelletier*,
898 F.2d 297 (2d Cir. 1990) ........................................................29

*U.S. v. Persico*,
774 F.2d 30 (2d Cir. 1985), *aff'g* 620 F. Supp. 836 (S.D.N.Y. 1985) ..........23

*U.S. v. Pham*,
No. 12-cr-423, 2022 WL 993119 (S.D.N.Y. Apr. 1, 2022) ........................48

*U.S. v. Prisco*,
391 F. App'x 920 (2d Cir. Sept. 2, 2010)...............................................23, 26

*U.S. v. Ready*,
82 F.3d 551 (2d Cir. 1996) ...............................................................22

*U.S. v. Reiter*,
848 F.2d 336 (2d Cir. 1988) ............................................................23

*U.S. v. Restrepo*,
890 F. Supp. 180 (E.D.N.Y. 1995) ....................................................29

*U.S. v. Richardson*,
512 F.2d 105 (3d Cir. 1975) ...............................................58, 60, 62

*U.S. v. Rivera*,
844 F.2d 916 (2d Cir. 1988) ............................................................23

*U.S. v. Russo*,
801 F.2d 624 (2d Cir. 1986) .......................................................23, 35

*U.S. v. Salameh*,
152 F.3d 88 (2d Cir. 1998) ..............................................................23

*U.S. v. Scharton*,
285 U.S. 518 (1926)...............................................................*passim*

*U.S. v. Schneider*,
801 F.3d 186 (3d Cir. 2015) ...........................................................48

*U.S. v. Schneider*,
C.A. No. 10-29, 2010 WL 3656027 (E.D. Pa. Sept. 15, 2010)... 58-59, 60, 62

*U.S. v. Taylor*,
142 S. Ct. 2015 (2022).....................................................................44

x

*U.S. v. Van Thournout*,
    100 F.3d 590 (8th Cir. 1996) ................................................................20, 28

*U.S. v. Vargas-Cordon*,
    733 F.3d 366 (2d Cir. 2013) .........................................................44

*United States v. Aleman*,
    286 F.3d 86 (2d Cir. 2002) .........................................................39

*United States v. Cavera*,
    550 F.3d 180 (2d. Cir. 2008) .........................................................82

*United States v. D'Amelio*,
    683 F.3d 412 (2d Cir. 2012) ...........................................75, 76, 80

*United States v. D'Amico*,
    734 F. Supp. 2d 321 (S.D.N.Y. 2010) .........................................35

*United States v. Daugerdas*,
    867 F. Supp. 2d 470 .......................................................................67

*United States v. Daugerdas*,
    Case No. 09-CR-581 .......................................................................69

*United States v. Dodge*,
    597 F.3d 1347 (11th Cir. 2010) .................................................48

*United States v. Langford*,
    990 F.2d 65 (2d Cir. 1993) .........................................................66

*United States v. Laskow*,
    688 F. Supp. 851 (E.D.N.Y.) *aff'd,* 867 F.2d 1425 (2d Cir. 1988) ........ 35-36

*United States v. Lawson*,
    683 F.2d 688 (2d Cir. 1982) .........................................................55

*United States v. Napolitano*,
    761 F.2d 135 (2d Cir. 1985) .........................................................55

*United States v. Rooney*,
    37 F.3d 847 (2d Cir. 1994) .........................................................86

*United States v. Salmonese*,
    352 F.3d 608 (2d Cir. 2003) .........................................................76

*United States v. Sattar*,
    2003 WL 22510398 (S.D.N.Y. Nov. 5, 2003) .............................39

xi

*United States v. Stewart*,
　　433 F.3d 273 (2006) ................................................66

*United States v. Thai*,
　　29 F.3d 785 (2d Cir. 1994) .......................................69

*United States v. Torres*,
　　128 F.3d 38 (2d Cir. 1997) .......................................67

*Vernon v. Cassadaga Valley Cent. Sch. Dist.*,
　　49 F.3d 886 (2d Cir. 1995) .......................................61

*Wasser v. New York State Off. of Vocational & Educational Servs.*,
　　602 F.3d 476 (2d Cir. 2010) ......................................47

*Weingarten v. U.S.*,
　　865 F.3d 48 (2d Cir. 2017) ....................................49, 50

*Young v. U.S.*,
　　953 F. Supp. 2d 1049 (D.S.D. 2013) ..............................21

*Ziglar v. Abbasi*,
　　137 S. Ct. 1843 (2017).............................................24

## Statutes & Other Authorities:

U.S. Const. amend. VI .................................................63

8 U.S.C. § 2 ............................................................4

8 U.S.C. § 1101(a)(43)(M)(i)......................................45, 50

8 U.S.C. § 2422 .........................................................4

18 U.S.C. § 2 ........................................................1, 4

18 U.S.C. § 16(b) ......................................................45

18 U.S.C. § 113(a)(5)..................................................38

18 U.S.C. § 371 .....................................................1, 4

18 U.S.C. § 924(c)(3)..................................................45

18 U.S.C. § 1591 ..................................................2, 9, 62

18 U.S.C. § 1591(a) ...............................................1, 4, 32

18 U.S.C. § 1591(b) ................................................................. 4

18 U.S.C. § 1591(b)(2) ........................................................ 1, 4

18 U.S.C. § 1623 .................................................................... 4

18 U.S.C. § 2251(a) .......................................................... 51, 52

18 U.S.C. § 2251(d) .............................................................. 51

18 U.S.C. § 2252A(a)(5)(B) ................................................... 51

18 U.S.C. § 2252A(b)(2) ....................................................... 51

18 U.S.C. § 2422 .................................................................... 4

18 U.S.C. § 2423(a) ........................................................ *passim*

18 U.S.C. § 3237(a) .............................................................. 45

18 U.S.C. § 3282 .................................................................. 49

18 U.S.C. § 3282(a) .............................................................. 41

18 U.S.C. § 3283 ............................................................ *passim*

18 U.S.C. § 3286 .................................................................. 57

18 U.S.C. § 3286(b) .............................................................. 48

18 U.S.C. § 3287 ............................................................. 46, 47

18 U.S.C. § 3293 .................................................................. 57

18 U.S.C. § 3299 ........................................................... 2, 9, 62

18 U.S.C. § 3553(c)(2) .......................................................... 84

28 U.S.C. § 1291 ................................................................... 1

26 U.S.C. § 6531 ............................................................. 45, 47

149 Cong. Rec. S5147 .......................................................... 56

Act of June 25, 1948, c. 546, 62 Stat. 828 ............................... 46

Act of November 17, 1921, c. 124, 42 Stat. 220 ....................... 45

Fed. R. App. P. 4(b) ............................................................... 1

Fed. R. Crim. P. 33 ................................................................ 4

Fed. R. Evid. 606 ................................................................. 70

Fed. R. Evid. 606(b) .............................................................. 70, 71

H.R. 1104, 108th Cong. § 202 (2003) ................................... 55

H.R. Conf. Rep. No. 108-66 (2003) ....................................... 49

Justice Manual, Comment to § 9-27.630 .............................. 34

Lucia Osborn-Croweley, "*Ghislaine Maxwell Juror Breaks Silence To The Independent: This Verdict Is For All The Victims*," Independent (Jan. 4, 2022) .............................................................. 71

New York Penal Law § 130.55 ........................................ *passim*

Pub. L. 101-647, 104 Stat. 4789 ....................................... 42, 57

Pub. L. 103-322, 108 Stat. 1796 ............................................ 42

Pub. L. 107-56, § 809, 115 Stat. 272 .................................... 57

Pub. L. 108-21, § 220, 117 Stat. 650 .................................... 42

Pub. L. 109-248, 120 Stat. 587 ............................................. 59

Restatement (Second) of Agency § 272 ............................... 20

Restatement (Second) of Conflict of Laws § 188 ........ 26, 27, 28

USSG § 3B1.1 ..................................................................... 84

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an appeal from a final judgment of the District Court (Alison Julie Nathan and a jury), rendered on June 28, 2022, convicting Defendant-Appellant Ghislaine Maxwell ("Defendant") of Conspiracy to Transport Minors with Intent to Engage in Criminal Sexual Activity in violation of Title 18 U.S.C. §371; Transportation of a Minor with Intent to Engage in Criminal Sexual Activity in violation of Title 18 U.S.C. §2423(a); and Sex Trafficking of a Minor in violation of Title 18 U.S.C. §1591(a), ( b) ( 2 ), and §2. The trial judge imposed concurrent terms of imprisonment of 60 months, 120 months, and 240 months, respectively, to be followed by concurrent terms of supervised release of three years, three years, and five years, respectively. The court also imposed a fine of $250,000 on each count for a total of $750,000.

Timely Notice of Appeal was filed on July 7, 2022 (A420),[1] pursuant to 28 U.S.C. §1291 and Fed. R. App. P. 4(b).

---

[1] Numerical references preceded by "A" are to the Appendix and by "Tr" are to the trial.

1

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether the District Court misapplied *U.S. v. Annabi*, 771 F.2d 670 (2d Cir. 1985) (per curiam) to impose limits on a non-prosecution agreement contrary to the agreement's plain meaning and endorsed its untenable interpretation without discovery or a hearing to determine the intent of the parties.

2.  Whether the District Court erred in extending the statute of limitations for violations of §2423(a) and §1591 under §3283 and whether the 2003 amendment to §3283 or §3299 applies retroactively to offenses committed before enactment of these statutes.

3.  Whether the court should have granted a new trial after it learned that a juror made materially false statements in jury selection that concealed that he had experienced the "exact same thing" as the victims, namely, childhood sexual abuse, because truthful answers given at the time of *voir dire* would have provided a valid basis for a cause challenge.

4.  Whether the District Court erred in refusing to correct the jury's misunderstanding (evident from a Jury Note) under Count 4 that sexual activity in New Mexico violated New York Penal Law §130.55), which caused the jury to convict Defendant solely based on evidence of sexual activity outside of New York, thereby constituting a constructive amendment and/or a variance from the Indictment.

**5.** Whether the District Court's sentence was based on a miscalculation of the guideline range that resulted in the imposition of an upward variance in the absence of providing the required explanation, and whether the District Court erred in applying the aggravating role adjustment when there was no evidence to support a finding that Defendant supervised another criminal participant.

## STATEMENT OF THE CASE

By a second superseding indictment, Indictment No.1:20-cr-00330 (AJN) (A114),[2] filed in the United States District Court for the Southern District of New York on March 29, 2021, Defendant was charged with the following counts: **(1)** Conspiracy to Entice Minors to Travel to Engage in Illegal Sex Acts (18 U.S.C. §2422 and §371); **(2)** Enticement of a Minor to Travel to Engage in Illegal Sex Acts (8 U.S.C. §2422 and §2); **(3)** Conspiracy to Transport Minors with Intent to Engage in Criminal Sexual Activity (18 U.S.C. 2423(a) and §371); **(4)** Transportation of a Minor with Intent to Engage in Criminal Sexual Activity (18 U.S.C. §2423(a)); **(5)** Sex Trafficking Conspiracy 18 U.S.C. §1591(a) and (b) and § 371; **(6)** Sex Trafficking of a Minor in violation of Title 18 , United States Code , §§1591(a), ( b)(2), and 2); and two counts **(7)** and **(8)** Perjury  (18 USC §1623).[3]

Defendant proceeded to trial on Counts One through Six. Defendant was acquitted of Count Two and convicted on the remaining counts.

Prior to sentencing, Defendant moved for a new trial pursuant to Fed. R. Crim. P. 33 after a juror revealed that he had made materially false statements in *voir dire* by which he concealed that he was a child sexual assault victim. The

_____

[2] The original indictment against Ms. Maxwell, was filed on June 29, 2020, and the first superseding indictment, was filed on July 8, 2020.

[3] The perjury counts were severed prior to trial and dismissed.

court conducted a hearing on March 8, 2022 (A264), after which it denied defendant's motion. A318.

On June 28, 2022, the court dismissed Counts One and Five on multiplicity grounds;  dismissed the severed perjury counts at the request of the Government; and sentenced Defendant on Counts Three, Four, and Six as described above. Defendant is currently serving the sentence imposed by the District Court.

On appeal, Defendant argues, as she did below, that (1) the convictions were obtained in violation of a nonprosecution agreement ("NPA"); (2) all counts are time-barred; (3) she was deprived of her constitutional right to be tried by a fair and impartial jury when a juror concealed his traumatic experience as a victim of child sexual abuse during *voir dire* by providing false answers to the jury questionnaire on every question designed to ferret out this information; (4) the court's refusal to correct the jury's misunderstanding of an element of the transportation offense resulted in a constructive amendment of the indictment or a prejudicial variance; and (5)  her sentence was predicated upon a miscalculation of the guideline range and the misapplication of an aggravating role adjustment.

### A. The Trial

The evidence at trial was based on the testimony of four women – Jane, Carolyn, Annie Farmer, and Kate.

Jane testified that she met Epstein and Maxwell in 1994 when she was 14 and that, shortly thereafter, Epstein began sexually abusing her. Jane testified that the sexual abuse occurred in Florida, New York, and New Mexico and that Maxwell was in the room "more than twice." Tr. 308-311; 340. But in interviews with the Government, prior to trial, Jane stated that she had no memory of Maxwell being present when she and Epstein engaged in sexual contact (Tr. 477) and that she was not sure if Maxwell had *ever* touched her. Tr. 475-6, 479-80.

Carolyn testified that she gave Epstein massages that involved sexual contact in exchange for money in Florida between 2001 and 2004. Carolyn testified that in 2001 when she was 14, Virginia Giuffre, then 18, introduced her to Epstein. Tr. 1574-5. Maxwell would sometimes call to set up appointments and pay Carolyn. Maxwell saw her naked in the massage room a few times and once touched her breasts and buttocks. Carolyn spoke to the FBI and the AUSA-SDFL in 2007 and never mentioned Maxwell. Tr. 1604-5, 1620 1679. In 2008, Carolyn sued Epstein and Kellen for the exact same conduct she ascribed to Maxwell at trial, but never mentioned Maxwell in her detailed complaint. Tr. 1571, 1617.

Kate testified that she met Maxwell in 1994 when she was 17. Tr. 1172-73, 1236, 1253-4. Maxwell invited Kate to visit her at her home on Kinnerton Street in Belgravia. Tr. 1176, 1235, 1253-54, but land records show that Maxwell did not purchase Kinnerton Street until March 20,1997, when Kate was 20. T: 2729 -30.

Maxwell introduced Kate to Epstein.  On two occasions, Maxwell called Kate and asked her to give Epstein a massage. T: 1183. In the massage room, Epstein took off his robe and Maxwell handed Kate massage oil and left. T: 1185. Epstein and Kate engaged in sexual activity during the massage. T: 1186.

Annie Farmer testified that in 1996, when she was 16, her sister introduced her to Epstein in New York and that, while there, Epstein held her hand and rubbed her leg in a movie theater.  She also testified that a few months later she visited Epstein in New Mexico where she met Maxwell.  There, she claimed that Maxwell gave her a massage in which Maxwell massaged her pectoral muscles. Tr. 2085

The jury was instructed that physical contact with Annie Farmer in New Mexico and Kate anywhere was not "illegal sexual activity," and that Kate was not a victim of any charges in the indictment. Tr. 1169, 2048-49.

# SUMMARY OF THE ARGUMENT

**1.** The NPA immunized Maxwell from prosecution for all counts. Maxwell has standing to enforce the NPA as a third-party beneficiary. The "potential co-conspirators" provision binds the USAO-SDNY by its express terms. Hence, the canon of construction enunciated in United *States v. Annabi*, 771 F.2d 670 (2d Cir. 1985), that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." is inapplicable here. *Id.* at 672. But even if the immunity provision was ambiguous, which it is not, *Annabi* should not apply here because (1) the NPA originated in a district outside this circuit with different rules that should control; (2) *Annabi* applies only if the new charges are sufficiently distinct and Count Six is not; (3) *Annabi* applies only where there is no affirmative indication that the agreement was intended to bind other districts and there were affirmative indications here; and (4) *Annabi* is a tiebreaking rule for ambiguous agreements which should be used only after an evidentiary hearing determines the intent of the parties. Here, the court refused to grant discovery or a hearing on this issue.

**2.** The convictions are time-barred. Section 3283 does not extend the statute of limitations for violations of § 2423(a), or conspiracy to do the same, because the "sexual or physical abuse…of a child" is not a necessary element of those offenses.

8

And even if it were, the Government cannot apply the 2003 amendment to §3283 to offenses that the Government alleges were committed *before* the enactment of this provision. *See Landgraf v. USI Film Prod.*, 511 U.S. 244 (1994). Rather, such offenses could only have been governed by the 1994 version of §3283, pursuant to which the statute of limitations expired once Defendant's accusers turned 25 and Defendant's accusers were all women above the age of 25 when the Government charged her in 2020. As to §1591, *Landgraf* precludes retroactive application of either §3283 or §3299.

**3.** In a trial about child sexual abuse, a juror's material misstatements on a juror Questionnaire, which allowed him to conceal the fact that he was a victim of child sexual abuse, and his post-verdict public statements about the effect of that traumatic experience on his participation as a juror in this case, satisfied the two prong test under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), namely, that the juror failed to answer honestly material questions in *voir dire* and that correct responses would have provided a valid basis for a challenge for cause. Irrespective of whether the juror's false statements were intentional, which they clearly were, the similarities between the traumatic experiences described by the juror and the victims in the case, together with the juror's public statements, established the juror's bias. In addition, the court unfairly limited the scope of the hearing.

**4.** Under Count Four, it was necessary to prove that Defendant caused Jane to travel to *New York* with the intent that she would engage in illegal sexual activity that violated New York Penal Law §130.55. A juror note plainly indicated that the jury believed that the sexual activity intended need not have occurred in New York. But the court refused to correct the jurors' misunderstanding, merely directing them to the charge which they had in their possession and to which they were already plainly referring when they asked about the "second element" of "count four." Jane's testimony about sexual abuse in New Mexico, to which the Note referred, presented the jury with an alternative basis for conviction that was entirely distinct from the charges in the Indictment. The Court's refusal to correct the jury's obvious misunderstanding, constituted a constructive amendment and/or a variance from the charges in the Indictment.

**5.** Defendant's sentence was predicated on a miscalculation of the guideline range and the court gave no explanation for her decision to sentence Defendant above the range.  In addition, the court erroneously applied the aggravating role adjustment when there was no evidence that defendant supervised another criminal participant.

**INTRODUCTION**

The Government prosecuted Ms. Maxwell ("Maxwell") as a proxy for Jeffrey Epstein ("Epstein"). It did so to satisfy public outrage over an unpopular non-prosecution agreement and the death of the person responsible for the crimes. In its zeal to pin the blame for its own incompetence and for Epstein's crimes on Maxwell, the Government breached its promise not to prosecute Maxwell, charged her with time-barred offenses, resurrected and recast decades-old allegations for conduct previously ascribed to Epstein and other named assistants, and joined forces with complainants' civil attorneys, whose interests were financial, to develop new allegations that would support charges against Maxwell.

Immediately after Epstein's death, complainants' civil attorneys representing Epstein victims, including those who testified at trial, began to assist in the creation of the Epstein Victims Compensation Program (VCP), a non-adversarial and confidential claims resolution program set up to compensate self-identified victims of Epstein, even as they were actively involved in the Government's investigation. On June 25, 2020, the Program began accepting claims. An attorney for one complainant encouraged her to cooperate with the Government in its case against Maxwell because it would improve her prospects for receiving a larger sum of money from the VCP. Tr. 2731-32. It did. "Jane" received $5,000,000.

11

The Government announced its arrest of Maxwell on July 2, 2020, the anniversary of Epstein's indictment. From that day, Maxwell was held in solitary confinement in the Brooklyn Detention Center. As COVID raged, the District Court denied four bail applications and dozens of applications to ameliorate Maxwell's deplorable conditions of confinement. By the time of trial, Maxwell was so disoriented and diminished that she was unable meaningfully to assist in her own defense, much less to testify.

As trial approached, the vilification of Maxwell was unprecedented in both scale and severity. The bipartisan political pressure to obtain a conviction was enormous. Judge Nathan refused to apply the NPA to Maxwell in accordance with its terms and refused to dismiss the case as time-barred. She precluded Maxwell from presenting a meaningful defense by excluding evidence and argument that was central to her defense, such as the NPA, the 2006 FBI investigation, the terms of the VCP, and the direct involvement of the complainants' civil attorneys in both the VCP and the Government's investigation.

The trial itself involved the testimony of four women, three of whom (Jane, Kate, and Carolyn), were permitted to testify under pseudonyms. The result transformed the trial into a form of Kabuki theater designed to remind the jury at every turn that these adult women were being protected because their privacy interests, and not Maxwell's constitutional right to a public trial, were paramount.

12

That this was a manipulation designed to prejudice the jury against Maxwell was eloquently proven by Carolyn who wasted no time in granting an interview with the Daily Mail after the verdict was reached. And Kate did not even wait until after the verdict as she made public statements before trial.

## POINT I

## ALL COUNTS SHOULD BE DISMISSED PURSUANT TO THE NON-PROSECUTION AGREEMENT

The Government negotiated an agreement with a criminal defendant and that defendant fulfilled all the conditions to the enforcement of the agreement, including a state guilty plea. As the Supreme Court held, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled. *Santobello v. New York*, 92 S. Ct. 495, 499 (1971).

On September 24, 2007, the Government and Epstein entered into a nonprosecution agreement. The NPA immunized Maxwell as a "potential co-conspirator."

### A.    The NPA

The NPA begins with several factual recitals. The recitals state, among other things, that (i) the "United States Attorney's Office" and the Federal Bureau of

Investigation ("FBI") have "conducted their own investigation into Epstein's background and any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007, including" five enumerated federal criminal offenses; (ii) Epstein seeks "to resolve globally his state and federal criminal liability" and thus is agreeing to comply with the terms of the NPA "in exchange for the benefits provided by this agreement"; and (iii) "*the interests of the United States*, the State of Florida, and the Defendant will be served by the following procedure." A175 (emphasis added). Nowhere in the recitals is reference made specifically to the United States Attorney's Office for the Southern District of Florida ("SDFL" or "USAO-SDFL"), nor is there any suggestion that the parties in any way intended to limit the "global[]" resolution of Epstein's liability.

The NPA then provides that "prosecution [of Epstein] in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by" the terms of the NPA. A175. The NPA also provides that, after its terms are fulfilled, no prosecution for the offenses set out on pages 1 and 2 of this Agreement [e.g., the five enumerated federal offenses], nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any

14

offenses that arose from the Federal Grand Jury investigation will be instituted in this District, and the charges against Epstein if any, will be dismissed.  A175.

After detailing the terms of the agreement as they relate to Epstein, the NPA lays out the following provision:

> In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, *the United States* also agrees that it will not institute any criminal charges against *any potential co-conspirators* of Epstein, *including but not limited to* Sarah Kellen, Adriana Ross, Lesley Groff, or Nadia Marcinkova.
>
> A178 (emphasis added).

The NPA clearly distinguishes "the United States" from the USAO-SDFL, repeatedly referring explicitly to the latter where such a limitation is intended. Thus, the NPA's references to the "United States" demonstrate a definitional intent not to limit such provisions to the USAO-SDFL. Unlike the provision that Epstein will not be prosecuted "in this District" (A175), the sentence regarding co-conspirators contains no provision limiting co-conspirators' immunity to the SDFL; no limitation on the scope of conduct for which "potential co-conspirators of Epstein" cannot be prosecuted, and no language limiting its binding effect on other USAOs, as standard agreements typically do.

**B.** **Appellant may enforce the NPA as a third-party beneficiary.**

Appellant is a third-party beneficiary of the NPA, and for that reason has standing to enforce it. The District Court declined to adopt the Government's arguments to the contrary, and this Court should do the same. *See U.S. v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000)

Here, the NPA grants immunity to "*any* potential co-conspirators of Epstein, including *but not limited to* [four named individuals]." A178 (emphasis added). As the court recognized, this is a definable class that includes Maxwell. A144.

**C.** **The "potential co-conspirators" provision binds the USAO-SDNY, and *Annabi* is not to the contrary**

**1. Introduction**

The court rejected Appellant's attempt to enforce the NPA against the S2 Indictment on only one ground: it found that the co-conspirator provision's reference to "the United States" did not really mean the United States, but only the USAO-SDFL, and thus did not bind other USAOs. A189-192. But in ruling that the NPA did not mean what it said, the District Court ignored the plain text of the NPA, unsettled the parties' objectively reasonable expectations, and misapplied Circuit precedent. What is more, the court abused its discretion by endorsing this

untenable reading without even granting Defendant's request for discovery or a hearing to determine the scope of the agreement.

To support its creative reading of the NPA, the court relied on *U.S. v. Annabi*, 771 F.2d 670 (2d Cir. 1985) (per curiam). That case warrants close attention. In *Annabi,* the defendants were charged under a three-count indictment in the Eastern District of New York with conspiring to import, importing, and possessing heroin with intent to distribute. *See* 771 F.2d at 671. After they pled guilty to the substantive importation charge, the prosecutor represented to the court that "the only agreement that exists between defendants and the Government is that at the time of the imposition of sentence …, the Government would move to dismiss the two open remaining counts…". *Id*. Accordingly, the conspiracy and possession counts were dismissed. *See id.* Subsequently, the defendants were indicted in the Southern District of New York with conspiracy to distribute heroin. *See id.* Whereas the dismissed EDNY charges had only alleged a conspiracy on or about a date in 1982, the new SDNY charges alleged criminal conduct extending from 1982 to 1985. The defendants argued that these new charges were barred by their plea agreement with the USAO-EDNY. *See id.* The court conducted an evidentiary hearing—obtaining testimony from both the prosecutor and the defense attorney from the Eastern District proceedings—and concluded that the agreement was not meant to bind the USAO-SDNY. *See id.* The Second Circuit noted that

this result was highly counterintuitive, acknowledging that "[a] plea agreement whereby a federal prosecutor agrees that 'the Government' will dismiss counts of an indictment…might be thought to bar the United States from reprosecuting the dismissed charges in any judicial district…." *Id.* at 672. Nevertheless, the Court declared, "the law has evolved to the contrary," adding, "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." *Id*. The Court concluded that, because the conspiracy alleged in the SDNY indictment "extended for an additional two years" beyond the date of the conspiracy alleged in the EDNY indictment, "the new charges are sufficiently distinct at least to warrant application of [this] rule concerning construction of plea agreements." *Id.*

*Annabi* has been sharply criticized. One circuit said it was "unable to discern a sound basis for the [*Annabi*] rule," adding that the decision "really has no analytically sound foundation." *U.S. v. Gebbie*, 294 F.3d 540, 547 (3d Cir. 2002). *Annabi* cited three prior cases from this Circuit in support of its statement that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered." 771 F.2d at 672 (citing *U.S. v. Abbamonte*, 759 F.2d 1065 (2d Cir. 1985); *U.S. v. Alessi*, 544 F.2d 1139 (2d Cir. 1976); and *U.S. v.*

*Papa*, 533 F.2d 815 (2d Cir. 1976)).  But, as *Gebbie* explained, *Annabi* misread this Court's precedent and fashioned an "illogical" rule out of whole cloth:

> The first case cited in *Annabi* is *Abbamonte*, but *Abbamonte* merely relies upon the other two cases cited in *Annabi*—*Alessi* and *Papa* …

> The court in *Alessi* relies upon *Papa*, which is a related case. …

> **Papa, however, provides no support for the rule the Second Circuit follows**. … Although *Papa* held that the plea agreement did not bind other districts *because the evidence revealed an intent to bind only one district*, the Second Circuit apparently has broadly interpreted this case as meaning that plea agreements do not bind other districts absent an affirmative appearance of doing so. *Papa* does not explain or attempt to rationalize the rule that has evolved.

294 F.3d at 547-48 (*brackets and italics in original; bold added*).

*Annabi* stands in tension with what the United States Supreme Court has written about plea and immunity agreements.  In *Santobello*, 404 U.S. 257 (1971)—the seminal case on plea bargaining—the Supreme Court held that one prosecutor's promise in a plea agreement would bind other prosecutors, even those who might have been unaware of the promise.  As *Santobello* explained, "[t]he staff lawyers in a prosecutor's office have the burden of 'letting the left hand know what the right hand is doing' or has done."  404 U.S. at 262.  And in *Giglio v. United States*, the Supreme Court held that an Assistant United Stated Attorney ("AUSA") had a duty under *Brady* to disclose a promise of immunity that another AUSA had made to a testifying witness, even though the first AUSA had been falsely assured that

no such promise was made. *See* 405 U.S. 150, 154 (1972) ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government") (citing Restatement (Second) of Agency § 272). These premises are inconsistent with the notion that a federal prosecutor in one district has no obligation to honor promises made by his or her counterpart in another.

It is thus unsurprising that few courts outside of this Circuit have found *Annabi* persuasive. Indeed, Defendant is not aware of *any* published authority from another circuit that follows *Annabi* in holding that an ambiguous promise made in a plea agreement by one USAO is presumed not to bind other USAOs. To the contrary, the weight of authority holds that a representation by the United States Attorney's Office or its agents will bind USAOs in other districts. *See Gebbie*, 294 F.3d at 550 ("[W]hen a United States Attorney negotiates and contracts on behalf of 'the United States' or 'the Government' in a plea agreement … that attorney speaks for and binds all of his or her fellow United States Attorneys with respect to those same crimes and those same defendants. … United States Attorneys should not be viewed as sovereigns of autonomous fiefdoms."); *U.S. v. Van Thournout*, 100 F.3d 590, 594 (8th Cir. 1996) ("Absent an express limitation, any promises made by an [AUSA] in one district will bind an [AUSA] in another district"); *Margalli-Olvera v. I.N.S.*, 43 F.3d 345, 353 (8th Cir. 1994)

("promises made by an [AUSA]" in a plea agreement "bind all agents of the United States government"); *Thomas v. I.N.S.*, 35 F.3d 1332 (9th Cir. 1994) (enforcing against the INS a cooperation agreement between defendant and an AUSA promising that "the government" would not oppose defendant's application for relief from deportation); *U.S. v. Levasseur*, 846 F.2d 786, 799 (1st Cir. 1988) (expressly declining to apply *Annabi* in the estoppel context, instead holding that "the representation of any [AUSA] may, in appropriate circumstances, be invoked to estop the United States…"); *U.S. v. Harvey*, 791 F.2d 294, 303 (4th Cir. 1986) ("Whenever a United States Attorney negotiates and enters a plea agreement, it is the Government that 'agrees' to whatever is agreed to."); *U.S. v. Carter*, 454 F.2d 426 (4th Cir. 1972) (en banc) (vacating conviction where a plea "bargain was allegedly breached in a neighboring district," adding that "[t]he United States government is the United States government throughout all of the states and districts"); *Young v. U.S.*, 953 F.Supp.2d 1049, 1069 n.4 (D.S.D. 2013) (plea agreement between defendant and "the United States" in West Virginia would bind federal prosecutors in South Dakota); *Little v. U.S.*, Nos. 1:08-cr-59, 1:09-cv-822, 2010 WL 3942749, at *3 (S.D. Ohio Oct. 7, 2010) (plea agreement between defendant "and the United States of America," which was "silent as to the effect it may have with respect to other United States Attorneys," would be interpreted to "bind[] the United States Attorneys in all other districts").

*Annabi* is also out of step with the law of *this* Circuit.  It is well-settled that "we determine whether a plea agreement has been breached by looking to the reasonable understanding of the parties and by resolving any ambiguities against the Government."  *Altro*, 180 F.3d at 375; *see also U.S. v. Carmichael*, 216 F.3d 224 (2d Cir. 2000) ("[W]e 'construe plea agreements strictly against the Government.'") (quoting *U.S. v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996)).  But *Annabi* flips this formulation on its head, holding that an ambiguous promise of immunity by "the United States" is to be construed *against the defendant*—binding just one USAO rather than the Government as a whole—"unless it affirmatively appears that the agreement contemplates a broader restriction."  771 F.2d at 672. *Annabi* did not explain or acknowledge its departure from this longstanding doctrine.

The District Court opined that this Court "has followed [*Annabi*] steadfastly." A190.  Nothing could be further from the truth.  This Court has been exceedingly reluctant to affirm a conviction on the force of *Annabi*'s reasoning. So reluctant, in fact, that it has *never* relied on *Annabi* in a published decision to hold that a plea agreement's reference to the "United States" or the "Government" was nonbinding on other districts.  *Every* decision from this Court that cited *Annabi* has done so essentially in dictum (as in cases involving unambiguous plea

agreements, which do not require resort to *Annabi*'s canon of construction),[4] or for

points unrelated to whether an agreement with one USAO will bind another,[5] or—

in one case—in an unpublished decision that provided too little information to

clarify whether the plea agreement as a whole was ambiguous.[6] *Annabi* is an

island of a case—without friends in other circuits, or this one.

    *Annabi*'s analytical faults[7] counsel strongly against extending it to new facts

or contexts. *Cf. Egbert v. Boule*, 142 S.Ct. 1793, 1803 (2022) (where underlying

---

[4] *See U.S. v. Prisco*, 391 F. App'x 920, 921 (2d Cir. Sept. 2, 2010) (agreement stated it was "limited to the United States Attorney's Office for the District of New Jersey and cannot bind other federal, state, or local authorities"); *U.S. v. Ashraf*, 320 F. App'x 26, 28 (2d Cir. Apr. 6, 2009) (agreement, "by its express terms, bound only the U.S. Attorney's Office for the Eastern District of Virginia"); *U.S. v. Gonzales*, 93 F. App'x 268, 271 (2d Cir. Mar. 24, 2004) (agreement "explicitly states that the agreement binds only the United States Attorney's Office for the District of New Mexico"); *U.S. v. Salameh*, 152 F.3d 88, 119, 120 (2d Cir. 1998) ("[T]his agreement is limited to the United States Attorney's Office for the Eastern District of New York and cannot bind other federal, state or local prosecuting authorities."); *U.S. v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986) ("[W]e need not resolve the question whether the Southern District is bound by this particular plea agreement…."); *U.S. v. Persico*, 774 F.2d 30 (2d Cir. 1985), *aff'g* 620 F.Supp. 836, 846 (S.D.N.Y. 1985) ("Persico's plea agreement explicitly states that it 'is binding on the United States only in [the Eastern] district'") (brackets in original).

[5] *See U.S. v. Reiter*, 848 F.2d 336, 340 (2d Cir. 1988) (discussing double jeopardy issue); *U.S. v. Rivera*, 844 F.2d 916, 923 (2d Cir. 1988) (plea agreement and later charges arose in the same district, unlike *Annabi*); *U.S. v. Nersesian*, 824 F.2d 1294, 1321-22 (2d Cir. 1987) (case related to *Annabi* itself).

[6] *See U.S. v. Brown*, Nos. 99-1230(L), 99-1762, 2002 WL 34244994, at *2 (2d Cir. Apr. 26, 2002).

[7] Appellant preserves her argument that *Annabi* should be overruled or abrogated.

precedent may have been doctrinally flawed, expanding it into "new…context[s]" would be "a disfavored judicial activity") (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857, 1859 (2017)). In this case, the District Court did not just purport to follow *Annabi,* but expanded its questionable doctrine into new and inapplicable territory. In this regard, the District Court erred in four respects.

**First**, unlike the plea agreement in *Annabi*, the NPA originated in a federal district *outside* of the Second Circuit. Under textbook choice-of-law rules and principles of fairness, it would be unreasonable to graft a unique, pro-prosecution canon of construction, derived from the law of a foreign circuit—this circuit—onto a plea agreement negotiated with prosecutors elsewhere.

**Second**, *Annabi* recognized that its "rule concerning construction of plea agreements" was only "warrant[ed]" when "the new charges are sufficiently distinct" from the old ones. 771 F.2d at 672. And *Annabi* made clear that charges are "sufficiently distinct" when they cover a different or expanded period of time. *Id.* But here, the USAO-SDNY charged Appellant under Count Six with conduct from 2001 through 2004 that falls entirely within the 2001-2007 offense period contemplated by the NPA. Therefore, *Annabi* is inapplicable at least as to Count Six.

**Third,** *Annabi* and its predecessors involved situations where there was no "affirmative" indication whatsoever that the plea agreement was intended to bind

other USAOs.  *See Annabi*, 771 F.2d at 671; *Alessi*, 544 F.2d at 1154; *Papa*, 533 F.2d at 823-25.  That is not the case here; Defendant produced ample evidence that the NPA was intended to bind other USAOs as to possible co-conspirators.

*Fourth*, at most, *Annabi* embraces a tiebreaking rule: after the court conducts an evidentiary hearing and receives testimony from the attorneys involved in the plea agreement, if it still cannot decide the agreement's geographic scope, it may presume that it was limited to a single district.  *See Annabi*, 771 F.2d at 671; *Papa*, 533 F.2d at 823.  The court erred when it applied the *Annabi* canon without first granting Defendant's reasonable request for an evidentiary hearing.

For all of these reasons or any of them, the court's ruling was error.

### 2. *Annabi* does not apply because the NPA was negotiated and entered into outside of the Second Circuit

Remarkably, the court applied *Annabi* to the NPA without conducting a choice-of-law analysis and without addressing Defendant's contention that Eleventh Circuit law should apply.  It did so even though the NPA was negotiated in Florida, with Southern District of Florida prosecutors, in exchange for Epstein's agreement to plead guilty in Florida state court.  As shown below, applying the Second Circuit's minority *Annabi* rule in this context was improper and unfair:

improper because it conflicted with both federal and New York choice-of-law rules and unfair because it unsettled the parties' reasonable expectations.

As a threshold matter, none of this Court's precedents require applying *Annabi* to agreements formed outside of this Circuit. Although this Court has done so in a few unpublished decisions, these mostly involved *unambiguous* agreements which made resort to the *Annabi* canon unnecessary in the first place. *See Prisco*, 391 F. App'x at 921; *Ashraf*, 320 F. App'x at 28; *Gonzalez*, 93 F. App'x at 270; *but see Brown*, 2002 WL 34244994, at *2. None of these decisions discussed the threshold question of which circuit's law applied, and at least one magistrate judge, the Honorable Vera M. Scanlon, has openly questioned this line of cases. *See U.S. v. Bruno*, Case No. 14-cr-556, 2015 WL 13731357, at *16 n.11 (E.D.N.Y. Dec. 15, 2015) (noting that there was "a compelling argument" against applying *Annabi* to a plea agreement from outside of this Circuit), *report and recommendation adopted in part, rejected on other grounds in part*, 159 F.Supp.3d 311 (E.D.N.Y. 2016).

Courts have held that federal plea and immunity agreements are analyzed under the same choice-of-law principles that apply to contracts generally. *See U.S. v. Lindemuth*, Case No. 16-40047-01-DDC, 2017 WL 3593226, at *3 (D. Kan. Aug. 21, 2017) (applying Restatement (Second) of Conflict of Laws ["Restatement"] §188 to determine which jurisdiction's law governed federal plea agreement); *Kaplan v. C.I.R.*, Case No. 25652-12, 2014 WL 988456, at *8 n.14

26

(U.S. Tax Ct. Mar. 13, 2014) (same); *U.S. v. Oruche*, 257 F.Supp.2d 230, 239 n.7 (D.D.C. 2003) (same, for federal immunity agreement); *see also Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F.Supp.2d 483 (D.D.C. 2005) (emphasizing that, in "constru[ing] an immunity agreement executed during a criminal prosecution, our court [does] not simply adopt the contract law of the District of Columbia as a default," but will instead follow "choice of law rules"). "The Restatement (Second) of Conflict of Laws, to which both New York and the federal courts look, declares that courts will apply the laws of the state that 'has the most significant relationship to the transaction and the parties.'" *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 412 (2d Cir. 2018) (quoting Restatement § 188). Here, it is clear that the Second Circuit is not the jurisdiction with the most significant relationship to the NPA, and the Government has not argued otherwise. Instead, the court should have construed the NPA under Eleventh Circuit law.

The Eleventh Circuit would hold that the NPA's promise on behalf of "the United States" not to prosecute Epstein's "potential co-conspirators" (including Defendant) is binding on other USAOs. That is because, under Eleventh Circuit precedent, even if the reference to "the United States" were deemed ambiguous, the ambiguity **"must be read against the government."** *U.S. v. Jefferies*, 908 F.2d 1520, 1523 (11th Cir. 1990) (citing *In re Arnett*, 804 F.2d 1200, 1203 (11th Cir. 1986)); *see also Rowe v. Griffin*, 676 F.2d 524, 526 n.4 (11th Cir. 1982). And

this result would bring the Eleventh Circuit in line with every circuit that has directly confronted this question (other than the Second Circuit). *See Gebbie*, 294 F.3d at 550; *Van Thournout*, 100 F.3d at 594; *Harvey*, 791 F.2d at 303.[8]

Because the NPA was almost certainly negotiated with Eleventh Circuit law in mind, it would be unfair to impose another circuit's minority rule of construction. A plea agreement must be enforced in accordance with the parties' reasonable expectations. *See Paradiso v. U.S.*, 689 F.2d 28, 31 (2d Cir. 1982) ("The dispositive question is what the parties to [the] plea agreement reasonably understood to be the terms of the agreement.") (quoting *U.S. v. Arnett*, 628 F.2d 1162, 1164 (9th Cir. 1979)). And as this Court has observed, "[p]arties entering a contract will expect … that the provisions of the contract will be binding"; "[t]heir expectations should not be disappointed by application of [a local rule] which would strike down the contract or a provision thereof …." *Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp.*, 502 F.3d 78, 82 (2d Cir. 2007) (quoting Restatement § 188 cmt b). Here, application of Second Circuit law would render the co-conspirator provision unenforceable—"strike [it] down"—in every federal district but one. It would ambush the parties with the law of a circuit that they did not

---

[8] Alternatively, the NPA might be governed by Florida state law. It is ultimately irrelevant whether this Court applies Florida or Eleventh Circuit law. Florida courts, like the Eleventh Circuit, would look to the weight of authority on this topic. *See, e.g., Brazeail v. State*, 821 So.2d 364 (Fla. App. 2002) (following the "overwhelming weight of authority" among federal circuits on a question of federal law). As noted, the weight of authority rejects *Annabi*.

anticipate, disregard the NPA's carefully-crafted text for the Government's benefit, and violate settled canons within the Eleventh Circuit (and every other circuit) for construing such agreements. *See Jefferies*, 908 F.2d at 1523; *Rowe*, 676 F.2d at 526 n.4.

The Government will likely respond that, on matters of federal common law, this Court should apply the *lex fora* without regard to regional circuit differences. But in criminal cases, differences in circuit law can affect the Constitution's guarantees. This principle is illustrated by the inter-circuit exclusionary rule: where a search or seizure is executed in one circuit but the defendant is charged in a different circuit, courts will look to the law of the circuit where the search or seizure happened to "ensure[] that the proper level of deterrence is maintained in the locale where the violation occurred." *U.S. v. Restrepo*, 890 F.Supp. 180, 191 (E.D.N.Y. 1995) (Weinstein, J.); *see also U.S. v. Ozuna*, 129 F.Supp.2d 1345, 1354 (S.D. Fla. 2001); *U.S. v. Longo*, 70 F.Supp.2d 225, 261 (W.D.N.Y. 1999); *U.S. v. Gerena*, 667 F.Supp. 911 (D. Conn. 1987). This rule prevents the Government from parachuting into a new circuit and prosecuting a case it would not otherwise have been able to bring. That rationale applies with equal force here. Like the Fourth Amendment in the search and seizure context, the Fifth Amendment requires courts to hold the Government to a minimum standard of conduct in the plea-bargaining process. *See U.S. v. Pelletier*, 898 F.2d 297, 302 (2d Cir. 1990)

("[D]ue process requires that the government adhere to the terms of any plea bargain or immunity agreement it makes"); *Harvey*, 791 F.2d at 300 ("[C]onstitutional and supervisory concerns require holding the Government to a greater degree of responsibility…for imprecisions or ambiguities in plea agreements"). Thus, when the Government promises immunity on behalf of "the United States," in a legal context where such promise will be construed to mean *nationwide* immunity, this Court should ensure that the Government keeps its promise in accordance with the law of the place where it was made.

### 3. *Annabi* does not apply to Count Six because that count falls wholly within the timeframe contemplated by the NPA

Even if Second Circuit law applied, *Annabi*'s rule of construction is subject to an important caveat: the new charges must be "sufficiently distinct" from those resolved by the plea "to warrant application of [the] rule." 771 F.2d at 672. "[S]ufficiently distinct," in this context, means at least partially encompassing a different time period. *Id.* Because Count Six relates to a timeframe wholly swallowed by the NPA, (A144), *Annabi* does not apply to that count.

The paragraph within which *Annabi* articulates its "sufficiently distinct" standard responded to an argument by the defendants that included references to the Double Jeopardy Clause. The paragraph from *Annabi* reads, in pertinent part (and with context supplied), as follows:

Even if, as appellants contend, the Southern District charges result from the same conspiratorial agreement that underlay the charges dismissed in the Eastern District, the allegation [*in the Southern District*] that the conspiracy extended for an additional two years suffices to show that the new charges are not identical to the dismissed charges. Therefore, regardless of what degree of preclusive effect [*under the Double Jeopardy Clause*] the dismissal of the Eastern District charges would have if the pending charges had been brought by the United States Attorney for [*the Eastern*] District, the [*Southern District*] charges are sufficiently distinct at least to warrant application of the *Abbamonte-Alessi* rule concerning construction of plea agreements [*viz., that '(a) plea agreement binds only the office of the United States Attorney for the district in which the plea is entered....'*]."

*Id.* (brackets and emphases added).

The court misread this portion of *Annabi* as pertaining only to "a claim based on the Double Jeopardy Clause, not a claim based on the plea agreement[.]". A191. A careful reading of the above shows that *Annabi*'s "sufficiently distinct" standard qualifies what the Court referred to as the "*Abbamonte-Alessi* rule," *i.e.*, the canon of construction for determining whether a plea agreement's ambiguous reference to "the Government" or "the United States" includes other USAOs. *Annabi*, 771 F.2d at 672. And under this test, it was dispositive that the later-brought SDNY charges in *Annabi* alleged a conspiracy period two years longer than the period alleged and resolved in the Eastern District. *See id.*

What this means is that, when new charges stem from "the same" conduct that "underlay" charges resolved by prior plea, *Annabi*'s rule of construction does not apply unless the new charges also cover a new time period; that is what makes

31

them "sufficiently distinct." A contrary rule—allowing the Government to gainsay a non-prosecution promise in plea agreement by hopping to a new district and prosecuting *the same crime*, covering *the same time period*—would upend federal plea bargaining nationally, disrupt expectations beyond this case, and turn the Second Circuit into a forum of convenience for the Government to reprosecute pled-out offenses that touch multiple federal districts. As the Fourth Circuit noted, prosecuting a defendant for the same charges resolved by plea agreement in a different district puts at stake "the honor of the government[,] public confidence in the fair administration of justice, and the efficient administration of justice in a federal scheme of government." *Carter*, 454 F.2d at 427-28.

Here, under the "sufficiently-distinct" qualification to *Annabi*, the Government was precluded, at minimum, from charging Appellant under Count Six. This count arose out of the 2006-08 SDFL investigation and is based on a trafficking statute, § 1591(a), that is explicitly mentioned in the NPA. A175. The only accuser on whom Count Six is based, Carolyn, was also a witness in the SDFL investigation. [T: 1604-5, 1614, 1679]. But unlike the SDNY charges in *Annabi*, Count Six falls wholly within the *time period* contemplated by the NPA as well. *Compare* 771 F.2d at 672. Count Six alleged that Defendant trafficked Carolyn from 2001 to 2004. The court held that the NPA "cover[s] any involvement of Maxwell in offenses committed by Epstein from 2001 to 2007,

32

other offenses that were the subject of the FBI and U.S. Attorney's Office investigation, and any offenses that arose from the related grand jury investigation." A144. Consequently, the charge is not "sufficiently distinct," *Annabi* does not apply, and the USAO-SDNY was bound by the NPA not to bring this charge. Count Six should be dismissed.

### 4. There is affirmative indication that the NPA binds the USAO-SDNY

The *Annabi* rule's presumption is unavailing by its own terms where "*it affirmatively appears that the agreement contemplates a broader restriction.*" *Annabi* at 672.

Here, the "affirmative appearance" that a broader restriction was intended for co-conspirators is evident within the four corners of the NPA, when the NPA is viewed as a whole. Unlike the agreement in *Annabi* and *Abbamonte*, the NPA is in written form and was carefully negotiated by sophisticated counsel. The absence of any limiting language in the co-conspirator immunity provision stands in sharp contrast to the NPA's provision regarding the non-prosecution of Epstein, which is expressly limited to prosecution "in this District." A175. It is difficult to envision a clearer "affirmative appearance" than the express inclusion elsewhere in the agreement of a limitation that is conspicuously absent here. Basic principles of contract interpretation require an inference that the parties considered the inclusion of the phrase "in this District" necessary to limit the scope of the non-prosecution

33

provision as to Epstein. *See, e.g., LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law, 'words and phrases ... should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'") (*citations omitted*); *Port Consol., Inc. v. Int'l Ins. Co. of Hannover, PLC, 826 F. App'x* 822, 827 (11th Cir. 2020) (same under Florida law). The Justice Manual supports this view, admonishing prosecutors who do not wish to bind USAOs in other districts to "explicitly limit the scope" of the NPA to their districts. Justice Manual, Comment to § 9-27.630 (emphasis added). The absence of the phrase "in this District" from the co-conspirator immunity provision therefore compels the inference that the parties did not intend to so limit its reach.

As the NPA reflects, Epstein's objective in negotiating the NPA was to obtain a global resolution that would, among other things, provide maximum protection for any alleged co-conspirators. A175 (noting that Epstein "seeks to resolve globally his state and federal criminal liability"). The NPA makes clear that its identification of four "potential co-conspirators" by name was not intended to limit the immunity provision to those four individuals ("but not limited to"). A178; Dkt 142, Exh. H (9/16/07 email from Villafana to Lefkowitz stating that "I will mention 'co-conspirators,' but I would prefer not to highlight for the judge all of the other crimes and all of the other persons that we could charge"). The NPA on

its face immunizes assistants who worked for Epstein out of his New York office. For example, Leslie Groff worked for Epstein out of the New York Office. Tr. 201; *See Doe v. Indyke et al.*, Case No. 1:21-cv-08469-PKC, Dkt No. 1 (S.D. Fla.).

Moreover, a promise to bind other districts need not be express; rather, it can be inferred from the negotiations between defendant and prosecutor, *see United States v. Alessi,* 544 F.2d 1139, 1153-54 (2d Cir.), *cert. denied,* 429 U.S. 960, 97 S.Ct. 384 (1976). *United States v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986) ("A promise to bind other districts can be inferred from the negotiations between defendant and prosecutor.") One relevant factor in this analysis is the extent to which the USAO negotiating the plea agreement acted on its own, as opposed to involving other USAOs or other offices within the Department of Justice. Cf., e.g., *United States v. D'Amico*, 734 F. Supp. 2d 321, 349 (S.D.N.Y. 2010) (finding that defendant "offers no meaningful support for his claim that he 'reasonably understood' the Agreement to bar subsequent prosecutions in this District. . . . He does not claim, for example, that the SDNY USAO was in any way consulted or involved in the plea negotiations."); *United States v. Laskow*, 688 F. Supp. 851, 854 (E.D.N.Y.) ("defendants concede [] that the Central District had no knowledge of the investigation that was taking place in the Eastern District at the time the Central District plea was being negotiated. . . . The Central District, unaware of defendants' potential criminal liability in the Eastern District, could not have

35

intended to insulate defendants from prosecution which they had no reason to foresee."), *aff'd*, 867 F.2d 1425 (2d Cir. 1988).

Unlike standard non-prosecution agreements, the NPA here was heavily negotiated. Negotiations began in January 2007, lasted for a period of eight months, and were "extensive" and involved the Department of Justice. The parties exchanged several drafts of an alternative plea agreement under which Epstein would have pled guilty to a federal offense. See, e.g., Dkt 142, Exh. E (9/15/07 email from Villafana to Lefkowitz attaching draft information and plea agreement); Dkt 142, Exh. F (draft plea agreement). Notably, those drafts of the plea agreement, unlike the NPA, expressly defined the term "United States" as limited to the United States Attorney for the SDFL.

The Office of Professional Responsibility's Report of the USAO-SDFL's resolution of its 2006-2008 investigation of Epstein ("OPR") (Dkt 142, Exh. A), reflects that negotiations involved the entire hierarchy of the USAO for the SDFL, all of whom signed off on the NPA. Senior levels of Main Justice were directly involved in the negotiation and approval of the NPA, even to the extent that separate presentations regarding the NPA were made to, and approval of the NPA was obtained from, the Office of the Deputy Attorney General. Further, the NPA itself reflects the involvement of the FBI. A174; Dkt 142, Exh. A at 1-2, 94-97, 103-18.

Moreover, the USAO-SDFL's involvement of the USAO for this District in its investigation of Epstein, as well its contact with witnesses in New York, reflect a coordinated effort that transcended the USAO-SDFL (Dkt 142, Exh. A at 46, 48, 60). From these facts, it affirmatively appears that the Government had every reason to foresee a potential prosecution of Epstein's co-conspirators in this District and, after multiple layers of review within the Department of Justice, intended to agree to preclude it. According to the OPR, the NPA originally read that it "resolves the federal criminal liability of the defendant and any co-conspirators in the Southern District of Florida…", but this language was modified and the final agreement was not so restricted as to the co-conspirators. Dkt 142, Exh. A at 74-75.

The OPR demonstrates the trans-district scope of the investigation and the negotiations.

- Dkt 142, Exh A at 27 n.38 (Feds considered arresting Epstein in the Virgin Islands, rather than Florida, indicating national scope of investigation);

- *Id.* at 46 ("[I]nvestigators had learned that Epstein used hidden cameras in his New York residence to record his sexual encounters");

- *Id.* at 58 (AUSA Villafana requested "enough time to go to New York, pursue investigative steps involving two of Epstein's assistants, do

witness interviews, and take additional legal steps to obtain Epstein's computers if Epstein rejected the deal.")

- *Id*. at 60 ("Villafana…reiterated that she wanted to contact Epstein's assistants in New York and to interview some of Epstein's colleagues and former employees there").

- *Id.* at 68 (Feds considered charging Epstein under 18 USC 113(a)(5), simple assault on an airplane, indicating possible bases to charge him in other districts).

- *Id.* at 69, 73, 75, 79-80 (Defense sought a government promise not to bring immigration proceedings against Epstein's assistants).

The NPA and the OPR provide ample evidence that the agreement as to the co-conspirators was intended to bind other districts. In contrast, in *Annabi*, *Abbamonte*, *Alessi*, and *Papa*, there was a complete absence of any evidence showing an intent to bind other districts.

**5. If it is reasonable to conduct a hearing, then *Annabi* is a tiebreaker that only applies if ambiguity remains after the hearing**

The language of the NPA and the evidence contained in the OPR are more than sufficient for the Court to find that the NPA bars the prosecution of Maxwell, particularly when any ambiguities are construed, as they must be, against the Government as drafter. In the alternative, however, the NPA and the circumstances of its execution merit discovery and an evidentiary hearing

38

regarding the parties' intent. To the extent that extrinsic materials do not make the parties' intent clear, the Court is obligated to make a finding as to the parties' "reasonable understanding," with ambiguities resolved in Maxwell's favor. *See United States v. Gonzalez*, 93 F. App'x 268 at 270 (2d Cir. 2004) (*emphasis and citation omitted*).

Courts in this circuit have routinely recognized the need for evidentiary hearings where the existence or scope of such agreements is in genuine dispute. *See, e.g., id.* at 270 (noting testimony from defendant's attorney); *United States v. Aleman*, 286 F.3d 86, 91 (2d Cir. 2002) *Annabi*, 771 F.2d at 671 (noting that district court heard testimony from two prosecutors, defendant, and defendant's counsel as of the time the plea agreement was reached); *United States v. Papa*, 533 F.2d 815, 820 (2d Cir. 1975) (describing "two evidentiary hearings"); *United States v. Sattar*, 2003 WL 22510398, at *1 (S.D.N.Y. Nov. 5, 2003) (noting conclusion that "an evidentiary hearing was warranted . . . to determine whether an agreement existed, what its terms were, and whether there was compliance with those terms").

At a minimum, a hearing should have been held here, as was the case in *Annabi*, itself, and *Papa* to ascertain the parties' intent. It is submitted that such a hearing would have established that Epstein intended tat any co-conspirators would

have total immunity from federal prosecution for matters that were the subject of the investigation.

### D. All counts fall within the scope of the NPA and must be dismissed.

Given that the NPA binds the USAO-SDNY, all three remaining counts must be dismissed because the plain text of the co-conspirator provision is not limited to any particular offense or any time period. A172.

That the co-conspirator immunity provision is not limited to the 2006-2007 investigation or the 2001-2007 timeframe or to prosecution in the SDFL is reinforced by another provision of the agreement which reads, in pertinent part, that a breach of the agreement, "allows the *United States* to elect to terminate the agreement and *to investigate and prosecute* Epstein and *any other individual* or entity for *any and all federal offenses*. A172.

In any, event, at minimum, Counts Three and Six must be dismissed because they indisputably fall within the scope of the NPA even as construed by the District Court.

# POINT II

## ALL COUNTS ARE BARRED BY THE STATUTE OF LIMITATIONS

For noncapital offenses such as those with which Appellant was charged, the statute of limitations is five years. 18 U.S.C. § 3282(a).  It is undisputed that a 5-year limitations period would bar all charges brought against Defendant.

To escape the consequences of its delay in bringing these charges, the Government hangs its hat on 18 U.S.C. § 3283.  Section 3283 is a narrow exception to the statute of limitations, but its application can expose a person to criminal prosecution during the lifetime of anyone who accuses him or her of child abuse or kidnapping.  To guard against overreach, it is important to recall the well-settled "principle that criminal limitations statutes are to be liberally interpreted in favor of repose." *Toussie*, 397 U.S. at 115 (quoting *U.S. v. Scharton*, 285 U.S. 518 (1926)).  Indeed, the Government's and District Court's capacious reading of §3283 would have wide-ranging ramifications in this Circuit—beyond Maxwell's case—if blessed by this Court.

Section 3283 provides that "[n]o statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child, or for ten years after the offense, whichever is longer."

18 U.S.C. § 3283. Congress enacted the predecessor to this provision under the Crime Control Act of 1990, Pub.L. 101-647, 104 Stat. 4789, and codified it as § 3283 under the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103-322, 108 Stat. 1796, commonly known as the "1994 Crime Bill." As promulgated in the 1994 Crime Bill, this section provided that the statute of limitations for an "offense involving the sexual or physical abuse of a child" would expire once the alleged victim "reaches the age of 25 years." 108 Stat. 2149. But it was not until 2003 that Congress amended § 3283 to provide for a limitations period running for the *entire life* of the alleged victim. *See* PROTECT Act, Pub.L. 108-21, § 220, 117 Stat. 650, 660.[9] The PROTECT Act was signed into law on April 30, 2003.

Contrary to what the Government argued below and what the District Court held, §3283 cannot salvage Counts Three and Four for two separate and independent reasons. ***First***, §3283 does not extend the statute of limitations for violations of § 2423(a), or conspiracy to do the same, because the "sexual or physical abuse…of a child" is not a necessary element of those offenses. ***Second***, the Government cannot apply the 2003 amendment to § 3283—the statute of limitations for the lifetime of one's accuser—to offenses that the Government alleges were committed *before* the enactment of this provision. *See Landgraf v.*

---

[9] Congress amended § 3283 again in 2006. The Government does not contend that that amendment is relevant here.

*USI Film Prod.*, 511 U.S. 244 (1994).  Rather, such offenses could only have been governed by the 1994 version of § 3283, pursuant to which the statute of limitations expired once Defendant's accusers turned 25 years old.  And it is undisputed that Defendant's accusers were all women above the age of 25 when the Government charged her in 2020.

For these reasons, Appellant's convictions under Counts Three and Four must be vacated.

### A. Section 3283 Does Not Apply to the Mann Act Violations (Counts Three and Four)

Under Counts Three and Four, the Government charged Defendant with substantive and conspiracy violations of the Mann Act, 18 U.S.C. § 2423(a), more than 15 years after the fact.  To accomplish this, the Government relies on § 3283's extension of the limitations period.  But by its text, § 3283 applies only to "offense[s] involving the sexual or physical abuse, or kidnaping, of a child."  18 U.S.C. § 3283.  Transportation of a minor or conspiracy to transport in violation of § 2423(a) is not such an offense, so Counts Three and Four must be dismissed.

At first blush, it may seem counterintuitive to assert that Counts Three and Four do not allege "offense[s] involving the sexual … abuse … of a child."  But longstanding legal precedent dictates a narrower application of § 3283.  The Supreme Court has frequently adopted a "categorical approach" (or "essential ingredient" test) when interpreting a statute's references to other offenses or

crimes. Under this approach, a court "look[s] to the statute defining the crime of conviction, rather than to the specific facts underlying the crime." *Kawashima v. Holder*, 565 U.S. 478, 483 (2012); *see also U.S. v. Taylor*, 142 S.Ct. 2015, 2020 (2022) (the categorical approach asks only what the Government is required "to prove—beyond a reasonable doubt, as an element of its case," and "precludes…an inquiry into how any particular defendant may commit the crime").

Here, applying the categorical approach to § 3283 means holding that this provision is inapplicable here. That is because "sexual or physical abuse, or kidnaping, of a child" is not a required element of transporting minors in violation of § 2423(a), or conspiracy to do the same. 18 U.S.C. § 2423(a). The offense is accomplished once a person "transports" a minor with the requisite knowledge and intent; "[t]he government need not prove … that the unlawful sexual activity actually took place." *U.S. v. Vargas-Cordon*, 733 F.3d 366, 375 (2d Cir. 2013). Thus, Counts Three and Four should have been dismissed.

However, to save Counts Three and Four from dismissal, the court rejected this categorical approach altogether and opted instead for a "case-specific" one, which would permit it to examine whether *this particular defendant's* alleged conduct "involve[ed] the sexual or physical abuse…of a child." In so doing, the court brushed aside the clear weight of authority, which holds that statutes employing "offense…involves" or "offense…involving" language identical to §

44

3283 should be read through a categorical rather than case-specific lens. *See U.S. v. Davis*, 139 S. Ct. 2319 (2019) (interpreting 18 U.S.C. § 924(c)(3)); *Kawashima*, 565 U.S. at 483 (interpreting 8 U.S.C. § 1101(a)(43)(M)(i)); *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004) (interpreting 18 U.S.C. § 16(b)); *U.S. v. Morgan*, 393 F.3d 192, 198 (D.C. Cir. 2004) (interpreting 18 U.S.C. § 3237(a)).

Indeed, the Supreme Court has—on multiple occasions—firmly held that a categorical approach must be employed to interpret statutes of limitation that bear striking resemblance to §3283. For instance, the Supreme Court has held that a proviso of the internal revenue laws, extending from three to six years the statute of limitations for prosecuting "*offenses involving* defrauding or attempting to defraud the United States," applies only when "defrauding or an attempt to defraud the United States is an ingredient *under the statute defining the offense*." *U.S. v Noveck*, 271 U.S. 201, 202-203, 204 (1926) (emphasis added) (quoting Act of November 17, 1921, c. 124, 42 Stat. 220, codified in its present version at 26 U.S.C. § 6531). *Noveck* held that this provision did not extend the statute of limitations for perjury, because fraud is not a required element of that crime. *Id.*; *see also Scharton*, 285 U.S. at 522 (same, with respect to tax evasion). Indeed, *Noveck* found this statute inapplicable *even when the indictment specifically alleges fraud*, because such fraud allegations are "mere surplusage," not an element of the offense. 271 U.S. at 203.

Similarly, in *Bridges v. U.S.*, 346 U.S. 209 (1953), the Court applied a categorical approach to the Wartime Suspension of Limitations Act (WSLA), which provided, in pertinent part, that "[w]hen the United States is at war the running of any statute of limitations applicable to any *offense ... involving* fraud or attempted fraud against the United States … shall be suspended…."  Act of June 25, 1948, c. 546, 62 Stat. 828 (emphasis added) (codified in its present version at 18 U.S.C. § 3287).  The Government charged Bridges with willfully making a false statement, to wit, denying membership in the Communist Party, in connection with his 1945 naturalization application.  Invoking the WSLA, the Government argued that the charges were timely.  But the Supreme Court, recalling *Noveck* and *Scharton*, held that the WSLA was "limited strictly to offenses in which defrauding or attempting to defraud the United States is an *essential ingredient of the offense charged*."  *Id.* at 221 (emphasis added).

In this case, the court made no attempt to distinguish *Scharton* or *Noveck*.  And though it purported to distinguish *Bridges*, it blatantly mischaracterized the Supreme Court's opinion, asserting that *Bridges* applied a categorical approach "in large part" because of the WSLA's legislative history. A149.  The District Court's statement was wrong.  *Bridges*' passing reference to legislative history concerned a different issue: whether the kind of "fraud" contemplated by the WSLA had to be fraud "of a pecuniary nature."  346 U.S. at 216.  But the Court then stated, as an

alternative holding — "[a] further ground for [its] conclusion" —that, even in cases where "fraud" occurs, a categorical analysis precludes extending the WSLA to prosecutions for making false statements. *Id.* at 221-22. And in applying this categorical approach, *Bridges* looked, not to the legislative history of the WSLA, but to *Scharton* and *Noveck* (which involved a different statute). *See Bridges*, 346 U.S. at 222 (citing, *inter alia*, *Scharton* and *Noveck*).

Here, *Bridges*, *Scharton*, and *Noveck* point the way. Because § 3283 employs the same "offense-involving" language as the statutes analyzed in those cases, *compare* 18 U.S.C. § 3283 *with id.* § 3287; 26 U.S.C. § 6531, a similar interpretation should govern. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005); *Wasser v. New York State Off. of Vocational & Educational Servs.*, 602 F.3d 476, 480 (2d Cir. 2010). The Court should apply a categorical approach and hold that § 3283 did not modify the statute of limitations for § 2423(a) violations.

Nothing in the text of § 3283 indicates a contrary result. Indeed, Congress has shown that when it wants to tether a statute of limitations to conduct occurring in a particular case, it knows how to do so—and uses unambiguous wording distinct from § 3283. Notably, in 2001, Congress eliminated the statute of limitations for certain terrorism offenses in which "*the commission of such offense resulted in, or created a foreseeable risk of, death or serious bodily injury to*

another person." *see U.S. v. Pham*, No. 12-cr-423, 2022 WL 993119, at *7 (S.D.N.Y. Apr. 1, 2022) (Nathan, J.) ("§3286(b)'s use of the terms 'foreseeable' and 'commission of such offense' … dictate a case-specific approach.").

It is noteworthy that the District Court could not identify a single page of legislative history supporting its expansive interpretation of § 3283. But that did not deter it from asserting, without citation to primary authority, that, when Congress extended the statute of limitations, it "evinced a general intention to cast a wide net to ensnare as many offenses against children as possible." A144. This questionable statement ultimately derives from a Third Circuit opinion, *U.S. v. Schneider*, 801 F.3d 186, 196 (3d Cir. 2015), which itself quotes an Eleventh Circuit case, *United States v. Dodge*, 597 F.3d 1347, 1355 (11th Cir. 2010). *Dodge*, however, had nothing to do with § 3283. Instead, *Dodge* addressed the Sex Offender Registration and Notification Act (SORNA), a completely different statute passed years after the relevant amendment to § 3283. Worse still, the full quote from *Dodge* is a comment about SORNA's *text*, not its legislative history. *See Dodge*, 597 F.3d at 1355 ("Our review *of the language of SORNA* confirms our conclusion that Congress cast a wide net to ensnare as many offenses against children as possible.") (emphasis added). Thus, the Third Circuit—and, by extension, the District Court—grossly misread *Dodge* and conjured up a legislative history for § 3283 that does not exist. If anything, § 3283's legislative history

corroborates Defendant's interpretation.  The Joint Report accompanying the 2003 amendment to this provision opined that the prior statute of limitations would not go far enough to allow the Government to prosecute "a person who abducted and raped a child."  H.R. Conf. Rep. No. 108-66, at 54 (2003).  This legislative history makes no mention of crimes, such as Mann Act violations, that do not categorically involve the actual abuse of minors.

Rather than grounding its construction of § 3283 in the text or legislative history of the statute, the District Court relied almost exclusively on an inapposite decision from this Court, *Weingarten v. U.S.*, 865 F.3d 48 (2d Cir. 2017).  The District Court conceded, as it had to, that *Weingarten* is not controlling (A147), but it essentially and erroneously treated *Weingarten* as though it were.  The only question in *Weingarten* was whether the petitioner's trial counsel provided constitutionally deficient representation by conceding that an indictment charging Mann Act violations was timely.  *See* 865 F.3d at 52.  The petitioner contended that his trial counsel should have argued that § 3283 must be interpreted under a categorical standard.  *See id.* at 58.  This Court disagreed only because "*[i]t was not obvious* at the time of Weingarten's motion to dismiss, nor is it today, that a court must apply a categorical approach, rather than a fact-specific analysis, to determine whether an offense is subject to § 3282 or § 3283."  *Id.* at 58-59

(emphasis added). *Weingarten* does not move the needle because it did not purport to decide how § 3283 should actually be construed.

The District Court's reliance on *Nijhawan v. Holder*, 557 U.S. 29 (2009), a case interpreting 8 U.S.C. § 1101(a)(43)(M)(i), was likewise misplaced. The District Court cited *Nijhawan* for the proposition that "the word 'involves' generally means courts should look to the circumstances of an offense as committed in each case." A148. But *Nijhawan* says otherwise; there, the Supreme Court reaffirmed its prior case law holding that statutory "language, covering 'crime[s]' that '*involv[e] conduct* that presents a serious potential risk of physical injury to another' … refers to crimes as generically defined." 557 U.S. at 36 (emphasis and brackets in original) (quoting *James v. U.S.*, 550 U.S. 192, 202 (2007)).[10] Indeed, the Supreme Court has explicitly held that the clause, "offense that … involves fraud or deceit," as used in § 1101(a)(43)(M)(i), *is* analyzed categorically, directly contrary to the District Court's apparent misreading of *Nijhawan*. *Compare Kawashima*, 565 U.S. at 483 ("employ[ing] a categorical approach") *with* A148.

This Court should decline to ratify the District Court's case-specific approach for an additional reason: it would conflict with at least two other circuits that have examined § 3283 and concluded that a categorical approach applies. *See*

_____

[10] In *Johnson v. U.S.*, the Supreme Court overruled *James* on other grounds, but expressly reaffirmed *James*' categorical approach. *See* 576 U.S. 591, 604 (2015).

*U.S. v. Diehl*, 775 F.3d 714 (5th Cir. 2015) (Graves, J.); *U.S. v. Coutentos*, 651 F.3d 809 (8th Cir. 2011). In *Coutentos*, a jury found the defendant guilty on two counts: sexual exploitation or attempted sexual exploitation of a minor to produce child pornography (18 U.S.C. § 2251(a) and (d)) and possession or attempted possession of child pornography (18 U.S.C. § 2252A(a)(5)(B) and (b)(2)). Both counts were untimely unless § 3283 applied. As the Court's recitation of the facts made clear, the production and possession counts were based on the same underlying conduct: the defendant's abuse of his granddaughters to create child pornography. *See Coutentos*, 651 F.3d at 813-14. Thus, in a factual sense, the defendant's possession clearly involved the sexual abuse of a child. Nevertheless, the Eighth Circuit, while affirming the production conviction, vacated the possession conviction on the ground that it was not an "offense involving the sexual…abuse of a child" within the precise meaning of § 3283. The Court considered the possession statute in the abstract, asked whether it *necessarily* required proof of involvement in the sexual abuse of a child, and concluded that it does not:

> Does someone who merely possesses child pornography sexually abuse the child portrayed in the images? No more than the offense of possessing methamphetamine involves the act of producing it, does the offense of child pornography involve the sexual abuse of a child. That a producer of child pornography will possess it at the time of the abuse is insufficient to change our view that the offense of possessing child pornography itself does not involve an act against a child, i.e.,

the sexual abuse of a child. Thus, we conclude that § 3283 is inapplicable….

*Id.* at 817.

In *Diehl*, the Fifth Circuit has similarly interpreted § 3283 through a categorical lens. The defendant was convicted of producing child pornography under 18 U.S.C. § 2251(a). To determine whether the defendant's offenses were "offense[s] involving the sexual…abuse of a child" under § 3283, the Court looked not to the facts of the case but, rather, "the language of the relevant statutes." *Diehl*, 775 F.3d at 720. The Court expressly cited *Coutentos* and held that § 2251(a) was an "offense involving the sexual … abuse of a child," as the statute "prohibits using or inducing children under the age of 18 to engage in sexually explicit conduct for the purpose of creating a visual depiction." *Id.* (citing *Coutentos*, 651 F.3d at 816-17).

## B. The District Court erred in applying § 3283 retroactively

Even if the District Court were correct to afford § 3283 a case-specific rather than categorical construction (and it was not), it erred again when it held that the April 30, 2003 amendment to that provision—extending the statute of limitations for the life of the accuser—reached back to attach to conduct occurring before its enactment. Contrary to what the District Court held, the 2003 amendment was not retroactive.

Pursuant to *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994), courts must follow a two-step framework to assess whether an act of Congress may be interpreted to apply retroactively. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *see also Enterprise Mortg. Acceptance Co., LLC, Securities Litig. v. Enterprise Mortg. Acceptance Co.*, 391 F.3d 401, 405-406 (2d Cir. 2004). "At the first stage, a court must 'determine whether Congress has expressly prescribed the statute's proper reach.' If Congress has done so, the inquiry ends[.]". *Enterprise*, 391 F.3d at 405-406 (quoting *Landgraf*, 511 U.S. at 280). If, however, "the statute is ambiguous or contains no express command, the court proceeds to the second stage of the *Landgraf* test and 'determine[s] whether the new statute would have retroactive effect[.]'" *Id.* (quoting *Landgraf*, 511 U.S. at 280). "If the statute, as applied, would have such an effect, it will not be applied retroactively 'absent clear congressional intent' to the contrary." *Id.* (quoting *Landgraf*, 511 U.S. at 280).

To apply the 2003 amendment to § 3283 retroactively, the Government must clear both hurdles of the *Landgraf* analysis. In fact, it cannot clear either of them. At step one, Congress clearly evinced an intent that the 2003 amendment operate only prospectively. Alternatively, at step two, the amendment would have an impermissible retroactive effect.

### 1. Congress evinced an intent that § 3283 operate only prospectively

The first step of *Landgraf* asks whether Congress "expressly prescribed" the temporal reach of the 2003 amendment. Here, Congress "expressly prescribed" that the 2003 Amendment was to apply prospectively only.

To begin with, the text of the 2003 amendment omits any mention of retroactivity. If anything, it points in the opposite direction. This section twice employs forward-looking modal verbs: "*would*" and "*shall*." *See* 18 U.S.C. 3283 ("No statute of limitations that *would* otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years *shall* preclude such prosecution during the life of the child, or for ten years after the offense, whichever is longer."); *see also Appalachian Power Co. v. E.P.A.*, 249 F.3d 1032, 1057 (D.C. Cir. 2001) (characterizing the phrase "would emit" as a "future conditional phrase"); *Salahuddin v. Mead*, 174 F.3d 271, 275 (2d Cir. 1999) ("There is no doubt that 'shall' is an imperative, but it is equally clear that it is an imperative that speaks to future conduct"); *Martin v. Hunter's Lessee*, 14 U.S. 304, 314 (1816) ("The word *shall*, is a sign of the future tense…."). This language indicates that § 3283 looks into the future, not the past.

Even if the text of § 3283 were unclear about its temporal reach, we would not proceed immediately to step two of *Landgraf*. Instead, courts must also "examin[e] legislative history to determine congressional intent at the first stage of

the *Landgraf* test." *Enterprise*, 391 F.3d at 408 (citing *Landgraf*, 511 U.S. at 262-63); *see also Martin v. Hadix*, 527 U.S. 343, 355-57 (1999); *Lattab v. Ashcroft*, 384 F.3d 8, 14 (1st Cir. 2004).

The legislative history of 2003's amendment makes it abundantly clear that Congress considered—and rejected—a retroactivity clause that would have expressly allowed § 3283's lifetime limitations period to attach to conduct predating its enactment. The House version of the bill included the following proviso:

> The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section.

Child Abduction Prevention Act, H.R. 1104, 108th Cong. § 202 (2003). When the House and Senate conferenced, however, this retroactivity provision was rejected. Courts give great weight to Congress' consideration and rejection of a legislative proposal in interpreting federal statutes, and such a clear expression of congressional intent ought to end the *Landgraf* analysis at step one here. *See Food & Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000); *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 104 (1983); *Hudson Valley Black Press v. I.R.S.*, 409 F.3d 106, 112 (2d Cir. 2005); *United States v. Napolitano*, 761 F.2d 135, 137 (2d Cir. 1985); *United States v. Lawson*, 683 F.2d 688, 693 (2d Cir. 1982).

Although the District Court was correct to recognize that Congress deleted the retroactivity provision purposefully, it failed to understand the reason. The District Court relied on a floor statement by Senator Leahy, in which the Senator offered his own reasons for opposing the retroactivity clause:

> I am pleased that the conference agreed to drop language from the original House-passed bill that would have extended the limitations period retroactively. That language, which would have revived the government's authority to prosecute crimes that were previously time-barred, is of doubtful constitutionality.

149 Cong. Rec. S5147. Based on this, the District Court theorized that Congress wanted only to ensure that the extended statute of limitations would not unconstitutionally revive time-barred claims. *See Stogner v. California*, 539 U.S. 607, 610 (2003).

But *Stogner* is an unilluminating lens through which to analyze Sen. Leahy's remark, as that case was not decided until after the PROTECT Act was passed. And though *Stogner* established, for Ex Post Facto Clause purposes, a clear division between statutes that revive time-barred prosecutions and those that merely extend the time to bring prosecutions not time-barred, this dichotomy would not have been apparent to Congress before *Stogner*. Indeed, the *Stogner* majority felt it necessary to clarify that its holding did "not prevent the State from extending time limits...for prosecutions not yet time barred," 539 U.S. at 632, while the dissent contended that this dichotomy was untenable, *see id.* at 650

(Kennedy, J., dissenting). Congress could not have known which point of view would carry the day; Sen. Leahy may very well have thought that *any* retroactive application of the statute would be of doubtful constitutionality.

In any event, Sen. Leahy's remark confirms that Congress's rejection of the provision was intentional—that it did not merely "agree to disagree," as in *Landgraf*, 511 U.S. at 623—his reasons *why* the provision was rejected cannot be ascribed to other members of Congress. *See Garcia v. U.S.*, 469 U.S. 70, 76 (1984) (noting floor statements by a single member are generally weak legislative history evidence). Indeed, we know that when Congress rejected the retroactivity provision in the 2003 House bill it almost certainly did *not* do so for constitutional-avoidance reasons. We know this because other criminal statutes of limitation passed by Congress contained language *identical* to the retroactivity provision that Congress rejected in the 2003 amendment to § 3283. *See* Pub.L. 107-56, § 809, 115 Stat. 272 (Oct. 26, 2001) (note to 18 U.S.C. § 3286) ("The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section."); Pub.L. 101-647, § 2505, 104 Stat. 4789 (Nov. 29, 1990) (note to 18 U.S.C. § 3293) (similar).

For these reasons, applying § 3283 retroactively fails under step one of *Landgraf*.

**2. The District Court's application of § 3283 creates "impermissible retroactive effects" without authorization from Congress**

Even if the text and legislative history of § 3283 were unclear, *Landgraf*'s "presumption against statutory retroactivity" would foreclose retroactive operation of this statute at step two. 511 U.S. at 293. Because "retroactive application [must] be avoided 'absent clear congressional intent favoring such a result,'" which is lacking here, the District Court's retroactive application of § 3283 must be reversed. *Enterprise*, 391 F.3d at 410 (quoting *Landgraf*, 511 U.S. at 280).

Were this Court to hold otherwise, it would stand in conflict with the Third Circuit. In *U.S. v. Richardson*, 512 F.2d 105 (3d Cir. 1975), the Third Circuit rejected the retroactive application of a criminal statute of limitations, citing both a general presumption against retroactivity similar to what the Supreme Court would later echo in *Landgraf*, and the more specific canon in favor of repose articulated in *Toussie. See Richardson*, 512 F.2d at 106.

Although *Richardson* was decided before *Landgraf*, courts continue to follow its holding that criminal statutes of limitations are presumed not to apply retroactively, even as to conduct that fell within the limitations period and could have been prosecuted at the time of enactment. *See U.S. v. Gentile*, 235 F.Supp.3d at 655-56 (holding that expansion of securities fraud statute of limitations did not apply retrospectively although the limitations period in his case had not yet expired when statute was expanded); *U.S. v. Schneider*, C.A. No. 10-29, 2010 WL

58

3656027, at *1 & n.1 (E.D. Pa. Sept. 15, 2010) (agreeing with Government's concession that the Adam Walsh Child Protection Act, Pub.L. 109-248, 120 Stat. 587 (Jul. 27, 2006) (codified in relevant part at § 3299), which abolished the statute of limitations for certain offenses against minors, did not apply retroactively to allow prosecution of defendant under the Mann Act, even though the prior five-year statute of limitations had not yet expired).

Judge Rakoff in this circuit observed that an expansion of a statute of limitation is "retroactive" if it applies to past conduct, even when it merely extends the time to bring an action that is not yet time-barred. *Morales v. Irizarry*, 976 F.Supp. 256, 258 (S.D.N.Y. 1997) (citing *Landgraf*, 511 U.S. at 279) ("In the absence of some such legislative indication, such a retroactive expansion of a substantive provision like the statute of limitations will not be presumed"). *Morales* was a civil case. But *Landgraf*'s "presumption against retroactive legislation," which "is deeply rooted in our jurisprudence," 511 U.S. at 265, applies with even stronger force in the criminal context. Unlike civil statutes, "criminal limitations statutes are 'to be liberally interpreted in favor of respose.'" *Toussie*, 397 U.S. at 115 (quoting *Scharton*, 285 U.S. at 522). *See U.S. v. Gentile*, 235 F.Supp.3d 649, 655 (D.N.J. 2017). Consequently, the extension of a criminal statute of limitations will not apply to pre-enactment conduct unless Congress has clearly stated that it should.

The Government argued that there is no Ex Post Facto violation in applying § 3283 retroactively to Appellant's pre-April 30, 2003 conduct. We agree. *See Stogner*, 539 U.S. at 632. But the Government's reliance on Ex Post Facto principles is misdirection. As *Richardson*, *Gentile*, and *Schneider* illustrate, the Ex Post Facto Clause is not the final word on whether a statute is impermissibly retroactive. Indeed, the entire premise of *Landgraf* is that certain statutes must be presumed (absent a clear statement from Congress) to apply only prospectively, *even though retroactive application would be entirely constitutional*:

> **But while the *constitutional* impediments to retroactive civil legislation are now modest, prospectivity remains the appropriate default rule.** Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price *273 to pay for the countervailing benefits.

*Landgraf*, 511 U.S. at 272-73 (emphasis in original; bold added). [11] This view was echoed by no less a jurist than Judge Calabresi, who opined that "[*Landgraf*'s] anti-retroactivity presumption is triggered by statutes whose retroactive application, while not the equivalent of criminal *ex post facto*, nevertheless would

---

[11] *Landgraf* cannot be distinguished in this regard simply because it was a civil case. Non-criminal statutes, like criminal statutes, can be unconstitutionally retroactive (i.e. under the Takings or Due Process Clauses), but the constitutional standard is different from the *Landgraf* test. *See E. Enterprises v. Apfel*, 524 U.S. 498 (1998). Conversely, some criminal statutes are presumed not to apply retroactively even though doing so would be perfectly constitutional.

run afoul of 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" *Thom v. Ashcroft*, 369 F.3d 158, 163 n.6 (2d Cir. 2004) (Calabresi, J., majority opinion but "[s]peaking only for [him]self") (quoting *Landgraf*, 511 U.S. at 270).

The authority cited by the District Court is not to the contrary. In *Vernon v. Cassadaga Valley Cent. Sch. Dist.* 49 F.3d 886 (2d Cir. 1995), a civil case, the Court concluded that an amendment to a statute of limitations applied retroactively because it was procedural. *id.* at 891, But in *Enterprise*, Judge Cabranes—writing for a unanimous Court—retreated altogether from *Vernon*'s prior characterization of statutes of limitations as purely "procedural." As Judge Cabranes wrote, *Vernon* "did not create a categorical exception [for statutes of limitations] from *Landgraf*'s presumption against retroactive application of legislation." 391 F.3d at 409. Most importantly for this case, *Enterprise* indicated that an extension of the statute of limitations may operate with impermissible retroactive effect when it applies to pre-enactment conduct, regardless of whether or not it revives claims that are altogether time-barred. *See id.* at 410.

Finally, The District Court also relied on decisions from the Eighth and Ninth Circuits, which—in tension with the Third Circuit's reasoning in *Richardson*,—concluded that §3283 can be applied retroactively. *See U.S. v. Leo Sure Chief*, 438 F.3d 920 (9th Cir. 2006); *U.S. v. Jeffries*, 405 F.3d 682 (8th Cir.

2005). But neither decision cited *Landgraf*; purported to follow its two-step framework; or examined §3283's legislative history. Instead, both decisions simply assumed that a criminal statute of limitations can be applied retroactively absent an Ex Post Facto problem under *Stogner*. *See Leo Sure Chief*, 438 F.3d at 924; Jeffries, 405 F.3d at 685. *But see Richardson, supra.*

### C. Count Six is also barred by the Statute of Limitations

Count Six (2001-2004) charging §1591 is also time-barred because the 2003 amendment to §3283 cannot be applied retroactively under *Landgraf* for the reasons stated above**.** In addition, §3299 cannot be applied retroactively. In 2006, Congress enacted §3299 to eliminate the limitations period for §1591. But since the sex trafficking in Count Six predates the enactment of §3299, Count Six is time-barred unless the statute applies retroactively. *Landgraf*'s "presumption against statutory retroactivity" forecloses retroactive operation of this statute at step two as the Government has conceded elsewhere. 511 U.S. at 293. *see U.S. v. Schneider*, C.A. No. 10-29, 2010 WL 3656027, at *1 n.1 (E.D. Pa. Sept. 15, 2010) *citing U.S. v. Richardson*, 512 F.2d 105 (3d Cir. 1975). Accordingly, Count Six is time-barred.

**POINT III**

**DEFENDANT WAS DENIED HER CONSTITUTIONAL RIGHT TO A
FAIR AND IMPARTIAL JURY BECAUSE A JUROR MADE FALSE
STATEMENTS IN VOIR DIRE AS TO MATERIAL FACTS THAT, IF
KNOWN, WOULD HAVE PROVIDED A VALID BASIS TO REMOVE
HIM FOR CAUSE. U.S. Const. amend. VI.**

## A. Introduction

After the trial concluded, a juror gave multiple interviews in which he
disclosed that he actively used his own self-described traumatic experience as a
victim of child sexual abuse to convince certain members of the jury to overlook
issues of credibility surrounding the victims and to convict Maxwell. Defendant
moved for a new trial, contending that the juror's presence on the jury violated her
Sixth Amendment right to an impartial jury. Dkt 613, 642.  The court ordered an
evidentiary hearing limited to questions concerning Juror 50's false statements on
the juror questionnaire. A239.

At the hearing, Juror 50 gave a patently absurd explanation for his failure to
give truthful answers to multiple questions on the juror questionnaire.
Nevertheless, the court found that Juror 50 testified credibly at the hearing and that
Juror 50 would not have been stricken for cause even if he had answered each
question on the questionnaire accurately. Accordingly, the court concluded that
Defendant failed to satisfy the demanding requirements of the controlling Supreme

63

Court decision, *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845 (1984).

In any event, there was ample evidence establishing that Juror 50 harbored actual bias and that the similarities of his child sexual abuse to the case supported a finding of implied and inferred bias at the time of jury selection such that, had Juror 50 given truthful answers at the time of jury selection, Defendant would have interposed a valid challenge for cause. A new trial must be ordered.

## B. Applicable Law

"When it is discovered that a juror gave false answers during *voir dire*, any motion for a new trial must first be analyzed under the Supreme Court's test in *McDonough Power Equity v. Greenwood*, 464 U.S. 548 (1984). Under a two-part test, a party must show that "a juror failed to answer honestly a material question on *voir dire*." *McDonough*, 464 U.S. at 556. Second, the party must show that "a correct response would have provided a valid basis for a challenge for cause.*" Id*. Moreover, a new trial can be ordered without a finding of actual prejudice. *Arizona v. Fulminante*, 499 U.S. 279, 307-10 (1991). The standard of review for a district court's denial of a motion for a new trial is abuse of discretion. *See, Rivas v. Brattesani*, 94 F.3d 802, 807 (2d. Cir. 1996).

**C. Juror No. 50's False Responses Deprived Ms. Maxwell of her Constitutional Right to a Trial by an Impartial Jury**

**1. Juror 50 Did Not Truthfully Answer Material Questions During *Voir Dire***

Juror No. 50's answers to Questions 25 ,48, and 49 were indisputably false. *Juror Questionnaire* at A289

At the hearing, Juror No. 50 admitted that he gave multiple false answers during *voir dire* which resulted in the concealment of his experience as a victim of child sexual abuse but denied that his misstatements were intentional. Of some 50 questions, only questions that would have revealed his sexual abuse history were answered incorrectly.  Juror 50 denied that he had ever been a victim of a crime because he was thinking about other types of crime and because his "healing process" meant that he did not consider himself a victim (#25); denied that he was the victim of sexual abuse because he was distracted and misread the question (#48); and denied that he had a family member who had been accused of a crime because he did not think of his step-brother who sexually abused him as family (#49). A268-270.

65

### D. Under the McDonough Test, Juror 50's Actual, Implied and Inferred Bias was established.

#### 1. The McDonough Test: The First Prong

"Intentionally false" answers are not a prerequisite to satisfying the first prong of the *McDonough* test. Although the Court held that "a party must first demonstrate that a juror failed to honestly answer a material question on *voir dire*," its focus on whether the juror was "honest," did not mean that an inadvertent mistake or inaccurate answer, not given deliberately, would not satisfy the test. *McDonough*, 464 U.S. at 556. Quite the opposite, a verdict can be undermined, and a new trial ordered, "regardless of whether a juror's answer is honest or dishonest." *Id*. at 557-59. Thus, "false" means inaccurate or materially misleading, not necessarily deliberately false or untruthful. *United States v. Langford*, 990 F. 2d 65, 68 (2d Cir. 1993). Here, as Juror No. 50's answers were plainly untrue, the first prong under *McDonough* was satisfied.

#### 2. The McDonough Test: The Second Prong

Pursuant to *McDonough*, once an untrue *voir dire* response has been discovered, the next question is would truthful answers have provided a valid basis for a challenge for cause? *United States v. Stewart*, 433 F.3d 273, 303 (2006). "[T]he test is not whether the true facts would compel the Court to remove a juror for cause, but rather whether a truthful response 'would have provided a valid basis

for a challenge for cause'" *Daugerdas*, 867 F. Supp. 2d at 470. Challenges for cause can be based on implied bias, inferred bias, or actual bias. *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). Clearly, had Juror No. 50 disclosed his "traumatic" victimization, his truthful answers to follow-up questions would have provided a valid basis for a challenge for cause because of the similarity of Juror 50's sexual abuse experience to the evidence in the case and the materiality of the nondisclosures.

In determining whether Juror No. 50 was biased, and whether a hypothetical challenge for cause would have been granted, a court should consider several factors, including (1) the similarity between Juror No. 50's past experience and the experiences of the witnesses who testified at trial, as well as (2) the severity of the juror's dishonesty, and (3) the juror's motives for lying. *See*, *Sampson v. United States*, 724 F.3d 150, 166 (1st Cir. 2013).

Here, Juror 50's undisclosed experience was strikingly similar to the experiences described by the witnesses at trial. Juror 50 was a victim of childhood sexual abuse; was abused as a minor on multiple occasions over the course of several years; was abused by someone he knew and trusted and another person; and delayed disclosing the abuse for years. A267-268. Juror 50's experience is more troubling because it directly bore upon Maxwell's central trial defense i.e., that the testimony of the complaining witnesses was unreliable because it

concerned memories of events that occurred so long ago and that those memories of Maxwell's peripheral involvement in the abuse were motivated and distorted by external events. This issue was so central to the trial that the defendant called an expert to testify about memories.

Assuming Juror 50 recounted a version of his abuse similar to what he described at the hearing and in media interviews, there is no question that he would have been excused on consent, stricken for cause or by an available peremptory challenge.[12] In the event that Juror 50 answered truthfully, Juror 50 would have been questioned at length by the court, *in camera*. Honest answers to those questions would certainly have resulted in a valid challenge for cause.

### E.    The District Court Abused its Discretion in the Manner in Which it Conducted the Post-Trial Hearing

The court abused its discretion in precluding cross-examination of Juror 50 by the defense and in limiting the scope of the questions.

---

[12] The potential jurors who admitted to being victims of sexual assault and were not stricken for cause, reported conduct such as groping, harassment at work or on the subway, and inappropriate touching in social settings - conduct that was drastically different than the abuse suffered by Juror 50 – drastically different from the abuse suffered by Juror 50 and the victims herein.

### 1. The Court Erred in Precluding Defense Counsel From Questioning Juror 50

Once the court ordered a hearing, it was essential that Maxwell be afforded a meaningful opportunity to have her counsel participate in the hearing. Although judges normally enjoy "broad flexibility" in addressing claims of jury misconduct, cases involving "media publicity or other outside influences" constrain their leeway. *United States v. Thai*, 29 F. 3d 785, 803 (2d Cir. 1994). *See*, *United States v. Daugerdas*, Case No. 09-CR-581 (William H. Pauly) (procedure followed in identical situation acknowledged that defense counsel was in best position to conduct the examination of the juror).

Defense counsel was not permitted to cross-examine Juror 50 and many of their proposed questions were rejected by the court. For example, the court refused inquiry into Juror 50's statements about his "healing process;" his therapy and specifically whether he spoke with a therapist about the case *during* the trial; the details of his sexual abuse to assess how similar it was to the stories of the accusers; his social media use to the extent it contradicted his statements in *voir dire*; and his public statements both about traumatic memories and his participation as a juror. A277-281. The court should have permitted Maxwell's attorneys to probe the impact that the sexual abuse had on the juror in other aspects of his life and assess whether his answers reflected an actual or implied bias as his voluntary post-verdict public comments surely did. The court's. hypothetical questions about

what he might have said in *voir dire* four months earlier, had he been truthful, were

pointless.

## 2. FRE 606 Did Not Prevent Inquiry into Juror 50's Use of Prior Abuse in Persuading Jury to Convict Maxwell

The court erred in applying Federal Rule of Evidence 606 to preclude any

testimony from Juror 50 about his statements to journalists.

Fed. R. Evid. 606(b) precludes a juror from testifying about deliberations

and jurors' mental processes in the course thereof but allows testimony regarding

extraneous prejudicial information, i.e., when certain outside influences on the jury

are involved. Rule 606(b) expressly authorizes jurors to testify as to "extraneous

prejudicial information" or "outside influences." The rationale behind 606(b) is the

need to prevent post-trial scrutiny, the harassment of former jurors by losing

parties, and to promote juror privacy. *See*, *Tanner v. United States*, 483 U.S. 107

(1987).

In this case, however, we are not faced with a conflict between policy

considerations underlying Rule 606(b). Indeed, such public policy concerns are

inapplicable in this case, where the juror, on his own, broadcast his experiences

and the role he played in jury deliberations. Inquiry into these statements does not

risk exposing a juror to harassment or intimidation. In fact, the only reason the

parties were aware of such statements is due to Juror 50's own conduct. In such a situation, Juror 50 does not get to use 606(b) as a shield.

Rule 606(b)'s exception for extraneous prejudicial information is applicable here. First, had this information been disclosed, Juror 50 would have been disqualified or excluded from being a member of the jury. Second, his statements demonstrate that he used information, concealed during *voir dire*, to operate as an unsworn expert on the subject of traumatic memory for which he was not qualified.[13] And, third, questioning Juror 50 about his statements to media would have provided the defense with an opportunity to establish through probing questions the credibility of Juror 50's conclusory protestations that he could be fair and establish a valid basis for a cause challenge. Thus, testimony on this topic was admissible as an exception to 606(b).

> **F.    The District Court Erred in Finding that (1) Juror 50 was Not Biased and (2) Juror 50 Would Not Have Been Stricken Even if He Had Answered the Questions Accurately**

Here, the District Court abused its discretion in unfairly limiting the hearing and in making clearly erroneous factual findings, namely, that Juror 50's hearing

---

[13]  Dr. Elizabeth Loftus testified that people "don't just record events and play it back later like a recording device would work, like a video machine, but rather, we are actually constructing memories when we retrieve memories." (Tr. at 2427). However, Juror No. 50 stated that the memories of the abuse he suffered can be "replayed like a video." Lucia Osborn-Croweley, *Ghislaine Maxwell Juror Breaks Silence To The Independent: This Verdict Is For All The Victims*," Independent (Jan. 4, 2022).

testimony was credible and that, had he given truthful answers during *voir dire*, he would not have been dismissed for cause.

The District Court erred when it did not find any bias (actual, implied, or inferred) on the part of Juror 50. Juror 50's testimony revealed that he was not, and could not have been, a fair and impartial juror. At the outset, Juror 50's explanation for his untruthful responses on the questionnaire only as to questions that would have revealed his sexual abuse history were not credible, rendering his self-serving statements that he was unbiased unreliable. His post-verdict statements show how closely he identified with the victims in this case. For example, Juror 50 stated that the verdict against Maxwell was a verdict "for all the victims."  During his hearing testimony, he told the trial court that after "seeing the victims be brave enough to give their story, I felt like if they can do it, so can I." (H. 24.)  As a victim of child sexual abuse, he was not capable of "separating [his] own life experiences from the evidence in the case." *Sampson*, 724 F. 3d at 167.

The court abused its discretion when it credited Juror 50's patchwork of self-serving explanations for his false answers to questions that could have led to the disclosure of his sexual abuse history. His explanation that he did not see the word "you" in question #48 is implausible since he saw it everywhere else. Juxtaposed with his other excuses for false statements, namely, that he did not consider a step-

brother to be family (#49) and that he did not consider sexual abuse a crime (#25), his answers border on the absurd.

A review of Juror 50's statements to the media and hearing testimony reveals that, after he retained and was advised by counsel, he took great pains to downplay his prior sexual abuse. But his view of the way *all* victims recall memories – which are at odds with the defendant's expert – revealed a bias that would have prevented him from serving as a juror, were he to have disclosed it. Thus, the court erred when it found that Juror 50 would not have been stricken as a juror even if he had answered the questions accurately during *voir* dire.

## POINT IV

## THE COURT CONSTRUCTIVELY AMENDED COUNTS THREE AND FOUR OF THE INDICTMENT

A jury note sent during their deliberations (A230) clearly indicated that the jurors were considering convicting Maxwell on Count Four of the Indictment based solely on Jane's testimony about sexual activity in New Mexico. The Court denied the defense's request to give a clarifying instruction to the jury that the New Mexico conduct could not form the basis of a conviction on Count Four because it was not a violation of New York law. Instead, the Court directed the jury to the existing jury charge for Count Four. The jury ultimately convicted Maxwell on Count Four and the two Mann Act

73

conspiracies (Counts One and Three). There is a substantial likelihood that the jury believed that sexual activity that violated New York Penal Law §130.55 need not have occurred in New York and that Maxwell was convicted of Count Four based on Jane's testimony about sexual activity with Epstein at his ranch in *New Mexico*.

Jane's testimony about sexual abuse in New Mexico presented the jury with an alternative basis for conviction that was entirely distinct from the charges in the Indictment. The Court's refusal to correct the jury's obvious misunderstanding, constituted a constructive amendment and/or a variance from the charges in the Indictment. Accordingly, this Court should vacate Maxwell's convictions on Counts Three and Four and grant a new trial.

### A. Background Facts

#### 1. The Jury Note

During their deliberations, the jury sent a note (the "Jury Note" or the "Note") inquiring about the proper basis to convict under Count Four of the Indictment (the substantive transportation count). The Jury Note read as follows:

> Under Count Four (4), if the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico where/if the intent was for Jane to engage in sexual activity, can she be found guilty under the second element?

A238

The second element of Count Four in the Jury Charge to which the jury plainly refers requires "that Maxwell knowingly transported Jane in interstate commerce with the intent that Jane engage in sexual activity for which any person can be charged with a criminal offense in violation of New York law," namely, "New York Penal Law, Section 130.55, sexual abuse in the third degree." Tr. 3037:10-19

## B. Applicable Law

To prevail on a constructive amendment claim, a defendant must demonstrate that "the terms of the indictment are, in effect, altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012). A constructive amendment is a *per se* violation of the Grand Jury Clause requiring reversal. Id at 417.

The defendant must be "given notice of the core of criminality to be proven at trial." *Id*. "After identifying the core of criminality, a court must then determine whether the evidence or jury instructions at trial created a substantial likelihood that the defendant was not convicted of the crime described in that

core, but of a crime 'distinctly different' from the one alleged." *D'Amelio*, 683

F.3d at 419-21). The standard of review is *de novo. D'Amelio*, at 416.

In contrast, "[a] variance occurs when the charging terms of the indictment

are left unaltered, but the evidence at trial proves facts materially different from

those alleged in the indictment." *Id.* (quoting *United States v. Salmonese,* 352 F.3d

608, 621 (2d Cir. 2003)). A defendant alleging variance must show "substantial

prejudice" to warrant reversal.

*Rigas*, 490 F.3d at 226.

## 1. The "Core of Criminality" of Counts Three and Four Was a Scheme to Cause Underaged Girls to Travel to New York with an Intent to Violate New York Law.

The "core of criminality" of the Mann Act transportation offenses was a

scheme to cause underage girls to travel to *New York* with the intent that they

would engage in sexual activity in violation of *New York* law. The Indictment

itself was clear on its face. Count Four, specifically alleged in the "to wit"

clauses that the charges were based on Jane's travel "from Florida to New

York, New York" where Maxwell intended for her to engage in sex acts with

Epstein "in violation of New York Penal Law, Section 130.55." Ind. ¶ 21 at

A129. Count Three alleged that the object of the conspiracy was to cause

underage girls to travel across state lines with the intent that they "engage in

sexual activity for which a person can be charged with a criminal offense"

(Ind. ¶ 18 at A128) and specified that the relevant criminal offense was a "violation of New York Penal Law, Section 130.55." Ind. ¶19b at A128. And the Government consistently represented to the court, in numerous conferences and filings, that a conviction under the Mann Act counts had to be based on an intent or an agreement to violate New York Penal Law §130.55. *See, e.g.*, 11/1/2021 Tr. 68:2- 4; Dkt. 410-1 at 52; and Tr. 2775:3-6.

It follows, then, that evidence that Jane traveled to any other state besides New York and engaged in sexual activity, even if illegal under that state's laws, would be insufficient, by itself, to convict Maxwell of Count Four. If Maxwell were convicted on Counts Three or Four based solely on such conduct, that would be a constructive amendment of the charges in the Indictment. *See Millstein*, 401 F.3d at 65; *Wozniak*, 126 F.3d at 106-08; *Roshko*, 969 F.2d at 4-6.

### 2. There is a Substantial Likelihood that. Maxwell Was Convicted on Counts Three and Four Based on Conduct Not Charged in the Indictment.

There is a substantial likelihood that Defendant was convicted on Count Four based solely on conduct in New Mexico.

The jurors were not given the Indictment and the jury charge failed to include that the relevant interstate travel "as charged in the Indictment" was travel "from Florida to New York, New York," despite a defense request. Dkt.

410-1 at 19; Tr. 2758:23-2760:9.

Count Four rested exclusively on the testimony of Jane. Jane recalled one trip to New Mexico when she was "15 or 16." Tr. 321:6- 321:13. She flew to New Mexico with Epstein and Maxwell and stayed at Epstein's ranch. Tr. 321:14-322:6., and, while there, she was sexually abused. Tr. 322:7-323:19.

Based on Jane's testimony and the Note, there is a substantial likelihood that the jury improperly based its conviction solely on the sexual abuse that Jane experienced in New Mexico. The jurors had the mistaken impression that it would be sufficient to satisfy the second element of Count Four if they found that Maxwell had intended Jane to engage in sexual activity *in New Mexico*, even though such conduct was not and could not have been "sexual activity in violation of New York Penal Law, Section 130.55."

The corroborating evidence supports the theory that the jury did not credit Jane's testimony that Maxwell participated in or helped arrange Jane's sexual abuse in New York and was instead focused on her involvement in the New Mexico conduct. The most important piece of evidence corroborating Jane's testimony were the flight logs kept by Epstein's pilot, Dave Rodgers. *See* GX-662-R. The flight logs were the only contemporaneous evidence offered at trial that could corroborate that Jane, in fact, traveled to New York and New Mexico and when those trips may have taken place. According to the

flight logs, there were only two trips that Jane may have taken while she was under the relevant age of 17. The first from Palm Beach to New York (Teterboro) on November 11, 1996 (GX-662-R at 44) and the second from New York (Teterboro) to Santa Fe, New Mexico on May 9, 1997, both when Jane was 16 (GX- 662-R at 48). The critical difference between the two trips was that Maxwell was not a passenger on the first trip to New York but was a passenger on the second trip to New Mexico.

Given the text of the Note, it is likely that the jurors decided that there was no corroborating evidence that Maxwell was present for, or helped to arrange, any of Jane's trips to New York, but that the flight logs did corroborate that Maxwell was present for Jane's trip to New Mexico. As a result, the jury began evaluating Maxwell's involvement in the New Mexico trip to see if it supported a conviction under Count Four, which led to the question posed by the Jury Note.

This is also consistent with the jury's decision to acquit Maxwell on the substantive enticement offense (Count Two). The jury likely determined that the only corroborating evidence linking Maxwell to the New Mexico trip was a flight log showing that she was *present* on the trip but said nothing about whether she "persuaded, induced, enticed, or coerced" Jane to take the trip. Hence, the acquittal on Count Two. By contrast, the jury likely believed that if

they found that Maxwell had some role in arranging Jane's return flight from New Mexico, after the sexual abuse had already taken place, they could convict her on the substantive transportation count (Count Four), assuming that arranging the return flight was sufficient to satisfy the second element of Count Four.  Hence, the question in the Jury Note.

Thus, it was necessary for the Court to give the jury a supplemental instruction, as requested by the defense, to clarify the correct basis for conviction under Count Four.  The Court's refusal to do so allowed the jury to modify the essential elements of the charged offense and created a substantial likelihood that Maxwell was convicted of a crime other than the one alleged in the Indictment.  *D'Amelio*, 683 F.3d at 419-21.

Moreover, given the substantial likelihood that the jury convicted Maxwell on Count Four based on the New Mexico conduct, there is also a substantial likelihood that they improperly convicted her on the related conspiracy count (Count Three) based on the same conduct.  The substantive transportation offense charged in Count Four was the object of the conspiracy charged in Count Three, and both conspiracy counts required an agreement to violate New York law.

### C. The Variance Between the Proof at Trial and the Allegations in the Indictment Substantially Prejudiced Maxwell.

In the alternative, the Court must vacate Maxwell's convictions on Counts Three and Four because the record demonstrates a variance between the proof at trial and the allegations in the Indictment that substantially prejudiced Maxwell as elaborated above.

Here, the Mann Act counts did not contain any allegations concerning Jane's sexual abuse in New Mexico. Indeed, although Jane had previously told the FBI about the trip to New Mexico, she had denied being sexually abused there. It was not until just before trial, that Jane claimed for the first time that she had engaged in sexual activity with Epstein while she was at the ranch.

For the foregoing reasons, Maxwell's convictions on Counts Three and Four were based on a constructive amendment to the charged offenses. The Court must vacate these convictions and grant a new trial on these counts.

## POINT V

## THE SENTENCE SHOULD BE VACATED AND REMANED FOR RESENTENCING AS THE DISTRICT COURT ERRED IN APPLYING AN INCORRECT GUIDLINE RANGE AND OFFENSE LEVEL.

The defendant's sentence should be vacated because the District Court erroneously calculated the guidelines range; imposed an upward variance, without providing the required explanation; and mistakenly applied the aggravating role adjustment. Accordingly, the sentence must be vacated and remanded back to the District Court for re-sentencing, or – in the interest of justice - the defendant's sentence should be substantially reduced.

### A. Standard of Review.

The standard of review for all sentences requires a "deferential abuse-of-discretion standard." *United States v. Cavera,* 550 F.3d 180, 189 (2d. Cir. 2008). A review has two components: procedural and substantive. *Id.* The procedural review "must first ensure that the District Court committed no significant procedural errors. *Gall v. United States*, 552 U.S. 38, 51 (2007). Here, the District Court improperly calculated the guidelines range in the first instance and then deviated upwards without *any* explanation for doing so.

**B. Procedural Errors.**

The Presentence Report ("PSR"), using the 2004 Sentencing Guidelines, initially calculated a guidelines range of 292-365 months, based on a total offense level of 40 and a criminal history category of I, but recommended a downward variance to 240 months' imprisonment. SH19.[14]

The District Court, using the 2003 Guidelines, initially miscalculated the applicable guidelines range. After realizing its error and adjusting to the correct guideline range, the court imposed a sentence above the corrected guidelines range without accounting for the upward variance. The court's initial miscalculation of the guidelines range carried serious consequences for the defendant, as it appears that the court believed it was imposing a guidelines sentence when, in fact, it imposed a sentence above the guideline range. After the court's calculation error was pointed out, and the range was significantly reduced, the court did not amend its sentence, which then became an upward variance.

The PSR delineated mitigating factors and reasons for the downward variance. But the court simply stated that it agreed with the PSR's recommendation of 240 months, without addressing the variance. The court based its sentencing decision of 240 months on a miscalculation and then adhered to its pre-determined sentence

---

[14] Numerical references preceded by "SH" are to the Sentencing Hearing on June 28, 2022.

even after it was made aware that its sentence was predicated on a miscalculation in the first instance.

Importantly, the court procedurally erred because it then failed to provide reasons for its upward variance both orally and in writing. 18 U.S.C. Section 3553(c)(2).

## C. The District Court improperly applied the four-level aggravating role adjustment under USSG § 3B1.1.

The court erred in applying the four-level aggravating role enhancement under USSG §3B1.1. Were this enhancement not applied, the proper offense level would be 33, which would correspond to a lesser guideline range of 135-168 months. To qualify for the enhancement under USSG §3B1.1, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." USSG §3B1.1., cmt. n.2. A "participant is defined as 'a person who is criminally responsible for the commission of the offense but need not have been convicted." *Id*.

The Government argued that Maxwell supervised Sarah Kellen. Yet the trial evidence belies this assertion. During the trial, Carolyn testified that Kellen scheduled massage appointments for her and took nude pictures of her at the Palm Beach residence. *Tr.* 1527-28; 1538-39. The Government acknowledged that

"there wasn't direct evidence about, you know, the defendant directly instructing Kellen to make a certain phone call, and we acknowledge that." A406. The court pointed to the testimony of Larry Visoski as support for the fact that Kellen was Maxwell's assistant. A417. But Visocki's testimony does not support this inference either. While Visoski initially testified that he "thought" Kellen was Maxwell's assistant, he later clarified that "he didn't know what her exact job" was; did not know whether Kellen was Epstein's assistant or Maxwell's assistant; and that his best recollection was that Kellen was "an employee who worked with Epstein." Tr. 204. Further, Cimberly Espinosa testified that Kellen was Epstein's assistant, and that she – not Kellen- was Maxwell's assistant. Tr. 2332-33, 2376-77. Espinosa further testified that, during the time Kellen interacted with Carolyn, Epstein and Maxwell had ended their romantic relationship and "went their separate ways." Tr. 2370-71. Indeed, even Carolyn testified that there was a clear break in the time when Maxwell called her to schedule massages and when Kellen began calling her. Tr. 1527.

Given the dearth of evidence, the government failed to meet its burden of establishing by a preponderance of the evidence that Maxwell supervised Kellen in *any* capacity, much less was there any inference available to suggest that there was supervision of a criminal nature. Thus, the court erred in applying the enhancement.

## **CONCLUSION**

For the foregoing reasons, all counts should be vacated and the indictment dismissed. However, based on the preceding arguments, the Court may determine that only Counts Three and Four or Three and Six should be reversed. In either scenario, the Court should order a new trial on the remaining count. This is due to the prejudice having resulted from the admission of evidence to prove Counts Three and Four or Three and Six. *United States v. Rooney*, 37 F.3d 847, 855 (2d Cir. 1994). In weighing a claim of prejudicial spillover, courts look at several factors, one being the "similarities and differences" between the evidence on the reversed counts and the remaining counts. *Id.* When the evidence admissible to prove the remaining counts arises from a distinct set of facts in a different time-period, involving a different complainant and the evidence admissible to prove the dismissed counts would not have been admissible to prove the remaining count, courts will find prejudice warranting a new trial on the remaining counts. *Id.*

Here, Counts Four and Six arise from distinct facts, time-periods, and complainants. Count Four is based on the testimony of Jane concerning conduct between 1994 and 1997, while Count Six is based on the testimony of Carolyn concerning conduct between 2001 and 2004. Plainly, much of the evidence to prove the dismissed counts would not have been admissible to prove the remaining

count (whether it be Count Four or Six). Accordingly, a new trial on the remaining count would be required.

**For the Reasons Stated in Points I and II, the Convictions Should Be Vacated and the Indictment Dismissed. For the Reasons Stated in Points III and IV, the Convictions should be Vacated and the Matter Remanded for a New Trial. For the Reasons Stated in Point V, the Court Should Remand To the District Court for Resentencing.**

Dated:     New York, New York
           February 28, 2023

                        Respectfully Submitted,

                        /s/Diana Fabi Samson

                        **ARTHUR L. AIDALA**
                        **DIANA FABI SAMSON**
                        **JOHN M. LEVENTHAL**
                        **AIDALA, BERTUNA &**
                           **KAMINS, PC**
                        ***Attorneys for Defendant-Appellant***
                        *Ghislaine Maxwell*
                        546 Fifth Avenue, Sixth Floor
                        New York, New York 10036
                        212 486-0011

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of the court's Order dated January 18, 2023, granting the Appellant a word limit of 20,000 words. This document contains 19,950 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
      February 28, 2023

/s/Diana Fabi Samson

**ARTHUR L. AIDALA**
**DIANA FABI SAMSON**
**JOHN M. LEVENTHAL**
**AIDALA, BERTUNA &**
    **KAMINS, PC**
***Attorneys for Defendant-Appellant***
*Ghislaine Maxwell*
546 Fifth Avenue, Sixth Floor
New York, New York 10036
212 486-0011

**SPECIAL APPENDIX**

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

|  | **Page** |
|---|---|
| Judgment of the Clerk, dated June 29, 2022.............. | SPA-1 |
| Notice of Appeal, dated July 7, 2022........................ | SPA-9 |

SPA-1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case      (form modified within District on Sept. 30, 2019)
                 Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| GHISLAINE MAXWELL | ) Case Number:  S2 20 CR 330 (AJN) |
| | ) USM Number:  02879-509 |
| | ) BOBBI C. STERNHEIM |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1, 3, 4, 5, 6 (judgment not entered on 1 & 5 as multiplicitous, Dkt. No. 657)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 371.F | CONSPIRACY TO TRANSPORT MINORS WITH INTENT TO ENGAGE IN CRIMINAL SEXUAL ACTIVITY | 7/30/2004 | 3 |

     The defendant is sentenced as provided in pages 2 through _____8_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   2

☑ Count(s)   7, 8 and underlying indictments  ☐ is  ☑ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/29/2022
Date of Imposition of Judgment

_Alison J. Nathan_
Signature of Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _6/29/2022_

ALISON J. NATHAN, US Circuit Judge sitting by designation
Name and Title of Judge

6/29/2022
Date

SPA-2

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

Judgment—Page    2    of    8

DEFENDANT:   GHISLAINE MAXWELL
CASE NUMBER:   S2 20 CR 330 (AJN)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC 2423.F | TRANSPORTATION OF A MINOR WITH INTENT TO ENGAGE IN CRIMINAL SEXUAL ACTIVITY | 12/31/1997 | 4 |
| 18 USC 1591.F | SEX TRAFFICKING OF AN INDIVIDUAL UNDER THE AGE OF EIGHTEEN | 7/30/2004 | 6 |

SPA-3

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __3__ of __8__

DEFENDANT:   GHISLAINE MAXWELL
CASE NUMBER:   S2 20 CR 330 (AJN)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
The Defendant is sentenced to a term of 240 Months.
Count 3 a sentence of 60 Months. Count 4 a sentence of 120 Months. Count 6 a sentence of 240 Months.  All Counts to run concurrently.

Defendant was notified of her right to Appeal.

☑ The court makes the following recommendations to the Bureau of Prisons:
   Defendant to be considered for designation to FCI Danbury.

   Defendant to be considered for enrollment in FIT program.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m.  ☐ p.m.  on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __4__ of __8__

DEFENDANT:   GHISLAINE MAXWELL
CASE NUMBER:   S2 20 CR 330 (AJN)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

 3 Years on Counts 3 and 4.  5 Years on Count 6 to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☑ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-5

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ____5____ of ____8____

DEFENDANT:  GHISLAINE MAXWELL
CASE NUMBER:  S2 20 CR 330 (AJN)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____   Date _____

SPA-6

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

| | | | | | |
|---|---|---|---|---|---|
| | | | Judgment—Page | 6 | of | 8 |

DEFENDANT:  GHISLAINE MAXWELL
CASE NUMBER:  S2 20 CR 330 (AJN)

## SPECIAL CONDITIONS OF SUPERVISION

You shall submit your person, and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer, and if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

You shall undergo a sex-offense-specific evaluation and participate in an outpatient sex offender treatment and/or outpatient mental health treatment program approved by the U.S. Probation Office. You shall abide by all rules, requirements, and conditions of the sex offender treatment program(s), including submission to polygraph testing and refraining from accessing websites, chatrooms, instant messaging, or social networking sites to the extent that the sex offender treatment and/or mental health treatment program determines that such access would be detrimental to your ongoing treatment. You will not view, access, possess, and/or download any pornography involving adults unless approved by the sex-offender specific treatment provider. You must waive your right of confidentiality in any records for mental health assessment and treatment imposed as a consequence of this judgment to allow the U.S. Probation Office to review the course of treatment and progress with the treatment provider. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the sex offender treatment provider and/or mental health treatment provider.

You must not have contact with the victim(s) in this case. This includes any physical, visual, written, or telephonic contact with such persons. Additionally, you must not directly cause or encourage anyone else to have such contact with the victim(s).

You must not have deliberate contact with any child under 18 years of age, unless approved by the U.S. Probation Office. You must not loiter within 100 feet of places regularly frequented by children under the age of 18, such as schoolyards, playgrounds, and arcades. You must not view and/or access any web profile of users under the age of 18. This includes, but is not limited to, social networking websites, community portals, chat rooms or other online environment (audio/visual/messaging), etc. which allows for real time interaction with other users, without prior approval from your probation officer.

You must provide the probation officer with access to any requested financial information.

You must not incur new credit charges or open additional lines of credit without the approval of the probation officer unless you are in compliance with the installment payment schedule.

If you are sentenced to any period of supervision, it is recommended that you be supervised by the district of residence.

SPA-7

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: GHISLAINE MAXWELL
CASE NUMBER: S2 20 CR 330 (AJN)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 300.00 | $ | $ 750,000.00 | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ _____ 0.00 | $ _____ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-8

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

DEFENDANT:  GHISLAINE MAXWELL
CASE NUMBER:  S2 20 CR 330 (AJN)

Judgment — Page  8  of  8

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $ __300.00__  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
    _____ *(e.g., months or years),* to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a
    term of supervision; or

E  ☑  Payment during the term of supervised release will commence within __30__ *(e.g., 30 or 60 days)* after release from
    imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.