# 22-1426

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 22-1426

———❖❖❖———

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

GHISLAINE MAXWELL, also known as Sealed Defendant 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
## VOLUME II OF II
## (Pages SA-257 to SA-471)

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

**TABLE OF CONTENTS**

PAGE

OPR Report (Nov. 2020) (Dkt. 204-3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-1

Opinion & Order of the District Court (Feb. 24, 2022) (Dkt. 620) . . . . . . . . . SA-349

Sentencing Transcript (June 28, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-370

GX-422 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-471

about the NPA because it was "confidential" and because the case was under "investigation and leading towards" the filing of charges.  Villafaña recalled mentioning the conversation to her supervisors and the case agents because she "thought he was somebody who could be of assistance to us and . . . could perhaps persuade Alex Acosta that this was a case that was meritorious and should be prosecuted."

Nevertheless, when OPR asked Villafaña why she did not inform Edwards of the same information that the FBI and she had provided to Wild in October 2007 and January 2008, Villafaña explained that she felt "prohibited":

> At the time that I spoke with him, you know, there had been all of this . . . letter writing or all of these concerns and instructions that I had been given by Alex [Acosta] and Jeff [Sloman] not to disclose things further and not to have any involvement in victim notification, and so I felt like that prohibited me from telling him about the existence of the NPA.

## X.   JUNE 2008:  EFFORTS TO NOTIFY VICTIMS ABOUT THE JUNE 30, 2008 PLEA HEARING

The Epstein team's appeals through the Department ended on June 23, 2008, when the Deputy Attorney General determined that "federal prosecution of this case is appropriate" and Epstein's allegations of prosecutorial misconduct did not rise to a level that would undermine such a decision.  Immediately thereafter, at Sloman's instruction, Villafaña notified Lefkowitz that Epstein had until "the close of business on Monday, June 30, 2008, to comply with the terms and conditions of the agreement . . . including entry of a guilty plea, sentencing, and surrendering to begin his sentence of imprisonment."  That same day, Villafaña made plans to file charges on July 1, 2008, if Epstein did not enter his guilty plea by the June 30 deadline.

On Friday, June 27, 2008, Villafaña received a copy of the proposed state plea agreement and learned that the plea hearing was scheduled for 8:30 a.m. on Monday, June 30, 2008.  Also on that Friday, Villafaña submitted to Sloman and Criminal Division Chief Senior a "final final" proposed federal indictment of Epstein.

Villafaña and the FBI finalized the government's victim list that they intended to disclose, for § 2255 purposes, to Epstein after the plea and, at Sloman's instruction, Villafaña contacted PBPD Chief Reiter to ask him to notify the victims of the plea hearing.  Villafaña told OPR that Sloman said, "Chief Reiter could contact the victims from the state case, and tell them about the plea."[351]  On Saturday, June 28, 2008, Villafaña emailed Sloman to inform him that PBPD Chief Reiter "is going to notify victims about the plea."[352]

---

[351]    Villafaña further stated, "I requested permission to make oral notifications to the victims regarding the upcoming change of plea, but the Office decided that victim notification could only come from a state investigator, and Jeff Sloman asked PBPD Chief Reiter to assist."

[352]    Sloman replied, "Good."

Villafaña told OPR that before the state plea hearing, she sent Reiter a list of the victims, including their telephone numbers, to notify and asked him to destroy the list. Villafaña recalled that Reiter told her that he would "try to contact as many as he could" and that he would destroy the list afterwards. Villafaña did not recall being "asked [to] provide a list of all our victims to the State Attorney's Office."

In his 2009 deposition, Reiter stated that Villafaña sent him a letter "around the time of sentencing," listing the victims in the federal investigation, and that she asked him to destroy the letter after he reviewed it. Reiter recalled that he requested the list because he was aware that the state grand jury's indictment of Epstein did not include all of the victims that the PBPD had identified and he "wanted to make sure that some prosecution body had considered all of our victims."[353]

In her 2017 declaration in the CVRA litigation, Villafaña stated that she and the PBPD "attempted to notify the victims about [the June 30] hearing in the short time available to us."[354] In her 2008 declaration, however, Villafaña conceded that "all known victims were not notified."

Villafaña told OPR that Edwards was the only victim attorney she was authorized to contact—she thought probably by Sloman—about the June 30, 2008 plea hearing because Edwards "had expressed a specific interest in the outcome." Villafaña recalled, "I was told that I could inform [Edwards] of [the plea date], but I still couldn't inform him of the NPA."[355] In her 2008 declaration in the CVRA litigation, Villafaña stated that she called Edwards and informed him of the plea hearing scheduled for Monday; Villafaña stated that Edwards told her that he could not attend the hearing but "someone" would be present. In a later filing in the CVRA litigation, however, Edwards asserted that Villafaña told him only that "Epstein was pleading guilty to state solicitation of prostitution charges involving other victims—not Mr. Edwards' clients nor any of the federally-identified victims."[356] Edwards further claimed that because Villafaña failed to inform him that the "guilty pleas in state court would bring an end to the possibility of federal prosecution pursuant to the plea agreement," his clients did not attend the hearing. Villafaña told OPR that her expectation was that the state plea proceeding would allow Edwards and his clients the ability to comment on the resolution:

---

[353]     Reiter showed the letter to the lead Detective so he could "confirm that all of the victims that we had for the state case were included on that." The Detective "looked at it and he said they're all there and then [Reiter] destroyed it." The Detective recalled viewing the list in Reiter's office, but he could not recall when Reiter showed it to him.

[354]     The FBI co-case agent told OPR that "I don't think the [FBI] reached out to anyone."

[355]     Villafaña told OPR that she thought that it was Sloman who gave her the instructions, but she could not "remember the specifics of the conversation."

[356]     Villafaña stated that she "never told Attorney Edwards that the state charges involved 'other victims,' and neither the state court charging instrument nor the factual proffer limited the procurement of prostitution charge to a specific victim." Although Edwards criticized Villafaña's conduct in his CVRA filings, in his recently published book, Edwards described Villafaña as a "kindhearted prosecutor who tried to do right," noting that she "believ[ed] in the victims and tr[ied] . . . to bring down Jeffrey Epstein." Bradley J. Edwards with Brittany Henderson, *Relentless Pursuit* at 380 (Gallery Books 2020).

[M]y expectation of what was going [to] happen at the plea was that it would be like a federal plea where there would be a factual proffer that was read, and where the judge would ask if there were any victims present who wanted to be heard, and that at that point if Brad Edwards wanted to address the court or if his clients wanted to address the court, they would be given the opportunity to do so.[357]

Sloman told OPR that he did not recall directing Villafaña to contact anyone about the plea hearing or directing her specifically not to contact anyone about it. Acosta told OPR that he believed the state would notify the victims of the "all-encompassing plea" resolving the federal case "and [the victims would] have an opportunity to speak up at the state court hearing." Nevertheless, Acosta did not know whether the state victims overlapped with the federal victims or whether the USAO "shared that list with them." Villafaña told OPR that she and Acosta "understood that the state would notify the state victims" but that neither of them were aware "that the state only believed they had one victim."[358] Villafaña told OPR that there was "very little" communication between the USAO and the State Attorney's Office, and although she discussed a factual proffer with the State Attorney's Office and "the fact that . . . the federal investigation had identified additional victims," she did not recall discussing "who the specific people were that they considered victims in the state case."[359]

Sloman told OPR that the "public perception . . . that we tried to hide the fact of the results of this resolution from the victims" was incorrect. He explained:

[E]ven though we didn't have a legal obligation, I felt that the victims were going to be notified and the state was going . . . to fulfill that obligation, and even as another failsafe, [the victims] would be notified of . . . the restitution mechanism that we had set up on their behalf.

Sloman acknowledged that although neither the NPA terms nor the CVRA prevented the USAO from exercising its discretion to notify the victims,

it was [of] concern that this was going to break down and . . . result in us prosecuting Epstein and that the victims were going to be witnesses and if we provided a victim notification indicating, hey, you're going to get $150,000, that's . . . going to be instant impeachment for the defense.

---

[357]     Assistant State Attorney Belohlavek told OPR that federal victims who were not a party to the state case would not have been able to simply appear at the state plea hearing and participate in the proceedings. Rather, such a presentation would have required coordination between the USAO and the State Attorney's Office and additional investigation of the victims' allegations and proposed statements by the State Attorney's Office.

[358]     In an email a few months earlier, Villafaña noted, "The state indictment [for solicitation of adult prostitution] is related to two girls. One of those girls is included in the federal [charging document], the other is not."

[359]     As noted in Chapter Two, Villafaña had stopped communicating with the State Attorney's Office regarding the state case following Epstein's defense team's objections to those communications.

When asked why the USAO did not simply notify the victims of the change of plea hearing, Sloman responded that he "was more focused on the restitution provisions. I didn't get the sense that the victims were overly interested in showing up . . . at the change of plea."

Also, in late June, Villafaña drafted a victim notification letter concerning the June 30, 2008 plea.[360] Villafaña told OPR that, because "Mr. Acosta had agreed in December 2007 that we would not provide written notice of the state change of plea, the written victim notifications were prepared to be sent immediately following Epstein's guilty plea."[361] As she did with prior draft victim notification letters, Villafaña provided the draft to the defense for comments.[362]

Although Epstein's plea hearing was set for June 30, 2008, Villafaña took steps to facilitate the filing of federal charges on July 1, 2008, in the event he did not plead guilty in state court.

OPR reviewed voluminous Epstein-related files that the State Attorney's Office made available online, but OPR was unable to locate any document establishing that before the hearing date, the state informed victims of the June 30, 2008 plea. On March 12, 2008, the State Attorney's Office issued trial subpoenas to three victims and one non-law enforcement witness commanding the individuals to "remain on call" during the week of July 8, 2008. However, the Palm Beach County Sheriff was unable to serve one of the victims in person because the victim was "away [at] college."

## XI.    JUNE 30, 2008:  EPSTEIN ENTERS HIS GUILTY PLEAS IN A STATE COURT HEARING AT WHICH NO VICTIMS ARE PRESENT

On June 30, 2008, Epstein appeared in state court in West Palm Beach, with his attorney Jack Goldberger, and pled guilty to an information charging him with procuring a person under 18 for prostitution, as well as the indictment charging him with felony solicitation of prostitution. The information charged that between August 1, 2004, and October 9, 2005, Epstein "did knowingly and unlawfully procure for prostitution, or caused to be prostituted, [REDACTED], a person under the age of 18 years," and referred to no other victims. The indictment did not identify any victims and alleged only that Epstein engaged in the charged conduct on three occasions between August 1, 2004, and October 31, 2005. Although the charges did not indicate whether they applied to multiple victims, during the hearing, Assistant State Attorney Belohlavek informed the court that "[t]here's several" victims. When the court asked Belohlavek whether "the victims in both these cases [were] in agreement with the terms of this plea," Belohlavek replied, "I have spoken to several myself and I have spoken to counsel, through counsel as to the other victim, and I believe,

---

[360]    Sloman forwarded the draft victim notification letter to Acosta, who responded with his own edited version stating, "What do you think?" Villafaña edited it further.

[361]    The letter began with the statement, "On June 30, 2008, Jeffrey Epstein . . . entered a plea of guilty." A week after Epstein's state guilty plea, Villafaña notified Acosta, Sloman, and other supervisors that "[Epstein's local attorney] Jack Goldberger is back in town today, so I am hoping that we will finalize the last piece of our agreement—the victim list and Notification. If I face resistance on that front, I will let you know."

[362]    According to Villafaña, either Acosta or Sloman made the decision to send the notifications following the state plea and to share the draft notification letters with the defense.

yes."  The court also asked Belohlavek if the juvenile victim's parents or guardian agreed with the plea, and Belohlavek stated that because the victim was no longer under age 18, Belohlavek spoke with the victim's counsel, who agreed with the plea agreement.[363]

Both Villafaña and the FBI case agent were present in the courtroom gallery to observe the plea hearing.  Later that day, Villafaña met with Goldberger and gave him the list of 31 individuals the government was prepared to name as victims and to whom the § 2255 provision applied.

In her 2015 CVRA case declaration, Wild stated that, "I did not have any reason to attend that hearing because no one had told me that this guilty plea was related to the FBI's investigation of Epstein's abuse of me."  She stated that she "would have attended and tried to object to the judge and prevent that plea from going forward," had she known that the state plea "had some connection to blocking the prosecution of my case."  Similarly, CVRA petitioner Jane Doe #2 stated that "no one notified me that [Epstein's] plea had anything to do with my case against him."

An attorney who represented several victims, including one whom the state had subpoenaed for the potential July trial, told OPR that he was present in court on June 30, 2008, in order to serve a complaint upon Epstein in connection with a civil lawsuit brought on behalf of one of his clients.[364]  Moreover, the attorney informed OPR that, although one of the victims he represented had been interviewed in the PBPD's investigation and had been deposed by Epstein's attorneys in the state case (with the Assistant State Attorney present), he did not recall receiving any notice of the June 30, 2008 plea hearing from the State Attorney's Office.[365]  Similarly, another of the victims the state had subpoenaed for the July trial told OPR through her attorney that she received subpoenas from the State Attorney's Office, but she was not invited to or aware of the state plea hearing.  Belohlavek told OPR that she did not recall whether she contacted any of the girls to appear at the hearing, and she noted that given the charge of solicitation of prostitution, they may not have "technically" been victims for purposes of notice under Florida law but, rather, witnesses.  On July 24, 2008, the State Attorney's Office sent letters to two victims stating that the case was closed on June 26, 2008 (although the plea occurred on June 30, 2008) and listed Epstein's sentence.  The letters did not mention the NPA or the federal investigation.

## XII.   SIGNIFICANT POST-PLEA DEVELOPMENTS

### A.   Immediately After Epstein's State Guilty Pleas, Villafaña Notifies Some Victims' Attorneys

Villafaña's contemporaneous notes show that immediately after Epstein's June 30, 2008 guilty pleas, she attempted to reach by telephone five attorneys representing various victims in

---

[363]   Villafaña, who was present in court and heard Belohlavek's representation, told OPR that she had no information as to whether or how the state had notified the victims about the plea hearing.

[364]   Villafaña did contact this attorney's law partner later that day.

[365]   When interviewed by OPR in 2020, this same attorney indicated that he was surprised to learn that despite the fact that his client was a minor at the time Epstein victimized her, she was not the minor victim that the state identified in the information charging Epstein.

civil suits that were pending against Epstein.[366]   Villafaña also emailed one of the *pro bono* attorneys she had engaged to help victims avoid defense harassment, informing him that the federal investigation had been resolved through a state plea and that Epstein had an "agreement" with the USAO "requir[ing] him to make certain concessions regarding possible civil suits brought by the victims."  Villafaña advised Goldberger:  "The FBI has received several calls regarding the [NPA]. I do not know whether the title of the document was disclosed when the [NPA] was filed under seal, but the FBI and our Office are declining comment if asked."

###   B.   July 7, 2008:  The CVRA Litigation Is Initiated

On July 3, 2008, victims' attorney Edwards spoke to Villafaña by telephone about the resolution of the state case against Epstein "and the next stage of the federal prosecution."[367]  In his 2017 affidavit filed in the CVRA litigation, Edwards asserted that during this conversation, Villafaña did not inform him of the NPA, but that during the call, he sensed that the USAO "was beginning to negotiate with Epstein concerning the federally identified crimes."  However, in an email Villafaña sent after the call, she informed Sloman that during the call, Edwards stated that "his clients can name many more victims and wanted to know if we can get out of the deal." Villafaña told Sloman that after she told Edwards that the government was bound by the agreement, assuming Epstein completed it, Edwards asked that "if there is the slightest bit of hesitation on Epstein's part of completing his performance, that he and his [three] clients be allowed to consult with [the USAO] before making a decision."[368]

That same day, Edwards wrote a letter to Villafaña, complaining that Epstein's state court sentence was "grossly inadequate for a predator of this magnitude" and urged Villafaña to "move forward with the traditional indictments and criminal prosecution commensurate with the crimes Mr. Epstein has committed."

On July 7, 2008, Edwards filed his emergency petition in the U.S. District Court for the Southern District of Florida on behalf of Courtney Wild, who was then identified only as "Jane Doe."  She was soon joined by a second petitioner, and they were respectively referred to as "Jane Doe 1" and "Jane Doe 2."[369]  Edwards claimed that the government had violated his clients' rights under the CVRA by negotiating to resolve the federal investigation of Epstein without consulting with the victims.  The petition requested that the court order the United States to comply with the CVRA.  The USAO opposed the petition, arguing that the CVRA did not apply because there were

---

[366]     According to Villafaña's handwritten notes from June 30, 2008, Villafaña left a message for two of the attorneys.

[367]     In his 2017 affidavit filed in the CVRA case, Edwards recalled that his telephone conversation occurred on June 30, 2008, but noted that it could possibly have occurred on July 3, 2008.

[368]     Sloman responded, "Thanks."

[369]     Later attempts by two additional victims to join the ongoing CVRA litigation were denied by the court.

no federal charges filed against Epstein as a result of the government's agreement in mid-2007 to defer prosecution to the state.[370]

### C.      July 2008:  Villafaña Prepares and Sends a Victim Notification Letter to Listed Victims

On July 8, 2008, Villafaña provided Goldberger with an updated victim list for 18 U.S.C. § 2255 purposes, noting that she had inadvertently left off one individual in her June 30, 2008 letter.  Villafaña also informed the defense that, beginning the following day, she would distribute notifications to each of the 32 victims and their counsel informing them that Epstein's attorney would be the contact for any civil litigation, if the victim decided to pursue damages.  Finally, the letter informed the defense that the government would consider a denial by Epstein that any "one of these victims is entitled to proceed under 18 U.S.C. § 2255" to be considered a breach of the terms of the NPA.

After exchanging emails and letters with the defense concerning the content of the notice letter, Villafaña drafted a letter she sent, on July 9 and 10, to nine victims who had previously retained counsel.  The letter informed the victims and their counsel that, "[i]n light of" Epstein's June 30, 2008 state court plea to felony solicitation of prostitution and procurement of minors to engage in prostitution, and his sentence of a total of 18 months' imprisonment followed by 12 months' community control, "the United States has agreed to defer federal prosecution in favor of this state plea and sentence, subject to certain conditions."  The letter included a reference to the 18 U.S.C. § 2255 provision of the NPA, and although the defense had never agreed to it, used language from Acosta's December 19, 2007 letter to Epstein defense attorney Sanchez clarifying the damages provision.  The paragraph below was described as "[o]ne such condition to which Epstein has agreed":

> Any person, who while a minor, was a victim of a violation of an offense enumerated in Title 18, United States Code, Section 2255, will have the same rights to proceed under Section 2255 as she would have had, if Mr. Epstein had been tried federally and convicted of an enumerated offense.  For purposes of implementing this paragraph, the United States shall provide Mr. Epstein's attorneys with a list of individuals whom it was prepared to name . . . as victims of an enumerated offense by Mr. Epstein.  Any judicial authority interpreting this provision, including any authority determining which evidentiary burdens if any a plaintiff must meet, shall consider that it is the intent of the parties to place these identified victims in the same position as they would have been had Mr. Epstein been convicted at trial.  No more; no less.

On July 10, 2008, Villafaña sent Goldberger a "Final Notification of Identified Victims," highlighting the defendant's obligations under the NPA concerning victim lawsuits pursuant to

---

[370]      As described in Section XII.G of this Part, the matter continued in litigation for years and resulted in the district court's February 21, 2019 opinion concluding that the government violated the victims' rights under the CVRA by failing to consult with them before signing the NPA.

18 U.S.C. § 2255 and again listing the 32 "individuals whom the United States was prepared to name as victims of an enumerated offense." [371]  The same day, Villafaña sent Goldberger a second letter, noting that the defense would receive copies of all victim notifications on a rolling basis.

Villafaña informed her managers that the FBI case agents would reach out by telephone to the listed victims who were unrepresented, to inform them that the case was resolved and to confirm their addresses for notification by mail.  With regard to the content of the telephone calls, Villafaña proposed the following language to the case agents:

> We are calling to inform you about the resolution of the Epstein investigation and to thank you for your help.
>
> Mr. Epstein pled guilty to one child sex offense that will require him to register as a sex offender for life and received a sentence of 18 months imprisonment followed by one year of home confinement. Mr. Epstein also made a concession regarding the payment of restitution.
>
> All of these terms are set out in a letter that AUSA Villafaña is going to send out.  Do you have a lawyer?  Get name or address.  If not[,] where do you want [the] letter sent?  If you have questions when you receive the letter, please understand that we cannot provide legal advice but the lawyers at the following victim rights organizations are able to help you at no cost to you.  (Provide names and phone numbers)
>
> Also ask about counseling and let them know that counseling is still available even though the investigation is closed.

On July 21, 2008, Villafaña sent the letter to the 11 unrepresented victims whose addresses the FBI had by that time confirmed.  Villafaña provided Epstein's defense counsel with a copy of the letter sent to each victim, directly or though counsel (with the mailing addresses redacted).

**D.    July – August 2008:  The FBI Sends the Victim Notification Letter to Victims Residing Outside of the United States**

While attempting to locate and contact the unrepresented victims, the FBI obtained contact information for two victims residing outside of the United States.  On July 23 and August 8, 2008, respectively, the FBI Victim Specialist transmitted an automated VNS form notification letter to each victim through the FBI representative at the U.S diplomatic mission for each country.  This

---

[371]    A month later, in an August 18, 2008 letter to the USAO, the defense sought to limit the government's victim list to those victims who were identified before the September 24, 2007 execution of the NPA.  Villafaña also raised with Acosta, Sloman, and other supervisors the question whether the USAO had developed sufficient evidence to include new victims it had identified since creation of the July 2008 list and whether Jane Doe #2, who had previously given a statement in support of Epstein, should be added back to the list.  Ultimately, Villafaña sent the defense a letter confirming that the government's July 10, 2008 victim list was "the final list."

238

letter was substantially identical to the previous FBI victim notification letter the FBI had sent to victims (in 2006, 2007, and 2008) in that it identified each recipient as "a possible victim of a federal crime" and listed her eight CVRA rights.

The letter did not indicate that Epstein had pled guilty in state court on June 30, 2008, or that the USAO had resolved its investigation by deferring federal prosecution in favor of the state plea. Rather, like the previous FBI VNS-generated letter, the letter requested the victims' "assistance and cooperation while we are investigating the case."

For each of the two victims residing outside of the United States, Villafaña also drafted a notification letter concerning the June 30, 2008 plea and the 18 U.S.C. § 2255 process, which were to be hand delivered along with the FBI's letters. However, FBI records do not reflect whether the USAO's letter was delivered to the two victims.

### E.   August – September 2008:  The Federal Court Orders the USAO to Disclose the NPA to Victims, and the USAO Sends a Revised Victim Notification Letter

On August 1, 2008, the petitioners in the CVRA litigation filed a motion seeking access to the NPA. The USAO opposed the motion by relying on the confidentiality portion of the NPA.[372] On August 21, 2008, the court ordered the government to provide the petitioners with a copy of the NPA subject to a protective order. In addition, the court ordered the government to produce the NPA to other identified victims upon request:

> (d) If any individuals who have been identified by the USAO as victims of Epstein and/or any attorney(s) for those individuals request the opportunity to review the [NPA], then the USAO shall produce the [NPA] to those individuals, so long as those individuals also agree that they shall not disclose the [NPA] or its terms to any third party absent further court order, following notice to and an opportunity for Epstein's counsel to be heard[.][373]

In September 2008, the USAO sent a revised notification letter to victims, and attorneys for represented victims, concerning Epstein's state court guilty plea and his agreement to not contest liability in victim civil suits brought under 18 U.S.C. § 2255.[374] The September letter appeared to address concerns raised by Epstein attorney Lefkowitz that the government's earlier notification letter referenced language concerning 18 U.S.C. § 2255 that the government had proposed in Acosta's December 19, 2007 letter to Epstein attorney Sanchez, but that the defense had not accepted.[375] As a result of the defense objection, Villafaña determined that she was

---

[372]   Pursuant to paragraph 13 of the NPA, Villafaña made Epstein's attorneys aware of the petitioners' request for the NPA.

[373]   *Doe*, Order to Compel Production and Protective Order at 1-2 (Aug. 21, 2008).

[374]   The USAO also sent a notification letter to additional victims who had not received a notification letter in July.

[375]   This issue is discussed more fully in Chapter Two.

obligated to amend her prior letter to victims to correct the reference to the December letter.[376] Accordingly, the September letter contained no information about the parties' intent in implementing 18 U.S.C. § 2255, but merely referred to the NPA language concerning Epstein's waiver of his right to contest liability under the provision.  In addition, the September letter described the appointment of a special master, the special master's selection of an attorney to represent the victims in their 18 U.S.C. § 2255 litigation against Epstein, and Epstein's agreement to pay the attorney representative's fees arising out of such litigation.  The letter also clarified that Epstein's agreement to pay for attorneys' fees did not extend to contested litigation against him.

The government also intended for the letter to comply with the court's order concerning providing victims with copies of the NPA.  The initial draft included a paragraph advising the victims that they could receive a copy of the NPA:

> In addition, a judge has ordered that the United States make available to any designated victim (and/or her attorney) a copy of the actual agreement between Mr. Epstein and the United States, so long as the victim (and/or her attorney) reviews, signs, and agrees to be bound by a Protective Order entered by the Court.  If [the victim] would like to review the Agreement, please let me know, and I will forward a copy of the Protective Order for her signature.

The government shared draft versions of the September letter with Epstein's counsel and responded to criticism of the content of the proposed letter.  For example, in response to the above language regarding the August 21, 2008 court order in the CVRA litigation, the defense argued that there was "no court order requiring the government to provide the alleged 'victims' with notice that the [NPA] is available to them upon request and doing so is in conflict with the confidentiality provisions of the [NPA]."  In response, and in consultation with USAO management, Villafaña revised the paragraph as follows:

> In addition, there has been litigation between the United States and two other victims regarding the disclosure of the entire agreement between the United States and Mr. Epstein.  [The attorney selected by the special master] can provide further guidance on this issue, or if you select another attorney to represent you, that attorney can review the Court's order in the [CVRA litigation].

On September 18, 2009, a state court judge unsealed the copy of the NPA that had been filed in the state case.[377]

---

[376]     In the letter, Villafaña expressed frustration with defense counsels' claim relative to the December 19, 2007 letter that was included in the July 2008 notification letter, noting that the July 2008 letter had been approved by defense counsel before being sent.

[377]     *See* Susan Spencer-Wendel, "Epstein's Secret Pact With Fed Reveals 'Highly Unusual' Terms," *Palm Beach Post*, Sept. 19, 2009.

F.     2010 – 2011:     Department and Congressional Actions Regarding
       Interpretation of the CVRA

In connection with the Department's 2010 effort to update its 2005 Guidelines, the Office of the Deputy Attorney General convened a Victim of Crimes Working Group that asked OLC to revisit its 2005 preliminary review concerning the definition of "crime victim" under the CVRA and solicited input concerning the issue from Department components and federal law enforcement agencies.   In response, OLC issued a December 17, 2010 opinion entitled, *The Availability of Crime Victims' Rights Under the Crime Victims' Rights Act of 2004*.   Based on the CVRA's language, relevant case law, and memoranda opinions from Department components, OLC reaffirmed its 2005 conclusion that CVRA rights do not vest until a criminal charge has been filed (by complaint, information, or indictment) and the rights cease to be available if "all charges are dismissed either voluntarily or on the merits (or if the [g]overnment declines to bring formal charges after the filing of a complaint)."[378]

After OLC issued its opinion, the Department revised the 2005 Guidelines in October 2011 but did not change its fundamental position that the CVRA rights did not vest until after criminal charges were filed.   The 2011 revision did, however, add language concerning victim consultation before a defendant is charged:   "In circumstances where plea negotiations occur before a case has been brought, Department policy is that this should include reasonable consultation prior to the filing of a charging instrument with the court."[379]   The use of the word "should" in the 2011 Guidelines indicates that "personnel are expected to take the action . . . unless there is an appropriate, articulable reason not to do so."[380]   Nevertheless, the required consultation "may be general in nature" and "does not have to be specific to a particular plea offer."[381]   The revisions also specified that AUSAs were to ensure that victims had a right to be reasonably heard at plea proceedings.[382]

On November 2, 2011, U.S. Senator Jon Kyl, a co-sponsor of the CVRA, sent a letter to Attorney General Eric Holder, arguing that the 2011 Guidelines revisions "conflict[ed] quite clearly with the CVRA's plain language" because the 2011 Guidelines did "not extend any rights to victims until charges have been filed."   The Department's response emphasized that the

---

[378]     OLC "express[ed] no opinion" as to whether it is a matter of "good practice" to inform victims of their CVRA rights prior to the filing of a complaint or after the dismissal of charges.

[379]     *See* 2011 Guidelines, Art. V, ¶ G.2, available at https://www.justice.gov/sites/default/files/olp/docs/ag_guidelines2012.pdf.   In its 2011 online training video regarding the Guidelines, the Department encouraged such consultation when reasonable, but it also continued to maintain that there was no CVRA right to confer for pre-indictment plea negotiations.

[380]     *See* 2011 Guidelines, Art. I, ¶ B.2.

[381]     *See* 2011 Guidelines, Art. V, ¶ G.2.

[382]     The 2005 Guidelines contained no specific provision requiring AUSAs to ensure that victims were able to exercise their right to be reasonably heard at plea proceedings, only at sentencing.   *See* 2005 Guidelines, Art. IV, ¶ C.3.b.(2).   However, the 2005 Guidelines generally require AUSAs to use their best efforts to comply with the CVRA, and the CVRA specifically affords victims the right to be heard at plea proceedings.   The 2011 revision remedied this omission.

Department had made its "best efforts in thousands of federal and District of Columbia cases to assert, support, and defend crime victims' rights." The response also referenced OLC's December 2010 opinion concluding that CVRA rights apply when criminal proceedings are initiated, noting that "the new AG Guidelines go further and provide that Department prosecutors should make reasonable efforts to notify identified victims of, and consider victims' views about, prospective plea negotiations, even prior to the filing of a charging instrument with the court."[383]

In 2015, Congress amended the CVRA, and added the following two rights:

> (9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

> (10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

## G.   The CVRA Litigation Proceedings and Current Status

While the CVRA litigation was pending in the Southern District of Florida, numerous federal civil suits against Epstein, brought in the same district, were transferred to the same judge as "related cases," as a matter of judicial economy pursuant to the Local Rules. As the parties agreed on settlements in those civil cases, they were dismissed.[384] Several of the victims who had settled their civil cases filed a pleading in the CVRA litigation asking the court to "maintain their anonymity" and not "further disseminate[]" their identities to the CVRA petitioners.[385]

In the CVRA case, the petitioners claimed that the government violated their CVRA rights to confer by (1) negotiating and signing the NPA without victim input; (2) sending letters to the victims claiming that the matter was "under investigation" after the NPA was already signed; and (3) not properly informing the victims that the state plea would also resolve the federal investigation. In addition, the petitioners alleged that the government violated their CVRA right to be treated with fairness by concealing the NPA negotiation and also violated their CVRA right to reasonable notice by concealing that the state court proceeding impacted the enforcement of the NPA and resolved the federal investigation.

During the litigation, the USAO argued that (1) the victims had no right to notice or conferral about the NPA because the CVRA rights did not apply pre-charge; (2) the government's

---

[383]   157 Cong. Rec. S7359-02 (2011) (Kyl letter and Department response).

[384]   Epstein also resolved some county court civil cases during this time period as well. In addition, numerous other cases were resolved outside of formal litigation. For example, one attorney told OPR that he resolved 16 victim cases, but did not file all cases with the court. Court data indicate that the attorney filed only 3 of the 16 cases he said he resolved.

[385]   *Doe,* Response to Court Order of July 6, 2015 and United States' Notice of Partial Compliance at 1 (July 24, 2015).

letters to victims sent after the NPA was signed were not misleading in stating that the matter was "under investigation" because the government continued to investigate given its uncertainty that Epstein would plead guilty; and (3) Villafaña contacted the petitioners' attorney prior to Epstein's state plea to advise him of the hearing.  Nonetheless, Villafaña told OPR that, while there were valid reasons for the government's position that CVRA rights do not apply pre-charge, "[T]his is a case where I felt we should have done more than what was legally required.  I was obviously prepared to spend as much time, energy and effort necessary to meet with each and every [victim]."

Over the course of the litigation, the district court made various rulings interpreting the provisions of the CVRA, including the court's key conclusion that victim CVRA rights "attach before the Government brings formal charges against a defendant."  The court also held that (1) "the CVRA authorizes the rescission or 'reopening' of a prosecutorial agreement, including a non-prosecution agreement, reached in violation of a prosecutor's conferral obligations under the statute"; (2) the CVRA authorizes the setting aside of pre-charge prosecutorial agreements"; (3) the CVRA's "reasonable right to confer" "extends to the pre-charge state of criminal investigations and proceedings"; (4) the alleged federal sex crimes committed by Epstein render the *Doe* petitioners "victims" under the CVRA; and (5) "questions pertaining to [the] equitable defense[s] are properly left for resolution after development of a full evidentiary record."

On February 21, 2019, the district court granted the petitioners' Motion for Partial Summary Judgment, ruling that "once the Government failed to advise the victims about its intention to enter into the NPA, a violation of the CVRA occurred."  The government did not dispute the fact that it did not confer with the petitioners prior to signing the NPA, and the court concluded that "[a]t a bare minimum, the CVRA required the Government to inform Petitioners that it intended to enter into an agreement not to prosecute Epstein."  The court found that the post-NPA letters the government sent to victims describing the investigation as ongoing "misled the victims to believe that federal prosecution was still a possibility" and that "[i]t was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute."[386]

The court relied on *Dean* and *BP Products* to support its holding and noted that the government's action with respect to the NPA was especially troubling because, unlike a plea agreement for which the victims could voice objection at a sentencing hearing, "[o]nce an NPA is entered into without notice, the matter is closed and the victims have no opportunity to be heard regarding any aspect of the case."  The court also highlighted the inequity of the USAO's failure to communicate with the victims while it simultaneously engaged in "lengthy negotiations" with Epstein's counsel and assured the defense that the NPA would not be "made public or filed with the Court."

Although the USAO defended its actions by citing the 2005 Guidelines for the Department's position that CVRA rights do not attach until after a defendant is charged, the court was "not persuaded that the [G]uidelines were the basis for the Government's decision to withhold information about the NPA from the victims."  The court found that the government's reliance on

---

[386]    The court did not resolve the factual question as to whether the victims were given adequate notice of Epstein's state court plea hearing.

the 2005 Guidelines was inconsistent with positions the USAO had taken in correspondence with Epstein's attorneys, in which the government acknowledged that "it had obligations to notify the victims." The court ordered the parties to submit additional briefs regarding the appropriate remedies. Accordingly, the petitioners requested multiple specific remedies, including rescission of the NPA; a written apology to all victims from the government; a meeting with Acosta, Villafaña, and her supervisors; access to government records, including grand jury materials; training for USAO employees; and monetary sanctions and attorneys' fees.[387]

Following Epstein's indictment on federal charges in New York and subsequent death while in custody, on September 16, 2019, the district judge presiding over the CVRA case denied the petitioners' motion for remedies and closed the case, stating that Epstein's death "rendered the most significant issue that was pending before the Court, namely, whether the Government's violation of Petitioners' rights under the CVRA invalidated the NPA, moot."[388] The court did not order the government to take corrective measures, but stated that it "fully expects the Government will honor its representation that it will provide training to its employees about the CVRA and the proper treatment of crime victims."[389] The court also denied the petitioners' request for attorneys' fees, finding that the government did not act in bad faith, because, "[a]lthough unsuccessful on the merits of the issue of whether there was a violation of the CVRA, the Government asserted legitimate and legally supportable positions throughout this litigation."

On September 30, 2019, Wild appealed the district court's rejection of the requested remedies, through a Petition for a Writ of Mandamus filed with the U.S. Court of Appeals for the Eleventh Circuit.[390] In its responsive brief, the government expressed sympathy for Wild and "regret[] [for] the manner in which it communicated with her in the past."[391] Nevertheless, the government argued that, "as a matter of law, the legal obligations under the CVRA do not attach prior to the government charging a case" and thus, "the CVRA was not triggered in SDFL because no criminal charges were brought."[392] The government conceded, however, that with regard to the New York prosecution in which Epstein had been indicted, "[p]etitioner and other Epstein

---

[387]     *Doe*, Jane Doe 1 and Jane Doe 2's Submission on Proposed Remedies (May 23, 2019).

[388]     *Doe*, Opinion and Order (Sept. 16, 2019). Among other things, the court rejected the petitioners' contention that it did not address whether the government had violated the victims' CVRA right to be treated with fairness and to receive fair notice of the proceedings, noting that "[t]hese rights all flow from the right to confer and were encompassed in the Court's ruling finding a violation of the CVRA."

[389]     The Department's Office of Legal Programs provided a training entitled Crime Victims' Rights in the Federal System to the USAO on January 10, 2020.

[390]     *See In re Wild*, No. 19-13843, Petition for a Writ of Mandamus Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771(d)(3) (Sept. 30, 2019).

[391]     *Wild*, Brief of the United States of America in Response to Petition for Writ of Mandamus Under the Crime Victims Rights Act at 14 (Oct. 31, 2019). As previously noted, at this point, the litigation was being handled by the U.S. Attorney's Office for the Northern District of Georgia.

[392]     The government also noted that although the CVRA was amended in 2015 to include a victim's right to be notified in a timely manner of plea bargains and deferred prosecution agreements, "the amendment did not extend to non-prosecution agreements" which, unlike plea agreements and deferred prosecution agreements, do not require court involvement.

victims deserve to be treated with fairness and respect, and to be conferred with on the criminal case, not just because the CVRA requires it, but because it's the right thing to do."  During oral argument on January 16, 2020, the government apologized for the USAO's treatment of Wild:

> The issue is whether or not the office was fully transparent with Ms. Wild about what it is that was going on with respect to the NPA, and they made a mistake in causing her to believe that the case was ongoing when in fact the NPA had been signed.  The government should have communicated in a straightforward and transparent way with Ms. Wild, and for that, we are genuinely sorry.[393]

On April 14, 2020, a divided panel of the Court of Appeals for the Eleventh Circuit denied Wild's petition for a writ of mandamus, concluding that "the CVRA does not apply before the commencement of criminal proceedings—and thus, on the facts of this case, does not provide the petitioner here with any judicially enforceable rights."[394]  The court conducted a thorough analysis of the language of the statute, the legislative history, and previous court decisions.  The court distinguished *In re Dean* as "dictum" consisting of a "three-sentence discussion . . . devoid of any analysis of the CVRA's text, history, or structural underpinnings."  The court noted that its interpretation of the CVRA was consistent with the Department's 2010 OLC opinion concerning victim standing under the CVRA and the Department's efforts in "implementing regulations."  Finally, the court raised separation of powers concerns with Wild's (and the dissenting judge's) interpretation of victim standing under the CVRA, noting that such an interpretation would interfere with prosecutorial discretion.

Nevertheless, the court was highly critical of the government's conduct in the underlying case, stating that the government "[s]eemingly . . . defer[red] to Epstein's lawyers" regarding information it provided victims about the NPA and that its "efforts seem to have graduated from passive nondisclosure to (or at least close to) active misrepresentation."  The court concluded that although it "seems obvious" that the government "should have consulted with petitioner (and other victims) before negotiating and executing Epstein's NPA," the court could not conclude that the government was obligated to do so.  In addition, the dissenting judge filed a lengthy and strongly worded opinion asserting that the majority's statutory interpretation was "contorted" because the "plain and unambiguous text of the CVRA does not include [a] post-indictment temporal restriction."

On May 5, 2020, Wild filed a petition for rehearing *en banc*.  On August 7, 2020, the court granted the petition for rehearing *en banc* and vacated the panel's opinion; as of the date of this Report, a briefing schedule has been issued and oral argument is set for December 3, 2020.

---

[393]     Audio recording of Oral Argument, *Wild*, No. 19-13843 (Jan. 16, 2020).

[394]     *In re Wild*, 955 F.3d 1196, 1220 (11th Cir. 2020).

[Page Intentionally Left Blank]

# CHAPTER THREE

## PART TWO:  APPLICABLE STANDARDS

I.    **STATUTORY PROVISIONS**

Pertinent sections of the CVRA and the VRRA, applicable during the relevant time period, are set forth below.

### A.    The CVRA, 18 U.S.C. § 3771

(a)  Rights of Crime Victims. —A crime victim has the following rights:

(1)  The right to be reasonably protected from the accused.
(2)  The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.
(3)  The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
(4)  The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
(5)  The reasonable right to confer with the attorney for the Government in the case.
(6)  The right to full and timely restitution as provided in law.
(7)  The right to proceedings free from unreasonable delay.
(8)  The right to be treated with fairness and with respect for the victim's dignity and privacy.

. . . .

(c)  Best Efforts To Accord Rights.—

(1)  Government.—Officers and employees of the Department of Justice . . . shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a).

. . . .

(e)  Definitions.

. . . .

(2)  Crime victim.—

(A)  In general. —The term "crime victim" means a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia.

247

**B.    The Victims' Rights and Restitution Act of 1990 (VRRA), 34 U.S.C. § 20141, Services to Victims (formerly cited as 42 USCA § 10607)**

(b)  Identification of victims

At the earliest opportunity after the detection of a crime at which it may be done without interfering with an investigation, a responsible official shall—

(1)  identify the victim or victims of a crime;

(2)  inform the victims of their right to receive, on request, the services described in subsection (c); and

(3)  inform each victim of the name, title, and business address and telephone number of the responsible official to whom the victim should address a request for each of the services described in subsection (c).

(c)  Description of services

(1)  A responsible official shall—

(A)  inform a victim of the place where the victim may receive emergency medical and social services;

(B)  inform a victim of any restitution or other relief to which the victim may be entitled under this or any other law and manner in which such relief may be obtained;

(C)  inform a victim of public and private programs that are available to provide counseling, treatment, and other support to the victim; and

(D)  assist a victim in contacting the persons who are responsible for providing the services and relief described in subparagraphs (A), (B), and (C).

(2)  A responsible official shall arrange for a victim to receive reasonable protection from a suspected offender and persons acting in concert with or at the behest of the suspected offender.

(3)  During the investigation and prosecution of a crime, a responsible official shall provide a victim the earliest possible notice of—

(A)  the status of the investigation of the crime, to the extent it is appropriate to inform the victim and to the extent that it will not interfere with the investigation;

(B)  the arrest of a suspected offender;

(C)  the filing of charges against a suspected offender;

(D)  the scheduling of each court proceeding that the witness is either required to attend or, under section 10606(b)(4) of Title 42, is entitled to attend;

(E)  the release or detention status of an offender or suspected offender;

(F)  the acceptance of a plea of guilty or nolo contendere or the rendering of a verdict after trial; and

(G)  the sentence imposed on an offender, including the date on which the offender will be eligible for parole.

(4)  During court proceedings, a responsible official shall ensure that a victim is provided a waiting area removed from and out of the sight and hearing of the defendant and defense witnesses.

. . . .

(e)  Definitions

. . . .

(2) the term "victim" means a person that has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime . . . .

## II.    DEPARTMENT POLICY:  THE 2005 ATTORNEY GENERAL GUIDELINES FOR VICTIM AND WITNESS ASSISTANCE (2005 GUIDELINES)

In 2005, the Department revised its guidelines for victim and witness assistance in order to incorporate the provisions of the CVRA.  The purpose of the 2005 Guidelines was "to establish guidelines to be followed by officers and employees of Department of Justice investigative, prosecutorial, and correctional components in the treatment of victims of and witnesses to crime." The relevant portions of the 2005 Guidelines are as follows:

Article IV:  Services to Victims and Witnesses

A.  Investigation Stage

The investigative agency's responsibilities begin with the report of the crime and extend through the prosecution of the case. In some instances, when explicitly stated, the investigative agency's responsibility for a certain task is transferred to the prosecuting agency when charges are filed.

. . . .

2.  Identification of Victims. At the earliest opportunity after the detection of a crime at which it may be done without interfering with an investigation, the responsible official of the investigative agency shall identify the victims of the crime.

3.  Description of Services.

a.  Information, Notice, and Referral

(1)  Initial Information and Notice. Responsible officials must advise a victim pursuant to this section at the earliest opportunity after detection of a crime at which it may be done without interfering with an investigation.  To comply with this requirement, it is recommended that victims be given a printed brochure or card that briefly describes their rights and the available services, identifies the local

249

service providers, and lists the names and telephone numbers of the victim-witness coordinator or specialist and other key officials.  A victim must be informed of—

(a)  His or her rights as enumerated in 18 U.S.C. § 3771(a).

(b)  His or her right entitlement, on request, to the services listed in 42 U.S.C. § 10607(c).

(c)  The name, title, business address, and telephone number of the responsible official to whom such a request for services should be addressed.

(d)  The place where the victim may receive emergency medical or social services.

(e)  The availability of any restitution or other relief (including crime victim compensation programs) to which the victim may be entitled under this or any other applicable law and the manner in which such relief may be obtained.

(f)  Public and private programs that are available to provide counseling, treatment, and other support to the victim.

. . . .

(i) The availability of services for victims of domestic violence, sexual assault, or stalking.

(j) The option of being included in VNS.

(k)  Available protections from intimidation and harassment.

. . . .

(3) Notice during the investigation. During the investigation of a crime, a responsible official shall provide the victim with the earliest possible notice concerning—

(a)  The status of the investigation of the crime, to the extent that it is appropriate and will not interfere with the investigation.

(b)  The arrest of a suspected offender.

B.  Prosecution Stage

The prosecution stage begins when charges are filed and continues through postsentencing legal proceedings, including appeals and collateral attacks.

250

1. Responsible Officials. For cases in which charges have been instituted, the responsible official is the U.S. Attorney in whose district the prosecution is pending.

2. Services to Crime Victims

        . . . .

   b. Information, Notice, and Referrals

      (1)  Notice of Rights. Officers and employees of the Department of Justice shall make their best efforts to see that crime victims are notified of the rights enumerated in 18 U.S.C. § 3771(a).

      (2)  Notice of Right To Seek Counsel. The prosecutor shall advise the crime victim that the crime victim can seek the advice of an attorney with respect to the rights described in 18 U.S.C. § 3771(a).

      (3)  Notice of Right To Attend Trial. The responsible official should inform the crime victim about the victim's right to attend the trial regardless of whether the victim intends to make a statement or present any information about the effect of the crime on the victim during sentencing.

      (4)  Notice of Case Events. During the prosecution of a crime, a responsible official shall provide the victim, using VNS (where appropriate), with reasonable notice of—

         (a)  The filing of charges against a suspected offender.

         (b)  The release or escape of an offender or suspected offender.

         (c)  The schedule of court proceedings.

            (i)  The responsible official shall provide the victim with reasonable, accurate, and timely notice of any public court proceeding or parole proceeding that involves the crime against the victim. In the event of an emergency or other last-minute hearing or change in the time or date of a hearing, the responsible official should consider providing notice by telephone or expedited means. This notification requirement relates to postsentencing proceedings as well.

            (ii)  The responsible official shall also give reasonable notice of the scheduling or rescheduling of any other court proceeding that the victim or witness is required or entitled to attend.

         (d)  The acceptance of a plea of guilty or nolo contendere or the rendering of a verdict after trial.

251

(e)  If the offender is convicted, the sentence and conditions of supervised release, if any, that are imposed.

> . . . .

(6)  Referrals. Once charges are filed, the responsible official shall assist the victim in contacting the persons or offices responsible for providing the services and relief [previously identified].

c.  Consultation With a Government Attorney

(1)  In General. A victim has the reasonable right to confer with the attorney for the Government in the case.  The victim's right to confer, however, shall not be construed to impair prosecutorial discretion.  Federal prosecutors should be available to consult with victims about major case decisions, such as dismissals, release of the accused pending judicial proceedings (when such release is for noninvestigative purposes), plea negotiations, and pretrial diversion.  Because victims are not clients, may become adverse to the Government, and may disclose whatever they have learned from consulting with prosecutors, such consultations may be limited to gathering information from victims and conveying only nonsensitive data and public information. Consultations should comply with the prosecutor's obligations under applicable rules of professional conduct.

Representatives of the Department should take care to inform victims that neither the Department's advocacy for victims nor any other effort that the Department may make on their behalf constitutes or creates an attorney-client relationship between such victims and the lawyers for the Government.

Department personnel should not provide legal advice to victims.

(2)  Prosecutor Availability. Prosecutors should be reasonably available to consult with victims regarding significant adversities they may suffer as a result of delays in the prosecution of the case and should, at the appropriate time, inform the court of the reasonable concerns that have been conveyed to the prosecutor.

(3)  Proposed Plea Agreements. Responsible officials should make reasonable efforts to notify identified victims of, and consider victims' views about, prospective plea negotiations. In determining what is reasonable, the responsible official should consider factors relevant to the wisdom and practicality of giving notice and considering views in the context of the particular case, including, but not limited to, the following factors:

(a)  The impact on public safety and risks to personal safety.
(b)  The number of victims.
(c)  Whether time is of the essence in negotiating or entering a proposed plea.

252

(d) Whether the proposed plea involves confidential information or conditions.

(e)  Whether there is another need for confidentiality.

(f)  Whether the victim is a possible witness in the case and the effect that relaying any information may have on the defendant's right to a fair trial.

## III.   FLORIDA RULES OF PROFESSIONAL CONDUCT

### A.   FRPC 4-4.1 – Candor in Dealing with Others

FRPC 4-4.1 prohibits a lawyer from knowingly making a false statement of material fact or law to a third person during the course of representation of a client.  A comment to this rule explains that "[m]isrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements," and "[w]hether a particular statement should be regarded as one of fact can depend on the circumstances."

### B.   FRPC 4-8.4 – Conduct Prejudicial to the Administration of Justice

FRPC 4-8.4(c) states that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

FRPC 4-8.4(d) prohibits a lawyer from engaging in conduct in connection with the practice of law that is prejudicial to the administration of justice.

As previously noted, courts have determined that FRPC 4-8.4(d) is not limited to conduct that occurs in a judicial proceeding, but can be applied to "conduct in connection with the practice of law." *Frederick*, 756 So. 2d at 87; *see also Shankman*, 41 So. 3d at 172.

**SA-280**

[Page Left Intentionally Blank]

# CHAPTER THREE

## PART THREE:  ANALYSIS

I.  **OVERVIEW**

In addition to criticism of Acosta's decision to end the federal investigation by means of the NPA, public and media attention also focused on the government's treatment of victims.  In the CVRA litigation and in more recent media reports, victims complained that they were not informed about the government's intention to end its investigation of Epstein because the government did not consult with victims before the NPA was signed; did not inform them of Epstein's state plea hearing and sentencing, thereby denying them the opportunity to attend; and actively misled them through statements that the federal investigation was ongoing.  The district court overseeing the CVRA litigation concluded that the government violated the Crime Victims' Rights Act and "misl[ed] the victims to believe that federal prosecution was still a possibility" and that "[i]t was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute."[395] The government's conduct, which involved both FBI and USAO actions, led to allegations that the prosecutors had purposefully failed to inform victims of the NPA to prevent victims from complaining publicly or in state court.

OPR examined the government's course of conduct when interacting with the victims, including the lack of consultation with the victims before the NPA was signed; Acosta's decision to defer to state authorities the decision to notify victims of Epstein's state plea; and the decision to delay informing victims about the NPA until after Epstein entered his plea on June 30, 2008.  OPR considered whether letters sent to victims by the FBI after the NPA was signed contained false or misleading statements.  OPR also evaluated representations Villafaña made to victims in January and February 2008, and to an attorney for a victim in June 2008.

II.  **THE SUBJECTS DID NOT VIOLATE A CLEAR AND UNAMBIGUOUS STANDARD BY ENTERING INTO THE NPA WITHOUT CONSULTING THE VICTIMS**

During the CVRA litigation, the government acknowledged that the USAO did not consult with victims about the government's intention to enter into the NPA.  In its February 21, 2019 opinion, the district court concluded that "once the Government failed to advise the victims about its intention to enter into the NPA, a violation of the CVRA occurred."  OPR considered this finding as part of its investigation into the USAO's handling of the Epstein case, and examined whether, before the NPA was signed on September 24, 2007, federal prosecutors were obligated to consult with victims under the CVRA, and if so, whether any of the subject attorneys—Acosta, Sloman, Menchel, Lourie, or Villafaña—intentionally violated or recklessly disregarded that obligation.

---

[395]     *Doe v. United States,* 359 F. Supp. 3d 1201, 1219, 1221 (S.D. Fla. Feb. 21, 2019).

As discussed below, OPR concludes that none of the subject attorneys violated a clear and unambiguous duty under the CVRA because the USAO resolved the Epstein investigation without a federal criminal charge. In September 2007, when the NPA was signed, the Department did not interpret CVRA rights to attach unless and until federal charges had been filed, and the federal courts had not established a clear and unambiguous standard applying the CVRA before criminal charges were brought. Pursuant to OPR's established analytical framework, OPR does not find professional misconduct unless a subject attorney intentionally or recklessly violated a clear and unambiguous standard. Accordingly, OPR finds that the subject attorneys' conduct did not rise to the level of professional misconduct. OPR nevertheless concludes that the lack of consultation was part of a series of government interactions with victims that ultimately led to public and court condemnation of the government's treatment of the victims, reflected poorly on the Department as a whole, and is contradictory to the Department's mission to "minimize the frustration and confusion that victims of a crime endure in its wake."[396]

A.  **At the Time, No Clear and Unambiguous Standard Required the USAO to Notify Victims Regarding Case-Related Events until after the Filing of Criminal Charges**

Although the rights enumerated in the CVRA are clear on their face, the threshold issue of whether an individual qualifies as a victim to whom CVRA rights attach was neither clear nor unambiguous at the time the USAO entered into the NPA with Epstein in September 2007. At that time, the Department interpreted the CVRA in a way that differed markedly from the district court's later interpretation in the CVRA litigation.

The CVRA defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense or an offense in the District of Columbia." On April 1, 2005, soon after the CVRA was enacted, OLC concluded that "the status of a 'crime victim' may be reasonably understood to commence upon the filing of a criminal complaint, and that the status ends if there is a subsequent decision not to indict or prosecute the Federal offense that directly caused the victim's harm." Beginning with the 2005 OLC guidance, the Department has consistently taken the position that CVRA rights do not apply until the initiation of criminal charges against a defendant, whether by complaint, indictment, or information. OLC applied its definition to all eight CVRA rights in effect in 2005, but noted that the obligation created by the eighth CVRA right—to "treat[] victims with fairness and respect"—is "always expected of Federal officials, and the Victims' Rights and Restitution Act of 1990 [(VRRA)] indicates that this right applies 'throughout the criminal justice process.'"[397] Consistent with the OLC interpretation, in May 2005, the Department issued the 2005 Guidelines to implement the CVRA.

The 2005 Guidelines assigned CVRA-related obligations to prosecutors only after the initiation of federal charges. Specifically, the 2005 Guidelines stated that during the "prosecution stage," the "responsible official" should make reasonable efforts to notify identified victims of,

---

[396]    2005 Guidelines, Foreword.

[397]    Nevertheless, the portion of the VRRA referenced in the OLC 2005 Informal Guidance, 42 U.S.C. § 10606, had been repealed upon passage of the CVRA.

and consider victims' views about, prospective plea negotiations.[398]  The "prosecution stage" began when charges were filed and continued through all post-sentencing legal proceedings.[399]

At the time the parties signed the NPA in September 2007, few courts had addressed victim standing under the CVRA.  Notably, district courts in New York and South Carolina had ruled that standing attached only upon the filing of federal charges.[400]  Two cases relied upon by the court in its February 2019 opinion—*Dean* and its underlying district court opinion, *BP Products*—were decided after the NPA was signed.

The CVRA litigation and proposed federal legislation—both pending as of the date of this Report—show that the interpretation of victim standing under the CVRA continues to be a matter of debate.[401]  In a November 21, 2019 letter to Attorney General William Barr, a Congressional Representative stated that she had recently introduced legislation specifically to "[c]larify that victims of federal crimes have the right to confer with the Government and be informed about key pre-charging developments in a case, such as . . . non-prosecution agreements."[402]  The CVRA litigation arising from the Epstein case shows the lack of clarity regarding when CVRA rights apply:  the district court concluded that CVRA rights applied pre-charge, but a sharply divided panel of the Eleventh Circuit Court of Appeals came to a contrary conclusion, a decision that has now been vacated while the entire court hears the case *en banc*.

Because the Supreme Court had not addressed the issue of when CVRA rights apply, the lower courts had reached divergent conclusions, and the Department had concluded that CVRA rights did not apply pre-charge, OPR concludes that the subjects' failure to consult with victims before signing the NPA did not constitute professional misconduct because at that time, the CVRA did not clearly and unambiguously require prosecutors to consult with victims before the filing of federal criminal charges.[403]

---

[398]    2005 Guidelines, Art. IV, ¶ B.2.c.(3).  Under the 2005 Guidelines, the term "should" means that "the employee is expected to take the action or provide the service described unless there is an appropriate, articulable reason not to do so."  *Id.*, Art. II, ¶ C.

[399]    *Id.*, Art. IV, ¶ B.1.

[400]    *Searcy v. Paletz,* 2007 WL 1875802, at *5 (D.S.C. June 27, 2007) (an inmate is not considered a crime victim for purposes of the CVRA until the government has filed criminal charges); *United States v. Turner*, 367 F. Supp. 2d 319, 326-27 (E.D.N.Y. 2005) (victims are not entitled to CVRA rights until the government has filed charges, but courts have discretion to take a more inclusive approach); and *United States v. Guevara-Toloso,* 2005 WL 1210982, at *2 (E.D.N.Y. May 23, 2005) (order *sua sponte*) (in case involving a federal charge of illegal entry after a felony conviction, the court determined that victims of the predicate state conviction were not victims under the CVRA).

[401]    *See Wild*, 955 F.3d at 1220; Courtney Wild Crime Victims' Rights Reform Act of 2019, H.R. 4729, 116th Cong. (2019).

[402]    165 Cong. Rec. E1495-01 (2019).

[403]    Violations of an unambiguous obligation concerning victims' rights could result in a violation of the rules of professional responsibility.  For example, in *Attorney Griev. Comm'n of Md. v. Smith*, 109 A.3d 1184 (Md. 2015), the Court of Appeals of Maryland concluded that a prosecutor's failure to provide any notice to the minor victim's foster family about the resolution of a sex abuse case during the ten months the prosecutor was responsible for the matter was a "consistent failure" amounting to "gross negligence in the discharge of the prosecutorial function" that deprived the victim of his rights under the Maryland Constitution.  The court found violations of Maryland Rules of Professional

257

**SA-284**

In *Wild*, the Eleventh Circuit panel compared the language of the CVRA to the language of the VRRA, noting that the VRRA "clearly extends victim-notice rights into the pre-charge phase" and opining that the government "may well have violated" the VRRA with regards to its investigation of Epstein. As a predecessor to the CVRA, the VRRA afforded victims various rights and services; however, it provided no mechanism for a victim to assert such rights in federal court or by administrative complaint. Like the CVRA, the rights portion of the VRRA established the victims' right to be treated with fairness and respect and the right to confer with an attorney for the government. However, the rights portion of the VRRA was repealed upon passage of the CVRA and was not in effect at the time of the Epstein investigation.

The portion of the VRRA directing federal law enforcement agencies to provide certain victim services such as counseling and medical care referrals remained in effect following passage of the CVRA. Furthermore, two of the VRRA requirements—one requiring a responsible official to "inform a victim of any restitution or other relief to which the victim may be entitled," and another requiring that a responsible official "shall provide a victim the earliest possible notice of the status of the investigation of the crime, to the extent it is appropriate to inform the victim and to the extent that it will not interfere with the investigation"—may have applied to the Epstein investigation. However, the VRRA did not create a clear and unambiguous obligation on the part of the subject attorneys, as the 2005 Guidelines assigned the duty of enforcing the two requirements to the investigative agency rather than to prosecutors. Moreover, the VRRA did not require notice to victims before the NPA was signed because, at that point, the case remained "under investigation," and the victims did not become entitled to pursue monetary damages under the NPA until Epstein entered his guilty pleas in June 2008. Once Epstein did so, and the victims identified by the USAO became entitled to pursue the § 2255 remedy, the USAO furnished the victims with appropriate notification.

**B.      OPR Did Not Find Evidence Establishing That the Lack of Consultation Was Intended to Silence Victims**

During her OPR interviews, Villafaña recalled more than one discussion in which she raised with her supervisors the issue of consulting with the victims before the NPA was signed on September 24, 2007. Acosta, Sloman, Menchel, and Lourie, however, had no recollection of discussions about consulting victims before the NPA was signed, and Menchel disputed Villafaña's assertions. OPR found only one written reference before that date, explicitly raising the issue of consultation. Given the absence of contemporaneous records, OPR was unable to conclusively determine whether the lack of consultation stemmed from an affirmative decision made by one or more of the subjects or whether the subjects discussed consulting the victims about the NPA before it was signed. Villafaña's recollection suggests that Acosta, Menchel, and Sloman may have been concerned with maintaining the confidentiality of plea negotiations and did not believe that the government was obligated to consult with victims about such negotiations. OPR

---

Conduct 1.3, lack of diligence, and 8.4(d), conduct prejudicial to the administration of justice. The holding in *Smith* was based on Article 47 of the Maryland Constitution and various specific statutes affording victims the right, among others, to receive various notices and an opportunity to be heard concerning "a case originating by indictment or information filed in a circuit court." However, both the underlying statutory provisions and, significantly, the facts are substantially different from the Epstein investigation. In *Smith*, the criminal defendant had been arrested and charged before entering a plea.

258

did not find evidence showing that the subjects intended to silence victims or to prevent them from having input into the USAO's intent to resolve the federal investigation.

Although the contemporaneous records provide some information about victim notification decisions made after the NPA was signed on September 24, 2007, the records contain little about the subjects' views regarding consultation with victims before the NPA was signed.  In a September 6, 2007 email primarily addressing other topics, as the plea negotiations were beginning in earnest and almost three weeks before the NPA was signed, Villafaña raised the topic of victim consultation with Sloman:  "The agents and I have not reached out to the victims to get their approval, which as [CEOS Chief Oosterbaan] politely reminded me, is required under the law. . . . [A]nd the [PBPD] Chief wanted to know if the victims had been consulted about the deal."[404] Sloman forwarded the email to Acosta with a note stating, "fyi."  Villafaña recalled that after she sent the email, Sloman told her by telephone, "[Y]ou can't do that now."[405]  Villafaña also told OPR that shortly before the NPA was signed, Sloman told her, "[W]e've been advised that . . . pre-charge resolutions do not require victim notification."  Villafaña also recalled a discussion with Acosta, Menchel, and Sloman, during which she stated that she would need to get victims' input on the terms being proposed to the defense, and she was told, "Plea negotiations are confidential. You can't disclose them."[406]

None of the other subjects recalled a specific discussion before the NPA was signed about the USAO's CVRA obligations.  Menchel told OPR he believed the USAO was not required to consult with victims during the preliminary "general discussion" phase of settlement negotiations; moreover, he left the USAO before the terms of the NPA were fully developed.

Sloman told OPR that he "did not think that we had to consult with victims prior to entering into the NPA" and "we did not have to seek approval from victims to resolve a case."  Sloman believed the USAO was obligated only to notify victims about resolution of "the cases that we handled, filed cases."  Sloman recalled that because the USAO envisioned a state court resolution of the matter, he did not "think that that was a concern of ours at the time to consult with [the victims] prior to entering into . . . the NPA."

Lourie told OPR that he did not recall any discussions about informing the victims about the terms of the NPA or any instructions to Villafaña that she not discuss the NPA with the victims. He stated that everything the USAO did was "to try and get the best result as possible for the victims. . . . [O]nce you step back and look at the whole forest . . ., you will see that. . . . [I]f you look at each tree and say, well, you didn't do this right for the victim, you didn't tell the victim this and that, you're missing the big picture."

---

[404]     As noted, the Department's position at the time was that the CVRA did not require consultation with victims because no criminal charges had been filed.  In addition, Villafaña's reference to victim "approval" was inaccurate because the CVRA, even when applicable, requires only "consultation" with victims about prosecutorial decisions.

[405]     Villafaña did not recall Sloman explaining the reason for the decision.

[406]     Villafaña also told OPR that she recalled Menchel raising a concern that "telling them about the negotiations could cause victims to exaggerate their stories because of their desire to obtain damages from Epstein."  Villafaña was uncertain of the date of the conversation, but Menchel's presence requires it to have occurred before August 3, 2007.

Acosta told OPR that there was no requirement to notify the victims because the NPA was "not a plea, it's deferring in favor of a state prosecution." Acosta said, "[W]hether or not victims' views were elicited is something I think was the focus of the trial team and not something that I was focused on at least at this time." Acosta could not recall any particular concern that factored into the decision not to consult with the victims before entering into the NPA, but he acknowledged to OPR, "[C]learly, given the way it's played out, it may have been much better if we had [consulted with the victims]."[407]

As indicated, the contemporaneous records reflect little about decisions made regarding victim consultation prior to when the NPA was signed. Villafaña raised the issue in writing to her supervisors in early September, but there is no evidence showing whether her supervisors affirmatively rejected Villafaña's contention that the USAO was obligated to consult with victims, ignored the suggestion, or failed to address it for other reasons, possibly because of the extended uncertainty as to whether Epstein would ever agree to the government's plea proposal. OPR notes that its subject interviews were conducted more than a decade after the NPA was signed, and the passage of time affected the recall of each individual OPR interviewed. Although Villafaña recalled discussions with her supervisors about notifying victims, her supervisors did not, and Menchel contended that Villafaña's recollection is inaccurate. Assuming the discussions occurred, the timing is unclear. Sloman was on vacation before the NPA was signed, so a call with Villafaña about victim notification at that point in time appears unlikely. Any discussion involving Menchel necessarily occurred before August 3, 2007, when it was unclear whether the defense would agree to the government's offer. Supervisors could well have decided that at such an early stage, there was little to discuss with victims.

To the extent that Villafaña's supervisors affirmatively made a decision not to consult victims, Villafaña's recollection suggests that the decision arose from supervisors' concerns about the confidentiality of plea negotiations and a belief that the government was not obligated to consult with victims about a pre-charge disposition. That belief accurately reflected the Department's position at the time about application of the CVRA. Importantly, OPR did not find evidence establishing that the lack of consultation was for the purpose of silencing victims, and Villafaña told OPR that she did not hear any supervisor express concerns about victims objecting to the agreement if they learned of it. Because the subjects did not violate any clear and unambiguous standard in the CVRA by failing to consult with the victims about the NPA, OPR concludes that they did not engage in professional misconduct.

However, OPR includes the lack of consultation in its criticism of a series of government interactions with victims that ultimately led to public and court condemnation of the government's treatment of the victims. Although the government was not obligated to consult with victims, a more straightforward and open approach would have been consistent with the government's goal to treat victims of crime with fairness and respect. This was particularly important in a case in which victims felt excluded and mistreated by the state process. Furthermore, in this case, consulting with the victims about a potential plea would have given the USAO greater insight into the victims' willingness to support a prosecution of Epstein. The consultation provision does not

---

[407]    Villafaña told OPR that she was not aware of any "improper pressure or promise made to [Acosta] in order to . . . instruct [her] not to make disclosures to the victim[s]."

require victim approval of the prosecutors' plans, but it allows victims the opportunity to express their views and to be heard before a final decision is made.  The lack of consultation in this case denied the victims that opportunity.[408]

### III.   LETTERS SENT TO VICTIMS BY THE FBI WERE NOT FALSE STATEMENTS BUT RISKED MISLEADING VICTIMS ABOUT THE STATUS OF THE FEDERAL INVESTIGATION

After the NPA was signed on September 24, 2007, Villafaña and the FBI separately communicated with numerous victims and victims' attorneys, both in person and through letters.  Apart from three victims who likely were informed in October or November 2007 about a resolution ending the federal investigation, victims were not informed about the NPA or even more generally that the USAO had agreed to end its federal criminal investigation of Epstein if he pled guilty to state charges until after Epstein entered his guilty plea in June 2008.  Despite the government's agreement on September 24, 2007, to end its federal investigation upon Epstein's compliance with the terms of the NPA, the FBI sent to victims in October 2007, January 2008, and May 2008, letters stating that the case was "currently under investigation."  In its February 21, 2019 opinion in the CVRA case, the district court found those letters "misl[ed] the victims to believe that federal prosecution was still a possibility" and that "[i]t was a material omission for the Government to suggest to the victims that they have patience relative to an investigation about which it had already bound itself not to prosecute."[409]

In the discussions throughout this section, OPR examines the government's course of conduct with victims after the NPA was signed.  As set forth in the previous subsection, OPR did not find evidence supporting a finding that Acosta, Sloman, or Villafaña acted with the intent to silence victims.  Nonetheless, after examining the full scope and context of the government's interactions with victims, OPR concludes that the government's inconsistent messages concerning the federal investigation led to victims feeling confused and ill-treated by the government.

In this section, OPR examines and discusses letters sent to victims by the FBI that were the subject of the district court's findings.  OPR found no evidence that Acosta, Sloman, or Villafaña was aware of the content of the letters until the USAO received them from the FBI for production for the CVRA litigation.  OPR determined that the January 10, 2008 and May 30, 2008 letters that the district court determined to be misleading, as well as the October 12, 2007 letter OPR located during its investigation, were "standard form letter[s]" sent by the FBI's Victim Specialist.  As noted previously in this Report, after the NPA was signed, Villafaña and the FBI agents continued to conduct their investigation in anticipation that Epstein would breach the NPA; absent such a

---

[408]     Villafaña told OPR that she recalled speaking to several victims along with FBI agents before the NPA was signed and "ask[ing] them how they wanted the case to be resolved."  FBI interview reports indicate that Villafaña was present with FBI agents for some of the interviews occurring well in advance of the NPA negotiations.  *See* 2005 Guidelines, Art. IV, ¶ B.2.c (1) (consultations may be limited to gathering information from victims and conveying only nonsensitive data and public information).  However, Villafaña did not meet with all of the victims identified in the federal investigation, including the CVRA litigation petitioners, and the government conceded during the CVRA litigation that it entered into the NPA without conferring with the petitioners.  *Doe,* 359 F. Supp. 3d at 1218.

[409]     *Doe,* 359 F. Supp. 3d at 1219, 1221.

breach, however, Epstein would enter his state guilty plea and the federal investigation would end. Thus, the statement that the case was "currently under investigation" was literally true, but the omission of important contextual information about the existence of the NPA deprived the victims of important information about the exact status of the investigation.

A.    **The USAO Was Not Responsible for Victim Notification Letters Sent by the FBI in October 2007, January 2008, and May 2008 Describing the Status of the Case as "Under Investigation"**

The 2005 Guidelines charged the FBI with informing the victims of CVRA rights and available services during the "investigative stage" of a case. During the Epstein investigation, the FBI case agents complied with the agency's notification obligation by hand delivering pamphlets to victims following their interviews and through computer-generated letters sent to the victims by the FBI's Victim Specialist. The FBI's notification process is independent of the USAO's. The USAO has its own Victim Witness Specialist who assumes the responsibility for victim notification after an indictment or complaint moved the case into the "prosecution stage."

The FBI's Victim Specialist used the VNS to prepare the October 2007, January 2008, and May 2008 letters, a system the FBI regularly employs to comply with its obligations under the 2005 Guidelines to inform the victims of their rights and other services during the "investigative stage." The stock language of that letter, however, was generic and failed to communicate the unique case-specific status of the Epstein investigation at that time. The FBI Victim Specialist who sent the letters acted at the case agent's direction and was not aware of the existence of the NPA at the time she created the letters.[410] Neither FBI case agent reviewed any of the letters sent by the FBI's Victim Specialist.[411] According to Villafaña, "The decision to issue the letters and the wording of those letters were exclusively FBI decisions." Although the FBI case agents informed Villafaña after the fact that the FBI's Victim Specialist sent her "standard form letter," Villafaña had never reviewed an FBI-generated victim notification letter and was not aware of its contents.[412] Villafaña told OPR she was unaware of the content of the FBI letters until they were collected for the CVRA litigation, sometime after July 2008.

---

[410]    The case agent told OPR that she did not recall specifically directing the Victim Specialist to send a letter, but acknowledged that "she would come to us before she would approach a victim."

[411]    The case agent told OPR that she had no role in drafting the letters and believed them to be "standard form letters." Similarly, the co-case agent told OPR, "I can't think that I've ever reviewed any of them . . . they just go from the victim coordinator."

[412]    Villafaña's lack of familiarity with the language in the FBI letters led to some inconsistency in the information provided to victims concerning their CVRA rights. Beginning in 2006, the FBI provided to victims standard letters advising victims of their CVRA rights but which also noted that only some of the rights applied pre-charge. During this period, Villafaña also crafted her own introductory letters to the victims to let them know of their CVRA rights and that the federal investigation "would be a different process" from the prior state investigation in which "the victims felt they had not been particularly well-treated by the State Attorney's Office." Villafaña told OPR that in a case in which she "need[ed] to be talking to young girls frequently and asking them really intimate questions," she wanted to "make sure that they . . . feel like they can trust me." Villafaña's letter itemized the CVRA rights, but it did not explain that those rights attached only after a formal charge had been made. The letter was hand

B.    **Because the Federal Investigation Continued after the NPA Was Signed, the FBI Letters Were Accurate but Risked Misleading Victims regarding the Status of the Federal Investigation**

As described previously, given Epstein's appeal to the Department and continued delay entering his guilty plea, Villafaña and other subjects came to believe that Epstein did not intend to comply with the NPA and that the USAO would ultimately file charges against Epstein. By April 2008, Acosta predicted in an email that charging Epstein was "more and more likely." As a result, Villafaña and the case agents continued their efforts to prepare for a likely trial with additional investigative steps. Among other actions, Villafaña, her supervisors, CEOS, and the case agents engaged in the following investigative activities:

- The FBI interviewed victims in October and November 2007 and between January and May 2008, and discovered at least six new victims.

- In January 2008, CEOS assigned a Trial Attorney to bring expertise and "a national perspective" to the matter.

- In January and February 2008, Villafaña and the CEOS Trial Attorney participated in victim interviews.

- Villafaña revised the prosecution memorandum to focus "on victims who are unknown to Epstein's counsel."

- The USAO informed the Department's Civil Rights Division "pursuant to USAM [§] 8-3.120," of the USAO's "ongoing investigation of a child exploitation matter" involving Epstein and others.

- Villafaña secured *pro bono* legal representation for victims whose depositions were being sought by Epstein's attorneys in connection with the Florida criminal case.[413]

- Villafaña prepared a revised draft indictment.

- Villafaña sought and obtained approval to provide immunity to a potential government witness in exchange for that witness's testimony.

- Even after Epstein's state plea hearing was set for June 30, 2008, Villafaña took steps to facilitate the filing of federal charges on July 1, 2008, in the event he did not plead guilty.

Villafaña told OPR that from her perspective, the assertion in the FBI victim letter that the case was "currently under investigation" was "absolutely true." Similarly, the FBI case agent told OPR that at the time the letters were sent the "case was never closed and the investigation was

---

delivered, along with the FBI's own victim's rights pamphlet and notification letter, to victims following their FBI interviews.

[413]    According to the 2017 affidavit filed by Wild's CVRA-case attorney, Edwards, the *pro bono* counsel that Villafaña secured assisted Wild in "avoiding the improper deposition."

continuing." The co-case agent also told OPR that, as of the time of his OPR interview in 2019, the "the case was open . . . it's never been shut down."

OPR found no evidence that the FBI's victim letters were drafted with the intent to mislead the victims about the status of the federal investigation. The "ongoing investigation" language generated by the VNS was generic template language in use nationwide at the time and identical to that contained in standard form notification letters the FBI generated and distributed from August 2006 through the 2007 signing of the NPA.[414] Nevertheless, the FBI's letters omitted important information about the status of the case because they failed to notify the victims that a federal prosecution would go forward *only if* Epstein failed to fulfill his obligations under an agreement he had reached with the USAO. Victims receiving the FBI's letter would logically conclude that the federal government was continuing to gather evidence to support a federal prosecution. CVRA petitioner Wild stated during the CVRA litigation that her "understanding of this letter was that [her] case was still being investigated and the FBI and prosecutors were moving forward on the Federal prosecution of Epstein for his crimes against" her. Furthermore, when the fact that the USAO had agreed to end its federal investigation in September 2007 eventually came to light, the statement in the subsequent letters contributed to victims' and the public's conclusions that the government had purposefully kept victims in the dark.

In sum, OPR concludes that the statement in the FBI victim letters that the matter was "currently under investigation" was not false because the USAO and the FBI did continue to investigate and prepare for a prosecution of Epstein. The letters, however, risked misleading the victims, and contributed to victim frustration and confusion, because the letters did not provide important information that would have advised victims of the actual status of the investigation. Nonetheless, OPR found no evidence that Villafaña or her supervisors participated in drafting those letters or were aware of the content of the FBI's letters until the Department gathered them for production in the CVRA litigation. The use of FBI form letters that gave incomplete information about the status of the investigation demonstrated a lack of coordination between the federal agencies responsible for communicating with Epstein's victims and showed a lack of attention to and oversight regarding communication with victims. Despite the fact that the case was no longer on the typical path for resolving federal investigations, form letters continued to be sent without any review by prosecutors or the case agents to determine whether the information provided to the victims was appropriate under the circumstances.[415]

---

[414] The Department of Justice Inspector General's Audit Report of the Department's Victim Notification System indicates that letters the FBI system generated in 2006 contained stock language for the notification events of "Initial (Investigative Agency)" and "Under Investigation" and letters generated in 2008 contained stock language for the notification events of "Advice of Victims Rights (Investigative)" and "Under Investigation."

[415] After Epstein entered his guilty pleas, the FBI sent a similar form letter requesting "assistance and cooperation while we are investigating the case" to the two victims living outside the United States.

**IV.    ACOSTA'S DECISION TO DEFER TO THE STATE ATTORNEY'S DISCRETION WHETHER TO NOTIFY VICTIMS ABOUT EPSTEIN'S STATE COURT PLEA HEARING DID NOT VIOLATE A CLEAR OR UNAMBIGUOUS STANDARD; HOWEVER, ACOSTA EXERCISED POOR JUDGMENT BY FAILING TO ENSURE THAT VICTIMS IDENTIFIED IN THE FEDERAL INVESTIGATION WERE ADVISED OF THE STATE PLEA HEARING**

As set forth in the factual discussion, within a few weeks of the NPA's signing, it became clear that the defense team disagreed with, and strongly objected to, the government's plan to inform victims of their ability to recover monetary damages from Epstein, under the 18 U.S.C. § 2255 provision of the NPA, and about Epstein's state court plea hearing. The USAO initially took the position that it was obligated to, and intended to, inform victims of both the NPA, including the § 2255 provision, and Epstein's change of plea hearing and sentencing, so that victims who wanted to attend could do so.

In November and December 2007, Epstein's attorneys challenged the USAO's position regarding victim notification. Ultimately, Acosta made two distinct decisions concerning victim notifications. Consistent with Acosta's concerns about intruding into state actions, Acosta elected to defer to state authorities the decision whether to notify victims about the state's plea hearing pursuant to the state's own victim's rights requirements. Acosta also determined that the USAO would notify victims about their eligibility to obtain monetary damages from Epstein under § 2255, a decision that was implemented by letters sent to victims after Epstein entered his state pleas. This decision, which postponed notification of the NPA until after Epstein entered his guilty pleas, was based, at least in part, on Villafaña's and the case agents' strategic concerns relating to preserving the victims' credibility and is discussed further in Section V, below.

In this section, OPR analyzes Acosta's decision to defer to the state the responsibility for notifying victims of Epstein's plea hearing and sentencing. OPR concludes that neither the CVRA nor the VRRA required the government to notify victims of the state proceeding and therefore Acosta did not violate any statutes or Department policy by deferring to the discretion of the State Attorney whether to notify victims of Epstein's state guilty pleas and sentencing. However, OPR also concludes that Acosta exercised poor judgment because by failing to ensure that the state intended to and would notify victims of the federal investigation, he failed to treat victims forthrightly and with the sensitivity expected by the Department. Through counsel, Acosta "strongly disagree[d]" with OPR's conclusion and argued that OPR unfairly applied a standard "never before expected of any U.S. Attorney." OPR addresses Acosta's criticisms in the discussion below.

**A.    Acosta's Decision to Defer to the State Attorney's Discretion Whether to Notify Victims about Epstein's State Court Plea Hearing Did Not Violate Any Clear or Unambiguous Standard**

In November 2007, Villafaña sought to avoid defense accusations of misconduct concerning her interactions with the victims by preparing a written notice to victims informing them of the resolution of the federal case and of their eligibility for monetary damages, and inviting them to appear at the state plea hearing. Villafaña and Sloman exchanged edits of the draft letter and, at Sloman's instruction, she provided the draft to defense attorney Lefkowitz, who, in turn,

strongly objected to the government's plan to notify victims of the state proceedings, which he described as "highly inappropriate" and an "intrusion into state affairs, when the identified individuals are not even victims of the crime for which Mr. Epstein is being sentenced."

Thereafter—at a time when the USAO believed Epstein's plea to be imminent—Villafaña drafted, and Sloman signed, the December 6, 2007 letter to Lefkowitz rejecting the defense arguments regarding notification and reiterating the USAO's position that the victims identified in the federal investigation be invited to appear at the state plea hearing. The letter took an expansive view of the applicable statutes by contending that both the CVRA and the VRRA required the USAO to notify the victims of the state proceedings:

> [T]hese sections are not limited to proceedings in a *federal* district court. Our Non-Prosecution Agreement resolves the federal investigation by allowing Mr. Epstein to plead to a state offense. The victims identified through the federal investigation should be appropriately informed, and our Non-Prosecution Agreement does not require the U.S. Attorney's Office to forego [*sic*] its legal obligations.[416]

The letter also asserted that the VRRA obligated the USAO to provide the victims with information concerning restitution to which they may be entitled and "the *earliest possible*" notice of the status of the investigation, the filing of charges, and the acceptance of a plea. Along with the letter, Sloman forwarded a revised draft victim notification letter to Lefkowitz for his comments. This draft victim notification letter stated that the federal investigation had been completed, Epstein would plead guilty in state court, the parties would recommend 18 months of imprisonment at sentencing, and Epstein would compensate victims for monetary damages claims brought under 18 U.S.C. § 2255. The draft victim notification letter provided specific information concerning the upcoming change of plea hearing and invited the victims to attend or provide a written statement to the State Attorney's Office. When Lefkowitz asked Sloman to delay sending victim notifications until after a discussion of their contents, Sloman instructed Villafaña, who was preparing letters for transmittal to 30 victims, to "Hold the letter." During his OPR interview, Sloman recalled that he had "wanted to push the letter out," but he "must have had a conversation with somebody" about whether the CVRA applied, and based on that conversation he directed Villafaña to hold the letter.

In his response letter to Acosta, Lefkowitz contended that the government had misinterpreted both the CVRA and VRRA because neither applied to the "public proceeding in this matter [which] will be in state court for the purpose of the entry of a plea on state charges."

---

[416]   Sloman told Lefkowitz the USAO did not seek to "federalize" a state plea, but "is simply informing the victims of their rights." Sloman also addressed the defense attorneys' objection to advising the victims that they could contact Villafaña or the FBI case agent with questions or concerns by referencing the CVRA, noting, "Again, federal law requires that victims have the 'reasonable right to confer with the attorney for the Government in this case.'"

Thereafter, in his December 19, 2007 letter to defense counsel mainly addressing other matters, Acosta informed the defense that the USAO would defer to the State Attorney's discretion the responsibility for notifying victims about Epstein's state plea hearing:

> I understand that the defense objects to the victims being given notice of [the] time and place of Mr. Epstein's state court [plea and] sentencing hearing. I have reviewed the proposed victim notification letter and the statute. I would note that the United States provided the draft letter to the defense as a courtesy. In addition, First Assistant United States Attorney Sloman already incorporated in the letter several edits that had been requested by defense counsel. I agree that Section 3771 applies to notice of proceedings and results of investigations of federal crimes as opposed to the state crime. We intend to provide victims with notice of the federal resolution, as required by law. *We will defer to the discretion of the State Attorney regarding whether he wishes to provide victims with notice of the state proceedings, although we will provide him with the information necessary to do so if he wishes.*

(Emphasis added.)

Acosta told OPR that he "would not have sent this [letter] without running it by [Sloman], if not other individuals in the office." Acosta explained that it was "not for me to direct the State Attorney, or for our office to direct the State Attorney's Office on its obligations with respect to the state outcome." Acosta acknowledged that the USAO initially had concerns about the state's handling of the case, but he told OPR, "that doesn't mean that they will not fulfill whatever obligation they have. Let's not assume. . . that the State Attorney's office is full of bad actors." Sloman initially believed that "the victims were going to be notified at some level, especially because they had restitution rights under [§] 2255"; but his expectations changed after "there was an agreement made that we were going to allow the state, since it was going to be a state case, to decide how the victims were going to be notified."[417] Sloman told OPR he had been "proceeding under the belief that we were going to notify the victims," even though "this was not a federal case," but once the NPA "looked like it was going to fall apart," the USAO "had concerns that if we g[a]ve them the victim notification letter . . . and the deal fell apart, then the victims would be instantly impeached by the provision that you're entitled to monetary compensation."

OPR could not determine whether the State Attorney's Office notified any victims in advance of the June 30, 2008 state plea hearing. Krischer told OPR that the State Attorney's Office had a robust and effective victim notification process and staff, but he was not aware of whether or how it was used in the Epstein case. Belohlavek told OPR that she could not recall whether victims were notified of the hearing nor whether the state law required notification for the

---

[417] Sloman stated in his June 3, 2008 letter to Deputy Attorney General Filip that Acosta made the decision together with the Department's Criminal Division Deputy Assistant Attorney General Mandelker. Acosta did consult with Mandelker about the § 2255 civil damages recovery process, but neither Acosta nor Mandelker recalled discussing the issue of victim notification, and OPR found no other documentation indicating that Mandelker played a role in the deferral decision.

particular charges and victims at issue.  Once the hearing was scheduled, Sloman told Villafaña to contact PBPD Chief Reiter about notifying the victims, and on June 28, 2008, she reported back to Sloman that Reiter "is going to notify victims about the plea."[418]  Villafaña recalled that she sent Reiter a list of the girls identified as victims during the federal investigation, and Reiter said he would "contact as many as he could."  The contemporaneous records do not show how many or which victims, if any, Reiter contacted, and no victims were present in the courtroom.  No victim who provided information to OPR, either in person or through her attorney, recalled receiving notice of the plea hearing from federal or state officials.  At the time Epstein pled guilty in state court, no one in the USAO knew exactly who, if anyone, Reiter or the State Attorney's Office had notified about the proceeding.  Accordingly, Villafaña, who was present in the courtroom for the hearing, had no knowledge to whom Belohlavek referred when she told the court that the victims were "in agreement with the terms of this plea."[419]

OPR considered whether Acosta's decision to defer to the State Attorney's Office the decision to notify victims of the scheduled date for Epstein's plea hearing constituted professional misconduct.  OPR could not conclude that the CVRA or VRRA provisions in question, requiring notice of any public proceeding involving the crime against the victim or that the victim is entitled to attend, unambiguously required federal prosecutors to notify victims of state court proceedings.  Furthermore, as discussed previously, OLC had issued guidance stating that the CVRA did not apply to cases in which no federal charges had been filed.[420]  Moreover, the section of the VRRA requiring notice of court proceedings that the victim is "entitled to attend" referred specifically to proceedings under 42 U.S.C. § 10606(b)(4), which, at the time of the Epstein case, had become part of the CVRA (18 U.S.C. § 3771(a)(2)).[421]

Because Acosta had no clear or unambiguous duty to inform victims identified in the federal investigation of the state plea hearing, OPR concludes that his decision to defer to the State Attorney the decision to notify victims of the state's plea hearing and the responsibility for doing so did not constitute professional misconduct.[422]

---

[418]     Sloman replied, "Good."  In her written response to OPR, Villafaña stated, "I requested permission to make oral notifications to the victims regarding the upcoming change of plea, but the Office decided that victim notification could only come from a state investigator, and Jeff Sloman asked PBPD Chief Reiter to assist."

[419]     Plea Hearing Transcript at 42.

[420]     OLC 2005 CVRA Informal Guidance; *see also United States v. Guevara-Toloso,* No. 04-1455, 2005 WL 1210982, at *2 (E.D.N.Y. May 23, 2005) (in case involving a federal charge of illegal entry after a felony conviction, the court determined that victims of the predicate state conviction were not victims under the CVRA).

[421]     In *Wild,* the Eleventh Circuit panel noted that the petitioner argued "only in passing" that the government violated her CVRA right "to reasonable, accurate, and timely notice of any public court proceeding . . . involving the crime"; however, the court concluded this provision "clearly appl[ies] only after the initiation of criminal proceedings."  *Wild,* 955 F.3d at 1205 n.7, 1208.

[422]     The government's letter to victims, following Epstein's guilty pleas, informing them of the resolution of the case by state plea and the availability of § 2255 relief, also appear to satisfy the potentially applicable VRRA requirements to "inform a victim of any restitution or other relief to which the victim may be entitled," and  to "provide a victim the earliest possible notice of the status of the investigation of the crime, to the extent it is appropriate to

**B.**     **Acosta Exercised Poor Judgment When He Failed to Ensure That Victims Identified in the Federal Investigation Were Informed of the State Plea Hearing**

Although Acosta (or the USAO) was not required by law or policy to notify victims of the state's plea hearing, he also was not *prohibited* by law or policy from notifying the victims that the federal investigation had been resolved through an agreement that included pleas to state charges.   As the contemporary records indicate, Acosta consistently expressed hesitancy to interfere in the state's processes or to "dictate" actions to the State Attorney.  His decision that the USAO refrain from notifying victims about the state plea hearing and defer to the State Attorney's judgment regarding whether and whom to notify was consistent with this view.   However, OPR found no evidence that Acosta's decision to defer victim notification "to the discretion of the State Attorney" was ever actually communicated to any state authorities or that Acosta recognized that the state, absent significant coordination with federal authorities, was unlikely to contact all of the victims identified in the state and federal investigations or that the state would inform the victims that it did notify that the state plea hearing was part of an agreement that resolved the federal investigation into their own cases.[423]

Even taking into account Acosta's views on principles of federalism and his reluctance to interfere in state processes, Acosta should have recognized the problems that would likely stem from passing the task of notifying victims to the State Attorney's Office and made appropriate efforts to ensure that those problems were minimized.   Appropriate notification would have included advising victims identified in the federal investigation that the USAO had declined to bring charges and that the matter was being handled by the State Attorney, and, at a minimum, provided the victims with Belohlavek's contact information.  Acosta could have interacted with the State Attorney, or instructed Villafaña or others to do so, to ensure the state intended to make notifications in a way that reached the most possible victims and that it had the information necessary to accomplish the task.  Instead, Acosta deferred the responsibility for victim notification entirely to the State Attorney's discretion without providing that office with the names of individuals the USAO believed were victims and, apparently, without even informing the state prosecutors that he was deferring to them to make the notifications, if they chose to do so.

Epstein was required by the NPA to plead to only two state charges, and even assuming that each charge was premised on a crime against a different victim, and the solicitation charge involved three separate victims, there were thus only at most four victims of the charged state offenses.   Without at least inquiring into the state's intentions, Acosta had no way of determining whether the state intended to notify more than those few victims.   Moreover, the federal investigation had resulted in the identification of several victims who had not been identified by

---

inform the victim and to the extent that it will not interfere with the investigation."  *See* 42 U.S.C. §§ 10607(c)(1)(B) and (c)(3)(A).

[423]     Through counsel, Acosta argued that OPR's criticism of him for "electing to 'defer' the notification obligation to the state" was inappropriate and "a *non sequitur*" because "where no federal notification obligation exists, it cannot be deferred."  OPR's criticism, as explained further below, is not with the decision itself, but rather with the fact that although Acosta intended for the federal victims to be notified of the state plea hearing, and believed that they should receive such notification, he nonetheless left responsibility for such notification to the state without ensuring that it had the information needed to do so and without determining the state's intended course of action.

the PBPD during its investigation into Epstein's conduct.  Absent information from the USAO, the state would not have been in a position to notify those additional victims of the state plea proceeding, even if the State Attorney had decided to include other victims identified during the state investigation.  Furthermore, at the time he made his decision, Acosta had already been advised by Villafaña that Belohlavek, in November 2007, had requested that the USAO notify victims, presumably those identified during the federal investigation, about the state plea hearing.

Acosta told OPR that it had been his understanding at the time of Epstein's plea that the victims would be made aware of the proceeding and would have an opportunity to speak.  Acosta also told OPR that he expected the state would have "notified [the victims] that that was an all-encompassing plea, that the state court sentence would also mean that the federal government was not proceeding."  There is no evidence, however, that he verified this understanding with Sloman or Villafaña, let alone the State Attorney.  OPR found no indication that Acosta ever communicated, or directed Sloman or Villafaña to communicate, his decision to the State Attorney or to provide the State Attorney's Office with a complete list of victims identified during the federal investigation.  OPR located a draft letter to the State Attorney's Office that Villafaña prepared and forwarded to Acosta in December 2007, which did provide such information, but OPR found no evidence that the letter was ever sent, and it was not among materials publicly released from the State Attorney's Office.[424]  OPR also found evidence that both Sloman and Villafaña interacted with the State Attorney's Office in the months leading up to the June 30, 2008 plea hearing, but there is no indication that they discussed victim notification issues with that office, and Villafaña's last minute request to PBPD Chief Reiter to notify victims indicates that the USAO had not coordinated with the State Attorney's Office.  Belohlavek told OPR that no one from the USAO provided her with a list of victims or coordinated any notification of victims to appear at the hearing.

Krischer and Belohlavek were thus evidently unaware that Acosta had decided to leave it to them to decide whether to notify victims about the state proceeding.  In the absence of some discussion of which or how many victims the state intended to notify, what the state intended to tell them about Epstein's plea, and whether the state intended to let the victims speak at the plea hearing, Acosta had no way to ensure that his assumption about victim notification was accurate. In other words, Acosta failed to plan for how all of the identified victims of Epstein's crimes, both federal and state, "would be aware of what was happening in the state court and have an opportunity to speak up at the state court hearing."

OPR did not find evidence that Acosta acted for the purpose of excluding victims from the plea hearing, and Acosta's assumption that the state would handle victim notification appropriately was not unsupported.  State prosecutors are subject to victim notification requirements under the Florida Constitution, and the state prosecution offices have victim witness personnel, resources, and processes to help accomplish notification.  However, Acosta was aware—through the prosecution memoranda, the draft indictment, and email communications from Villafaña—that the USAO's investigation had expanded beyond those victims identified in the original PBPD

---

[424]     The text of the letter indicated that Epstein's attorneys asked the USAO not to inform victims of "any rights they may have as victims of the charges filed by the State Attorney's Office" and that the USAO was providing the State Attorney's Office with a list of the 33 identified federal victims "in case you are required to provide them with any further notification regarding their rights under Florida law."

investigation.  Because the state indictment and information appeared to pertain to far fewer than the total victims identified in either the state or the federal investigation, and no one at the USAO was certain which victims were covered by the state charges, it should have been apparent to Acosta that without advance planning between the USAO and the State Attorney's Office, there was a substantial risk that most of the victims identified in the federal investigation would not receive notice of the hearing.[425]  Notification to the broadest possible number of identified victims could only have been successful if there was appropriate communication between the USAO and the state prosecutors, communication that had previously been lacking regarding other significant issues relating to Epstein.  Villafaña and Sloman's hastily arranged effort to enlist in the notification process PBPD Chief Reiter, who likely played little role in complying with the state's victim notification obligations in a typical case, was not an adequate substitute for careful planning and coordination with the State Attorney's Office.[426]

Even if the State Attorney's Office had notified all of the identified victims of the upcoming plea hearing, there was no guarantee that such notification would have included information that the state plea was resolving not just the state's investigation of Epstein, but the federal investigation as well.  The State Attorney was not obligated by state statutes to inform the victims of the status of the federal investigation, and there was little reason to assume Krischer, or one of his staff, would voluntarily do so, thereby putting the State Attorney's Office in the position of fielding victim questions and concerns about the outcome.  Furthermore, as both the USAO and the defense had differing views as to who could lawfully participate in the state plea hearing, there is no indication that Acosta, Sloman, or Villafaña took steps to confirm that, if victims appeared, they could actually participate in the state court proceeding when they were not victims of the charged crimes.[427]

Through counsel, Acosta asserted to OPR that because Villafaña and Sloman both told OPR that they believed that state officials would notify the victims, "OPR identified no reason why Secretary Acosta should have distrusted his team on these points."  Acosta's counsel further

---

[425]     Krischer told OPR that the state's notification obligation extended to all victims identified in the state investigation.  Nonetheless, which victims were encompassed in the state's investigation was unclear.  The PBPD's probable cause affidavit included crimes against only 5 victims, not the 19 identified in the state investigation.  According to state records made public, the state subpoenaed to the grand jury only 3 victims.  After Epstein's guilty plea, the state sent notification letters to only 2 victims.  Belohlavek told OPR that because of the nature of the charges, she did not know whether "technically under the law" the girls were "victims" she was required to notify of the plea hearing.

[426]     The State Attorney's Office had its own procedures and employees who handled victim notification, and Belohlavek told OPR that the Chief of the Police Department would not regularly play a role in the state victim notification process.

[427]     Although Villafaña's notes indicate that she researched Florida Statutes §§ 960.001 and 921.143 when she drafted unsent letters to victims in November and December 2007 inviting them to participate in the state plea hearing pursuant to those statues, the caselaw was not clear that all federal victims would have been allowed to participate in the state plea hearing.  In Lefkowitz's November 29, 2007 letter to Acosta, he argued that the statutes afforded a right to speak at a defendant's sentencing or to submit a statement only to the victims of the crime for which the defendant was being sentenced.  In April 2008, a Florida District Court of Appeal ruled against a defendant who argued that Florida Statute § 921.143(l) did not allow the testimony of the victim's relatives at the sentencing hearing.  The court ruled that § 921.143(l) "should not be read as limiting the testimony Rule 3.720(b) allows trial courts to consider at sentencing hearings."  *Smith v. State*, 982 So. 2d 69, 72 (Fla. Dist. Ct. App. 2008).

argued that Acosta should have been able to rely on his staff to accomplish the victim notification task, and thus had no responsibility to personally confirm that Chief Reiter would notify the victims of the hearing.[428]  Acosta is correct that under usual circumstances, USAO management played no role in the victim notification process; however, in this case, the issue of victim notification had been elevated from a rote administrative task to a major area of dispute with the defense.  Acosta personally involved himself by resolving the notification dispute with defense counsel in his December 19, 2007 letter.  Villafaña provided Acosta with a draft letter to state officials that would have opened a dialogue concerning the notification of all the victims identified in the federal investigation.  OPR found no evidence, however, that Acosta sent the letter or any similar communication to the State Attorney's Office or that he provided Villafaña and Sloman with instructions concerning victim notification other than those contained in his December 19, 2007 letter.  Having inserted himself into the notification process, Acosta had a responsibility to ensure that his expectation that the victims would be notified could be accomplished through the state process.

Many victims only learned of Epstein's state court pleas when they later received a letter from the USAO informing them that those pleas had resolved the federal investigation, and some victims only learned of the state court pleas and sentencing from the news media.  In the end, although Villafaña and Sloman hastily attempted to ensure victim notification through Chief Reiter, their effort was too little and too late to ensure that victims had the opportunity to attend the plea hearing or were given sufficient information about its significance to their own cases.[429]  Although Acosta may have conferred with others about the decision to defer the responsibility for notifying victims to the State Attorney, Acosta was responsible for choosing this course of action.  OPR concludes that under these unique circumstances, its criticisms are warranted because Acosta personally decided to change the process initiated by his staff, and although he expected that the federal victims would be notified, he did not take the necessary steps to ensure that they would be.  Acosta could have authorized disclosure of the plea hearing to victims, even if he did not believe the CVRA required it, to ensure that the victims identified in the federal investigation were aware of the state court proceeding.  Because the state pleas ended the federal investigation into Epstein's conduct, ensuring that the victims were notified of the state plea hearing would have been consistent with the Department's overarching commitment to treat victims with fairness, dignity, and sensitivity.  Acosta's failure to prioritize notification and coordinate communication about the

---

[428]    As noted, in his comments on OPR's draft report, Acosta's counsel strongly objected to OPR's finding of poor judgment with respect to victim notification, arguing that OPR "unwarrantedly applies a standard never before expected of any US Attorney," and inappropriately criticizes Acosta for "not personally confirming that the State Attorney had the information needed" to notify the victims and for "not personally confirming" that Chief Reiter had actually notified the victims.  For the reasons discussed, the issue is not whether Acosta "personally" took certain specific steps but that he stopped his staff from implementing a notification plan they had devised, and instead, shifted responsibility for notification to another entity while failing to consider how or even whether that entity would be able to accomplish the notification that Acosta expected to happen.

[429]    OPR notes that Villafaña contacted Reiter soon after the state plea hearing was scheduled, and the resulting window of time for Reiter to make any notifications was short.  Had the USAO coordinated with the State Attorney at some point in time closer to Acosta's December 19, 2007 letter and decision, the USAO could have ensured that the State Attorney had an appropriate notification process in place to act quickly when the hearing was scheduled and that issues concerning the victims' appearance at the hearing were appropriately considered by state authorities.  Similarly, if the USAO believed that Reiter should make the notifications, it could have coordinated with Reiter in the months that the matter was under review by the Department.

resolution of the case to ensure Epstein's victims were given an opportunity to attend the plea hearing, and to possibly speak about the impact of Epstein's crimes, presented a glaring contrast with Acosta's responsiveness to the demands of Epstein's attorneys, which included the unusual courtesy of allowing them to preview and respond to the USAO's draft victim notifications. This contrast added to the victims' perception that they had been treated unfairly, a view shared by the public.

Nothing in the documentary record suggests that Acosta thought through the issue of determining which victims would be notified by the state, or that he took any steps to ensure that all of the known federal victims received information about the state plea hearing. Instead, as with his decision to resolve the federal investigation through a state-based resolution, Acosta exercised poor judgment when he made critical decisions affecting the federal investigation and the victims, but also failed to consider the full consequences of those decisions or what was needed to implement them. Acosta's failure to consider these issues before simply leaving the responsibility for making notifications entirely to the State Attorney's discretion reflected poorly on the USAO and the Department as a whole. It left victims in the dark about an important proceeding that resolved the federal investigation, an investigation about which the USAO had communicated with victims for months. It also ultimately created the misimpression that the Department intentionally sought to silence the victims by keeping them uninformed about the NPA and the resulting state proceeding. Acosta failed to ensure that victims were afforded an opportunity to attend a hearing that was related to their own cases and thus failed to ensure that victims were treated with forthrightness and dignity.

## V. VILLAFAÑA DID NOT COMMIT PROFESSIONAL MISCONDUCT IN HER ORAL COMMUNICATIONS TO VICTIMS AND VICTIMS' ATTORNEYS, IN WHICH SHE DESCRIBED THE CASE AS "UNDER INVESTIGATION" BUT DID NOT DISCLOSE THE EXISTENCE OF THE NPA TO SOME VICTIMS

From September 24, 2007, when the NPA was signed, until after Epstein's June 30, 2008 state court plea, the case agents, acting under Villafaña's direction, directly informed only three victims that the government had signed an NPA and that, if Epstein complied with its terms, the federal investigation would be closed. During this time period, Villafaña and the case agents interacted with several victims and their attorneys, and Villafaña contacted victims' attorney Bradley Edwards to encourage him to attend the state court plea hearing, but she did not inform victims or Edwards of the NPA or the resolution of the federal investigation.

As described in Part One of this chapter, after the NPA was signed, the FBI case agent and co-case agent began notifying victims about the NPA.[430] After speaking to three victims, however, the FBI case agent became concerned that informing the victims about the NPA and the monetary damages provision would create potential impeachment material for the victims and the agent should Epstein breach the NPA and the case proceed to indictment and trial. As the case agent told OPR, "I would . . . have to testify that I told every one of these girls that they could sue Mr. Epstein for money, and I was not comfortable with that, I didn't think it was right." The case

---

[430]    Although Wild disputed that she was informed of the resolution of the federal case, the case agent's email to Villafaña from this time period reflects that at least one victim understood that the federal case was resolved and that she was unhappy with the resolution.

agent and Villafaña consulted with the USAO's Professional Responsibility Officer about the matter, and thereafter stopped notifying the victims about the NPA and their ability to pursue monetary damages according to its terms.

Villafaña advised Sloman by email of her concerns regarding the potential impeachment evidence, telling him, "One thing I am concerned about is that, if we [file charges] now, cross-examination will consist of- 'and the government told you that if Mr. Epstein is convicted, you are entitled to a large amount of damages right?'" Explaining the decision in her later CVRA declaration, Villafaña said that after Epstein's attorneys "complained that the victims were receiving an incentive to overstate their involvement with Mr. Epstein in order to increase their damages claims," she "concluded that informing additional victims could compromise the witnesses' credibility at trial if Epstein reneged on the agreement." Acosta was aware of these concerns as he referred to them in an August 2008 email, "[W]e also believed that contacting the victims would compromise them as potential witnesses. Epstein argued very forcefully that they were doing this for the money, and we did not want to discuss liability with them, which was [a] key part of [the] agree[ment]."

The case agents interviewed victims in October and November 2007, but did not inform them about the NPA.[431] On January 31, 2008, the FBI agents, Villafaña, and the CEOS Trial Attorney interviewed three victims, including Courtney Wild, and they interviewed at least one more victim the next day.[432] Wild and two others had been contacted by the FBI in the fall of 2007 and may have been informed about the resolution of the federal investigation.

Villafaña told OPR that during the January 31, 2008 interviews, she did not specifically tell the victims that "there was a signed non-prosecution agreement that had these terms." She stated that she would not use "terminology" such as "NPA" because "most people don't understand what that means." Instead, with respect to the three victims who, according to Villafaña, had been informed by the FBI about the resolution, she stated that "an agreement had been reached where [Epstein] was going to be entering a guilty plea, but it doesn't look [like] he intends to actually perform . . . [and] now it looks like this may have to be charged . . . and may have to go to trial." Villafaña recalled telling some victims that Epstein "was supposed to enter a plea in state court" that would end the investigation, but she did not recall distinguishing between the "federal investigation versus a state investigation." Villafaña told OPR she explained "the case was under investigation," she and the agents "were preparing . . . again" to file charges, and they hoped "that charges would be brought." An email from Villafaña to Sloman and Acosta during this time period reflects that she had such discussions with at least one victim interviewed on this date: "The second girl . . . was very upset about the 18 month deal she had read about in the paper. . . . [S]he would rather not get any money and have Epstein spend a significant time in jail." Villafaña, however, did not recall telling all of the victims interviewed at this time of the state plea; rather, she likely only told those who knew about the resolution from the FBI. In her own 2015 CVRA-case declaration, Wild stated that she "was not told about any [NPA] or any potential resolution of

---

[431]    FBI agents also interviewed victims in March and May of 2008, without prosecutors, and did not inform the victims of the NPA.

[432]    Two additional victims were scheduled to be interviewed on February 1, 2008, but the evidence is unclear as to whether the interviews occurred.

the federal investigation I was cooperating in.  If I had been told of a[n NPA], I would have objected."  Wild further stated in her declaration that, "Based on what the FBI had been telling me, I thought they were still investigating my case."

Neither the CEOS Trial Attorney nor the FBI case agent recalled the specifics of the victim interviews.  The FBI reports memorializing each interview primarily addressed the facts elicited from the victim regarding Epstein's abuse and did not describe any discussion about the status of the case or the victim's view about the prosecution of Epstein.[433]

When asked whether she was concerned that failing to tell victims about the NPA when she was interviewing them would mislead victims, as previously noted, Villafaña told OPR that she believed she and the agents were conducting an investigation because they continued "interviewing witnesses" and "doing all these things" to file charges and prepare for a federal trial. As Villafaña stated, "So to me, saying to a victim the case is now back under investigation is perfectly accurate."

Villafaña was also aware that some victims were represented by counsel in connection with civil lawsuits against Epstein, but did not proactively inform the victims' attorneys about the NPA. In a 2017 affidavit filed in the CVRA litigation, victims' attorney Bradley Edwards alleged that during telephone calls with Villafaña, he "asked very specific questions about what stage the investigation was in," and Villafaña replied that she could not answer his questions because the matter "was an on-going active investigation."  Edwards stated that Villafaña gave him "the impression that the Federal investigation was on-going, very expansive, and continuously growing, both in the number of identified victims and complexity."  Edwards also stated, "A fair characterization of each call was that I provided information and asked questions and Villafaña listened and expressed that she was unable to say much or answer the questions I was asking."

In her written response to OPR, Villafaña stated that she "listened more than [she] spoke" during her interactions with Edwards and that due to the "uncertainty of the situation" and the possibility of a trial, she "did not feel comfortable sharing any information about the case." Villafaña also told OPR that because of "all of these concerns and instructions that I had been given by Alex [Acosta] and Jeff [Sloman] not to disclose things further and not to have any involvement in victim notification," she felt "prohibited" from providing additional information to Edwards.

 Sloman told OPR that although neither the NPA terms nor the CVRA prevented the USAO from exercising its discretion to notify the victims, "[I]t was [of] concern that this was going to break down and . . . result in us prosecuting Epstein and that the victims were going to be witnesses and if we provided a victim notification indicating, hey, you're going to get $150,000, that's . . . going to be instant impeachment for the defense."[434]  Acosta told OPR that, because Epstein did

---

[433]        As noted above, the FBI agent's notes for one victim's interview reported that she wanted another victim to be prosecuted.

[434]        When asked why the USAO did not simply notify the victims of the change of plea hearing, Sloman responded that he "was more focused on the restitution provisions.  I didn't get the sense that the victims were overly interested in showing up . . . at the change of plea."

not plead guilty in October 2007 as the USAO expected, it was a "very open question" whether the case would go to trial, and Acosta thought that "where there is no legal requirement[,] [t]here has to be discretion to judge how much you can tell the victims and when."

Epstein's attorneys' conduct during the period between the signing of the NPA and Epstein's entry of his state guilty pleas illustrated the risk that Acosta, Sloman, and Villafaña all identified. As Epstein's counsel deposed victims related to the state court criminal charges and civil cases against Epstein, counsel suggested that the victims were motivated to testify against Epstein by the government's promises of financial gain. For example, during a February 20, 2008 state deposition of a victim, defense counsel asked her whether the federal prosecutors or FBI agents told her that she was entitled to receive money from Epstein.[435] In her 2017 declaration in the CVRA litigation, Villafaña identified that line of questioning as a motivating factor in the government's decision to stop notifying the victims about the potential for 18 U.S.C. § 2255 recovery.

On June 27, 2008, the Friday before Epstein's Monday, June 30, 2008 state court guilty plea hearing, Villafaña contacted Edwards to inform him about that upcoming hearing. Villafaña told OPR she "was not given authorization to contact" any victim's attorney other than Edwards about the scheduled state plea hearing.[436] In his 2017 affidavit prepared for the CVRA litigation, Edwards stated that Villafaña "gave the impression that she was caught off-guard herself that Epstein was pleading guilty or that this event was happening at all."

Edwards said in a 2016 court filing that Villafaña told him only that "Epstein was pleading guilty to state solicitation of prostitution charges involving other victims—not Mr. Edward's clients nor any of the federally-identified victims." Villafaña stated in her 2017 declaration that she "never told Attorney Edwards that the state charges involved 'other victims,' and neither the state court charging instrument nor the factual proffer limited the procurement of prostitution charge to a specific victim." Villafaña told OPR she "strongly encouraged [Edwards] and his clients to attend" the plea hearing but "could not be more explicit" because she was not "authorized by the Office to disclose the terms of the NPA." In his 2017 affidavit, Edwards acknowledged that "Villafaña did express that this hearing was important, but never told me why she felt that way." Edwards claimed that Villafaña's failure to inform him that the "guilty pleas in state court would bring an end to the possibility of federal prosecution pursuant to the plea agreement" resulted in his clients not attending the hearing. Edwards himself was out of town and not able to

---

[435]    As previously noted, the defense used Florida criminal procedure to depose potential federal victims to learn information concerning the federal investigation even though those individuals were not involved in the state prosecution. For example, in a March 2008 email, Villafaña informed her managers that she spoke to a victim who had received a subpoena "issued in connection with the state criminal case, which, as you know, doesn't involve most of the victims in our case (including the girl who was subpoenaed)." Villafaña further observed that because Epstein is "going to plead to the solicitation of adults for prostitution charge [in state court], [the act of subpoenaing the victim] seems to be a clear effort to find out about our case through the state case."

[436]    Villafaña's June 30, 2008 handwritten notes reflect that, at the time of Epstein's state court guilty plea, Villafaña was aware of the identities of a least five other attorneys representing Epstein's victims. In her written response to OPR, Villafaña stated, "I requested permission to make oral notifications to the victims regarding the upcoming change of plea, but the Office decided that victim notification could only come from a state investigator, and Jeff Sloman asked PBPD Chief Reiter to assist." On Saturday, June 28, 2008, Villafaña emailed Sloman to inform him that PBPD Chief Reiter "is going to notify victims about the plea." Sloman replied, "Good."

attend the hearing.  In his affidavit, Edwards asserted, "[T]here was no possible way I could have believed that this state plea could affect the federal investigation or the rights of my clients in that federal investigation."

In *Wild*, the Eleventh Circuit panel stated that the government "seemingly" deferred to Epstein's attorneys' requests not to notify the victims about the NPA, and that in sending the January and May 2008 FBI letters, the government's efforts "seem to have graduated from passive nondisclosure to (or at least close to) active misrepresentation."[437]  Although both the appellate court and district court focused on the FBI's letters for which OPR concludes that neither Villafaña, Sloman, nor Acosta was responsible, OPR considered the courts' analyses in evaluating whether similar representations Villafaña made to the victims whom she interviewed on January 31 and February 1, 2008, and to Edwards, were misleading.  Therefore, OPR considered whether Villafaña's statements that the matter was "under investigation" and her failure to inform all of the victims whom she interviewed or Edwards about the NPA violated FRPC 4-4.1(a), 4-8.4(c), or 4-8.4(d).

FRPC 4-4.1(a) prohibits an attorney from "knowingly mak[ing] a false statement of material fact or law to a third person" during the representation of a client.  The FRPC defines "knowingly" as "denot[ing] actual knowledge of the fact in question" and states that such knowledge may be "inferred from circumstances."[438]  The comment to FRPC 4-4.1 states that "[m]isrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements."  The comment references FRPC 4-8.4 "[f]or dishonest conduct that does not amount to a false statement."  Like FRPC 4-4.1(a), Rule 4-8.4(c) requires evidence that the attorney knew the statement in question was false.  Under FRPC 4-8.4(c), the intent requirement can be satisfied "merely by showing that the conduct was deliberate or knowing" and the "motive underlying the lawyer's conduct is not determinative; instead the issue is whether he or she purposefully acted."[439]  In *Feinberg*, the court concluded that the prosecutor violated FRPC 4-4.1 and 4-8.4(c) and (d) by deliberately making untruthful statements to a defense attorney, despite evidence that the prosecutor intended to help the defendant by making the statements.[440]  In this case, Villafaña was fully aware of the signed NPA when she interviewed the victims on January 31 and February 1, 2008, and when she spoke to Edwards on the telephone, but she did not inform them specifically of the signed NPA.  The question is whether this omission amounted to a knowing false statement or misrepresentation.

One difficulty is determining what Villafaña actually said during conversations that participants were asked to recall many years later.  With respect to three of the victims whom she interviewed in January and February 2008, Villafaña contended that she discussed the agreement with them, even if she did not specifically refer to it as the NPA or discuss all of its terms, and as

---

[437]     *Wild,* 955 F.3d at 1199-1200.

[438]     *See* R. Regulating Fla. Bar 4-Preamble: A Lawyer's Responsibilities, "Terminology."

[439]     *Florida Bar v. Schwartz*, 284 So. 3d 393, 396 (Fla. 2019) (citing *Florida Bar v. Berthiaume*, 78 So. 3d 503, 510 n.2 (Fla. 2011); *Florida Bar v. Riggs*, 944 So. 2d 167, 171 (Fla. 2006); *Florida Bar v. Smith*, 866 So. 2d 41, 46 (Fla. 2004)).

[440]     *Florida Bar v. Feinberg*, 760 So. 2d 933, 937-38 (Fla. 2000).

previously noted, there is some contemporaneous evidence supporting her assertion. Villafaña's mention of the agreement, even if not described in specific terms, would have been sufficient to apprise those victims of the status of the federal investigation.

Nevertheless, Villafaña did not recall discussing the NPA specifically or in general terms with other victims interviewed at that time, nor did she do so with Edwards or any other victim's attorney. OPR therefore considered whether the omission of information about the existence of the NPA during these interactions rose to the level of professional misconduct in violation of FRPC 4-4.1 or 4-8.4.[441]

OPR evaluated Villafaña's conduct in light of the comment to FRPC 4-4.1:

> A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements.

The victims and their attorneys were certainly not "opposing part[ies]" to the USAO, but the comment indicates that the rule recognizes that omissions made during discussions with third parties, even of relevant facts, are not always treated as false statements.

Here, the evidence does not show that Villafaña knowingly made an affirmative false statement to the victims or Edwards or that her omissions were "the equivalent of affirmative false statements" about material facts. First, Villafaña told OPR that she believed the investigation was ongoing and her statement to that effect truthful, and as discussed earlier in this Chapter, the evidence shows that Villafaña and the agents did continue to investigate the case until Epstein entered his guilty plea in state court in June 2008. Villafaña's email correspondence with her supervisors reflects her strong advocacy during that timeframe to declare Epstein in breach and to charge him. The evidence similarly does not show that Villafaña knowingly made any affirmative false statement to Edwards when she informed him of the state court plea, although she declined to provide additional information in response to his questions.[442]

Second, in reaching its conclusion, OPR considered the full context in which Villafaña interacted with the victims and Edwards. Prosecutors routinely make decisions about what information will be disclosed to witnesses, including victims, for a variety of strategic reasons. In many cases, prosecutors must make difficult decisions about providing information to witnesses,

---

[441]     In *Florida Bar v. Joy,* the court affirmed a referee's conclusion that Joy violated FRPCs 4-4.1(a) and 4-8.4(c) "for making false statements by omission of material facts in his representations [to counsel]." *Florida Bar v. Joy,* 679 So. 2d 1165, 1166-68 (Fla. 1996). *See also Florida Bar re Webster,* 647 So. 2d 816 (Fla. 1994) (petition for reinstatement denied due to "misrepresentation by omission").

[442]     In *Feinberg,* 760 So. 2d at 938, the court found that an Assistant State Attorney lacked candor and violated ethics rules when, after meeting with a defendant outside his attorney's presence, the prosecutor falsely stated to the defense attorney that he (the prosecutor) had not met with the defendant.

and they often cannot fully reveal either the facts or the status of an investigation, even with victims.  The 2005 Guidelines advise that in consulting with a victim, prosecutors may be limited in their disclosures:  "Because victims are not clients, may become adverse to the Government, and may disclose whatever they have learned from consulting with prosecutors, such consultations may be limited to gathering information from victims and conveying only nonsensitive data and public information."[443]

Villafaña's concern about generating potential impeachment evidence by informing victims of their potential to recover monetary damages from Epstein was not unreasonable. Indeed, the case agents initially raised the impeachment issue, and after considering the problem, Villafaña agreed with the agents' concerns.  Villafaña raised those concerns with the USAO's Professional Responsibility Officer in October 2007 after the agents brought the issue to her attention, and she ultimately raised the issue with Sloman and Acosta as well, neither of whom advised her that those concerns were improper or unsound.  OPR also considered that although Villafaña had sought to notify the victims in writing of the NPA soon after it was signed, her supervisor, the U.S. Attorney, had decided otherwise.  When authorized to inform Edwards of the scheduled change of plea hearing, she did so.  Although she did not inform Edwards that the plea was part of a global resolution that would end the federal investigation, the evidence does not show that Villafaña acted for the purpose of deceiving Edwards or preventing him from attending the hearing.  Had she sought to exclude him from the state proceedings, she could have elected not to inform Edwards at all, or she could have discouraged him from attending the state proceedings. Rather, as Edwards confirmed, Villafaña told him the hearing was "important."  Villafaña sought to strike a difficult balance of securing Edwards's (and his clients') attendance at the state court plea, while obeying her management's directive that informing victims of the resolution of the federal investigation should not be done until completion of the state plea.

Therefore, after carefully considering all of the circumstances, OPR concludes that the evidence does not establish that Villafaña violated her obligations under FRPC 4-4.1 or 4-8.4(c) or (d).[444]  Nonetheless, as discussed below, Villafaña's interactions with victims and victims' attorneys without informing them of the NPA and the potential conclusion of the federal investigation contributed to the likelihood that the victims would feel that the government was

---

[443]     2005 Guidelines, Art. IV, ¶ B.2.c(1).  As noted, some victims continued to express favorable views of Epstein during interviews with the government and they, or their attorneys, could have provided information to Epstein about the government's communications.  For example, within a day of Villafaña contacting a victim's attorney about a potential victim notification letter, Starr complained to Acosta that the government had recently inappropriately provided "oral notification of the victim notification letter" to one girl's attorney, even though it was clear from the girl's recorded FBI interview that she "did not in any manner view herself as a victim."

[444]     The case most directly on point is *Smith*, 109 A.3d 1184, in which the Maryland Court of Appeals affirmed a violation of Maryland Rule of Professional Conduct 8.4(d) based on a prosecutor's failure to notify the victim of the resolution of a sex abuse case.  However, as noted previously, in *Smith*, the criminal defendant had been arrested and charged before entering a plea, and various specific statutes afforded victims the right to receive notices and an opportunity to be heard concerning "a case originating by indictment or information in a circuit court."  In this case, for the reasons previously discussed, Villafaña did not have a clear and unambiguous obligation to inform the victims or Edwards of the NPA.

intentionally concealing information from them and was part of a series of interactions with victims that led to condemnation of the government's treatment of victims.[445]

## VI.   THE GOVERNMENT FAILED TO TREAT VICTIMS FORTHRIGHTLY AND WITH SENSITIVITY WHEN IT FAILED TO TIMELY PROVIDE VICTIMS WITH IMPORTANT INFORMATION ABOUT THE RESOLUTION OF THE FEDERAL INVESTIGATION

Although OPR does not conclude that any of the subjects committed professional misconduct, either by failing to consult with the victims before the NPA was signed or in interactions afterwards, OPR's findings are not an endorsement of the government's course of action.  The government's interactions with victims confused and frustrated many of the victims, particularly the two CVRA petitioners and the two victims who had unsuccessfully attempted to join in the CVRA litigation.  As a result, the victims' and the public's perception of the matter is that the prosecutors worked with Epstein's attorneys to disenfranchise and silence the victims.  It is unfortunate, and appears fundamentally unfair to the victims, that Acosta and Sloman (after Menchel and Lourie departed) took the unusual step of deciding to vet the USAO victim notification letters with the defense after the NPA was signed, but failed to go beyond the requirements of the CVRA or the 2005 Guidelines to consult with the victims before the NPA was signed.  This result is contrary to the Department's intent, as set forth in the 2005 Guidelines, that Department employees work to "minimize the frustration and confusion that victims of crime endure in its wake."  When considering the entirety of the government's interactions with victims, OPR concludes that victims were not treated with the forthrightness and sensitivity expected by the Department.

Wild's criticisms of the government's conduct were based on interactions that are similar to and generally representative of the government's interactions with other Epstein victims and that demonstrate an overall lack of sensitivity to the victims by the government.  Wild experienced a series of confusing and inconsistent communications in her interactions with Villafaña and the case agents.  Wild received Villafaña's letter in June 2007 stating inaccurately that she was a federal victim entitled to CVRA rights.  She was interviewed by the FBI in August 2007 but was not told that a potential outcome was a state plea.  Shortly after the September 24, 2007 signing of the NPA, the FBI contacted her to inform her of the resolution of the federal case.  Nonetheless, on January 10, 2008, the FBI sent her a victims' rights letter indicating that the case was under investigation and that some of her CVRA rights may not apply until after the defendant was charged.  On January 31, 2008, Villafaña re-interviewed Wild, along with a CEOS attorney and the FBI agents, and told Wild that the case was under investigation, but did not specifically mention the NPA, although she may have mentioned a possible resolution.  In mid-June 2008, when Edwards contacted Villafaña on Wild's behalf, Villafaña informed him that the case was under investigation but did not mention the NPA.  Just before Epstein's June 30, 2008 state court plea,

---

[445]     OPR notes that, similar to Villafaña, Sloman interacted with a victim's attorney during the time period between the signing of the NPA and Epstein's state guilty plea.  In January 2008, Sloman received a telephone call from his former law partner, who represented one of the victims and who asked Sloman whether the federal government could bring charges against Epstein.  Sloman, concerned about the potential for conflict of interest allegations due to his prior business relations with the attorney, refused to answer any questions regarding Epstein. Because Sloman refused to provide any information, OPR found no basis for finding that Sloman misled the attorney.

Villafaña informed Edwards about the state plea, but did not mention the NPA or the fact that the state pleas would resolve the federal investigation.  Edwards then filed the CVRA petition and learned about the NPA signed months earlier and that the federal investigation of Epstein had concluded with Epstein's state guilty pleas.  Wild only received access to the NPA when a judge permitted it in August 2008 pursuant to a protective order.  After considering this series of interactions, it is not surprising that Wild came away from the experience feeling confused and believing she had been misled.

OPR did not find evidence supporting a conclusion that Villafaña, Acosta, Sloman, Menchel, or Lourie opted not to consult with the victims in order to protect Epstein or shield the NPA from public scrutiny.  Although neither Sloman nor Acosta could recall a specific discussion of CVRA obligations before the NPA was signed, both recalled knowing that victim consultation was not required, and Menchel also told OPR that consultation was not required, at least not up to the point when he left the USAO.  The evidence is clear that Villafaña sought at various points to consult with and to notify victims about the details of the NPA but was constrained before the NPA was signed by managers who either made a decision to not consult victims or did not address the issue after it was raised, and after the signing by her own concern about creating possible impeachment evidence that would damage the victims' credibility at a possible trial.

Nonetheless, a more open and straightforward approach with the victims, both before and after the signing of the NPA, would have been the better practice.  Before the NPA was signed, victims could have been asked for their views about the general terms the USAO was contemplating offering, including that a plea to state charges was one of the options being considered; asked for their views in general about a guilty plea; or, at a minimum, asked to share their views of how the case should be resolved.  Even if the USAO ultimately determined to proceed with the NPA, the government would have had the benefit of the victims' thoughts and concerns, particularly on the issue of punishment, and victims would have felt included in the process.  OPR found no evidence that the benefits of victim consultation were discussed or considered before the NPA was signed.

After the NPA was signed, no one from the government explained the agreement to the majority of the victims until months later and only after the entry of Epstein's guilty plea.  Although the evidence supports Villafaña's assertion that she acted from a good faith belief that Epstein might breach the NPA and a potential trial would be harmed if information about the NPA was divulged to the victims and their counsel, she, Sloman, and Acosta failed to consider how the desire to shield the victims from that potential impeachment might impact the victims' sense of the openness and fairness of the process.  As Wild stated during the CVRA litigation, she believed she had been "mistreated in the process."  When deciding not to inform the victims of the NPA to avoid creating impeachment evidence, Villafaña, Sloman, and Acosta do not appear to have carefully considered possible alternatives to, or all of the ramifications of, that decision, nor did they revisit the decision before Villafaña met the victims in person to discuss a potential trial or spoke to Edwards or other attorneys representing victims.[446]  Furthermore, more attention needed

---

[446]     It is not at all clear whether a court would have permitted impeachment of the victims concerning one provision in a plea agreement that otherwise could not be used as evidence.  *See* Fed. R. Crim. P. 11(f) ("The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410.").  In any case, the victims could have been impeached regarding the possibility of their obtaining monetary damages through either a civil suit or through 18 U.S.C. § 2255 (if Epstein were convicted after a trial),

to be paid to the FBI's communications to ensure that the victims were receiving accurate and timely information that was consistent with the status of the case and with the USAO's communications with victims.[447]

The decision not to inform victims and their attorneys about the existence of the NPA gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the agreement secret from the victims. Moreover, the lack of openness about the NPA gave the impression that the USAO lacked sensitivity for the victims in resolving the matter and undercut public confidence in the legitimacy of the resulting plea agreement. The overall result of the subjects' anomalous handling of this case left at least some of the victims feeling ignored and frustrated, failed to promote their healing process, and resulted in extensive public criticism. Although OPR credits Villafaña's statements that she wanted to go beyond her obligations in dealing with victims, the end result nonetheless was that communications with victims were not prioritized by the USAO. In part this was due to the fact that interactions with victims are generally handled by staff in the USAO and the FBI who are trained and have expertise in dealing with victims and other witnesses. However, decisions made by Acosta, Sloman, and Villafaña also contributed to the problems. The government, as it ultimately acknowledged in the CVRA litigation, could have, and should have, engaged with the victims in a more transparent and unified fashion.

OPR recognizes that the Epstein investigation occurred soon after the passage of the CVRA. In the years since, the Department's prosecutors and personnel have become more familiar with its provisions. OPR encourages the Department as a whole to take the issues discussed above into account when providing training and direction to its employees regarding victims' rights to ensure that in the future, Department attorneys' actions promote victim inclusion whenever possible.[448] For example, although the division of responsibility between the FBI and the USAO for communicating with victims works efficiently and appropriately in the average case, the USAO failed to consider that in a case involving a pre-charge disposition, the victims were receiving inconsistent and confusing communications from the separate entities. In certain cases, such as the Epstein case, prosecutors may need to provide more oversight when multiple Department components are communicating with victims to avoid providing confusing and contradictory messages.

---

independent of the NPA provision. OPR also notes that impeachment regarding the NPA provision may have permitted the government to rehabilitate the victims through their prior statements to law enforcement. In other words, while the USAO's view concerning potential impeachment was not unreasonable, more extensive consideration of the case agent's concerns might have led the prosecutors to conclude that the risk of the information being used to significantly damage the credibility of the victims was low.

[447]     In addition to the FBI letters previously discussed, another example of the inconsistent communication can be seen in letters that were to be sent after Epstein entered his guilty plea to two victims residing in foreign countries. Although OPR was unable to confirm that the two victims actually received the letters, it appears from the records OPR reviewed that the government intended to provide them with a standard FBI letter stating that the case was under investigation while also providing them with a USAO letter stating that the case had been resolved through Epstein's state guilty plea.

[448]     OPR understands that the Department is in the process of revising the 2011 Guidelines.

**SA-309**

## CONCLUSION

In November 2018, the *Miami Herald* published an extensive investigative report about state and federal criminal investigations initiated more than 12 years earlier into allegations that Jeffrey Epstein, a wealthy financier with residences in Florida, New York, and other United States and foreign locations, had coerced girls into engaging in sexual activity with him at his Palm Beach, Florida estate. The *Miami Herald* reported that in 2007, the U.S. Attorney for the Southern District of Florida, R. Alexander Acosta, entered into an "extraordinary" deal with Epstein that permitted Epstein to avoid federal prosecution and a potentially lengthy prison sentence by pleading guilty in state court to "two prostitution charges," immunized from prosecution Epstein's co-conspirators, and concealed from Epstein's victims the terms of the NPA.

Following the *Miami Herald's* report, and after receiving a Congressional request to investigate, OPR initiated an investigation into the allegations that prosecutors in the USAO improperly resolved the federal investigation into the criminal conduct of Jeffrey Epstein by negotiating and executing the NPA. OPR subsequently included in its investigation allegations stemming from judicial criticism of the government's conduct relating to federal prosecutors' and law enforcement agents' interactions with Epstein's victims. In July 2008, a victim, later joined by a second victim, filed in federal court in the Southern District of Florida an emergency petition for enforcement of her rights under the CVRA. In February 2019, the district court found that the government violated the CVRA by failing to advise victims about its intention to enter into the NPA. The court also found that letters the government sent to victims after the NPA was signed, describing the investigation as ongoing, were misleading.

During the course of its investigation, OPR obtained and reviewed hundreds of thousands of records from the USAO, the FBI, and other Department of Justice components. The records included emails, letters, memoranda, and investigative materials. OPR also collected and reviewed materials relating to the state investigation and prosecution of Epstein, including sealed pleadings, grand jury transcripts, and grand jury audio recordings; examined extensive publicly available information, including depositions, pleadings, orders, and other court records; and reviewed media reports and interviews, articles, podcasts, and books relating to the Epstein case. OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel; current and former USAO staff and attorneys; current and former Department attorneys and senior managers; and the former State Attorney and Assistant State Attorney in charge of the state investigation of Epstein. OPR also interviewed or received written information from several victims and attorneys representing victims concerning victim contacts with the USAO and federal law enforcement.

OPR identified the following five former USAO attorneys as subjects of its investigation based on information indicating that each of them was involved in the decision to resolve the case through the NPA or in the negotiations leading to the agreement: former U.S. Attorney R. Alexander Acosta, and former AUSAs Jeffrey H. Sloman, Matthew I. Menchel, Andrew C. Lourie, and Ann Marie C. Villafaña. Each subject submitted written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation. OPR conducted extensive interviews of all five subjects. The subjects also submitted comments on OPR's draft report.

OPR evaluated the conduct of each subject based on his or her individual role in various decisions and events and assessed that conduct pursuant to OPR's analytical framework. OPR found that Acosta made the pivotal decision to resolve the federal investigation of Epstein through a state-based plea and either developed or approved the terms of the initial offer to the defense that set the beginning point for the subsequent negotiations that led to the NPA. Although Acosta did not sign the NPA, he participated in its drafting and approved it, with knowledge of its terms. Therefore, OPR considers Acosta to be responsible for the NPA and for the actions of the other subjects who implemented his decisions.

Based on its extensive investigation, OPR concludes that the subjects did not commit professional misconduct with respect to the development, negotiation, and approval of the NPA. Under OPR's framework, professional misconduct requires a finding that a subject attorney intentionally or recklessly violated a clear and unambiguous standard governing the conduct at issue. OPR found no clear and unambiguous standard that required Acosta to indict Epstein on federal charges or that prohibited his decision to defer prosecution to the state. Furthermore, none of the individual terms of the NPA violated Department or other applicable standards.

As the U.S. Attorney, Acosta had the "plenary authority" under established federal law and Department policy to resolve the case as he deemed necessary and appropriate, as long as his decision was not motivated or influenced by improper factors. Acosta's decision to decline to initiate a federal prosecution of Epstein was within the scope of his authority, and OPR did not find evidence that his decision was based on corruption or other impermissible considerations, such as Epstein's wealth, status, or associations. Evidence shows that Acosta resisted defense efforts to have the matter returned to the state for whatever result state authorities deemed appropriate, and he refused to eliminate the incarceration and sexual offender registration requirements. OPR did not find evidence establishing that Acosta's "breakfast meeting" with one of Epstein's defense counsel in October 2007 led to the NPA, which had been signed weeks earlier, or to any other significant decision that benefited Epstein. The contemporaneous records show that USAO managers' concerns about legal issues, witness credibility, and the impact of a trial on the victims led them to prefer a pre-charge resolution and that Acosta's concerns about the proper role of the federal government in prosecuting solicitation crimes resulted in his preference for a state-based resolution. Accordingly, OPR does not find that Acosta engaged in professional misconduct by resolving the federal investigation of Epstein in the way he did or that the other subjects committed professional misconduct through their implementation of Acosta's decisions.

Nevertheless, OPR concludes that Acosta's decision to resolve the federal investigation through the NPA constitutes poor judgment. Although this decision was within the scope of Acosta's broad discretion and OPR does not find that it resulted from improper factors, the NPA was a flawed mechanism for satisfying the federal interest that caused the government to open its investigation of Epstein. In Acosta's view, the federal government's role in prosecuting Epstein was limited by principles of federalism, under which the independent authority of the state should be recognized, and the federal responsibility in this situation was to serve as a "backstop" to state authorities by encouraging them to do more. However, Acosta failed to consider the difficulties inherent in a resolution that relied heavily on action by numerous state officials over whom he had no authority; he resolved the federal investigation before significant investigative steps were completed; and he agreed to several unusual and problematic terms in the NPA without the consideration required under the circumstances. In sum, Acosta's application of federalism

284

principles was too expansive, his view of the federal interest in prosecuting Epstein was too narrow, and his understanding of the state system was too imperfect to justify the decision to use the NPA.  Furthermore, because Acosta assumed a significant role in reviewing and drafting the NPA and the other three subjects who were supervisors left the USAO, were transitioning to other jobs, or were absent at critical junctures, Acosta should have ensured more effective coordination and communication during the negotiations and before approving the final NPA.  The NPA was a unique resolution, and one that required greater oversight and supervision than Acosta provided.

OPR further concludes that none of the subject attorneys committed professional misconduct with respect to the government's interactions with victims.  The subjects did not intentionally or recklessly violate a clear and unambiguous duty under the CVRA by entering into the NPA without consulting with victims, because the USAO resolved the Epstein investigation without a federal criminal charge.  Significantly, at the time the NPA was signed, the Department did not interpret CVRA rights to attach unless and until federal charges had been filed, and the federal courts had not established a clear and unambiguous standard applying the CVRA before criminal charges were brought.  In addition, OPR did not find evidence that the lack of consultation was for the purpose of silencing victims.  Nonetheless, the lack of consultation was part of a series of government interactions with victims that ultimately led to public and court condemnation of the government's treatment of the victims, reflected poorly on the Department as a whole, and is contradictory to the Department's mission to minimize the frustration and confusion that victims of a crime endure.

OPR determined that none of the subjects was responsible for communications sent to certain victims after the NPA was signed that described the case as "under investigation" and that failed to inform them of the NPA.  The letters were sent by an FBI administrative employee who was not directly involved in the investigation, incorporated standard form language used by the FBI when communicating with victims, and were not drafted or reviewed by the subjects.  Moreover, the statement that the matter was "under investigation" was not false because the government in fact continued to investigate the case in anticipation that Epstein would not fulfill the terms of the NPA.  However, the letters risked misleading the victims and contributed to victim frustration and confusion by failing to provide important information about the status of the investigation.  The letters also demonstrated a lack of coordination between the federal agencies responsible for communicating with Epstein's victims and showed a lack of attention to and oversight regarding communication with victims.

After the NPA was signed, Acosta elected to defer to the State Attorney the decision whether to notify victims about the state's plea hearing pursuant to the state's own victim's rights requirements.  Although Acosta's decision was within his authority and did not constitute professional misconduct, OPR concludes that Acosta exercised poor judgment when he failed to make certain that the state intended to and would notify victims identified through the federal investigation about the state plea hearing.  His decision left victims uninformed about an important proceeding that resolved the federal investigation, an investigation about which the USAO had communicated with victims for months.  It also ultimately created the misimpression that the Department intentionally sought to silence the victims.  Acosta failed to ensure that victims were made aware of a court proceeding that was related to their own cases, and thus he failed to ensure that victims were treated with forthrightness and dignity.

**SA-312**

OPR concludes that the decision to postpone notifying victims about the terms of the NPA after it was signed and the omission of information about the NPA during victim interviews and conversations with victims' attorneys in 2008 do not constitute professional misconduct. Contemporaneous records show that these actions were based on strategic concerns about creating impeachment evidence that Epstein's victims had financial motives to make claims against him, evidence that could be used against victims at a trial, and were not for the purpose of silencing victims.   Nonetheless, the failure to reevaluate the strategy prior to interviews of victims and discussions with victims' attorneys occurring in 2008 led to interactions that contributed to victims' feelings that the government was intentionally concealing information from them.

After examining the full scope and context of the government's interactions with victims, OPR concludes that the government's lack of transparency and its inconsistent messages led to victims feeling confused and ill-treated by the government; gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the NPA secret from the victims; and undercut public confidence in the legitimacy of the resulting agreement.   The overall result of the subjects' anomalous handling of this case understandably left many victims feeling ignored and frustrated and resulted in extensive public criticism.   In sum, OPR concludes that the victims were not treated with the forthrightness and sensitivity expected by the Department.

# METHODOLOGY

### A.     Document Review

As referenced in the Executive Summary, OPR obtained and reviewed hundreds of thousands of pages of documents from the U.S. Attorney's Office for the Southern District of Florida (USAO), other U.S. Attorney's offices, the FBI, and other Department components, including the Office of the Deputy Attorney General, the Criminal Division, and the Executive Office for U.S. Attorneys (EOUSA).  The categories of documents reviewed by OPR, and their sources, are set forth below.

### 1.     USAO Records

The USAO provided OPR with access to all of its records from its handling of the Epstein investigation and the CVRA litigation.  The records included, but were not limited to, boxes of material that Villafaña updated and maintained through the course of both actions, which contained pleadings from the Epstein investigation, the CVRA litigation, and other related cases; extensive compilations of internal and external correspondence, including letters and emails; evidence such as telephone records, FBI reports, material received from the state investigation, and other confidential investigative records; court transcripts; investigative transcripts; prosecution team handwritten notes; research material; and draft and final case documents such as the NPA, prosecution memoranda, and federal indictments.

The USAO also provided OPR with access to filings, productions, and privileged material in the CVRA litigation; Outlook data collected to respond to production requests in that case; a set of Epstein case documents maintained by Acosta and Sloman; computer files regarding the Epstein case collected by Sloman; Villafaña's Outlook data; Acosta's hard drive; and the permanently retained official U.S. Attorney records of Acosta held by the Federal Records Center.

### 2.     EOUSA Records

EOUSA provided OPR with Outlook data from all five subjects and six additional witnesses.  This information, dating back to 2005, included all inbox, outbox, sent, deleted, and saved emails, and calendar entries that it maintained.  EOUSA provided OPR with over 850,000 Outlook records in total (not including email attachments or excluding duplicate records).  OPR identified key time periods and fully reviewed those records.  OPR applied search terms to the remainder of the records and reviewed any responsive documents.

After reviewing the emails, OPR identified a data gap in Acosta's email records:  his inbox contained no emails from May 26, 2007, through November 2, 2008.  This gap, however, was not present with respect to Acosta's sent email.  OPR requested that EOUSA investigate.  During its investigation, EOUSA discovered a data association error that incorrectly associated Acosta's data with an unrelated employee who had a similar name.  Once the data was properly associated, EOUSA found and produced 11,248 Acosta emails from April 3, 2008, through the end of his tenure at the USAO.  However, with respect to the remaining emails, EOUSA concluded that the emails were not transferred from the USAO when, in 2008 and 2009, Outlook data for all U.S.

Attorney's Offices was migrated to EOUSA's centralized system to be maintained.  The USAO's data was migrated between March and June 2008.

EOUSA and OPR separately confirmed with the USAO that it was unable to locate any additional emails.  OPR questioned Acosta, as well as numerous administrative staff, about the email gap.  Acosta and the witnesses denied having any knowledge of the problem, or that they or, to their knowledge, anyone else made any efforts to intentionally delete the emails.  In addition, at OPR's request, EOUSA conducted an analysis of records migrated from four other U.S. Attorney's Offices and found that each office provided data that also contained significant gaps in their U.S. Attorney email records, although the time periods varied for each office.  OPR found no evidence indicating that the gap in Acosta's emails was caused by any intentional act or for the purpose of concealing evidence relating to the Epstein investigation and concludes that it was most likely the result of a technological error.

Although a gap in Acosta's email inbox from May 26, 2007, through April 2, 2008, remained, OPR was nonetheless able to examine a significant number of Acosta's emails from this time due to the extensive case files kept by the USAO; the availability of Acosta's sent email, which did not contain a similar gap; and the availability of emails of other USAO subjects and witnesses who were included on emails with Acosta.

### 3.      Federal Bureau of Investigation Records

OPR worked with the FBI's Palm Beach Office, including with two case agents and the Victim Witness Specialist who worked on the Epstein matter, to obtain relevant FBI documents. In addition, the FBI searched its Automated Case Support system and also provided documentation concerning its victim notification system.

### 4.      Criminal Division Records

The Office of the Assistant Attorney General for the Criminal Division provided OPR with Outlook data for the four individuals from that Office who examined issues connected to the USAO's Epstein investigation.  The data included the individuals' inbox, outbox, sent, deleted, and saved emails, and calendar entries.

CEOS also provided OPR with Outlook data for the four individuals from that office who worked on, or examined issues connected to, the USAO's Epstein investigation.  The data included the individuals' inbox, outbox, sent, deleted, and saved emails.  CEOS also conducted a check of its shared hard drive and provided documents that were potentially relevant to OPR's investigation.

### 5.      Office of the Deputy Attorney General Records

OPR obtained Outlook data for the three individuals from the Office of the Deputy Attorney who examined issues connected to the USAO's Epstein investigation, including the former Deputy Attorney General.  The data included the individuals' inbox, outbox, sent, deleted, and saved emails, and calendar entries.

6.      **U.S. Attorney's Office for the Middle District of Florida Records**

The U.S. Attorney's Office for the Middle District of Florida provided OPR with records related to its review of evidence against Epstein, after he concluded his Florida state sentence, when the Department recused the USAO in August 2011 from "all matters, to include the investigation and potential prosecution, relating to Jeffrey Epstein's alleged sexual activities with minor females," and assigned the matter to the Middle District of Florida U.S. Attorney's Office for further consideration.  The records included a declination of the matter due to the NPA.

7.      **U.S. Attorney's Office for the Northern District of Georgia Records**

The U.S. Attorney's Office for the Northern District of Georgia provided OPR with records related to its work on the CVRA litigation after the recusal of the USAO.

8.      **Public Records**

OPR obtained and reviewed a variety of public records, including publicly released records of the Palm Beach Police Department, the State Attorney's Office for the 15th Judicial Circuit, and the Palm Beach Sheriff's Office; documents pertaining to the CVRA litigation and other court proceedings involving Epstein and related individuals; and books and media reports.

B.      **Information from Subjects, Witnesses, and Victims**

1.      **Subjects**

OPR requested that all five subjects provide written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation.  In addition, OPR conducted extensive interviews of each subject under oath and before a court reporter.  Each subject was represented by counsel and had access to relevant contemporaneous documents before the subject's OPR interview.  The subjects reviewed and provided comments on their interview transcripts and on OPR's draft report.

2.      **Witnesses**

OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel.  OPR interviewed current and former USAO staff and attorneys and current and former Department attorneys and senior managers, including former Deputy Attorney General Mark Filip and former Assistant Attorney General for the Criminal Division Alice Fisher.  OPR also interviewed former State Attorney Barry Krischer and former Assistant State Attorney Lanna Behlolovick.

3.      **Communications with Victims and Victims' Attorneys**

OPR contacted attorneys known to represent 26 victims among the 30 surviving individuals who were identified in the USAO's July 2008 listing of 32 victims the USAO was prepared to include in federal charges against Epstein and who accordingly were entitled to the benefits of the 18 U.S.C. § 2255 monetary damages provision of the NPA.  OPR contacted the attorneys to invite

**SA-316**

the victims to provide OPR with information regarding their contacts with, and notification received from, the FBI and USAO, during the period before the NPA was signed or before Epstein's state plea hearing, about the status of the federal investigation, about Epstein's state plea, or about the NPA. OPR received information from or pertaining to 13 victims.

**SA-317**

# EXHIBIT 1

# State Indictment

SA-318

[Page Intentionally Left Blank]

**SA-319**

# INDICTMENT

A TRUE BILL   06-9454 CF
A-2

## IN THE NAME OF AND BY THE AUTHORITY OF THE STATE OF FLORIDA

### IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL
### CIRCUIT OF THE STATE OF FLORIDA

For Palm Beach County, at the Spring Term thereof, in the year of our Lord Two Thousand and Six, to-wit:

The Grand Jurors of the State of Florida, inquiring in and for the body of said County of Palm Beach, upon their

oaths do present that JEFFREY E. EPSTEIN in the County of Palm Beach aforesaid, in the Circuit and State

aforesaid,

### COUNT ONE
### FELONY SOLICITATION OF PROSTITUTION

on or about or between the 1st day of August in the year of our Lord Two Thousand and Four and October 31,

2005, did solicit, induce, entice, or procure another to commit prostitution lewdness, or assignation, contrary to

Florida Statute 796.07(1) on three or more occasions between August 01, 2004 and October 31, 2005,

contrary to Florida Statute 796.07(2)(f) and (4)(c).  (3 DEG FEL)(LEVEL 1)

against the form of the statute, to the evil example of all others, and against the peace and dignity of the State

of Florida.

I hereby certify that I have advised the Grand Jury returning this indictment as authorized and required by law.

STATE OF FLORIDA
I hereby certify that the
foregoing is a true copy
for the record in my office.

THIS _____ DAY OF _____, 20___
SHARON R. BOCK
CLERK & COMPTROLLER

BY _____
DEPUTY CLERK

_____
Assistant State Attorney of the
Fifteenth Judicial Circuit of the State
of Florida, prosecuting for the said
State

_____
GRAND JURY FOREPERSON

July 19, 2006
_____
DATE

Jeffrey E. Epstein, Race: White, Sex: Male, DOB: ████████   SS#: ████████ ; Issue Warrant

**SA-320**

[Page Intentionally Left Blank]

**SA-321**

# EXHIBIT 2

## September 6, 2007
## Draft Non-Prosecution
## Agreement

**SA-322**

[Page Intentionally Left Blank]

**SA-323**

IN RE:
**INVESTIGATION OF**
**JEFFREY EPSTEIN**
_____/

## NON-PROSECUTION AGREEMENT

IT APPEARING that Jeffrey Epstein (hereinafter "Epstein") is reported to have committed offenses against the United States from in or around 2001 through in or around October 2005, including:

    (1)    knowingly and willfully conspiring with others known and unknown to commit an offense against the United States, that is, to use a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); all in violation of Title 18, United States Code, Section 371;

    (2)    knowingly and willfully conspiring with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females, in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code, Section 2423(e);

    (3)    using a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution; in violation of Title 18, United States Code, Sections 2422(b) and 2;

    (4)    traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females; in violation of Title 18, United States Code, Section 2423(b); and

    (5)    knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act as defined in 18 U.S.C. § 1591(c)(1); in violation of Title 18, United States Code, Sections 1591(a)(1) and 2; and

IT APPEARING that Epstein has accepted responsibility for his behavior by his

signature on this Agreement; and

IT APPEARING, after an investigation of the offenses and Epstein's background, that the interest of the United States and Epstein's own interest and the interest of justice will be served by the following procedure;

THEREFORE, on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set out below.

Should Epstein violate any of the conditions of this Agreement, the United States Attorney may at any time initiate prosecution against Epstein for any offense.  In this case, the United States Attorney will furnish Epstein with notice specifying the conditions of the Agreement which he has violated.

After timely fulfilling all the terms and conditions of the Agreement, no prosecution for the offenses set out on page 1 of this Agreement will be instituted in this District, and the charges against Epstein if any, will be dismissed.

Neither this Agreement nor any other document filed with the United States Attorney as part of this Agreement will be used against Epstein, except for impeachment purposes, in connection with any prosecution for the above-described offenses.

Terms of the Agreement:

1.    Epstein shall plead guilty (not nolo contendere) to an Information filed by the State Attorney's Office for the 15th Judicial Circuit in and for Palm Beach County (hereinafter, the "State Attorney's Office") charging violations of the following Florida Statutes:

(a)    lewd and lascivious battery on a child, in violation of Fl. Stat. 800.04(4);

(b)    solicitation of minors to engage in prostitution, in violation of Fl. Stat. 796.03; and

(c)    engaging in sexual activity with minors at least sixteen years of age, in violation of Fl. Stat. 794.05.

2.    Epstein and the State Attorney's Office shall make a joint, binding recommendation that Epstein serve at least two years in prison, without any opportunity for withholding adjudication or sentencing; and without probation or community control in lieu of imprisonment.

Παγε 2 οφ  4

3.      Epstein shall waive all challenges to the Information filed by the State Attorney's Office and shall waive the right to appeal his conviction and sentence.

4.      Epstein agrees that, if any of the victims identified in the federal investigation file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the U.S. District Court for the Southern District of Florida over his person and/or the subject matter, and Epstein will not contest that the identified victims are persons who, while minors, were victims of violations of Title 18, United States Code, Sections(s) 2422 and/or 2423.

5.      The United States shall provide Epstein's attorneys with a list of the identified victims, which will not exceed forty, after Epstein has signed this agreement and entered his guilty plea.  The United States shall make a motion with the United States District Court for the Southern District of Florida for the appointment of a guardian ad litem for the identified victims and Epstein's counsel may contact the identified victims through that counsel.

6.      Epstein shall enter his guilty plea and be sentenced not later than September 28, 2007, and shall begin service of his sentence not later than October 15, 2007.

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial.  Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial.  Epstein hereby requests that the United States Attorney for the Southern District of Florida defer such prosecution.  Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this

**SA-326**

agreement.   Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Civil Procedure provide that all felonies must be charged in an indictment presented to a grand jury.   Epstein hereby agrees and consents that, if a prosecution against him is instituted, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury.

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him.   Epstein hereby states that he understands the conditions of this non-Prosecution Agreement and agrees to comply with them.

Dated: _____          _____
                                              Jeffrey Epstein

Dated: _____          _____
                                              Roy Black, Esq.
                                              Counsel to Jeffrey Epstein

                                              R. ALEXANDER ACOSTA
                                              UNITED STATES ATTORNEY

Dated: _____          _____
                      By:     A. Marie Villafaña
                                 Assistant United States Attorney

Παγε 4 οφ  4

**SA-327**

# EXHIBIT 3

## September 24, 2007 Non-Prosecution Agreement

**SA-328**

[Page Intentionally Left Blank]

IN RE:
**INVESTIGATION OF**
**JEFFREY EPSTEIN**

_____/

<u>**NON-PROSECUTION AGREEMENT**</u>

IT APPEARING that the City of Palm Beach Police Department and the State Attorney's Office for the 15th Judicial Circuit in and for Palm Beach County (hereinafter, the "State Attorney's Office") have conducted an investigation into the conduct of Jeffrey Epstein (hereinafter "Epstein");

IT APPEARING that the State Attorney's Office has charged Epstein by indictment with solicitation of prostitution, in violation of Florida Statutes Section 796.07;

IT APPEARING that the United States Attorney's Office and the Federal Bureau of Investigation have conducted their own investigation into Epstein's background and any offenses that may have been committed by Epstein against the United States from in or around 2001 through in or around September 2007, including:

(1)     knowingly and willfully conspiring with others known and unknown to commit an offense against the United States, that is, to use a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); all in violation of Title 18, United States Code, Section 371;

(2)     knowingly and willfully conspiring with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females, in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code, Section 2423(e);

(3)     using a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution; in violation of Title 18, United States Code, Sections 2422(b) and 2;

(4)     traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females; in violation

Page 1 of 7

of Title 18, United States Code, Section 2423(b); and

(5)     knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act as defined in 18 U.S.C. § 1591(c)(1); in violation of Title 18, United States Code, Sections 1591(a)(1) and 2; and

IT APPEARING that Epstein seeks to resolve globally his state and federal criminal liability and Epstein understands and acknowledges that, in exchange for the benefits provided by this agreement, he agrees to comply with its terms, including undertaking certain actions with the State Attorney's Office;

IT APPEARING, after an investigation of the offenses and Epstein's background by both State and Federal law enforcement agencies, and after due consultation with the State Attorney's Office, that the interests of the United States, the State of Florida, and the Defendant will be served by the following procedure;

THEREFORE, on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida, prosecution in this District for these offenses shall be deferred in favor of prosecution by the State of Florida, provided that Epstein abides by the following conditions and the requirements of this Agreement set forth below.

If the United States Attorney should determine, based on reliable evidence, that, during the period of the Agreement, Epstein willfully violated any of the conditions of this Agreement, then the United States Attorney may, within ninety (90) days following the expiration of the term of home confinement discussed below, provide Epstein with timely notice specifying the condition(s) of the Agreement that he has violated, and shall initiate its prosecution on any offense within sixty (60) days' of giving notice of the violation. Any notice provided to Epstein pursuant to this paragraph shall be provided within 60 days of the United States learning of facts which may provide a basis for a determination of a breach of the Agreement.

After timely fulfilling all the terms and conditions of the Agreement, no prosecution for the offenses set out on pages 1 and 2 of this Agreement, nor any other offenses that have been the subject of the joint investigation by the Federal Bureau of Investigation and the United States Attorney's Office, nor any offenses that arose from the Federal Grand Jury investigation will be instituted in this District, and the charges against Epstein if any, will be dismissed.

Terms of the Agreement:

1.    Epstein shall plead guilty (not nolo contendere) to the Indictment as currently pending against him in the 15th Judicial Circuit in and for Palm Beach County (Case No. 2006-cf-009495AXXXMB) charging one (1) count of solicitation of prostitution, in violation of Fl. Stat. § 796.07. In addition, Epstein shall plead guilty to an Information filed by the State Attorney's Office charging Epstein with an offense that requires him to register as a sex offender, that is, the solicitation of minors to engage in prostitution, in violation of Florida Statutes Section 796.03;

2.    Epstein shall make a binding recommendation that the Court impose a thirty (30) month sentence to be divided as follows:

    (a)    Epstein shall be sentenced to consecutive terms of twelve (12) months and six (6) months in county jail for all charges, without any opportunity for withholding adjudication or sentencing, and without probation or community control in lieu of imprisonment; and

    (b)    Epstein shall be sentenced to a term of twelve (12) months of community control consecutive to his two terms in county jail as described in Term 2(a), *supra*.

3.    This agreement is contingent upon a Judge of the 15th Judicial Circuit accepting and executing the sentence agreed upon between the State Attorney's Office and Epstein, the details of which are set forth in this agreement.

4.    The terms contained in paragraphs 1 and 2, *supra*, do not foreclose Epstein and the State Attorney's Office from agreeing to recommend any additional charge(s) or any additional term(s) of probation and/or incarceration.

5.    Epstein shall waive all challenges to the Information filed by the State Attorney's Office and shall waive the right to appeal his conviction and sentence, except a sentence that exceeds what is set forth in paragraph (2), *supra*.

6.    Epstein shall provide to the U.S. Attorney's Office copies of all

proposed agreements with the State Attorney's Office prior to entering into those agreements.

7.    The United States shall provide Epstein's attorneys with a list of individuals whom it has identified as victims, as defined in 18 U.S.C. § 2255, after Epstein has signed this agreement and been sentenced. Upon the execution of this agreement, the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for these persons, who shall be paid for by Epstein. Epstein's counsel may contact the identified individuals through that representative.

8.    If any of the individuals referred to in paragraph (7), *supra*, elects to file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the United States District Court for the Southern District of Florida over his person and/or the subject matter, and Epstein waives his right to contest liability and also waives his right to contest damages up to an amount as agreed to between the identified individual and Epstein, so long as the identified individual elects to proceed exclusively under 18 U.S.C. § 2255, and agrees to waive any other claim for damages, whether pursuant to state, federal, or common law. Notwithstanding this waiver, as to those individuals whose names appear on the list provided by the United States, Epstein's signature on this agreement, his waivers and failures to contest liability and such damages in any suit are not to be construed as an admission of any criminal or civil liability.

9.    Epstein's signature on this agreement also is not to be construed as an admission of civil or criminal liability or a waiver of any jurisdictional or other defense as to any person whose name does not appear on the list provided by the United States.

10.   Except as to those individuals who elect to proceed exclusively under 18 U.S.C. § 2255, as set forth in paragraph (8), *supra*, neither Epstein's signature on this agreement, nor its terms, nor any resulting waivers or settlements by Epstein are to be construed as admissions or evidence of civil or criminal liability or a waiver of any jurisdictional or other defense as to any person, whether or not her name appears on the list provided by the United States.

11.   Epstein shall use his best efforts to enter his guilty plea and be

sentenced not later than October 26, 2007. The United States has no objection to Epstein self-reporting to begin serving his sentence not later than January 4, 2008.

12.   Epstein agrees that he will not be afforded any benefits with respect to gain time, other than the rights, opportunities, and benefits as any other inmate, including but not limited to, eligibility for gain time credit based on standard rules and regulations that apply in the State of Florida. At the United States' request, Epstein agrees to provide an accounting of the gain time he earned during his period of incarceration.

13.   The parties anticipate that this agreement will not be made part of any public record. If the United States receives a Freedom of Information Act request or any compulsory process commanding the disclosure of the agreement, it will provide notice to Epstein before making that disclosure.

Epstein understands that the United States Attorney has no authority to require the State Attorney's Office to abide by any terms of this agreement. Epstein understands that it is his obligation to undertake discussions with the State Attorney's Office and to use his best efforts to ensure compliance with these procedures, which compliance will be necessary to satisfy the United States' interest. Epstein also understands that it is his obligation to use his best efforts to convince the Judge of the 15th Judicial Circuit to accept Epstein's binding recommendation regarding the sentence to be imposed, and understands that the failure to do so will be a breach of the agreement.

In consideration of Epstein's agreement to plead guilty and to provide compensation in the manner described above, if Epstein successfully fulfills all of the terms and conditions of this agreement, the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to ███████████ ████████████████████████. Further, upon execution of this agreement and a plea agreement with the State Attorney's Office, the federal Grand Jury investigation will be suspended, and all pending federal Grand Jury subpoenas will be held in abeyance unless and until the defendant violates any term of this agreement. The defendant likewise agrees to withdraw his pending motion to intervene and to quash certain grand jury subpoenas. Both parties agree to maintain their evidence, specifically evidence requested by or directly related to the grand jury subpoenas that have been issued, and including certain computer equipment, inviolate until all of the terms of this agreement have been satisfied. Upon the successful completion of the terms of this agreement, all outstanding grand jury subpoenas shall be deemed withdrawn.

Page 5 of 7

By signing this agreement, Epstein asserts and certifies that each of these terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the agreement and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses.

By signing this agreement, Epstein asserts and certifies that he is aware of the fact that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. Epstein further is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information, or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information, or in bringing a defendant to trial. Epstein hereby requests that the United States Attorney for the Southern District of Florida defer such prosecution. Epstein agrees and consents that any delay from the date of this Agreement to the date of initiation of prosecution, as provided for in the terms expressed herein, shall be deemed to be a necessary delay at his own request, and he hereby waives any defense to such prosecution on the ground that such delay operated to deny him rights under Rule 48(b) of the Federal Rules of Criminal Procedure and the Sixth Amendment to the Constitution of the United States to a speedy trial or to bar the prosecution by reason of the running of the statute of limitations for a period of months equal to the period between the signing of this agreement and the breach of this agreement as to those offenses that were the subject of the grand jury's investigation. Epstein further asserts and certifies that he understands that the Fifth Amendment and Rule 7(a) of the Federal Rules of Criminal Procedure provide that all felonies must be charged in an indictment presented to a grand jury. Epstein hereby agrees and consents that, if a prosecution against him is instituted for any offense that was the subject of the grand jury's investigation, it may be by way of an Information signed and filed by the United States Attorney, and hereby waives his right to be indicted by a grand jury as to any such offense.

/ / /

/ / /

/ / /

Page 6 of  7

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him.  Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____        By: _____

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _9/24/07_        _____

JEFFREY EPSTEIN

Dated: _____        _____

GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: _____        _____

LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him.  Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: 9/27/07                By:  _____
                                  A. MARIE VILLAFAÑA
                                  ASSISTANT U.S. ATTORNEY

Dated: _____        _____
                              JEFFREY EPSTEIN

Dated: 9/24/07                _____
                              GERALD LEFCOURT, ESQ.
                              COUNSEL TO JEFFREY EPSTEIN

Dated: _____        _____
                              LILLY ANN SANCHEZ, ESQ.
                              ATTORNEY FOR JEFFREY EPSTEIN

Page 7 of 7

By signing this agreement, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the conditions of this Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _____     By: _____

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY


Dated: _____     _____

JEFFREY EPSTEIN


Dated: _____     _____

GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN


Dated: 9-24-07     _____

LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN


Page 7 of 7

**SA-338**

[Page Intentionally Left Blank]

# EXHIBIT 4

# Addendum to the Non-Prosecution Agreement

**SA-340**

[Page Intentionally Left Blank]

**SA-341**

IN RE:

INVESTIGATION OF

JEFFREY EPSTEIN

_____/

## ADDENDUM TO THE NON-PROSECUTION AGREEMENT

      IT APPEARING that the parties seek to clarify certain provisions of page 4, paragraph 7 of the Non-Prosecution Agreement (hereinafter "paragraph 7"), that agreement is modified as follows:

7A.    The United States has the right to assign to an independent third-party the responsibility for consulting with and, subject to the good faith approval of Epstein's counsel, selecting the attorney representative for the individuals identified under the Agreement. If the United States elects to assign this responsibility to an independent third-party, both the United States and Epstein retain the right to make good faith objections to the attorney representative suggested by the independent third-party prior to the final designation of the attorney representative.

7B.    The parties will jointly prepare a short written submission to the independent third-party regarding the role of the attorney representative and regarding Epstein's Agreement to pay such attorney representative his or her regular customary hourly rate for representing such victims subject to the provisions of paragraph C, infra.

7C.    Pursuant to additional paragraph 7A, Epstein has agreed to pay the fees of the attorney representative selected by the independent third party. This provision, however, shall not obligate Epstein to pay the fees and costs of contested litigation filed against him. Thus, if after consideration of potential settlements, an attorney representative elects to file a contested lawsuit pursuant to 18 U.S.C. s 2255 or elects to pursue any other contested remedy, the paragraph 7 obligation of the Agreement to pay the costs of the attorney representative, as opposed to any statutory or other obligations to pay reasonable attorneys fees and costs such as those contained in s 2255 to bear the costs of the attorney representative, shall cease.

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: _10/30/07_          By: _Jeffrey H. Sloman_ FAUSA

                               _AM_ A. MARIE VILLAFAÑA
                               ASSISTANT U.S. ATTORNEY

Dated: _10/29/07_

                               JEFFREY EPSTEIN

Dated: _____

                               GERALD LEFCOURT, ESQ.
                               COUNSEL TO JEFFREY EPSTEIN

Dated: _____

                               LILLY ANN SANCHEZ, ESQ.
                               ATTORNEY FOR JEFFREY EPSTEIN

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: *10/30/07*                    By: _____ *FAUSA*

A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY


Dated: _____

_____
JEFFREY EPSTEIN

Dated: *10/29/07*

_____
GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN


Dated: _____

_____
LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

By signing this Addendum, Epstein asserts and certifies that the above has been read and explained to him. Epstein hereby states that he understands the clarifications to the Non-Prosecution Agreement and agrees to comply with them.

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

Dated: 10/30/07

By: _____ FAUSA
fo A. MARIE VILLAFAÑA
ASSISTANT U.S. ATTORNEY

Dated: _____

_____
JEFFREY EPSTEIN

Dated: _____

_____
GERALD LEFCOURT, ESQ.
COUNSEL TO JEFFREY EPSTEIN

Dated: 10-29-07

_____
LILLY ANN SANCHEZ, ESQ.
ATTORNEY FOR JEFFREY EPSTEIN

**SA-345**

# EXHIBIT 5

# State Information

**SA-346**

[Page Intentionally Left Blank]

**SA-347**

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA
CRIMINAL DIVISION "W" (LB)

08 CF 9381

STATE OF FLORIDA

ARISES FROM BOOKING NO.:
2006036744

vs.

JEFFREY E EPSTEIN, W/M, █████████

**INFORMATION FOR:**

1)   PROCURING PERSON UNDER 18 FOR PROSTITUION

In the Name and by Authority of the State of Florida:
BARRY E. KRISCHER, State Attorney for the Fifteenth Judicial Circuit, Palm Beach County, Florida, by and
through his undersigned Assistant State Attorney, charges that JEFFREY E EPSTEIN on or about or between
the 1ˢᵗ day of August in the year of our Lord Two Thousand and Four and October 9, 2005, did knowingly and
unlawfully procure for prostitution, or caused to be prostituted, ████, a person under the age of 18 years,
contrary to Florida Statute 796.03. (2 DEG FEL)

LANNA BELOHLAVEK
FL. BAR NO. 0776726
Assistant State Attorney

STATE OF FLORIDA
COUNTY OF PALM BEACH
          Appeared before me, LANNA BELOHLAVEK Assistant State Attorney for Palm Beach County,
Florida, personally known to me, who, being first duly sworn, says that the allegations as set forth in the
foregoing information are based upon facts that have been sworn to as true, and which, if true, would constitute
the offense therein charged, that this prosecution is instituted in good faith, and certifies that testimony under
oath has been received from the material witness or witnesses for the offense.

Assistant State Attorney

Sworn to and subscribed to before me this 6ᵗʰ day of June, 2008.

NOTARY PUBLIC, State of Florida

Damaris Pina
MY COMMISSION # DD580778 EXPIRES
August 2, 2010
BONDED THRU TROY FAIN INSURANCE, INC.

LB/dp

FCIC REFERENCE NUMBERS:
1) FELONY SOLICITATION OF PROSTITUTION 3699

STATE OF FLORIDA · PALM BEACH COUNTY
I hereby certify that the
foregoing is a true copy
of the record in my office.
THIS ____ DAY OF ____ JUL 22 2008 , 20____
SHARON R. BOCK
CLERK & COMPTROLLER
BY ____
DEPUTY CLERK

CA3   JUN 26 2008

**SA-348**

[Page Intentionally Left Blank]

**SA-349**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/24/22
```

---

United States of America,

        –v–

Ghislaine Maxwell,

               Defendant.

---

20-CR-330 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Before the Court is the Defendant's motion for a new trial pursuant to Federal Rule of

Criminal Procedure 33, which the Government opposes. *See* Maxwell Br., Jan. 19, 2022; Gov.

Br., Feb. 2, 2022. The Defendant seeks a new trial on the basis that Juror 50 "falsely answered a

material question during *voir dire* and . . . that, had he answered truthfully, he would have been

subject to a challenge for cause." Maxwell Br. at 48. The Defendant contends that the current

paper record sufficiently supports her motion and should be granted without a hearing. *Id.* In

the alternative the Defendant requests an evidentiary hearing to inquire into Juror 50's alleged

nondisclosure. She also argues a broader hearing is required based on a news article that

suggests a second juror was allegedly a victim of sexual abuse. *Id.* at 49. The Government urges

this Court to deny the Defendant's motion on the current record, but it consents to a limited

hearing on the issue of whether Juror 50 provided a materially false answer to Question 48 of the

questionnaire. Gov. Br. at 31–32.

The Defendant's motion for a new trial based on the current record is DENIED.

Defendant's motion on the current record relies extensively on statements made by Juror 50

regarding what occurred during jury deliberations that the Court is prohibited from considering

under Rule 606. With regard to Juror 50's statements that do not pertain to jury deliberations, in

1

order to resolve the motion at this stage, the Court would have to accept these unsworn

statements made to media outlets as true and reach factual determinations that are not available

on the current record.

Accordingly, a hearing is necessary to resolve the Defendant's motion.  The Court

concludes, and the Government concedes, that the demanding standard for holding an

evidentiary hearing is met as to Juror 50's answer to Question 48 of the questionnaire.  The

Court further concludes that Juror 50's response to Question 25 is relevant to the inquiry.

Following trial, Juror 50 made several direct, unambiguous statements to multiple media outlets

about his own experience that do not pertain to jury deliberations and that cast doubt on the

accuracy of his responses to Questions 25 and 48.  Such statements are "clear, strong, substantial

and incontrovertible evidence that a specific, nonspeculative impropriety"—namely a false

statement during jury selection—has occurred.  To be clear, the potential impropriety is not that

someone with a history of sexual abuse may have served on the jury.  Rather, it is the potential

failure to respond truthfully to questions during the jury selection process that asked for that

material information so that any potential bias could be explored.  Conversely, the demanding

standard for ordering an evidentiary hearing is not met as to Juror 50's use of social media nor

the conduct of any other juror.  The Court therefore ORDERS a hearing take place at which the

Court will question Juror 50 under oath.  The Defendant's request for a broader hearing and pre-

hearing discovery is DENIED.

## I.   Background

On December 29, 2021, the jury returned a verdict in this case, finding the Defendant

guilty of five counts.  A week after the jury announced its verdict, on January 5, 2022, the

Government informed the Court that a juror had given at least three post-verdict interviews to

press outlets about his jury service and requested a hearing be held on the matter.  Dkt. No. 568.

The letter noted that in the interviews, which were both in print and on video, the juror

"described being a victim of sexual abuse" and asserted that he "flew through" the juror

questionnaire and did not recall being asked whether he had been a victim of sexual abuse.  *Id.* at

1.  The Government indicated in a redacted footnote that it believed the juror to be Juror 50, and

a review of his questionnaire showed that he had provided a negative response to a question that

asked whether a prospective juror had been a victim of sexual abuse.  *Id.* at 2 n.2.[1]  Finally, the

Government requested that the Court offer court-appointed counsel to the juror in the event a

hearing was ordered.  A letter from the Defendant followed shortly thereafter also informing the

Court about the juror's interviews.  Dkt. No. 569.  The Defendant filed a second letter that same

day opposing the Government's request "because based on undisputed, publicly available

information, the Court can and should order a new trial without any evidentiary hearing."  Dkt.

No. 570.[2]

The Defendant filed a motion for a new trial on January 19, 2022.  The Government

opposed the motion on February 2, 2022, and the Defendant filed a reply in support on February

9, 2022.  In addition to Juror 50's post-trial interviews, the Defendant's motion relies on a *New*

*York Times* article reporting that "a second juror described in an interview . . . having been

---

[1] The Government proposed redacting the footnote because the juror questionnaire was not a public document at that time.  Because (for the reasons explained below) the Court now unseals the questionnaire, that redaction is no longer necessary.

[2] For completeness of the record, the Court notes the following occurred also on January 5, 2022:  The Jury Department of the Southern District of New York received a call from Juror 50 asking for guidance because of statements he had given to certain media outlets that were being widely reported on in the press and inquiring whether he needed an attorney.  At the Court's direction, the District Executive returned Juror 50's call and informed him that the Court was unable to provide any guidance or response to his question.  Juror 50 then asked the District Executive if he could access his questionnaire.  The District Executive, again at the Court's direction, informed Juror 50 that the questionnaire was not a public document and could not be provided to him.

sexually abused as a child" as a basis for a broader hearing beyond inquiry into Juror 50.

Maxwell Br. at 21, 49.

**II.    Motion for a new trial on the current record**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed.

R. Crim. P. 33(a).  The parties agree that a defendant's Rule 33 motion premised on a juror's

alleged nondisclosure during *voir dire* is governed by *McDonough Power Equipment, Inc. v.*

*Greenwood*, 464 U.S. 548 (1984).  Maxwell Br. at 22–28; Gov. Br. at 11.  In *McDonough*, the

Supreme Court held that to obtain a new trial on the basis of juror nondisclosure during *voir dire*,

"a party must first demonstrate that a juror failed to answer honestly a material question on *voir*

*dire*, and then further show that a correct response would have provided a valid basis for a

challenge for cause."  *McDonough*, 464 U.S. at 556; *see also United States v. McCoy*, 995 F.3d

32, 51 (2d Cir. 2021); *United States v. Shaoul*, 41 F.3d 811, 815–16 (2d Cir. 1994); *United States*

*v. Langford*, 990 F.2d 65, 68 (2d Cir. 1993).[3]

> The *McDonough* inquiry is restricted by Federal Rule of Evidence 606, which states:
>
> During an inquiry into the validity of a verdict or indictment, a juror may not
> testify about any statement made or incident that occurred during the jury's
> deliberations; the effect of anything on that juror's or another juror's vote; or
> any juror's mental processes concerning the verdict or indictment. The court
> may not receive a juror's affidavit or evidence of a juror's statement on these
> matters.

Fed. R. Evid. 606(b)(1).

---

[3] The parties dispute certain contours of the *McDonough* test, including whether it requires a deliberately false answer.  But at a minimum, the parties agree that the deliberateness of a juror's incorrect answer is relevant to this inquiry.  Maxwell Reply at 13–14.  Because, as explained below, the Court does not now resolve at this juncture whether Juror 50's answers on the questionnaire and *voir dire* merit a new trial, it need not and does not resolve those disputes pre-hearing.

The Defendant urges this Court to resolve the motion on the papers, without the need for a hearing.  Maxwell Br. at 28.  But resolving the motion now would require the Court to accept as true Juror 50's unsworn statements made to media outlets.  Moreover, in arguing for a new trial based on the current record, the Defendant relies extensively on statements prohibited from consideration by Rule 606.  *E.g.*, Maxwell Br. at 12–14 (describing Juror 50's statements in deliberation and other jurors' reactions).  The Defendant also urges the Court to reach factual conclusions that are unavailable on the current record; for example, that Juror 50 deliberately lied in failing to disclose that he was the victim of sexual abuse.  *See* Maxwell Br. at 39–43. Finally, the Defendant cites no authority—nor is the Court aware of any—in which a court granted a new trial under the *McDonough* standard without first conducting an evidentiary hearing.  As the Second Circuit has instructed, "if any significant doubt as to a juror's impartiality remains in the wake of objective evidence of false *voir dire* responses, an evidentiary hearing generally should be held."  *United States v. Stewart*, 433 F.3d 273, 306 (2d Cir. 2006) (citing *United States v. Boney*, 977 F.2d 624, 634 (D.C. Cir. 1992)).  The Court therefore denies the Defendant's motion to grant a new trial on the current record.

## III.   Evidentiary hearing

For the reasons outlined below, the Court determines that a hearing must be held regarding Juror 50's alleged nondisclosure during the jury selection process.

### A.  Threshold for an evidentiary hearing

Because of the importance of finality of judgments, the threshold for conducting a post-verdict inquiry is high.  A post-verdict inquiry into juror misconduct is conducted only "when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant."  *United States v.*

*Baker*, 899 F.3d 123, 130 (2d Cir. 2018) (cleaned up) (quoting *United States v. Moon*, 718 F.2d

1210, 1234 (2d Cir. 1983)).  Mere "[g]ossip and anonymous tips do not satisfy this standard."

*United States v. Stewart*, 317 F. Supp. 2d 432, 443 (S.D.N.Y. 2004).  Rather, "[a]llegations of

impropriety must be 'concrete allegations of inappropriate conduct that constitute competent and

relevant evidence.'"  *Baker*, 899 F.3d at 130 (quoting *United States v. Ianniello*, 866 F.2d 540,

543 (2d Cir. 1989)).

      The Defendant argues that this is the wrong standard.  Maxwell Reply, Feb. 9, 2022, at 8

n.4.  But the Defendant does not identify an alternative standard.  And the Second Circuit has

applied precisely this standard to determine whether a district court should hold a *McDonough*

hearing on the basis of a juror's nondisclosure during *voir dire*.  *Stewart*, 433 F.3d at 302–03.

The Court is bound to apply this demanding standard.

      This high standard for an evidentiary hearing intentionally raises an "exacting hurdle" for

defendants because "motions to set aside a jury verdict are disfavored."  *United States v.

Ventura*, No. 09-CR-1015 (JGK), 2014 WL 259655, at *3 (S.D.N.Y. Jan. 21, 2014).  As the

Second Circuit has repeatedly warned, "post-verdict inquiries may lead to evil consequences:

subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless

applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts."

*Ianniello*, 866 F.2d at 543; *see also Tanner v. United States*, 483 U.S. 107, 119–20 (1987) (citing

*McDonald v. Pless*, 238 U.S. 264, 267–68 (1915)).  And an evidentiary hearing "is not held to

afford a convicted defendant the opportunity 'to conduct a fishing expedition.'"  *Stewart*, 433

F.3d at 306 (quoting *Moon*, 718 F.2d at 1234).

      The Defendant argues that the considerations in *Tanner* and *Ianniello* are inapplicable to

her motion because those cases "involved alleged conduct during trial and, crucially, during

deliberations." Maxwell Reply Br. at 8. This argument is wrong, as "the ultimate purpose of the [requested] post-trial evidentiary hearing is to set aside a jury verdict." *Ventura*, 2014 WL 259655, at *3. And "there is no discernible reason to apply a different general standard to new trial motions based on juror misconduct than to those premised on any other reason." *United States v. Guzman Loera*, No. 09-CR-0466 (BMC), 2019 WL 2869081, at *5 n.5 (E.D.N.Y. July 3, 2019), *aff'd*, 24 F.4th 144 (2d Cir. 2022). "[E]ven though there are additional considerations . . . when ruling on an evidentiary hearing and new trial motion premised upon allegations of juror misconduct, these are the overarching legal standards applicable to all Rule 33 motions, including when juror misconduct is at issue." *Id.*

If a hearing is held, "its scope should be limited to only what is absolutely necessary to determine the facts with precision." *Ianniello*, 866 F.2d at 544. "Therefore, in the course of a post-verdict inquiry . . . , when and if it becomes apparent that the above-described reasonable grounds to suspect prejudicial jury impropriety do not exist, the inquiry should end." *Moon*, 718 F.2d at 1234. The Court has discretion to structure the hearing and to determine what testimony is needed. *Ianniello*, 866 F.2d at 544.

**B. The scope of the hearing**

The Court will conduct an evidentiary hearing on whether Juror 50 provided false answers on the questionnaire, the explanation for those answers, and how Juror 50 would have responded to follow-up questions if accurate answers had been provided. The Government acknowledges that Juror 50's answer to Question 48 satisfies the demanding standard for an evidentiary hearing under *McDonough*. Gov. Br. at 33. The Court agrees. Question 48 asked jurors:

> Have you or a friend or family member ever been the victim of sexual
> harassment, sexual abuse, or sexual assault? (This includes actual or attempted

sexual assault or other unwanted sexual advance, including by a stranger,
acquaintance, supervisor, teacher, or family member.)

Dkt. No. 462 at 24.  In response to that question, Juror 50 checked the box for "No," not the box

for either "Yes (self)" or "Yes (friend or family member)."  But in several public statements

made to media outlets after the trial, including interviews in *The Independent* and *The Daily Mail*

dated January 5, 2022, Juror 50 stated that he was sexually abused as a minor.  The statements

are direct, unambiguous, and made by Juror 50 himself to multiple media outlets.  Moreover, the

statements themselves describe Juror 50's own experience.[4]  They constitute "clear, strong,

substantial and incontrovertible evidence that a specific, nonspeculative impropriety has

occurred," and so warrant an evidentiary hearing.  *Baker*, 99 F.3d at 130.

　　　Although the Court does not decide whether the threshold to hold a hearing based on

Question 25 alone has been met, because the Court will hold a hearing on Juror 50's answer to

Question 48 and because Question 48 and 25 are sufficiently related, the Court will inquire into

Juror 50's answer to Question 25.  Question 25 asked jurors:

　　　Have you, or any of your relatives or close friends, ever been a victim of a crime?

Dkt. No. 462 at 13.  Again, Juror 50 checked the box for "No," and not the box for either "Yes

(self)" or "Yes (friend or family member)."  But Juror 50's post-trial statements, if true, may

describe criminal conduct of which he was the victim.  Therefore, Juror 50's answer to Question

25 is sufficiently related to the answer to Question 48 and so the Court will also inquire as to

Question 25 at an evidentiary hearing.  *See Baker*, 99 F.3d at 130.

---

[4] The articles additionally state that Juror 50 shared this experience with the jury during deliberations.  The Court is
prohibited by Rule 606 from considering that Juror 50 also told this information to the jury.  That Juror 50 revealed
that he also disclosed this information to the jury does not prohibit the Court from considering Juror 50's
independent statements made to a reporter about his own experience.

The potential impropriety that warrants a hearing is not that someone with a history of sexual abuse may have served on the jury. Rather, it is Juror 50's potential failure to respond truthfully to questions during the jury selection process that asked for such material information so that any potential bias could be explored. Accordingly, the Court will hold a hearing limited in scope to Juror 50's answers to Questions 25 and 48 of the questionnaire.

### C. The Defendant has not justified an inquiry into Juror 50's social media

The parties devote significant portions of the briefs to the question of whether Juror 50 answered falsely the Court's questions about social media usage during *voir dire*. To the extent that the Defendant seeks a hearing to probe Juror 50's answers to *voir dire* about his social media usage, her arguments are based on speculation, and she has failed to make the high showing required. *See Baker*, 899 F.3d at 130. At *voir dire*, when asked if he "use[s] social media," Juror 50 stated, "I do, but I actually just deleted them because I just got out of a relationship and I didn't want to see anything regarding them. So I am fully off of it right now." Nov. 16, 2021 Tr. at 133. The Court then asked, "What did you use, Facebook, Twitter?" to which Juror 50 replied "Facebook and Instagram," clarifying that the accounts contained "[p]ersonal stuff, like selfies." *Id.*

The screenshots proffered by the Defendant do not demonstrate that any of these answers implicate *McDonough*. First, Juror 50 did not deny having a Twitter account. Second, Juror 50's account had only 1 follower and followed only 39 people, which corroborates that his Twitter use was, at most, relatively minimal. *See* Maxwell Br. at 17. Third, the fact that Juror 50's Twitter account was opened in April 2021 and that he used it again in January 2022, after the completion of the trial, is consistent with Juror 50's answer that he deleted his social media accounts, or just the social media applications, shortly before *voir dire*. The same is true of Juror

**SA-358**

50's Instagram account, on which he also posted in January 2022, after the completion of the

trial.  *Id.* at 20.  And fourth, the screenshots proffered match Juror 50's description of his social

media accounts as containing only "[p]ersonal stuff, like selfies."  *Id.*  The threshold for a

hearing has not been met on this issue and the Court will not permit "a fishing expedition" into

Juror 50's social media usage.  *Moon*, 718 F.2d at 1234 (quoting *United States v. Moten*, 582

F.2d 654, 667 (2d Cir. 1978)).

      **D.  The Defendant has not justified an inquiry into other jurors**

      The Defendant seeks to examine not only Juror 50 at an evidentiary hearing but also the

other eleven members of the jury in order to identify a second juror who, according to an article

published by the *New York Times*, also was sexually abused as a minor.  Maxwell Br. at 21, 49–

50.  The Defendant further argues that even if the article alone is insufficient to order a hearing

as to the juror mentioned in the article, Juror 50's post-trial statements corroborate that another

juror discussed sexual abuse during deliberations.  Maxwell Reply at 24.  As explained below,

the evidence of this allegation is inadequate to meet the exacting standard for a hearing and the

Court denies the Defendant's request to examine any jurors on this basis.[5]

_____

[5] On December 31, 2021, the Court informed the parties by sealed order that a juror had contacted court staff about
being approached by a reporter despite the fact that the juror had not identified themselves publicly and wished to
remain anonymous.  Because the contact by the member of the media had been uninvited by the juror, chambers
staff notified all jurors via email on December 30, 2021, about the development.  Subsequently, on January 5, 2022,
a juror replied to the December 30 email sent by court staff.  In that reply email, the juror wrote regarding news
reports about the issue with Juror 50.  The Court informed the parties of the juror communications by sealed order
on January 6, 2022.  The Defendant requested the communications, which the Court denied without prejudice.  *See*
Sealed Memo Endorsement, Jan. 13, 2022.  The Defendant now renews her request on the theory that the
communications could shed light on the identity of the second juror referred to by the *New York Times*.  *See*
Maxwell Br. at 21 n.10; Maxwell Reply at 23 n.12.  Such a request is nothing but unfounded speculation. A juror's
communication expressing fear about the media reports and the parties' responses to Juror 50's interviews are not
relevant to the current inquiry.  Nonetheless, in order to ensure a complete record, the Court will transmit under seal
the concerned juror's communications to the parties with the name and contact information of the concerned juror
redacted in order to protect the juror's privacy and prevent juror harassment.  *See Ianniello*, 866 F.2d at 543.  The
Court also includes a subsequent communication with the same juror expressing additional concerns so that the
parties have a complete record of non-logistical juror communications.  The Court will file the unredacted
communications under seal for preservation for the appellate record.

*First*, the news article upon which the Defendant relies does not warrant a hearing. *Baker*, 899 F.3d at 130.  The article includes a short, non-detailed mention of an anonymous juror.  As the Second Circuit recently held in affirming the denial of a hearing after a high-profile trial, "the unsworn, uncorroborated statements that one unidentified juror made to a magazine reporter do not constitute the 'clear, strong, substantial and incontrovertible evidence'" of misconduct that requires a hearing.  *United States v. Guzman Loera*, 24 F.4th 144, 161 (2d Cir. 2022) (quoting *Moon*, 718 F.2d at 1234).  Another court in this circuit held that a *New York Times* article that, in a single sentence, alleged misconduct by an unidentified juror was insufficient to justify a hearing.  *United States v. Bin Laden*, No. S7R 98-CR-1023 (KTD), 2005 WL 287404, at *2 (S.D.N.Y. Feb. 7, 2005), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) ("This single sentence, an unsworn snippet of hearsay within a newspaper article, is far less substantial than the sworn affidavits present in cases where evidentiary hearings have been ordered.").

Other courts have also concluded that unsworn, hearsay, and/or anonymous reports of juror misconduct are not the clear, strong, and nonspeculative evidence required for a hearing. *See, e.g.*, *King v. United States*, 576 F.2d 432, 438 (2d Cir. 1978) (affirming the denial of a hearing where the defendant presented "weakly authenticated, vague, and speculative material as to one juror," even where that juror was not anonymous); *United States v. Wilbern*, 484 F. Supp. 3d 79, 87 (W.D.N.Y. 2020) (finding a "double hearsay" report of misconduct inadequate to justify a hearing); *Stewart*, 317 F. Supp. 2d at 438 (denying the defendant's request for an evidentiary hearing where the defendant's support, including post-trial media interviews, "amount[s] to little more than hearsay, speculation, and in one instance, vague allegations made by a person who refused to identify himself").  Accordingly, the *New York Times* article is an

insufficient basis for an evidentiary hearing, especially one that, according to the Defendant, would require the Court to "haul [11] jurors in after they have reached a verdict" to probe for who, if anyone, may have been mentioned in the article. *Guzman Loera*, 24 F.4th at 161 (quoting *Moon*, 718 F.2d at 1234).

     *Second*, Federal Rule of Evidence 606 bars the Court from considering Juror 50's statements as evidence of another juror's statements purportedly made during deliberations.  As previously quoted, the rule states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1).

     Rule 606(b) is subject to three enumerated exceptions that permit a juror to testify about whether (A) "extraneous prejudicial information was improperly brought to the jury's attention"; (B) "an outside influence was improperly brought to bear on any juror"; or (C) "a mistake was made in entering the verdict on the verdict form."  Fed. R. Evid. 606(b)(2).  In addition to these exceptions enumerated in the rule, the Supreme Court has held that Rule 606 "give[s] way" where "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant."  *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017).  Absent one of these circumstances, evidence within the ambit of Rule 606 may not be considered.

     Here, the Defendant relies on Juror 50's statements of what another juror allegedly stated during deliberations.  That proffer is barred by Rule 606.

     In response, the Defendant argues that Juror 50's statements about the second juror fall outside the scope of Rule 606 because she "does not seek to impeach the verdict based on the

content of deliberations" but instead to demonstrate that the second juror made a false statement during *voir dire*, like Juror 50 allegedly did.  Maxwell Br. at 50.  But this reading of Rule 606 has been squarely rejected by the Supreme Court, which held that the "plain meaning" of this language is that "Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*."  *Warger v. Shauers*, 574 U.S. 40, 44 (2014).  The Defendant's one-sentence attempt to dismiss *Warger* because it involved a civil rather than a criminal case is unavailing.  Maxwell Reply at 23 n.11.  It is the same rule of evidence in issue, and the principles enunciated by the Supreme Court apply here with equal force.

The Defendant may also be suggesting in this argument that Rule 606 does not bar Juror 50's statements because they concern "extraneous prejudicial information," which is an enumerated exception to the rule.  *See* Fed. R. Evid. 606(b)(2)(A).  To the extent that argument is raised, it is meritless.  Information is "extraneous" when it is "external to the jury"—that is, "publicity and information related specifically to the case the jurors are meant to decide," rather than "the general body of experiences that jurors are understood to bring with them to the jury room."  *Warger*, 574 U.S. at 51 (cleaned up).  So, for example, the Supreme Court has held that a foreperson's undisclosed experience with a car accident is not extraneous information, even in a motor-vehicle lawsuit where that failure to disclose could have supported a for-cause strike.  *Id.* at 42–43.  The same is true here, as the second juror's alleged undisclosed experience "did not provide either [the juror] or the rest of the jury with any specific knowledge regarding" this particular case.  *Id.* at 51–52.  Rather, as this Court instructed, jurors are expected to bring their "reason, experience, and common sense" to bear in evaluating witnesses' credibility and the

Defendant's ultimate guilt.  Trial Tr. at 3066; *see also U.S. ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970).

Last, the Defendant argues—in a single sentence of her reply brief—that if Rule 606 does bar consideration of Juror 50's statements about the second juror, then the rule "violates Ms. Maxwell's constitutional rights to due process and to confrontation as applied to her."  Maxwell Reply at 23.  The Court rejects this argument.  The Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him."  U.S. Const., amend. VI. The Defendant's right to confrontation is not implicated here because Juror 50 is not a "witness[] against" the Defendant but was instead a factfinder in her trial.  Simply put, Juror 50's testimony at the hearing will be proffered to determine whether *Juror 50* has engaged in any misconduct warranting a new trial, not to accuse *the Defendant* of any crime.  *Cf. Crawford v. Washington*, 541 U.S. 36, 43 (2004) (describing the Confrontation Clause as a "right to confront one's *accusers*" (emphasis added)).  Even if the Confrontation Clause were implicated, Rule 606's prohibition on juror affidavits to impeach a verdict is a reasonable limitation, subject to other exceptions not at issue here, on the evidence that a defendant may muster, a limitation with a long historical pedigree.  *See Pena-Rodriguez*, 137 S. Ct. at 863 (tracing Rule 606 to traditional English common law); *Crawford*, 541 U.S. at 54 (explaining that the Confrontation Clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding").

Next, the Defendant's due-process claim is squarely foreclosed by controlling precedent. The Supreme Court in *Tanner v. United States* rejected a constitutional challenge to Rule 606, explaining that a criminal defendant's right to an impartial jury is "protected by several aspects of the trial process," including questions asked in *voir dire*; observations in court made by the

14

judge, court personnel, and counsel; observations by other jurors, who "may report inappropriate juror behavior to the court *before* they render a verdict"; and "impeach[ment] [of] the verdict by nonjuror evidence of misconduct."  483 U.S. at 127; *see also Warger*, 574 U.S. at 51 ("[A] party's right to an impartial jury remains protected despite Rule 606(b)'s removal of one means of ensuring that jurors are unbiased.").  The Defendant cites in support the Supreme Court's decision in *Pena-Rodriguez v. Colorado*, but that case is unavailing to her position.  There, the Supreme Court held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee."  137 S. Ct. at 869.  Throughout the opinion, the Supreme Court took great care to hold that the "unique historical, constitutional, and institutional concerns" intrinsic to a juror with racial animus do not attach to other forms of juror misconduct.  *Id.* at 868.  In fact, it *expressly* contrasted the case of a juror with racial animus to a juror that "ha[s] a personal experience that improperly influences her consideration of the case," as was at issue in *Warger v. Shauers* and as is alleged here.  *Id.* at 869.

        *Third*, even if the Court did consider Juror 50's statements about what another juror said during deliberations—which Rule 606 prohibits—the statements proffered by the Defendant do not meet the threshold of "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred."  *Baker*, 899 F.3d at 130.  According to an article in the *Daily Mail*, Juror 50 "revealed that he was not the only juror to share a story of sexual abuse."  That sentence summarizes an unsworn and non-specific statement, which does not identify the alleged misconduct or the juror in question with any particularity.  It therefore falls

**SA-364**

short of the demanding standard for ordering a post-verdict evidentiary hearing. *See Bin Laden*, 2005 WL 287404, at \*2. Notably, this case is far from *United States v. Colombo*, where the Second Circuit ordered an evidentiary hearing on the basis of two sworn affidavits that identified another juror by name and described with particularity the alleged misconduct. 869 F.2d 149, 151 (2d Cir. 1989).

The Court therefore rejects the Defendant's as-applied constitutional challenge to Rule 606 and further concludes that Rule 606 bars the Court's consideration of Juror 50's statements about the second juror. Even if the Court considered Juror 50's statement about another juror, the evidence would be insufficient to meet the high threshold for an inquiry. Without nonspeculative evidence of misconduct by any juror but Juror 50, the Court restricts the focus of the evidentiary hearing to Juror 50. *See Ianniello*, 866 F.2d at 544.[6]

## IV.    The nature of the hearing

### A.    The Court will examine the witnesses and the parties may submit questions

In concluding that an inquiry into Juror 50's conduct is warranted, the Court is mindful that the "object of the proceeding is to permit the truth to be discovered with the least possible harm to other interests." *Moten*, 582 F.2d at 666. Accordingly, the Court denies the Defendant's request that counsel directly question the juror—a decision committed to this Court's "sound discretion." *Id.* at 667; *see also Ianniello*, 866 F.2d at 544 ("We leave it to the district court's discretion to decide the extent to which the parties may participate in questioning the witnesses, and whether to hold the hearing in camera."). The Court will conduct the questioning at the

---

[6] The Defendant's briefing is unclear as to whether she seeks to question the other 11 jurors only to identify the juror implicated by the news article, or if she would seek to question the other jurors in any event to determine "what Juror No. 50 said to the other jurors." *See* Maxwell Br. at 49. To the extent the Defendant is requesting the ability to question jurors about what Juror 50 allegedly disclosed during deliberations, that request is denied as it is plainly foreclosed by Rule 606. *See also Ianniello*, 866 F.2d at 544.

16

public hearing with input from counsel.  The parties may submit questions consistent with this

ruling, including what the Court holds in this Opinion are the limitations imposed by Rule 606

and the appropriate scope of the hearing.  Once again, the scope of the inquiry is whether Juror

50's answers were false; if so, what is the explanation for the answers; and how Juror 50 would

have responded to follow-up questions if accurate answers had been provided.

Per this Court's prior order, the parties must submit the proposed questions under

temporary seal to ensure the integrity of the inquiry.  *See* Dkt. No. 596 at 4.  Proposed questions

must be submitted via email on or before **March 1, 2022**.  The proposed questions will be

unsealed following the hearing.

### B. The Defendant's subpoena requests are denied

The Defendant seeks two sets of subpoenas to conduct discovery in advance of the

hearing.  Maxwell Br. at 48–49.  First, from Juror 50, the Defendant seeks any emails or other

communications between Juror 50 and any alleged victim or witness; any other juror; any other

person or media organization about Juror 50's jury service; and, finally, any record of payments

for any interview or information that Juror 50 gave about his jury service.  Second, from

Facebook, Twitter, LinkedIn, Instagram, and other social media platforms, the Defendant seeks

all communications to and from Juror 50 regarding his jury service; all posts, comments, or

photographs by Juror 50 regarding his jury service; and all documents reflecting when Juror 50

opened or closed his accounts.  In her initial brief, the Defendant simply lists these requests

without justification.  In her reply, she provides only a short rebuttal to the Government's

objections and does not explain why each request is relevant or proper.

The Court denies these requests as vexatious, intrusive, unjustified, and a fishing

expedition.  Given the focused inquiry the Court is ordering, the evidentiary hearing's scope

must be "limited to only what is absolutely necessary to determine the facts with precision."

*Ianniello*, 866 F.2d at 544.  The Defendant can only speculate that the requested communications between Juror 50 and unknown persons and entities would shed any light on Juror 50's answers to the questionnaire and his bias *before* the trial at the time of *voir dire*.  Nor has the Defendant explained why Juror 50's receipt of financial payment for interviews *after* the trial, if true, would be probative of his inclination to not disclose at *voir dire prior* to trial.  The Court will not grant the Defendant "the opportunity to 'conduct a fishing expedition.'"  *Moon*, 718 F.2d at 1234 (quoting *Moten*, 582 F.2d at 667).

Moreover, the Defendant's requested subpoenas directed at social media companies who have custody of Juror 50's communications, comments, and posts are procedurally improper.  Those requests for social media content are subject to the Stored Communications Act, 18 U.S.C. §§ 2701–11, which requires an additional factual showing for the Court to order disclosure, *see* 2 Wayne LaFave et al., Criminal Procedure §§ 4.8(b), 4.8(d) (4th ed. 2021); *Matter of Warrant to Search a Certain E-Mail Acct. Controlled & Maintained by Microsoft Corp.*, 829 F.3d 197, 206 (2d Cir. 2016), *vacated and remanded on other grounds*, 138 S. Ct. 1186 (2018).  And only the Government, not private parties like the Defendant, may request disclosure pursuant to the Act.  *United States v. Nix*, 251 F. Supp. 3d 555, 559 (W.D.N.Y. 2017) ("[T]he [SCA] does not permit a defendant in a criminal case to subpoena the content of a Facebook or Instagram account."); *Facebook, Inc. v. Wint*, 199 A.3d 625, 629 (D.C. 2019) (collecting cases).  Though the Government raised the Act in its briefing, the Defendant does not acknowledge it or purport to show she is entitled to make a request.  Accordingly, the requests as to the listed social media companies are denied.

18

**SA-367**

The Court concludes that the Defendant has not made a showing that any pre-hearing discovery is appropriate, and the request to engage in an intrusive fishing expedition is denied.

### C. The Court will release Juror 50's questionnaire

This Court previously reserved ruling on Juror 50's request that the Court release his jury questionnaire to counsel, but that the document otherwise remain under seal to protect his supposed privacy interest.  *See* Dkt. No. 596 at 5 n.1.  The Defendant opposes both the unsealing and releasing the questionnaire to counsel, arguing that "advance disclosure . . . will undoubt[edly] color Juror No. 50's testimony and allow him to place himself in the best possible posture."  Maxwell Br. at 53.  The Government argues that there is no legitimate interest in limiting Juror 50's access and opposes maintaining the questionnaire under seal.  Gov. Br. at 42; *see also* Dkt. No. 594.

The Court will provide Juror 50 a copy of his completed questionnaire.  Unlike the parties' proposed questions, Juror 50's access to his completed questionnaire—the answers to which he wrote—will not undermine the integrity of the inquiry.  The Defendant's concern that advance disclosure may somehow taint Juror 50's testimony is unfounded.  *See United States v. McCoy et al.*, No. 14-CR-6181 (EAW), Dkt. No. 329, at 15 (W.D.N.Y. June 2, 2017) (providing the jury questionnaire to juror's counsel in advance of the hearing).  Rather, delaying disclosure until the hearing would needlessly delay the fact-finding process.

Moreover, the Court concludes that the presumption of access dictates that the questionnaire must be docketed.  Juror 50's and the Defendant's request that the questionnaire remain sealed is governed by the three-part test articulated by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  *See* Dkt. No. 596 at 2 (outlining the test).  First, the jury questionnaire easily qualifies as a judicial document.  It is a key exhibit to

the Defendant's motion for a new trial. *Cf. Carbon Inv. Partners, LLC v. Bressler*, No. 20-cv-3617 (ER), 2020 WL 5441497, at *2 (S.D.N.Y. Sept. 10, 2020). Accordingly, a high presumption of access attaches. For the reasons stated in this Court's prior order, this presumption of access is not outweighed by the possibility of media interest in the document. *See* Dkt. No. 596 at 3. Nor is sealing necessary to safeguard a possible hearing for the reasons stated above. Finally, any privacy interest Juror 50 may have had in his questionnaire, *see Press-Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 511–12 (1984), has at least been greatly diminished, if not extinguished, since his public comments. The Court further notes that prospective jurors had the opportunity to request that particular questionnaire answers remain confidential; Juror 50 did not make any such request. Accordingly, Juror 50's privacy interest in the questionnaire is now outweighed by the presumption of access. *Lugosch*, 435 F.3d at 119–20. The Defendant is accordingly ORDERED to docket Exhibit 1 to her motion for a new trial, Juror 50's completed questionnaire.

**V.    Conclusion**

For the reasons stated above, the Court will hold a hearing regarding Juror 50's answers to Questions 25 and 48 of the questionnaire. The public proceeding will take place on **March 8, 2022, at 10:00 a.m.** Juror 50 is hereby ORDERED to appear in Courtroom 906 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York at that date and time to give testimony under oath in response to the Court's questions. Counsel for the Defendant and the Government are ORDERED to submit via email proposed questions in accordance with this Opinion & Order on or before **March 1, 2022**.

SO ORDERED.

**SA-369**

Dated: February 24, 2022
     New York, New York

_____
ALISON J. NATHAN
United States District Judge

**SA-370**

1

M6SQmax1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                          20 CR 330 (AJN)
4                                               Sentencing
    GHISLAINE MAXWELL,
5
                Defendant.
6   ------------------------------x
                                        New York, N.Y.
7                                       June 28, 2022
                                        11:00 a.m.
8
    Before:
9                       HON. ALISON J. NATHAN,

10                                  United States Circuit Judge
                                    Sitting by Designation
11

12                          APPEARANCES

13

    DAMIAN WILLIAMS
14       United States Attorney for the
         Southern District of New York
15  BY:  MAURENE COMEY
         ALISON MOE
16       LARA POMERANTZ
         ANDREW ROHRBACH
17       Assistant United States Attorneys

18  HADDON MORGAN AND FOREMAN
         Attorneys for Defendant
19  BY:  CHRISTIAN R. EVERDELL
             -and-
20  BOBBI C. STERNHEIM

21  Also Present:  Amanda Young, FBI
                   Paul Byrne, NYPD
22                 Sunny Drescher,
                    Paralegal, U.S. Attorney's Office
23

24

25

**SA-371**

2

M6SQmax1

1              (In open court; case called)

2              DEPUTY CLERK:  Counsel, please state your name for the

3    record starting with the government.

4              MS. MOE:  Good morning, your Honor.  Alison Moe, Lara

5    Pomerantz, Maurene Comey and Andrew Rohrbach for the

6    government.  We're joined at counsel table by paralegal

7    specialist Sunny Drescher.  Also as a member of our team in the

8    gallery are our case agents, Special Agent Amanda Young and

9    Detective and Paul Byrne.

10             THE COURT:  Good morning to you all.

11             MS. STERNHEIM:  Good morning.  Bobbi C. Sternheim and

12   Christian R. Everdell for Ghislaine Maxwell, who is present at

13   counsel table.

14             THE COURT:  Good morning, Counsel.

15             Good morning, Ms. Maxwell.

16             Please, be seated everyone.

17             We are here today for sentencing in United States v.

18   Ghislaine Maxwell 20 CR 330.

19             In preparation for today's proceeding, I have reviewed

20   the probation report, which is dated June 9, 2022 by revision

21   date.

22             I have also received and reviewed the following

23   additional submissions:  I have the defense memorandum in

24   support of PSR objections, which is dated June 15, 2022.  I

25   have the defendant's primary sentencing submission, which is

**SA-372**

M6SQmax1

1    dated June 15, 2022.  There are exhibits attached to that

2    sentencing submission, Exhibits A through J.  A through H --

3    I'm sorry -- A through I were a series of letters from friends

4    and family members of Ms. Maxwell.  J is a forensic psychiatric

5    evaluation.  And then I received by a later transmission date

6    of June 26, 2022 a letter from an inmate at MDC related to

7    Ms. Maxwell's assistance of other inmates with tutoring.

8              I have the government's sentencing submission, which

9    is dated June 22, 2022.

10             With respect to victim impact statements, I have dated

11   June 22, 2022 a victim impact statement from Annie Farmer.  I

12   have a victim impact statement from the witness who went by the

13   name of Kate under my pseudonym order during trial.  That I

14   believe is undated.  I have a statement dated June 22, 2022

15   from Virginia Roberts, or Giuffre.  I have same date from

16   Juliette Bryant, same date from Maria Farmer, same date from

17   Teresa Helm.  I also have undated statements from Sarah

18   Ransome -- I apologize if I'm saying your name wrong -- and

19   Elizabeth Stein.

20             Counsel, is there anything else I should have in front

21   of me for purposes of sentencing?

22             MS. MOE:  No, your Honor.  Thank you.

23             THE COURT:  Ms. Sternheim.

24             MS. STERNHEIM:  Other than the submissions that we

25   made in connection with the CVRA, that is a complete record of

**SA-373**

M6SQmax1

1    what we have received and reviewed.

2            THE COURT:  Yes.  Thank you.  And that is part of the

3    record including there was an ethics letter and other materials

4    submitted in connection with your objection to that.

5            MS. STERNHEIM:  Thank you very much.

6            THE COURT:  Thank you.

7            All right.  Counsel, would you just please confirm

8    that you've received each other's submissions?

9            MS. MOE:  Yes, your Honor.

10           MS. STERNHEIM:  Yes.

11           THE COURT:  Let's also confirm all submissions are

12   filed on ECF.

13           MS. MOE:  That's correct, your Honor.

14           MS. STERNHEIM:  Yes.

15           THE COURT:  Thank you.

16           Ms. Moe, I did have the government indicate this in a

17   letter, but if you would confirm and articulate what the

18   government has done to notify any crime victims of their rights

19   under the Justice For All Act?

20           MS. MOE:  Yes, your Honor.

21           With respect to the six individuals who were proved at

22   trial to be directly impacted by the offense conduct, the

23   government has notified those individuals through their counsel

24   about the sentencing and about their right to be heard.

25           In addition to that notification, the government has

**SA-374**

5

M6SQmax1

1    used the victim notification page on the U.S. Attorney's Office

2    website regarding this case about the upcoming sentencing.

3              THE COURT:  And you posted the Court's order there

4    regarding a process for submission of statements.

5              MS. MOE:  Yes, your Honor.

6              THE COURT:  Thank you.

7              We'll turn to the presentence report.

8              Ms. Sternheim, I know that you have because you've

9    objected to a lot which we will talk about, but for the record,

10   have you read the presentence report and discussed it with your

11   client?

12             MS. STERNHEIM:  Yes, your Honor.

13             And, if I may, Mr. Everdell will handle the objections

14   portion of our presentation.

15             THE COURT:  Okay.  We'll get to that in just a moment.

16   Thank you.

17             Ms. Maxwell, can you please confirm that you've read

18   the presentence report and had a full opportunity to discuss it

19   with your counsel?

20             THE DEFENDANT:  I did have an opportunity to read it.

21             THE COURT:  And an opportunity to discuss it with your

22   counsel?

23             THE DEFENDANT:  I did.

24             THE COURT:  Okay.

25             Ms. Moe, for the record, have you reviewed the

**SA-375**

M6SQmax1

1  presentence report?

2  　　　　　MS. MOE:  Yes, your Honor.

3  　　　　　THE COURT:  Thank you.

4  　　　　　So we will turn first -- we'll set aside first the

5  guideline calculation.  We'll turn to the factual accuracy of

6  the report.  And I did receive substantial factual objections

7  to factual assertions in the report.  I am prepared to go

8  through those with respect to any continuing factual objections

9  by the defense.

10  　　　　　Let me confirm, Ms. Moe, does the government have any

11  objections to the report regarding factual accuracy?

12  　　　　　MS. MOE:  None, aside from those which are already

13  noted in the PSR.

14  　　　　　THE COURT:  No continuing objections.

15  　　　　　MS. MOE:  That's correct, your Honor.

16  　　　　　THE COURT:  Mr. Everdell, I know that you do have

17  continuing objections.  Tell me where you'd like to begin.

18  　　　　　MR. EVERDELL:  Well, your Honor, I don't know if the

19  Court is planning on resolving each and every factual

20  discrepancy or dispute or whether there are certain ones that

21  the court will find are relevant to sentencing or whether we

22  should go through each in detail.

23  　　　　　THE COURT:  I am prepared to -- what I typically do is

24  go through each one so that if there is a correction to the

25  report that is being requested to be made, whether it's

**SA-376**

7

M6SQmax1

 1    material to sentencing or not, I am prepared to address it.

 2              So I believe the first -- what I see as your first

 3    continued objection is to paragraph 22.

 4              MR. EVERDELL:  I'm just getting my submissions.

 5              Yes, that's correct, your Honor.

 6              THE COURT:  I overrule the objection.  I do credit

 7    Juan Alessi's testimony that the defendant identified and

 8    targeted Virginia after seeing her in the Mar-a-Lago parking

 9    lot.  The defendant also worked with Epstein to identify and

10    target Jane.

11              Paragraph three I see three objections to this

12    paragraph.  Is that a continuing objection, Mr. Everdell?

13              MR. EVERDELL:  Paragraph three, your Honor?

14              THE COURT:  23.  I apologize.

15              MR. EVERDELL:  Yes, your Honor.

16              THE COURT:  I overrule the objection.  The first

17    objection is regarding the conclusion that Ms. Maxwell was the

18    author of the essay in the paragraph.  I overrule the objection

19    because a reasonable inference supported by the trial evidence

20    is that the defendant authored the essay.  Metadata indicated

21    that the computer was registered to "GMax" and the document was

22    saved under the user name "Ghislaine."

23              The second objection is to the assertion that Epstein

24    transferred Ms. Maxwell approximately $23 million during the

25    conspiracy.  I overrule that objection.  Bank statements

**SA-377**

8

M6SQmax1

1    admitted at trial showed that accounts under Epstein's name

2    wired approximately $23 million over two occasions during the

3    conspiracy to accounts of "Ghislaine Maxwell."  The defendant's

4    assertion that Epstein's accountant may have had access to and

5    control over these accounts does not undermine the reasonable

6    inference that the defendant controlled the funds in accounts

7    bearing her name, so that is established by a preponderance.

8            As to the third objection that there's no evidence in

9    the record that Epstein bought the defendant her New York City

10   townhouse, I overrule that objection because I credit Kate's

11   testimony that the defendant told her that Epstein bought the

12   defendant her New York townhouse.

13           Paragraph 25 is an objection to the characterization

14   of the Palm Beach residence being operated through a culture of

15   silence.

16           You'll let me know if you're not maintaining an

17   objection.

18           MR. EVERDELL:  Yes.  I think that the default is we

19   are, your Honor.

20           THE COURT:  Understood.

21           I overrule this objection.  Evidence at trial

22   indicates that this was the case.  For example, the household

23   manual instructed employees to "see nothing, hear nothing, say

24   nothing."  I credit Mr. Alessi's testimony that he understood

25   this instruction to be a kind of warning that he was supposed

**SA-378**

M6SQmax1

1    to be blind, deaf and dumb, and to say nothing of Epstein's and

2    Ms. Maxwell's lives.

3              Paragraph 26, there's an objection to the

4    characterization concerning the defendant's identification and

5    isolation of minor girls as inconsistent with the trial

6    evidence.  I overrule this objection for the same reasons as

7    articulated with respect to paragraph 22.  In addition, the

8    trial evidence established that the defendant and Epstein

9    isolated girls by spending time with them alone away from their

10   families.  For example, Annie's testimony regarding the trip to

11   New Mexico.  Jane's testimony that she would spend time at the

12   Palm Beach residence alone with Epstein and the defendant.

13             Paragraphs 27 and 28 the defendant makes two

14   objections:  First, to the assertion that the defendant and

15   Epstein developed a scheme that created a "constant stream of

16   girls who recruited each other."  And, second, she objects to

17   the assertion that she encouraged minor girls to bring other

18   minor girls to provide Epstein with sexualized massages.

19             Again, based on the trial testimony and evidence, I

20   overrule the objection.  It supported the information in these

21   paragraphs.  The evidence indicated the scheme started with the

22   defendant's recruitment of Virginia.  Virginia then enlisted

23   Carolyn in addition to at least two other girls.  Carolyn in

24   turn recruited at least three friends, and those friends then

25   brought more girls.

**SA-379**

M6SQmax1

1    Carolyn credibly testified that she was paid twice as

2    much when she brought friends to the massages.  Based on the

3    defendant's control of household and Carolyn's testimony that

4    the defendant on occasion paid her directly, I find it more

5    probable than not by a preponderance of the evidence that

6    Virginia was also paid more as encouragement to recruit

7    additional girls.

8    Paragraph 9, there's an objection to the inclusion of

9    Kate in this paragraph.  It argues that her name should be

10   deleted because Kate is not a victim of the crimes charged in

11   the indictment.

12   MR. EVERDELL:  Your Honor, I'm sorry to interrupt.  I

13   think you said paragraph 9.

14   THE COURT:  I did.  I'm sorry.  I'm skipping the first

15   number for some reason.  29.  Thank you, Mr. Everdell.

16   I overrule this objection because the paragraph

17   doesn't assert that Kate was a statutory victim as we've

18   discussed throughout trial and the government didn't contend

19   that Kate was a victim of the crimes charged in the indictment,

20   and that paragraph doesn't assert that she was.

21   Paragraphs 30 to 38, there's objection throughout

22   these to the characterization of the defendant having groomed

23   Jane.  I overrule these objections.  I think the government is

24   right here that the objection is conflating grooming with

25   enticement to travel for purposes of sexual contact.  Jane's

**SA-380**

M6SQmax1

1    credible trial testimony established that the defendant took

2    steps to make Jane comfortable and encouraged her to engage in

3    illegal sex acts with Epstein.

4            Paragraphs 39 to 45 which describe specific conduct

5    involving Kate, I think the specific request here -- well,

6    first, was that it should be removed from the PSR because Kate

7    was not a victim of the crimes charged in the indictment, and

8    then, alternatively, that it be moved to a different paragraph

9    with a heading offense behavior not part of relevant conduct.

10   I don't see that this is necessary.  I overrule the objection.

11   Conduct involving Kate may be considered at sentencing her

12   testimony revealed additional details of the defendant's method

13   of identifying and introducing to Epstein young girls for

14   sexualized massages.  Her testimony also established the

15   defendant's knowledge of the sexualized nature of massages with

16   Epstein.

17           Paragraph 43, the defendant contends this paragraph

18   should include a sentence that Kate was above the age of

19   consent at all times.  I think the paragraph says that Kate was

20   age 17 or above at all relevant times, and I have no objection

21   to including that she was above the age of consent at all times

22   based on the trial evidence, so I will make that change to

23   paragraph 43 of the PSR.

24           Paragraph 54, the defendant objects that there's no

25   evidence that Epstein paid for Annie's trip to Thailand.  That

**SA-381**

M6SQmax1

1    objection is overruled.  Annie testified to this fact at trial,

2    and I credit this testimony.

3            Paragraph 5 -- sorry -- did it again.  55, defendant

4    makes three objections to the paragraph.  I overrule the

5    objections.  The record supports that the defendant personally

6    recruited Virginia to provide Epstein with sexualized massages

7    when she was a minor.  Jane and Kate's testimony established

8    that the defendant was aware that the massages were sexualized.

9    I credit Mr. Alessi's testimony that the defendant approached

10   Virginia, and that Virginia visited the residence -- approached

11   Virginia for the first time, and that Virginia visited the

12   residence later that day.  Flight records and credible witness

13   testimony established that this meeting occurred before

14   Virginia was 18.  In addition, when Virginia brought Carolyn to

15   the residence, the defendant greeted them and instructed

16   Virginia to show Carolyn -- quoting from the trial record --

17   "what to do."  Carolyn then witnessed Virginia give Epstein a

18   sexualized massage involving sexual intercourse.  Finally, as I

19   explained in my resolution to paragraphs 27 and 28, I do

20   conclude that there is a sufficient basis to find by a

21   preponderance of the evidence that the defendant used monetary

22   incentives to encourage Virginia to recruit Carolyn.

23           Paragraph 58, the defendant objects to the assertion

24   that Carolyn was 14 years old when Virginia brought her to

25   Epstein's residence, claiming that Carolyn's recollection is

**SA-382**

M6SQmax1

1  inconsistent and unreliable.  I overrule this objection.

2  Carolyn testified at trial that Virginia first brought her to

3  Epstein's residence when she was 14 years old.  I found Carolyn

4  to be credible and credit her testimony.  I'm not persuaded by

5  the arguments to the contrary.  Moreover, @Sean's credible

6  testimony corroborated Carolyn's recollection.

7        Paragraph 59, the defendant makes two objections.

8  Same objection to Carolyn being 14.  For the reasons I've

9  stated, that's overruled.  She objects to Carolyn's assertion

10  that she visited Epstein's residence more than a hundred times.

11  I overrule that objection.  Again, I credit Carolyn's

12  testimony.  She testified that she went to the house "over 100

13  times."  I reject the suggestion that this is improbable based

14  on Epstein's travel schedule.

15        Paragraphs 61 and 62 again object to Carolyn's age,

16  and I overrule for the same reasons.

17        Paragraph 64, three objections.  First, the defendant

18  objects to Carolyn's assertion that she visited the Palm Beach

19  residence over a hundred times and her assertion that she was

20  14.  For the reasons I've given, I overrule those objections.

21  She objects to the assertion that Carolyn stopped performing

22  sexualized massages in 2001 when she was 18 years old and

23  argues that the evidence indicates she was 17 years old.  We're

24  going to take up the issue of this timing question with respect

25  to the issue of which Guidelines Manual controls.  So I'll skip

**SA-383**

M6SQmax1

1   that for now.

2           Paragraph 72, defendant objects to the assertion that

3   Epstein briefly penetrated Carolyn's vagina with his penis

4   because her trial testimony the defense claims is contradicted

5   by a 2009 deposition testimony.  I overrule this objection.

6   Again, I credit Carolyn's testimony.  Carolyn plainly testified

7   to this at trial.

8           Paragraph 74, the defendant again objects to the

9   assertion as to the age and timing.  Again, we'll pick up on

10  that issue when we discuss the appropriate guideline manual.

11          Paragraphs 75 and 76 the defendant objects to the

12  inclusion of these paragraphs in the presentence report because

13  the perjury counts have not been presented to a jury, and so

14  she contends have no bearing on the sentence in this case.  I

15  do overrule this objection.  A sentencing court's discretion is

16  largely unlimited as to the kind of information it may

17  consider.  It's free to consider evidence of uncharged crimes,

18  dropped counts of an indictment, criminal activity resulting in

19  acquittal in determining sentence.  *United States v. Bennett*,

20  839 F.3d 153 (2d Cir. 2016).  I may consider the information as

21  long as the information is reliable and accurate.  For the

22  following reasons, I do conclude the information underlying the

23  severed perjury charges is reliable.  The defendant testified

24  under oath in 2016 that she was not aware of Epstein's scheme

25  to recruit underage girls for sexual massages and other than

**SA-384**

M6SQmax1

1    Virginia, was unaware if she had interacted with anyone under

2    the age of 18 at Epstein's properties.  She never gave Annie

3    Farmer a massage.  She was unaware whether Epstein possessed

4    sex toys.  She was unaware that he was engaging in sexual

5    activity with anyone other than her in the 1990s and 2000s.

6    She never gave Epstein a massage.  The credible testimony and

7    evidence admitted at trial disproves these assertions which

8    were made under oath.

9          Paragraph 79, the defendant objects to the

10   characterization of the offense conduct as contrary to the

11   trial record.  Here, defense hasn't provided any reason

12   specifying this, and I don't see one.  So based on the written

13   objection, it's overruled.

14         Paragraph 81, the defendant objects to the assertion

15   that Ms. Maxwell had direct responsibility for any sexualized

16   massages that several women or any other people that Carolyn

17   may have brought to Epstein's residence may have performed, and

18   she contends there's no record that she interfaced with these

19   individuals.  I am prepared to overrule that objection.

20         The paragraph makes clear that these individuals did

21   not interact directly with Ms. Maxwell.  Nevertheless, for the

22   reasons explained a little while ago in overruling the

23   objections to paragraphs 27 and 28, I do conclude that the

24   evidence at trial established that the defendant's recruitment

25   of Virginia set the recruitment scheme in motion that resulted

**SA-385**

M6SQmax1

1    in the abuse of these individuals.

2         Paragraph 82, the objection is to the assertion that

3    the records recovered from the Palm Beach residence during the

4    2005 search reveal that additional minors provided Epstein with

5    sexualized massages between 2001 and 2004.  Again, I overrule

6    the objection.  The trial record including message pads, phone

7    book entries, and testimony of witnesses establishes by a

8    preponderance that the information contained in this paragraph

9    is accurate.

10         Paragraph 83, so there was a revision here.  I'm not

11   sure if there is a continuing objection, Mr. Everdell.  The

12   previous objection was to the assertion that the defendant is

13   responsible for the victimization of untold number of other

14   victims.  The probation department adopted the government's

15   suggestion, revised the paragraph to assert that the defendant

16   is responsible for the victimization of additional minor

17   victims.  To the extent there is a continuing objection, I

18   overrule it for the reasons stated regarding paragraphs 27 and

19   28.

20         Paragraph 85 is an objection to the inclusion of

21   Kate's victim impact statement and her status under the CVRA.

22   We have litigated the question of Kate's ability to make a

23   statement here.  I believe that defense's ultimate position was

24   that with the requested redactions, there were no objections to

25   her making a statement.  Do I have that right?

**SA-386**

M6SQmax1

1    MR. EVERDELL:  That's correct, your Honor.

2    THE COURT:  So I did reject the request for redactions

3    for the reasons explained in my order.  And as I explained in

4    overruling the objection to paragraphs 39 to 45, Kate's

5    testimony and her statement are relevant to sentencing which

6    I've indicated she may give.  And with that, there's objections

7    pertaining to fine and assets and the like.  I think we can

8    turn to those when we get to the fine.  Mr. Everdell, okay with

9    that?

10    MR. EVERDELL:  Yes, your Honor.  So we'll delay the

11    offense level calculation objections and the ones related to

12    the financial penalties for now?

13    THE COURT:  Yes, precisely, and we'll pick those up.

14    I think otherwise that's it for what I understand to be

15    continuing objections after probation responded to your

16    requests and assertions.  Agree with that, Mr. Everdell?

17    MR. EVERDELL:  Your Honor, the only one that I would

18    highlight is there was an objection, I believe it's framed

19    according to paragraph 173, which deals with the financial

20    penalties.  The government made in their response some

21    representations that we take issue with, but if you're planning

22    on covering that later, we can reserve that till later because

23    it does deal with the financial penalties.

24    THE COURT:  Yes, I have objections to 172, 178, 192

25    and 193.

**SA-387**

M6SQmax1

1           MR. EVERDELL:  I guess in the final version, it

2     probably pertains to 172.

3           THE COURT:  Thank you.

4           And with that, no further factual objections that need

5     resolution, Mr. Everdell?

6           MR. EVERDELL:  Other than the ones we've just

7     discussed, no, your Honor.

8           THE COURT:  Ms. Moe?

9           MS. MOE:  No, your Honor.  Thank you.

10          THE COURT:  So, with those rulings, hearing no further

11    objections, with those rulings, I otherwise adopt the factual

12    recitations set forth in the PSR.  As in all cases, the PSR is

13    sealed and made a part of the record in this matter.  If an

14    appeal is taken, counsel on appeal may have access to the PSR

15    without further application to this court.

16          We'll turn now to the guideline calculation.  As

17    counsel is aware, I am no longer required to follow the United

18    States Sentencing Guidelines, but I am still required to

19    consider the applicable guidelines in imposing sentence and

20    must therefore accurately calculate the Sentencing Guideline

21    range.  The parties dispute multiple aspects of the guideline

22    calculation.

23          Just to outline the relevant overall calculations, the

24    defense contends that the correct guideline calculation is 51

25    to 63 months' imprisonment.  The government contends that the

**SA-388**

M6SQmax1

1  correct calculation is 360 to 660 months' imprisonment and

2  argues that a guideline sentence is warranted.

3         The probation department has calculated the range at

4  292 to 365 months' imprisonment, but recommends a downward

5  variance to a term of 240 months' imprisonment.

6         Counsel, I have reviewed your written arguments

7  carefully.  I have a few questions I want to ask, but I don't

8  need to hear repetition of your written arguments, but I would

9  be happy to give you an opportunity to add anything beyond your

10  submission if you'd like to make any additional arguments.

11         I'll hear from you now, Mr. Everdell.

12         MR. EVERDELL:  Thank you, your Honor.

13         I will largely rely on my written submissions.  I just

14  would like to amplify one or two things.

15         Your Honor, our initial argument, of course, is that

16  the Court must resolve who is to make the determination about

17  which book like -- when the offense conduct ended, which

18  determines guidelines book applies: the 2003 or 2004

19  guidelines.  We argue that that is a jury determination because

20  the issue implicates the *Ex Post Facto* Clause.  So the 2003

21  guidelines must apply because the jury was never asked to make

22  that factual determination.

23         I know your Honor is familiar with the arguments we

24  raised.  I would just point out that the government in their

25  response really did not engage with our arguments about the

**SA-389**

M6SQmax1

1    issue of the *Ex Post Facto Clause* being implicated.  They want

2    to cast this as purely a Sixth Amendment issue and cited cases

3    along the *Apprendi* lines.  But this is an ex post facto issue

4    properly framed.  This decision of when the offense conduct

5    ended implicates whether or not an ex post facto violation will

6    occur if the later guidelines is applied.

7         Under the cases that we've cited, your Honor, we think

8    that that is an issue for the jury to decide, and it is not

9    really in the *Apprendi* line of cases.  It is focused on

10   ex post facto law.  I just, for example, highlight for your

11   Honor the *Tykarsky* opinion that we cited for the Court.  That

12   is not an *Apprendi* decision.  That is not a Sixth Amendment

13   decision.  In that case, there was an increase in the mandatory

14   minimum that took effect potentially after the offense conduct

15   ended.  It's interesting that at the time the law was that you

16   could do that, a judge could make a finding and increase it as

17   long as it didn't increase beyond the statutory maximum, so

18   there was no *Apprendi* issue there.  That decision later got

19   overruled by the Supreme Court, but at the time of *Tykarsky*, it

20   clearly wasn't a Sixth Amendment *Apprendi* issue.  They resolved

21   that issue on an ex post facto basis.  This decision about

22   whether or not the offense conduct ended at a certain time, if

23   it triggers an increase that implicates the ex post facto

24   clause is a decision for the jury to make.  The government has

25   not responded to that argument, and we think that that is a

**SA-390**

M6SQmax1

1    persuasive -- along with the other sources and opinions we've

2    cited, it's persuasive authority for the fact this is a jury

3    decision, not a Court determination.

4            THE COURT:  Are you leaving that argument?

5            MR. EVERDELL:  Yes, your Honor.

6            THE COURT:  We'll do a little back-and-forth so I have

7    everybody's arguments in mind.  Thank you.

8            Go ahead, Ms. Moe.

9            MS. MOE:  Thank you, your Honor.

10           The government is confident the 2004 Manual applies in

11   this case.  I believe we did engage with the ex post facto

12   issue thoroughly in our brief.  The question is whether the

13   factual record at trial establishes that the offense continued

14   throughout the duration of 2004, which it emphatically did.

15   The testimony of a crime victim who testified at this trial

16   establishes that the offense conduct went past November 1,

17   2004.

18           THE COURT:  So I think the framing of the question

19   here is very important and its technical -- this whole

20   discussion is very technical.  It seems to me the question is

21   can the government point to a preponderance of the evidence

22   that conspiratorial conduct took place in this very small time

23   window, basically November and December 2004.  That is what's

24   in issue, and the question is what the trial record establishes

25   with respect to that two-month window.

**SA-391**

M6SQmax1

1      To some extent, the government points, I think, to

2  post conspiracy conduct, and that concerns me.  And so I would

3  like to ask you to draw my attention to what in the trial

4  record specifically speaks to November and December of 2004.

5      MS. MOE:  Yes, your Honor.

6      As a threshold matter, the government's understanding

7  that the case law is that the question is what is the end date

8  of the conspiracy.  In other words, if the conspirators are

9  taking actions periodically over time, the question is what is

10  the last date of the conspiracy?  What does the trial evidence

11  establish about the final date?  And here the trial evidence

12  was that the conspiracy was ongoing through all of 2004 and

13  into 2005.

14      THE COURT:  But to make that point, I think you're

15  relying on post conspiracy evidence.

16      MS. MOE:  No, your Honor.  We're relying on evidence

17  that exceeds the date in the indictment, but it --

18      THE COURT:  It exceeds also the date of Carolyn's 18th

19  birthday.  And so it's not just what the indictment charges --

20      MS. MOE:  Yes, your Honor.

21      THE COURT:  -- but by a conspiracy that is dependent

22  here on Carolyn being under 18 for its continuation.  And so

23  that's why I see what you're pointing to as post conspiracy,

24  not only because it goes past what the indictment charged, but

25  because I think legally you're pointing to non-conspiracy

**SA-392**

M6SQmax1

1    evidence.

2          MS. MOE:  No, your Honor.  I think our point is that

3    the conspiracy was still live at the end of 2004, and we know

4    that because in fact the conspiracy was still ongoing beyond

5    that, and I don't mean to be --

6          THE COURT:  But, see, just in that sentence, the

7    conspiracy was going on beyond that, what you point to, I

8    think -- and tell me if I should look at something else, but

9    what you point to to make that argument is definitionally

10   non-conspiracy conduct.

11         MS. MOE:  No, your Honor, in part because -- well, to

12   step back and discuss the framing of the issue.  The question

13   is whether a conspiracy was still ongoing throughout 2004.  And

14   the key thought tells us it's the defendant's burden to show

15   that she withdraw from the conspiracy if it was ongoing.  The

16   question is in framing it, when did this conspiracy end.  We

17   know that it was still live as of the end of 2004, in fact,

18   because, among other reasons, Carolyn testified that she was

19   continually going to Epstein's house through age 17 and through

20   age 18, which would have been throughout the duration of 2004

21   and 2005.

22         The government is not required to show that any

23   conspirator took an action in between those specific dates

24   because the question is when did the conspiracy terminate?  Was

25   it still live at the end of 2004?  And the evidence here shows

**SA-393**

M6SQmax1

1   that it certainly was.  The message pads show that Carolyn was

2   still going to the house.  Her testimony establishes that she

3   was still going to the house throughout that time period.  We

4   do not agree that we're required to show that any conspirator

5   took a specific act in that exact window but just that the

6   conspiracy was still live, and the fact that there were

7   additional acts ratifying membership of the conspiracy

8   throughout 2004 and into 2005 satisfies that burden.

9           THE COURT:  Again, just to make sure I'm not missing

10  anything you want to point to, the into 2005 is pointing to

11  post conspiracy conduct.

12          MS. MOE:  Post indictment conduct, your Honor.

13          THE COURT:  Post indictment.  Is it in some way not

14  post conspiracy?

15          MS. MOE:  Well, your Honor, again, the question before

16  the Court, according to the application is when the did offense

17  end.

18          THE COURT:  Ms. Moe, I do understand you're framing

19  that question.  I'm asking record evidence question.  Is there

20  something you're pointing to for your statement, the post 2005

21  which consists of conspiratorial conduct?

22          MS. MOE:  I think separate from the 2005 evidence, we

23  would point to in the fall of 2004, a message from Carolyn in

24  November of 2004 showing that she was contacting the house to

25  make a scheduled appointment.

**SA-394**

M6SQmax1

1          THE COURT:  It's not dated November 2004; am I right?

2     It's on a page that has dates surrounding it of December,

3     November.

4          MS. MOE:  Yes, your Honor, all of the dates

5     surrounding the message would be after November 1, 2004.  The

6     neighboring dates are November 13.  There's a date in December.

7     And I think looking at the message pads as a whole, it tells us

8     they're dated essentially sequentially.

9          THE COURT:  Is there any way to tell -- again, this is

10    very technical -- if it's October and November?

11         MS. MOE:  Your Honor, I'd be happy to take a look at

12    physical book.  I just have the sheet in front of me to see the

13    page before and after, if the Court would like to examine it.

14    Our view is the combination of the message itself and the

15    neighboring dates tell us it's November of 2004.  In addition,

16    as we noted in our brief, the defendant was still traveling

17    with Epstein during this exact same time period.  Again, it's

18    the defendant's burden to establish withdrawal from an ongoing

19    conspiracy, which they've not attempted to do, nor could they.

20    We think that the message pads, the flight records, the fact

21    that the testimony of a crime victim Carolyn was that the

22    conspiracy was ongoing more than meets this burden.

23         THE COURT:  Okay.

24         MR. EVERDELL:  Your Honor, if I could just respond to

25    that.  I do pick up on what the Court is saying, and we agree

**SA-395**

M6SQmax1

1    with the point, which is we're focusing on the record evidence.

2    The conspiracy as charged requires there be to be a minor

3    involved.  Carolyn is not a minor in 2005.  Her birthday is

4    January -- I don't know if I can say that, I'm sorry, but you

5    understand it's at the beginning.

6              THE COURT:  It's early.

7              MR. EVERDELL:  It's early.  So as of 2005, she is not

8    a minor any more.  So if we're looking to the end date of the

9    conspiracy that's charged in the indictment, that does not

10   exist in 2005, and Carolyn is not a minor in 2005, that

11   evidence can't be used to support the end date of the

12   conspiracy that is charged.

13             So what we're really talking about is one message pad

14   that is undated, unverified, and not even in evidence.  It's

15   not even properly authenticated.  I would also point out --

16   it's not reliable, your Honor.  But I would also point out that

17   I think we did have testimony that there were multiple message

18   pads going on at any one time.  The surrounding message pads

19   are not a perfect indicator of when that message would have

20   been taken if it's undated.  It could have been weeks, months

21   afterwards that someone decided to use that message pad to take

22   that message instead of another of message pad that was ongoing

23   at the same time.  So there is no reliable credible evidence

24   that's the date of that message pad.

25             And so, your Honor, we cited a number of cases in our

**SA-396**

M6SQmax1

1   submission about the Court has to consider the weight and

2   reliability of the evidence when determining a factor -- a

3   sentencing factor that is going to increase the guidelines,

4   especially by the amount that this is going to increase it by.

5   And this one uncorroborated, unadmitted, unreliable message pad

6   is not sufficient for that purpose.  So if we're relying on a

7   factual record argument, there is not enough of evidence in the

8   record to support that the conspiracy ended in November or

9   December of 2004.  Therefore, the 2003 guidelines must apply.

10          THE COURT:  Okay.  I have a question about the

11  leadership enhancement, as I said, but anything else you want

12  to raise that you didn't have the opportunity to raise in your

13  papers, Mr. Everdell?

14          MR. EVERDELL:  Your Honor, just one point about that

15  same book issue.  I think there was a section of the

16  government's brief where they were trying to show -- this was

17  the point about the Court's discretion.  We argued the Court

18  has discretion to sentence as if it were the 2003 guidelines.

19  I realize that might not be where the Court is headed, but I

20  would point out --

21          THE COURT:  You mean as a variance argument.

22          MR. EVERDELL:  Exactly.  In that section, the

23  government made reference to an argument that the defendant was

24  receiving money into the 2007 time period.  I believe they

25  pointed to $7 million.  I think that is an extreme stretch,

**SA-397**

M6SQmax1

```
 1    your Honor.  If the Court remembers the record evidence, there
 2    was some evidence of money moving, but it was to buy a
 3    helicopter that was not for her.  We heard testimony from Larry
 4    Visoski that he often kept assets of cars in his name for
 5    Mr. Epstein.  That doesn't make Larry Visoski a participant in
 6    the criminal endeavors.  I think it's a stretch for the
 7    government to point to that as some sort of evidence of
 8    continued involvement or continued profit after the end date of
 9    the conspiracy.  I just wanted to make that one point, your
10    Honor.
11              THE COURT:  Anything on that, Ms. Moe?
12              MS. MOE:  Your Honor, with respect to the financial
13    transaction, we offered that along with other evidence to
14    refute the claim that the defendant had moved on, which, as we
15    noted, is an expression that has no legal meaning.  And so
16    contrary to the assertion that the defendant had moved on and
17    was no longer associated with Epstein, the trial evidence
18    established that she remained a close associate for many years,
19    and that is the purpose for which we offered that evidence.
20              THE COURT:  Understood.  Thank you.
21              I do want to address -- do you have other -- I want to
22    ask about 3(b)(1).
23              MR. EVERDELL:  Yes, your Honor.
24              THE COURT:  I think it's for the government.  So as I
25    see the question here, the guidelines require me to find that
```

**SA-398**

M6SQmax1

1    the defendant was an organizer or leader, and that the criminal

2    activity either involved five or more participants or was

3    otherwise extensive.  The guidelines defines a participant as a

4    person who is criminally responsible for the commission of the

5    offense but need not have been convicted.

6         So I think my question for the government is, you're

7    asking the Court to look to as a criminally responsible -- a

8    person who is criminally responsible for the commission of the

9    offense over whom Ms. Maxwell exercised supervisory or

10   leadership role.

11        MS. MOE:  Yes, your Honor.  As we noted in our

12   briefing, our view is that the trial evidence establishes that

13   the defendant had a supervisory role over Sarah Kellen.  Here,

14   we're not required to establish that there were five or more

15   participants; that is, people who were criminally responsible

16   for the charged conduct, but rather that it was extensive, and

17   that the defendant supervised at least one other person.

18   That's the text of the commentary, although as we noted, the

19   Second Circuit in applying this factor hasn't really engaged

20   with that from what we can tell, but on the factual question of

21   the trial record and whether it establishes the defendant

22   supervised another participant, it absolutely does.

23        THE COURT:  And the government is pointing to Sarah

24   Kellen for that conclusion, which you agree, there has to be

25   one criminally responsible participant who we can point to.

**SA-399**

M6SQmax1

1        MS. MOE:  Yes, your Honor.  Looking at the text of the

2   application note -- again, it's unclear from some case law on

3   this, but under the text of the application note, if we're

4   looking to one criminal participant, we would direct the

5   Court's attention to Sarah Kellen.

6        THE COURT:  And the leadership over her as opposed to

7   Epstein being the leader over her or them being -- Kellen sort

8   of replacing the defendant's role, could you focus my mind on

9   what specifically you point to to show supervision and

10  leadership by Ms. Maxwell over Ms. Kellen.

11       MS. MOE:  Yes, your Honor.

12       The trial evidence was that Sarah Kellen became an

13  assistant, and that she worked for both Maxwell and Epstein.

14  Essentially, when you look at defendant's role in earlier

15  years, she was doing things like calling victims and arranging

16  for massage appointments.  As the scheme shifted, they brought

17  in another member of the scheme beneath them in the structure

18  and hierarchy of the scheme.  The defendant remained a close

19  associate.  She was often traveling with them, often traveling

20  with Kellen together.  So as Kellen took on some of the tasks

21  that were then delegated to a lower member of the conspiracy,

22  the defendant was higher up in the leadership structure.

23       There wasn't direct evidence about, you know, the

24  defendant directly instructing Kellen to make a certain phone

25  call, and we acknowledge that, but we think the inference is

**SA-400**

M6SQmax1

1    very clear that when you have two knowing conspirators, Maxwell

2    and Epstein, and they bring in a much younger woman as an

3    assistant and have her take on some of those roles while the

4    defendant remains a lady of the house in the hierarchy of the

5    structure to whom a person like Sarah Kellen would report, that

6    she has leadership of that person; that she is directing that

7    person; that she has control.  Even the simple task of

8    directing her to take on some of those responsibilities, which,

9    of course, to transition parts of that role she would have to

10   do would qualify for leadership.

11           THE COURT:  And there's clear time overlap in the

12   role?

13           MS. MOE:  Yes, your Honor.  As we noted in our brief,

14   the flight records reflect that the defendant continued flying

15   on Epstein's private jet at the same time that Sarah Kellen was

16   also traveling, and that there was an overlap in the years of

17   the time period where they were all close associates of Jeffrey

18   Epstein and the scheme was ongoing.

19           THE COURT:  Go ahead.

20           MR. EVERDELL:  Yes.  Your Honor, before I address the

21   Sarah Kellen point, I would just make the point that the

22   government seems to argue that there is some case law that is

23   not clear that you don't have to necessarily show that they're

24   supervising another criminal participant.  That's just wrong.

25   All those cases that the government cites, the issue has

SOUTHERN DISTRICT REPORTERS, P.C.···
(212) 805-0300

**SA-401**

M6SQmax1

1    already been decided or conceded by the defendant.  The court

2    found they were leader or the defendant didn't contest that, so

3    the issue was only about whether the criminal activity was

4    otherwise extensive.  So that is not -- that is clear under

5    Second Circuit law, that they have to supervise another

6    criminal participant, and it's clear from the guidelines too,

7    as the government concedes.

8            Let's just talk a bit about Sarah Kellen.  I don't

9    think it is a fair inference to say from the trial record that

10   Ms. Maxwell was supervising Sarah Kellen.  In fact, the

11   inference is exactly the opposite.  And you can rely on

12   Carolyn's testimony alone for that; that she herself testified

13   that there was a clear break between when she says that

14   Ms. Maxwell was calling her to schedule for massage

15   appointments versus when Sarah Kellen took over and scheduled

16   for massage appointments.  They did not overlap.  There was a

17   break.  That is corroborated by Juan Alessi no less, who said

18   the same thing.  He said Sarah Kellen came at the end of my

19   employment, to his recollection, and as soon as she got there,

20   she took over the responsibility of scheduling the massage

21   appointments.  Again, a clear break.

22           What the record shows is that there was a replacement.

23   Sarah Kellen replaced Ms. Maxwell, at least according to the

24   trial testimony; not that there was some sort of ongoing

25   supervision by Ms. Maxwell over Sarah Kellen.  It couldn't be

**SA-402**

M6SQmax1

1    clearer, your Honor, this notion that she was somehow -- Sarah

2    Kellen was an assistant of both Epstein and Maxwell is again

3    belied by the trial record.

4         If you look at Larry Visoski's testimony, which I

5    believe is what the government is relying on there, he

6    originally testified, oh, I think she was an assistant for

7    both.  But on cross-examination, he conceded that he really

8    didn't know what her role was, and his best recollection was

9    that she was an assistant for Epstein.

10        And again, just look again at Cimberly Espinosa's

11   testimony who was the actual assistant for Ms. Maxwell, and she

12   says unequivocally, "I was her assistant.  Kellen was Epstein's

13   assistant."  So there is no fair inference that Ms. Maxwell was

14   supervising Sarah Kellen.  The inference is exactly the

15   opposite, and it can't provide a basis for that leadership

16   enhancement.

17        THE COURT:  All right.  Anything further on the

18   enhancements for the government's objection?

19        MS. MOE:  Your Honor, just very briefly with respect

20   to the leadership question, I just want to direct the Court's

21   attention, we noted this on page 27 of our brief, but the

22   testimony at trial was that Carolyn recalled that even after

23   Sarah Kellen took over calling to schedule massages, Maxwell

24   was still present inside the Palm Beach residence when Carolyn

25   arrived for massage appointments.

**SA-403**

M6SQmax1

1    With respect to the testimony of the pilots who

2    testified, whether they -- whether an employee was paid by

3    Maxwell or Epstein or technically reported to one, according to

4    their job descriptions, is not the question here.  The fact

5    that pilots based on their observation thought at one point

6    that Kellen reported to Maxwell proves the point that she had

7    supervisory authority over Kellen and exercised it, whether in

8    the chain of command or on their formal employment paperwork,

9    she was just an employee for one or the other, it makes no

10   difference.  There was an overlap here.  They had different

11   roles in the conspiracy, and the defendant had a supervisory

12   roll over Kellen.

13        MR. EVERDELL:  Your Honor, just to that point.  Being

14   present does not mean that you're a supervisor.  That's way too

15   far a stretch.  So the fact that there was testimony she was

16   present still in the house while Kellen was making the calls

17   and scheduling the massage appointments means nothing in terms

18   of supervisory authority.

19        THE COURT:  Thank you.  Other enhancements before the

20   government's objection is to be addressed.

21        MS. MOE:  No, your Honor.  Thank you.

22        MR. EVERDELL:  Your Honor, I assume you don't want to

23   hear or have any questions about the five-point enhancement for

24   repeated and dangerous sex offenders.

25        THE COURT:  I believe I have what I need, but as I

**SA-404**

M6SQmax1

1    said, I don't need repetition of the arguments in the papers,

2    but if there is any additional points you want to make, you're

3    welcome to.

4          MR. EVERDELL:  Your Honor, just one point.  I will be

5    brief.  The government in its papers makes the argument that

6    the background commentary can't be relied upon as authoritative

7    because it is not explanatory or interpretative of what the

8    guideline is.  I think that is incorrect.

9          It is not simply a recitation of what Congress was

10   considering.  That first sentence or two which talks about how

11   this guideline can only be applied to offenders who represent a

12   continuing danger to the community is interpretative of what

13   the guideline is.  The title of the guideline is repeat and

14   dangerous sex offenders.  That explanatory commentary explains

15   how to interpret what dangerous means.  It means someone who is

16   continuously dangerous to the community, not someone who's

17   never been accused of a crime in the 18 plus years since the

18   crime in this case, and has never been accused of re-offending.

19   So I don't agree with that point.  This is authoritative

20   guidance from the Sentencing Commission, and the Court should

21   consider it as such.  Thank you.

22         THE COURT:  Ms. Moe, do you want to respond?

23         MS. MOE:  No, your Honor.  We rest on our briefing on

24   this issue, but thank you.

25         THE COURT:  Thank you.  Anything else?

**SA-405**

M6SQmax1

1            MR. EVERDELL:  No, your Honor.  We rest on the papers.

2            THE COURT:  I thank you counsel for your thorough

3    briefing.  I am prepared to rule.

4            The defendant raises four objections to the

5    calculation of the guideline range contained in the PSR.  As we

6    discussed, first, she argues I must apply the 2003 guidelines

7    rather than the 2004 guidelines.  Beyond that, she objects to

8    the application of three sentencing enhancements.  The

9    government's sole objection to the calculation of the

10   guidelines is that Virginia Roberts and Melissa should be

11   considered victims.  So I will address the defense objections

12   and then the government's objections.

13           I begin by determining which of the Guideline manuals

14   apply.  Generally, a sentencing court applies the version of

15   the guidelines in effect on the date that the defendant is

16   sentenced.  18 U.S.C. Section 3553(a)(4)(A)(ii).  But the

17   *Ex Post Facto* Clause is violated if a defendant is sentenced

18   under Guidelines issued after she's committed her offense and

19   the new Guidelines provide a higher sentencing range than the

20   version in place at the time of the offense.  That's the

21   principle of a case called *Peugh v. United States*, 569 U.S. 530

22   (2013).  In that case, a sentencing court must -- in the case

23   of a higher range at the time of sentencing than in place at

24   the time of the offense, in that case the sentencing court must

25   apply the guidelines in effect when the offense was committed.

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

**SA-406**

M6SQmax1

1    *United States v. Guerrero*, 910 F.3d 72 (2d Cir. 2018).  Here,

2    the parties and the probation department agree that applying

3    the current Guidelines would result in a significantly longer

4    sentence than the application of the guidelines in place when

5    the defendant committed her offense, whether that is the 2003

6    or 2004 guidelines.

7         The controlling date for ex post facto purposes is the

8    last date of the offense of conviction.  The 2004 Guidelines

9    became effective on November 1, 2004.  So I must determine if

10   the last date of the offense was after November 1, 2004.

11        Because it seeks an increased punishment, the

12   government bears the burden of persuasion.  The government

13   charged a decade-long conspiracy of sexual abuse that the

14   indictment alleged ended in 2004.  It's proof at trial that the

15   conspiracy continued in 2004 related to Carolyn.  And the

16   charged conspiracy had to end no later than very early 2005

17   because that's when Carolyn turned 18 and can no longer be

18   deemed a victim of the federal sex-trafficking offense charged

19   which proscribes conduct with respect to individuals under the

20   age of 18.  So the government purports to carry its burden on

21   this issue based on portions of Carolyn's testimony and some

22   message pads regarding what occurred in 2004 and 2005.

23        Let me state clearly, I found, as I said repeatedly in

24   my factual conclusions on the PSR objections, I found Carolyn

25   to be a credible witness, as did the jury.  The question before

**SA-407**

M6SQmax1

1    me is specific and highly technical.  Does the preponderance of

2    the evidence demonstrate that the offense to sex traffic

3    Carolyn continued after November 1, 2004 before she turned 18

4    in early 2005?  In other words, does a preponderance of the

5    evidence establish that acts in furtherance of the conspiracy

6    to traffic Carolyn occurred in either November or

7    December 2004?  Although Carolyn testified regarding contact

8    earlier in 2004 and after she turned 18 in 2005, there is no

9    evidence, either in the form of testimony or documentary

10   evidence, including the message pads, that demonstrates by a

11   preponderance of the evidence conspiratorial conduct during

12   those last two months of 2004 before Carolyn turned 18 in 2005.

13          In those portions of Carolyn's testimony cited by the

14   government, Carolyn stated that she was 18 years old the last

15   time she went to Epstein's house, which would have been in

16   2005.  As Carolyn further explained, she returned more than

17   four or five times to Epstein after she gave birth to her son

18   in March of 2004, and that testimony is supported by message

19   pads entered at trial that show Carolyn called Epstein several

20   times in the summer of 2004:  Once in late April or early May

21   again on July 6, and again on July 30.  When she did return to

22   Epstein, Carolyn testified Epstein asked if she had younger

23   friends, and she explained during her testimony that at 18

24   years old, she was too old for him.  Carolyn wasn't asked, and

25   her testimony doesn't specifically address, whether she went to

**SA-408**

M6SQmax1

1    Epstein's house after November 2004 before she turned 18.

2    Message pads entered at trial show contact only before

3    November 1.

4           The government's reliance on two additional pads that

5    were not entered into evidence doesn't change my analysis.  The

6    first message GX-4B, it's undated, and the context does not

7    give sufficient confidence that it came after November 1.  The

8    other message pad is dated March 1, 2005, which falls outside

9    the scope of the conspiracy alleged in the indictment, and

10   after Carolyn turned 18.  Because I cannot on this record find

11   by a preponderance of the evidence that the offense continued

12   during that two-month window after November 1, 2004, and before

13   early 2005, I must apply the 2003 guidelines.  Because I find

14   that the date of the offense was not after November 1, 2004, I

15   do not address the defendant's alternative argument that a jury

16   must decide if the 2004 Guidelines apply.

17          Within the Guidelines themselves, the defendant

18   objects to the application of three enhancements in the PSR.

19   She takes issue first with 4B1.5(b).  The enhancement

20   statements that the offense level is increased by five if:

21   One, the offense of conviction is a covered sex crime; two,

22   4B1.5(a) for prior convictions does not apply; three, the

23   defendant engaged in a pattern of activity involving prohibited

24   sexual conduct.  All three requirements are met:  The defendant

25   was convicted of a covered sex crime; she was not previously

**SA-409**

M6SQmax1

1  convicted of a sex crime; and I readily find she engaged in a

2  pattern of activity involving prohibited sexual conduct.

3  Specifically, the Guidelines define a pattern of such activity

4  as the defendant engaging in prohibited sexual conduct with a

5  minor on at least two separate occasions.

6      The defendant doesn't contest any of these enumerated

7  requirements.  Rather, she argues that I may apply this

8  enhancement only if I further find that the defendant poses a

9  continuing danger to the public.  Here, the defense draws this

10  requirement from background commentary by the Sentencing

11  Commission and a few statements made by members of the Congress

12  who of emphasized high recidivism rates in enhancing sentences

13  for sex offenders.

14      I overrule this objection because it lacks any basis

15  in the Guidelines.  As with all interpretive matters, I start

16  with the text of the Guidelines.  If the text is unambiguous, I

17  apply it as written and do not resort to background commentary.

18  *United States v. Sash*, 396 F.3d 515 (2d Cir. 2005).  Commentary

19  cited by the defendant simply provides policy rationale for a

20  particular enhancement.  It does not purport to interpret the

21  Guidelines and so is not binding.  Nor can scattered

22  legislative history override the clear text of the Guidelines,

23  especially when that history amounts to only a few short floor

24  statements which are "among the least illuminating forms of

25  legislative history."  *NLRB v. SW General, Inc.* 137, S. Ct. 929

**SA-410**

M6SQmax1

1    (2017).

2              Moreover, the defendant fails to prove that 4B1.5(b)

3    was enacted only to prevent future danger to the public.

4    Background commentary explains that aside from recidivism,

5    Congress "directed the Commission to ensure lengthy

6    incarceration for offenders who engage in a pattern of activity

7    involving the sexual abuse or exploitation of minors."  That's

8    4B1.5 comment background.

9              Further, the legislative history quoted by the

10   defendant says that Congress increased Guidelines sentences for

11   sexual abuse of minors "to address the egregiousness of these

12   crimes."  And, in fact, the defendant's brief cites that I

13   believe at 12.  Thus, I find no basis for a requirement that I

14   must first find the defendant to be a public danger before

15   applying the enhancement.  The defendant's remaining argument

16   that applying this enhancement would result in an excessive

17   sentence is appropriately considered as part of the defendant's

18   request for a downward variance.

19             Next the defendant objects to the application

20   3B1.1(a), which we've discussed, which adds four offense levels

21   for her leadership role in a criminal activity.  "a court must

22   make two specific factual findings before it can properly

23   enhance a defendant's offense level under 3B1.1(a): (i) that

24   the defendant was an organizer or leader; and (ii) that the

25   criminal activity involved five or more participants or was

# SA-411

M6SQmax1

1    otherwise extensive."  Quoting from *United States v. Patasnik*,

2    89 F.3d 63 (2d Cir. 1996).  The Guidelines define a participant

3    as a person who is criminally responsible for the commission of

4    the offense, but need not have been convicted.  That's Section

5    3B1.1, comment note 1.  And in assessing whether criminal

6    activity is extensive, all persons involved during the course

7    of the entire offense are to be considered, including persons

8    who provided services unknowingly.  Comment note 3.

9         The defendant argues that she did not lead another

10   criminal participant.  I overrule this objection because I do

11   conclude that the government has proved by a preponderance that

12   the defendant supervised Sarah Kellen, who was a knowing

13   participant in the criminal conspiracy.

14        Larry Visoski and David Rodgers both testified for

15   that at least part of the time period at issue Sarah Kellen

16   acted as a personal assistant to the defendant.  I credit that

17   testimony which is corroborated by further testimony that the

18   defendant was Epstein's number two and the lady of the house.

19   At some point, Kellen took over some of the defendants duties.

20   But even after that time, the defendant retained her leadership

21   position, as evidenced by Carolyn's testimony, by flight

22   records in evidence, and the household manual in evidence.  I

23   do conclude by a preponderance of the evidence that the

24   defendant led a criminally responsible participant.

25        I further find that the defendant's criminal activity

**SA-412**

M6SQmax1

```
1    was extensive.  Whether criminal activity is extensive is based
2    primarily on the number of people involved, criminally and
3    noncriminally, rather than on other possible indicators of the
4    extensiveness of the activity.  District courts must determine
5    the number of knowing participants in the criminal activity,
6    the number of unknowing participants whose activities were
7    organized or led by the defendant with specific criminal
8    intent, and the extent to which the services of the unknowing
9    participants were peculiar and necessary to the criminal
10   scheme.  For example, a taxi driver that drives a defendant to
11   a crime scene would not count.  That is an example from a case
12   called Carrozzella, 105 F.3d at 804.
13          At all relevant times, the conspiracy proved at trial
14   included at least two knowing participants:  Epstein and the
15   defendant.  Beginning in 2002, Sarah Kellen joined, and
16   beginning in approximately 2001, additional minor victims were
17   recruited through Virginia and Carolyn.  Additionally, trial
18   evidence established that services were unknowingly provided by
19   various Epstein employees.  For example, I credit Juan Alessi's
20   testimony that following the defendant's instructions, he
21   scheduled massage appointments, set up the massage table for
22   appointments, cleaned up after sexualized massages, and on at
23   least one occasion drove Virginia to an appointment.
24          Additionally, both Visoski and Rodgers were employed
25   as Epstein's pilots over the same time period as the counts of
```

**SA-413**

M6SQmax1

```
 1    conviction.  Visoski testified that Maxwell partially owned the

 2    jet, and both pilots testified that she would tell them when to

 3    fly Epstein or schedule flights for herself.  The evidence at

 4    trial demonstrates that Epstein and the defendant had the

 5    pilots fly victims of the conspiracy.  Across the timeframe of

 6    all counts of conviction, Alessi, Visoski and Rodgers provided

 7    personalized services that were peculiarly tailored to the

 8    defendant's offenses and were not fungible services generally

 9    available to the public.  Again, I'm citing from the

10    Carrozzella case, 105 F.3d at 804.

11          In addition to these unknowing participants that

12    testified at trial, I find by a preponderance of the evidence

13    that there were other unknowing persons led by Maxwell.  As

14    Epstein's number one, Ms. Maxwell managed Epstein's numerous

15    households and interviewed, hired and oversaw the household

16    staff.  The defendant had her own personal assistants, like

17    Sarah Kellen and another individual.  From the record, I can't

18    determine the precise number of these other individuals that

19    unknowingly assisted Epstein and the defendant in their

20    criminal activity, but I find an adequate basis in the record

21    that the number is sufficient to make the activity extensive

22    within the meaning of 3B1.1(a) from 1994 to 2004.  See United

23    States v. Archer, 671 F.3d 149 (2d Cir. 2011).

24          Last, the defendant objects to enhancement

25    2G1.1(b)(4)(B).  That provision increases the offense level by
```

## SA-414

M6SQmax1

1    two if a participant unduly influenced a minor to engage in a

2    commercial sex act.  In defining the enhancement, the

3    Commission instructs courts to closely consider the facts of

4    the case to determine whether a participant's influence over

5    the minor compromised the voluntariness of the minor's

6    behavior.  2G1.1, comment note 7.  And if the participant is at

7    least ten years older than the minor, there is a rebuttable

8    presumption that the participant unduly influenced the minor to

9    engage in a commercial sex act.  I overrule the defendant's

10    objection.

11          The defendant first says the undue influence

12    enhancement would punish her for the same harm already counted

13    in her base offense level.  Impermissible double counting

14    occurs when a guideline enhancement is applied to reflect the

15    kind of harm that's already fully accounted for elsewhere in

16    the Guidelines but does not occur if the enhancement aims at

17    differing harms emanating from the same conduct or reflects

18    different facets of the defendant's conduct.  *United States v.*

19    *Watkins*, 667 F.3d 254 (2d Cir. 2012).  There isn't double

20    counting here.  The 2G1.1(a) base offense level reflects the

21    aggregating factor that the victim of the defendant's sex

22    offense was a minor.  The enhancement, by contrast, reflects

23    the use of undue influence to engage in a commercial sex act.

24    I'll cite a few cases that stand for that proposition,

25    including *United States v. Kohlmeier*, 858 F. App'x, 444 (2d

**SA-415**

M6SQmax1

1    Cir. 2021) (summary order).   Similar conclusion, *United States*

2    *v. Smith*, a Ninth Circuit case from 2013, 719 F.3d 1120.   That

3    case explains 2G1.3(a) base offense level and the undue

4    influence enhancement "serve unique purposes under the

5    Guidelines."

6           The defense argues that because the enhancement

7    applies only if undue influence was exerted with the aim of a

8    commercial sex act, it does not apply here.   But the jury in

9    Count Six did convict the defendant of sex trafficking Carolyn

10   to participate in commercial sex acts.   The Court finds that

11   Virginia Roberts, who brought Carolyn and Melissa who was

12   brought by Carolyn similarly were paid.   The remaining victims,

13   including Jane and Annie, also testified that they received

14   money and gifts during their abuse which satisfies the

15   enhancement.

16          The defendant argues Carolyn was not unduly influenced

17   to sexually massage Epstein.   I find this argument meritless.

18   The age gap between Carolyn and Epstein and the defendant far

19   exceeded ten years, and the defendant does not rebut the

20   resulting presumption of undue influence.   2G1.1, comment note

21   7.   Carolyn testified she was paid to give Epstein sexualized

22   massages, and she needed the money for her drug addiction.

23   Later, Carolyn returned to Epstein because she needed the money

24   for herself and her newborn son.   Plainly, taking advantage of

25   a victim's financial need is a form of undue influence.   I'll

**SA-416**

M6SQmax1

1   cite some cases for that proposition.  *Watkins* 667 F.3d at 265;

2   *United States v. Streb*, 36 F.4th 782.  That's and Eighth

3   Circuit case from 2022.  Courts have repeatedly concluded that

4   a minor can be the victim of undue influence even if the minor

5   initiates a sexual meeting.  See, for example, *United States v.*

6   *Lay*, 583 F.3d 436 (6h Cir. 2009).  I therefore overrule the

7   defendant's objection.

8           I next turn to the government's only objection to the

9   PSR Guideline calculation.  I do find that Virginia Roberts and

10  Melissa were minor victims of sex offenses -- they were

11  trafficked and abused by the defendant and Epstein during the

12  charged period.  The Guidelines require that each minor victim

13  be considered a separate count of conviction.  2G1.1.(d)1.

14  Probation department excluded Virginia and Melissa from this

15  provision only because they were not named in the indictment.

16  This is an incorrect basis for excluding them from the

17  calculation.  Relying on commentary by the Commission, the

18  Second Circuit has instructed "that conduct against victims

19  other than those charged in the indictment may constitute

20  relevant conduct, and, if such conduct qualifies, should be

21  treated for sentencing purposes as though it occurred in a

22  separate count of conviction."  I United States V. Wernick,

23  691, F.3d 108 (2d Cir. 2012) (citing 2G1.1 comment note 4).  I

24  therefore consider Virginia and Melissa as two additional

25  groups of victims and assign each a unit under Section 3D1.4.

**SA-417**

48

M6SQmax1

1      Having resolved the parties' objections, I will

2  calculate the Guideline range.  As explained, I will use the

3  2003 Guidelines manual.  Following Section 2G1.1(d)(1), each

4  victim is considered a separate count of conviction.  In

5  addition to the three victims for which an offense level was

6  calculated in the PSR -- Jane, Annie, and Carolyn -- I

7  calculate offense levels, for Virginia and Melissa, coming to a

8  total of 5 groups.

9      For all groups, the base offense level is 19.  That's

10  Sections 2G1.1(a) and 2X1.1(a).

11      For Jane and Carolyn, because they were older than 12

12  but were not yet 16 when abuse began, the offense level is

13  enhanced by 2.  2G1.1(b)(2)(B).

14      The offense level for Jane and Carolyn is further

15  enhanced by 2 because they were unduly influenced into a

16  commercial sex act.  2G1.1(b)(4)(B).

17      For Annie, Virginia, and Melissa, who were at least

18  16, the offense level is increased by 2 because they were

19  unduly influenced into a commercial act.  2G1.1.(b)(4)(B).

20      The offense level for all groups are also enhanced by

21  4 points because of the supervisory role in an extensive

22  criminal activity.  3B1.1(a).

23      This brings the total offense level for Jane's and

24  Carolyn's groups to 27.  And Annie's, Virginia's and Melissa's

25  groups each to 25.

**SA-418**

M6SQmax1

1      Because there are multiple counts, all within at least

2   four offense levels of each other, I determine 5 units under

3   3D1.4(a).  And under 3D1.4, 5 units increases the total offense

4   level of the group with the highest total offense level by 5

5   from 27 to 32.

6      Last, because the defendant engaged in a pattern of

7   activity involving prohibited sexual conduct, the total offense

8   level is increased by 5 from 32 to 37.  4B1.5(b)(1).

9      In conclusion, I find the correct total offense level

10  under the 2003 Guidelines is 37.

11      No party disputes the defendant's Criminal History

12  Category of I.

13      Under the 2003 Guidelines, a Criminal History Category

14  of I and total offense level of 37, produces a guideline range

15  of 210 to 262 months' imprisonment.

16      The range for the fine, again, under the 2003 manual

17  is $20,000 to $200,000 for each count.  That's 5E1.2(c)(3).

18      The range for supervised release is three years to

19  life.  5D1.2(a)(1) and (c) and 18 U.S.C. 3583(k), although I

20  believe there is a -- yeah, I think that's supervised release.

21      I don't want to hear repeated objections, but any

22  objections based on anything I said that is new?

23      MS. MOE:  Yes, your Honor.  With respect to the unit

24  analysis, we wanted to note that under 3D1.4, a total of 5

25  units adds 4 levels, not 5 levels.  I think the next layer on

**SA-419**

M6SQmax1

1   the table is more than 5, as 5 levels.  And, thus, the total

2   number would be 36.

3              THE COURT:  I presume you agree with that,

4   Mr. Everdell?

5              MR. EVERDELL:  Yes, your Honor.

6              THE COURT:  Under the 2003 manual -- I see.  The

7   highest total offense level, increase by 4 from 32 to 36.

8              MS. MOE:  Yes, your Honor.  Thank you.

9              THE COURT:  Thank you, Ms. Moe.  And that produces a

10  guideline range 188 to 235.

11             MS. MOE:  Yes, your Honor.

12             MR. EVERDELL:  We agree with that, your Honor.

13             THE COURT:  Thank you.  Same question to you,

14  Mr. Everdell.  Preserving your objections, of course, but

15  anything new based on what I said?

16             MR. EVERDELL:  Yes, your Honor.  I don't think because

17  the government's response was the one added their request to

18  add Virginia and Melissa as separate groups, so we do object to

19  that.  I know the Court has already ruled on that.  We don't

20  think the record is adequate to make them separate offense

21  groups.  I understand the Court has already ruled on that, but

22  we would like to preserve that objection.

23             THE COURT:  Understood.  Thank you.

24             Do you want to respond, Ms. Moe?

25             MS. MOE:  Your Honor, I think the Court's rulings

**SA-420**

M6SQmax1

1    addressing the factual objections speak directly to this issue.

2    The record at trial amply established that Melissa and Virginia

3    were victims of this conspiracy, and that the defendant had

4    been involved with recruiting Virginia, who in turn recruited

5    Carolyn, who in turn recruited Melissa.

6            With respect to Melissa in particular, we would not

7    that, like Virginia, her name appears in the defendant's little

8    black book, noting that she's a friend of Carolyn's.  For all

9    those reasons, and the reasons in our brief, we think the trial

10   record amply establishes that they were both victims of the

11   conspiracy.

12           THE COURT:  I agree with that, and for the reasons

13   indicated, do -- I agree with the government's objection to the

14   probation calculation for that reason.

15           I think that means we don't need to resolve the

16   factual objections that pertain to Carolyn's age.  As I said, I

17   credit Carolyn's testimony.  The objections I would overrule

18   because I think she accurately testified regarding her age both

19   in 2004 and 2005, but it doesn't answer the question, as I see

20   it, the legal question as to establishment of acts

21   conspiratorial conduct in the relevant two-month period.

22           With respect to fines, Mr. Everdell, what is now

23   paragraph 172 of the revised report, the defendant objects to

24   the inclusion a $10 million bequest from Epstein being included

25   in her assets for purposes of determining her ability to pay a

**SA-421**

M6SQmax1

1   fine.  I can't quite tell from the papers whether -- I know you

2   say the bequest is likely to be contested.  What is the current

3   status of the bequest?

4        MR. EVERDELL:  Your Honor, my understanding is that

5   the document says what it says, and the estate is undergoing

6   bankruptcy proceedings.  I don't believe there is any -- this

7   issue has been addressed because I think the estate is still

8   dealing with victims' claims and other claims against the

9   estate.  But because it's in bankruptcy, I assume that this

10  will be contested, and we don't know if there will be any money

11  left at the end of that proceeding to honor the bequest.  So

12  that's one of the many reasons why I think this is such a

13  tenuous asset that it shouldn't be considered for purposes of

14  fines.

15       THE COURT:  It's listed as an asset in the financial

16  affidavit, is it not?

17       MR. EVERDELL:  It is, your Honor, because we felt we

18  wanted to fully disclose everything we know about, and we do

19  know about simply because we were produced that document.  We

20  didn't know about it before.  We knew about it because we got

21  it in discovery, and we saw it was there, so we felt in good

22  faith, we had to list it or at least disclose it, but I don't

23  think it should be considered for purposes of fine.

24       THE COURT:  Ms. Moe, do you want to respond to that?

25       MS. MOE:  Your Honor, I don't have additional

## SA-422

M6SQmax1

1    information about the status of the estate.  With respect to

2    whether this information should be in the PSR, I think the

3    Court is exactly right.  This is listed on an asset on her

4    balance sheet.  Whether she ultimately recovers that amount or

5    not, it's listed in the same way that liabilities are listed

6    even though it may be uncertain as to how those are resolved.

7    So I don't think the objection is founded.

8            THE COURT:  Yes, I'm going to overrule this objection

9    to the PSR paragraph.  It is included as an asset in

10   Ms. Maxwell's financial aid affidavit.  The uncertain assertion

11   that she may lose the asset is not a basis to exclude it from a

12   considered asset for purposes of determining a fine.

13           Paragraph 178, the assertion here is that she is

14   unable to pay a fine.

15           Do I have that right, Mr. Everdell?

16           MR. EVERDELL:  Yes, your Honor.

17           THE COURT:  I overrule the objection.  Section

18   5E1.2(a) of the Guidelines requires the Court to impose a fine

19   in all cases except where the defendant establishes that she is

20   unable to pay and is not likely to become able to pay any fine.

21   The defendant has failed to establish this.  As I just noted,

22   there is a $10 million bequest from Epstein this is in addition

23   to other assets noted in the PSR.

24           I will say the assets and finances have been a moving

25   target.  In July 2020, Ms. Maxwell reported $3.8 million in

**SA-423**

M6SQmax1

1    assets, and then reported $22 million in assets in support of

2    the December 2020 bail application.  The claim now of an

3    inability to pay the fine, as I understand it, at the same time

4    in which the defense has not provided documentation of her

5    marriage or the purported pending divorce settlement.  So I am

6    unpersuaded based on the balance of facts that the defendant is

7    indigent, and I do intend to impose a fine.

8            I will address restitution at the end.  I understand

9    the government is not seeking restitution.  So we will pick

10   that up at the end.

11           All right.  With that, I'm going to take a break, and

12   then I will come back and hear from -- just fill a few

13   formalities.  Neither of the papers make an argument for formal

14   downward departures, as I understood them.  In any event, I've

15   considered whether there's an appropriate basis for departure

16   from the advisory range within the Guideline system and do not

17   find any grounds warranting departure under the Guidelines.

18           When we return with the Guideline calculation

19   complete, I will hear from the parties as to what they contend

20   a reasonable sentence is for Ms. Maxwell, taking into account

21   the 3553(a) factors.

22           It's 12:30, which is a shocking fact to me.  I suppose

23   we should take a 30-minute break so that everyone can get

24   lunch, as I imagine we still have a fair amount of matters to

25   discuss and time to get through.  So we'll take a 30-minute

**SA-424**

55

M6SQmax1

1    break.

2              Ms. Moe

3              MS. MOE:  With respect to the sequence of events, just

4    so victims are aware, would the Court prefer to hear from

5    victims before the Court hears from the parties or after?  We

6    defer to the Court, but it would be helpful to know for the

7    victims.

8              THE COURT:  I was anticipating government, victim

9    statements, defense counsel and then Ms. Maxwell if she wishes

10   to make a statement.  My staff did provide counsel for the

11   victims making statements an order in which they're speaking.

12             MS. MOE:  Thank you, your Honor.

13             THE COURT:  Any objection to that ordering, Ms. Moe?

14             MS. MOE:  No, your Honor.  Thank you.

15             THE COURT:  Ms. Sternheim?

16             MS. STERNHEIM:  I'm on now.  No.  Thank you.

17             THE COURT:  I'll see you at 1:00.  Thank you.

18             (Luncheon recess taken)

19             (Continued on next page)

20

21

22

23

24

25

**SA-425**

56

M6SQmaxS1

1                        AFTERNOON SESSION

2                           1:10 p.m.

3            THE COURT:  As I indicated, I'll hear first from the

4   government as to what a reasonable sentence is under the

5   3553(a) factors.

6            Ms. Moe, when you're ready.

7            MS. MOE:  Thank you, your Honor.  May I take the

8   podium?

9            THE COURT:  You may.  Thank you.

10           MS. MOE:  Your Honor, Ghislaine first met Jane at

11  summer camp in August of 1994.  Jane was 14 years old.  What

12  Maxwell did in the years that followed to Jane and Kate and

13  Annie and Virginia and Carolyn and Melissa, was almost

14  unspeakable, but the truth came out in this case; and while

15  many years have past, their pain is palpable, it's real, and it

16  matters.

17           Today we ask the Court to impose an above-guideline

18  sentence of multiple decades in prison, a sentence that holds

19  Maxwell accountable for the essential role she played in an

20  extensive and disturbing child exploitation scheme.

21           Maxwell trapped young girls in a horrifying nightmare.

22  Her victims were vulnerable kids who found themselves alone in

23  giant mansions where they were sexually exploited by adults

24  they thought would help them.  These girls were just kids.

25  They were just finding their way in the world, trying to figure

**SA-426**

M6SQmaxS1

1   out who they were and who they might be some day when they grew

2   up.  These kids had hopes and dreams for their future and the

3   defendant used those dreams as her tool to abuse them.

4           We ask the Court to take an unflinching look at the

5   defendant's actions and consider what that tells you about who

6   she really is.  What kind of person persuades young girls to

7   massage the feet of a middle-aged man?  What kind of person

8   gets a 16-year-old girl all alone at a ranch in the middle of

9   nowhere and tells her to take off her clothes and get on a

10  massage table so that she can grope that girl's chest?  What

11  kind of person teaches a 14-year-old girl how a middle-aged man

12  likes his penis to be touched?  What kind of person sees a

13  17-year-old girl on the street and pulls over so that she can

14  persuade that girl to come to a house of horrors where that

15  young girl will be trafficked for sex?  What kind of person

16  flies around on a plane with underage girls so that when her

17  boyfriend travels, he always has a young girl to touch?  What

18  kind of person would use their privilege, their power in this

19  world to intentionally prey on the vulnerable, young girls from

20  struggling families:  Girls without fathers, girls who needed

21  help.  These are the actions of a person who was indifferent to

22  the suffering of other human beings.

23          The defendant's actions were not a one-time mistake;

24  not at all.  Maxwell was an adult woman, and she made the

25  choice, week in, week out for years to commit crimes with

**SA-427**

M6SQmaxS1

1    Jeffrey Epstein, to be his right hand, to make his crimes

2    possible.  Those choices were hers, and they have to have

3    serious consequences.

4          What's more, her actions portrayed a disturbing view

5    of the world we live in.  To Maxwell there were two kinds of

6    people in this world:  The people who really mattered and the

7    people who were disposable.  Maxwell wanted to make sure that

8    she stayed among the people who she thought mattered.  She

9    wanted to live a luxurious lifestyle jet-setting around the

10   world.  She took millions of dollars from Epstein over the

11   years and that's because they were predators together, they

12   were partners in crime together, and they molested kids

13   together.

14         The defendant's actions had serious consequences for

15   her victims.  These girls, now women, are strong.  They have

16   shown the world what true bravery really is.  But when the

17   defendant preyed on them, they were just kids, and they'll

18   carry with them for their entire lives the trauma of what

19   they've experienced.  What is truly remarkable about this case,

20   your Honor, is that we don't have to speculate about the

21   lasting irreparable harm that the defendant's actions have had.

22   You have seen for yourself the devastating effects of the

23   defendant's crimes and how much her actions have affected her

24   victims even years later.

25         The defendant has shown absolutely no remorse for her

**SA-428**

M6SQmaxS1

1    crimes.  She has not owned up to the truth.  She has lied

2    repeatedly.  She has been dishonest with the Court, and she has

3    made misrepresentations when it suits her.  Your Honor, we

4    recognize that the Court has calculated the guidelines to be

5    188 to 235 months.  That is far below the sentence that the

6    government believes is appropriate in this case.  We recognize

7    that there are a small number of cases where the Court imposes

8    an above-guideline sentence.  This is that case, your Honor.

9           In the almost 20 years since the 2003 manual was

10   enacted, our Sentencing Commission, our Congress, and our

11   country have all recognized just how serious sex crimes against

12   children are.  Our country now recognizes how woefully

13   inadequate the 2003 guidelines were, and the Supreme Court has

14   expressly held that sentencing courts can vary upwards for

15   exactly that reason.  Again, this is that case.  This is

16   exactly that case.  This is the time to impose an

17   above-guideline sentence.  A guideline sentence in this case

18   would create unwarranted sentencing disparities with

19   individuals being sentenced today for sex-trafficking offenses.

20   This case calls out for an above-guideline sentence because of

21   the breathtaking scope of the defendant's conduct, the length

22   of her crimes, the number of victims, the vulnerability of her

23   victims, the sophistication of the defendant's predatory

24   conduct and the degree to which she psychologically manipulated

25   her victims.  Her conduct was shockingly predatory, and it

**SA-429**

M6SQmaxS1

1    calls out for an above-guideline sentence.

2           We ask the Court to impose an above-guideline

3    sentence, a sentence that sends a message that those who would

4    conspire with sexual predators would be held responsible for

5    their significant role in these crimes.  We ask the Court to

6    send a message that nobody is above the law, and nobody is too

7    rich or powerful to be held accountable.  We ask the Court to

8    send a message that it is never too late for justice.

9           Your Honor, you should not hesitate to hold the

10   defendant accountable for the full measure of her crimes.  She

11   deserves to spend decades in prison for her crimes.  Thank you.

12          THE COURT:  Thank you, Ms. Moe.

13          And I will ask that the individuals who are making

14   statements come to the podium.

15          Ms. Farmer is first.  You're welcome to remove the

16   mask when you get there, Ms. Farmer, if you'd like.

17          MS. FARMER:  Judge Nathan:  For a long time I wanted

18   to erase from my mind the crimes that Ghislaine Maxwell and

19   Jeffrey Epstein committed against me and pretend they hadn't

20   happened.  It was the type of dark memory that feels safest to

21   keep locked away.  But I've had to acknowledge the long-lasting

22   effects.  One of the most painful and ongoing impacts of

23   Maxwell's and Epstein's abuse was a loss of trust in myself, my

24   perceptions and my instincts.  When predators groom and then

25   abuse or exploit you, they are in a sense training you to

**SA-430**

M6SQmaxS1

1    distrust yourself.  When a boundary is crossed or an

2    expectation violated, you tell yourself, "Someone who cares

3    about me to do all these nice things surely wouldn't also be

4    trying to harm me."  This pattern of thinking is insidious, so

5    these seeds of self-doubt took root even as I learned my sister

6    had also been harmed by them and came to find out years later

7    that many others had been exploited.

8              THE COURT:  Just a request to slow down.

9              MS. FARMER:  For years these memories triggered

10   significant self-recrimination, minimization and guilt.  I

11   blame myself for believing these predators actually wanted to

12   help me.  I felt tremendous survivor guilt when I heard about

13   what other girls and young women had experienced at hands of

14   Maxwell and Epstein.  I saw about how my sister's concern about

15   me weighed on her and felt guilty about this as well.

16             This toxic combination of being sexually exposed and

17   exploited, feeling confused and naïve and blaming myself all

18   resulted in significant shame; that sickening feeling that

19   makes you want to disappear.  It was not constant but would

20   come in waves, similar to the waves that anxiety would also

21   show up.  When I think back, I see a slide-show of moments when

22   these feelings would surface and overwhelm me.  There are too

23   many of these moments to name and though I have come a long way

24   in my path of healing, I know that these feelings will continue

25   to be triggered at times.

## SA-431

M6SQmaxS1

```
 1              The ripple effects of trauma are undeniable.  When one
 2      person is abused, many others are also harmed.  In addition to
 3      the way I was impacted as an individual, there was the pain I
 4      experienced as a sister due to how Maria was abused by Maxwell
 5      and Epstein and the harm caused to the rest of my family due to
 6      these events.  My sister Maria's abuse, the sexual assault,
 7      Maxwell's threats that stole her sense of safety and her
 8      career, the way they used her to get to me had devastating
 9      effects on her.  As my family watched her grow more isolated
10      and more physically ill from the stress of all of it, we all
11      felt powerless.  It was heartbreaking and infuriating, and we
12      later learned how often this pattern was repeated.  A young
13      person on the path of pursuing her dreams was pulled in by
14      Maxwell, was abused and exploited, and then had to try and
15      piece together a life in the aftermath of this trauma that left
16      them feeling distrustful and fearful.  Most of these
17      individuals had families who also were negatively impacted as
18      they witnessed and felt the systemic effects of their loved
19      one's losses and struggles.  The number of people harmed is
20      impossible to measure.  Maxwell had many opportunities to come
21      clean but instead continued to make choices that caused more
22      harm.
23              When my sister and I first spoke out to the media
24      about what happened to us, Maxwell lied about us and threatened
25      Maria, thus helping shut down investigations into their
```

**SA-432**

M6SQmaxS1

1    behavior so they could together continue to harm children and

2    young women.  After this attempt to alert people to Epstein and

3    Maxwell's abusive behavior, I avoided being public about it for

4    two decades.  My shame told me I should hide this fact because

5    it was embarrassing.  Later as I pursued my profession as a

6    psychologist, I feared it could potentially ruin my career.  I

7    worried clients would not want to work with me if I was

8    associated with this story, wrongly labeled as one of child

9    prostitution.  I feared being on Epstein's and Maxwell's radar

10   as a problem because of their previous lies and threats.

11          Once arrested, Maxwell faced another choice.  She

12   could admit her participation in this scheme, acknowledge the

13   harm caused or even provide information that could have helped

14   hold others accountable.  Instead, she chose again to lie about

15   her behavior, causing additional harm to all of those she

16   victimized.

17          Judge Nathan, I hope when you consider the appropriate

18   prison sentence for the role Maxwell played in this

19   sex-trafficking operation, you take into account the ongoing

20   suffering of the many women whom she abused and exploited as we

21   will continue to live with the memories of the way she harmed

22   us.  I hope you weigh the systemic effects of the crimes she

23   perpetrated, the ways that our family members, romantic

24   partners and friends have been hurt through our suffering.  I

25   ask you to bear in mind how Maxwell's unwillingness to

# SA-433

M6SQmaxS1

1   acknowledge her crimes, her lack of remorse and her repeated

2   lies about her victims created the need for many of us to

3   engage in a long fight for justice that has felt like a black

4   hole sucking in our precious time, energy and well-being for

5   much too long now, things that cannot be replaced.  Thank you.

6           THE COURT:  Thank you, Ms. Farmer.

7           Kate may make a statement now.

8           MS. MOE:  Your Honor, before Kate speaks, I just

9   wanted to confirm that the Court's anonymity order, in

10  particular with respect to sketch artists, is in effect.

11          THE COURT:  Yes.  Consistent with the Court's prior

12  anonymity and pseudonym order, we will refer to this witness as

13  Kate only, and the sketch artists shall not draw an exact image

14  of Kate so that she can remain anonymous.

15          Thank you, Ms. Moe.

16          Kate, you may proceed.

17          KATE:  Good afternoon, your Honor.  Thank you for

18  hearing me.  I believe you've already seen my victim impact

19  statement, so I have something else to say.

20          At a time when women's rights have so callously been

21  discarded, as the mother a young daughter, I fear for the

22  safety and freedom of my child.  Today offers hope that change

23  is possible.  Our voices may not have been heard before, but we

24  united to bring justice to a common enemy.  If we cannot stop

25  women who have been raped from being forced to bear the

**SA-434**

M6SQmaxS1

1    children of their rapists, then we must take a stand on zero

2    tolerance to those who abuse their power to groom and traffic

3    and rape the vulnerable.

4          How you do anything is how you do everything.  Every

5    single person should have equal value.  Every single person

6    should have an equal right to be protected.  Every single child

7    must have their innocence defended.  No person should be

8    shielded from the consequences of their actions no matter their

9    status or class.  Ghislaine's lack of remorse and her blatant

10    refusal to take responsibility for her crimes towards us is the

11    final insult.

12          Having a difficult childhood is irrelevant to the

13    choices she made to traffic and supply women/children to

14    Jeffrey Epstein and other powerful men.  Despite the atrocities

15    perpetrated on me, I have never recruited a child or any person

16    to be sexually abused.  Someone being a hard worker does not

17    excuse sex trafficking of minors.  Someone starting a

18    non-profit does not excuse sex trafficking of minors.  Someone

19    who had it difficult or even an abusive father does not excuse

20    sex trafficking of minors.  Losing money and prestige does not

21    excuse sex trafficking of minors.  The lack of remorse or

22    responsibility taken by Ghislaine for how she ruined the lives

23    of countless women and children is exactly how we can tell that

24    she doesn't think what she did is wrong.  She is not sorry, and

25    she would do it again.

**SA-435**

M6SQmaxS1

```
1              I have known Ghislaine for many years now, and I have

2       seen her be kind and generous to me and many others until she

3       doesn't get what she wants from that person, and then I have

4       seen her stop at nothing to enforce her will -- a manipulative

5       cruel and merciless person who only uses kindness to manipulate

6       and generosity to seek recognition.

7              Today for the first time I stand with my sisters,

8       bonded by a trauma that I wish on no one, to draw a line and to

9       set a precedent to say enough is enough; to say no with a

10      chorus of voices that you cannot ignore.  May that chorus ring

11      through the ears of people still being victimized and give them

12      strength.  May it echo in the ears of perpetrators to remind

13      them that there are those of us who will never stop until we

14      stop them.

15             Today is not a happy day.  I take no pleasure in being

16      part of a world where this is necessary, but I am proud to

17      stand shoulder to shoulder with these brave women and do what

18      is necessary to stop Ghislaine, to hold her accountable, and

19      for the first time in my life not to feel afraid.  I could not

20      have done this alone, and I thank those who walked alongside me

21      and those who carried me.  Today I can look at Ghislaine and

22      tell her that I became what I am today in spite of her and her

23      efforts to make me feel powerless and insignificant, and I will

24      pass that empowerment on to my daughter that she may never

25      consider being silent when faced with injustice because she
```

**SA-436**

M6SQmaxS1

1    will feel all of us standing behind her.  Thank you.

2              THE COURT:  Thank you.

3              I will hear the statement from counsel for Virginia

4    Roberts.

5              VIRGINIA ROBERTS COUNSEL:  Good afternoon, your Honor.

6              May it please the Court, this statement I am reading

7    on behalf of my client, Virginia Giuffre, is written to

8    Ghislaine Maxwell.

9              Ghislaine:  22 years ago in the summer of 2000, you

10   spotted me at Mar-a-Lago in Florida, and you made a choice:

11   You chose to follow me and procure me for Epstein.  Just hours

12   later, you and he abused me together for the first time.

13   Together you damaged me physically, mentally, sexually and

14   emotionally.  Together you did unthinkable things that still

15   have a corrosive impact on me to this day.

16             I want to be clear about one thing:  Without question,

17   Jeffrey Epstein was a terrible pedophile, but I never would

18   have met Jeffrey Epstein if not for you.  For me, and for so

19   many others, you opened the door to hell, and then, Ghislaine,

20   like a wolf in sheep's clothing, you used your femininity to

21   betray us and you led us all through it.  When you did that,

22   you changed the course of our lives forever.  You joked that

23   you were like a new mother to us.  As a woman, I think you

24   understood the damage that you were causing, the price you were

25   making us victims pay.  You could have put an end to the rapes,

**SA-437**

M6SQmaxS1

1   the molestation, the sickening manipulation that you arranged,

2   witnessed and even took part in.  You could have called the

3   authorities, and reported that you were part of something

4   awful.

5          I was young and naïve when we met, but you knew that.

6   In fact, you were counting on it.  My life as a young person

7   was just beginning.  You robbed me of that by exploiting my

8   hopes and ambitions.  Ghislaine, the pain you have caused me is

9   almost indescribable.  Because of your choices and the world

10  you brought me into, I don't sleep.  Nightmares wake me at all

11  hours.  In those dreams, I relive the awful things that you and

12  others did to me and the things that you forced me to do.

13  Those memories will never go away.

14         I have trouble meeting new people without questioning

15  if somehow they're going to hurt me too.  There is not a day

16  that doesn't go by that I don't ask why.  Why did you enjoy

17  hurting us so much?  I worry every single day and night that

18  you will get away with it and evade being punished.  I will

19  worry about that until you're brought to justice.  And what

20  should that justice look like?  Ghislaine, you deserve to spend

21  the rest of your life in prison in a jail cell.  You deserve to

22  be trapped in a cage forever just like you trapped your

23  victims.  But I want you to know that while you tried to break

24  me, you did not succeed.  Despite you, I've grown into a woman

25  who tries to do good in the world; a woman who on her best days

**SA-438**

M6SQmaxS1

 1    feels like she's making a difference.

 2            My promise to you is as follows:  As long as you and

 3    perpetrators like you continue to prey on the vulnerable, I

 4    will not stop standing up and speaking out.  Together with so

 5    many others you abused, we will do all we can to keep predators

 6    from stealing the innocence of children.  I will never give up.

 7    I will never go away.  If you ever get out of prison, I will be

 8    here watching you and making sure you never hurt anyone else

 9    again.  Thank you.

10            THE COURT:  Thank you, counsel.

11            And I do have the written submissions submitted in

12    accordance with the Court's order from Ms. Bryant, Ms. Maria

13    Farmer and Ms. Helm, who I understand was not able to be

14    present.  And so I'll hear from Ms. Ransome.  Please tell me

15    how tell me how to say your name correctly.

16            MS. RANSOME:  Ransome.

17            THE COURT:  Thank you.

18            MS. RANSOME:  Your Honor, it's been a long journey to

19    bring Maxwell to justice.  Although I have physically escaped

20    the hideous trap set by Epstein, Maxwell and other

21    co-conspirators, I continue now, 17 years later, to suffer from

22    the horrific trauma it has caused.

23            I came to New York at the age of 22 hoping to attend

24    New York's FIT and work in the fashion industry.  Soon after

25    arriving, I made met an Epstein-Maxwell recruiter named Natalya

**SA-439**

M6SQmaxS1

1    Malyshev.  She described him as a kind philanthropist who could

2    help me get into FIT and provide much needed support.

3              Over the next seven to eight months, I became against

4    my will nothing more than a sex toy for the entertainment of

5    Epstein, Maxwell and others.  I was subjected to sexual

6    predation multiple times per day, both in his New York mansion

7    and on his private island in the U.S. Virgin Islands.  On one

8    of the visits to the island, the sexual demands, degradation

9    and humiliation became so horrific that I tried to escape by

10   attempting to jump off a cliff into shark-infested waters.

11             Epstein and Maxwell were masters at finding young,

12   vulnerable girls and young women to exploit.  Upon targeting a

13   vulnerable girl/young woman, they would ingratiate themselves

14   to her, giving her compliments and small gifts, telling her how

15   special she was.  Soon after lulling me and others into a false

16   sense of security and comfort, they pounced, ensnaring us in

17   the upside-down, twisted world of rape, rape, rape.  Like Hotel

18   California, you can check into the Epstein-Maxwell dungeon of

19   sexual hell, but you could never leave.

20             The manipulation, intimidation and emotional abuse

21   used to control the victims took many forms.  In my case,

22   Epstein and Maxwell used my dysfunctional family history,

23   naivete, visa status, lack of education and desire to go to FIT

24   to manipulate, scare and ensnare me.  They told me that I was

25   exceptionally intelligent and that I had real potential to be

**SA-440**

71

M6SQmaxS1

1    someone and something in life one day.

2         Epstein's and Maxwell's strong ties to FIT could make

3    this happen.  With their help, my admission was almost assured,

4    but there was always a but.  First I had to write my

5    application, which I did.  But Maxwell had to review it and

6    conveniently always found fault.  Then another but, I needed to

7    lose 30 pounds because I was a piglet.  Maxwell's numerous

8    degrading descriptions of me.  Epstein and Maxwell put me on a

9    strict Atkins diet while simultaneously sending me to a

10   psychiatrist who prescribed antidepressants that caused weight

11   gain.  It was a classic no-win situation, and they knew it:

12   Precisely what human traffickers seek.  I never lost the

13   weight, my application was never good enough, and it never got

14   submitted.

15        I thank the almighty God that in 2007, I managed to

16   escape the horror by fleeing to the U.K.  Since then, I have

17   been coping as best as I can and frequently experience

18   flashbacks and wake up in a cold sweat from nightmares from

19   reliving the awful experience.  I'm hypervigilant.  I do not

20   trust people easily.  I experience dramatic mood changes.  I

21   will sometimes start crying uncontrollably for reasons I cannot

22   always comprehend.  I worked hard with several mental health

23   professionals.  They have diagnosed me with extreme symptoms of

24   anxiety, depression, low self-esteem, PTSD and tendency to

25   self-harm.

**SA-441**

M6SQmaxS1

1        Despite my earnest effort I have not realized life's

2    true potential professionally, nor entered any healthy personal

3    relationships.  I have never married, and I do not have

4    children, something I always wished for when I was a little

5    girl.  I shy away from meeting new people and have difficulty

6    making new friends because I fear they too could be associated

7    with Epstein and Maxwell and their enablers and

8    co-conspirators.

9        To this day I attend meetings to treat alcoholism, but

10    I have had numerous relapses, and I cannot always control that.

11    I know that only by the grace of God do I continue to live.  I

12    have attempted suicide twice since the abuse -- both near

13    fatal.

14        Last year, I traveled to New York to attend Maxwell's

15    trial.  It was therapeutic to hear the testimony of the four

16    brave victim-witnesses, whose experience paralleled my own, to

17    know that I was not alone, and that our story was finally being

18    told for the world to hear.

19        I am grateful the jury believed the victims and

20    returned a guilty verdict, but a question still tears at my

21    soul.  After all of this, how can this five-star general of

22    this enormous sex-trafficking conspiracy involving hundreds, if

23    not thousands, of vulnerable girls and young women over three

24    decades continue to maintain her innocence?  Reflecting on it,

25    I know the answer to my questions.

**SA-442**

M6SQmaxS1

1    Maxwell is today the same woman I met almost 20 years

2  ago, incapable of compassion and human common decency.  Because

3  of her wealth, her social status and connections, she believes

4  herself beyond reproach and above the law.  Sentencing her to

5  the rest of her life in prison will not change her, but it will

6  give the other survivors and I a slight sense of justice and

7  help us as we continue to work to recover from the

8  sex-trafficking hell she perpetrated.

9    She will never ever hurt another young woman or child

10  again in this lifetime, and for that I am sure.

11    To Ghislaine, I say, you broke me in unfathomable

12  ways, but you did not break my spirit, nor did you dampen my

13  eternal flame that now burns brighter than ever before.

14    Thank you, your Honor.

15    THE COURT:  Thank you, Ms. Ransome.  I will hear the

16  statement from Ms. Stein.

17    MS. STEIN:  Good afternoon, your Honor.

18    THE COURT:  Good afternoon.

19    MS. STEIN:  I came to New York in 1991 at the age of

20  18 to attend FIT and immediately began to excel academically.

21  In my sophomore year, I accepted a Christmastime internship at

22  Henri Bendel New York.  I performed well and was asked to stay

23  on as a part-time employee.

24    In the fall semester of my senior year at FIT,

25  Ghislaine Maxwell came into the store where she was a frequent

SOUTHERN DISTRICT REPORTERS, P.C.•••
(212) 805-0300

**SA-443**

M6SQmaxS1

1    customer.  Her usual salesperson wasn't there, so I helped her.

2    Ghislaine was electrifying.  We hit it off immediately.  In

3    this first meeting we spoke of our mutual love of fashion, of

4    difficult fathers and formal upbringing, of boyfriends and of

5    how we both saw New York as a chance to start over.  She told

6    me that her boss, who I later came to understand was Jeffrey

7    Epstein, was close friends with Lex Wexner, the CEO and founder

8    of The Limited, which owned Henri Bendel at the time.

9         When she completed her purchases, I offered to deliver

10   them to her so she didn't have to carry them around all day.

11   This was a courtesy I frequently extended to my high-end

12   clients.  Later that day, I called her office for delivery

13   instructions and was told to bring them to a hotel close by to

14   the store.  When I arrived, the hotel concierge told me

15   Ms. Maxwell was in the bar and wanted me to meet someone.  It

16   was Jeffrey Epstein.  That night in the hotel was the first of

17   many times they sexually assaulted me.

18        Afterwards I tried to pretend everything was normal.

19   I returned to my classes at FIT and continued to work at Henri

20   Bendel, but I started to crack.  I failed a course that was

21   necessary for my degree and had to retake it to get my diploma.

22   Shortly after my first meeting with Epstein and Maxwell, I was

23   offered a full-time position at Henri Bendel.  It was a newly

24   created position at the store, and it would have required me to

25   leave FIT a semester short of completing my degree.  I had

**SA-444**

M6SQmaxS1

1  aspirations of going to law school, and I knew I could not do

2  so without my undergraduate degree, so I declined it.

3        When Ghislaine found out, she flew into a rage.  I

4  didn't understand why until she told me that she and Epstein

5  were responsible for giving me that opportunity and that in

6  turning it down I was being ungrateful.  I now know that this

7  was their standard operating procedure.  Give a gift or a favor

8  and then demand sex in return.  Nevertheless, I completed my

9  course work, got my degree from FIT, at which point I left

10  Henri Bendel and took a position at Bloomingdales.  I wanted to

11  leave Epstein and Maxwell and the abuse they perpetrated

12  against me behind as I started my professional life.  I never

13  wanted to or expected to see them again.

14        One day in the fall of 1995, Maxwell showed up at

15  Bloomingdales looking for me.  When I asked her how she knew

16  where I was, she said she asked my colleagues at Henri Bendel.

17  She immediately began befriending me once again, asking me to

18  go out socially.  I tried to resist but eventually she wore me

19  down, and I began spending time with them again.  They made me

20  feel like they were friends, contemporaries.

21        In one instance, they took me to Florida and insisted

22  that I stay longer than planned which caused me to miss work

23  and led to me being fired.  Seizing on this new vulnerability

24  they began trafficking me to their friends.  By that time I was

25  trapped.  I was assaulted, raped and trafficked countless times

**SA-445**

M6SQmaxS1

1    in New York and Florida during a three-year period.  Things

2    happened that were so traumatizing that to this day I am unable

3    to speak about them.  I don't even have the vocabulary to

4    describe them.  In the most literal sense of the word, Epstein

5    and Maxwell terrified me.  They told me that if I told anyone,

6    no one would believe me; and if they did, they would kill me

7    and the people closest to me.  I believed them.

8         I was once bright, fun, outgoing and kind.  I loved

9    life and people genuinely enjoyed being around me.  After

10   meeting Jeffrey Epstein and Ghislaine Maxwell, it felt like

11   someone shut off the lights to my soul.  My secrets became too

12   much for me to handle, and I began doing whatever I could to

13   try to get away from Maxwell and Epstein.  I changed jobs,

14   apartments, cities and even states to try to get away.

15   Everywhere I went, they found me.

16        In 1997 I moved to Philadelphia with the hopes of

17   finally starting law school.  They found me again, and it was

18   more than I could take.  I was hospitalized with a nervous

19   breakdown.  It would be the first of over two dozen

20   hospitalizations in a decade following my involvement with

21   Epstein and Maxwell.

22        In addition to my escalating mental health problems, I

23   began to experience physical symptoms that doctors could never

24   quite put their fingers on.  I could no longer even pretend to

25   be able to hold down a job or take care of myself in any

**SA-446**

M6SQmaxS1

1    meaningful way, and I had to move back home once again.

2    Emotionally, I had cracked and nobody thought I would ever get

3    better, but I didn't give up.  I was determined to do whatever

4    I had to to prove everyone wrong.  I wasn't crazy.  I was hurt.

5            For over a decade and a half, I went to all kinds of

6    medical specialists and was in and out of medical and

7    psychiatric hospitals, having tests and procedures, even

8    submitting to clinical trials and an experimental implantable

9    medical device.  Nothing helped.

10           Just as I began to repair the emotional damage, I was

11   diagnosed with complex regional pain syndrome.  CRPS is a rare

12   neuro-inflammatory disorder characterized raised by intense

13   relentless physical pain.  Both CRPS and PTSD are

14   psychophysical states in which the sympathetic nervous system

15   is engaged and remains inappropriately hyperaroused.  There is

16   no cure.  The mind and body are interconnected.  Despite of

17   this, I immersed myself this trauma therapy and repaired my

18   emotional health.  I began physical therapy and regained my

19   physical mobility.  I started to rebuild my life.

20           The arrest of Epstein in 2019 and Maxwell in 2020

21   helped me immensely.  For the first time, I was finally able to

22   disclose their abuse to friends and medical providers.  25

23   years after meeting them my experience was validated.  I could

24   finally see the possibility of closure.  This past November and

25   December I commuted almost every day from my home in

**SA-447**

M6SQmaxS1

1    Philadelphia to attend Ghislaine Maxwell's trial in Manhattan.

2    For weeks I sat in this courtroom anonymously, only revealing

3    my identity the day before the verdict.  I had to see justice

4    myself.

5            At the age of 48, I feel as if I'm just starting my

6    life.  All those things I assumed I would have in life, the

7    things that my siblings and my friends have achieved:  A

8    career, success, partner, family, a home, a legacy to be proud

9    of leaving behind were jeopardized for more than two and a half

10   decades.  The only pronounced difference between my life

11   experience and theirs is that one day when I was doing my job,

12   I met Ghislaine Maxwell who fed me to Jeffrey Epstein.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

**SA-448**

M6s2Max2

1        MS. STEIN:  In more ways than one, they almost killed

2    me, but I wasn't going to let them.  Overcoming what happened

3    to me became my decades-long, full-time career.  In that, I

4    have been successful.

5        For the past 25 years, Ghislaine Maxwell has been free

6    to live a life of wealth and privilege that is almost

7    incomprehensible.  Meanwhile, I have had virtually none of the

8    life experiences I might have had we never met.  For over two

9    and a half decades, I felt like I was in prison.  She has had

10   her life.  It's time to have mine.  She needs to be imprisoned

11   so all of her victims can finally be free.

12       Thank you, your Honor

13       THE COURT:  Thank you, Ms. Stein.

14       Ms. Sternheim?

15       MS. STERNHEIM:  Thank you, Judge.  Judge, I would like

16   to stand at the podium.

17       THE COURT:  Please.

18       Let me just note again that I did have the statements

19   of the victims in the record.  I thank them for making

20   statements today and thank their counsel for working with them

21   in conformity with my order.

22       MS. STERNHEIM:  Your Honor, I would like to address

23   the victims.  I am going to try to turn around if the Court

24   permits me.

25       THE COURT:  As long as I can hear you and the court

**SA-449**

M6s2Max2

1    reporters can hear you.

2              MS. STERNHEIM:  I am going to speak as best as I can.

3              I want to acknowledge the courage that all of you have

4    exhibited in coming forward at the trial and again today.  Your

5    statements are immensely powerful.  We feel the pain.  We can

6    only hope that the end of this case and the sentence to be

7    imposed will give you some solace and the sanctity that you

8    have the ability to move forward and beyond all of this.

9              Judge Nathan, can you hear me?  I didn't pull it out,

10   I hope.

11             THE COURT:  I can.

12             MS. STERNHEIM:  Okay.

13             You have heard all of the trial testimony and you are

14   fully familiar with the record.  We will refrain from pointing

15   out many statements that we disagree with by the government

16   that we believe stretches the elasticity of the record well

17   beyond what we believe is fair inference.  But the purpose of

18   today is not to take issue with the record; that will be

19   addressed to the Court of Appeals.

20             The government asks the Court to sentence Ms. Maxwell

21   above the more reasonable guideline range that the Court

22   determined is applicable in this case and seeks a sentence of

23   multiple decades in prison for a woman who is almost 61 years

24   old and for almost the last 20 years has not engaged in any

25   conduct similar to that which was the subject of the trial and

**SA-450**

M6s2Max2

1     the conviction.

2          The government has asked for an immense sentence.  We

3     recognize that any sentence in this case is going to be

4     significant and is going to be immensely punishing.  The

5     probation department, based on the original guidelines in the

6     presentence report, recommended a downward variance to 20

7     years.  That recommendation is now higher than the guideline

8     range that is applicable in this case.  But we ask the Court to

9     consider the justification that probation articulated in the

10    presentence report in fashioning a sentence that takes into

11    consideration that a sentence lower than the guideline range is

12    appropriate in this case.

13          The government's sentence asks for the outer limits,

14    and although we still believe that even the recommendation is

15    too high, a sentence within the guideline range now may be more

16    reasonable, but it still does not take into consideration some

17    of the various factors that we have brought to the Court's

18    attention in our submission.  Simply stated, based upon the

19    conduct of conviction, the government's request is out of

20    proportion.  Jeffrey Epstein would have faced the same

21    sentence, and he is clearly far more culpable than Ghislaine

22    Maxwell.

23          THE COURT:  You mean he would have faced the same

24    guidelines.

25          MS. STERNHEIM:  Yes, that is correct, Judge.

SOUTHERN DISTRICT REPORTERS, P.C.···
(212) 805-0300

# SA-451

M6s2Max2

1    The sentencing submissions, which I know the Court has

2   read——and I know the Court reads everything very critically and

3   carefully——outlines and details our position, and I am not

4   going to take the time to repeat those things unless the Court

5   requests me to answer certain questions.

6    But in fashioning the appropriate sentence for this

7   case and this defendant, the Court needs to take into

8   consideration the various 3553(a) factors that the Court must

9   take into consideration in every case regardless of what the

10   crime of conviction is.

11    I know that what we heard today does not beg sympathy

12   for Ms. Maxwell, but there are circumstances in her life that

13   bear attention by the Court in imposing a reasonable sentence

14   in this case.  She has lived the entirety of her life under

15   giant clouds that have cast very dark shadows.  The tragic

16   accident of her eldest brother within 72 hours of her birth on

17   Christmas Day left him in a coma for seven years, until he

18   died, an event that impacted her family to this day and

19   overshadowed infant Ghislaine's entry into the world and her

20   early childhood.  Her narcissistic, brutish, and punitive

21   father overwhelmed her adolescence and early adulthood.  And

22   the controlling, demanding, manipulative Jeffrey Epstein cast a

23   deceptive shadow over Ghislaine's adulthood, the repercussions

24   of which will plague her until her last breath.  And like the

25   past two years of intense presentence incarceration, which was

**SA-452**

M6s2Max2

1    unusually harsh and punishing, she will remain in the shadow of
2    prison bars until she can return to the sunlight of liberty.

3            As I said before, she is over 60 years old.  She has
4    no history of violence.  She had no criminal history before or
5    after the crimes of conviction, which ended some 20 years ago,
6    and the Court needs to consider that there is an extensive
7    period that has elapsed from the end of the charged conduct.
8    She poses no danger to society or of recidivism.  Her personal
9    circumstances include many accomplishments and good deeds.

10           As I said, she has been subjected to extensive
11   punishing conditions of presentence incarceration in solitary
12   confinement.  When she was moved within the last two months to
13   general population, she began interacting with the inmates and
14   assisting them in many, many ways.  She began conducting
15   English classes and GED tutoring, programs that were no longer
16   being offered in the MDC and certainly had been suspended as a
17   result of the ongoing pandemic.  Her asset to the unit in
18   general population is recited in the unsolicited letter
19   submitted to the Court from one of her fellow unit inmates.
20   But I have also been contacted personally by counsel for other
21   inmates in Ms. Maxwell's unit, reporting to me that she is
22   providing needed educational assistance that has not been
23   ongoing for at least two years.

24           Ms. Maxwell is being sentenced for terrible conduct.
25   There is no denying that.  But she has the ability and the

**SA-453**

M6s2Max2

1    desire to be law-abiding, which she has exhibited, and to do

2    good.  Before the charged offense and for the better part of

3    the past 20 years, she has demonstrated that she is not a

4    danger to anyone.  A sentence below the applicable guidelines

5    is sufficient, but not greater than necessary, punishment for

6    Ghislaine Maxwell.  The Court should not send her away for the

7    rest of her life.

8            Thank you.

9            THE COURT:  Thank you, Ms. Sternheim.

10           Ms. Maxwell, you have the right to make a statement.

11   You are not obligated to do so, but if you would like to, you

12   may do so now.

13           THE DEFENDANT:  I would, your Honor.

14           MS. STERNHEIM:  She would.  Where would you like her

15   to -- I'm sorry, Judge.  Where would you like her to address

16   the Court?

17           THE COURT:  Are the marshals comfortable with the

18   podium?

19           THE MARSHAL:  Yes, your Honor.

20           THE COURT:  You can go to the podium, Ms. Maxwell.

21           MS. STERNHEIM:  Thank you very much.

22           And she may remove her mask?

23           THE COURT:  Once you are at the podium, yes, you may

24   remove your mask.

25           THE DEFENDANT:  Thank you, your Honor.

**SA-454**

M6s2Max2

1          Your Honor, it is hard for me to address the Court

2     after listening to the pain and anguish expressed in the

3     statements made here today.  The terrible impact on the lives

4     of so many women is difficult to hear and even more difficult

5     to absorb, both in its scale and in its extent.  I want to

6     acknowledge their suffering and empathize.  I empathize deeply

7     with all of the victims in this case.

8          I also acknowledge that I have been convicted of

9     helping Jeffrey Epstein commit these crimes.  And despite the

10    many helpful and positive things I have done in my life, and

11    will continue to do, to assist others during my sentence, I

12    know that my association with Epstein and this case will

13    forever and permanently stain me.

14         It is the greatest regret of my life that I ever met

15    Jeffrey Epstein.  I have had plenty of time to think, having

16    spent two years in solitary confinement.  I believe that

17    Jeffrey Epstein was a manipulative, cunning, and controlling

18    man who lived a profoundly compartmentalized life and fooled

19    all of those in his orbit.

20         Variously, his victims considered him as a godfather,

21    a mentor, benefactor, friend, lover.  It is absolutely

22    unfathomable today to think that that is how he was viewed

23    contemporaneously.

24         His impact on all those who were close to him has been

25    devastating, and today those who knew him even briefly, or

SOUTHERN DISTRICT REPORTERS, P.C.···
(212) 805-0300

**SA-455**

M6s2Max2

1   never met him but were associated with someone who did, have

2   lost relationships, have lost jobs, and have had their lives

3   completely derailed.

4              Jeffrey Epstein should have been here before all of

5   you.  He should have stood before you all those years ago.  He

6   should have stood before you in 2005, again in 2009, and again

7   in 2019, all of the many times he was accused, charged, and

8   prosecuted.

9              But today it is not about Epstein ultimately.  It is

10   for me to be sentenced and for the victims to address me, and

11   me alone, in this court.

12             To you, all the victims, those who came in court and

13   to those outside, I am sorry for the pain that you experienced.

14   I hope that my conviction, along with my harsh and unusual

15   incarceration, brings you closure.  I hope this brings the

16   women who have suffered some measure -- I hope that this brings

17   the women who have suffered some measure of peace and finality

18   to help you put the experiences of those many years ago in a

19   place that allows you to look forward and not back.

20             I also acknowledge the pain this case has brought to

21   those that I love, the many I held and still hold close, which

22   tortures me every single day, and the relationships that I have

23   lost and will never be able to regain.

24             It is my sincerest wish to all those in this courtroom

25   and to all those outside this courtroom that this day brings a

**SA-456**

M6s2Max2

1    terrible chapter to the end, to an end.  And to those of you

2    who spoke here today and to those of you who did not, may this

3    day help you travel from darkness into the light.

4              Thank you, your Honor.

5              THE COURT:  Thank you, Ms. Maxwell.

6              Counsel, is there anything else -- I'm sorry, let

7    me -- I do want to ask defense counsel, before I get there, if

8    there are any objections to any of the conditions recommended

9    by the Probation Department with respect to supervised release.

10             MS. STERNHEIM:  No, Judge.

11             THE COURT:  Okay.  And I understand the government is

12   not -- I just want to talk about restitution before I get to

13   the statement of judgment.

14             Count Six is mandatory restitution, but the

15   government's position is that no restitution should be ordered

16   because all victims have been compensated.

17             MS. MOE:  That is correct, your Honor.

18             THE COURT:  Counsel, is there anything else I should

19   consider or any reason why sentence should not be imposed at

20   this time?

21             MS. MOE:  No, your Honor.  Thank you.

22             MS. STERNHEIM:  No.

23             THE COURT:  All right.  Let me gather my thoughts for

24   one moment.

25             (Pause)

**SA-457**

M6s2Max2

1          THE COURT:  Thank you for your patience.

2          As I have stated, the guideline range applicable to

3     this case is 188 to 235 months' imprisonment.

4          Under the Supreme Court's decision in a case called

5     *Booker* and related cases, the guideline range is only one

6     factor that the Court must consider in deciding the appropriate

7     sentence.  I am also required to consider the other factors set

8     forth in a provision called 18 U.S.C. 3553(a).  These include

9     the nature and circumstances of the offense, and the history

10    and characteristics of the defendant; the need for the sentence

11    imposed to reflect the seriousness of the offense, to promote

12    respect for the law, to provide just punishment for the

13    offense, to afford adequate deterrence to criminal conduct, to

14    protect the public from further crimes of the defendant, to

15    provide needed educational, vocational training, medical care,

16    or other treatment.  I am to take into account the kinds of

17    sentences available, as I have said, the guideline range, any

18    pertinent policy statement, the need to avoid unwarranted

19    sentence disparities among defendants with similar records who

20    have been found guilty of similar conduct, the need to provide

21    restitution as appropriate under the law to any victims of the

22    offense.

23         I am required to impose a sentence sufficient, but no

24    greater than necessary, to comply with the purposes I have just

25    described.  I have given substantial thought and attention to

**SA-458**

M6s2Max2

1    the appropriate sentence in this case in light of the 3553(a)

2    factors and the appropriate purposes of sentencing as reflected

3    in that statute.

4         The crimes for which I sentence Ms. Maxwell today are

5    the crimes for which a jury convicted her of committing

6    following trial.  I do want to emphasize that today the

7    sentence is based entirely on those crimes and the harm done to

8    the victims of those charged and proved crimes.  The evidence

9    at trial established that Ms. Maxwell directly and repeatedly

10   and over the course of many years participated in a horrific

11   scheme to entice, transport, and traffic underage girls, some

12   as young as 14, for sexual abuse by and with Jeffrey Epstein.

13        I will pause on those words for a moment, "by and with

14   Epstein."  It is important at the outset to emphasize that

15   although Epstein was, of course, central to this criminal

16   scheme, Ms. Maxwell is not being punished in place of Epstein

17   or as a proxy for Epstein.  Like every other participant in a

18   multi-defendant case, Ms. Maxwell is being punished for the

19   role that she played in the criminal conduct.  As to that role,

20   the trial evidence established that Ms. Maxwell was

21   instrumental in the abuse of several underage girls and that

22   she herself participated in some of the abuse, and it is her

23   conduct for which she has been convicted in the court under the

24   laws of this country and it is her conduct for which she must

25   be held accountable.

**SA-459**

M6s2Max2

 1            Turning to that conduct, the punishment here must

 2    reflect the seriousness of the offense, promote respect for the

 3    law, provide just punishment for the offense, and deter.

 4            First, as to the seriousness, the defendant's conduct

 5    was, as aptly described by the probation department, heinous

 6    and predatory.  Ms. Maxwell worked with Epstein to select young

 7    victims who were vulnerable.  Once selected, Ms. Maxwell played

 8    a pivotal role in facilitating the abuse of the underaged girls

 9    through a series of deceptive tactics.  A sophisticated adult

10    woman, she provided an initial venire of responsibility and

11    even safety.  She befriended and developed relationships of

12    trust.  She then manipulated the victims and normalized sexual

13    abuse through her involvement, encouragement, and instruction.

14            To give one example from trial, Jane testified that

15    Ms. Maxwell cultivated a friendship with her, took her to

16    movies and shopping.  In an initial sexual interaction, while

17    Jane was 14 years old, the defendant engaged in sexual conduct

18    with Epstein while Jane was present.  After that, the defendant

19    instructed Jane, again, while she was only 14 years old, on how

20    to massage Epstein, including instructions on how to touch his

21    penis during massages.  The abuse later escalated to Epstein

22    using vibrators on Jane, penetrating her with his fingers.

23    During some of the sexual abuse, the defendant would herself

24    touch Jane's breasts.

25            Carolyn, the victim of the sex trafficking charge,

**SA-460**

M6s2Max2

 1    provides another example.  She testified that she confided in

 2    the defendant that her mother was an alcohol and that she had

 3    been raped and molested by her grandfather starting at a very

 4    young age.  The defendant, aware of this knowledge, used it to

 5    subject Carolyn to a continuing cycle of sexual abuse.  The

 6    defendant wasn't an impassive observer, but herself touched

 7    Carolyn's breasts, again, at the time Carolyn was 14.  For

 8    years, Carolyn was paid for the sexualized massages, including

 9    personally paid by the defendant.

10         Similar patterns of conduct were described by other

11    witnesses.  Indeed, the criminal conduct established at trial

12    was extensive and it was far-reaching.  Ms. Maxwell and Epstein

13    victimized multiple underaged girls using this pattern, this

14    playbook, over the span of many years and in a variety of

15    locations.  And the damage done to these young girls was

16    incalculable.  They did bravely testify at trial about what

17    happened to them despite the extraordinary difficulty that

18    entailed.  They withstood cross-examination from zealous

19    defense counsel and testified credibly at trial about the

20    trauma that they had endured and the painful, horrific, and

21    lasting impact of that trauma.  They did so, they told me in

22    their statements, in order to help ensure justice for

23    themselves and others and to do what they could to try to

24    prevent other girls from suffering in the future as they had

25    suffered.

**SA-461**

M6s2Max2

1        The sentence I impose must reflect the gravity of

2    Ms. Maxwell's conduct, of Ms. Maxwell's offense, the pivotal

3    role she played in facilitating the offense, and the

4    significant and lasting harm it inflicted.  So, too, must the

5    sentence promote respect for the law, provide just punishment,

6    and afford adequate deterrence.

7        As I have described, this scheme was long-lasting, it

8    was far-reaching, it was horribly damaging to the victims.

9    Just punishment and promotion of respect for the law, it

10    demands a substantial sentence that meets the scope of the

11    conduct and the scope of the harm.

12        Moreover, general deterrence is critically important

13    to the sentence I will impose.  A substantial sentence will

14    send an unmistakable message that those who engage in and

15    facilitate the sexual abuse and trafficking of underaged

16    victims will be held accountable by the law.

17        As the probation department stated, a significant

18    sentence should promote general deterrence against the

19    exploitation and degradation of humans made possible by this

20    offense, and I fully agree.  But let me be clear that

21    Ms. Maxwell is wealthy or that this case is high profile is not

22    a basis for increasing punishment in any regard, but the rule

23    of law demands, and this Court must ensure that, whether you

24    are rich or poor, powerful or entirely unknown, nobody is above

25    the law.  That message serves the important interest in

**SA-462**

M6s2Max2

1    deterrence and just punishment as well.  All of these factors

2    suggest that a very serious, a very significant sentence is

3    necessary to achieve the purposes of punishment that I have

4    just described.

5         Of course I must, and I do, take into account the

6    history and characteristics of the defendant.  Ms. Maxwell is

7    over 60 years old.  This is her first conviction.  Neither in

8    arguing for pretrial detention nor with respect to sentencing

9    has the government contended that Ms. Maxwell represents a

10   continuing danger to the public.  As I explained, I do not need

11   to find she is a continuing danger to apply 4B1.5(b), as her

12   decade-long pattern of predatory activity amply justifies that

13   enhancement and a substantial sentence, but her present lack of

14   dangerousness is a factor in my consideration of a proper

15   sentence.

16        Her sentencing submission letters and psychological

17   report discuss the impacts of an overbearing and demanding

18   father and the tragic death of her brother at the beginning of

19   her life.  The record indicates that she has engaged in some

20   charitable works, including environmental conservation and

21   health-related charitable organizing and giving.  The set of

22   letters I received from her family members and friends describe

23   her as attentive and loving to her family and a loyal and

24   generous friend.  A letter from an inmate describes her

25   tutoring of other inmates while incarcerated and Ms. Sternheim

**SA-463**

M6s2Max2

1    represents that she has heard similarly from other defense

2    counsel.  I take all of these factors into account consistent

3    with the 3553(a) statutory provision when deciding what

4    sentence to impose.

5            Beyond these factors, much of the defense written

6    submission, not the oral statement today, but much of the

7    written submission focused on a series of complaints about

8    Ms. Maxwell's pretrial detention.  As I have said in many

9    sentencing proceedings since the pandemic began, the conditions

10   in the MDC have been extremely difficult for all inmates as a

11   result.  There have been extended periods of lockdown, health

12   risks, and the lack of access to legal and social visits and

13   programming and the like.  Conditions at the MDC are, to put it

14   mildly, not what they should be, and serving time during the

15   pandemic has been more difficult than serving time before it.

16   As I have in other sentencings, I take into account this in

17   imposing an appropriate sentence.  I also take into account

18   that, as a high-profile defendant charged and convict of sex

19   offenses against minors, Ms. Maxwell faces security risks and

20   has endured additional isolation and surveillance beyond the

21   typical pretrial detainee.

22           That said, I largely reject the defense's primary

23   written contention that Ms. Maxwell has been singled out for

24   uniquely harsh and punishing treatment.  To the contrary, I

25   agree with the government that many of the complaints have been

**SA-464**

M6s2Max2

1    unfounded and exaggerated and that Ms. Maxwell's treatment at

2    MDC was overall as good as or better than that of the typical

3    pretrial detainee at the MDC during the pandemic.

4           I also reject the repeated allegations that

5    Ms. Maxwell, who was provided extensive access to computers and

6    legal materials, as well as to highly involved counsel, was in

7    any way not able to prepare for trial or sentencing.  I will

8    say that I think a lack of full candor regarding treatment is

9    consistent with a lack of candor to Pretrial Services and to

10   the Court regarding finances, as well as the dishonesty that I

11   have concluded occurred during the civil deposition that makes

12   up the perjury counts.  Overall, the behavior appears

13   consistent with a pattern of deflection of blame.

14          I will note that I was -- I would emphasize that the

15   sentencing submission talks about these complaints and blames

16   others but did not express remorse or acceptance of

17   responsibility.  Ms. Sternheim and Ms. Maxwell today

18   acknowledge the courage of the victims who testified and who

19   spoke, talked about the pain and anguish that they have

20   expressed, to some extent acknowledged the impact on them and

21   their suffering, and I think that is important for the victims

22   to hear.  What there wasn't expressed was acceptance of

23   responsibility.  Now let me be clear.  Ms. Maxwell is fully

24   entitled to exercise her constitutional -- was fully entitled

25   and is fully entitled to exercise her constitutional right to

**SA-465**

M6s2Max2

1    go to trial.  She has every right to appeal that verdict.  But

2    it is appropriate for this Court, in the face of genuine

3    expressions of remorse and acceptance of responsibility, to

4    decrease punishment because that's part of the message that's

5    being sent by the law.  It's appropriate to note and to take

6    into account a lack of acceptance of responsibility, a lack of

7    expression of remorse as to her own conduct.  Today's sentence

8    will attempt to acknowledge the harm that Ms. Maxwell caused

9    and it will strongly and unequivocally condemn her criminal

10   conduct.

11           I do conclude, consistent with the Probation

12   Department recommendation, that a sentence of 240 months, which

13   is slightly above the guideline range that I found, is both

14   sufficient and necessary -- and no greater than necessary to

15   meet the purposes of punishment that I have described.

16           I will now formally state the sentence I intend to

17   impose.  I will ask Ms. Maxwell and her counsel to please rise.

18           Ms. Maxwell, it is the judgment of this Court that you

19   be sentenced to a period of 240 months, 20 years, to be

20   followed by a period of five years' supervised release.

21           You may be seated.

22           To be precise, I am sentencing Ms. Maxwell to 60

23   months on Count Three, 120 months on Count Four, and 240 months

24   on Count Six, all to run concurrently, for a total of 240

25   months' imprisonment.  I am sentencing her to three years of

**SA-466**

M6s2Max2

1   supervised release on Counts Three and Four and five years on

2   Count Six, all to run concurrently, for a total of five years

3   of supervised release.

4           Defense counsel indicated no objection to the

5   conditions of supervised release indicated in the presentence

6   report, and so I impose them precisely as stated in the

7   presentence report, including the standard conditions, special

8   conditions, and mandatory conditions of supervised release.

9   Again, I am imposing them precisely as stated in the PSR.

10          I order Ms. Maxwell to pay a fine in the amount of

11  $750,000.  The maximum amount per count is $250,000, so that is

12  $750,000 total.  As I have indicated, I reject the contention

13  that the defendant is unable to pay a fine.  Ms. Maxwell has

14  received a $10 million bequest from Epstein.  This is in

15  addition to her other assets.  And the defendant, I conclude,

16  is able to afford a substantial fine, and I conclude that the

17  maximum amount per count is reasonable under all relevant

18  circumstances in light of the counts of conviction.

19          The government has indicated that it is not seeking

20  restitution nor forfeiture.

21          I am imposing a mandatory special assessment, as I

22  must, of $100 per count, which is due immediately.

23          Does either counsel know of any legal reason, other

24  than those already argued, why the sentence shall not be

25  imposed as stated?

**SA-467**

M6s2Max2

1        MS. MOE:  No, your Honor.

2        MS. STERNHEIM:  Your Honor, I would just like to make

3   one statement, if I may.  With regard to the fine, the Court

4   indicated the bequest in the will.  I just want the record to

5   reflect that that is an unactualized bequest, as Ms. Maxwell

6   has received nothing, and it is the expectation that she will

7   receive nothing.

8        THE COURT:  I understand.  And to be clear, I am not

9   finding and accept that she hasn't received anything, but there

10  have only been nonspecific claims that she won't receive

11  anything and there are additional assets that lead me to the

12  conclusion that she is able to pay the fine.

13       MS. STERNHEIM:  Thank you, Judge.

14       THE COURT:  Thank you.

15       And just to confirm, Ms. Sternheim, any legal reason

16  why the sentence should not be imposed as stated other than

17  what already was argued?

18       MS. STERNHEIM:  No, your Honor, but I do have requests

19  for recommendation.

20       THE COURT:  I will get there.  Thank you.

21       The sentence as stated is imposed.  I do find the

22  sentence is sufficient but not greater than necessary to

23  satisfy the sentencing purposes that I described earlier.

24       Ms. Maxwell, when you are released and on supervised

25  release, you will have the guidance and support of the

**SA-468**

M6s2Max2

1    probation department.  I must caution you to comply strictly

2    with all of your conditions of supervised release.  If you are

3    brought back before me for a violation of those conditions, I

4    may sentence you to another term of imprisonment.

5            With that, Ms. Sternheim, requests regarding

6    designation?

7            MS. STERNHEIM:  Thank you, Judge.

8            We request that Ms. Maxwell be designated, based on a

9    recommendation by the Court, to the BOP facility, the women's

10   facility in Danbury, and also a recommendation that she be

11   enrolled in the FIT program, which is the Female Integrated

12   Treatment program, to address past familial and other trauma.

13           THE COURT:  Okay.

14           MS. STERNHEIM:  Thank you.

15           THE COURT:  I recommend to the Bureau of Prisons

16   consideration of placement in Danbury and consideration of

17   eligibility for enrollment in the FIT program.

18           Ms. Moe, remaining counts and underlying indictments

19   that need to be dismissed at this time?

20           MS. MOE:  Yes, your Honor.  The government moves to

21   dismiss Counts Seven and Eight and any underlying indictments.

22           THE COURT:  The motion is granted.  Counts Seven and

23   Eight are dismissed and any underlying indictments are

24   dismissed.

25           Ms. Maxwell, I am required to inform you of your

**SA-469**

M6s2Max2

1   appellate rights.  You have the right to appeal your conviction

2   and your sentence.  The notice of appeal must be filed within

3   14 days of the judgment of conviction.

4              Other matters to take up counsel?

5              MS. MOE:  Not from the government, your Honor.  Thank

6   you.

7              MS. STERNHEIM:  No.  Thank you.

8              THE COURT:  Let me note, I will issue a housekeeping

9   order posttrial to ensure complete docketing of all -- any

10  outstanding materials and complete records, so please look for

11  that.  I will issue the judgment -- I should just say, Ms. Moe,

12  the Court intends to indicate the end of the conspiracy date as

13  the last date in the record, which I believe is in July of

14  2004, of acts in furtherance of the criminal conduct, and

15  obviously the government took a different position with respect

16  to that.  But in light of the Court's finding, any objection to

17  that?

18             MS. MOE:  No, your Honor.  We will review the

19  exhibits.  If that date is different from the sentencing

20  transcript, we will submit a letter to the Court, but otherwise

21  no objection, your Honor.

22             MS. STERNHEIM:  No objection.

23             THE COURT:  All right.

24             MS. MOE:  With apologies, your Honor, with respect to

25  the judgment, in light of the Court's decision to impose an

**SA-470**

M6s2Max2

1    above-guidelines sentence and an above-guidelines fine, we

2    would respectfully request that the Court address both the

3    sentence and the fine in the Court's statement of reasons.

4              THE COURT:  Yeah, I actually -- guideline range, let

5    me just check.  I meant to talk about that.  I'm not sure it is

6    an above-guidelines, but it may be since, as we know, I read

7    over five to mean five.  So maybe I got that wrong.  Let me

8    just check.

9              Oh, you are right.  It is 20 to 200,000 for each

10   count.  Do I have that right?

11             MS. MOE:  Yes, your Honor.  Thank you.

12             THE COURT:  All right.  Thank you.

13             I want to thank counsel.  As I indicated, I do thank

14   the victims who made statements in writing or orally and their

15   counsel who supported them in that endeavor.  I thank counsel

16   for Ms. Maxwell and counsel for the government.

17             We are adjourned.

18                                 oOo

19

20

21

22

23

24

25

**SA-471**

Jeffrey and Ghislaine have been together, a couple, for the last 11 years. They are, contrary to what many people think, rarely apart – I almost always see them together

Ghislaine is highly intelligent, and great company with a ready smile and an infectious laugh who always puts one at ones ease, and always makes one feel welcome.

Jeffrey and Ghislaine share many mutual interests and they have a lot of fun together.   They both have keen searching and inquisitive minds. She grew up amongst scientists and in an academic and business environment.

They share a love of travel and art. She speaks 5 languages. She enjoys spending time visiting auction houses (she says that is the best way to learn about art and antiques – your expected to look touch and ask questions)

Ghislaine also has her own interests and has her own business pursuits – she is independent and strong willed - something which Jeffrey loves about her - She is adventurous – she flies helicopters, she is athletic – she rides horses, plays tennis, skis and scuba dives. She is a serious photographer (she always has a camera in hand) who is collaborating with some of the leading people involved at the cutting edge of digital photography.

Jeffrey and Ghislaine compliment each other really well and I cannot imagine one without the other. On top of being great partners they are also the best of friends.

GOVERNMENT
EXHIBIT
422
S2 20 Cr. 330 (AJN)