# 22-1426

*To Be Argued By*:
Maurene Comey

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 22-1426

➤➤➤

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

GHISLAINE MAXWELL, also known as Sealed Defendant 1,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR THE UNITED STATES OF AMERICA

Damian Williams,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

Maurene Comey,
Alison Moe,
Lara Pomerantz,
Won S. Shin,
    *Assistant United States Attorneys,
        Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . . .  2

        1.  Sexual Abuse of Jane . . . . . . . . . . . . . .  6

        2.  Sexual Abuse of Kate . . . . . . . . . . . . . .  7

        3.  Sexual Abuse of Annie Farmer . . . . . . .  8

        4.  Sexual Abuse of Virginia Roberts . . . . .  9

        5.  Sexual Abuse of Carolyn . . . . . . . . . . .  10

        6.  Sexual Abuse of Melissa . . . . . . . . . . .  12

    B.  The Defense Case, Verdict, and
        Sentencing . . . . . . . . . . . . . . . . . . . . . . . . .  12

ARGUMENT:

POINT I—The District Court Correctly Concluded
    That Jeffrey Epstein's Non-Prosecution
    Agreement Does Not Bar Maxwell's Prosecution
    in the Southern District of New York . . . . . . .  13

    A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .  14

    B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  15

    C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  16

        1.  Maxwell Is Not Entitled to Enforce the
           NPA . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

ii

PAGE

2.  The NPA's Terms Bind Only the
    USAO-SDFL.................... 18

3.  The District Court Did Not Abuse Its
    Discretion in Declining to Conduct a
    Hearing........................ 27

POINT II—The District Court Correctly Concluded
that the Charges Were Timely.............. 28

A. Applicable Law ...................... 28

    1.  Standard of Review ............... 28

    2.  Statutes of Limitations for Offenses
        Against Children (18 U.S.C. § 3283) and
        Child Abduction and Sex Offenses (18
        U.S.C. § 3299).................... 29

    3.  Retroactivity under *Landgraf* ....... 31

B. Discussion .......................... 31

    1.  There Was No Impermissible
        Retroactivity in Applying Section 3283
        to Maxwell ..................... 31

        a.  There Was No Retroactivity as to
            Counts Three and Six .......... 32

        b.  Applying Section 3283 to Maxwell
            Complies with *Landgraf*........ 33

            i.  *Landgraf* Step One......... 33

iii

PAGE

ii.  *Landgraf* Step Two . . . . . . . . 37

2.  Section 3283 Reaches Counts Three
and Four . . . . . . . . . . . . . . . . . . . . . . 42

a.  Counts Three and Four Are
Offenses Involving the Sexual
Abuse of a Child . . . . . . . . . . . . . 43

b.  Maxwell's Argument for Use of
a Categorical Approach Lacks
Merit . . . . . . . . . . . . . . . . . . . . . . 46

POINT III—The District Court Did Not Abuse Its
Discretion in Concluding that Juror 50 Could
Be Fair and Impartial Notwithstanding His
Inadvertent Mistakes on His Juror
Questionnaire . . . . . . . . . . . . . . . . . . . . . . . . . 49

A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . 50

1.  The Jury Selection Process . . . . . . . . . 50

2.  Juror 50 . . . . . . . . . . . . . . . . . . . . . . . 51

3.  The Hearing . . . . . . . . . . . . . . . . . . . . 53

4.  The District Court's Decision . . . . . . . 55

B.  Applicable Law . . . . . . . . . . . . . . . . . . . . 56

C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . 59

iv

PAGE

POINT IV—The District Court's Response to a Jury
    Note Did Not Constructively Amend the
    Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   66

    A. Relevant Facts . . . . . . . . . . . . . . . . . . . . . . .   66

    B. Applicable Law . . . . . . . . . . . . . . . . . . . . . .   70

    C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .   71

POINT V—The Sentence Was Procedurally
    Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76

    A. Applicable Law . . . . . . . . . . . . . . . . . . . . . .   76

    B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .   76

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79

## TABLE OF AUTHORITIES

*Cases*:

*Bochese v. Town of Ponce Inlet,*
    405 F.3d 964 (11th Cir. 2005) . . . . . . . . . . . . . . . 18

*Bridges v. United States,*
    346 U.S. 209 (1953) . . . . . . . . . . . . . . . . . . . . . . . 48

*Burgess v. United States,*
    552 U.S. 124 (2008) . . . . . . . . . . . . . . . . . . . . . . . 45

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) . . . . . . . . . . . . . . . . . . . . . . . 45

v

PAGE

*Cruz v. Maypa,*
   773 F.3d 138 (4th Cir. 2014) . . . . . . . . . . . . 39, 40

*Falter v. United States,*
   23 F.2d 420 (2d Cir. 1928) . . . . . . . . . . . . . . . . . 40

*In re Enter. Mort. Acceptance Co. Sec. Litig.,*
   391 F.3d 401 (2d Cir. 2004) . . . . . . . . . 34, 38, 39

*Kawashima v. Holder,*
   565 U.S. 478 (2012) . . . . . . . . . . . . . . . . . . . . . . . 48

*Kirtsaeng v. John Wiley & Sons, Inc.,*
   568 U.S. 519 (2013) . . . . . . . . . . . . . . . . . . . . . . . 20

*Landgraf v. USI Film Products,*
   511 U.S. 244 (1994) . . . . . . . . . . . . . 31, 33, 40, 41

*Leocal v. Ashcroft,*
   543 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . 47, 48

*McDonough Power Equip., Inc. v. Greenwood,*
   464 U.S. 548 (1984) . . . . . . . . . . . . . . . . . . . . 56, 57

*Nijhawan v. Holder,*
   557 U.S. 29 (2009) . . . . . . . . . . . . . . . . . . . . . . . . 47

*San Pedro v. United States,*
   79 F.3d 1065 (11th Cir. 1996) . . . . . . . . . . . . . . 25

*Stogner v. California,*
   539 U.S. 607 (2003) . . . . . . . . . . . . . . . . . . . . 36, 39

*Tanner v. United States,*
   483 U.S. 107 (1987) . . . . . . . . . . . . . . . . . . . . . . . 56

*Thompson v. United States,*
   431 F. App'x 491 (7th Cir. 2011) . . . . . . . . . . . . 26

vi

PAGE

*United States v. Annabi,*
   771 F.2d 670 (2d Cir. 1985) . . . . . . . . . . . . . . 15, 23

*United States v. Archer,*
   977 F.3d 181 (2d Cir. 2020) . . . . . . . . . . . . . . . . 58

*United States v. Ashraf,*
   320 F. App'x 26 (2d Cir. 2009) . . . . . . . . . . . . . . 24

*United States v. Baker,*
   899 F.3d 123 (2d Cir. 2018) . . . . . . . . . . . . . . . . 57

*United States v. Banki,*
   685 F.3d 99 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 71

*United States v. Ben Zvi,*
   242 F.3d 89 (2d Cir. 2001) . . . . . . . . . . . . . . . . . 32

*United States v. Botti,*
   711 F.3d 299 (2d Cir. 2013) . . . . . . . . . . . . . . . . 78

*United States v. Brown,*
   No. 99-1230(L),
   2002 WL 34244994 (2d Cir. 2004) . . . . . . . . . . . 24

*United States v. Calbas,*
   821 F.2d 887 (2d Cir. 1987) . . . . . . . . . . . . . . . . 58

*United States v. Carpenter,*
   680 F.3d 1101 (9th Cir. 2012) . . . . . . . . . . . 44, 45

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) . . . . . . . . . . . . . . . . 76

*United States v. Countentos,*
   651 F.3d 809 (8th Cir. 2011) . . . . . . . . . . . . . . . . 49

vii

PAGE

*United States v. Cramer*,
    777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . . . . 76

*United States v. D'Amelio*,
    693 F.3d 412 (2d Cir. 2012) . . . . . . . . . . . . . . . . 70

*United States v. Davis*,
    139 S. Ct. 2319 (2019). . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Diehl*,
    775 F.3d 714 (5th Cir. 2015) . . . . . . . . . . . . . . . 45

*United States v. Dove*,
    884 F.3d 138 (2d Cir. 2018) . . . . . . . . . . . . . . 70, 71

*United States v. Eppolito*,
    543 F.3d 25 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 32

*United States v. Feldman*,
    939 F.3d 182 (2d Cir. 2019) . . . . . . . . . . . . . . . . 17

*United States v. Fla. W. Int'l Airways, Inc.*,
    853 F. Supp. 2d 1209 (S.D. Fla. 2012) . . . . . . . . . 18

*United States v. Gonzalez*,
    93 F. App'x 268 (2d Cir. 2004) . . . . . . . . . . . 19, 24

*United States v. Greenberg*,
    835 F.3d 295 (2d Cir. 2016) . . . . . . . . . . . . . . . . 16

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002) . . . . . . . . . . . . . . . . 63

*United States v. Ianniello*,
    866 F.2d 540 (2d Cir. 1989) . . . . . . . . . . 56, 58, 64

*United States v. Jeffries*,
    405 F.3d 682 (8th Cir. 2005) . . . . . . . . . . . . . 34, 41

viii

PAGE

*United States v. Khalupsky*,
　5 F.4th 279 (2d Cir. 2021) . . . . . . . . . . . . . . . 70, 71

*United States v. Kim*,
　471 F. App'x 82 (2d Cir. 2012) . . . . . . . . . . . . . . 73

*United States v. Langford*,
　990 F.2d 65 (2d Cir. 1993) . . . . . . . . . . . . . . . . 60

*United States v. Lebedev*,
　932 F.3d 40 (2d Cir. 2019) . . . . . . . . . . . . . . 70, 75

*United States v. Lopez*,
　944 F.2d 33 (1st Cir. 1991) . . . . . . . . . . . . . . . . 17

*United States v. Mariamma Viju*,
　No. 15 Cr. 240,
　2016 WL 107841 (N.D. Tex. Jan. 11, 2016). . . . . 17

*United States v. McCourty*,
　562 F.3d 458 (2d Cir. 2009) . . . . . . . . . . . . . . . 56

*United States v. McCoy*,
　995 F.3d 32 (2d Cir. 2021) . . . . . . . . . . . . . . . . 60

*United States v. Miller*,
　911 F.3d 638 (1st Cir. 2018). . . . . . . . . . . . . . . . 39

*United States v. Monaco*,
　194 F.3d 381 (2d Cir. 1999) . . . . . . . . . . . . . . . 32

*United States v. Montague*,
　67 F.4th 520 (2d Cir. 2023) . . . . . . . . . . . . . . . 16

*United States v. Morgan*,
　393 F.3d 192 (D.C. Cir. 2004). . . . . . . . . . . . . . 48

ix

PAGE

*United States v. Moten*,
  582 F.2d 654 (2d Cir. 1978) . . . . . . . . . .  53, 58, 64

*United States v. Nader*,
  425 F. Supp. 3d 619 (E.D. Va. 2019) . . . . . . . . . . 41

*United States v. Noveck*,
  271 U.S. 201 (1926). . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Padilla*,
  186 F.3d 136 (2d Cir. 1999) . . . . . . . . . . . . . . . . 16

*United States v. Payne*,
  591 F.3d 46 (2d Cir. 2010) . . . . . . . . . . . . . . . . . 24

*United States v. Piette*,
  45 F.4th 1142 (10th Cir. 2022). . . . . . . . . . . . . . 41

*United States v. Prisco*,
  391 F. App'x 920 (2d Cir. 2010) . . . . . . . . . . . 16, 24

*United States v. Restrepo*,
  890 F. Supp. 180 (E.D.N.Y. 1995) . . . . . . . . . . . 25

*United States v. Richardson*,
  512 F.2d 105 (3d Cir. 1975) . . . . . . . . . . . . . . . . 41

*United States v. Rommy*,
  506 F.3d 108 (2d Cir. 2007) . . . . . . . . . . . . . . 72, 73

*United States v. Rourke*,
  74 F.3d 802 (7th Cir. 1996) . . . . . . . . . . . . . . . . . 26

*United States v. Russo*,
  801 F.2d 624 (2d Cir. 1986) . . . . . . . . . . . . . . 16, 22

*United States v. Rutigliano*,
  790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . . . . . . 33

x

PAGE

*United States v. Salameh*,
　152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . 16, 19, 37

*United States v. Salmonese*,
　352 F.3d 608 (2d Cir. 2003) . . . . . . . . . . . . . . . . 75

*United States v. Sampson*,
　898 F.3d 270 (2d Cir. 2018) . . . . . . . . . . . . . . . . 28

*United States v. Scharton*,
　285 U.S. 518 (1932). . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Schneider*,
　801 F.3d 186 (3d Cir. 2015) . . . . . . . . . . 45, 46, 47

*United States v. Sensi*,
　No. 08 Cr. 253 (WWE),
　2010 WL 2351484 (D. Conn. June 7, 2010). . . . . 46

*United States v. Shaoul*,
　41 F.3d 811 (2d Cir. 1994) . . . . . . . . . . . . . . . . . 60

*United States v. Stewart*,
　433 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . 57

*United States v. Sure Chief*,
　438 F.3d 920 (9th Cir. 2006) . . . . . . . . . . . . . 35, 41

*United States v. Teman*,
　465 F. Supp. 3d 277 (S.D.N.Y. 2020) . . . 58, 59, 60

*United States v. Torres*,
　128 F.3d 38 (2d Cir. 1997) . . . . . . . . . . . 57, 63, 64

*United States v. Vickers*,
　No. 13 Cr. 128 (RJA),
　2014 WL 1838255 (W.D.N.Y. May 8, 2014). . . . . 45

xi

PAGE

*United States v. Walters,*
910 F.3d 11 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 16

*United States v. Wilkerson,*
361 F.3d 717 (2d Cir. 2004) . . . . . . . . . . . . . . . . 26

*United States v. Wilson,*
216 F.3d 645 (7th Cir. 2000) . . . . . . . . . . . . . . . 17

*United States ex rel. Owen v. McMann,*
435 F.2d 813 (2d Cir. 1970) . . . . . . . . . . . . . . . . 64

*Vernon v. Cassadaga Valley Cent. School Dist.,*
49 F.3d 886 (2d Cir. 1995) . . . . . . . . . . . . . . 37, 38

*Warger v. Shauers,*
574 U.S. 40 (2014). . . . . . . . . . . . . . . . . . . . . . 66, 67

*Weingarten v. United States,*
865 F.3d 48 (2d Cir. 2017) . . . . . . . . . . . . . . *passim*

*Statutes, Rules & Other Authorities:*

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 32

18 U.S.C. § 1591(a). . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1623 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2422 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2423(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2423(b). . . . . . . . . . . . . . . . . . . . . . . . . . 47

18 U.S.C. § 3282(a). . . . . . . . . . . . . . . . . . . . . . . . . . 29

18 U.S.C. § 3283 . . . . . . . . . . . . . . . . . . . . . . . . *passim*

xii

PAGE

18 U.S.C. § 3299 . . . . . . . . . . . . . . . . . . . . 29, 30, 31, 42

18 U.S.C. § 3509(a) . . . . . . . . . . . . . . . . . . . . . . . . . 44

18 U.S.C. § 3509(a)(8) . . . . . . . . . . . . . . . . . . . . 44, 46

18 U.S.C. § 3509(k) . . . . . . . . . . . . . . . . . . . . . . . 29, 43

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . 78

28 U.S.C. § 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

N.Y. Penal Law § 130.55 . . . . . . . . . . . . . . . . . . . . . 68

Pub. L. No. 101-647 . . . . . . . . . . . . . . . . . . . . . . . . 29

Pub. L. No. 103-322 . . . . . . . . . . . . . . . . . . . . . . . . 29

Pub. L. No. 108-21 . . . . . . . . . . . . . . . . . . . . . . 30, 34

Pub. L. No. 109-162 . . . . . . . . . . . . . . . . . . . . . . . . 30

Pub. L. No. 109-248 . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Evid. 606(b)(1) . . . . . . . . . . . . . . . . . . . . . . 58

Fed. R. Evid. 606(b)(2)(A) . . . . . . . . . . . . . . . . . . . 65

U.S.S.G. § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

H.R. Conf. Rep. No. 108-66 (2003) . . . . . . . . . . 29, 35

American Conflicts Law (5th ed. 2021) . . . . . . . 24, 25

2 Attorney-Client Privilege in the United States
    § 12:10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 22-1426

————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

GHISLAINE MAXWELL, also known as Sealed
Defendant 1,

*Defendant-Appellant.*

————————

## BRIEF FOR THE UNITED STATES OF AMERICA

————————

### Preliminary Statement

Ghislaine Maxwell appeals from a judgment of conviction entered on June 29, 2022 in the United States District Court for the Southern District of New York, by the Honorable Alison J. Nathan, United States Circuit Judge, sitting by designation, following a four-and-a-half-week jury trial.

Superseding Indictment S2 20 Cr. 330 (AJN) (the "Indictment") was filed on March 29, 2021, in eight counts. Count One charged Maxwell with conspiracy to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371. Count Two charged

2

Maxwell with enticement of a minor, in violation of 18 U.S.C. §§ 2422 and 2. Count Three charged Maxwell with conspiracy to transport minors to engage in illegal sexual activity, in violation of 18 U.S.C. § 371. Count Four charged Maxwell with transportation of a minor with intent to engage in illegal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2. Count Five charged Maxwell with sex trafficking conspiracy, in violation of 18 U.S.C. § 371. Count Six charged Maxwell with sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a) & (b)(2) and 2. Counts Seven and Eight charged Maxwell with perjury, in violation of 18 U.S.C. § 1623.

Trial on Counts One through Six commenced on November 29, 2021, and ended on December 29, 2021, when the jury found Maxwell guilty on Counts One and Three through Six, and acquitted Maxwell on Count Two.

On June 29, 2022, Judge Nathan sentenced Maxwell to a term of 240 months' imprisonment, to be followed by five years' supervised release, and imposed a $750,000 fine and a $300 mandatory special assessment.

Maxwell is serving her sentence.

## Statement of Facts

### A. The Government's Case

The Government's evidence at trial established that over the course of a decade, Maxwell facilitated and participated in the sexual abuse of multiple young girls. From 1994 to 2004, Maxwell and Jeffrey Epstein

worked together to identify girls, groom them, and then entice them to travel and transport them to Epstein's properties in New York, Florida, New Mexico, and elsewhere. The girls—some of whom were as young as 14 years old—were then sexually abused, often under the guise of a "massage."

The evidence at trial included, among other things, the testimony of four women who described the sexual abuse they suffered at the hands of Maxwell and Epstein; the testimony of former employees of Epstein and Maxwell; the testimony of law enforcement officers; corroborating physical evidence, including photographs of and evidence recovered from searches of Epstein's residences and Maxwell and Epstein's black address book; and other corroborating records, such as flight logs of Epstein's private planes and FedEx records.

Beginning in approximately 1991, Maxwell had a close and intimate relationship with Epstein. (Tr.1494-96; GX-422).[1] Maxwell was Epstein's girlfriend for many years, until the early 2000s, after

---

[1] "Tr." refers to the trial transcript; "GX" refers to a Government exhibit at trial; "Voir Dire Tr." refers to the voir dire transcript; "Br." refers to Maxwell's brief on appeal; "A." refers to the appendix filed with that brief; "SA" refers to the supplemental appendix filed with this brief; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, quotations omit internal quotation marks, citations, alterations, and footnotes.

4

which Maxwell and Epstein remained close friends.
(Tr.1494-96; GX-422). For over a decade, Maxwell
traveled with Epstein, a multi-millionaire, on his pri-
vate planes and mingled with rich and famous people,
while enjoying a life of extraordinary luxury. (Tr.96-
99, 233-34, 303-04, 1194). Maxwell and Epstein spent
time together in Epstein's various properties, includ-
ing his mansion on the Upper East Side in Manhattan,
his villa in Palm Beach, his ranch in New Mexico, his
apartment in Paris, and his private island in the U.S.
Virgin Islands. (Tr.99). Maxwell also received a town-
house that Epstein bought for her in New York City,
and Epstein transferred more than $23 million to Max-
well during the timeframe of the conspiracy. (Tr.1194,
1310-17).

In addition to her role as Epstein's girlfriend, Max-
well also supervised Epstein's households as "the lady
of the house." (Tr.95, 783-84). When she took charge of
Epstein's homes, she imposed strict rules for staff,
some of which were included in a household manual
dictating the operation of the Palm Beach residence.
(Tr.807-08, 823-31).

To protect her criminal activities from exposure,
Maxwell fostered a culture of silence at Epstein's
homes. (Tr.784, 826). The household manual made
clear that staff were to "see nothing, hear nothing, say
nothing, except to answer a question directed at" that
staff member. (Tr.826). Maxwell directed Juan Alessi,
the former manager of Epstein's Palm Beach villa, to
speak to Epstein only when spoken to and not to look
Epstein in the eyes. (Tr.784).

5

This culture of silence provided cover for Maxwell and Epstein to sexually abuse young girls. In the early phase of the conspiracy, between 1994 and 2001, Maxwell and Epstein identified vulnerable girls, typically from single-mother households and difficult financial circumstances. (Tr.295, 1178, 2051-52). Maxwell and Epstein then isolated the girls, spending time with them away from their family and friends. (Tr.296-99, 1175-82, 2069-70, 2077-79). During that time, they groomed the girls through techniques such as giving them gifts, pretending to be friends, and building trust. (Tr.298-303, 348, 2079-81). Maxwell and Epstein then normalized sexual situations and sexual touching. (Tr.300-01, 2081-84). Finally, they transitioned to sexual abuse, often through the pretext of giving Epstein a massage. (Tr.306-15, 319-23, 1183-88, 2084-88).[2]

In the later phase of the scheme, from 2001 through 2004, Maxwell and Epstein developed a stream of girls who recruited each other to visit Epstein at his Palm Beach residence. (Tr.1518-25, 1543-46). Maxwell and Epstein paid young girls hundreds of dollars in cash in

---

[2] These techniques were the textbook methods of child predators. At trial, Dr. Lisa Rocchio, an expert in psychology with a specialized expertise in traumatic stress and interpersonal violence, explained that children are most frequently sexually abused through grooming and coercion in the context of a relationship. (Tr.713). Dr. Rocchio explained that abusers use a series of deceptive tactics to engage a child in sexual abuse. (Tr.715-20).

6

exchange for meeting Epstein to be sexually abused, under the pretext of giving Epstein a massage. (Tr.1518-25, 1540-41, 1544-46). Once a girl was introduced to these sexualized massages, she was offered more money if she brought other girls to engage in sexualized massages. (Tr.1544-45).

The trial evidence focused on six girls who suffered abusive sexual contact as a result of Maxwell's criminal actions: Jane, Kate, Annie, Carolyn, Virginia, and Melissa.

### 1. Sexual Abuse of Jane

Maxwell and Epstein met Jane in 1994 when she was just 14 years old at a summer camp for talented kids. (Tr.290-94). Jane was particularly vulnerable, as her father had just died (a fact that she told both Epstein and Maxwell), and her family was struggling financially. (Tr.293-94). Maxwell and Epstein cultivated a relationship with Jane, spending time with her at Epstein's Palm Beach home and taking her to the movies and shopping. (Tr.295-302, 348). Maxwell and Epstein gave Jane gifts, and Jane came to look up to Maxwell like an older sister figure. (Tr.298-301).

Maxwell and Epstein sexually abused Jane starting when she was 14 years old, and the sexual abuse continued for years. (Tr.306-15). When Jane was still only 14 years old, Maxwell and Epstein instructed Jane to follow them to Epstein's bedroom where Maxwell and Epstein fondled each other, casually giggling, while Epstein asked Jane to take her top off. (Tr.307). After this sexual interaction, Maxwell and Epstein taught Jane how Epstein liked to be massaged and

gave Jane instructions about touching Epstein's penis.
(Tr.308-11). Jane was repeatedly sexually abused by
Epstein between the ages of 14 and 16 years old, and
Maxwell was frequently in the room when the abuse
happened. (Tr.307-15). Over time, the abuse escalated,
as Epstein used vibrators on Jane, put his fingers in
Jane's vagina, and asked Jane to straddle his face.
(Tr.319-20). Maxwell sometimes touched Jane, includ-
ing on her breasts, during these incidents. (Tr.311).
Jane also traveled with Maxwell (who assisted Jane in
making travel arrangements) and Epstein to Epstein's
townhouse in New York City and his ranch in New
Mexico, where she was sexually abused. (Tr.316-24).

## 2. Sexual Abuse of Kate

Maxwell and Epstein's sexual abuse of Kate started
in 1994, around the same time that Maxwell and Ep-
stein started sexually abusing Jane. (Tr.1172, 1179-
86). After Kate, then 17 years old, told Maxwell that
she lived alone with her mother and had a difficult
home life, Maxwell introduced Kate to Epstein in Lon-
don. (Tr.1178-82). Maxwell delivered Kate to a naked
Epstein in Maxwell's own home for massages and told
Kate to "have a good time." (Tr.1182-89). During these
massages, Epstein initiated sexual contact. (*Id.*).

Kate traveled to meet both Maxwell and Epstein in
Palm Beach, the Virgin Islands, and New York City
between the ages of 18 and 24. (Tr.1190-98). Epstein
initiated sexual activity with Kate every time she vis-
ited him. (*Id.*). Maxwell brought up sexual topics with
Kate, ranging from talking about how sexually de-
manding Epstein was to asking if Kate knew "anybody

8

who could come and give Jeffrey a blow job" to remarking that Epstein liked cute, young, pretty girls like Kate. (Tr.1191-93).

When Kate was approximately 18 years old, she visited Epstein and Maxwell in Palm Beach. (Tr.1199). Maxwell left a schoolgirl outfit for Kate and said it would be fun for Kate to wear for Epstein. (Tr.1200-01). Kate—alone in a place she had never previously visited—complied. (*Id.*). Epstein initiated sexual contact with Kate and engaged in a sex act with her. (Tr.1202). Later that day, Maxwell asked Kate if she had fun and told Kate that she was a "good girl" and "one of [Epstein's] favorites." (Tr.1202). Epstein engaged in unwanted sexual activity with Kate multiple times during that same trip. (*Id.*).

### 3. Sexual Abuse of Annie Farmer

Maxwell also took steps to normalize sexual contact with Annie Farmer, who was then 16 years old. Annie first met Epstein on a trip to New York, where she and her older sister visited Epstein's Manhattan townhouse, and during which Epstein began to groom Annie by stroking her hand and leg while watching a movie with her. (Tr.2056-61). In the spring of 1996, Annie's mother, at Epstein's request, agreed to send Annie to Epstein's ranch in New Mexico for a retreat for a group of students who were academically gifted. (Tr.2069-70, 2253-55). Annie felt more comfortable going once she understood that Maxwell, a grown woman in a romantic relationship with Epstein, would be there. (Tr.2077).

9

During the New Mexico trip, Maxwell took steps to normalize sexual contact under the ruse of massage. Maxwell instructed Annie to hold Epstein's foot and showed her how to give Epstein a foot massage. (Tr.2083-84). Maxwell then offered to give Annie a massage. (Tr.2084-85). After telling Annie to get undressed, Maxwell gave Annie a massage on a massage table while Annie was naked. (Tr.2085). During the massage, Maxwell directed Annie to roll over so that Annie was laying on her back. (*Id.*). After Annie complied and rolled to her back, Maxwell pulled the sheet down and exposed Annie's breasts. (*Id.*). Then, while Annie was naked, Maxwell rubbed Annie's breasts. (Tr.2085-86).

During this same New Mexico trip, Epstein later got into Annie's bed, cuddled with her, pressed his body into her, and rubbed against her. (Tr.2086-87, 2224). But when Annie managed to extricate herself from the situation by running to the bathroom, thereby denying Epstein further sexual contact, Maxwell seemed "very disinterested" in Annie for the remainder of the trip. (Tr.2086-88).

### 4. Sexual Abuse of Virginia Roberts

Beginning in or about the summer of 2000, Maxwell and Epstein entered a new phase of their scheme to sexually abuse teenage girls. That summer, Maxwell recruited a 17-year-old girl named Virginia Roberts from the parking lot of Mar-a-Lago to provide Epstein with massages. (Tr.840-46). Over the next several months, Virginia was paid to provide Epstein with sexualized massages at his Palm Beach residence, in

10

exchange for hundreds of dollars in cash for each massage. (Tr.840-46. 1518-24, 1742-46). Virginia also traveled with Epstein and Maxwell to other locations, including New York and the Virgin Islands, on Epstein's private plane. (Tr.1854-70). Virginia brought other teenage girls to Epstein's Palm Beach house. (Tr.845). One of those girls was a 14-year-old girl named Carolyn who Virginia introduced to Maxwell and Epstein at the Palm Beach villa in 2001. (Tr.1518-24).

### 5. Sexual Abuse of Carolyn

Carolyn met Maxwell the very first time she went to Epstein's house, and she interacted with Maxwell multiple times thereafter. (Tr.1520-21). On Carolyn's first visit to the house, Maxwell greeted Virginia, who introduced Carolyn to Maxwell. (*Id.*). Maxwell then told Virginia, "You can bring her upstairs and show her what to do," after which Virginia showed Carolyn how to perform a sexual massage on Epstein. (Tr.1521-23).

Thereafter, Carolyn performed over 100 paid sexualized massages for Epstein when she was between 14 and 18 years old. (Tr.1525). The vast majority involved the same course of abuse through which Epstein masturbated, touched Carolyn's breasts and buttocks, and directed Carolyn to touch his nipples. (Tr.1545-46). Epstein also attempted to touch Carolyn's vagina with a vibrator, brought other females into the room to engage in oral sex with Carolyn, and raped Carolyn by penetrating her vagina with his penis. (Tr.1545-47).

At first, Maxwell personally scheduled Carolyn's appointments with Epstein, including on phone calls

11

from New York, and sometimes sent a car to pick Car-
olyn up because she was too young to drive. (Tr.1524,
1527-32). Maxwell also engaged Carolyn in conversa-
tions during which Carolyn revealed that she had pre-
viously been sexually abused by a relative, that her
parents were separated, and that her mother strug-
gled with addiction. (Tr.1533-36). Maxwell invited
Carolyn to travel with Maxwell and Epstein, but Car-
olyn responded that because she was only 14 years old,
she would not be able to get permission to travel.
(Tr.1534-35). Carolyn was paid several hundred dol-
lars in one-hundred-dollar bills after each massage,
and Carolyn also received gifts of lingerie from Epstein
and Maxwell shipped from Manhattan to her home in
Florida. (Tr.1540-42). Usually, the money was laid out
on the table or by the sink in the bathroom, but Max-
well personally paid Carolyn after a few massages.
(Tr.1540-41).

Maxwell saw Carolyn fully nude in the massage
room on approximately three occasions when Carolyn
had already undressed in preparation for the massage
but before Epstein entered the room. (Tr.1536-38). On
one such occasion, when Carolyn was 14 years old,
Maxwell told Carolyn that she had a nice body and
touched Carolyn's breasts. (*Id.*).

At some point, Epstein asked Carolyn if she had
any young friends she could bring for massages.
(Tr.1544). Carolyn ended up bringing multiple girls to
Epstein for sexualized massages, including multiple
minors. (Tr.1544-46, 1753-54). When Carolyn brought
girls to massage Epstein, both the girl and Carolyn

12

would be paid hundreds of dollars in cash. (Tr.1544-45).

### 6. Sexual Abuse of Melissa

One of the minor girls Carolyn brought to provide paid sexualized massages to Epstein was a 16-year-old named Melissa. (Tr.1753, 1758-61). Melissa went to Epstein's residence to provide Epstein with massages on multiple occasions when she was under the age of 18. (*Id.*). When Melissa and Carolyn went to the Palm Beach house, they remained in the home for about an hour and then returned with hundreds of dollars in cash. (*Id.*).

## B. The Defense Case, Verdict, and Sentencing

Maxwell called nine witnesses in her defense case, including former employees and associates, as well as an expert on memory. (Tr.2327-2531, 2595-2684).

On December 29, 2021, the jury found Maxwell guilty of Counts One, Three, Four, Five, and Six. (A.86).

On April 1, 2022, Judge Nathan denied Maxwell's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 based on a juror's provision of inaccurate information during jury selection, as discussed in greater deal in Point III, *infra*. (A.318-57). On April 29, 2022, Judge Nathan denied all but one of Maxwell's remaining post-trial motions. (A.358-402). Judge Nathan found that the three conspiracy counts (Counts One, Three, and Five) were multiplicitous and that she would, therefore, enter judgment on Count Three alone among the conspiracy counts. (*Id.* at 3).

13

On June 29, 2022, Judge Nathan sentenced Maxwell to 60 months' imprisonment on Count Three, 120 months' imprisonment on Count Four, and 240 months' imprisonment on Count Six, all to run concurrently, to be followed by five years' supervised release, and imposed a $750,000 fine and a $300 mandatory special assessment.

## ARGUMENT

### POINT I

### The District Court Correctly Concluded That Jeffrey Epstein's Non-Prosecution Agreement Does Not Bar Maxwell's Prosecution in the Southern District of New York

In 2007, the U.S. Attorney's Office for the Southern District of Florida entered into a non-prosecution agreement with Jeffrey Epstein. Maxwell argues that this agreement, which neither she nor the U.S. Attorney's Office for the Southern District of New York signed, nevertheless bars her prosecution in the Southern District of New York in this case, and she twice sought dismissal of the charges in the Indictment on that ground. The District Court denied the motions to dismiss, correctly recognizing that Maxwell's argument is precluded by the text of the agreement and this Court's longstanding precedent. Accordingly, this Court should affirm the denial of the motions to dismiss.

14

## A.  Relevant Facts

In 2005, the Palm Beach Police Department in Florida opened an investigation into Epstein on the complaint of the parents of a fourteen-year-old girl. The Palm Beach Police ultimately brought the investigation to the Federal Bureau of Investigation in West Palm Beach, which in turned opened an investigation with the U.S. Attorney's Office for the Southern District of Florida ("USAO-SDFL"). (SA3). That investigation culminated in a draft sixty-page indictment proposing to charge Epstein for the sexual abuse of multiple victims. (SA3).

In 2007, the USAO-SDFL and Epstein entered into a non-prosecution agreement ("NPA"). (A.173). The agreement was signed "on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida." (A.175). Under the terms of the NPA, Epstein agreed to plead guilty in a pending Florida state case and to receive a sentence of at least eighteen months' imprisonment and twelve months' community control. (A.176). He also consented to jurisdiction in the Southern District of Florida for civil suits involving victims specified by the USAO-SDFL, among other terms. (A.177). In exchange, USAO-SDFL agreed to defer "prosecution in this District." (A.175). Once Epstein completed his half of the bargain, the NPA provided that "no prosecution" for the offenses then under investigation by "the Federal Bureau of Investigation and the U.S. Attorney's Office . . . will be instituted in this District." (A.175).

The NPA also provided that, if Epstein complied with the agreement, "the United States also agrees

15

that it will not institute any criminal charges against any potential co-conspirators of Epstein, including but not limited to" four named individuals, none of whom was Maxwell. (A.178). Indeed, Maxwell was neither a party to the agreement nor involved in negotiating its terms. This provision "appears to have been added 'with little discussion or consideration by the prosecutors.'" (A.140 (citing SA195, 211)). The NPA continues that, "upon execution of this agreement, and a plea agreement with the State Attorney's Office, the federal Grand Jury investigation will be suspended." (A.178). The agreement was executed on September 24, 2007 (A.182), and Epstein pleaded guilty in state court on June 30, 2008 (SA137). In 2019, the Department of Justice Office of Professional Responsibility conducted an investigation into the negotiations around the NPA and issued a 290-page report containing detailed factual findings. (SA1-348).

After the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") charged Maxwell in this case in the Southern District of New York, she twice moved to dismiss the charges on the ground that they were barred by the NPA. The District Court denied the motions, concluding that "the NPA does not bind the [USAO-SDNY]." (A.140-45, 189-92).

## B. Applicable Law

This Court has long held that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction." *United States v. Annabi*, 771

16

F.2d 670, 672 (2d Cir. 1985); *accord, e.g.*, *United States v. Prisco*, 391 F. App'x 920, 921 (2d Cir. 2010); *United States v. Salameh*, 152 F.3d 88, 120 (2d Cir. 1998). The requisite affirmative appearance may be established by "an express statement" in the plea agreement, or it may be "inferred from the negotiations between defendant and prosecutor, as well as from statements at the plea colloquy." *United States v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986).

This Court reviews de novo both the denial of a motion to dismiss an indictment and the interpretation of a plea agreement. *United States v. Montague*, 67 F.4th 520, 527 (2d Cir. 2023); *United States v. Padilla*, 186 F.3d 136, 139 (2d Cir. 1999). This Court reviews for abuse of discretion a district court's denial of an evidentiary hearing before ruling on a motion to dismiss. *United States v. Walters*, 910 F.3d 11, 22, 28 (2d Cir. 2018); *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016).

## C.   Discussion

The District Court correctly rejected Maxwell's argument that the NPA bars this prosecution. Maxwell has no right to invoke the protections of the NPA because she is neither a party to nor a third-party beneficiary of the agreement. But even if Maxwell had standing under the NPA, it would not bar this prosecution because it was plainly intended to bind only the USAO-SDFL. Thus, Judge Nathan rightly concluded that under longstanding Second Circuit precedent, the NPA does not bind USAO-SDNY. Accordingly, this

17

Court should affirm the denial of Maxwell's motions to dismiss.

### 1. Maxwell Is Not Entitled to Enforce the NPA

As an initial matter, Maxwell has no right to invoke the protections of the NPA. Maxwell was not a signatory to the agreement. While the third-party beneficiary doctrine is a tenet of contract law (Br.16), its application to plea agreements under federal law is a separate question because plea agreements differ from commercial contracts in meaningful respects. *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019) ("We have long recognized that plea agreements are significantly different from commercial contracts."). It is doubtful that a third-party beneficiary can enforce a plea agreement. *See United States v. Lopez*, 944 F.2d 33, 37 (1st Cir. 1991) (observing that "we are unaware of authority" supporting application of "third party beneficiary principles ... to a plea agreement in a criminal case"); *United States v. Mariamma Viju*, No. 15 Cr. 240, 2016 WL 107841, at *4 (N.D. Tex. Jan. 11, 2016) (explaining that "[t]he right to enforce a plea deal does not exist for its own sake; rather, it is a means to achieve fairness in plea bargaining," and "enforcement by third parties adds nothing to protecting the defendant's right").

In any event, even under the third-party beneficiary law on which Maxwell relies (Br.16), she would have to show that "the original parties intended the [agreement] to directly benefit [her] as [a] third part[y]." *United States v. Wilson*, 216 F.3d 645, 663 (7th Cir. 2000) (assuming without deciding that third

18

party could enforce immunity agreement); *see also United States v. Fla. W. Int'l Airways, Inc.*, 853 F. Supp. 2d 1209, 1228 (S.D. Fla. 2012) (third party must show that "a direct and primary object of the contracting parties was to confer a benefit on the third party" (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005))). Here, Maxwell has failed to make the requisite showing: she is not named in the provision naming four potential co-conspirator (A.178), and she has offered no evidence that the parties to the NPA intended to confer a benefit on her specifically. Accordingly, Maxwell may not enforce the NPA.

## 2. The NPA's Terms Bind Only the USAO-SDFL

Even if Maxwell had a right to invoke the NPA's protections, it would not bar the charges in this case. By its terms, the NPA only applies to prosecutions brought by the USAO-SDFL. The agreement was signed "on the authority of R. Alexander Acosta, United States Attorney for the Southern District of Florida." (A.175). And in exchange for Epstein's plea in state court, the USAO-SDFL agreed to defer "prosecution in this District"—that is, the Southern District of Florida. (A.175). The USAO-SDFL further promised that no prosecution by "the Federal Bureau of Investigation and the U.S. Attorney's Office . . . will be instituted in this District." (A.175). An agreement by the USAO-SDFL not to prosecute Epstein in the Southern District of Florida is an agreement intended to apply only to the USAO-SDFL and only in the Southern District of Florida. Moreover, the agreement was signed

19

by officials of the USAO-SDFL and by no other compo-
nents of the Department of Justice. Accordingly, the
plain terms of the NPA make clear that the agreement
only binds the USAO-SDFL.

Maxwell's argument that the NPA binds the
USAO-SDNY relies on a separate provision of the
agreement, which says that "the United States also
agrees that it will not institute any criminal charges
against any potential co-conspirators of Epstein, in-
cluding but not limited to" a list of four individuals
that does not include the defendant (A.178). (Br.15,
33). But her argument that the term "United States"
means the entire federal government requires the
term to be read in isolation. As Judge Nathan ex-
plained, terms like "the United States" or "the govern-
ment" are "common shorthand" for a single U.S. Attor-
ney's Office, and "a plea agreement need not painstak-
ingly spell out 'the Office of the United States Attorney
for Such-and-Such District' in every instance to make
clear that it applies only in the district where signed"
(A.141). *See Salameh*, 152 F.3d at 120 ("The mere use
of the term 'government' in the plea agreement does
not create an affirmative appearance that the agree-
ment contemplated barring districts other than the
particular district entering into the agreement.");
*United States v. Gonzalez*, 93 F. App'x 268, 270 (2d Cir.
2004) ("Although paragraph 12(b) uses the term
'United States' rather than the term 'government,' this
is a distinction from our prior caselaw without a differ-
ence.").

Reading the NPA as a whole confirms that conclu-
sion. The very next sentence of the agreement states

20

that "*the* federal Grand Jury investigation will be suspended." (A.178 (emphasis added)). The grand jury investigation is the one that USAO-SDFL agreed to defer in the same agreement (A.175), and not any potential federal grand jury investigations in other districts. Furthermore, the NPA elsewhere refers to the "United States" on occasions that could only mean the USAO-SDFL. For instance, the NPA commits the "United States"—that is, the USAO-SDFL—to providing Epstein with a list of victims. (A.177 ("The United States shall provide Epstein's attorneys with a list of individuals whom it has identified as victims . . . .")). Another provision states that the NPA will not be made part of the public record and commits "the United States"—again, the USAO-SDFL—to providing notice to Epstein if it receives a Freedom of Information Act request requiring disclosure of the agreement. (A.178). The mere fact that the co-conspirator provision of the NPA used the phrase "United States" rather than "U.S. Attorney's Office" is not evidence that the parties intended an unusually broad immunity provision. *See, e.g.*, *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013) ("We are not aware, however, of any canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing."). As Judge Nathan concluded, given the repeated limitations of the commitments in the NPA to the USAO-SDFL, including the commitment not to prosecute Epstein, "[i]t is not plausible . . . that the parties intended to drastically expand the agreement's scope in the single sentence on

the prosecution of co-conspirators without clearly saying so." (A.142).[3]

Maxwell also points to the NPA provision stating that "Epstein seeks to resolve globally his state and federal criminal liability." (A.175). Based on that statement, Maxwell argues that Epstein's purpose in negotiating the NPA was to "obtain a global resolution that would, among other things, provide maximum protection for any alleged co-conspirators." (Br.34). But the cited provision only says that Epstein sought to resolve "his" liability, not anyone else's. Furthermore, under Maxwell's reading, Epstein bargained for a truly "global" resolution only for his co-conspirators, and limited his own "global" resolution expressly to the USAO-SDFL. There is no reason to believe that Epstein expressly sought and obtained *broader* immunity for his co-conspirators than he did for himself. (*See also* SA107 n.125 (observing that a supervisor at the USAO-SDFL "pointed out that the NPA was not a

––––––––––

[3] Maxwell also relies on draft plea agreements which "expressly defined the term 'United States' as limited to" USAO-SDFL. Those plea agreements—which differed significantly from the NPA—also use both the terms "United States" and "United States Attorney's Office for the Southern District of Florida," including using the USAO-SDFL term expressly in the context of the co-conspirator provision. (*See, e.g.*, Dkt.142, Ex. F at 2). This point only highlights the parties' understanding at all times that their negotiations merely bound the USAO-SDFL, and not the entire federal government.

22

'global resolution' and other co-conspirators could have been prosecuted 'by any other [U.S. Attorney's] office in the country.' ")).

Lacking support in the text of the NPA itself, Maxwell attempts to show that the NPA applies here based on "the negotiations between defendant and prosecutor." *Russo*, 801 F.2d at 626. In particular, Maxwell claims that the negotiating history of the NPA shows that "[s]enior levels of Main Justice were directly involved in the negotiation and approval of the NPA, even to the extent that separate presentations were made to, and approval of the NPA was obtained from, the Office of the Deputy Attorney General." (Br.36). This assertion, however, mischaracterizes the record and further underscores the absence of any senior approvals in negotiating the NPA. The pages to which Maxwell cites describe activities *after the NPA was signed*, in which Justice Department officials in Washington refused to relieve Epstein of his obligations under the NPA. (Br.36 (citing SA120-23, 129-44); A.143 ("The OPR report reflects that the Office of the Deputy Attorney General reviewed the NPA, but only after it was signed when Epstein tried to get out of it.")). Even then, however, those officials did not "approve" the NPA. (SA121 (statement by the Assistant Attorney General that she "did not review or approve the agreement either before or after it was signed"), 129 ("The Department, however, only reviewed the issue of federal jurisdiction and never reviewed the NPA or any specific provisions.")). Maxwell also cobbles together instances in which the USAO-SDFL and the FBI in Florida enlisted the assistance of other components of the federal government or considered acting outside

23

Florida, such as the USAO-SDFL's "contact with witnesses in New York." (Br.38). These disparate and unconnected events do not show that the USAO-SDFL acted on behalf of the entire federal government when entering into the NPA, or that Epstein understood the USAO-SDFL to be doing so.

Maxwell also advances several arguments attempting to minimize or side-step this Court's precedent. For example, Maxwell argues that *Annabi* applies only if the charges in the indictment are "sufficiently distinct" from the counts resolved by the earlier agreement. (Br.30-33 (quoting 771 F.2d at 672)). Not so. The relevant portion of *Annabi* concerned an argument by the defendants that in seeking to have a plea agreement in the Eastern District of New York bar the pending charges in the Southern District of New York, they were "seeking only the same protection accorded by th[e Double Jeopardy] Clause." 771 F.2d at 672. This Court rejected that argument, reasoning that even if the Double Jeopardy Clause applied (notwithstanding that the defendants were "never in jeopardy" on those charges in the Eastern District), the defendants would not be entitled to relief because the pending charges "extended for an additional two years" and thus were "not the same as the charges that were dismissed." *Id.* Thus, *Annabi* did not hold that its rule—that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction," *id.*—applies only if the charges are sufficiently distinct. And as Judge Nathan recognized, "no subsequent Second Circuit case applying *Annabi* has so held." (A.191).

24

Next, Maxwell argues that this Court should disregard its own precedents and instead apply Eleventh Circuit law because "the NPA was negotiated in Florida, with Southern District of Florida prosecutors, in exchange for Epstein's agreement to plead guilty in Florida state court." (Br.25). But this Court has consistently applied *Annabi* even when considering plea agreements from out-of-Circuit districts. *Prisco*, 391 F. App'x at 921 (District of New Jersey); *United States v. Ashraf*, 320 F. App'x 26, 28 (2d Cir. 2009) (Eastern District of Virginia); *Gonzalez*, 93 F. App'x at 270 (District of New Mexico). *United States v. Brown*, No. 99-1230(L), 2002 WL 34244994, at *2 (2d Cir. 2004) (Southern District of Florida).[4] These decisions are consistent with choice-of-law principles in criminal cases, where "[t]he governing law is always that of the forum state, if the forum court has jurisdiction." American Conflicts Law 375 (5th ed. 2021); *see* 2 Attorney-Client Privilege in the United States § 12:10 ("Choice of law scholars have long recognized that criminal law is peculiarly local in nature, and it is settled that, in criminal prosecutions, the court will routinely apply the substantive law of the forum."); American Conflicts Law 390 ("[A]s a sort of corollary to the local nature of

———————

[4] While these are nonprecedential decisions, this Court does not lightly depart from prior panels' summary orders. *United States v. Payne*, 591 F.3d 46, 48 (2d Cir. 2010) ("[D]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases.").

25

substantive criminal law," "[p]rocedures in criminal cases are always those of the forum.").[5]

In any event, Eleventh Circuit law would not support Maxwell's claim. Maxwell does not cite any Eleventh Circuit decisions addressing when one U.S. Attorney's Office is bound by a plea agreement with another U.S. Attorney's Office. But in an analogous context, the Eleventh Circuit held that a U.S. Attorney's promise made in a plea agreement—that a criminal defendant would not be deported—was unenforceable because the U.S. Attorney lacked authority to make that promise. *San Pedro v. United States*, 79 F.3d 1065, 1072 (11th Cir. 1996). If the Eleventh Circuit were to apply the reasoning of *San Pedro* to the issue in this case, it would likely reach the same result because a U.S. Attorney only has authority to act "within his district," 28 U.S.C. § 547, and must seek the

––––––––––

[5]    Maxwell cites a handful of district court cases that apply the exclusionary rule of a foreign circuit to prevent, in her words, "the Government from parachuting into a new circuit and prosecuting a case it would not otherwise have been able to bring." (Br.29). This "inter-circuit exclusionary rule," as Maxwell calls it, is hardly a settled doctrine. *See* American Conflicts Law 391-94 (discussing cases in both directions). In any event, the purpose of this putative rule is tied to its context: "to ensure that the proper level of deterrence is maintained in the locale where the violation occurred." (Br.29 (quoting *United States v. Restrepo*, 890 F. Supp. 180, 191 (E.D.N.Y. 1995)). That rationale is inapplicable here.

26

approval of each affected U.S. Attorney's Office before entering into any non-prosecution agreement that purports to bind another district. *See* Justice Manual § 9-27.641 ("No district or division shall make any agreement, including any agreement not to prosecute, which purports to bind any other district(s) or division without the approval of the United States Attorney(s) in each affected district and/or the appropriate Assistant Attorney General.").

Finally, Maxwell devotes much of her brief to criticizing *Annabi*. (*E.g.*, Br.18-23). But this Court's rule is sound, as it ensures that a criminal defendant (or even, as here, a co-conspirator) will not receive the windfall of immunity that was never intended by the parties to the original agreement, while leaving parties free to enter into legitimate multi-district resolutions if they wish. Nor has Maxwell's parade of horribles come to pass in the decades since *Annabi* was decided. Furthermore, the same rule has long been applied in the Seventh Circuit. *See Thompson v. United States*, 431 F. App'x 491, 493 (7th Cir. 2011); *United States v. Rourke*, 74 F.3d 802, 807 n.5 (7th Cir. 1996). In any event, this Court need not engage in a point-by-point analysis of the merits of *Annabi*, because it remains binding precedent. *See United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004) (Court is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court").

27

Thus, Epstein's NPA with the USAO-SDFL does not bar this prosecution of Maxwell, and Judge Nathan correctly denied the motions to dismiss.[6]

### 3. The District Court Did Not Abuse Its Discretion in Declining to Conduct a Hearing

Finally, Maxwell argues that the District Court erred by denying her motions to dismiss without an evidentiary hearing. (Br.38-40). But as Judge Nathan explained, the cases cited by Maxwell in support of her request for a hearing "mostly involved oral agreements where there was no written record of the full set of terms reached by the parties," and all of which "involved defendants with first-hand knowledge of the negotiations. . . . This is no such case. The NPA's terms are clear." (A.145). Furthermore, Maxwell had "an unusually large amount of information about the NPA's negotiation history in the form of the OPR report yet

---

[6] Even if the NPA were deemed to apply here, it would only cover Count Six, which concerns a victim known to USAO-SDFL and a statute mentioned in the NPA, and not Counts Three and Four, which concern different or additional victims and offenses over an expanded time period. Maxwell's suggestion that the co-conspirator provision "is not limited to any particular offense or any time period" (Br.40) is based on the premise that the USAO-SDFL immunized Maxwell for any and all crimes, past or future, and highlights the unreasonableness of reading the NPA to apply to other U.S. Attorney's Offices.

28

identifies no evidence that the Department of Justice made any promises not contained in the NPA." (A.142-43). Here, as below, Maxwell's further request for a hearing "rests on mere conjecture." (A.145). Judge Nathan did not abuse her discretion.

## POINT II

### The District Court Correctly Concluded that the Charges Were Timely

In 2003, Congress extended the statute of limitations for "offense[s] involving the sexual or physical abuse" of a minor to allow prosecution so long as the victim remains alive. 18 U.S.C. § 3283. Attempting to undermine the clear legislative intent, Maxwell argues that the amendment did not apply to her case because her crimes both pre-dated the amendment and did not involve sexual abuse. These arguments fly in the face of the statutory text, legislative history, this Court's own decisions, and the persuasive authority of other Circuits. The charges fell squarely within the amended statute of limitations, and this Court should affirm Judge Nathan's well-reasoned decisions denying Maxwell's motions to dismiss the charges as untimely.

### A. Applicable Law

#### 1. Standard of Review

This Court reviews *de novo* both the denial of a motion to dismiss an indictment and the application of a statute of limitations. *United States v. Sampson*, 898 F.3d 270, 276, 278 (2d Cir. 2018).

29

### 2. Statutes of Limitations for Offenses Against Children (18 U.S.C. § 3283) and Child Abduction and Sex Offenses (18 U.S.C. § 3299)

Most federal noncapital offenses carry a five-year statute of limitations. *See* 18 U.S.C. § 3282(a). In 1990, Congress enacted a provision titled, "Extension of Child Statute of Limitations," which provided that "[n]o statute of limitation that would otherwise preclude prosecution for an offense involving the sexual or physical abuse of a child under the age of 18 years shall preclude such a prosecution before the child reaches the age of 25 years." Crime Control Act of 1990, Pub. L. No. 101-647, tit. II, § 225(a), 104 Stat. 4789, 4798 (codified at 18 U.S.C. § 3509(k) (1990)). This provision "extended the federal criminal limitations period for child sex abuse offenses, making it easier to prosecute offenders who commit sex crimes that may be difficult to detect quickly." *Weingarten v. United States*, 865 F.3d 48, 54 (2d Cir. 2017). In 1994, Congress re-codified this provision, moving it to 18 U.S.C. § 3283 with identical language. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XXXIII, § 330018(a), 108 Stat. 1796, 2149 (codified at 18 U.S.C. § 3283 (1994)).

Within a decade, "Congress began to view even the extended statute of limitations period in the 1994 version of § 3283 as 'inadequate in many cases' because it released from criminal liability sex abusers whose crimes were not brought to the attention of federal authorities until after their victims turned twenty-five." *Weingarten*, 865 F.3d at 54 (citing H.R. Conf. Rep. No.

30

108–66, at 54 (2003)). Accordingly, in 2003, Congress enacted a provision titled, "No Statute of Limitations for Child Abduction and Sex Crimes," which amended Section 3283 to read: "No statute of limitations that would otherwise preclude prosecution for an offense involving the sexual or physical abuse, or kidnaping, of a child under the age of 18 years shall preclude such prosecution during the life of the child." Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, tit. II, § 202, 117 Stat. 650, 660 (codified at 18 U.S.C. § 3283 (2003)).

In 2006, Congress enacted a provision titled, "Longer Statute of Limitation for Human Trafficking-Related Offenses," and sub-titled "Modification of Statute Applicable to Offense Against Children," which further amended Section 3283 to its current form to permit the prosecution of such offenses during the lifetime of the victim or ten years after the offense, whichever is longer. Violence Against Women and Department of Justice Reauthorization Act of 2006, Pub. L. No. 109-162, tit. XI, § 1182(c), 119 Stat. 2960, 3126 (codified at 18 U.S.C. § 3283 (2006)).

Later in 2006, Congress enacted 18 U.S.C. § 3299 in a provision titled, "No Limitation for Prosecution of Felony Sex Offenses," which provides that "[n]otwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense under section 1201 involving a minor victim, and for any felony under chapter 109A, 110 (except for section 2257 and 2257A), or 117, or section 1591." Adam Walsh Child Protection and Safety

31

Act of 2006, Pub. L. No. 109-248, tit. II, § 211(1), 120
Stat. 587, 616 (codified at 18 U.S.C. § 3299 (2006)).

### 3.  Retroactivity under *Landgraf*

In *Landgraf v. USI Film Products*, 511 U.S. 244
(1994), the Supreme Court set forth a two-part frame-
work for determining whether a statute may be ap-
plied retroactively. At the first step, "if Congress ex-
pressly prescribed that a statute applies retroactively
to antecedent conduct, the inquiry ends and the court
enforces the statute as it is written, save for constitu-
tional concerns." *Weingarten*, 865 F.3d at 54-55. If,
however, the "statute is ambiguous or contains no ex-
press command regarding retroactivity," then the
court must turn to the second step, where "a reviewing
court must determine whether applying the statute to
antecedent conduct would create presumptively im-
permissible retroactive effects." *Id.* at 55. "If it would,
then the court shall not apply the statute retroactively
absent clear congressional intent to the contrary." *Id.*
"If it would not, then the court shall apply the statute
to antecedent conduct." *Id.*

## B.  Discussion

### 1.  There Was No Impermissible Retroactivity
### in Applying Section 3283 to Maxwell

Maxwell claims that the District Court erred by ap-
plying Section 3283's 2003 amendment to her three
counts of conviction, *i.e.*, Counts Three, Four, and Six,
because they involved conduct that pre-dated the
amendment. As an initial matter, this argument ig-
nores the fact that Counts Three and Six both charge

32

continuing offenses that continued into 2004, thus post-dating Section 3283's amendment. Moreover, under the *Landgraf* framework, the 2003 amendment properly applies to pre-enactment criminal conduct that still could have been timely prosecuted at the time of the enactment, as was the case here.

### a. There Was No Retroactivity as to Counts Three and Six

As an initial matter, Counts Three and Six both charged conduct that continued through 2004, *i.e.*, *after* the 2003 amendment to Section 3283, and thus present no retroactivity concerns.

For conspiracy charges requiring proof of an overt act, including 18 U.S.C. § 371, the conspiracy statute at issue here, "[t]he statute of limitations runs from the date of the last overt act in furtherance of the conspiracy." *United States v. Monaco*, 194 F.3d 381, 387 n.2 (2d Cir. 1999); *accord United States v. Ben Zvi*, 242 F.3d 89, 97 (2d Cir. 2001). Similarly, for a continuing substantive offense, the statute of limitations only "begin[s] to run when the crime is complete," meaning when "the conduct has run its course." *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir. 2008).

Here, the Indictment alleged that the conspiracy charged in Count Three and the sex trafficking offense charged in Count Six continued through 2004. (A.127, 132; *see also* A.123-24, 131-32 (describing conduct through 2004 involving Victim-4)).[7] Thus, the statute

_____

[7] To the extent Maxwell's argument challenges the sufficiency of the evidence rather than the denial

33

of limitations for these two counts did not begin to run until 2004, well after Congress enacted the 2003 amendment to Section 3283. Maxwell's arguments about retroactivity are therefore inapplicable to Counts Three and Six.

### b. Applying Section 3283 to Maxwell Complies with *Landgraf*

Furthermore, under the *Landgraf* framework, the 2003 amendment to Section 3283 properly applies to pre-enactment conduct for which the statute of limitations had not expired at the time the amendment was passed. Because the statute of limitations had not expired when Congress amended Section 3283 in 2003, that amendment extended the limitations period for prosecuting Maxwell, rendering the charges timely.

### i. *Landgraf* Step One

At step one of the *Landgraf* analysis, the question is whether Congress has "expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. When evaluating Congress's intent at step one, this

––––––––––

of the motions to dismiss, *see United States v. Rutigliano*, 790 F.3d 389, 400 (2d Cir. 2015), the evidence at trial established that Carolyn continued to visit Epstein's residence through 2004. (Tr.1525, 1548-49; GX-1B; GX-3D through K; *see also* SA406-07 (District Court summarizing such evidence at sentencing)).

34

Court has considered both statutory text and legislative history. *In re Enter. Mort. Acceptance Co. Sec. Litig. ("Enterprise")*, 391 F.3d 401, 406-08 (2d Cir. 2004). Here, the text and history of Section 3283 establish that Congress intended to extend the time to bring charges of child sexual abuse in cases where the limitations period had not yet expired.

Prior to 2003, any child sex abuse offense could be prosecuted until the victim reached the age of 25 years, at which point the statute of limitations then in effect would bar prosecution. In the 2003 amendment, which was titled, "No Statute of Limitations for Child Abduction and Sex Crimes," Pub. L. No. 108-21, § 202, 117 Stat. 660, Congress explicitly provided that "[n]o statute of limitations that would otherwise preclude prosecution for [such an offense] shall preclude such prosecution during the life of the child." 18 U.S.C. § 3283 (2003). The amendment draws no distinction between pre-enactment and post-enactment conduct. Instead, as Judge Nathan explained, by stating that "*no statute of limitations that would otherwise preclude* prosecution of these offenses will apply," the amendment's "plain language unambiguously requires that it apply to prosecutions for offenses committed before the date of enactment." (A.151). Thus, the breadth of the text shows that Congress intended "to extend the . . . statute of limitations," even for pre-enactment conduct. *United States v. Jeffries*, 405 F.3d 682, 684 (8th Cir. 2005) (reaching same conclusion as to § 3283's predecessor based on similar "title and . . . wording" of statute); *cf. Enterprise*, 391 F.3d at 407 (describing provision that "no limitation shall terminate the period within which suit may be filed" as example of statute

35

reflecting clear congressional intent to apply to pre-en-actment conduct).[8]

Legislative history confirms this conclusion. In ini-tially enacting a special statute of limitations for child sex abuse offenses, Congress sought to "mak[e] it eas-ier to prosecute offenders who commit sex crimes that may be difficult to detect quickly." *Weingarten*, 865 F.3d at 54. But that limitations period proved to be "in-adequate in many cases." H.R. Conf. Rep. No. 108-66, at 54. Tellingly, the conference report offered the ex-ample of a child rapist who "could not be prosecuted" because he was "identified . . . as the perpetrator one day after the victim turned 25." *Id.* Given that Con-gress bemoaned those offenders who escaped prosecu-tion because the limitations period had expired, there is every reason to believe that it intended to preserve the ability to prosecute pre-enactment offenders whose limitations period had not yet expired. *See United States v. Sure Chief*, 438 F.3d 920, 924 (9th Cir. 2006) (concluding that in enacting the 2003 amendment,

––––––––––

8    Maxwell's only response regarding the statute's text is that the words "would" and "shall" are "forward-looking." (Br.54). But those words readily apply in de-scribing the application of the 2003 amendment to pre-enactment conduct. Consider an offense committed against a 16-year-old in the year 2000. The statute of limitations then in effect indeed "would . . . preclude prosecution" nine years in the future, once the victim turned twenty-five. The 2003 amendment ensured that "[n]o" such "statute of limitations . . . shall pre-clude such prosecution during the life of the child."

36

"Congress evinced a clear intent to extend" the limitations period).

Maxwell notes that Congress "considered—and rejected—a retroactivity clause" before enacting the 2003 amendment. (Br.55). But as Judge Nathan recognized, "the legislative history makes clear that Congress abandoned the retroactivity provision . . . because it would have produced unconstitutional results." (A.152 (discussing co-sponsor remarks expressing concern that "the proposed retroactivity provision was 'of doubtful constitutionality' because it 'would have revived the government's authority to prosecute crimes that were previously time-barred' ")).[9] Thus, the rejection of the retroactivity clause "shows only that Congress intended to limit the PROTECT Act to its constitutional applications, including past conduct —like Maxwell's—on which the statute of limitations had not yet expired." (*Id.*).

---

[9] Maxwell contests this explanation of the retro-activity clause's rejection because *Stogner v. California*, 539 U.S. 607 (2003), had not yet been decided. (Br.56-57). But the co-sponsor could hardly have been clearer in expressing his constitutional doubts. And the co-sponsor did not need *Stogner* as a basis for his concern, as courts and Congress have long recognized the distinction between permissible extensions of un-expired statutes of limitations and impermissible extensions of expired statutes of limitations. *Stogner*, 539 U.S. at 616-18.

37

The reach of the 2003 amendment to Section 3283 is clear. Because Congress has expressly extended the statute of limitations to pre-enactment conduct, Judge Nathan correctly resolved this analysis at *Landgraf* step one. In the alternative, however, the statute is—at worst—ambiguous. If the Court takes that view, it should proceed to *Landgraf* step two, which examines the retroactive effects of the statute.

### ii. *Landgraf* Step Two

As the Supreme Court explained in *Landgraf*, "[e]ven absent specific legislative authorization," applying a statute to pre-enactment conduct "is unquestionably proper in many situations." 511 U.S. at 273. "A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Id.* at 269. Instead, the question is whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. Importantly, "the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive," because parties have "diminished reliance interests in matters of procedure" and "[b]ecause rules of procedure regulate secondary rather than primary conduct." *Id.* at 275.

In *Vernon v. Cassadaga Valley Cent. School Dist.*, 49 F.3d 886 (2d Cir. 1995), this Court considered a new statute of limitations that shortened the time to file

38

certain discrimination claims, and held that applying the new statute in a case "filed after its enactment, but arising out of events that predate its enactment," is not impermissibly retroactive under *Landgraf*. *Id*. at 889-90. As the Court explained, "[t]he conduct to which the statute of limitations applies is not the primary conduct of the defendants, the alleged discrimination, but is instead the secondary conduct of the plaintiffs, the filing of their suit." *Id*. at 890. The 2003 amendment to Section 3283 likewise applies only to the secondary conduct of filing a criminal case; it does not apply to the primary conduct of Maxwell's child sexual abuse by, for example, modifying the elements of an offense to criminalize conduct that previously had not constituted a crime. *See id*. at 891 ("*Landgraf* and other cases countenance treating statutes of limitations differently from statutory provisions that affect substantive rights."). Thus, like the new statute in *Vernon*, the 2003 amendment "impaired no rights possessed by either party, increased neither party's liability, nor imposed any new duties with respect to past transactions." *Id*. at 890.

*Enterprise* does not alter this conclusion. There, this Court considered whether an amended statute of limitations operated to "revive already expired securities fraud claims." *Enterprise*, 391 F.3d at 405. While acknowledging that under *Vernon*, "retroactive application of a revised statute of limitations generally does not have an impermissible retroactive effect," the Court concluded that "the resurrection of previously time-barred claims has an impermissible retroactive effect." *Id*. at 409-10 (emphasis removed). *Enterprise* has no application here, as the limitations period for

39

the charges against Maxwell did not expire before the statute of limitations was extended. Thus, unlike *Enterprise*, where resurrection of expired claims would have "stripp[ed] [defendants] of a complete affirmative defense they previously possessed," *id.* at 410, here Maxwell never possessed that complete defense. Judge Nathan correctly concluded that the 2003 amendment accordingly "did not deprive [Maxwell] of any vested rights." (A.153).

To be sure, this Court has observed that there may be "colorable arguments" that "the logic of *Enterprise* extends to criminal cases where the defendant's statute of limitations defense had not vested when the limitations period was extended" because the extension "'increases the period of time during which a defendant can be sued,' thereby 'increasing a defendant's liability for past conduct.'" *Weingarten*, 865 F.3d at 57 (quoting *Enterprise*, 391 F.3d at 410); *see also United States v. Miller*, 911 F.3d 638, 644-46 (1st Cir. 2018) (discussing potential defense arguments). But such a claim runs headlong into "the vast weight of retroactivity decisions," which recognize that "revoking a vested statute of limitations defense is different from retroactively extending the filing period for a still-viable claim." *Weingarten*, 865 F.3d at 57 (collecting cases).

For example, "in the criminal context, there is a consensus that extending a limitations period before prosecution is time-barred does not run afoul of the Ex Post Facto Clause of the Constitution." *Cruz v. Maypa*, 773 F.3d 138, 145 (4th Cir. 2014); *see also Stogner*, 539 U.S. at 632 (holding that the *Ex Post Facto* Clause

40

"does not prevent the State from extending time limits for . . . prosecutions not yet time barred"). As this Court explained long ago, while it is "unfair and dishonest" for the government to "assure a man that he has become safe from its pursuit" but then "withdraw its assurance," it is permissible to extend a statute of limitations "while the chase is on." *Falter v. United States*, 23 F.2d 420, 426 (2d Cir. 1928) (L. Hand, J.). These ex post facto cases are particularly instructive here because "*Landgraf* and the *Ex Post Facto* Clause are informed by the same retroactivity concerns." *Cruz*, 773 F.3d at 145; *see also Landgraf*, 511 U.S. at 266 (citing the Ex Post Facto Clause as an "expression" of "the antiretroactivity principle" it was applying).

Thus, applying the Section 3283's 2003 amendment to Maxwell's unexpired charges is permissible under *Landgraf*. As the Tenth Circuit recently explained with respect to the very same statute of limitations at issue here:

> By extending the unexpired statute of limitations, Congress did not increase [defendant's] exposure to prosecution retroactively. It did not raise the penalty for the charged offense. It did not redefine the offense to make it easier to establish. It did not expose [defendant] to criminal prosecution anew. It merely altered the ongoing charging period for the conduct that had already exposed him to criminal prosecution. [Defendant] was subject to indictment in 2002, before the statutes of limitations were extended, and he

41

> remained subject to indictment in 2007,
> once the changes were made. A dead
> charge was not resurrected, and the un-
> derlying nature of [defendant's] potential
> criminal liability remained the same.

*United States v. Piette*, 45 F.4th 1142, 1161-62 (10th Cir. 2022). The decisions of other Courts of Appeals are in accord. *Sure Chief*, 438 F.3d at 922-25; *Jeffries*, 405 F.3d at 685.

Maxwell cites *United States v. Richardson*, 512 F.2d 105 (3d Cir. 1975), and two district court decisions that are bound to follow it. (Br.58-59). But *Richardson*, which was decided before *Landgraf*, is "inconsistent with *Landgraf*." *United States v. Nader*, 425 F. Supp. 3d 619, 630 (E.D. Va. 2019). Specifically, *Richardson* focused on whether Congress expressed a "clear intention" to overcome the presumption against retroactivity, 512 F.2d at 106, without engaging in *Landgraf*'s second step, *i.e.*, considering whether the statute "would have retroactive effect," *Landgraf*, 511 U.S. at 280. Moreover, unlike the 2003 amendment, the statute at issue in *Richardson* did not expressly provide that "[n]o statute of limitations that would otherwise preclude prosecution" of the relevant offense "shall preclude" prosecution under the terms of the amended statute.

In sum, the statute of limitations for the charges in the Indictment had not yet expired when the 2003 amendment to Section 3283 extended the limitations period, and Judge Nathan correctly determined that applying the 2003 amendment in this case does not create impermissible retroactive effects. Therefore,

42

step two of *Landgraf* is satisfied, and Section 3283 ap-
plies retroactively. *See Weingarten*, 865 F.3d at 55 ("If
[a statute] would not [create impermissible retroactive
effects], then the court shall apply the statute to ante-
cedent conduct."). Accordingly, the charges were
timely.[10]

## 2. Section 3283 Reaches Counts Three and Four

Maxwell separately argues that Section 3283 does
not apply to Counts Three and Four because neither is
an "offense involving the sexual or physical abuse . . .
of a child." Maxwell contends that these counts, which
charged her with transporting a minor with intent
that the minor engage in illegal sexual activity and
conspiracy to do the same, are not offenses involving
the sexual abuse of a child because a completed sex act
is not an essential element of either charge. But Max-
well does not dispute that the evidence at trial estab-
lished that her commission of Counts Three and Four
involved completed sex acts abusing one or more minor
victims. Nor could she, as Jane testified that she was

---

[10] As the Government argued below, and as Judge
Nathan found, Count Six is also timely under 18
U.S.C. § 3299, which eliminated the statute of limita-
tions for violations of 18 U.S.C. § 1591 in 2006, and
which also applies retroactively under *Landgraf* for
the same reasons discussed above with respect to Sec-
tion 3283. (A.196 (concluding that, "like § 3283, § 3299
applies retroactively to offenses for which the previous
limitations period has not yet run")).

43

in fact sexually abused when transported across state lines, including to New York, as a minor. Instead, Maxwell insists that Counts Three and Four do not involve sexual abuse of a child because a completed sex act is not *an element* of those crimes. This argument misreads the relevant statutes and legislative history, and runs contrary to the decisions of this Court and other Courts of Appeals.[11]

### a. Counts Three and Four Are Offenses Involving the Sexual Abuse of a Child

Maxwell's entire argument is based on a mistaken premise: that the phrase "offense involving the sexual . . . abuse . . . of a child," 18 U.S.C. § 3283, only encompasses crimes in which "unlawful sexual activity actually took place." (Br.44). This flawed proposition ignores relevant statutory definitions, which make clear that Section 3283 reaches more broadly to include offenses in which there was no completed illegal sex act.

As described above, Section 3283 was originally codified at 18 U.S.C. § 3509(k). The definition of the term "sexual abuse" is located within that same section:

> For purposes of this section . . . the term 'sexual abuse' includes the employment, use, persuasion, inducement, enticement,

---

[11] Maxwell raises no analogous argument with respect to Count Six, which charges sex trafficking of a minor, in violation of 18 U.S.C. § 1591.

44

> or coercion of a child to engage in, or as-
> sist another person to engage in, sexually
> explicit conduct or the rape, molestation,
> prostitution, or other form of sexual ex-
> ploitation of children, or incest with chil-
> dren.

18 U.S.C. § 3509(a)(8). The term "sexually explicit con-
duct" is in turn defined to mean, among other things,
"sexual intercourse, including sexual contact"; and the
term "sexual contact" means "the intentional touching,
either directly or through clothing, of the genitalia,
anus, groin, breast, inner thigh, or buttocks of any per-
son with an intent to abuse, humiliate, harass, de-
grade, or arouse or gratify sexual desire of any person."
*Id.* § 3509(a)(9)(A). Courts have looked to the defini-
tion of "sexual abuse" set forth in Section 3509(a) to
determine whether the statute of limitations of Section
3283 applies to an offense. *United States v. Carpenter*,
680 F.3d 1101, 1103-04 (9th Cir. 2012) ("We join our
sister circuits in looking to subsection 3509(a) for a def-
inition of 'sexual abuse' under federal law, and find it
the appropriate definition to use in applying section
3283's extended statute of limitations.").

The definition of "sexual abuse" includes not only
actual "sexual contact," but also the "the employment,
use, persuasion, inducement, enticement, or coercion
of a child to engage in, or assist another person to en-
gage in," sexual contact. 18 U.S.C. § 3509(a). The
breadth of this definition is underscored by Congress's
use of the word "includes" in Section 3509(a)'s text,
which is "significant because it makes clear that the
examples enumerated in the text are intended to be

45

illustrative, not exhaustive." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (citing *Burgess v. United States*, 552 U.S. 124, 131 n.3 (2008)). And the text of Section 3283 goes even further beyond the definition provided in Section 3509 by covering any crime "involving" the sexual abuse of a child. Congress therefore did not require that a particular statute have actual sexual contact with a minor as an element of its offense, but rather swept broadly to cover any crime that in any way involves sexual abuse as broadly defined. Given this expansive language, sexual abuse "as defined here encompasses a wider set of behavior than just rape or other unwanted sexual touching." *United States v. Schneider*, 801 F.3d 186, 197 (3d Cir. 2015). Thus, courts throughout the country have concluded that Section 3283 applies to a variety of offenses that do not require "a sexual act between a defendant and a specific child," *United States v. Vickers*, No. 13 Cr. 128 (RJA), 2014 WL 1838255, at *11 (W.D.N.Y. May 8, 2014), or "physical contact with the victim," *Carpenter*, 680 F.3d at 1103; *accord United States v. Diehl*, 775 F.3d 714, 720 (5th Cir. 2015).

Section 3283's definition thus captures crimes of intent where a perpetrator seeks to have a minor engage in sexual contact even if such sexual contact does not occur. Transportation of a minor with intent to engage in an illegal sex act (as charged in Count Four) and conspiracy to commit the same (as charged in Count Three) fall comfortably within that definition. Even though a completed sex act is not required to commit those two crimes, Count Four has "sexual abuse" as an element because it requires the defendant to

46

"induce[ ]" a child to engage in illegal sexual activity by transporting the minor across state lines with intent that the child engage in an illegal sex act, 18 U.S.C. § 3509(a)(8), and Count Three, as a conspiracy to commit Count Four, is an "offense involving [such] sexual . . . abuse," *id.* § 3283. *See United States v. Sensi*, No. 08 Cr. 253 (WWE), 2010 WL 2351484, at *2-3 (D. Conn. June 7, 2010) (collecting cases interpreting the term "sexual abuse" to encompass "all crimes that would logically relate to the common understanding of sexual abuse even when found in chapters 110 ('Sexual Exploitation and Other Abuse of Children') and 117 ('Transportation of Illegal Sexual Activity and Related Crimes') of title 18"); *Schneider*, 801 F.3d at 196-97 (holding that Section 3283 applied to defendant convicted of traveling with the purpose of engaging in sex with a minor victim, in violation of 18 U.S.C. § 2423(b)).

Accordingly, even considering only the elements of the offenses, Counts Three and Four fall squarely within Section 3283's definition of an offense involving sexual abuse of a child.

### b. Maxwell's Argument for Use of a Categorical Approach Lacks Merit

Because Counts Three and Four qualify as "offense[s] involving the sexual . . . abuse . . . of a child," 18 U.S.C. § 3283, even without resort to the facts of the case, the Court need not address Maxwell's claim that the categorical approach applies in this context. But the arguments Maxwell advances in support of her claim are meritless in any event.

47

Maxwell first relies on Section 3283's use of the phrase "offense involving" the sexual abuse of a child, which, she contends, "dictates" looking only to the elements of the offense. (Br.43). But as this Court has already recognized, Section 3283's text "reaches beyond the offense and its legal elements to the conduct 'involv[ed]' in the offense"—a "linguistic expansion" that shows Congress's intent for "courts to look beyond the bare legal charges in deciding whether § 3283 applied." *Weingarten*, 865 F.3d at 59-60; *see also Nijhawan v. Holder*, 557 U.S. 29, 32, 38 (2009) (holding that a statute that includes an "offense . . . involves" phrase is "consistent with a circumstance-specific approach"). Indeed, the Third Circuit has expressly rejected an "'essential ingredient' test" comparable to the categorical approach and instead applied case-specific analysis to determine that Section 3283 applied to travel with intent to commit an illegal sex act with a minor, in violation of 18 U.S.C. § 2423(b). *Schneider*, 801 F.3d at 196-97.

Maxwell also argues that "the clear weight of authority" holds that statutes employing similar language "should be read through a categorical rather than case-specific lens." (Br.44-45). But the decisions she cites involved statutes with *other* features favoring the categorical approach, which are notably absent here. Some cases involved statutes that defined a "crime of violence" as an offense that either "has as an element" the use of physical force or "by its nature" involves a substantial risk of force—language that invokes an elements-based approach. *United States v. Davis*, 139 S. Ct. 2319, 2328-29 (2019); *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004). Some cases concerned the

48

definition of an "aggravated felony" under federal immigration law, *Kawashima v. Holder*, 565 U.S. 478 (2012); *Leocal*, 543 U.S. at 7, a context in which the categorical approach traditionally applies because the inquiry is whether the alien's prior conviction meets the definition. *Weingarten*, 865 F.3d at 59. And *United States v. Morgan*, 393 F.3d 192 (D.C. Cir. 2004), is likewise distinguishable, as it "involved a venue statute presenting significantly different concerns" than those present here. (A.148).

Maxwell also relies on a trio of cases, chief among them *Bridges v. United States*, 346 U.S. 209 (1953). (Br.45-47). In *Bridges*, the Supreme Court "applied an 'essential ingredient' test to determine whether an offense qualified for a provision . . . that extended the criminal limitations period for certain fraud offenses." *Weingarten*, 865 F.3d at 59 n.10. But as this Court has explained, "*Bridges* is distinguishable" because the Supreme Court "there believed applying the restrictive 'essential ingredient' test to determine if an offense 'involv[ed] the defrauding of the United States' effectuated Congress's specific intent to limit the . . . extended limitations period to only a few offenses," while "Congress had the opposite intention for § 3283." *Id.* The other two cases, *United States v. Scharton*, 285 U.S. 518 (1932), and *United States v. Noveck*, 271 U.S. 201 (1926), are distinguishable on similar grounds. In any event, the "essential ingredient" test does not help Maxwell. As discussed above, an "offense involving the sexual . . . abuse . . . of a child," 18 U.S.C. § 3283, must be read in light of the definition of "sexual abuse" set forth in Section 3509(a), which encompasses a wide range of conduct that is not limited to actual sexual

49

contact with a child. Counts Three and Four each have an "essential ingredient" that fits within that broad definition. *See supra* Point II.B.2.a.

Finally, neither *Diehl* nor *United States v. Countentos*, 651 F.3d 809 (8th Cir. 2011), supports the use of a categorical approach. (Br.51-52). In each decision, the court concluded that Section 3283 applied to the subject offenses without considering the specific facts of the crime, but in neither case did the court consider whether a categorical approach was required—let alone hold that it was.

As noted above, it is undisputed that the evidence at trial established that Maxwell's commission of Counts Three and Four involved completed sex acts abusing one or more minor victims: Jane testified that she was in fact sexually abused when transported across state lines, including to New York, as a minor. Accordingly, Counts Three and Four qualify as offenses involving the sexual abuse of a child both by their statutory terms and based on the specific facts of this case.

## POINT III

### The District Court Did Not Abuse Its Discretion in Concluding that Juror 50 Could Be Fair and Impartial Notwithstanding His Inadvertent Mistakes on His Juror Questionnaire

Maxwell contends that she was denied her right to a fair and impartial jury because a juror failed to disclose during voir dire that he was sexually abused as a child, and therefore incorrectly answered three

50

questions on his written questionnaire. After an extensive hearing, Judge Nathan concluded that the juror's error was inadvertent, and in any event, she would not have struck the juror for cause had he answered those question accurately because he was not biased in any way against Maxwell and was qualified to serve as a juror. Judge Nathan therefore found that Maxwell failed to meet the high bar for a new trial and denied her motion. This Court should affirm that careful determination.

## A. Relevant Facts

### 1. The Jury Selection Process

In November 2021, in advance of trial, 694 jurors completed a juror questionnaire approved by the District Court. (Dkt.529 at 2). The juror questionnaire was 29 pages and consisted of 51 questions, many of which contained subparts. (A.290-317). After the parties reviewed the questionnaires, 231 of the 694 proceeded to voir dire. (Dkt.529 at 2-4). The District Court then examined prospective jurors, asking them about questions in the jury questionnaire that prospective jurors had answered affirmatively. The District Court asked the prospective jurors whether the information or experiences resulting in the affirmative answer would interfere with their ability to be fair and impartial.

At the conclusion of voir dire, the District Court qualified 58 jurors. (Voir Dire Tr.717). Of the 58 individuals who were qualified to serve as jurors, eight individuals responded to Question 48 of the juror questionnaire that they themselves had been a victim of

51

sexual harassment, sexual abuse, or sexual assault, and that this experience would not affect their ability to serve fairly and impartially as a juror in the case.[12] (A.344-45; Voir Dire Tr.18, 52, 200, 207, 259, 293, 532, 538-39, 635). Each confirmed that he or she could be fair and impartial, and defense counsel did not move to strike any these jurors for cause based on their answer to Question 48. (A.345).

For instance, one juror said that she was "sexually molested by an uncle when she was 12 or 13," but that would not affect her ability to be fair and impartial in the case. (A.345). Another juror indicated that she had recently "reported that a friend was being coerced and sexually abused by a professor," but confirmed that experience would not "in any way interfere with her ability to be fair and impartial" in this case. (*Id.*). Neither the Government nor defense counsel challenged those jurors for cause.

The parties then exercised their peremptory strikes, and a jury was seated.

## 2. Juror 50

Juror 50 completed the questionnaire and was questioned by Judge Nathan during voir dire. In his questionnaire, Juror 50 repeatedly made clear that he could be fair and impartial. In response to Question 13,

_____

[12] Twelve of the 58 qualified prospective jurors indicated that a friend or family member had been a victim of sexual harassment, sexual abuse, or sexual assault.

52

he indicated that he could decide the case "based solely on the evidence or lack of evidence presented in Court, and not on the basis of conjecture, suspicion, bias, sympathy, or prejudice." (A.295). He also accepted the principle that the law provides that a defendant in a criminal case is presumed innocent and the Government is required to prove guilt beyond a reasonable doubt. (A.294). Juror 50 indicated that there was nothing about the nature of the case and the accusations as summarized in the questionnaire that might make it difficult for him to be fair and impartial. (A.308; *see also* A.310). He repeated these assurances at oral voir dire. (*See* Voir Dire Tr.128-34).

Juror 50 checked the "no" box in response to Question 48, which asked whether he or a friend or family member had ever been the victim of sexual harassment, sexual abuse, or sexual assault. (A.310). He also checked the "no" box in response to the question of whether he or any of his relatives or close friends had ever been a victim of a crime. (A.299).

Juror 50 was seated. Following the verdict, he discussed his experience as a juror during interviews with multiple journalists. During these interviews, Juror 50 stated that he was a survivor of childhood sexual abuse, which he did not disclose until high school, and that his experience of sexual abuse did not affect his ability to view Maxwell as innocent until proven guilty. (A.249). He also stated that he did not recall the details of the juror questionnaire, which he "flew through," but he believed he answered the questions honestly. (A.245, 262).

53

### 3. The Hearing

Following these reports, the Government filed a letter highlighting Juror 50's public statements and requesting that the District Court conduct a hearing. (Dkt.568). After briefing, Judge Nathan ordered a limited hearing focused on Juror 50's "potential failure to respond truthfully to questions during the jury selection process that asked for that material information." (A.240; SA350). Judge Nathan denied Maxwell's request to directly question Juror 50, which was "committed to [her] sound discretion," but permitted the parties to propose questions in advance of the hearing. (SA364 (quoting *United States v. Moten*, 582 F.2d 654, 667 (2d Cir. 1978)). The parties did so—and Maxwell submitted a letter renewing her request to question Juror 50 directly and proposing twenty-one pages of questions on topics including the nature and length of Juror 50's sexual abuse, the nature of the sexual abuse experienced by any of Juror 50's family or friends, his own employment responsibilities, the impact of his sexual abuse on his life and personal relationships, whether Juror 50 ever sought mental health counseling or spoke with a therapist, how he came to give media interviews, and whether he was attempting to be viewed as a "champion of victims of sexual abuse." (Dkt.636).

The District Court held a hearing on March 8, 2022, at which Juror 50 testified under a grant of immunity. Juror 50 testified that his answers to three questions were not accurate: Questions 25 (whether he or a close associate had been a victim of a crime), 48 (whether he or a friend or family member had been a victim of

54

sexual harassment or abuse), and 49 (whether he or a friend or family member had been accused of sexual harassment or abuse). He explained that, when he was nine or ten years old, he was sexually abused by a step-brother, who he no longer considered part of the family, and the stepbrother's friend. He explained that he answered Question 49 "no" because he no longer considered the stepbrother part of his family, although he should have answered "yes." He also acknowledged that he should have answered "yes" to Question 25 because he was a crime victim, although he read the question at the time to inquire about robbery, mugging, or similar crimes. (A.267-68).

Juror 50 also testified that his failure to disclose this experience was an inadvertent mistake. He explained that he "completely skimmed way too fast" when completing the questionnaire. (A.270-71). He did so, he explained, in light of the context: he started the questionnaire after several hours' waiting in security lines and after technical issues with the instructions. He was preoccupied with his own recent romantic breakup and with disruptions in the jury room. And he rushed to complete his questionnaire because he thought it virtually impossible that he would be selected as a juror given the number of people completing the questionnaire. He did not generally think about his personal history of sexual abuse, and it did not occur to him while carelessly speeding through the questionnaire. (A.269-72).

At oral voir dire, Juror 50 had not been asked the questions Judge Nathan posed to prospective jurors who answered affirmatively to questions 25, 48, or 49,

and therefore was not asked any questions about sexual abuse. At the hearing, Judge Nathan examined Juror 50 in detail, and Juror 50 emphasized that his experiences did not affect his ability to be fair and impartial, his ability to fairly assess the credibility of victim-witnesses, or his ability to impartially judge Maxwell's guilt. (A.268, 270, 276-77).

### 4. The District Court's Decision

Judge Nathan denied Maxwell's motion for a new trial in a detailed written opinion. (A.318). First, Judge Nathan concluded that Juror 50's answers were not deliberately inaccurate, crediting Juror 50's testimony in light of his demeanor and consistent, logical answers to her questions. (A.333-35). Second, Judge Nathan concluded that she would not have granted a for-cause challenge to Juror 50 had he provided accurate information. At the hearing, Judge Nathan asked Juror 50 the questions she asked other jurors who indicated a personal experience with sexual assault or abuse. She concluded that "Juror 50's credible responses [to those questions] under oath at the hearing established that he would not have been struck for cause if he had provided accurate responses to the questionnaire." (A.340). As Judge Nathan explained, other jurors who answered the questions similarly were not even challenged for cause, and she would not have granted a challenge had one been made. (A.344-45). She also rejected the notion that mere similarities between Juror 50's life experiences and the issues at trial required her to excuse Juror 50 for cause. (A.346).

## B. Applicable Law

Federal Rule of Criminal Procedure 33(a) permits a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." As this Court has explained, "[t]he defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

Post-verdict inquiries into juror conduct are strongly disfavored. Such inquiries "seriously disrupt the finality of the process." *Tanner v. United States*, 483 U.S. 107, 120-21 (1987). Permitting "post-verdict scrutiny of juror conduct" would undermine pillars that undergird the jury trial right, including "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Id.* Such inquiries may instead "lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).

Accordingly, a defendant seeking Rule 33 relief based on alleged juror misrepresentations during voir dire must satisfy a stringent two-part test. First, a party must "demonstrate that a juror failed to answer honestly a material question on *voir dire*." *McDonough*

57

*Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Second, the party must show "that a correct response would have provided a valid basis for a challenge for cause." *Id.* To satisfy this prong, a court must determine whether, if the juror had answered truthfully, it would have granted a hypothetical strike for cause. *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006).

A party may challenge a juror for cause based only on "narrowly specified, provable and legally cognizable bases." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). In the context of voir dire, challenges for cause generally fall into one of three "limited" categories: actual bias, implied bias, or inferable bias. *Id.* "Actual bias is bias in fact—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.* Implied bias, also called "presumed bias," is "bias conclusively presumed as a matter of law." *Id.* at 45. This Court has emphasized that this category is "narrow," and "reserved for 'exceptional situations,'" generally meaning circumstances in which jurors "are related to the parties" or "were victims of the alleged crime itself." *Id.* at 45-46. Finally, "[b]ias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Id.* at 46-47.

Where there are concrete allegations of juror misconduct, a court may conduct a post-verdict hearing. *See United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018). The inquiry "should be limited to only what is

58

absolutely necessary to determine the facts with precision." *Ianniello*, 866 F.2d at 544. "[T]he proper functioning of the jury system requires that the courts protect jurors from being harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Moten*, 582 F.2d at 664. Accordingly, the district court "has the power and the duty to supervise and closely control such inquiries." *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir. 1987). For example, the district court may choose to personally conduct the questioning of a juror in order to avoid intruding on the jury's deliberations. *See, e.g., Calbas*, 821 F.2d at 896. At such a hearing, and with limited exceptions, the juror "may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters." Fed. R. Evid. 606(b)(1).

This Court reviews the denial of a Rule 33 motion for abuse of discretion. *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020). A district court only abuses its discretion if its decision "rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding" or "its decision . . . cannot be located within the range of permissible decisions." *Id.* This Court "has only on rare occasions overturned a verdict or remanded for an evidentiary hearing" based on the failure of a juror to disclose information during jury selection. *United States v. Teman*, 465 F. Supp. 3d 277, 330 (S.D.N.Y. 2020).

59

## C.   Discussion

Judge Nathan conducted a thorough inquiry and determined that Juror 50's inadvertent errors on the jury questionnaire did not undermine Maxwell's right to a fair trial. Maxwell does not meaningfully engage with Judge Nathan's careful opinion, instead suggesting that Juror 50's testimony at the hearing was "patently absurd." (Br.63). These conclusory arguments fall far short of establishing that Judge Nathan abused her discretion in finding that this case does not present the extraordinary circumstances that justify overturning a jury's verdict based on an error during *voir dire*.

Maxwell's claim fails at the first step of *McDonough* because Juror 50's errors were inadvertent. Juror 50 testified as much at the hearing, providing a detailed narrative of why his errors were a failure of diligence as he rushed through the questionnaire while distracted. (A.333-34). Judge Nathan credited this explanation in light of his demeanor, which she "closely observe[d]" as he testified, including during his answers to questions "he appeared not to expect." (A.333). She explained that his answers were "logical explanations and generally internally consistent," given in a "calm and straightforward manner." (*Id.*). Juror 50's explanations were consistent with "his sworn statements months earlier at oral *voir dire*" and his testimony that "his sexual abuse history was not salient or [a] front-of mind consideration." (*Id.*). Judge Nathan also noted that Juror 50's answers aligned with his incentives: by testifying under a grant of immunity, he could not be prosecuted for his false answers on the questionnaire, but he could be

60

prosecuted for false testimony at the hearing (*id.*), and had he hidden his sexual abuse in order to get on the jury, he would not have immediately disclosed it to the media after trial (A.335). To the contrary, in one video interview with the media, Juror 50 "appears genuinely and completely surprised to learn that the question-naire" asked about his history of sexual abuse. (*Id.*).

Maxwell does not directly challenge Judge Na-than's factual findings on this point, much less demon-strate that they are clearly erroneous. Instead, relying on *United States v. Langford*, 990 F.2d 65, 68 (2d Cir. 1993), Maxwell argues that *McDonough*'s first step is satisfied by any falsehood, deliberate or otherwise. (Br.66).

This argument misses the mark. This prong re-quires a showing of deliberate dishonesty by the juror, rather than mere honest mistake. This Court has ex-plained that, in *McDonough*, the Supreme Court "found that the juror's good faith failure to respond, though mistaken, did not satisfy even the first prong of the test." *United States v. Shaoul*, 41 F.3d 811, 815 (2d Cir. 1994). The defendant in *Shaoul* also relied on *Langford* to contend that a new trial was appropriate "even if he cannot establish the juror's dishonesty." *Id.* This Court rejected that argument, concluding that "[s]uch a contorted reading of *Langford* is incorrect, be-cause it would eliminate the threshold requirement of the *McDonough* test: juror dishonesty." *Id.* And this Court concluded that the defendant failed to satisfy the first prong of the test because "defense counsel ex-plicitly conceded the good faith of the juror." *Id.* at 816; *see United States v. McCoy*, 995 F.3d 32, 51 (2d Cir.

61

2021) (holding that district court "properly recognized that the initial question to be explored is whether the juror's nondisclosure was deliberate or inadvertent"), *vacated on other grounds*, 142 S. Ct. 2863 (2022), *reinstated*, 58 F.4th 72, 75 (2d Cir. 2023).

Maxwell's claim also fails at the second step of *McDonough*. The hearing established that Juror 50 harbored no bias, approached his jury service with an open mind, and was committed to deciding the case based on the evidence and the District Court's legal instructions. As Judge Nathan found, "Juror 50's credible responses [to questions asked of all jurors who indicated prior personal experience with sexual abuse] under oath at the hearing established that he would not have been struck for cause if he had provided accurate responses to the questionnaire." (A.340). If Juror 50 had accurately answered the questions relating to sexual abuse in the questionnaire, Judge Nathan would have asked Juror 50 follow-up questions during voir dire to determine if it would have granted a challenge for cause. Judge Nathan asked those questions at the hearing, and Juror 50's sworn responses made clear that he was a fair and impartial juror who did not harbor any bias and who would not have been excused for cause.

Nor was Juror 50 the subject of any bias, actual, implied, or inferred. After assessing Juror 50's demeanor, Judge Nathan found that he "repeatedly and credibly affirmed that his personal history of sexual abuse would not affect his ability to serve as a fair and impartial juror 'in any way'" (A.341-42), belying any suggestion that he was actually biased against

Maxwell. Judge Nathan also correctly rejected Maxwell's "central argument" that she should imply or infer bias "based on the purported similarities between [Juror 50's] personal history and the issues at trial." (A.342-43). Judge Nathan explained that she "need not imagine a wholly hypothetical universe" to reach that conclusion. (A.344). During *voir dire*, she asked "every follow-up question requested by the Defendant with regard to a juror's personal experience with sexual assault, abuse, or harassment; although, for a majority of these eight jurors, the Defendant did not propose any follow-up questions." (A.344-45). One prospective juror described her own childhood sexual abuse at an age closer to the victims in this case; another described a friend's recent coercive sexual abuse by a professor. (A.345). Maxwell did not even bring a for-cause challenge as to either. (*Id.*). Similarly, a for-cause challenge against Juror 50 would not have prevailed.

On appeal, Maxwell contends that, had Juror 50 answered the questionnaire accurately, it "clearly" would have provided a basis for a for-cause challenge." (Br.67). In particular, Maxwell challenges Judge Nathan's finding that Juror 50 was credible and unbiased, relying on a few isolated statements drawn from various parts of the hearing transcript and some of his post-verdict statements. (Br.71-72). As described above, Judge Nathan explained how Juror 50's explanation for his erroneous answers was plausible and consistent, and she found him credible after assessing his demeanor through challenging questioning. She also properly disregarded his post-verdict statements about the case, explaining that "[a] juror's view of a case and defendant would necessarily change after

63

reviewing thirteen days of evidence that persuaded twelve jurors of the Defendant's guilt." (A.352). Actual and inferred bias are both committed to the province of the trial judge, and Judge Nathan's findings that neither existed were not clearly erroneous. *See Torres*, 128 F.3d at 44 ("[A] finding of actual bias is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province."*); United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002) ("[A] finding of inferred bias is, by definition, within the discretion of the trial court.").

Maxwell also argues that Judge Nathan should have implied bias, highlighting some similarities between Juror 50's sexual abuse and the sexual abuse discussed at trial. (Br.67). That falls far short of requiring the District Court to imply bias. First, as Judge Nathan explained, the law is not that "bias must be implied when a juror has a personal experience similar to the issues at trial." (A.349). Rather, this Court has "consistently refused to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case." (A.349 (quoting *Torres*, 128 F.3d at 46)). This case is not within one of the rare, extreme circumstances where a mandatory presumption of bias applies. *See, e.g.*, *Torres*, 128 F.3d at 45; *Greer*, 285 F.3d at 172. Second, although there are some similarities between Juror 50's childhood sexual abuse, there are also differences: Juror 50 was younger than the trial victims at the time of their abuse, he was abused by a family member, and he disclosed his abuse much earlier. (A.350). And critically,

64

Juror 50 credibly testified at the hearing that he was able to put aside his experience of sexual abuse and judge the evidence fairly. This is not the sort of "extreme situation that call[s] for mandatory removal." (A.349 (quoting *Torres*, 128 F.3d at 46)).

More generally, it is entirely appropriate for jurors to "rely on their common sense and life experiences to adjudge guilt." (A.352). These "very human elements . . . constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations." (A.353 (quoting *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir. 1970)). On these facts, "[t]o imply or infer that Juror 50 was biased—simply because he was himself a victim of sexual abuse in a trial related to sexual abuse and sex trafficking, and despite his own credible testimony under the penalty of perjury, establishing that he could be an even-handed and impartial juror— would be tantamount to concluding that an individual with a history of sexual abuse can never serve as a fair and impartial juror in such a trial. That is not the law, nor should it be." (A.346-47).

Finally, Maxwell suggests that Judge Nathan abused her discretion by precluding defense counsel from questioning Juror 50, and precluding inquiry into Juror 50's "statements to journalists." (Br.70). As to the former, the manner in which the hearing proceeds is committed to a district court's "sound discretion," *Moten*, 582 F.2d at 666, including specifically the "extent to which the parties may participate in questioning the witnesses," *Iannielo*, 866 F.2d at 544. Judge Nathan reasonably decided to lead the questioning

herself, with repeated opportunities both before and during the hearing for counsel to suggest questions. And Judge Nathan's decision is reinforced by counsel's requests for "vexatious, intrusive, unjustified" subpoenas (SA365), and for questions that swept well beyond Juror 50's ability to be an impartial juror and instead probed deeply into "other aspects of his life" (Br.69).

As to Juror 50's "statements to journalists," it is not entirely clear which statements Maxwell thinks should have been part of the hearing. The hearing of course covered both the substance of his sexual abuse and the fact of his statements to journalists. (*See, e.g.*, A.275 (asking whether Juror 50 understood "from your interviews that the fact that you were abused would be a known fact in the world.")). It appears that, in Maxwell's view, Judge Nathan should have inquired into whether and how his sexual abuse affected the deliberations in the jury room. (Br.71 (suggesting that Juror 50 "operate[d] as an unsworn expert on the subject of traumatic memory")). Acknowledging Rule 606(b)'s prohibition on inquiry into jurors' deliberations and mental processes, Maxwell argues that the exception for "extraneous prejudicial information [that] was improperly brought to the jury's attention," Fed. R. Evid. 606(b)(2)(A), applies here. (Br.71). But Maxwell expressly waived this argument in the District Court, explaining that she "[d]oes not seek to impeach the verdict based on the content of deliberations" and "need not inquire into the content of deliberations to establish her jury bias claim." (Dkt.613 at 49-50). And in any event, the exception does not apply because the "experiences that jurors are understood to bring with them to the jury room" are "internal matters" that do

66

not constitute "extraneous" information. *Warger v. Shauers*, 574 U.S. 40, 51-52 (2014) (rejecting party's attempt to use the "extraneous" information exception to establish that a juror should have been excluded under *McDonough* based on his personal experiences).

## POINT IV

### The District Court's Response to a Jury Note Did Not Constructively Amend the Indictment

At all times the Government consistently argued that Maxwell enticed and transported Jane to New York with the intent that Jane engage in illegal sexual activity, and that Maxwell conspired to do so regarding Jane and the other victims. That is the issue Judge Nathan instructed the jury to resolve, and that is the criminal conduct charged in Counts Three and Four of the Indictment. Accordingly, no constructive amendment or variance occurred.

### A.  Relevant Facts

Counts Three and Four charged Maxwell with arranging for Jane's transportation to New York with the intent that Jane would engage in sex acts with Epstein, in violation of New York state law, and with a conspiracy to transport minors to New York for the same purpose. (A.127-30). At trial, the Government marshalled evidence that Maxwell transported Jane to New York, and aided and abetted Epstein in doing so, with the intent that Jane engage in sexual activity there. That evidence included detailed testimony from Jane about Epstein's New York residence (Tr.316-19)

67

and specific sexual acts that took place in New York while Jane was a minor (Tr.319-20).

The Government's summation similarly discussed these charges as encompassing conduct directed at New York. As to Count Four, the Government argued the evidence showed "Jane was transported *to New York*," and Maxwell was involved in making travel arrangements. (Tr.2891 (emphasis added)). The Government also clarified that "[t]he crime happened the moment [Maxwell, Epstein, and Jane] crossed state lines," and "to be very clear, when Epstein flew Jane *to New York* and Maxwell aided and abetted him, that's enough too." (*Id.* (emphasis added)). For the conspiracy counts, the Government referenced its earlier discussion of the elements of the substantive offenses. And the Government argued that, "even though Carolyn and Annie were not sexually abused *in New York* . . . that is what [Maxwell and Epstein] both intended." (Tr.2895 (emphasis added); *see* Tr.2895-96 (arguing that Maxwell "groomed Annie for abuse after she had already visited Epstein *in New York*." (emphasis added))).

The District Court's jury instructions also permitted the jury to determine only whether Maxwell had intended that Jane (for the substantive counts) or the conspiracy victims engage in sexual activity in New York. During trial, Judge Nathan granted defense requests for limiting instructions at the time evidence came in to make clear that the charges focused on the intent that sexual activity take place in New York. (Tr.1167-68 (Kate), 2048-49 (Annie)). At the conclusion of trial, Judge Nathan instructed the jury that Count

68

Four alleged that Maxwell knowingly transported Jane "with the intent that Jane engage in sexual activity for which any person can be charged with a criminal offense in violation of New York law." (Tr.3037; *see* Tr.3035 (second element of Count Four requires proof of an intent to violate "New York law as alleged in the indictment")). Judge Nathan also instructed the jury on one and only one predicate state offense: a violation of N.Y. Penal Law § 130.55. (Tr.3034, 3037). The instructions on Count Three incorporated this discussion of the elements of Count Four, and the only statute identified was N.Y. Penal Law § 130.55. (Tr.3049-50, 3056-57).

During deliberations, the jury sent the following note:

> Under Count Four, if the defendant aided in the transportation of Jane's return flight, but not the flight to New Mexico where/if the intent was for Jane to engage in sexual activity, can she be found guilty under the second element?

(Tr.3126). The note led to a lengthy discussion, at the conclusion of which Judge Nathan determined she should refer the jury back to the jury charge on the second element of Count Four because the jury note was otherwise "too difficult to parse factually and legally." (Tr.3126-40).

That night, Maxwell filed a letter seeking reconsideration of Judge Nathan's response and raising the possibility of a constructive amendment or prejudicial variance because, in her view, the note showed that

69

the jury might convict based on Jane's testimony that she was abused in New Mexico. (A.224-25). Maxwell asked Judge Nathan to instruct the jury as to the intent elements of Counts Two and Four, and add that "[a]n intent that Jane engage in sexual activity in any state other than New York cannot form the basis of these two elements of Counts Two and Four." (A.229).

Judge Nathan rejected Maxwell's request both because the jury did not inquire about Count Two and because the final sentence as "just wrong" in suggesting that an intent that Jane engage in sexual activity outside of New York "may have no relevance." (Tr.3149). As Judge Nathan explained, "This is the same discussion we've had a couple of times . . . . Sexual activity with respect to Jane in New Mexico under the age of 17 can be relevant to an intent to transport to New York to engage in sexual activity under the age of 17 . . . ." (Tr.3149-50). Judge Nathan repeated that she did "not know how to parse the jury's question exactly," but that her instruction directing the jury to the original charge included a reminder that "it's a violation of New York penal law that's charged and is the illegal sexual activity that they're considering." (Tr.3150). Judge Nathan also pointed out that Maxwell did not "seek to exclude" Jane's testimony about New Mexico, or "seek a limiting instruction with respect to that testimony." (Tr.3153). Judge Nathan added "I have no idea if that's what the jury is asking or many other plausible readings," noted that the defense had proposed an "incorrect" instruction, and concluded no more was required than sending the jury "back to the charge." (Tr.3154).

70

## B. Applicable Law

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021). "Not every alteration of an indictment, however, rises to the level of a constructive amendment." *United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018). Instead, "[t]o prevail on a constructive amendment claim, a defendant must demonstrate that the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States v. D'Amelio*, 693 F.3d 412, 416 (2d Cir. 2012).

This Court has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *United States v. Lebedev*, 932 F.3d 40, 53 (2d Cir. 2019). The "core of criminality" is "the essence of a crime, in general terms," but not "the particulars of how a defendant effected the crime." *D'Amelio*, 693 F.3d at 418. There is no constructive amendment where the allegations in the indictment and the proof at trial both relate to a "single set of discrete facts," or form "part of a single course of conduct" with the same "ultimate purpose." *Id.* at 419-21.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those

71

alleged in the indictment." *United States v. Banki*, 685 F.3d 99, 119 (2d Cir. 2012). Reversal due to a variance is appropriate only when the defendant can establish "that substantial prejudice occurred at trial as a result of the variance," a showing that cannot be made "where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *Khalupsky*, 5 F.4th at 294. So long as a defendant receives notice of the Government's theory, the defendant cannot show prejudice. *See, e.g.*, *Banki*, 685 F.3d at 119.

This Court reviews claims of constructive amendment and prejudicial variance *de novo*. *Dove*, 884 F.3d at 146, 149.

## C. Discussion

There is no likelihood—much less a substantial likelihood—that the jury convicted Maxwell solely because Jane was transported to New Mexico. At no point during the trial, including its summation, did the Government argue that the jury could convict on a theory that Maxwell intended Jane to be abused in New Mexico. Similarly, the District Court's charge required the jury to decide whether Maxwell intended to violate *New York* law. The trial contained no instructions describing for the jury any particular criminal statute in New Mexico, or any other basis by which a jury could convict based on conduct in New Mexico.

Maxwell's argument to the contrary rests entirely on her reading of the jury note. According to Maxwell, the note shows that the jury "decided that there was no corroborating evidence that Maxwell was present for, or helped to arrange, any of Jane's trips to New York, but that the flight logs did corroborate that Maxwell was present for Jane's trip to New Mexico." (Br.79). This reading, she claims, is buttressed by the fact that the jury acquitted on Count Two, which, in her telling, shows that the jury "determined that the only corroborating evidence linking Maxwell to the New Mexico trip was a flight log showing that she was present on the trip but said nothing about whether she 'persuaded, induced, enticed, or coerced' Jane to take the trip." (Br.79).

Judge Nathan correctly rejected this argument. Judge Nathan found that the original jury instructions and the Government's summation captured the core of criminality charged in the Indictment, focusing specifically on conduct directed at and sexual activity in New York. (A.382-85). Even if the note revealed that the jury were confused and wondered whether it could convict based on conduct in New Mexico, Judge Nathan's response ameliorated that confusion. As Judge Nathan explained, she sent the jury back to the instruction, which "accurately instructed that Count Four had to be predicated on finding a violation of New York Law." (A.387). That was sufficient. *See United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007) (court "enjoys considerable discretion" in "framing a response" to a jury note and "is only required to answer the particular inquiries posed"). As Judge Nathan explained, Maxwell failed to propose a better response,

73

requesting instead a series of instructions that were "unresponsive," "redundant," and "legally inaccurate." (A.388-89). *See Rommy*, 506 F.3d at 126 (court responding to jury note "is not required to reference specific arguments advanced or defenses raised by counsel in urging particular outcomes"). Judge Nathan's response to the jury note was sound and did not constructively amend the Indictment.

Maxwell's contrary view rests on extensive speculation about "which flights and evidence the jury was referencing in the note." (A.386). The trial included, among other evidence, testimony by Jane about "taking numerous flights both on Epstein's private plane and on commercial carriers." (A.386). Maxwell ignores that evidence, focusing on a specific trip referenced in the flight logs. (Br.78-79). Even if Maxwell correctly identified the flight at issue, it still betrayed no jury confusion. The origin of that trip was New York, and the jury's focus was on the "return flight"—which it could have inferred was a flight to New York, where Maxwell intended Jane to engage in sexual activity.

Her view also rests on adopting one specific reading of a note that, as Judge Nathan explained, was "decidedly ambiguous as to the precise legal question being asked" (A.386). *See Rommy*, 506 F.3d at 126 (district court "enjoys considerable discretion in construing the scope of a jury inquiry"). Maxwell herself initially understood the note to be about "aiding and abetting" liability, and whether sexual activity was a sufficiently "'significant or motivating purpose' for the travel." (A.387); *see United States v. Kim*, 471 F. App'x 82, 84 (2d Cir. 2012) (affirming jury instructions that

74

prostitution must be a "significant or motivating pur-
pose" of the interstate transportation). Maxwell only
came to the theory she now advances after a lengthy
discussion spanning ten pages of the transcript.
(A.387). And that reading is far from clear: the jury's
question does not ask whether certain facts are suffi-
cient for guilt; it asks whether Maxwell "can be found
guilty" if a certain fact is true. Maxwell "can" be found
guilty based in part on sexual activity occurring in
New Mexico, which is probative of Maxwell's intent
and role in transporting Jane. That is a perfectly sen-
sible question for the jury to ask—indeed, it was re-
peatedly raised by defense counsel to Judge Nathan at
trial. (*See, e.g.*, Tr.3149).

Setting aside the jury note, Maxwell's position re-
quires the jury to have reached a series of odd conclu-
sions. Jane testified at length about her travel to New
York and the ensuing sexual abuse there. It would
make little sense for the jury to reject that testimony,
and then conclude that Maxwell arranged the uniden-
tified commercial return flight Maxwell now empha-
sizes, for which there is no documentary evidence in
the record, including no specific corroboration of Max-
well's role in arranging that flight. (*Compare* Br.79-80
("[T]he jury likely believed that if they found Maxwell
had some role in arranging Jane's return flight from
New Mexico, after the sexual abuse had already taken
place, they could convict her on the substantive trans-
portation count . . . .") *with* Tr.3133 (defense argument
that there is "no evidence" Maxwell arranged a return
flight from New Mexico)). Maxwell suggests that the
jury thought the flight records to be critical evidence,
but the flight logs also demonstrate that Jane was

flown to New York on Epstein's private jet, corroborating her testimony on that point. (*See* Br.79 (citing GX-662-R at 44)). The same is true regarding Maxwell's comparison of Counts Two and Four: in Maxwell's view, the jury rejected nearly all of the evidence of Maxwell's enticement of Jane to New York for lack of corroboration, and then convicted her based on an unsupported speculative leap about arranging an unidentified return flight from New Mexico. That is not plausible, and it certainly is not a "substantially likely" conclusion that can be drawn from an inscrutable jury note.

For similar reasons, no variance occurred. As discussed above, the proof at trial corresponded to the allegations in the Indictment, namely, evidence and argument that Maxwell enticed and transported Jane to New York in order to facilitate sexual abuse there. Maxwell was also well aware that the Government's proof would include conduct in New Mexico. (*See* A.117, 121-22, 126). Maxwell therefore had "fair and adequate notice" that the conspiracies included conduct at Epstein's New Mexico home, which is all that is required. *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003). In any event, the Government produced on November 6, 2021—more than three weeks before trial—notes from an interview with Jane describing sexual abuse in New Mexico. That is sufficient. *See Lebedev*, 932 F.3d at 54 (rejecting a prejudice argument in part because "[t]he government disclosed the evidence and exhibits . . . four weeks prior to trial").

76

## POINT V

### The Sentence Was Procedurally Reasonable

#### A. Applicable Law

A district court commits procedural error if, among other things, it "makes a mistake in its Guidelines calculation" or "fails adequately to explain its chosen sentence." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). This Court reviews a district court's" application of the Guidelines *de novo*, while factual determinations underlying a district court's Guidelines calculation are reviewed for clear error." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). In explaining the sentence, a district court must show that "it has considered the parties' arguments and that it has a reasoned basis for exercising its own legal decisionmaking authority." *Cavera*, 550 F.3d at 193.

#### B. Discussion

Maxwell argues that the District Court erred by applying a four-level leadership enhancement under § 3B1.1 of the Sentencing Guidelines. That enhancement applies when a defendant was an "organizer or leader of a criminal activity that was . . . otherwise extensive," which must include the defendant's leadership of at least one other criminal participant. U.S.S.G. § 3B1.1 & cmt. n.2. Maxwell contests only whether the evidence showed that she led another criminal participant. (Br.84-85).

77

On that point, Judge Nathan found that Maxwell led Sarah Kellen. Two witnesses, both pilots for Epstein, testified that Kellen was Maxwell's assistant. (A.417; *see* Tr.139-40, 1890). Judge Nathan found that testimony credible, in part because it was corroborated by other testimony that Maxwell was Epstein's "number two and the lady of the house" in Palm Beach where much of the abuse occurred and where Kellen worked. (A.417). The trial evidence showed that Kellen scheduled sexualized massages and took nude photographs of Carolyn. (PSR ¶ 66; Tr.1554-55). Even after Kellen took over some of Maxwell's duties, Maxwell continued to manage her by virtue of her position in the house, a fact corroborated by a household manual directing staff to tend to the specific needs of Epstein, Maxwell, and their guests, as well as flight records showing that Maxwell and Kellen flew together on Epstein's planes dozens of times. (A.417). The clear inference from this record is that Maxwell instructed Kellen regarding how to schedule massages and run the part of the scheme that Maxwell had previously handled, at which point Kellen switched to making calls to schedule appointments following Maxwell's directions. Maxwell argues that Judge Nathan erred because a defense witness testified that she, rather than Kellen, was Maxwell's assistant. (Br.85). That uncorroborated testimony is not enough to render Judge Nathan's finding clearly erroneous. Moreover, what matters is whether Maxwell exercised supervisory authority over Kellen, not whether Kellen or another individual was formally Maxwell's assistant.

Maxwell also argues that when imposing the 240-month sentence, which was above the Guidelines

range of 188 to 235 months' imprisonment, Judge Nathan "failed to provide reasons for its upward variance." (Br.84). Maxwell's one-sentence argument is so cursory and undeveloped that it should be deemed waived. *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). In any event, Judge Nathan engaged in a lengthy discussion of the sentencing factors when imposing sentence, including Maxwell's "pivotal role" in "heinous and predatory" sexual abuse of minor girls. (SA459). In describing the seriousness of the offense, Judge Nathan found Maxwell's crimes to be both "extensive" and far-reaching" and concluded that "the damage done to these young girls was incalculable," as a result of "the painful, horrific, and lasting impact of [the] trauma" they endured. (SA460). After an extensive discussion of Maxwell's horrifying crimes, Judge Nathan explained that this conduct "demands a substantial sentence that meets the scope of the conduct and the scope of the harm," and that the sentence must "send an unmistakable message" of general deterrence to "those who engage in and facilitate the sexual abuse and trafficking of underage victims" that "nobody is above the law." (SA461). Accordingly, Judge Nathan concluded that "a very serious, a very significant sentence is necessary to achieve the purposes of punishment" under 18 U.S.C. § 3553(a). (SA462). This discussion belies any claim that Judge Nathan inadequately explained the sentence.

79

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:      New York, New York
            June 29, 2023

                        Respectfully submitted,

                        DAMIAN WILLIAMS,
                        *United States Attorney for the*
                        *Southern District of New York,*
                        *Attorney for the United States*
                            *of America.*

MAURENE COMEY,
ALISON MOE,
LARA POMERANTZ,
WON S. SHIN,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its order dated April 28, 2023. As measured by the word processing system used to prepare this brief, there are 19,291 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: WON S. SHIN,
*Assistant United States Attorney*