# 22-1426-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

GHISLAINE MAXWELL, AKA Sealed Defendant 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

ARTHUR L. AIDALA
DIANA FABI SAMSON
JOHN M. LEVENTHAL
AIDALA BERTUNA & KAMINS PC
*Attorneys for Defendant-Appellant*
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

PRELIMINARY STATEMENT IN REPLY ........................................................ 1

POINT I

    (Point I in Appellant's Principal Brief)
MS. MAXWELL IS A THIRD-PARTY BENEFICIARY OF A
NON-PROSECUTION AGREEMENT WHICH, BY ITS TERMS,
BARRED THE USAO-SDNY FROM PROSECUTING MS.
MAXWELL FOR THESE OFFENSES ......................................................... 2

    A.     Ms. Maxwell has Standing to Enforce the Non-Prosecution
Agreement as a Third-Party Beneficiary ................................................. 3

    B.     The Co-Conspirators Provision of the Non-Prosecution
Agreement Binds the USAO-SDNY and *Annabi* is not to the
Contrary ............................................................................................ 7

    C.     The Court's Failure to Hold a Hearing on the Scope of the
Non-Prosecution Agreement is an Error .............................................. 11

POINT II

    (Point IV in Appellant's Principal Brief)
THE DISTRICT COURT ERRED IN CREDITING A JUROR'S
PATENTLY DISHONEST TESTIMONY OFFERED TO
EXPLAIN FALSE ANSWERS TO MATERIAL QUESTIONS IN
VOIR DIRE AND FURTHER ERRED IN CONCLUDING THAT
HONEST ANSWERS TO THOSE SAME QUESTIONS WOULD
HAVE NOT PROVIDED A VALID BASIS TO REMOVE THE
JUROR FOR CAUSE ........................................................................... 13

    A.     Juror 50 Concealed Material Information in *Voir Dire* by
Giving False Answers on a Juror Questionnaire and Then
Lied About it to the Court in a Post-Verdict Hearing ......................... 13

    B.     Had Juror 50 Disclosed in *Voir Dire* his Traumatic
Experience as a Victim of Child Sex Abuse, the Information
Would Have Established a Valid Basis for a Cause Challenge .......... 16

i

C.     The District Court Abused Its Discretion in Imposing Unreasonable Limitations on the Range of Questions it Agreed to Pose to Juror 50 at the Post-Verdict Hearing ....................19

D.     Juror 50's Actual, Implied, and Inferable Bias Was Established...........................................................................................22

POINT III

(Point V in Appellant's Principal Brief)
THE DISTRICT COURT ERRED IN SENTENCING MS. MAXWELL ................................................................................26

CONCLUSION ......................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aldridge v. United States*,
283 U.S. 308 (1931)..............................................................................19

*Bochese v. Town of Ponce Inlet*,
405 F.3d 964 (11th Cir. 2005) ...............................................................4

*Burton v. Johnson*,
948 F.2d 1150 (10th Cir. 1991) ..................................................... 17, 18

*Clark v. United States*,
289 U.S. 1 (1933), *vacated on other grounds sub nom. United States v. Parse*,
789 F.3d 83 (2d Cir. 2015) ...................................................................13

*Dennis v. United States*,
339 U.S. 162 (1950)..............................................................................23

*In re Altro*,
180 F.3d 372 (2d Cir. 1999) ...............................................................4, 5

*Jones v. Cooper*,
311 F.3d 306 (4th Cir. 2002) ...............................................................25

*McDonough Power Equipment v. Greenwood*,
464 U.S. 548 (1984)..................................................................... 13, 24, 25

*Newin Corp. v. Hartford Accident & Indemn. Co.*,
37 N.Y.2d 211 (N.Y. 1975) ...............................................................5-6

*Sampson v. United States*,
724 F.3d 150 (1st Cir. 2013)................................................................17

*Skaggs v. Otis Elevator Co.*,
164 F.3d 511 (10th Cir. 1998) .............................................................25

*Smith v. Phillips*,
455 U.S. 209 (1982)..............................................................................23

*State v. Ashfar*,
196 A.3d 93 (N.H. 2018) .....................................................................17

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
425 F.3d 119 (2d Cir. 2005) ..................................................................4

iii

*U.S. v. Aleman*,
   286 F.3d 86 (2d Cir. 2002) .................................................................................12

*U.S. v. Andreas*,
   216 F.3d 645 (7th Cir. 2000) ...............................................................................3

*U.S. v. Colombo*,
   869 F.2d 149 (2d Cir. 1989) ...............................................................................20

*U.S. v. Colon*,
   220 F.3d 48 (2d Cir. 2002) .................................................................................4

*U.S. v. El-Sadig*,
   133 F. Supp. 2d 600 (N.D. Ohio 2001) ..............................................................4

*U.S. v. Greer*,
   285 F.3d 158 (2d Cir. 2002) ...............................................................................20

*U.S. v. Langford,*
   990 F.2d 65 (2d Cir. 1993) .................................................................................14

*U.S. v. Lawlor*,
   168 F.3d 633 (2d Cir. 1999) ...............................................................................5

*U.S. v. Ready*,
   82 F.3d 551 (2d Cir. 1996) .................................................................................12

*U.S. v. Riggi*,
   649 F.3d 143 (2d Cir. 2011) ...............................................................................5

*U.S. v. Stolt-Nielsen*,
   524 F. Supp. 2d 609 (E.D. Pa. 2007) ..............................................................4, 6

*U.S. v. Torres*,
   128 F.3d 38 (2d Cir. 1997) ................................................................ *passim*

*U.S. v. Woltmann*,
   610 F.3d 37 (2d Cir. 2010) .................................................................................5

*United States v. Alessi*,
   554 F.2d 1139 (2d Cir 1976) ........................................................... 7-8

*United States v. Annabi*,
   771 F.2d 670 (2d Cir. 1985) ...........................................................1, 2

*United States v. Burr*,
   25 Fed Cas. 49 (C.C. Va. 1807)........................................................23

iv

*United States v. Barnes*,
   604 F.2d 121 (2d Cir. 1979) .................................................................... 19, 20, 21

*United States v. Bright*,
   2022 WL 53621 (2d Cir. Jan. 6, 2022) .................................................19

*United States v. Cambindo-Valencia*,
   609 F.2d 603 (2nd Cir. 1979) ........................................................... 2-3

*United States v. CFW Const. Co. Inc.,*
   583 F. Supp. 197 (D.S.C. 1984) ............................................................4

*United States v. Daugerdas*,
   867 F. Supp. 2d 445 (S.D.N.Y. 2012) .................................................... 13, 17, 24

*United States v. Difeaux*,
   163 F.3d 725 (2d Cir. 1998) ................................................................. 11, 12

*United States v. Florida West Int'l Airways, Inc.*,
   853 F. Supp. 2d 1209 (S.D. Fla. 2012) ........................................................ 4, 6, 7

*United States v. Haynes*,
   398 F.2d 980 (2d Cir. 1968) ................................................................23

*United States v. Nieves*,
   58 F.4th 623 (2d Cir. 2023) ........................................................... 19, 20, 21, 23

*United States v. Russo*,
   801 F.2d 624 (2d Cir. 1986) ........................................................... 7, 12

*United States v. Sampson*,
   820 F. Supp. 2d 151 (D. Mass. 2011) .................................................17

## Statutes & Other Authorities:

18 U.S.C. § 3553(c)(2) ........................................................................ 2, 26

Fed. R. Evid. 606(b)(1) ........................................................................13

USSG § 3B1.1 ........................................................................ 2, 26

## PRELIMINARY STATEMENT IN REPLY

Ms. Maxwell relies on her arguments in her principal Appellant's Brief, Points II and IV, and supplements her arguments in Points I, III, and V herein.

Ms. Maxwell argues that she is a third-party beneficiary of the non-prosecution agreement (hereinafter, "NPA") and, as such, has standing to enforce the co-conspirator immunity provision which, by its terms, barred this prosecution. Alternatively, the District Court's reliance on *U.S. v. Annabi*, 771 F.2d 670 (2d Cir. 1985) to resolve perceived ambiguities was an error and the District Court should have ordered a hearing.

Ms. Maxwell further argues that the District Court's findings and conclusions concerning Juror 50 were an abuse of discretion in three respects: (1) Juror 50's explanations for his false answers to a juror questionnaire were incredible on their face; (2) Juror 50's concealed traumatic experience as a victim of childhood sexual abuse under circumstances analogous to the experiences of the Government witnesses, if known during *voir dire*, would have provided a valid basis for a challenge for cause; and (3) the Court abandoned its obligation to ascertain not merely the juror's credibility, but also the validity of a challenge for cause, when it unduly narrowed the scope of its examination of Juror 50 at the post-trial hearing.

1

Ms. Maxwell argues that the District Court's sentence was in error because (1) its four-point enhancement under USSG Section 3B1.1 lacked any support in the record that Ms. Maxwell supervised another criminal participant; and (2) its sentencing decision was predicated on a miscalculation of the applicable guideline range for incarceration and fines in the first instance and a subsequent failure to correct its error by either recalculating the sentence so as to comport with the proper guideline range or provide reasons for its upward departure. 18 U.S.C. Section 3553(c)(2).

The conviction must be reversed and the indictment dismissed or, in the alternative, the matter should be remanded for the appropriate hearings.

## POINT I

### (Point I in Appellant's Principal Brief)

**MS. MAXWELL IS A THIRD-PARTY BENEFICIARY OF A NON-PROSECUTION AGREEMENT WHICH, BY ITS TERMS, BARRED THE USAO-SDNY FROM PROSECUTING MS. MAXWELL FOR THESE OFFENSES.**

In this Circuit, while ordinarily any plea or non-prosecution agreement is confined to enforcement in the district of origin, under *U.S. v. Annabi*, *supra*., there is an exception wherein "it affirmatively appears that the agreement contemplates a broader restriction," as is the case here. *See Annabi* at 672. This exception dictates that the NPA be enforced to protect Ms. Maxwell as a third-party beneficiary to the agreement from prosecution for these offenses. *See U.S. v. Cambindo-Valencia*, 609

2

F.2d 603 (2nd Cir. 1979) (standing for the proposition that there can be a third-party beneficiary of a plea bargain of another). The NPA, together with the Justice Office of Professional Responsibility (hereinafter, "OPR"), establish that the immunity given Ms. Maxwell precluded the United States from prosecuting her in the Southern District of New York or elsewhere.

### A. Ms. Maxwell has Standing to Enforce the Non-Prosecution Agreement as a Third-Party Beneficiary.

The District Court correctly found that Ms. Maxwell is a third-party beneficiary of the NPA, and, for that reason, has standing to enforce it.[1]  As the Seventh Circuit has observed, plea agreements, like all "ordinary contracts," may be enforced by third parties "when the original parties intended the contract to directly benefit them as third parties."  *U.S. v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000) (indicating that third-party beneficiary standing applies to "[i]mmunity agreements" and "plea bargains," but concluding on the facts presented, that defendants were not third-party beneficiaries).  No circuit has held otherwise, and this Court should not create a split on this issue.  The Seventh Circuit has been joined by numerous district courts in holding that an agreement promising immunity to a third party may be enforced by that party if that party is later prosecuted in breach of the agreement.

---

[1] In its brief, the Government fails to concede that the Court found that Maxwell was in fact a third-party beneficiary of the NPA.

*See U.S. v. Stolt-Nielsen*, 524 F.Supp.2d 609, 613-14, 620-23, 628 (E.D. Pa. 2007) (dismissing indictment against Stolt-Nielsen's "directors and/or officers," as they were "intended third-party beneficiaries of the [Conditional Leniency] Agreement" between the DOJ Antitrust Division and Stolt-Nielsen); *U.S. v. Florida West Int'l Airways, Inc.*, 853 F.Supp.2d 1209, 1228-32 (S.D. Fla. 2012) (dismissing indictment against employee of air cargo provider, as he had "third party beneficiary standing necessary to establish [his] immunity under the Plea Agreement" between the Government and his employer); *U.S. v. El-Sadig*, 133 F.Supp.2d 600 (N.D. Ohio 2001) ("[E]ven if the non-prosecution agreement was never directly communicated to Defendant El-Sadig, he can enforce the non-prosecution agreement as a third party beneficiary"); *U.S. v. CFW Const. Co., Imc.*, 583 F.Supp. 197 (D.S.C. 1984) ("[A]n intended third party beneficiary of a contract may enforce its provisions….Thus, if the Government, in negotiating the aforementioned plea agreements, 'promised' that there would be no prosecution against CFW…the promise must be enforced.").

This rule makes sense. "Plea agreements are interpreted in accordance with contract law principles," U.S. *v. Colon*, 220 F.3d 48, 51 (2d Cir. 2002) (citing *U.S. v. Altrom* 180 F.3d 372, 275 (2d Cir. 1999)), and it is hornbook contract law that an intended third-party beneficiary may enforce a contract. *See Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 982 (11th Cir. 2005). There is no reason to treat plea or non-

prosecution agreements differently from other contracts. If anything, Second Circuit precedent strongly suggests that courts may depart from ordinary contract principles when construing plea agreements only when such departures cut *against* the Government. *See U.S. v. Riggi*, 649 F.3d 143 (2d Cir. 2011) ("[B]ecause plea agreements are unique contracts, we temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards") (*quoting U.S. v. Woltmann*, 610 F.3d 37, 39-40 (2d Cir. 2010)); *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) ("[P]lea agreements are unique contracts…[W]e hold the Government 'to the most meticulous standards of both promise and performance.'") (original ellipses omitted) (*quoting U.S. v. Lawlor*, 168 F.3d 633, 636 (2d Cir. 1999)). It would turn this doctrine on its head to deviate from ordinary contract principles in a manner that benefits the Government.

To the extent the Government argues that Ms. Maxwell is not a third-party beneficiary because the NPA did not mention her by name (Br. 18)[2], that argument should be rejected. As this Court has held, "an intention to benefit a third party may be gleaned from the contract as a whole and the party need not be named specifically as a beneficiary." *Owens*, 601 F.2d at 1250 (citing *Newin Corp. v. Hartford Accident*

---

[2] "Br." refers to the Government's brief; "A" refers to the appendix filed with Ms. Maxwell's brief; "SA" refers to the supplemental appendix filed with the Government's brief; and "Dkt" refers to an entry on the District Court's Docket for this case.

& *Indemn. Co.*, 37 N.Y.2d 211, 219 (N.Y. 1975). And, as the court stated in *Florida West*, a plea agreement is enforceable by a third party as long as the "[a]greement evince[s] an intent to extend [immunity] to a definable class of third parties" and the third party seeking enforcement "fall[s] within this category of beneficiaries." 853 F.Supp.2d at 1228-29; *see id.* at 1214 (defendant, as a third-party beneficiary, could enforce a plea agreement between the Government and an air cargo company, which immunized unnamed "employees" of the company's subsidiaries); *see also Stolt-Nielsen*, 524 F.Supp.2d at 613, 620 (defendants, as third-party beneficiaries, could enforce an agreement between the Government and Stolt-Nielsen, which promised leniency to unnamed directors, officers, and employees).

Here, the NPA grants immunity to "any potential co-conspirators of Epstein, including but not limited to [four named individuals]." A178. As the District Court recognized, this is a definable class that includes Ms. Maxwell. A144[3] ("[T]he co-conspirator provision…cover[s] any involvement of Maxwell in offenses committed by Epstein from 2001 to 2007, other offenses that were the subject of the FBI and

---

[3] To the extent that the Government suggests that Ms. Maxwell is not a co-conspirator within the meaning of the NPA, the trial evidence demonstrated, according to the Government's main brief, that she was a member of the conspiracies charged in the indictment from 1994- 2004 in the SDNY and elsewhere. Moreover, there was significant overlap between the investigation in Florida and the trial. Specifically, investigators in Florida had interviewed Carolyn (SA86, SA72fn.72; SA193fn.241), Virginia Roberts (SA173fn.217, SA193fn.240, fn.241), and Annie Farmer (SA193fn.239).

U.S. Attorney's Office investigation, and any offenses that arose from the related grand jury investigation."); *cf. Florida West*, 853 F.Supp.2d at 1228-29.

### B. The Co-Conspirators Provision of the Non-Prosecution Agreement Binds the USAO-SDNY and *Annabi* is not to the Contrary.

Embedded within *Annabi's* canon of construction that prosecutors in one district cannot bind prosecutors in another district, is a requirement that there must be a complete absence of language expressing a broader intention. Thus, if "it affirmatively appears that the agreement contemplates a broader restriction," *Annabi's* restrictive rule does not apply. *U.S. v. Russo*, 801 F.2d 624, 626 (2d Cir. 1986).

The language expressing a broader intention can be found in the NPA, which (1) explicitly states that "the United States also agrees that it will not institute any criminal charges against any potential co-conspirators of Epstein" (A178), (2) contains a structural separation of this clause from the more restrictive language used elsewhere, and (3) utilizes the expressed language that Epstein intended a "global" agreement. Obviously, an intent to limit the immunity afforded the co-conspirators easily could have been made explicit by the incorporation of limiting language. No such language was utilized and was, in fact, removed from the co-conspirator clause.

A promise to bind other districts can be inferred from negotiations between a defendant and a prosecutor. See *United States v. Alessi*, 554 F2d 1139,1153-4 (2d

Cir 1976). The OPR[4] (SA1-348) contains just such evidence of the negotiations between the Government and Epstein's counsel which, in corroborating an intent on the part of the parties to draft a co-conspirator clause that provided broader immunity, accords with the plain meaning of the NPA. This is so, notwithstanding that the OPR relies almost exclusively on the distant recollection of government employees whose judgment and professionalism were being questioned with little to no input from Epstein's attorneys as to who or what they intended or understood the co-conspirator clause of the NPA to cover. *See* SA166.

The Government questions why Epstein would have sought a broader grant of immunity for co-conspirators than for himself. Br.21. But the answer is provided in the OPR. The line prosecutor remembered that defense counsel told her that "Epstein wanted to make sure that he's the only one who takes the blame for what happened." SA193. Indeed, the Government believed that Epstein's conduct was his own "dirty little secret" and did not have any specific evidence against Ms. Maxwell even though they had interviewed Carolyn, the complainant in Count Six, and Annie Farmer, two of the four women who testified at trial (SA193), and had also

---

[4] The Department of Justice Office of Professional Responsibility investigated and issued a report on the NPA (SA1-348) on issues tangential to the instant appeal, but it provides a skeletal outline of the United States' negotiation with a multitude of Epstein's counsel. In particular, the investigation was focused on "whether any of the [Government actors were] influenced by corruption, bias, or other improper motive…to include terms in the NPA that were favorable to Epstein." SA166.

interviewed Virginia Roberts, who the Government elected not to call as a witness. And, of course, a broader immunity deal for co-conspirators accomplished what Epstein may not have been able to obtain more directly, namely co-conspirator immunity that would have insulated Epstein from criminal prosecutions elsewhere, where co-conspirators might otherwise have been forced to testify against him in return for leniency.

There is no question that the NPA did not contain standard federal plea agreement language. SA103 fn.120. The co-conspirator clause was, in the words of the Government, "unusual," even "very unusual" and "pretty weird." SA194, SA212 fn.258. Not surprisingly, the first iteration of this clause was proposed by the defense. SA95. It "preclude[d] the initiation of any and all criminal charges which might otherwise in the future be brought against [four named female assistants] or any employee of [a specific Epstein corporate entity] for any criminal charge that arises out of the ongoing federal investigation."[5] *Id.* This demonstrates that, from the beginning, the defense sought immunity for third parties beyond the SDFL. The Government responded with a draft proposal that resolved the federal criminal liability of any co-conspirators in the Southern District of Florida growing out of any criminal conduct by those persons known to the USAO as of the date of the

---

[5] Notably, even in this iteration, Ms. Maxwell would have been protected as she was Epstein's employee.

agreement. SA100, SA105 fn.122. However, that language, limiting co-conspirator immunity to the Southern District of Florida, was removed from the final signed NPA. SA166-167fn.237, fn.239, & fn.240. The intentional excision of this limiting language from the draft version of the co-conspirator clause establishes that that limitation was not intended to apply to the co-conspirator clause. Indeed, it is difficult to imagine any clearer evidence than the purposeful removal of that limiting language, especially as it is replaced by the term "United States." And to punctuate this point, the U.S. Attorney himself as part of a final review and edit of the NPA, instructed the line prosecutor to restore the reference to Epstein's desire to reach a global agreement of his State and Federal criminal liabilities. SA110.

The Government denies that Main Justice was involved in the plea negotiations. Br. 22. But the OPR demonstrates that Andrew C. Lourie, Deputy Assistant Attorney General for the Department's Criminal Division and Chief of Staff to Assistant Attorney General Alice Fisher, was actively participating in a critical phase of plea negotiations in September "from his new post at the Department in Washington, DC." SA101. After his transfer, he continued to be consulted on the negotiations and apprised of their status. He repeatedly rendered opinions, trying to close the deal involving a plea agreement and the NPA (SA106, 110). On September 24, 2007, Lourie, now stationed in Washington D.C. at Main

Justice, sent additional comments on the NPA 's final draft. SA110. That afternoon, the final version was circulated and signed.

C. **The Court's Failure to Hold a Hearing on the Scope of the Non-Prosecution Agreement is an Error.**

What is significant with regard to this issue is the lack of a sufficient record. Given that the District Court ignored the plain language of the co-conspirator clause together with the corroborating evidence from the OPR that establishes that that language was changed to remove rather than add words of limitation, the District Court's decision to apply *Annabi's* rule of construction without a hearing was an error. This is especially so because the OPR was lacking in relevant information from defense counsel as to their understanding of the agreement and, in the absence of such information, the District Court was obligated to resolve any ambiguities in favor of Ms. Maxwell.

The Government argues that, based upon *Annabi*, there is no need for a hearing. But, in fact, courts in this Circuit have routinely recognized the need for evidentiary hearings where the scope of an agreement is in dispute. The failure to hold a hearing precluded Ms. Maxwell from offering evidence as to the intent and understanding of defense counsel; as a result, the Court did not construe the NPA against the Government, as the law requires, but against Ms. Maxwell. *See United States v. Difeaux*, 163 F.3d 725, 728 (2d Cir. 1998). A reviewing court must read the

NPA's ambiguous provisions against the Government, which drafted the agreement and enjoys unequal bargaining power in the sentencing process. *See United States v. Aleman*, 286 F.3d 86, 89 (2d Cir. 2002); *United States v. Ready*, 82 F.3d 551, 558-59 (2d Cir. 1996); *See also Difeaux* at 728. In this instance, the District Court accepted the facts proffered by the U.S. Attorney's Office of the Southern District of New York and relied on *Annabi* to preclude any further inquiry, thereby eviscerating the exception in *U.S. v Russo, supra.*

Epstein performed under the NPA in response to the promise of the United States. The Government, having received the totality of the benefit of the bargained elements in the NPA, should be held to its terms. There is no remedy other than enforcement of the NPA according to its terms or, should the Court determine that such terms are ambiguous, the holding of a hearing. Should the hearing establish that Epstein understood the co-conspirator clause to be global, while the Government deemed its reach a mistake or the subject of regret, Epstein, now dead, cannot undo it. The Government, having removed limiting language in the NPA, cannot restrict the NPA in retrospect, as it had convinced the District Court.

# POINT II

## (Point IV in Appellant's Principal Brief)

**THE DISTRICT COURT ERRED IN CREDITING A JUROR'S PATENTLY DISHONEST TESTIMONY OFFERED TO EXPLAIN FALSE ANSWERS TO MATERIAL QUESTIONS IN VOIR DIRE AND FURTHER ERRED IN CONCLUDING THAT HONEST ANSWERS TO THOSE SAME QUESTIONS WOULD HAVE NOT PROVIDED A VALID BASIS TO REMOVE THE JUROR FOR CAUSE.**

Juror honesty is the bedrock of the criminal jury system. *McDonough Power Equipment v. Greenwood,* 464 U.S. 548 (1984). *Voir dire* examination serves to protect the right to a trial by an impartial jury. It is designed to expose biases both known and unknown. The trial judge has broad flexibility in responding to allegations of juror misconduct, particularly when the incidents relate to statements made by the jurors themselves, rather than to outside influences, and do not violate the sanctity of jury deliberations. *See* FRE 606(b)(1).

"A juror's dishonesty during *voir dire* undermines a defendant's right to a fair trial." *United States v. Daugerdas*, 867 F. Supp. 2d 445, 468 (S.D.N.Y. 2012) (*citing Clark v. United States*, 289 U.S. 1, 11(1933), vacated on other grounds sub nom. *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015).

## A. Juror 50 Concealed Material Information in *Voir Dire* by Giving False Answers on a Juror Questionnaire and Then Lied About it to the Court in a Post-Verdict Hearing.

Juror 50 was given a questionnaire to execute under oath. It contained a statement of the case, calling attention to the subject of sex trafficking of minors on

the fourth page of the document. It posed its questions in the form of "Have you or [anyone else]?" The juror gave the Court and counsel sworn false answers on his questionnaire relating to the most sensitive issues in the case. *U.S. v Langford,* 990 F.2d 65, 68 (2d Cir. 1993).

The court held a hearing narrowly confined to an inquiry about the juror's false answers on the questionnaire. A326. The juror, through counsel, invoked his Fifth Amendment privilege and was granted immunity by the Government to the extent he testified truthfully. Ironically, he testified that his false statements on the jury questionnaire were inadvertent. Hence, there was no reasonable basis upon which to invoke his Fifth Amendment privilege as he was not admitting to having made intentionally false statements, and his exposure to a perjury charge existed without an immunity deal. This immunity deal was a Potemkin village, providing only the veneer of credibility. The court repeatedly noted that the immunity deal provided Juror 50 "a strong incentive to testify truthfully" (A333, A336, A340), when in fact it provided only a strong incentive to offer testimony that would satisfy the Government's interest in preserving the verdict.

There can be no dispute that Juror 50's testimony established conclusively that he falsely answered three separate questions on the jury questionnaire – Questions 25, 48 and 49. A299, A310, A311. It is no coincidence that Juror 50 gave false answers to these questions and only these questions. These were the questions

that, had he answered truthfully, would have revealed his prior sexual abuse. Juror 50 testified that he inadvertently answered incorrectly all, and only, the questions that would have elicited information about his child sexual abuse.[6] In response to the Court's inquiry as to whether he could have been fair and impartial, he replied by rote in the affirmative. His answers and explanations were incredible, ever shifting, and even outright contradictory. He attributed his false answers to having simply misread questions because he was tired and distracted, but then claimed that one answer was predicated on his view that a stepbrother was not a family member, and another, on his view that he did not consider that his sexual assault made him a victim of a crime (A268) – an explanation that made sense only if he had actually read and understood the questions in the first instance.

Juror 50's testimony was incredible as a matter of law, but the Court found that the juror's false statements were an "inadvertent mistake." A340, 347. The Court refused to inquire as to the juror's post-trial activity that included multiple media interviews about the part his own experience as a victim of sexual abuse played in his role as a juror on this case. Nor would the Court inquire about Juror 50's statements concerning a second juror's undisclosed sexual abuse. Dkt. 613 at

---

[6] None of the 18 individuals selected for service as a deliberating or alternate juror answered "yes" when asked if they were a victim of sexual abuse, sexual assault, or sexual harassment. DKT. 613.

p28. Juror 50's pretrial selective false answers only to questions that would have elicited his child sexual abuse, his post-verdict activity, and his patently false and contradictory explanations in the post-verdict hearing should have disqualified him for service as a juror in this case.

**B. Had Juror 50 Disclosed in *Voir Dire* his Traumatic Experience as a Victim of Child Sex Abuse, the Information Would Have Established a Valid Basis for a Cause Challenge**

At the hearing, Juror 50 disclosed the facts of his sexual abuse, which significantly paralleled the abuse described by the Government's four key victim witnesses at trial. Like the four accusers, Juror 50 (i) was sexually abused as a minor; (ii) was abused on multiple occasions over the course of several years; and (iii) delayed reporting the abuse. A267-268. Like the four accusers, Juror 50 was abused by two people who were friends and who each had participated in the abuse. A267. Furthermore, Juror 50 was not abused by a stranger or sexually assaulted by someone he did not know. Like the four accusers, he was sexually abused by someone familiar to him, namely his stepbrother. These similarities are significant and contrast sharply with other jurors who answered "Yes" to Question 48 and were not struck for cause, but who disclosed incidents that were not directly analogous to the facts presented at trial. In this situation, where Juror 50 experienced the same traumatic childhood sexual abuse that the trial victims had experienced, with many of the same surrounding circumstances, he was not capable of setting his experiences aside and

impartially deciding the case solely on the evidence at trial. *See Daugerdas*, 867 F. Supp. 2d at 472 ("Courts imply bias 'when there are similarities between the personal experiences of the juror and the issues being litigated.'" (*quoting United States v. Sampson*, 820 F. Supp. 2d 151, 163-64 (D. Mass. 2011)); *Sampson* v. *U.S.* 724 F.3d 150, 167 (1st Cir 2013) ("It would be natural for a juror who had been the victim of [the same crime] to harbor bias against a defendant accused of such a crime."). Had this information come to light during *voir dire*, Juror 50 would have been struck for cause. *Sampson*, 724 F.3d at 167 (affirming grant of new trial when juror in a gunpoint bank robbery case did not disclose that she had been threatened by her husband with a gun); *State v. Ashfar*, 196 A.3d 93, 94-97 (N.H. 2018) (affirming grant of new trial when juror in child sexual assault case did not disclose that he was sexually assaulted by a babysitter when he was five or six years old); *U.S. v. Torres*, 128 F.3d 38, 47-48 (2d Cir. 1997*)* (affirming for cause strike of juror in a structuring case who did not disclose she had engaged in similar structuring activity herself); *Burton v. Johnson*, 948 F.2d 1150 1159 (10th Cir. 1991) (affirming grant of new trial when juror in murder case involving domestic violence did not disclose she was living in similarly abusive circumstances at the time of trial).

Inexplicably, the Court held that, based on the answers of the juror at the hearing, he would not have been excused for cause, even if he had disclosed his childhood abuse during *voir dire*. The Court's determination that it would not have

granted a challenge for cause of the juror had he given truthful answers, is an abuse of discretion. Demonstrated bias in the responses to questions in *voir dire* may result in a juror being excused for cause. The necessity of truthful answers by prospective jurors is obvious, if this process is to serve its purpose. The failure to provide truthful answers is itself a proper challenge for cause.

After the hearing, the court held that the juror was entitled to use his "life experiences" in deliberations, even though the life experiences mirrored testimony at trial and were particular to the charges against Maxwell. But "[w]hen a juror has life experiences that correspond with evidence presented during trial, that congruence raises obvious concerns about the juror's possible [implied or inferred] bias." *U.S. v. Torres*, 128 F.3d at 47-48; *see Burton v. Johnso*n, 948 F.2d 1150, 1158-59 (10th Cir. 1991). That bias went unexplored at the hearing resulting in the failure of the Court to take proper steps to screen the juror for bias after the verdict.

A conviction will only be reversed if the District Court abused its discretion by incorporating an error of law, or resting its decision on a clearly erroneous factual finding. Here, both the Court's finding that Juror 50 was credible (a clearly erroneous factual finding), and its ruling that Juror 50's truthful answers during *voir dire* would not have established a valid basis for cause (an error of law), meet that standard for abuse of discretion.

18

**C. The District Court Abused Its Discretion in Imposing Unreasonable Limitations on the Range of Questions it Agreed to Pose to Juror 50 at the Post-Verdict Hearing.**

The Court's decision to narrow the scope of the hearing to questions relating only to the juror's false responses to the juror questionnaire, was an abuse of discretion because it deprived Ms. Maxwell of a full and fair opportunity to establish Juror 50's bias. For example, the court refused to ask Juror 50 why he disclosed to the jury that he was a victim of sexual assault. According to Juror 50, coming to a unanimous verdict "wasn't easy, to be honest." In fact, several jurors doubted the credibility of Jane and Carolyn. "When I shared that [I had been sexually abused]," recounted Juror 50, the jurors who had doubts "were able to sort of come around on, they were able to come around on the memory aspect of the sexual abuse." Dkt 613 at 14.

The standard of review applies to questions that the court decides to ask or to not ask a juror. This Court recently emphasized that a court's discretion is not boundless in this regard. *See U.S. v Nieves*, 58 F.4th 623, 626 (2d Cir. 2023). The discretion must be exercised consistent with 'the essential demands of fairness.'" *United States v. Barnes*, 604 F.2d 121, 137-38 (2d Cir. 1979) (footnote omitted), *quoting Aldridge v. United States*, 283 U.S. 308, 310 (1931); *see also United States v. Bright*, 2022 WL 53621, at *1 (2d Cir. Jan. 6, 2022) (summary order).

"[T]he defense deserves 'a full and fair opportunity to expose bias or prejudice on the part of veniremen.'" *United States v. Colombo*, 869 F2d 149, 151 (2d Cir. 1989) *quoting Barnes* 604 F2d at 139. *Nieves* at 632. *Nieves* stands for the proposition that there must be sufficient fact finding to allow for facts probative of the three forms of bias to reveal themselves. Otherwise, a violation of fundamental fairness arises if the *voir dire* is not adequate to identify unqualified jurors. Here, the inquiry by the Court at the post-verdict hearing failed to provide a full and fair opportunity to expose bias. While it need not give the defense lawyers the opportunity to question the juror, it must fulfill its constitutional duty to eliciting sufficient information to allow a determination of whether a challenge to the juror for cause should be made.

*U.S. v. Greer*, 285 F.3d 158, (2d Cir. 2002) set out the types of bias that produce proper cause challenges. Cause challenges are generally based on one of three species of bias: (1) actual bias, or "bias in fact"; (2) implied bias, or bias that is "presumed as a matter of law" where a typical person in the juror's position would be biased, irrespective of whether actual bias exists; and (3) inferable bias, which arises "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." 285 F.3d at 171-172.

All three forms of bias must be "grounded in facts developed at *voir dire*." *Torres*, 128 F.3d at 47.

The bias implied by the juror's false answers went unexplored. *Nieves* turned on the court's failure to explore juror bias related to gangs – a prejudice analogous to the systematic or pervasive bias in the community against accused sex traffickers and those who consort with them. Maxwell, tied to Epstein by media coverage, went to trial against a constant drumbeat of news and allegations concerning child molesters and sex trafficking. Far more pervasive than fear of gang violence was fear and revulsion as to child sex abuse and trafficking of which Epstein, and then Maxwell became the poster child. In the hearing, and despite defense suggested questions, the Court refused to explore Juror 50's child sexual abuse for bias.

To assess a challenge for cause as to this seated juror after trial the court should use the same standards for cause challenges at trial. To do otherwise would appear to shield the verdict rather than the defendant from improper juror bias. As in *Nieves,* the juror's omitted information related to a "material issue" that was at trial "the cornerstone of the government's theory." There was a strong likelihood that the material issue would skew deliberations considering the strong feelings that sex trafficking of minors engenders. *See Nieves*; see also *Barnes,* 604 F.2d at 137-139. The court deprived Maxwell unfairly of the opportunity post-trial to unearth a pervasive bias relevant to the issue pivotal to the case against her.

**D. Juror 50's Actual, Implied, and Inferable Bias Was Established.**

Maxwell does not seek a *per se* rule of exclusion of victims of child abuse in sex trafficking cases, although admittedly, it would be difficult to imagine how such a traumatic experience could fail to give rise to inferable bias. Certain life experiences create permanent biases. Nevertheless, it is this juror in this situation that the law would properly "cautiously incapacitate" because persons in such a situation would naturally feel prejudice. In his post-verdict interviews, Juror 50 admitted as much when he described how he identified with the Government witnesses through the lens of his own experience of child sexual abuse; convinced other jurors to credit the testimony of Government witnesses and discredit defense witnesses precisely because of his unique insight about memory for child sexual assault; and bonded so profoundly with the Government witnesses that he felt compelled to contact one after trial and to give interviews about his own experience. Suffice to say, this was not an example of an impartial juror using his "life experiences" in the performance of his civic duty, contrary to the Court's view. A352.

Juror 50 had no such relationships to the parties, counsel, or the very crime itself. But his omissions during *voir dire* presented the sort of "extreme situation" that would qualify for presumptive bias. *Torres* at 46. The average person, victimized by sexual abuse, would be biased when he speaks about his healing

22

process, his trauma and his need for therapy to "deal with the stress of the [Maxwell] case. A353-354.

In determining whether a juror should be excluded on the grounds of implied bias, a juror's statements in *voir dire* are completely irrelevant. The juror may declare that he feels no prejudice in the case. But the law cautiously incapacitates him from serving on the jury because, in general, persons in a similar situation would feel prejudice. *U.S. v Burr*, 25 Fed Cas. 49,50 (C.C. Va. 1807). It is called the average person test. *See U.S. v Haynes*, 398 F2d 980, 984 (2d Cir 1968); *Dennis v U.S*. 339 U.S. 162,176 (1950). Juror 50 fails that test.

*Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)), led this Court to caution that "automatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself." *Id.* (*quoting Torres*, 128 F.3d at 45). But this limited set of examples is not exclusive. And while sex abuse victims who timely disclose their victimization may not be presumed biased, jurors who do not disclose their victimization, thereby depriving the court and counsel of vital information as to challenges for cause or peremptory challenges create the extreme situation warned about by Justice O'Connor and the *Torres* court. See also *Nieves*.

This Court has also recognized a third form of partiality, known as inferable bias, applicable in "a few circumstances that involve no showing of actual bias, and that fall outside of the implied bias category, where a Court may, nevertheless, properly decide to excuse a juror." *Torres*, 128 F.3d at 46-47, *Daugerdas*, 867 F. Supp. 2d at 475.

Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make a presumption of bias mandatory. *Torres* at 43, 47. In *Torres*, the Second Circuit declined to "consider the precise scope of a trial judge's discretion to infer bias." *Id.* The circumstances herein present a scenario in which bias is inferred from the non-disclosure of critical potentially disqualifying information at the time of *voir dire* because the risk of partiality is sufficiently significant to excuse a juror for cause based on non-disclosure. "Because [in such cases] the bias of a juror will rarely be admitted by the juror himself, partly because the juror may have an interest in concealing his own bias or partly because the juror may be unaware of it, [partiality] necessarily must be inferred from surrounding facts and circumstances." *McDonough*, 464 U.S. at 558 (Brennan, J., concurring).

Juror 50 claims not to have connected his history with the charges in the case despite the description in the questionnaire. The implausibility of the explanation

that he did not see that key questions related to sex abuse and his belief that they only applied to others and not to him beggars belief since the process was to determine if he was to be a qualified juror. The court, in accepting his answers, was credulous, willing to trust the juror's answers almost uncritically.

The Court also ignored existing authority for the proposition that a new trial may still be ordered, separate from the *McDonough* prongs if the defendant can show bias. *See, e.g., Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002) A showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial."); *Skaggs v. Otis Elevator Co*., 164 F.3d 511, 516 (10th Cir. 1998) ("The advent of the [*McDonough*] test did not eliminate a litigant's broader historic right to prove actual or implied juror bias."). In *McDonough* itself, Justices Blackmun, Stevens, and O'Connor concurred separately "to clarify that juror partiality could still be proven by showing actual or implied bias." *McDonough*, 464 U.S. at 556.

While the *McDonough* Court highlighted the importance of the *voir dire* process as a guard against juror bias, it also noted that no trial is perfect, and that counsel has a responsibility to obtain relevant information from prospective jurors. 464 U.S. at 554-55. While the court unfairly limited the inquiry into Juror 50's bias, the record, nevertheless, amply demonstrates that Juror 50 gave intentionally false statements under oath in his juror questionnaire to conceal that he had experienced

childhood sexual abuse identical to that experienced by the victims in the case and lied to conceal his misconduct at the hearing. The Court abused its discretion in not granting Ms. Maxwell a new trial.

## POINT III

### (Point V in Appellant's Principal Brief)
### THE DISTRICT COURT ERRED IN SENTENCING MS. MAXWELL

The Government defends the Court's decision to apply a four-level leadership enhancement under Section 3B1.1 of the Sentencing Guidelines. However, the trial evidence did not support a finding that Ms. Maxwell was an "organizer or leader of a criminal activity that was…otherwise extensive," because there was no evidence that she supervised another criminal participant. Specifically, the court's finding that Ms. Maxwell supervised Sarah Kellen, who the Government claimed was a criminal participant but chose not to indict, is unsupported by the record. *See* Br. 77. This error coupled with the Court's failure to provide reasons for its upward variance as required by 18 U.S.C. Section 3553(c)(2), requires that Ms. Maxwell be resentenced.

To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. See USSG Section 3B1.1, cmt. n.2. The Government at sentencing correctly conceded that there was no direct evidence that Maxwell supervised Kellen. A406. The two pilots did not know who Kellen worked for and waffled in their testimony. Tr. 204,

1892. But Kimberly Espinoza did. *Id.* In fact, according to Espinoza, by the time Kellen began working for Epstein in 2001-2002, Ms. Maxwell and Epstein "went their separate ways" (Tr. 2370) and Kellen sat in the office where Ms. Maxwell used to sit and managed Epstein's properties. Tr. 2337, 2370-71, 2375-6, 2382. Carolyn corroborates this fact when she testified that there was a clean break in time between when she dealt with Maxwell and when she dealt with Kellen. Tr. 1527. There is, quite simply, not a single witness that testified that Ms. Maxwell supervised Kellen in any capacity, much less in connection with anything of a criminal nature. Nor does the existence of an earlier version of the 2005 household manual, attested to by Juan Alessi (Tr. 808) or flight records support a finding that Ms. Maxwell supervised Sarah Kellen as a criminal participant. This is the thin gruel upon which the court based its finding (see A417) and it is simply not sufficient to support the enhancement even by a preponderance of the evidence.

## CONCLUSION

For the reasons stated here and in Points I and II of Ms. Maxwell's Principal Brief, the Convictions should be reversed, and the Indictment, or a portion thereof, be dismissed and a new trial ordered on any remaining counts. Alternatively, for the reasons stated in Point I, the matter should be remanded to the District Court for a hearing. For the reasons stated in Points III (Point II herein) and IV of Ms. Maxwell's Principal Brief, the Convictions should be reversed, and the matter remanded for a

new trial. Alternatively, for the reasons stated in Point III of Ms. Maxwell's Principal

Brief (Point II herein), the matter should be remanded to the District Court for a

hearing. For the reasons stated in Point V of Ms. Maxwell's Principal Brief (Point

III herein), the matter should be remanded to the District Court for resentencing.

Dated:  New York, New York
      July 27, 2023

                                      Respectfully Submitted,


                                      /s/Diana Fabi Samson

                                      ARTHUR L. AIDALA
                                      DIANA FABI SAMSON
                                      JOHN M. LEVENTHAL
                                      AIDALA, BERTUNA & KAMINS, PC
                                      ***Attorneys for Defendant-Appellant***
                                      *Ghislaine Maxwell*
                                      546 Fifth Avenue, Sixth Floor
                                      New York, New York 10036
                                      212 486-0011

# CERTIFICATE OF COMPLIANCE

1.      I certify that this document complies with Fed. R. App. P. Rule 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,723 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using the Microsoft Word Office 365 word processing program in 14-point Times New Roman type.

Dated:  New York, New York
          July 27, 2023
                              Respectfully Submitted,


                              /s/Diana Fabi Samson

                              ARTHUR L. AIDALA
                              DIANA FABI SAMSON
                              JOHN M. LEVENTHAL
                              AIDALA, BERTUNA & KAMINS, PC
                              **Attorneys for Defendant-Appellant**
                              *Ghislaine Maxwell*
                              546 Fifth Avenue, Sixth Floor
                              New York, New York 10036
                              212 486-0011